**No. 25-1110**

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

UNITED STATES, ex rel. OMNI HEALTHCARE INC.,

*Plaintiff-Appellant*,

STATE OF ALASKA, ex rel. Omni Healthcare, Inc.; STATE OF CALIFORNIA, ex rel. Omni Healthcare, Inc.; STATE OF COLORADO, ex rel. Omni Healthcare, Inc.; STATE OF CONNECTICUT, ex rel. Omni Healthcare, Inc.; STATE OF DELAWARE, ex rel. Omni Healthcare, Inc.; DISTRICT OF COLUMBIA, ex rel. Omni Healthcare, Inc.; STATE OF FLORIDA, ex rel. Omni Healthcare, Inc.; STATE OF GEORGIA, ex rel. Omni Healthcare, Inc.; STATE OF HAWAII, ex rel. Omni Healthcare, Inc.; STATE OF ILLINOIS, ex rel. Omni Healthcare, Inc.; STATE OF INDIANA, ex rel. Omni Healthcare, Inc.; STATE OF IOWA, ex rel. Omni Healthcare, Inc.; STATE OF LOUISIANA, ex rel. Omni Healthcare, Inc.; STATE OF MARYLAND, ex rel. Omni Healthcare, Inc.; STATE OF MASSACHUSETTS, ex rel. Omni Healthcare, Inc.; STATE OF MICHIGAN, ex rel. Omni Healthcare, Inc.; STATE OF MINNESOTA, ex rel. Omni Healthcare, Inc.; STATE OF MONTANA, ex rel. Omni Healthcare, Inc.; STATE OF NEVADA, ex rel. Omni Healthcare, Inc.; STATE OF NEW JERSEY, ex rel. Omni Healthcare, Inc.; STATE OF NEW MEXICO, ex rel. Omni Healthcare, Inc.; STATE OF NEW YORK, ex rel. Omni Healthcare, Inc.; STATE OF NORTH CAROLINA, ex rel. Omni Healthcare, Inc.; STATE OF OKLAHOMA, ex rel. Omni Healthcare, Inc.; STATE OF RHODE ISLAND, ex rel. Omni Healthcare, Inc.; STATE OF TENNESSEE, ex rel. Omni Healthcare, Inc.; STATE OF TEXAS, ex rel. Omni Healthcare, Inc.; STATE OF VERMONT, ex rel. Omni Healthcare, Inc.; STATE OF VIRGINIA, ex rel. Omni Healthcare, Inc.; STATE OF WASHINGTON, ex rel. Omni Healthcare, Inc.,

*Plaintiffs*,

v.

MD SPINE SOLUTIONS LLC, d/b/a MD Labs Inc.; DENIS GRIZELJ; MATTHEW RUTLEDGE; DOE HEALTHCARE PROVIDERS 1 – 100,

*Defendants-Appellees*.

On Appeal from the U.S. District Court for the District of Massachusetts
Hon. Patti B. Saris, Case No. 1:18-cv-12558-PBS

## BRIEF OF PLAINTIFF-APPELLANT OMNI HEALTHCARE INC.

Evan Bianchi
Thomas M. Kenny
Spiro Harrison & Nelson LLC
40 Exchange Place, Ste. 1100
New York, New York 10005
(646) 880-8850

*Counsel for Plaintiff-Appellant*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), OMNI Healthcare Inc. certifies that it does not have a parent corporation and that no publicly held corporation owns more than ten percent of its stock.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF AUTHORITIES ............................................................................. iii

STATEMENT REGARDING ORAL ARGUMENT ............................................. vi

STATEMENT OF JURISDICTION .................................................................... 1

STATEMENT OF THE ISSUE .......................................................................... 2

INTRODUCTION ............................................................................................. 3

STATEMENT OF THE CASE ........................................................................... 5

I.      LEGAL AND FACTUAL BACKGROUND ............................................. 5

        A.      Medicare's "Medically Necessary" Requirement ..................... 5

        B.      Methods of UTI Testing ........................................................... 7

        C.      Defendants Purposefully Ignored Seeking Guidance on Medical
                Necessity ................................................................................. 10

        D.      OMNI Uncovers MD Labs' False Claims ................................ 12

II.     PROCEDURAL HISTORY .................................................................. 12

        A.      Defendants Settle Some of OMNI's Claims for up to $16 Million .... 12

        B.      Post-Settlement Litigation History .......................................... 13

        C.      The District Court's Summary Judgment Decision .................. 15

SUMMARY OF ARGUMENT ........................................................................ 18

ARGUMENT ................................................................................................ 19

I.      STANDARD OF REVIEW ................................................................. 19

II.     THE FCA'S SCIENTER REQUIREMENT ........................................... 20

III.    THE DISTRICT COURT ERRED IN FINDING THAT OMNI HAD NOT
        PROVEN SCIENTER .......................................................................... 22

        A.      The record shows that Defendants recognized and ignored the risk of
                PCR UTI testing being medically unnecessary. ....................... 22

        B.      The District Court relied on irrelevant and inapposite evidence. ....... 27

IV.     OMNI'S STATE LAW CLAIMS SHOULD BE REINSTATED ................. 29

CONCLUSION ............................................................................................. 30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Clukey v. Town of Camden*,
  717 F.3d 52 (1st Cir. 2013)..............................................................................................30

*Guilfoile v. Shields*,
  913 F.3d 178 (1st Cir. 2019)............................................................................................20

*Heckler v. Ringer*,
  466 U.S. 602 (1984).........................................................................................................5

*Ithier v. Aponte-Cruz*,
  105 F.4th 1 (1st Cir. 2024)..............................................................................................19

*Ripoli v. Dep't of Hum. Servs., Off. of Veterans Servs.*,
  123 F.4th 565 (1st Cir. 2024)..........................................................................................19

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000).........................................................................................................20

*Sec. & Exch. Com'sn v. Commonwealth Equity Servs., LLC*,
  133 F.4th 152 (1st Cir. 2025)..........................................................................................20

*Sec. & Exch. Comm'n v. Ficken*,
  546 F.3d 45 (1st Cir. 2008).............................................................................................20

*Sec. & Exch. Comm'n v. Lemelson*,
  546 F.3d 45 (1st Cir. 2008).............................................................................................20

*United States ex rel. Allen v. Alere Home Monitoring, Inc.*,
  334 F. Supp. 3d 349 (D. Mass. 2018).............................................................................25

*United States v. Coloplast Corp.*,
  327 F. Supp. 3d 300 (D. Mass. 2018).............................................................................20

*United States ex rel. Martino-Fleming v. S. Bay Mental Health Centers*,
  540 F. Supp. 3d 103 (D. Mass. 2021).............................................................................20

*United States ex rel. Schutte v. SuperValu Inc.*,
 598 U.S. 739 (2023)................................................................21, 23

*Warder v. Shalala*,
 149 F.3d 73 (1st Cir. 1998)............................................................5

*Willowood of Great Barrington, Inc. v. Sebelius*,
 638 F. Supp. 2d 98 (D. Mass. 2009) ...............................................6

**Statutes**

28 U.S.C. § 1291 ...............................................................................1

28 U.S.C. § 1331 ...............................................................................1

28 U.S.C. § 1345 ...............................................................................1

31 U.S.C. § 3729. ........................................................................20, 21

42 U.S.C. § 1395ff ............................................................................6

42 U.S.C. § 1395kk-1 ........................................................................6

42 U.S.C. § 1395u .............................................................................6

42 U.S.C. § 1395y .............................................................................5

**Regulations**

42 C.F.R. § 421.5 ..............................................................................6

42 C.F.R. § 421.404 ..........................................................................6

**Other Authorities**

68 Fed. Reg. 63,692 ..........................................................................7

Hao et al., *The Essential Role of PCR and PCR Panel Size in Comparison with Urine Culture in Identification of Polymicrobial and Fastidious Organisms in Patients*

*with Complicated Urinary Tract Infections*, 24(18) Int. J. Molecular Sci. 14269 (2023) .................................................................................................................26

L38988, Palmetto GBA, *MolDX: Molecular Syndromic Panels for Infectious Disease Pathogen Identification Testing* (effective Jan. 30, 2025) ......................10

L39001, Noridian Healthcare Solutions, LLC (Noridian), *MolDX: Molecular Syndromic Panels for Infectious Disease Pathogen Identification Testing* (effective June 2, 2022).....................................................................................9

L39003, Noridian Healthcare Solutions, LLC, *MolDX: Molecular Syndromic Panels for Infectious Disease Pathogen Identification Testing* (effective Jan. 30, 2025) ...............................................................................................................10

L39038, CGS Administrators, LLC, *MolDX: Molecular Syndromic Panels for Infectious Disease Pathogen Identification Testing* (effective Jan. 30, 2025) ....10

L39044, Wisconsin Physicians Service Insurance Company, *MolDX: Molecular Syndromic Panels for Infectious Disease Pathogen Identification Testing* (effective Jan. 30, 2025)..................................................................................10

*Medicare Program Integrity Manual* (2015) ............................................................6

*United States ex rel. Bibb v. Gamma Healthcare Inc.*, Settlement Agreement, Case No. 1:20-cv-00250-SNLJ (E.D. Mo.) ......................................................28

## STATEMENT REGARDING ORAL ARGUMENT

OMNI Healthcare Inc. respectfully submits that oral argument would aid this Court's decisional process, as the issue on appeal involves a fact-intensive analysis of evidence that is occasionally technical in nature.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this False Claims Act suit under 28 U.S.C. §§ 1331 and 1345. The district court issued a final judgment on January 6, 2025. Add.31.[1] OMNI Healthcare Inc. timely appealed from that final decision on February 6, 2025. A.841. This Court thus has jurisdiction under 28 U.S.C. § 1291.

---

[1] Throughout this brief, "Add.__" citations refer to this brief's addendum; "A.__" citations refer to OMNI's appendix; and "ECF No. __" citations refer to the District Court docket in this matter, Case No. 1:18-cv-12558-PBS.

# STATEMENT OF THE ISSUE

OMNI Healthcare, Inc. (OMNI) sued MD Spine Solutions LLC, d/b/a MD Labs, Inc. (MD Labs) and its co-founders Denis Grizelj and Matthew Rutledge (together, Defendants), asserting violations of the federal False Claims Act (FCA) and state analogs based on Defendants' submission of reimbursement claims to Medicare for a method of urinary tract infection testing that was not medically necessary. The District Court granted summary judgment in favor of Defendants after finding that the plaintiff did not demonstrate a triable issue regarding Defendants' scienter. Was this error?

# INTRODUCTION

In an email to the other co-founder of MD Labs, a medical laboratory, Mathew Rutledge asked Denis Grizelj whether they should inform the Medicare contractor responsible for their jurisdiction of a new method of urinary tract infection (UTI) testing that MD Labs had begun rolling out. The testing method was based on polymerase chain reaction (PCR) technology, a novel departure from bacterial urine testing that has been the gold standard for UTI testing since the 1950s. Grizelj responded by saying that they should ask the Medicare contractor "to give us guidance on medical necessity."

Grizelj's response made complete sense. After all, Medicare only reimburses services that are medically necessary, and Defendants often sought reimbursement for testing services from Medicare. Yet, despite recognizing the need to obtain guidance to ensure that their claims qualified for reimbursement, Defendants did nothing to seek such assurance. Instead, Defendants billed Medicare for PCR UTI testing for years, burying their heads in the sand with respect to medical necessity.

OMNI brought this *qui tam* action against Defendants, asserting claims under the federal False Claims Act (FCA) and state analogs. A person is liable under the FCA if they *knowingly* submit false claims. This scienter requirement is satisfied not just by actual knowledge, but also by deliberate ignorance (and even by mere recklessness). Rutledge and Grizelj's exchange shows that Defendants knew they

3

were submitting false claims. Defendants identified a substantial risk that the newly developing PCR UTI testing was not medically necessary, but chose not to validate that risk, despite the means and obligation to do so.

Defendants also lacked any external basis to believe that PCR UTI testing was medically necessary. Guidelines published by the American Urological Association confirmed that the accuracy and utility of PCR UTI testing was undocumented and unproven *even after* Defendants submitted false claims (let alone before). Nor was there any governmental authorization of such testing during the relevant time period.

Adding insult to injury, Defendants drafted requisition forms—which are used by physicians to order UTI testing—to force physicians to order PCR panels that tested seventeen or nineteen pathogens. In other words, despite knowing that PCR UTI testing was medically unnecessary, Defendants padded their PCR panels so that physicians had to order not just one unnecessary test, but up to nineteen.

Notwithstanding this evidence, the District Court granted summary judgment for Defendants, holding that no reasonable jury could conclude that they knowingly submitted false claims for PCR UTI testing. That was error. Drawing all inferences in OMNI's favor, as is appropriate at summary judgment, the record supports a finding that Defendants knew that their PCR UTI testing claims were false.

For the reasons below, this Court should reverse the District Court's scienter holding, vacate the District Court's judgment in part, and remand.

**STATEMENT OF THE CASE**

## I.     LEGAL AND FACTUAL BACKGROUND

### A.     Medicare's "Medically Necessary" Requirement

The Medicare Act, 42 U.S.C. § 1395 *et seq.*, "establishes a national health insurance program for the elderly and the disabled." *Warder v. Shalala*, 149 F.3d 73, 75 (1st Cir. 1998). Under the Act, medical providers (such as laboratories like MD Labs) can seek reimbursement from Medicare for expenses incurred providing certain medical services. Not every medical service qualifies for reimbursement. Among other exceptions, the Act states that "no payment may be made . . . for any expenses incurred for items or services" that "are not reasonable and *necessary* for the diagnoses or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A) (emphasis added). Medicare will therefore not reimburse expenses incurred for testing that is unnecessary to diagnose or treat an illness or injury.

The Secretary of Health and Human Services determines whether a given service is "reasonable and necessary" by "promulgating a generally applicable rule or by allowing individual adjudication." *Heckler v. Ringer*, 466 U.S. 602, 617 (1984). Generally applicable rules take the form of regulations, "national coverage determinations" (NCD), or "local coverage determinations" (LCD). The Centers for Medicare & Medicaid Services (CMS), an agency within the Department of Health

and Human Services, issues NCDs and regulations, both of which pronounce "whether or not a particular item or service is covered nationally." 42 U.S.C. § 1395ff(f)(1)(B).

LCDs are similar to NCDs, but are limited in geographic scope and are made by Medicare "contractors," 42 U.S.C. § 1395ff(f)(2)(B)—private entities that contract with CMS to administer Medicare and are responsible for a particular region of the country, *see* 42 U.S.C. §§ 1395u(a), 1395kk-1(a); 42 C.F.R. §§ 421.5(c), 421.404(b)(1).[2] Because Medicare contractors are bound by CMS' NCDs and regulations, LCDs can only be made in the absence of such binding determinations. *See Willowood of Great Barrington, Inc. v. Sebelius*, 638 F. Supp. 2d 98, 106 (D. Mass. 2009). In making LCD determinations during the time period at-issue in this case, Medicare contractors were to consider whether a service was "[s]afe and effective," "[n]ot experimental or investigational," and "[a]ppropriate" (*i.e.*, furnished in accordance with accepted standards of medical practice, not exceeding a patient's medical need, etc.). CMS, *Medicare Program Integrity Manual* § 13.5.1 (2015) (describing the "reasonable and necessary" conditions).

---

[2] Medicare contractors process claims for the type of services at issue in this appeal in twelve separate jurisdictions. *See* CMS, *Who are the MACS* (Sept. 10, 2024), https://www.cms.gov/medicare/coding-billing/medicare-administrative-contractors-macs/who-are-macs (describing "A/B MACs"); CMS, *A/B MAC Jurisdiction Map (PDF)*, https://www.cms.gov/files/document/ab-jurisdiction-map03282023pdf.pdf (providing map of twelve Medicare contractor jurisdictions).

Aside from these generally applicable rules, Medicare contractors can also make individual claim determinations regarding whether a service is "reasonable and necessary." *See* 68 Fed. Reg. 63,692, 63,693 (Nov. 7, 2003).

**B.     Methods of UTI Testing**

The urinary tract is comprised of the bladder, urethra, and kidneys. U.S. Centers for Disease Control and Prevention, *Urinary Tract Infection Basics* (Jan. 22, 2024), https://www.cdc.gov/uti/about/index.html. UTIs are "common infections that happen when bacteria . . . enter[s] the urethra and infect[s] the urinary tract." *Id.*

For the better part of the past century, bacterial urine cultures have been the "gold standard" for detecting and diagnosing UTIs. Add.4; *see also* A.233 (Defendants expert opining that "[o]ver the past 60 to 70 years, the conventional gold standard for diagnosing UTIs has been using standard urine cultures"). This method of testing involves placing a urine sample on a growth medium—if bacteria grow, a UTI can be diagnosed and the type of bacteria that caused the UTI can be identified. Add.4; *see also* A.233.

A second, more recently developing method of UTI testing is polymerase chain reaction (PCR) testing. Add.4. PCR testing "amplifies one or more copies of a DNA segment in the sample, which enables identification of genetic material belonging to a particular biological origin." *Id.* Notably, PCR UTI testing costs significantly more than bacterial urine culture testing (in this case, nearly 7,000%

more), meaning that PCR UTI test providers stand to make far more money from Medicare reimbursements than providers of bacterial urine culture tests. *See* Add.4; *see also* ECF No. 136 at ¶ 10 (admitting that Medicare pays approximately $10 for bacterial urine culture testing); A.648 (confirming that MD Labs charged Medicare $700 for PCR UTI testing).

Whether PCR UTI testing is medically necessary is not relevant to this appeal. What *is* relevant is that, between at least 2017 and 2019, the use of PCR UTI testing was not accepted in the industry as being medically necessary—or even being an accurate method of diagnosing UTIs. In fact, guidelines published by the American Urological Association (AUA) in 2019 (and reviewed and confirmed in 2022) state that "[t]he impact of [PCR] tests on the accuracy of [UTI] diagnosis is not documented and cannot yet be recommended for incorporation into clinical practice." A.484–85; *see generally* A.480–510 (AUA, *Recurrent Uncomplicated Urinary Tract Infections in Women: AUA/CUA/SUFU Guideline* (2022)). Despite the "growing desire for the accurate diagnosis of UTI in patients with suggestive symptoms," the AUA's guidelines conclude that "the utility of [PCR testing] technology remains unproven and the potential for overtreatment with antibiotics remains significant." A.485; *see also* A.493 ("[M]ore evidence is needed before these technologies become incorporated into the guideline, as there is concern that

adoption of this technology in the evaluation of lower urinary tract symptoms may lead to over treatment with antibiotics.").

Consistent with these guidelines, OMNI's expert, Dr. Arthur Mourtzinos (the vice-chair in the division of urology at Lahey Health & Medical Center and a urology professor at Tufts University School of Medicine), testified that he used PCR UTI testing only once in seventeen years of practice. A.618. Even MD Labs' conflicted medical expert, Dr. Dicken S. C. Ko,[3] testified that he did not start using PCR tests for UTI diagnosis until June 2020 (and that most of his patients had recurrent or complicated UTIs). A.518, A.520–21.

Unsurprisingly, CMS has never issued an NCD for PCR UTI testing. And it was not until 2022 that a Medicare contractor made an LCD determination on PCR UTI testing (and, even then, the LCD allowed coverage for PCR UTI testing only in limited circumstances, such as where patients are at higher risk or seen in specialty care settings). *See* L39001, Noridian Healthcare Solutions, LLC (Noridian), *MolDX: Molecular Syndromic Panels for Infectious Disease Pathogen Identification Testing*

---

[3] Dr. Ko serves on the scientific advisory board of Pathnostics, a laboratory that has developed its own PCR UTI testing and stands to benefit from the expanded use of PCR UTI testing. A.515–16. A recent publication on PCR UTI testing co-authored by Dr. Ko in the Journal of Urology acknowledged Dr. Ko's conflict of interest arising from his relationship with Pathnostics. A.537.

(effective June 2, 2022). Medicare contactors in the minority of jurisdictions have since issued similar LCDs, each of which was not effective until earlier this year.[4]

### C. Defendants Purposefully Ignored Seeking Guidance on Medical Necessity

MD Labs is an independent clinical laboratory that was founded by Matthew Rutledge and Denis Grizelj in 2011. Add.4; A.155 at ¶ 1. At some point in 2017, MD Labs added PCR UTI testing as an offering. Add.4; A.155 at ¶ 2. Depending on the time period, MD Labs used PCR technology to test for either seventeen or nineteen pathogens that could cause UTIs. Add.5; A.156 at ¶ 7. MD Labs offered no other type of UTI testing other than PCR UTI testing. *See* A.622 (Rutledge testifying that physicians seeking non-PCR UTI testing "probably would not have used MD Labs"). Physicians ordered PCR UTI testing from MD Labs by submitting a requisition form. Some of MD Labs' requisition forms only allowed doctors to select a seventeen- or nineteen-pathogen panel. Add.5; *see, e.g.*, A.612 (requisition form allowing a physician to check a box labeled only "Urinary Tract Infection Testing

---

[4] *See* L39038, CGS Administrators, LLC, *MolDX: Molecular Syndromic Panels for Infectious Disease Pathogen Identification Testing* (effective Jan. 30, 2025); L39003, Noridian Healthcare Solutions, LLC, *MolDX: Molecular Syndromic Panels for Infectious Disease Pathogen Identification Testing* (effective Jan. 30, 2025); L38988, Palmetto GBA, *MolDX: Molecular Syndromic Panels for Infectious Disease Pathogen Identification Testing* (effective Jan. 30, 2025); L39044, Wisconsin Physicians Service Insurance Company, *MolDX: Molecular Syndromic Panels for Infectious Disease Pathogen Identification Testing* (effective Jan. 30, 2025).

Panel on File"). Approximately 70% of MD Labs' PCR UTI testing business was reimbursed by Medicare. A.651.

As MD Labs was rolling out its PCR UTI testing, Rutledge sent Grizelj a draft email to Noridian, the Medicare contractor overseeing MD Labs' jurisdiction. A.659–60. The draft email would have put Noridian on notice "of some new clinical laboratory testing [MD Labs] [is] now offering which is becoming very popular in the area of urinary tract infection"—*i.e.*, PCR testing. A.659. In his correspondence to Grizelj, Rutledge asked:

> What do you think about this letter to Dr[.] Lurvey at Noridian to give them a heads-up on our new molecular diagnostic testing? I think it would be a prudent move to at least document that we told CMS of this new technology and advised them to modify their billing and coding. I think it's our duty, in a way.

*Id.*

In response, Grizelj wrote: "I think we should wait on this and instead of asking them to modify their rates, we should ask them to give us guidance on medical necessity instead." *Id.* There is no record evidence that Rutledge, Grizelj, or anyone else at MD Labs ever sought the "guidance on medical necessity" that Grizelj rightfully identified was needed.

11

### D. OMNI Uncovers MD Labs' False Claims

OMNI is a medical group in Florida that is owned by Dr. Craig Deligdish. Add.5; *see also* A.677 at ¶ 53. OMNI has recovered tens of millions of dollars on behalf of the government through other *qui tam* actions. *See* A.677–78 at ¶ 54.

Between 2017 and 2019, OMNI sent approximately 600 requisition forms to MD Labs for the provision of PCR UTI testing, to substantiate its allegations in this case. Add.5; A.333–34 (Dr. Deligdish testifying that OMNI ordered PCR UTI testing from MD Labs to "accumulate the necessary evidence to substantiate [its] allegations"). MD Labs billed the government for at least some of the tests OMNI ordered. Add.5. Because PCR UTI testing is medically unnecessary (an issue the District Court declined to address), OMNI accordingly confirmed that MD Labs was submitting false claims for reimbursement.

## II. PROCEDURAL HISTORY

### A. Defendants Settle Some of OMNI's Claims for up to $16 Million

OMNI filed suit against Defendants in December 2018, asserting violations of the FCA and state equivalents. *See generally* ECF No. 1. OMNI alleged, among other things, that MD Labs billed the government for medically unnecessary services including UTI testing, urine drug testing, and pharmacogenetic testing. *Id.*

On October 20, 2021, Defendants entered a settlement agreement with the United States and OMNI. *See generally* A.446–70. In the agreement, Defendants

admitted that between 2015 and 2019, MD Labs improperly billed federal health care programs for urine drug testing. A.449. MD Labs would perform two types of urine drug testing at the same time: "presumptive" testing (non-definitive testing indicating the likelihood of a result), and "confirmatory" testing (definitive testing confirming a result). A.448–49. MD Labs reported the results of both tests to its clients at the same time. A.448. MD Labs' clients "would not use such presumptive test results in their medical decision-making" because they simultaneously received the more precise confirmatory test results. A.448–49. Defendants thus admitted and accepted responsibility for billing the government for testing that was not medically reasonable and necessary. A.449–50.

Under the terms of the settlement agreement, Defendants agreed to pay the government up to $16 million (and no less than $11.6 million). A.451. While OMNI agreed to release some of its claims against MD Labs as part of the settlement, the agreement expressly provided that OMNI would "retain[] any and all claims based on [Defendants'] submission or causing the submission of false claims for urinary tract infection testing." A.456.

### B. Post-Settlement Litigation History

After the October 2021 settlement, OMNI filed an amended complaint against Defendants in April 2022. ECF No. 71. Defendants moved to dismiss in May 2022. ECF Nos. 84, 85. After motion practice and oral argument, ECF Nos. 93, 101, 107,

120, the District Court denied Defendants' motion to dismiss, ECF No. 116. Defendants filed their answers to OMNI's amended complaint in October 2022. ECF Nos. 137, 138, 139.

In May 2023, OMNI filed a second amended complaint. ECF No. 184. In June 2023, Defendants again moved to dismiss. ECF Nos. 187, 188. After another round of motion practice and oral argument, ECF Nos. 189, 193, 196, 218, 222, the District Court allowed in part and denied in part Defendants' motion in January 2024, ECF No. 232. Defendants answered OMNI's second amended complaint in February 2024. ECF No. 237.

After discovery, both sides filed summary judgment motions in July 2024. ECF Nos. 252, 253, 255, 256. Defendants' motion sought judgment on each of OMNI's claims, which—following the District Court's January 2024 order— included its FCA claims (A.98 at ¶¶ 300–08), and claims asserted under state analogues of the FCA (A.99–140 at ¶¶ 309–595). On January 6, 2025, following motion practice and oral argument, ECF Nos. 259, 261, 264, 265, 269, 270, 277, the District Court granted Defendants' summary judgment motion and denied OMNI's as moot, Add.3–3-. The District Court entered judgment in favor of Defendants the same day. Add.31.

OMNI timely filed a notice of appeal as to the District Court's order and judgment on February 3, 2025. A.841–42.

### C. The District Court's Summary Judgment Decision

The District Court's decision granted Defendants' summary judgment motion. Add.30. After a discussion of the background facts and applicable legal standards, Add.4–10, the District Court addressed the merits of OMNI's claims, Add.10–30. While OMNI asserted multiple theories of FCA liability, including two theories based on federal anti-kickback statutes, OMNI does not appeal the District Court's analysis and resolution of those theories. Add.20–29 (assessing OMNI's liability theories based on MD Labs' commission-based payments to independent-contractor sales representatives and its billing practices). Rather, OMNI appeals only the District Court's resolution of its "main theory of FCA liability" concerning the submission of claims for medically unnecessary PCR UTI testing. Add.11–16.

After recognizing that submitting reimbursement claims to Medicare "for medically unnecessary treatment [is] actionable under the FCA," Add.14, the District Court noted that Defendants sought summary judgment on this liability theory on three grounds: (1) "the claims for PCR UTI testing were not false because the tests were not medically unnecessary"; (2) OMNI "cannot prove that Defendants caused the submission of false claims" because there was an intervening cause that broke any causal chain; and (3) "Defendants did not know that MD Labs was performing medically unnecessary tests," *id.* Because the District Court held that Defendants' third ground—the scienter argument—independently sank OMNI's

liability theory, the District Court expressly declined to address the questions of medical necessity and causation. *Id.*

In its scienter analysis, the District Court first stated that Defendants "offer[ed] evidence indicating that they believed that PCR testing was superior to [bacterial urine culture] testing for diagnosing UTIs." Add.15. In support of this finding, the District Court cited a paragraph of Rutledge's declaration, *see* A.223 at ¶ 6 ("MD Labs was aware that several labs already offered PCR UTI testing when MD Labs began offering the testing, and that contemporaneous research indicated the superiority of PCR UTI testing over bacterial urine culture ('BUC')."), and testimony of a former MD Labs employee, *see* A.275, 279–80 (testifying that MD Labs was assessing whether there was a "more useful way to provide information to doctors concerning urinary tract testing than the traditional method," and that PCR UTI testing results were available sooner than bacterial urine culture testing results).

Determining, based on this evidence, that Defendants had shown that they thought PCR UTI testing was medically necessary, the District Court next concluded that OMNI had put forth evidence raising a triable issue as to Defendants' scienter. Add.15–16. First, the District Court rejected OMNI's argument that the absence of an NCD or LCD governing Medicare's coverage of PCR UTI testing during the applicable time period was relevant to Defendants' scienter, holding that services can still be medically necessary even absent such coverage determinations. Add.16–

17. Second, the District Court held that OMNI's reliance on the AUA's guidelines was misplaced because the AUA guidelines did not pre-date the submission of any at-issue reimbursement claims. Add.17. Third, the District Court downplayed the importance of Grizelj's January 2018 email in which he recommended seeking "guidance on medical necessity" regarding the PCR UTI tests from a Medicare contractor. Add.19 (observing that no evidence "indicat[ed] that Defendants were ever advised that they were conducting medically unnecessary tests or aware of a substantial risk that the tests were medically unnecessary"). Finally, the District Court rejected OMNI's theory that Defendants should have known that their seventeen- or nineteen-pathogen panel was medically unnecessary, because Defendants' expert "opined based on peer-reviewed literature that the make-up of MD Labs' panels . . . was appropriate for UTI testing." *Id.*[5]

Based on its review of the evidence, the District Court concluded that "no reasonable jury could conclude on this record that Defendants knew that they were submitting claims for PCR UTI testing that was medically unnecessary." Add.20. The District Court thus granted judgment in favor of Defendants on OMNI's claims under the federal FCA and state analogs. Add.29–30.

---

[5] The District Court also held that MD Labs' processing of incomplete requisition forms was negligent, at best, and thus did not rise to the level of an FCA violation. Add.15–16.

**SUMMARY OF ARGUMENT**

Granting summary judgment on scienter, an element requiring a fact-intensive inquiry, is unusual. Yet, that is exactly what the District Court did. In concluding that no reasonable jury could find that Defendants possessed the requisite scienter, the District Court failed to draw all inferences in favor of OMNI and improperly discounted the significance of OMNI's evidence.

First, there is no doubt that Defendants were aware of the substantial risk that PCR UTI testing was medically unnecessary. In an email exchange between MD Labs' two co-founders, one recognized the "duty" to inform their assigned Medicare contractor about MD Labs' use of PCR UTI testing, and the other advised that they seek "guidance on medical necessity." But Defendants never sought such guidance. Instead, they submitted claims to Medicare for PCR UTI testing for years without confirming whether that testing was even medically necessary.

Second, the record shows that Defendants had no external basis for believing that PCR UTI testing was medically necessary. The AUA's guidelines confirm that even after MD Labs began submitting PCR UTI testing claims for reimbursement, the accuracy and utility of that method of testing was unproven and undocumented. Moreover, no NCD or LCD regarding PCR UTI testing was ever issued during the relevant time period.

Third, to make matters worse, Defendants not only billed Medicare for medically unnecessary PCR UTI testing, they also sometimes forced physicians to order PCR panels that contained between seventeen and nineteen pathogens. In other words, despite having concerns about the medical necessity of PCR UTI testing generally, Defendants structured requisition forms to ensure that they could bill for up to nineteen medically unnecessary tests per order.

On this record, a jury could have found that Defendants acted knowingly when they submitted PCR UTI testing claims to Medicare. This Court should thus reverse the District Court's scienter finding and vacate the District Court's judgment on OMNI's PCR UTI testing theory of liability—which was based solely on scienter.

## ARGUMENT

### I. STANDARD OF REVIEW

This Court reviews a district court's entry of summary judgment *de novo*. *See Ripoli v. Dep't of Hum. Servs., Off. of Veterans Servs.*, 123 F.4th 565, 571 (1st Cir. 2024); *see also Ithier v. Aponte-Cruz*, 105 F.4th 1, 6 (1st Cir. 2024).

Summary judgment is appropriate only when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if, based on the evidence, "a reasonable jury could resolve the point in the favor of the non-moving party"—a showing that is "not a high bar to clear." *Ellis v. Fid. Mgmt. Tr.*

*Co.*, 883 F.3d 1, 7 (1st Cir. 2018). Importantly, when this Court reviews a district court's grant of summary judgment, it "draw[s] all reasonable inferences in favor of the nonmoving party." *Sec. & Exch. Com'sn v. Commonwealth Equity Servs., LLC*, 133 F.4th 152, 167 (1st Cir. 2025).

In particular, "[i]t is unusual to grant summary judgment on scienter." *Sec. & Exch. Comm'n v. Lemelson*, 532 F. Supp. 3d 30, 42 (D. Mass. 2021) (quoting *Sec. & Exch. Comm'n v. Ficken*, 546 F.3d 45, 51 (1st Cir. 2008)); *see also United States ex rel. Martino-Fleming v. S. Bay Mental Health Centers*, 540 F. Supp. 3d 103, 117 (D. Mass. 2021). This is because of the scienter inquiry's "fact-intensive nature," *United States v. Coloplast Corp.*, 327 F. Supp. 3d 300, 309 (D. Mass. 2018), which is best suited for a jury to assess, *Lemelson*, 532 F. Supp. 3d at 42 (recognizing the "general principle that scienter is usually a question reserved for the jury"); *cf. Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").

## II.   THE FCA'S SCIENTER REQUIREMENT

An FCA violation occurs when a person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). The statute's use of the term "knowingly" imposes a scienter requirement. *See Guilfoile v. Shields*, 913 F.3d 178, 187 (1st Cir. 2019). The FCA

helpfully defines "knowingly" as "has actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). Proof of specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1)(B).

Each of these standards of knowledge "focus primarily on what [the alleged violator] thought and believed." *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 751 (2023); *id.* at 752 (recognizing that the FCA's "knowingly" definition "tracks traditional common-law fraud, which ordinarily depends on a subjective test and the defendant's culpable state of mind" (internal quotation marks omitted)). To that end, "actual knowledge" refers to when a person "is 'aware of' information." *Id.* at 751. "Deliberate ignorance" refers to when a person is "aware of a substantial risk" of falsity, "but intentionally avoid taking steps to confirm" such falsity. *Id.*; *see also id.* at 750 (a person is deliberately ignorant if they "purposely abstain[] from inquiring into" facts). And "reckless disregard" refers to when a person is "conscious of a substantial and unjustifiable risk that their claims are false, but submit[s] the claims anyway." *Id.*

Finally, the scienter requirement turns on "what the defendant thought when submitting the claim—not what the defendant may have thought *after* submitting it." *Id.* at 752 (citing 31 U.S.C. § 3729(a)(1)(A)). "[P]ost hoc interpretations that may have rendered their claims accurate" are thus irrelevant. *Id.*

**III. THE DISTRICT COURT ERRED IN FINDING THAT OMNI HAD NOT PROVEN SCIENTER**

The District Court granted summary judgment for Defendants on OMNI's theory that Defendants submitted claims for PCR UTI testing that were medically unnecessary. Add.20. The sole basis for the District Court's decision was that OMNI had not demonstrated a genuine dispute as to Defendants' scienter. Add.14 (agreeing that "Defendants did not know that MD Labs was performing medically unnecessary tests" and declining to address Defendants' other arguments). This was error. OMNI established that Defendants acted in deliberate ignorance and reckless disregard of the fact that PCR UTI testing is medically unnecessary. The District Court's scienter holding should thus be reversed and its judgment on this liability theory vacated.

**A. The record shows that Defendants recognized and ignored the risk of PCR UTI testing being medically unnecessary.**

As MD Labs began offering PCR UTI testing, one of its founders, Rutledge, emailed the other founder, Grizelj. In that message, Rutledge proposed contacting Noridian—the Medicare contractor that was responsible for administering Medicare in MD Labs' jurisdiction—to "give them a heads-up *on our new molecular testing*." A.659 (emphasis added); *see also id.* (referring, in a draft email to Noridian, to PCR UTI testing as "*new* clinical laboratory testing . . . which is becoming very popular in the area of urinary tract infection" (emphasis added)). Rutledge not only believed that "it would be a prudent move to at least document that we told CMS of this new

technology," he thought Defendants were *obligated* to do so. *Id.* ("I think it's our duty, in a way."). In response, Girzelj said the quiet part out loud: "I think we should wait on this and instead of asking them to modify their rates, *we should ask them to give us guidance on medical necessity instead*." *Id.* (emphasis added).

As the District Court correctly observed, "[a] laboratory violates the FCA . . . if it knows that it is submitting claims for medically unnecessary tests." Add.15 (collecting cases). Rutledge and Girzelj knew they should inform Noridian of their use of PCR UTI testing. Rutledge acknowledged that PCR UTI testing was a new form UTI testing and that Defendants had a duty to tell Noridian about it. A.659. And Grizlej acknowledged that Defendants should seek guidance on whether PCR UTI testing was medically necessary. *Id.*

The only reason Grizlej could have believed guidance on medical necessity was required is that he recognized the risk that the new PCR UTI testing was not medically necessary. By acknowledging this risk but failing to seek such guidance, Defendants either "intentionally avoid[ed] taking steps to confirm" whether their PCR UTI testing claims were false and were thus deliberately ignorant, or recklessly submitted their claims by being conscious of the real risk that PCR UTI testing was medically unnecessary. *Schutte*, 598 U.S. at 751. Drawing all inferences in OMNI's favor, *Commonwealth Equity*, 133 F.4th at 167, a jury could easily have found that Defendants knowingly submitted false claims.

23

If the exchange between Rutledge and Girzelj existed in isolation, it would be sufficient to satisfy the FCA's scienter requirement. But there is more. Guidelines published in 2019 by the AUA (in collaboration with the Canadian Urological Association and the Society of Urodynamics, Female Pelvic Medicine & Urogenital Reconstruction) confirmed that "the utility of [PCR testing] technology remains unproven and the potential for overtreatment with antibiotics remains significant," and that "[t]he impact of [PCR] tests on the accuracy of [UTI] diagnosis is not documented and cannot yet be recommended for incorporation into clinical practice." A.485; A.493.[6] The District Court mistakenly discounted the significance of the AUA's guidelines because they post-dated the submission of any at-issue claims. *See* Add.17. The AUA guidelines are probative not because Defendants relied on them, but because *even after* Defendants submitted false claims, the country's authoritative urological organization confirmed that the utility and accuracy of PCR UTI testing was unsubstantiated. Defendants thus could not have had a basis for believing that PCR UTI testing was medically necessary—which explains why Grizlej recognized the need to seek guidance on that very issue.

---

[6] In fact, OMNI's expert testified he had used PCR UTI testing only once in seventeen years of practice, and Defendants' expert testified he did not start using PCR UTI testing until June 2020. *See supra* 9, A.618; A.520–21.

Driving the point home, CMS has *never* issued an NCD regarding PCR UTI testing. And while relevant LCDs have been issued in a minority of Medicare jurisdictions, the first did not become effective until 2022 and the rest became effective just this year. *See supra* 9 & n.4. The District Court wrongfully discounted this evidence for the same reason it discounted the AUA guidelines. But, again, Defendants were already aware of (and ignored) the risk of PCR UTI testing being medically unnecessary—the lack of any governmental authorization of such testing during the relevant time period is simply further support for finding that Defendants knew the PCR UTI testing claims were false.

Finally, assuming that PCR UTI testing is medically unnecessary (an issue the District Court declined to address), even the testing of a single pathogen would be unnecessary. *See* A.358 (testifying that MD Labs tested for too many pathogens because "[b]illing for any would be too many"). Yet, Defendants' conduct here was far more egregious. Some of Defendants' requisition forms did not even give physicians the opportunity to select the number of pathogens tested. Instead, those forms forced physicians to request seventeen- or nineteen-pathogen panels. *See supra* 10. Defendants' bundling of up to nineteen unnecessary tests is further indicative of Defendants' scienter, especially given Girzelj's concern about the medical necessity of PCR UTI testing generally. *See, e.g.*, *United States ex rel. Allen v. Alere Home Monitoring, Inc.*, 334 F. Supp. 3d 349, 357 (D. Mass. 2018)

(collecting cases and acknowledging that "bundled tests, ordered via a pre-printed form, can create FCA liability, provided the certifying entity is aware that one or more of the tests is medically unnecessary, or recklessly disregards such a risk"); *see also* A.638 ("[T]he use of overly broad panels can also be used for the purpose of maximizing reimbursement in the absence of medical necessity.").

The District Court downplayed Defendants' overly broad panels by relying on Defendants' expert's opinion, ostensibly based on "peer-reviewed literature," that "the make-up of MD Labs' panels of seventeen and nineteen pathogens was appropriate for UTI testing." Add.19. But a cursory review of that expert's report shows that the literature in question—a single study that was not even published until 2023, so could not have informed Defendants' knowledge—has no bearing on the question of medical necessity. For one, the study is limited to "complicated" UTIs, *see* A.239, significantly narrowing its relevance. And for another, the study did not find that a panel range of seventeen- to nineteen-pathogens for PCR UTI testing was medically necessary—it instead concluded that panel size impacts the "non-detection rate" of PCR testing relative to bacterial urine culture testing (*i.e.*, the percentage of pathogens found on urine cultures but *not* detected by a PCR panel). *See* Hao et al., *The Essential Role of PCR and PCR Panel Size in Comparison with Urine Culture in Identification of Polymicrobial and Fastidious Organisms in Patients with Complicated Urinary Tract Infections*, 24(18) Int. J. Molecular Sci.

14269, at § 2.5 (2023), https://doi.org/10.3390/ijms241814269. Because Defendants knew that PCR UTI testing was medically unnecessary, they also knew that each additional pathogen test they forced physicians to order was medically unnecessary.

The record establishes that Defendants knowingly submitted false claims. At worst, they were deliberately ignorant; at best, they were reckless. Either way, they satisfied the FCA's scienter requirement. The District Court thus erred when it held that a jury could not conclude that Defendants "knowingly" submitted false claims.

**B.      The District Court relied on irrelevant and inapposite evidence.**

The evidence above is sufficient to demonstrate Defendants' scienter and satisfy OMNI's burden to defeat summary judgment. *See* Fed. R. Civ. P. 56(a). The District Court's reliance on Defendants' evidence does nothing to undermine that conclusion, as none of Defendants' evidence actually addressed scienter.

At the threshold, the District Court noted that "Defendants offer evidence indicating that they believed that PCR testing was superior to [bacterial urine culture] testing for diagnosing UTIs." Add.15. Whether one form of testing is "superior" to another form of testing is not the proper standard for assessing scienter in this case. The relevant inquiry is whether Defendants knew that PCR UTI testing was medically unnecessary—*i.e.*, is it safe and effective, not experimental or investigation, and is it appropriate. *See supra* 6. Superiority does not answer that inquiry. One form of testing could be superior to another because it was easier to

administer, more readily attainable, or more comfortable for the patient. Those considerations do not bear on Medicare's medical necessity requirement.

In any event, the District Court cited two pieces of Defendants' evidence. Add.15. The first was a paragraph from Rutledge's declaration, in which he stated: "MD Labs was aware that several labs already offered PCR UTI testing when MD Labs began offering the testing, and that contemporaneous research indicated the superiority of PCR UTI testing over bacterial urine culture." A.223 at ¶6. The fact that other laboratories may have offered PCR UTI testing does not render such testing medically necessary. *Cf.* Settlement Agreement, *United States ex rel. Bibb v. Gamma Healthcare Inc.*, Case No. 1:20-cv-00250-SNLJ (E.D. Mo.) (stating that physicians notified another laboratory in March 2020 about their concerns that UTI PCR testing was more expensive than urine culture testing and not medically necessary). And Rutledge's vague assertion about contemporaneous research fails to identify any specific research[7] and falls into the same "superiority" fallacy addressed above.

---

[7] Notably, Defendants' expert's report also omits any reference to PCR UTI testing research contemporaneous with the 2017 time period, instead focusing primarily on studies from 2023 and 2024. *See* A.234–36. The inference that can be, and should have been, drawn is that such research does not exist. That inference is supported by the AUA's guidelines, which noted the lack of documentation and evidence in support of PCR UTI testing. *See supra* 8–9.

The second piece of evidence identified by the District Court was testimony from a former MD Labs employee who testified that PCR UTI testing can deliver results faster than bacterial urine culture testing. *See* A.279–80. But the quickness of obtaining results, in and of itself, does not render a testing method medically necessary. Reliance on this testimony thus similarly misses the mark.

In sum, the record amply supports a finding of scienter. A jury assessing the evidence could have determined that Defendants recognized the significant risk that the new and insufficiently researched PCR UTI testing was not medically necessary, yet affirmatively ignored seeking guidance from their Medicare contractor (and then forced physicians to order not one, but up to nineteen medically unnecessary PCR tests). For this reason, the District Court's scienter holding should be reversed, its judgment on OMNI's PCR UTI testing theory of liability should be vacated, and this matter should be remanded so that the District Court can resolve the issues it did not address in the first instance.

## IV. OMNI'S STATE LAW CLAIMS SHOULD BE REINSTATED

The District Court granted judgment in favor of Defendants with respect to each of OMNI's claims asserted under state analogs of the federal FCA. *See* Op. at 27–28. The District Court apparently did so because it believed that OMNI's state law claims failed for the same reason its federal FCA claim failed (*i.e.*, OMNI's inability to demonstrate a genuine dispute as to scienter). *Id.* For the reasons

described above, *supra* 22–29, the District Court's scienter holding was wrong. Thus, this Court should vacate the District Court's judgment insofar as it granted judgment in favor of Defendants on OMNI's state law claims. *Cf. Clukey v. Town of Camden*, 717 F.3d 52, 62 (1st Cir. 2013) (vacating dismissal of state law claims that were erroneously dismissed "for want of any surviving federal claims").

## CONCLUSION

For the reasons above, the District Court's erred when it granted summary judgment in favor of Defendants on OMNI's FCA claim and analogous state law claims. This Court should reverse the District Court's scienter holding, vacate the District Court's judgment, and remand for further proceedings.

Dated: May 5, 2025

Respectfully submitted,

/s/ Evan Bianchi
Evan Bianchi
Thomas M. Kenny
Spiro Harrison & Nelson LLC
40 Exchange Place, Ste. 1100
New York, New York 10005
(646) 880-8850
ebianchi@shnlegal.com
tkenny@shnlegal.com

*Counsel for Plaintiff-Appellant*

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,618 words, excluding those parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.      This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared using Microsoft Word in 14-point Times New Roman, a proportionally spaced typeface.

Dated: May 5, 2025

/s/ Evan Bianchi
Evan Bianchi

# CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Evan Bianchi
Evan Bianchi



**ADDENDUM**

**TABLE OF CONTENTS**

31 U.S.C. § 3729(b)(1)................................................................Add.1

42 U.S.C. § 1395ff(f)(1)(B) .........................................................Add.1

42 U.S.C. § 1395ff(f)(2)(B) .........................................................Add.1

42 U.S.C. § 1395kk-1(a) ..............................................................Add.1

42 U.S.C. § 1395u(a) ...................................................................Add.2

42 U.S.C. § 1395y(a)(1)(A).........................................................Add.2

Memorandum and Order on Summary Judgment Motion [Saris, J.] (Jan. 6, 2025) .................................................................................Add.3

Clerk's Judgment (Jan. 6, 2025) .................................................Add.31

**31 U.S.C. § 3729(b)(1)**

**(b)Definitions.—For purposes of this section—**

(1)the terms "knowing" and "knowingly"—
(A)mean that a person, with respect to information—
(i) has actual knowledge of the information;
(ii) acts in deliberate ignorance of the truth or falsity of the information; or
(iii) acts in reckless disregard of the truth or falsity of the information; and
(B) require no proof of specific intent to defraud;

**42 U.S.C. § 1395ff(f)(1)(B)**

**(B)Definition of national coverage determination**

For purposes of this section, the term "national coverage determination" means a determination by the Secretary with respect to whether or not a particular item or service is covered nationally under this subchapter, but does not include a determination of what code, if any, is assigned to a particular item or service covered under this subchapter or a determination with respect to the amount of payment made for a particular item or service so covered.

**42 U.S.C. § 1395ff(f)(2)(B)**

**(B)Definition of local coverage determination**

For purposes of this section, the term "local coverage determination" means a determination by a fiscal intermediary or a carrier under part A or part B, as applicable, respecting whether or not a particular item or service is covered on an intermediary- or carrier-wide basis under such parts, in accordance with section 1395y(a)(1)(A) of this title.

**42 U.S.C. § 1395kk-1(a)**

**(a)Authority**

**(1)Authority to enter into contracts**

The Secretary may enter into contracts with any eligible entity to serve as a medicare administrative contractor with respect to the performance of any or all of the functions described in paragraph (4) or parts of those functions (or, to the extent provided in a contract, to secure performance thereof by other entities).

**42 U.S.C. § 1395u(a)**

**(a)In general**

The administration of this part shall be conducted through contracts with medicare administrative contractors under section 1395kk–1 of this title.

**42 U.S.C. § 1395y(a)(1)(A)**

**(a)Items or services specifically excluded**

Notwithstanding any other provision of this subchapter, no payment may be made under part A or part B for any expenses incurred for items or services—

**(1)(A)**
which, except for items and services described in a succeeding subparagraph or additional preventive services (as described in section 1395x(ddd)(1) of this title), are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member,

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
_____
                                )
OMNI HEALTHCARE, INC., et al.,   )
                                 )
                Plaintiffs,      )
                                 )
v.                               )        Civil Action
                                 )        No. 18-cv-12558-PBS
MD SPINE SOLUTIONS LLC, et al.,  )
                                 )
                Defendants.      )
_____ )
```

**MEMORANDUM AND ORDER**

January 6, 2025

Saris, D.J.

**INTRODUCTION**

Relator OMNI Healthcare, Inc. ("Relator" or "OMNI") brings this qui tam action on behalf of the federal government, 29 states, and the District of Columbia against MD Spine Solutions LLC ("MD Labs") and its owners, Denis Grizelj and Matthew Rutledge (collectively, "Defendants"). Relator alleges that Defendants violated the federal False Claims Act ("FCA") and state law by submitting or causing the submission of false claims for medically unnecessary urinary tract infection ("UTI") tests. Relator also alleges that Defendants submitted false claims for UTI testing that resulted from violations of the federal Anti-Kickback Statute ("AKS").

1

Add.3

Defendants move for summary judgment on all of Relator's remaining claims. Relator cross-moves for partial summary judgment, asking the Court to resolve legal questions about the FCA standard for materiality, causation, and damages.

After hearing, the Court **ALLOWS** Defendants' motion for summary judgment (Dkt. 252) and **DENIES** as moot Relator's motion for partial summary judgment (Dkt. 255).

## BACKGROUND

### I.   Factual Background

The following facts are undisputed, except where otherwise noted. See Deaton v. Town of Barrington, 100 F.4th 348, 353 (1st Cir. 2024).

### A.   MD Labs' UTI Testing

MD Labs is an independent clinical laboratory founded by Grizelj and Rutledge. MD Labs began performing UTI testing around 2017. The standard test for UTIs for over 60 years has been the bacterial urine culture ("BUC"). The BUC test involves placing a urine sample on a growth medium and waiting between twenty-four and forty-eight hours to see if any bacteria grow. MD Labs used a different testing method involving polymerase chain reaction ("PCR") technology. PCR testing amplifies one or more copies of a DNA segment in the sample, which enables identification of genetic material belonging to a particular biological origin. PCR testing is more costly than BUC testing.

Add.4

MD Labs used PCR technology to test for either seventeen or nineteen pathogens that could cause UTIs, depending on the time period. Some requisition forms that MD Labs used for UTI testing orders only allowed the physician to select the entire seventeen- or nineteen-pathogen panel, while others enabled physicians to customize the panel to test for specific pathogens.

Relator OMNI is a medical practice in Florida owned by Dr. Craig Deligdish. OMNI sent around 600 samples to MD Labs for PCR UTI testing between 2017 and 2019, some of which were billed to government health programs. When an OMNI provider determined that a particular laboratory test was warranted, the provider would select the test in the patient's electronic medical record, and a medical assistant would complete a requisition form for a laboratory.

Deligdish instructed his staff to order PCR UTI testing from MD Labs even when the provider had selected a BUC test for the patient.[1] He did so in order to substantiate OMNI's FCA claims against MD Labs. All the PCR UTI testing that MD Labs performed for OMNI patients resulted from this switch.

---

[1] The parties explained at the summary judgment hearing that the only option for UTI testing in OMNI's electronic medical record system was a BUC test.

**B.    MD Labs' Sales Force**

During the relevant period, MD Labs used both employees and independent contractors to promote its PCR UTI testing to providers. These sales representatives received commissions based on the revenue generated from the testing ordered by providers at their accounts. MD Labs trained and managed its sales representatives identically whether they were employees or independent contractors. In 2018, Dr. Deligdish and others at OMNI discussed PCR UTI testing with multiple independent-contractor sales representatives from MD Labs. There is no evidence that any sales representative offered or paid inducements to providers.

MD Labs sought legal advice about its use of independent-contractor sales representatives in late 2016 and early 2017. Outside counsel advised MD Labs multiple times that making commission-based payments to independent-contractor sales representatives could violate the AKS. Nonetheless, Grizelj and Rutledge both testified at their depositions that they either believed the arrangement was lawful or that they were unsure of its legality. MD Labs reconfigured its sales force to use solely employees after counsel reported that a 2021 Fourth Circuit decision had upheld a jury verdict finding federal FCA liability for commissions paid to independent-contractor sales representatives. See United States v. Mallory, 988 F.3d 730, 738 (4th Cir. 2021).

4

Add.6

### C.    MD Labs' Billing Practices

MD Labs advertised to providers that it did not balance bill -- i.e., bill patients for the difference between its charge and the amount paid by insurance -- for PCR UTI testing and that a patient would never pay more than $50 per test. See Mass. Med. Soc'y v. Dukakis, 815 F.2d 790, 790 (1st Cir. 1987) (defining balance billing). The $50 cap applied if the patient lacked insurance, the patient's insurer denied coverage, or the billed amount would go entirely to the patient's deductible. An MD Labs sales representative advertised the $50 self-pay price to Dr. Deligdish and OMNI.

Although the record reflects that MD Labs routinely advertised its billing practices in this manner, Grizelj claimed at his deposition that MD Labs always balance billed patients. For his part, Rutledge stated in an affidavit that only some patients benefited from the $50 cap as part of MD Labs' financial hardship policy and that MD Labs stopped charging a reduced rate to certain patients around 2020.

## II.    Procedural Background

Relator filed this action against MD Labs in December 2018. Relator alleged that MD Labs submitted false claims for medically unnecessary or otherwise improper UTI tests, pharmacogenetic tests, and urine drug tests in violation of the federal FCA and various state and local analogs.

5

In October 2021, Defendants entered into a settlement agreement with the federal government and Relator to resolve some of the claims regarding urine drug tests ("UDTs"). Defendants admitted that MD Labs simultaneously performed presumptive and confirmatory UDTs even though Defendants knew that, in certain situations, providers would not use the result of the presumptive test because the more precise confirmatory result was available at the same time. Relator retained the right to pursue other claims relating to the "submission or causing the submission of false claims for [UTI] testing." Dkt. 85-1 at 9. The United States has not intervened in the non-settled claims.

Defendants moved to dismiss in May 2022. The Court denied the motion, holding that Relator had adequately pled claims under the federal FCA and state and local analogs with regard to medically unnecessary UTI testing. Relator subsequently amended its complaint to add claims under the AKS and the Eliminating Kickbacks in Recovery Act ("EKRA"). Relator also advanced three new sets of factual allegations in support of its FCA claims: 1) that MD Labs entered into independent-contractor service agreements in which it paid compensation for referrals; 2) that MD Labs routinely did not balance bill patients; and 3) that MD Labs submitted claim forms to health care programs listing diagnosis codes that differed from those on the requisition forms from the ordering physicians. Defendants moved to dismiss these new claims and allegations. The

6

Add.8

Court allowed the motion with respect to the new AKS and EKRA claims and the allegation that Defendants submitted claim forms with false diagnosis codes but otherwise denied the motion.

In due course, Defendants moved for summary judgment on all of Relator's remaining claims. Relator cross-moved for summary judgment on three questions of law related to the federal FCA standard.[2]

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute is one which 'a reasonable jury could resolve . . . in the favor of the non-moving party,' and a material issue is one with the 'potential to affect the outcome . . . under the applicable law.'" Kinzer v. Whole Foods Mkt., Inc., 99 F.4th 105, 108 (1st Cir. 2024) (alterations in original) (quoting Cherkaoui v. City of Quincy, 877 F.3d 14, 23-24 (1st Cir. 2017)). In determining whether to grant summary judgment, a court must construe "the facts in the light most favorable to the non-moving party" and "draw[] all reasonable inferences" in its favor. Id.

---

[2] After the deadline for summary judgment motions, Defendants sought leave to file a supplemental motion arguing that the FCA's qui tam provision is unconstitutional. Because the Court grants summary judgment to Defendants on all of Relator's remaining claims for other reasons, there is no need to address the constitutional issue.

7

Add.9

(quoting Harley-Davidson Credit Corp. v. Galvin, 807 F.3d 407, 408 (1st Cir. 2015)).

The party seeking summary judgment "must [first] adumbrate 'an absence of evidence to support the nonmoving party's case.'" Pleasantdale Condos., LLC v. Wakefield, 37 F.4th 728, 733 (1st Cir. 2022) (alteration in original) (quoting Brennan v. Hendrigan, 888 F.2d 189, 191 (1st Cir. 1989)). Once the movant does so, "[t]he burden then shifts to the nonmovant to establish the existence of a genuine issue of material fact." Id. To satisfy this burden, the nonmovant "must present definite, competent evidence" demonstrating that a trialworthy issue exists. Id. (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)). "[C]onclusory allegations, improbable inferences, and unsupported speculation" do not suffice. Kinzer, 99 F.4th at 108 (quoting Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018)).

## DISCUSSION

### I.   Federal FCA Standard

#### A.   General Standard

Relator's primary argument is that Defendants "knowingly present[ed], or cause[d] to be presented, a false or fraudulent claim for payment or approval" to the federal government. 31 U.S.C. § 3729(a)(1)(A). Liability under this presentment provision has multiple elements. "Evidence of an actual false claim is 'the sine qua non of [an FCA] violation.'" United States ex rel. Booker v.

8

Add.10

Pfizer, Inc., 847 F.3d 52, 57 (1st Cir. 2017) (quoting United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 225 (1st Cir. 2004)). The plaintiff also must prove that the defendant either "present[ed]" or "cause[d] to be presented" the false claim to the federal government, 31 U.S.C. § 3729(a)(1)(A), and that the claim's falsity was material to the government's payment decision, see Guilfoile v. Shields, 913 F.3d 178, 187 (1st Cir. 2019). Lastly, "[t]he FCA includes a scienter requirement that the false claim be submitted 'knowingly.'" Id. (quoting 31 U.S.C. § 3729(a)(1)(A), (b)(1)). The FCA defines "knowingly" to mean that the defendant "has actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). "[P]roof of specific intent to defraud," however, is not required. Id. § 3729(b)(1)(B).

### B.   FCA Claims Premised on an AKS Violation

Two of Relator's theories of FCA liability are premised on alleged AKS violations. The AKS makes it a criminal offense to "knowingly and willfully offer[] or pay[] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person":

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program . . . .

42 U.S.C. § 1320a-7b(b)(2). Congress enacted the AKS "to prevent medical providers from making decisions based on improper financial incentives rather than medical necessity and to ensure that federal health care programs do not bear the costs of such decisions." United States ex rel. Banigan v. PharMerica, Inc., 950 F.3d 134, 137 (1st Cir. 2020). "[T]he heartland of what the AKS is intended to prevent" is "the use of payments to improperly influence decisions on the provision of health care that lead to claims for payment to federal health care programs." Guilfoile, 913 F.3d at 192-93. "Essentially, the AKS targets any remunerative scheme through which a person is 'paid "in return for" referrals' to a program under which payments may be made from federal funds." Id. at 189 (quoting United States v. Patel, 778 F.3d 607, 618 (7th Cir. 2015)).

For purposes of the FCA, "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim." 42 U.S.C. § 1320a-7b(g). In other words, "[a]n AKS violation that results in a federal health care

10

Add.12

payment is a per se false claim under the FCA." Guilfoile, 913 F.3d at 190 (alteration in original) (quoting United States ex rel. Lutz v. United States, 853 F.3d 131, 135 (4th Cir. 2017)).

Certain legal principles come into play when an FCA claim is premised on an underlying AKS violation. For starters, the plaintiff need not prove that "compliance with the AKS was material to the government's decision to pay any specific claim." Id. The plaintiff must show, however, "a sufficient causal connection between [the] AKS violation and a claim submitted to the federal government." Id. Finally, establishing a violation of the AKS requires proof that the defendant acted "knowingly and willfully." 42 U.S.C. § 1320a-7b(b)(2). In this context, the term "willfully" refers to knowledge that the conduct was unlawful. See United States ex rel. Langer v. Zimmer Biomet Holdings, Inc., __ F. Supp. 3d __, __ (D. Mass. 2024) [2024 WL 3633536, at *5]; United States v. Teva Pharms. USA, Inc., 560 F. Supp. 3d 412, 421 (D. Mass. 2021); see also United States ex rel. Hart v. McKesson Corp., 96 F.4th 145, 154-55, 157 (2d Cir.) (adopting this construction and collecting cases from other circuits doing the same), cert. denied, __ S. Ct. __ (2024) [2024 WL 4426646].

## II.  **Medically Unnecessary PCR Testing**

Relator's main theory of FCA liability posits that Defendants submitted claims for medically unnecessary PCR testing for UTIs. Medicare is statutorily prohibited from covering "items or

services" that "are not reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(1)(A); see D'Agostino v. ev3, Inc., 845 F.3d 1, 10 (1st Cir. 2016). And the Medicare claim form requires the submitting entity to certify that the listed items or services were medically necessary. See United States ex rel. Riedel v. Bos. Heart Diagnostics Corp., 332 F. Supp. 3d 48, 57 (D.D.C. 2018). Thus, "claims for medically unnecessary treatment are actionable under the FCA." United States ex rel. Polukoff v. St. Mark's Hosp., 895 F.3d 730, 742 (10th Cir. 2018) (quoting United States ex rel. Riley v. St. Luke's Episcopal Hosp., 355 F.3d 370, 376 (5th Cir. 2004)).

Defendants seek summary judgment on this theory of liability on three grounds: 1) the claims for PCR UTI testing were not false because the tests were not medically unnecessary; 2) Relator cannot prove that Defendants caused the submission of false claims because Dr. Deligdish's direction to his staff to order PCR testing from MD Labs was an intervening cause that broke any causal chain with regard to OMNI-related claims; and 3) Defendants did not know that MD Labs was performing medically unnecessary tests. The Court agrees with Defendants' scienter argument and, therefore, need not address their other arguments.

"[A] laboratory generally may rely on [a] doctor's order in submitting a claim for reimbursement as medically necessary." United States v. Bertram, 900 F.3d 743, 750 (6th Cir. 2018); cf.

12

Add.14

United States ex rel. Allen v. Alere Home Monitoring, Inc., 334 F. Supp. 3d 349, 365 (D. Mass. 2018) (explaining that the seller of an at-home testing kit was "generally entitled to rely on the independent judgment of a medical provider" regarding medical necessity). A laboratory violates the FCA, however, if it knows that it is submitting claims for medically unnecessary tests. See, e.g., Bertram, 900 F.3d at 750; Allen, 334 F. Supp. 3d at 357, 365; United States ex rel. Groat v. Bos. Heart Diagnostics Corp., 296 F. Supp. 3d 155, 165 (D.D.C. 2017). To satisfy the FCA's scienter requirement, Relator must show one of the following: 1) Defendants were aware they were submitting claims for medically unnecessary tests (actual knowledge); 2) they were aware of a substantial risk that they were submitting claims for medically unnecessary tests but intentionally avoided confirming that fact (deliberate ignorance); or 3) they were conscious of a substantial and unjustifiable risk that the tests were medically unnecessary but submitted the claims anyway (reckless disregard). See 31 U.S.C. § 3729(b)(1)(A); United States ex rel. Schutte v. SuperValu Inc., 598 U.S. 739, 751 (2023).

Defendants offer evidence indicating that they believed that PCR testing was superior to BUC testing for diagnosing UTIs. See Dkt. 254-3 ¶ 6; Dkt. 254-7 at 10, 14-15. The evidence Relator puts forth in response is not sufficient to raise a triable issue that

13

Add.15

Defendants submitted claims for PCR UTI tests knowing that the performance of the PCR testing was medically unnecessary.

Relator first argues that a reasonable jury could infer that Defendant acted knowingly from the absence of government authorization for coverage for PCR UTI testing. There was no national coverage determination ("NCD") or local coverage determination ("LCD") governing Medicare's coverage of PCR UTI testing during the relevant period, although half of Medicare administrative contractors have since adopted an applicable LCD that took effect in June 2022. See Odell v. U.S. Dep't of Health & Hum. Servs., 995 F.3d 718, 720 (9th Cir. 2021) (describing NCDs and LCDs). This argument fails because Relator concedes that "an NCD or LCD may not be specifically required in all cases for a particular service" to be deemed medically necessary. Dkt. 269 at 7. "Absent a regulation, [an NCD], or an LCD, the Medicare contractor proceeds on a case-by-case basis to determine whether a service is reasonable and necessary." Odell, 995 F.3d at 720; see Banks v. Sec'y, Dep't of Health & Hum. Servs., 38 F.4th 86, 90 (11th Cir. 2022) ("[A]pplying [the medical necessity] standard often entails case-by-case adjudication."); Polukoff, 895 F.3d at 735 (noting that Medicare contractors may "make individual claim determinations, even in the absence of [a national or local coverage determination], . . . based on the individual's particular factual situation" (alterations in original) (quoting

14

Add.16

Medicare Program: Review of National Coverage Determinations and Local Coverage Determinations, 68 Fed. Reg. 63,692, 63,693 (Nov. 7, 2003))). Knowledge of the absence of an applicable NCD or LCD would not have made Defendants aware of a substantial risk that the PCR UTI tests were medically unnecessary.

Relator's reliance on a set of guidelines from the American Urological Association ("AUA") is similarly unconvincing. The AUA guidelines -- which were "published" in 2019 and had their "validity confirmed" in 2022 -- state that "the impact of [PCR] tests on the accuracy of diagnosis [of UTIs] is not documented and cannot yet be recommended for incorporation into clinical practice." Dkt. 259-4 at 2, 6-7. The only specific claims for payment documented in the record, however, occurred in 2018 and early 2019. See Dkt. 259-8 at 3-4. Even assuming the AUA guidelines did not change in relevant part between 2019 and 2022, Relator has not shown that their original publication in 2019 pre-dated submission of any claim for payments. Nor has Relator provided guidelines with similar language about PCR testing that were published before MD Labs' submission of claims.

Relator also highlights an analysis examining fifty-seven PCR tests that MD Labs performed for OMNI patients. Of the requisition forms sent to MD Labs for these patients, the box for the PCR UTI panel was unchecked on twenty-one forms, and the provider failed to sign twenty-three forms. See id. at 4. Under the circumstances,

15

Add.17

the absence of checkmarks and provider signatures on certain requisition forms would not have suggested a substantial risk that the ordered tests were medically unnecessary. See Allen, 334 F. Supp. 3d at 365 (asking whether the defendant "had a specific basis to second-guess" the physician's certification of medical necessity). As the form at issue was specific to MD Labs' PCR UTI testing, see Dkt. 259-15 at 2, MD Labs had no reason to doubt that the provider intended to order such a test. And the form expressly stated that a provider signature was "optional." Id.

Moreover, Relator offers no reason to believe that this sample of fifty-seven tests -- which was selected by counsel, see Dkt. 254-18 at 5 -- is representative of the PCR UTI tests performed for OMNI patients, let alone of the tests MD Labs performed for all patients. With no proof of the representativeness of this sample, all that is left is missing checkmarks and signatures on a small percentage of the requisition forms submitted to MD Labs. At best, this evidence may support a reasonable finding that Defendants negligently performed PCR tests that providers did not intend to order. But "innocent mistakes and negligence are not offenses under the [FCA]." United States v. President & Fellows of Harvard Coll., 323 F. Supp. 2d 151, 189 (D. Mass. 2004) (alteration in original) (quoting United States v. Taber Extrusions, LP, 341 F.3d 843, 845 (8th Cir. 2003)).

16

Add.18

Finally, Relator points to a January 2018 email in which Grizelj recommended to Rutledge that they ask a Medicare administrative contractor for "guidance on medical necessity" regarding the PCR UTI tests. Dkt. 259-25 at 2. Relator does not, however, offer evidence indicating that Defendants were ever advised that they were conducting medically unnecessary tests or aware of a substantial risk that the tests were medically unnecessary when a doctor orders them.

In addition to arguing that the performance of PCR UTI testing was generally medically unnecessary, Relator advances a separate theory regarding the make-up of MD Labs' PCR testing panels. Relator notes that MD Labs' default PCR panel tested for either seventeen or nineteen pathogens and argues that use of these overly broad panels resulted in the performance of medically unnecessary tests. It is true that "bundled tests, ordered via a pre-printed form, can create FCA liability, provided the certifying entity is aware that one or more of the tests is medically unnecessary, or recklessly disregards such a risk." Allen, 334 F. Supp. 3d at 357 (collecting cases). But a medical expert for Defendants opined based on peer-reviewed literature that the make-up of MD Labs' panels of seventeen and nineteen pathogens was appropriate for UTI testing. See Dkt. 254-5 at 6. Relator does not respond with any record evidence indicating that the make-up of the panels was unnecessarily broad.

17

Add.19

In sum, no reasonable jury could conclude on this record that Defendants knew that they were submitting claims for PCR UTI testing that was medically unnecessary. Summary judgment is therefore warranted for Defendants on this theory of liability.

## III. __Independent-Contractor Sales Representatives__

Relator's second theory of FCA liability is premised on Defendants' purported violation of the AKS via MD Labs' commission-based payments to independent-contractor sales representatives.[3] The AKS prohibits individuals from paying remuneration to induce a person to "arrange for or recommend purchasing . . . or ordering" healthcare items or services. 42 U.S.C. § 1320a-7b(b)(2)(B). The AKS includes a safe harbor for payments "by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services," id. § 1320a-7b(b)(3)(B); see 42 C.F.R. § 1001.952(i), but this safe harbor does not protect payments to independent contractors, see Mallory, 988 F.3d at 738; Langer, __ F. Supp. 3d at __ [2024 WL 3633536, at *4].

---

[3] Relator asserts that these payments also violated the EKRA, which criminalizes the knowing and willful payment of "any remuneration . . . to induce a referral of an individual to a . . laboratory" for "services covered by a health care benefit program." 18 U.S.C. § 220(a)(2). Relator frames its arguments solely in terms of the AKS, however, and does not contend that the analysis would differ under the EKRA.

The plain language of the AKS's broad prohibition covers payments to independent contractors who were hired to influence those who make healthcare decisions on behalf of providers by promoting a company's product or service. See Mallory, 988 F.3d at 738; Langer, __ F. Supp. 3d at __ [2024 WL 3633536, at *3-4]. At the hearing, the government stated: "The law is that paying independent contractors commission-based fees is not per se unlawful, but it does bring the conduct within the confines of the [AKS]." Dkt. 277 at 30.[4] While Relator does not dispute that MD

---

[4] The Department of Health and Human Services' Office of Inspector General ("OIG") has twice outlined factors relevant for determining whether an independent-contractor sales arrangement falls afoul of the AKS. See OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23,731, 23,739 (May 5, 2003) (advising consideration of 1) "[t]he amount of compensation"; 2) "[t]he identity of the sales agent engaged in the marketing or promotional activity (e.g., is the agent a 'white coat' marketer or otherwise in a position of exceptional influence)"; 3) "[t]he sales agent's relationship with his or her audience"; 4) "[t]he nature of the marketing or promotional activity"; 5) "[t]he item or service being promoted or marketed"; and 6) "[t]he composition of the target audience"); OIG Advisory Opinion No. 98-10, 1998 WL 35287765, at *3-4 (Aug. 31, 1998) (listing the following "suspect characteristics": 1) "compensation based on percentage of sales"; 2) "direct billing of a Federal health care program by the Seller for the item or service sold by the sales agent"; 3) "direct contact between the sales agent and physicians in a position to order items or services that are then paid for by a Federal health care program"; 4) "direct contact between the sales agent and Federal health care program beneficiaries"; 5) "use of sales agents who are health care professionals or persons in a similar position to exert undue influence on purchasers or patients"; and 6) "marketing of items or services that are separately reimbursable by a Federal health care program"); see also Langer, __ F. Supp. 3d at __ [2024 WL 3633536, at *4] (discussing these OIG factors).

Labs' payments to sales representatives who were employees fall within the bona fide employee safe harbor, it alleges that the payments to independent-contractor sales representatives violated the AKS and that this violation resulted in the submission of claims for payment for PCR UTI testing.[5]

Again, Defendants seek summary judgment on this theory of liability on three alternative grounds: 1) no underlying AKS violation occurred because Defendants did not pay the sales representatives with an unlawful intent to induce referrals; 2) no underlying AKS violation occurred because Defendants did not know that the payments at issue were unlawful; and 3) even if an underlying AKS violation occurred, it did not result in the submission of claims.

The Court begins and ends its analysis with Defendants' causation argument. Under 42 U.S.C. § 1320a-7b(g), "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of" the FCA. The First Circuit has interpreted the "resulting from" language in this provision as requiring "a sufficient causal connection

---

[5] Relator asserts that MD Labs paid sales representatives a fee for collecting specimens from providers. It is not clear from the record whether these payments are different from the commission-based payments that the parties otherwise discuss. The characterization of the payments as a specimen collection fee rather than a commission does not affect the legal analysis.

20

between an AKS violation and a claim submitted to the federal government." Guilfoile, 913 F.3d at 190.

The parties dispute the relevant standard for determining whether this "sufficient causal connection" exists. Defendants urge the Court to apply the "but-for" causation standard adopted by the Sixth and Eighth Circuits. See United States ex rel. Martin v. Hathaway, 63 F.4th 1043, 1052-55 (6th Cir.), cert. denied, 144 S. Ct. 224 (2023); United States ex rel. Cairns v. D.S. Med. LLC, 42 F.4th 828, 834-36 (8th Cir. 2022). Under this standard, the plaintiff must show "that the defendants would not have included particular 'items or services' [in claims for payment] absent the illegal kickbacks." Cairns, 42 F.4th at 835 (quoting 42 U.S.C. § 1320a-7b(g)). Relator responds that proof of but-for causation is not necessary. The Third Circuit has held that a claim results from an AKS violation if the plaintiff shows "that at least one of [the] claims sought reimbursement for medical care that was provided in violation of the [AKS]." United States ex rel. Greenfield v. Medco Health Sols., Inc., 880 F.3d 89, 98 (3d Cir. 2018). In other words, a court must ask whether "a particular patient [was] exposed to an illegal recommendation or referral and a provider submit[ted] a claim for reimbursement pertaining to that patient." Id. at 100. Courts within this district are split on whether but-for causation is required in this context. Compare United States v. Regeneron Pharms., Inc.,

21

Add.23

No. 20-11217-FDS, 2023 WL 6296393, at *11 (D. Mass. Sept. 27, 2023) (adopting the but-for causation standard), perm. app. granted, No. 23-8036, 2023 WL 8599986 (1st Cir. Dec. 11, 2023), with United States ex rel. Witkin v. Medtronic, Inc., No. 1:11-cv-10790-IT, 2024 WL 1892405, at *18-19 (D. Mass. Mar. 31, 2024) (rejecting but-for causation), and United States v. Teva Pharms. USA, Inc., 682 F. Supp. 3d 142, 148 (D. Mass. 2023) (same).

The Court holds that the "resulting from" language in § 1320a-7b(g) requires a plaintiff to show that the AKS violation was a but-for cause of the inclusion of the item or service in a claim for payment. To begin, I do not read the First Circuit's decision in Guilfoile to have reached a binding holding adopting the Third Circuit's approach. While the First Circuit stated that a "sufficient causal connection" is required and then cited to the Third Circuit's opinion in Greenfield, it did not define what type of causal connection is "sufficient." Guilfoile, 913 F.3d at 190. The First Circuit also expressly warned that it was "not attempt[ing] to assess the full implications of" § 1320a-7b(g) because it was addressing "not the standard for proving an FCA violation based on the AKS, but rather the requirements for pleading an FCA retaliation claim." Id.

Moreover, construing "resulting from" to mandate a showing of but-for causation is consistent with basic principles of statutory interpretation. When, as here, "Congress uses a term in a statute

22

Add.24

and does not define it," courts "generally assume that the term carries its plain and ordinary meaning." United States v. Saemisch, 70 F.4th 1, 7 (1st Cir. 2023) (quoting City of Providence v. Barr, 954 F.3d 23, 31 (1st Cir. 2020)). The Supreme Court has explained that the "ordinary meaning" of a nearly identical phrase -- "results from" -- entails "a requirement of actual causality," i.e. but-for causation. Burrage v. United States, 571 U.S. 204, 210-11 (2014). There is "no textual or contextual indication" that Congress intended to give a different meaning to the phrase "resulting from" in § 1320a-7b(g). Id. at 212. While the congressional record suggests that § 1320a-7b(g) was enacted to "strengthen[] whistleblower actions," Guilfoile, 913 F.3d at 190 (alteration in original) (quoting 155 Cong. Rec. S10,852, S10,853 (daily ed. Oct. 28, 2009) (statement of Sen. Kaufman)), that legislative history cannot "be used to 'muddy' the meaning of 'clear statutory language.'" Food Mktg. Inst. v. Argus Leader Media, 588 U.S. 427, 436 (2019) (quoting Milner v. Dep't of Navy, 562 U.S. 562, 572 (2011)). Relator emphasizes the First Circuit's decision in United States ex rel. Hutcheson v. Blackstone Medical, Inc., 647 F.3d 377 (1st Cir. 2011), in support of its argument that it need not prove but-for causation. The court in Hutcheson expressly declined to address the then-recently enacted language in § 1320a-7b(g), see id. at 392 & n.17, so that decision does not help Relator's case.

23

Applying this but-for causation standard, the Court concludes that no reasonable jury could find on this record that the submission of claims for PCR UTI testing resulted from the alleged AKS violation, i.e., Defendants' commission-based payments to independent-contractor sales representatives. For one, Relator has offered no evidence that the independent-contractor status of some of its sales representatives unduly influenced any provider's decision to order PCR UTI testing from MD Labs. As previously noted, the AKS includes a safe harbor for payments made to bona fide employees. See 42 U.S.C. § 1320a-7b(b)(3)(B); 42 C.F.R. § 1001.952(i). Defendants submitted unrebutted evidence that MD Labs trained, managed, disciplined, and paid its sales representatives identically whether they were employees or independent contractors. See Dkt. 254-3 ¶¶ 15-17. Plainly, the sales representatives, whether employee or independent contractor, sought to influence referral of testing to MD Labs -- that's why they were hired. But there is no evidence that MD Labs' independent-contractor sales representatives acted any differently than the employees receiving commission-based payments from MD Lab.

Nor does the record support a reasonable finding that any independent-contractor sales representative engaged in conduct that improperly or unduly influenced a provider's decision to purchase the product. It is true that sales representatives

24

Add.26

participated in discussions with OMNI about an arrangement in which OMNI would share in the profits from PCR UTI tests ordered from MD Labs. See Dkt. 259-22 at 2; Dkt. 259-23 at 2. While Defendants insist that these troubling discussions concerned the negotiation of a lawful reference laboratory agreement, they have not adequately explained when that type of arrangement is permissible. Nonetheless, the record reflects that the parties never executed any such agreement, and Relator offers no evidence that the profit-sharing proposal ever came to fruition. Thus, any potentially improper conduct by the independent-contractor sales representatives did not cause the submission of claims for MD Labs' PCR UTI testing.

Finally, Dr. Deligdish admitted at his deposition that OMNI chose to order PCR UTI testing from MD Labs in every instance in order to substantiate FCA allegations against Defendants. See Dkt. 254-12 at 22-23; Dkt. 260 ¶¶ 60-61. In other words, Dr. Deligdish caused submission of false claims for PCR testing which he knew were not medically necessary. Relator cites no evidence that the commission-based payments to independent-contractor sales representatives played any role in OMNI's decision to order PCR UTI tests from MD Labs. Accordingly, no reasonable jury could find that the alleged AKS violation arising from these payments was a but-for cause of the submission of claims for payment to the federal government.

## IV.  Billing Practices

That leaves Relator's final theory of FCA liability, which concerns Defendants' purported failure to balance bill patients and capping of out-of-pocket costs for patients at $50. Relator asserts that these billing practices violated the AKS and that Defendants submitted claims for payment to the federal government that resulted from these AKS violations. Defendants have submitted evidence that they never engaged in these practices. The matter is disputed.

Even assuming that the record suffices to show that MD Labs declined to balance bill and capped out-of-pocket costs for certain patients, Relator has put forth no proof that MD Labs submitted a claim for PCR UTI testing to a government health care program for a patient that received either of these financial benefits. The only evidence in the record of specific claims for MD Labs' PCR UTI testing is a summary chart that describes fifty-seven tests conducted by MD Labs for OMNI patients (only some of which involved claims submitted to a government health care program). See Dkt. 259-8 at 3-4. The chart does not state whether MD Labs declined to balance bill or capped out-of-pocket costs for any of the patients for whom the claims were submitted. Without such evidence, a reasonable jury could not conclude that, absent the allegedly

26

Add.28

unlawful kickbacks, Defendants would not have submitted the claims for payment for PCR UTI testing. See Cairns, 42 F.4th at 835.[6]

## V.    Texas Law Claims

Finally, Defendants assert that Relator's claims under various state and local analogs of the federal FCA fail as a matter of law for the same reasons as its federal claims. Relator responds that even if summary judgment is warranted for Defendants on its federal claims, its claim under Texas law (Count XXVIII) survives. Relator points to three purported differences between Texas law and federal law: 1) liability under the Texas Medicaid Fraud Prevention Act ("TMFPA") does not require proof either of the submission of false claims or of materiality; 2) the TMFPA defines "materiality" differently than the federal FCA in that it "reaches conduct beyond influencing the payment of money"; and 3) unlike the federal AKS, neither the TMFPA nor the Texas Anti-Kickback Statute requires that a defendant act "willfully." Dkt. 259 at 30-31.

Relator's arguments about Texas law are unconvincing. Because the Court's grant of summary judgment to Defendants on the federal

---

[6] This evidentiary gap would be fatal to this theory of liability even under the looser causation standard employed by the Third Circuit. See Greenfield, 880 F.3d at 98, 100 (requiring a plaintiff to "prove that at least one of [the] claims sought reimbursement for medical care that was provided in violation of the [AKS]," i.e., that "a particular patient [was] exposed to an illegal recommendation or referral and a provider submit[ted] a claim for reimbursement pertaining to that patient").

27

Add.29

claims does not turn either on the federal FCA's materiality element or on the willfulness requirement for a federal FCA claim premised on an AKS violation, any distinctions in those elements between federal and Texas law are beside the point. And insofar as Relator wishes to advance theories of liability under Texas law that differ from those it presses under federal law -- i.e., that do not involve the submission of false claims -- it does not articulate those theories with any specificity. Relator's allusion to other possible theories of liability cannot save its case at this juncture.

### ORDER

For the reasons stated above, Defendants' motion for summary judgment (Dkt. 252) is **ALLOWED**, and Relator's motion for partial summary judgment (Dkt. 255) is **DENIED** as moot.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge

28

Add.30

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

OMNI HEALTHCARE, INC.              )
                                   )
              Plaintiff,           )
       v.                          )          CIVIL ACTION
                                   )          NO. 18-12558-PBS
MD SPINE SOLUTIONS LLC, ET AL      )
                                   )
              Defendants.          )

## **JUDGMENT**

SARIS, D. J.

In accordance with the Court's Memorandum and Order dated January 6, 2025 (Docket No. 279), granting defendants' motion for summary judgment, it is hereby ORDERED that judgment is entered in favor of defendants.

By the Court,

Robert M. Farrell
Clerk of Court


/ s / Clarilde Karasek
Deputy Clerk

DATED: January 6, 2025

Add.31