# UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

UNITED STATES, ex rel. OMNI HEALTHCARE INC.,

*Plaintiff-Appellant,*

STATE OF ALASKA, ex rel. Omni Healthcare, Inc.; STATE OF CALIFORNIA, ex rel. Omni Healthcare, Inc.; STATE OF COLORADO, ex rel. Omni Healthcare, Inc.; STATE OF CONNECTICUT, ex rel. Omni Healthcare, Inc.; STATE OF DELAWARE, ex rel. Omni Healthcare, Inc.; DISTRICT OF COLUMBIA, ex rel. Omni Healthcare, Inc.; STATE OF FLORIDA, ex rel. Omni Healthcare, Inc.; STATE OF GEORGIA, ex rel. Omni Healthcare, Inc.; STATE OF HAWAII, ex rel. Omni Healthcare, Inc.; STATE OF ILLINOIS, ex rel. Omni Healthcare, Inc.; STATE OF INDIANA, ex rel. Omni Healthcare, Inc.; STATE OF IOWA, ex rel. Omni Healthcare, Inc.; STATE OF LOUISIANA, ex rel. Omni Healthcare, Inc.; STATE OF MARYLAND, ex rel. Omni Healthcare, Inc.; STATE OF MASSACHUSETTS, ex rel. Omni Healthcare, Inc.; STATE OF MICHIGAN, ex rel. Omni Healthcare, Inc.; STATE OF MINNESOTA, ex rel. Omni Healthcare, Inc.; STATE OF MONTANA, ex rel. Omni Healthcare, Inc.; STATE OF NEVADA, ex rel. Omni Healthcare, Inc.; STATE OF NEW JERSEY, ex rel. Omni Healthcare, Inc.; STATE OF NEW MEXICO, ex rel. Omni Healthcare, Inc.; STATE OF NEW YORK, ex rel. Omni Healthcare, Inc.; STATE OF NORTH CAROLINA, ex rel. Omni Healthcare, Inc.; STATE OF OKLAHOMA, ex rel. Omni Healthcare, Inc.; STATE OF RHODE ISLAND, ex rel. Omni Healthcare, Inc.; STATE OF TENNESSEE, ex rel. Omni Healthcare, Inc.; STATE OF TEXAS, ex rel. Omni Healthcare, Inc.; STATE OF VERMONT, ex rel. Omni Healthcare, Inc.; STATE OF VIRGINIA, ex rel. Omni Healthcare, Inc.; STATE OF WASHINGTON, ex rel. Omni Healthcare, Inc.,

*Plaintiffs,*

v.

MD SPINE SOLUTIONS LLC, d/b/a MD Labs Inc.; DENIS GRIZELJ; MATTHEW RUTLEDGE; DOE HEALTHCARE PROVIDERS 1 – 100,

*Defendants-Appellees.*

On Appeal from the U.S. District Court for the District of Massachusetts
Hon. Patti B. Saris, Case No. 1:18-cv-12558-PBS

## APPENDIX OF PLAINTIFF-APPELLANT OMNI HEALTHCARE INC.

Evan Bianchi
Thomas M. Kenny
Spiro Harrison & Nelson LLC
40 Exchange Place, Ste. 1100
New York, New York 10005
(646) 880-8850

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS – APPENDIX

Table of Contents ..................................................................................i

DM Civil Docket Case No. 1:18-cv-12558-PBS .....................................A.1

[ECF #184] - Second Amended Complaint Filed (May 28, 2023) .........A.38

[ECF #252] - Defendants' Motion for Summary Judgment (Jul. 31, 2024)...............................................................................................A.151

[ECF #254] - Statement of Material Facts (Jul. 31, 2024) ....................A.155

[ECF #254-1] - Exhibit 1, Deposition Transcript Excerpt, Denis Grizelj (Dec. 20, 2023).........................................................................A.170

[ECF #254-2] - Exhibit 2, Deposition Transcript Excerpt, Matthew Rutledge (Dec. 22, 2023)...................................................................A.201

[ECF #254-3] - Exhibit 3, Declaration, Matthew Rutledge (Jul. 31, 2024)................................................................................................A.221

[ECF #254-4] - Exhibit 4, Internet Printout Re Polymerase Chain Reaction ..........................................................................................A.226

[ECF #254-5] -Exhibit 5, Expert Report, Dicken S.C. Ko, M.D. .........A.229

[ECF #254-6] - Exhibit 6, Deposition Transcript  Excerpt, Dicken S.C. Ko, M.D. (Apr. 26, 2024)............................................................A.241

[ECF #254-7] - Exhibit 7, Deposition Transcript  Excerpt, Steven W. Parker, M.D. (Dec. 7, 2023) ..................................................................A.266

[ECF #254-8] - Exhibit 8, Order Form, MD Labs [Specimen].............A.282

[ECF #254-9] - Exhibit 9, Deposition Transcript Excerpt, Arthur P. Mourtzinos (Apr. 25, 2024)................................................................A.287

[ECF #254-10] - Exhibit 10, Urology Times Article re Reimbursement (Nov. 8, 2022) ...........................................................A.300

[ECF #254-11] - Exhibit 11, Email Thread, Mouraviev with Rutledge (Jan. 2019) .....................................................................A.310

[ECF #254-12] - Exhibit 12, Deposition Transcript Excerpt, Craig K. Deligdish, M.D. (Dec. 21, 2023).......................................................A.312

[ECF #254-13] - Exhibit 13, ACLA Amicus Brief, DC District Case No. 15-487 ...................................................................................A.364

[ECF #254-14] - Exhibit 14, Deposition Transcript Excerpt, Kimberly McGrath, M.D. (Nov. 21, 2023).............................................A.376

[ECF #254-15] - Exhibit 15, Declaration, Roy Riley [Pace Solutions] (Jul. 29, 2024)..............................................................................A.387

[ECF #254-16] - Exhibit 16, Email Thread, Bobango with Todd (Aug. 27, 2018)...................................................................................A.395

[ECF #254-17] - Exhibit 17, Deposition Transcript, Michael Arrigo (May 9, 2024) .............................................................................A.398

[ECF #254-18] - Exhibit 18, Expert Report in Response, Constantine T. Yiannoutsos (Mar. 29, 2024) ........................................A.406

*[ECF #254-20] - Exhibit 20, Email Thread, Deligdish with Todd (Aug. 2018)..................................................................................A.443

[ECF #259-1] - Exh. A, Settlement Agreement, U.S. Dept. of Health and Human Services with MD Labs (Oct. 20, 2021) ...........A.446

[ECF #259-2] - Exh. B, MD Labs Advertisement..................................A.471

[ECF #259-3] - Exh. C, CMS.gov Medicare Coverage Determination Process ...............................................................................................A.473

[ECF #259-4] - Exh. D, AUA Guidelines re UTI (2022)......................A.479

[ECF #259-5] - Exh. E, Deposition Transcript Excerpt, Dicken S. C. Ko, M.D., Mass. District Court Case No, 18-cv-12558 (Apr. 26, 2024)...................................................................................................A.511

[ECF #259-6] - Exh. F, Journal Article by Ko, et al. (May 2023) ........A.528

[ECF #259-7] - Exh. G, Dept. of Health and Human Services Comments and Recommendations (Aug. 17, 1998).............................A.542

[ECF #259-8] - Exh. H, Expert Report Excerpt, Michael F. Arrigno, M.D. (Jan. 29, 2024)........................................................................A.555

[ECF #259-9] - Exh. I, BAA Report .....................................................A.559

ii

[ECF #259-10] - Exh. J, Email Thread, Grizelj with Rutledge (Mar. 1, 2017)......................................................................................A.566

[ECF #259-11] - Exh. K, Email Thread, Grizelj with Redman (Feb. 2017)......................................................................................A.571

[ECF #259-12] - Exh. L, Lighthouse Lab Slide Presentation ...............A.578

[ECF #259-13 (262-1)] - Exh. M, Email Thread, Dushman with Mathis (Sep. 2019) ......................................................................A.601

[ECF #259-14 (262-2)] - Exh. N, MD Labs Communication, Real-time PCRq with Concurrent Culturing ....................................A.608

[ECF #259-15] - Exh. O, MD Labs Order Form..................................A.611

[ECF #259-16] - Exh. P, Deposition Transcript Excerpt, Arthur P. Mourtzinos, M.D. (Apr. 25, 2024) ........................................A.613

[ECF #259-17] - Exh. Q, Deposition Transcript Excerpt, Matthew Rutledge (Dec. 22, 2023)........................................................A.619

[ECF #259-18] - Exh. R, Deposition Transcript Excerpt, Alexander Stojanoff, Ph.D. (Nov. 15, 2023)...........................................A.623

[ECF #259-19] - Exh. S, Healthcare Fraud Prevention Partnership Review (May 2018)...................................................................A.627

[ECF #259-20] - Exh. T, Email Thread, Todd with Deligdish (Apr. 2018)......................................................................................A.644

[ECF #259-21] - Exh. U, Email, Williams to Bobango (Aug. 3, 2018) A.647

[ECF #259-22] - Exh. V, Memo re Claussen Conversation, Craig Deligdish, M.D. (Aug. 13, 2018)..........................................A.650

[ECF #259-23] - Exh. W, Email, Bobango to Smith (Aug. 27, 2018)..A.652

[ECF #259-24] - Exh. X, Deposition Transcript Excerpt, John Todd (Nov. 28, 2023).....................................................................A.654

[ECF #259-25] - Exh. Y, Email, Rutledge to Grizelj (Jan. 2, 2018).....A.658

[ECF #260] - Omni Response to Statement of Material Facts (Aug. 29, 2024)..................................................................................A.661

[ECF #265-1] - Exhibit 21, Deposition Transcript Excerpt, Craig K. Deligdish (Dec. 21, 2023) ......................................................................A.690

[ECF #265-2] - Exhibit 22, Deposition Transcript Excerpt, Deni Grizelj [Dec. 20, 2023]........................................................................A.697

[ECF #265-3] - Exhibit 23, Deposition Transcript Excerpt, Deni Grizelj [Jul. 26, 2024]...........................................................................A.708

[ECF #265-4] - Exhibit 24, Deposition Transcript Excerpt, Matthew Rutledge (Jul. 26, 2024) .....................................................................A.721

[ECF #266] - MD Labs Defendants' Response to Additional Material Facts (Sep. 18, 2024) ......................................................................A.728

[ECF #266-1] - Exhibit 25, MD Labs Requisition Form by Sinha (Mar. 15, 2021)...........................................................................A.752

[ECF #266-2] - Exhibit 26, Deposition Transcript Excerpt, Alexander Stojanoff, Ph.D. (Nov. 15, 2023)...........................................................A.756

[ECF #269-1 (273-1)] - Exhibit Z, Email, Dushman to Mathis (Sep. 18, 2019)...........................................................................A.764

[ECF #269-2 (273-2)] - Exhibit AA, MD Labs qPCR Communication A.766

[ECF #269-3 (273-3)] - Exhibit BB, Email Thread, Claussen with Laudeenschlager (Jul. 20, 2018)...........................................................A.770

[ECF #277 11-13-24] -Transcript of Motion Hearing [Saris, J.] (Nov. 13, 2024)...........................................................................A.774

[ECF #279] - Memorandum and Order on Summary Judgment Motion [Saris, J.] (Jan. 6, 2025) ............................................................A.812

[ECF #280] - Clerk's Judgment (Jan. 6, 2025) ...................................A.840

[ECF #283] - Notice of Appeal (Feb. 3, 2025)....................................A.841

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:18-cv-12558-PBS

Omni Healthcare, Inc. et al v. MD Spine Solutions LLC et al
Assigned to: Chief Judge Patti B. Saris
Case in other court:  USCA - First Circuit, 25-01110
Cause: 31:3729 False Claims Act

Date Filed: 12/12/2018
Date Terminated: 01/06/2025
Jury Demand: Both
Nature of Suit: 376 Qui Tam (31 U.S.C. § 3729(a))
Jurisdiction: Federal Question

### Plaintiff

**Omni Healthcare, Inc.**
*Relator*

represented by **Christa McLeod**
Spiro Harrison & Nelson
363 Bloomfield Avenue
Ste 2c
Montclair, NJ 07042
732-889-3515
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eric G. Penley**
RS Law LLP
401 Edgewater Place
Suite 630
Wakefield, MA 01880
781-486-6249
Email: eric@advantagetriallawyers.com
*(Inactive)*
*TERMINATED: 07/30/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jesse Hoyer Estes**
Hoyer Law Group, PLLC
2801 West Busch Blvd
Suite 200
Tampa, FL 33618
813-375-3700
Email: jesse@hoyerlawgroup.com
*TERMINATED: 12/29/2022*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Svjetlana Tesic**

A.1

Spiro Harrison & Nelson LLC
Spiro Harrison & Nelson, LLC
363 Bloomfield Avenue
Suite 2c
07042
Montclair, NJ 07042
973-744-2100
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David Butler Harrison , I**
Spiro Harrison & Nelson
363 Bloomfield Ave
Suite 2c
Montclair, NJ 07042
973-232-4109
Email: dharrison@shnlegal.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eric H. Jaso**
Spiro Harrison & Nelson
363 Bloomfield Avenue
Suite 2C
Montclair, NJ 07042
973-310-4026
Fax: 973-232-0887
Email: ejaso@shnlegal.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jared L. Hubbard**
Fitch Law Partners LLP
1 Beacon Street
Boston, MA 02108
617-542-5542
Fax: 617-542-1542
Email: jared.hubbard@gmail.com
*TERMINATED: 12/22/2022*
*ATTORNEY TO BE NOTICED*

**Jonathan W. Fitch**
Fitch Law Partners LLP
One Beacon Street
16th Floor
Boston, MA 02108
617-542-5542
Fax: 617-542-1542
Email: jwf@fitchlp.com
*TERMINATED: 12/29/2022*
*ATTORNEY TO BE NOTICED*

**Rachel N. Seville**

A.2

Spiro | Harrison
363 Bloomfield Avenue, Suite 2C
Montclair, NJ 07042
(973) 232-4109
Email: tkenny@spiroharrison.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott M. Heidorn**
Bergstresser & Pollock LLC
4th Floor
52 Temple Place
Boston, MA 02111
617-682-9211
Email: scott@bergstresser.com
*ATTORNEY TO BE NOTICED*

**Terrance D. Lanier**
Fitch Law Partners LLP
One Beacon Street
16th Floor
Boston, MA 02108
617-542-5542
Email: tdl@fitchlp.com
*TERMINATED: 12/29/2022*
*ATTORNEY TO BE NOTICED*

**Thomas M. Kenny**
Spiro Harrison & Nelson
363 Bloomfield Avenue
Suite 2C
Montclair, NJ 07042
973-232-0881
Email: tkenny@shnlegal.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**United States of America**
*ex rel Omni Healthcare, Inc.*

represented by **Abraham R. George**
US Attorney's Office - MA
J. Joseph Moakley U.S. Courthouse
1 Courthouse Way
Suite 9200
Boston, MA 02210
617-748-3152
Email: abraham.george@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian M. LaMacchia**
US Attorney's Office - MA
J. Joseph Moakley U.S. Courthouse
1 Courthouse Way
Suite 9200

A.3

Boston, MA 02210
617-748-3126
Email: brian.lamacchia@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles B. Weinograd**
United States Attorney's Office
1 Courthouse Way
Suite 9200
Boston, MA 02210
617-748-3107
Email: charles.weinograd@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of Alaska**
*ex rel Omni Healthcare, Inc.*
*TERMINATED: 05/27/2022*

**Plaintiff**

**State of California**
*ex rel Omni Healthcare, Inc.*
*TERMINATED: 05/27/2022*

**Plaintiff**

**State of Colorado**
*ex rel Omni Healthcare, Inc.*
*TERMINATED: 05/27/2022*

**Plaintiff**

**State of Connecticut**
*ex rel Omni Healthcare, Inc.*
*TERMINATED: 05/27/2022*

**Plaintiff**

**State of Delaware**
*ex rel Omni Healthcare, Inc.*
*TERMINATED: 05/27/2022*

**Plaintiff**

**The District of Columbia**
*ex rel Omni Healthcare, Inc.*
*TERMINATED: 05/27/2022*

**Plaintiff**

**State of Florida**
*ex rel Omni Healthcare, Inc.*
*TERMINATED: 05/27/2022*

**Plaintiff**

**State of Georgia**
*ex rel Omni Healthcare, Inc.*

A.4

*TERMINATED: 05/27/2022*

**<u>Plaintiff</u>**

**State of Hawaii**
*ex rel Omni Healthcare, Inc.*
*TERMINATED: 05/27/2022*

**<u>Plaintiff</u>**

**State of Illinois**
*ex rel Omni Healthcare, Inc.*
*TERMINATED: 05/27/2022*

**<u>Plaintiff</u>**

**State of Indiana**
*ex rel Omni Healthcare, Inc.*
*TERMINATED: 05/27/2022*

**<u>Plaintiff</u>**

**State of Iowa**
*ex rel Omni Healthcare, Inc.*
*TERMINATED: 05/27/2022*

**<u>Plaintiff</u>**

**State of Louisiana**
*ex rel Omni Healthcare, Inc.*
*TERMINATED: 05/27/2022*

**<u>Plaintiff</u>**

**State of Maryland**
*ex rel Omni Healthcare, Inc.*
*TERMINATED: 05/27/2022*

**<u>Plaintiff</u>**

**State of Massachusetts**   represented by **Matthew R. Turnell**
*ex rel Omni Healthcare, Inc.*   1 Ashburton Place
*TERMINATED: 05/27/2022*   Boston, MA 02108
617-682-2231
Email: matthew.turnell@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**State of Michigan**
*ex rel Omni Healthcare, Inc.*
*TERMINATED: 05/27/2022*

**<u>Plaintiff</u>**

**State of Minnesota**
*ex rel Omni Healthcare, Inc.*
*TERMINATED: 05/27/2022*

**<u>Plaintiff</u>**

**State of Montana**
*ex rel Omni Healthcare, Inc.*
*TERMINATED: 05/27/2022*

**Plaintiff**

**State of Nevada**
*ex rel Omni Healthcare, Inc.*
*TERMINATED: 05/27/2022*

**Plaintiff**

**State of New Jersey**
*ex rel Omni Healthcare, Inc.*
*TERMINATED: 05/27/2022*

**Plaintiff**

**State of New Mexico**
*ex rel Omni Healthcare, Inc.*
*TERMINATED: 05/27/2022*

**Plaintiff**

**State of New York**
*ex rel Omni Healthcare, Inc.*
*TERMINATED: 05/27/2022*

**Plaintiff**

**State of North Carolina**
*ex rel Omni Healthcare, Inc.*
*TERMINATED: 05/27/2022*

**Plaintiff**

**State of Oklahoma**
*ex rel Omni Healthcare, Inc.*
*TERMINATED: 05/27/2022*

**Plaintiff**

**State of Rhode Island**
*ex rel Omni Healthcare, Inc.*
*TERMINATED: 05/27/2022*

**Plaintiff**

**State of Tennessee**
*ex rel Omni Healthcare, Inc.*
*TERMINATED: 05/27/2022*

**Plaintiff**

**State of Texas**
*ex rel Omni Healthcare, Inc.*
*TERMINATED: 05/27/2022*

**Plaintiff**

**State of Vermont**
*ex rel Omni Healthcare, Inc.*

*TERMINATED: 05/27/2022*

**Plaintiff**

**State of Virginia**
*ex rel Omni Healthcare, Inc.*
*TERMINATED: 05/27/2022*

**Plaintiff**

**State of Washington**
*ex rel Omni Healthcare, Inc.*
*TERMINATED: 05/27/2022*


V.

**Defendant**

| | | |
|---|---|---|
| **MD Spine Solutions LLC**<br>*doing business as*<br>MD Labs Inc. | represented by | **Edward J. Heath**<br>Robinson & Cole LLP<br>One State Street<br>Hartford, CT 06103-3102<br>860-275-8200<br>Fax: 860-275-8299<br>Email: eheath@rc.com<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |

**Julianna M. Charpentier**
Robinson & Cole
One Boston Place
Boston, MA 02108-4404
617-557-5930
Email: jcharpentier@rc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin P. Daly**
Robinson&Cole LLP
One State Street
Hartford, CT 06103
860-275-8200
Email: kdaly@rc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Seth B. Orkand**
Robinson & Cole LLP
One Boston Place, 25th floor
Boston, MA 02108
617-557-5915
Fax: 617-557-5999
Email: sorkand@rc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

A.7

**Alexander O. Canizares**
Perkins Coie LLP
Suite 600
700 13th Street, NW
Washington, DC 20005
202-654-1769
Email: ACanizares@perkinscoie.com
*TERMINATED: 10/13/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Barak Cohen**
Perkins Coie LLP
Suite 600
700 13th Street, NW
Washington, DC 20005
202-654-6200
Email: bcohen@perkinscoie.com
*TERMINATED: 10/13/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle h. Tangorre**
Robinson & Cole LLP
111 Washington Avenue, Third Floor
Ste 3rd Fl
Albany, NY 12210
212-451-2964
Email: dtangorre@rc.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gary Campbell**
Perkins Coie LLP
700 Thirteenth Street, NW
Suite 800
Washington, DC 20005
202-654-6200
Email: garycampbell@perkinscoie.com
*TERMINATED: 10/13/2022*
*ATTORNEY TO BE NOTICED*

**Matthew J. Moffa**
Perkins Coie LLP
1155 Avenue of the Americas
22nd Flr.
New York, NY 10036
212-261-6857
Email: mmoffa@perkinscoie.com
*TERMINATED: 07/22/2022*
*ATTORNEY TO BE NOTICED*

**Paul Juang-Korol**

A.8

Perkins Coie LLP
700 13th Street, NW
Suite 800
Washington, DC 20005
202-654-1747
Email: paul.korol@dot.gov
*TERMINATED: 06/17/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Doe Healthcare Providers 1-100**

**Defendant**

**Dennis Grizeli**                    represented by    **Edward J. Heath**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julianna M. Charpentier**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin P. Daly**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew J. Moffa**
(See above for address)
*TERMINATED: 07/22/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Seth B. Orkand**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander O. Canizares**
(See above for address)
*TERMINATED: 10/13/2022*
*ATTORNEY TO BE NOTICED*

**Barak Cohen**
(See above for address)
*TERMINATED: 10/13/2022*
*ATTORNEY TO BE NOTICED*

**Danielle h. Tangorre**
(See above for address)
*PRO HAC VICE*

A.9

*ATTORNEY TO BE NOTICED*

**Gary Campbell**
(See above for address)
*TERMINATED: 10/13/2022*
*ATTORNEY TO BE NOTICED*

**Paul Juang-Korol**
(See above for address)
*TERMINATED: 06/17/2022*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Matthew Rutledge**                    represented by **Edward J. Heath**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julianna M. Charpentier**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin P. Daly**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew J. Moffa**
(See above for address)
*TERMINATED: 07/22/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Seth B. Orkand**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander O. Canizares**
(See above for address)
*TERMINATED: 10/13/2022*
*ATTORNEY TO BE NOTICED*

**Barak Cohen**
(See above for address)
*TERMINATED: 10/13/2022*
*ATTORNEY TO BE NOTICED*

**Danielle h. Tangorre**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

A.10

**Gary Campbell**
(See above for address)
*TERMINATED: 10/13/2022*
*ATTORNEY TO BE NOTICED*

**Paul Juang-Korol**
(See above for address)
*TERMINATED: 06/17/2022*
*ATTORNEY TO BE NOTICED*

**Mediator**

**Judge Jennifer C. Boal**

| Date Filed | # | Docket Text |
|---|---|---|
| 12/12/2018 | 1 | COMPLAINT against Doe Healthcare Providers 1-100, MD Spine Solutions LLC, filed by Omni Healthcare, Inc.. (Attachments: # 1 Civil Cover Sheet and Category Form) (Danieli, Chris) (Entered: 12/12/2018) |
| 10/20/2021 | 45 | NOTICE of Intervention in part for settlement purposes and declination in part by United States of America. (Attachments: # 1 Proposed Order)(Geraldino-Karasek, Clarilde) Modified on 3/11/2022 to unsealed docket entry pursuant to Order 47 entered. (Geraldino-Karasek, Clarilde). (Entered: 10/21/2021) |
| 10/21/2021 | 47 | Judge Patti B. Saris: ORDER entered. ORDER Intervention in part for settlement purposes and declination in part.(Geraldino-Karasek, Clarilde) (Entered: 11/01/2021) |
| 01/21/2022 | 48 | Judge Patti B. Saris: ELECTRONIC ORDER entered. The parties shall file a status report on or before February 4, 2022. (Geraldino-Karasek, Clarilde) (Entered: 01/21/2022) |
| 01/26/2022 | 49 | NOTICE of Appearance by Scott M. Heidorn on behalf of Omni Healthcare, Inc. (Heidorn, Scott) (Entered: 01/26/2022) |
| 01/26/2022 | 50 | MOTION for Leave to Appear Pro Hac Vice for admission of David Harrison, Esq., Thomas Kenny, Esq., Eric Jaso, Esq., and Rachel Seville, Esq. Filing fee: $ 400, receipt number AMADC-9155786 by Omni Healthcare, Inc.. (Attachments: # 1 Affidavit, # 2 Affidavit, # 3 Affidavit, # 4 Affidavit)(Heidorn, Scott) (Entered: 01/26/2022) |
| 01/26/2022 | 51 | WAIVER OF SERVICE Returned Executed by Omni Healthcare, Inc.. MD Spine Solutions LLC waiver sent on 1/18/2022, answer due 3/21/2022. (Heidorn, Scott) (Entered: 01/26/2022) |
| 01/28/2022 | 52 | STIPULATION of Dismissal by United States of America. (Attachments: # 1 Text of Proposed Order)(George, Abraham) (Entered: 01/28/2022) |
| 01/28/2022 | 53 | NOTICE of Appearance by Matthew J. Moffa on behalf of MD Spine Solutions LLC (Moffa, Matthew) (Entered: 01/28/2022) |
| 01/28/2022 | 54 | MOTION for Leave to Appear Pro Hac Vice for admission of Barak Cohen, Alexander O. Canizares, Paul M. Korol Filing fee: $ 300, receipt number AMADC-9159183 by MD Spine Solutions LLC. (Attachments: # 1 Affidavit Certification of B. Cohen, # 2 Affidavit Certification of A. Canizares, # 3 Affidavit Certification of P. Korol, # 4 Text of Proposed Order Proposed Order)(Moffa, Matthew) (Entered: 01/28/2022) |
| 01/31/2022 | 55 | Judge Patti B. Saris: ELECTRONIC ORDER entered granting 50 Motion for Leave to Appear Pro Hac Vice Added David Harrison, Esq., Thomas Kenny, Esq., Eric Jaso, Esq., |

A.11

| | | |
|---|---|---|
| | | and Rachel Seville.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(Geraldino-Karasek, Clarilde) (Entered: 01/31/2022) |
| 01/31/2022 | 56 | Judge Patti B. Saris: ELECTRONIC ORDER entered granting 54 Motion for Leave to Appear Pro Hac Vice Added Barak Cohen, Alexander O. Canizares, Paul M. Korol.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(Geraldino-Karasek, Clarilde) (Entered: 01/31/2022) |
| 01/31/2022 | 57 | NOTICE of Appearance by Thomas M. Kenny on behalf of Omni Healthcare, Inc. (Kenny, Thomas ) (Entered: 01/31/2022) |
| 02/02/2022 | 58 | NOTICE of Appearance by Barak Cohen on behalf of MD Spine Solutions LLC (Cohen, Barak) (Entered: 02/02/2022) |
| 02/02/2022 | 59 | NOTICE of Appearance by Alexander O. Canizares on behalf of MD Spine Solutions LLC (Canizares, Alexander) (Entered: 02/02/2022) |
| 02/02/2022 | 60 | NOTICE of Appearance by David Butler Harrison, I on behalf of Omni Healthcare, Inc. (Harrison, David) (Entered: 02/02/2022) |
| 02/02/2022 | 61 | NOTICE of Appearance by Paul M. Korol on behalf of MD Spine Solutions LLC (Korol, Paul) (Entered: 02/02/2022) |
| 02/02/2022 | 62 | NOTICE of Appearance by Eric H. Jaso on behalf of Omni Healthcare, Inc. (Jaso, Eric) (Entered: 02/02/2022) |
| 02/04/2022 | 63 | STIPULATION of Dismissal *Joint* by MD Spine Solutions LLC. (Attachments: # 1 Text of Proposed Order Proposed Order)(Cohen, Barak) (Entered: 02/04/2022) |
| 02/04/2022 | 64 | STATUS REPORT *JOINT* by MD Spine Solutions LLC. (Cohen, Barak) (Entered: 02/04/2022) |
| 02/07/2022 | 65 | CORPORATE DISCLOSURE STATEMENT by MD Spine Solutions LLC. (Canizares, Alexander) (Entered: 02/07/2022) |
| 02/07/2022 | 67 | Judge Patti B. Saris: ORDER entered. ORDER on 63 JOINT STIPULATION OF DISMISSAL. (Geraldino-Karasek, Clarilde) (Entered: 02/15/2022) |

A.12

| | | |
|---|---|---|
| 02/08/2022 | 66 | CORPORATE DISCLOSURE STATEMENT by Omni Healthcare, Inc.. (Kenny, Thomas ) (Entered: 02/08/2022) |
| 02/24/2022 | 68 | Judge Patti B. Saris: ORDER entered. CORRECTED JOINT STIPULATION OF DISMISSAL as to Omni Healthcare, Inc. et al v. MD Spine Solutions LLC et al. (Geraldino-Karasek, Clarilde) (Entered: 02/25/2022) |
| 03/21/2022 | 69 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by MD Spine Solutions LLC.(Canizares, Alexander) (Entered: 03/21/2022) |
| 03/21/2022 | 70 | MEMORANDUM in Support re 69 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by MD Spine Solutions LLC. (Attachments: # 1 Exhibit A)(Canizares, Alexander) (Entered: 03/21/2022) |
| 04/04/2022 | 71 | AMENDED COMPLAINT against All Defendants, filed by Omni Healthcare, Inc.. (Harrison, David) (Entered: 04/04/2022) |
| 04/07/2022 | 72 | Consent MOTION for Extension of Time to May 18, 2022 to File Answer re 71 Amended Complaint by MD Spine Solutions LLC.(Canizares, Alexander) (Entered: 04/07/2022) |
| 04/07/2022 | 73 | Consent MOTION for Extension of Time to May 18, 2022 to File Answer re 72 Consent MOTION for Extension of Time to May 18, 2022 to File Answer re 71 Amended Complaint , 71 Amended Complaint *(CORRECTED)* by MD Spine Solutions LLC. (Canizares, Alexander) (Entered: 04/07/2022) |
| 04/12/2022 | 74 | Judge Patti B. Saris: ELECTRONIC ORDER entered ALLOWED re 72 and 73 Motion for Extension of Time to Answer re 71 Amended Complaint.<br><br>MD Spine Solutions LLC answer due 5/18/2022. (Geraldino-Karasek, Clarilde) Modified docket text on 4/12/2022 (Geraldino-Karasek, Clarilde). (Entered: 04/12/2022) |
| 04/18/2022 | 75 | Summons Issued as to Dennis Grizeli, Matthew Rutledge. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (Geraldino-Karasek, Clarilde) (Entered: 04/18/2022) |
| 05/09/2022 | 76 | NOTICE of Appearance by Matthew J. Moffa on behalf of Dennis Grizeli (Moffa, Matthew) (Entered: 05/09/2022) |
| 05/09/2022 | 77 | NOTICE of Appearance by Matthew J. Moffa on behalf of Matthew Rutledge (Moffa, Matthew) (Entered: 05/09/2022) |
| 05/09/2022 | 78 | NOTICE of Appearance by Alexander O. Canizares on behalf of Dennis Grizeli (Canizares, Alexander) (Entered: 05/09/2022) |
| 05/09/2022 | 79 | NOTICE of Appearance by Alexander O. Canizares on behalf of Matthew Rutledge (Canizares, Alexander) (Entered: 05/09/2022) |
| 05/09/2022 | 80 | NOTICE of Appearance by Paul M. Korol on behalf of Dennis Grizeli (Korol, Paul) (Entered: 05/09/2022) |
| 05/09/2022 | 81 | NOTICE of Appearance by Paul M. Korol on behalf of Matthew Rutledge (Korol, Paul) (Entered: 05/09/2022) |
| 05/09/2022 | 82 | NOTICE of Appearance by Barak Cohen on behalf of Dennis Grizeli (Cohen, Barak) (Entered: 05/09/2022) |
| 05/09/2022 | 83 | NOTICE of Appearance by Barak Cohen on behalf of Matthew Rutledge (Cohen, Barak) (Entered: 05/09/2022) |

A.13

| | | |
|---|---|---|
| 05/18/2022 | 84 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge.(Canizares, Alexander) (Entered: 05/18/2022) |
| 05/18/2022 | 85 | MEMORANDUM in Support re 84 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge. (Attachments: # 1 Exhibit A to Defendants' Memo of Law ISO of Motion to Dismiss) (Canizares, Alexander) (Entered: 05/18/2022) |
| 05/19/2022 | 86 | Consent MOTION for Extension of Time to June 15, 2022 to File Response/Reply as to 85 Memorandum in Support of Motion, 84 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Omni Healthcare, Inc..(Kenny, Thomas ) (Entered: 05/19/2022) |
| 05/20/2022 | 87 | Judge Patti B. Saris: ELECTRONIC ORDER entered ALLOWED re 86 Consent MOTION for Extension of Time to File Response as to 84 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM. <br><br> Responses due by 6/15/2022. (Geraldino-Karasek, Clarilde) (Entered: 05/20/2022) |
| 05/23/2022 | 88 | STIPULATION of Dismissal *as to Plaintiff States* by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge. (Attachments: # 1 Text of Proposed Order)(Canizares, Alexander) (Entered: 05/23/2022) |
| 05/27/2022 | 89 | Judge Patti B. Saris: ORDER entered re 88 STIPULATION of Dismissal as to Plaintiff States.(Geraldino-Karasek, Clarilde) (Entered: 05/27/2022) |
| 06/02/2022 | 90 | ELECTRONIC NOTICE Setting Hearing BY VIDEO on 69 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 84 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM : <br><br> MOTION HEARING SET FOR 8/4/2022 03:00 PM BY VIDEO before Judge Patti B. Saris. <br><br> This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible. <br><br> Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html. <br><br> For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov. <br><br> (Geraldino-Karasek, Clarilde) (Entered: 06/02/2022) |
| 06/08/2022 | 91 | MOTION for Attorney Fees by Omni Healthcare, Inc..(Harrison, David) (Entered: 06/08/2022) |
| 06/08/2022 | 92 | MEMORANDUM in Support re 91 MOTION for Attorney Fees filed by Omni Healthcare, Inc.. (Attachments: # 1 Declaration of David B. Harrison in Support of Motion for Attorneys' Fees, # 2 Exhibit A to Harrison Declaration, # 3 Exhibit B to Harrison Declaration, # 4 Exhibit C to Harrison Declaration, # 5 Exhibit D to Harrison Declaration, # 6 Exhibit E to Harrison Declaration, # 7 Exhibit F to Harrison Declaration, # 8 Exhibit G to Harrison Declaration, # 9 Exhibit H to Harrison Declaration, # 10 Exhibit I to Harrison Declaration, # 11 Exhibit J to Harrison Declaration, # 12 Exhibit K to |

A.14

| | | |
|---|---|---|
| | | Harrison Declaration, # 13 Exhibit L to Harrison Declaration)(Harrison, David) (Entered: 06/08/2022) |
| 06/15/2022 | 93 | MEMORANDUM in Opposition re 84 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Omni Healthcare, Inc.. (Attachments: # 1 Declaration of David B. Harrison, # 2 Exhibit A to Harrison Declaration)(Harrison, David) (Entered: 06/15/2022) |
| 06/16/2022 | 94 | Consent MOTION to Withdraw as Attorney by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge.(Korol, Paul) (Entered: 06/16/2022) |
| 06/17/2022 | 95 | Judge Patti B. Saris: ELECTRONIC ORDER entered Allowed re 94 Motion to Withdraw as Attorney. Attorney Paul M. Korol terminated (Geraldino-Karasek, Clarilde) (Entered: 06/17/2022) |
| 06/22/2022 | 96 | MEMORANDUM in Opposition re 91 MOTION for Attorney Fees *and Cross-Motion to Defer Ruling on Relator's Motion* filed by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge. (Canizares, Alexander) (Entered: 06/22/2022) |
| 06/23/2022 | 97 | Consent MOTION for Leave to File *Reply and Sur-Reply Regarding Motion to Dismiss the Amended Complaint* by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge. (Canizares, Alexander) (Entered: 06/23/2022) |
| 06/23/2022 | 98 | Judge Patti B. Saris: ELECTRONIC ORDER entered granting 97 Consent MOTION for Leave to File Reply and Sur-Reply<br><br>Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Geraldino-Karasek, Clarilde) (Entered: 06/23/2022) |
| 06/23/2022 | 99 | Consent MOTION for Leave to File *Reply and Sur-Reply Regarding Plaintiff's Motion for Reasonable Expenses, Attorneys' Fees and Costs* by Omni Healthcare, Inc..(Kenny, Thomas ) (Entered: 06/23/2022) |
| 06/23/2022 | 100 | Judge Patti B. Saris: ELECTRONIC ORDER entered granting 99 Consent MOTION for Leave to File Reply and Sur-Reply.<br><br>Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Geraldino-Karasek, Clarilde) (Entered: 06/23/2022) |
| 07/01/2022 | 101 | REPLY to Response to 84 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *(Leave to file granted on 6/23/2022)* filed by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge. (Canizares, Alexander) (Entered: 07/01/2022) |
| 07/08/2022 | 103 | NOTICE of Appearance by Matthew R. Turnell on behalf of State of Massachusetts (Turnell, Matthew) (Entered: 07/08/2022) |
| 07/08/2022 | 104 | NOTICE by State of Massachusetts *of States' Election to Decline Intervention* (Attachments: # 1 Text of Proposed Order)(Turnell, Matthew) (Entered: 07/08/2022) |
| 07/08/2022 | 105 | REPLY to Response to 91 MOTION for Attorney Fees , 99 Consent MOTION for Leave to File *Reply and Sur-Reply Regarding Plaintiff's Motion for Reasonable Expenses, Attorneys' Fees and Costs* filed by Omni Healthcare, Inc.. (Attachments: # 1 Declaration of Thomas M. Kenny, # 2 Exhibit A to Declaration of Thomas M. Kenny, # 3 Exhibit B to Declaration of Thomas M. Kenny, # 4 Exhibit C to Declaration of Thomas M. Kenny) (Kenny, Thomas ) (Entered: 07/08/2022) |

A.15

| | | |
|---|---|---|
| 07/14/2022 | 106 | ELECTRONIC NOTICE SETTING HEARING BY VIDEO ON ALL MOTIONS : <br><br>Docket No. 91 MOTION for Attorney Fees; <br><br>Docket No. 69 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM; <br><br>Docket No. 84 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM; <br><br>MOTION(S) HEARING SET FOR 8/4/2022 03:00 PM BY VIDEO before Judge Patti B. Saris <br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible. <br><br>Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html. <br><br>For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov. <br><br>(Geraldino-Karasek, Clarilde) (Entered: 07/14/2022) |
| 07/14/2022 | 107 | SUR-REPLY to Motion re 97 Consent MOTION for Leave to File *Reply and Sur-Reply Regarding Motion to Dismiss the Amended Complaint*, 84 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Omni Healthcare, Inc.. (Harrison, David) (Entered: 07/14/2022) |
| 07/21/2022 | 108 | NOTICE of Appearance by Gary Campbell on behalf of MD Spine Solutions LLC (Campbell, Gary) (Entered: 07/21/2022) |
| 07/21/2022 | 109 | NOTICE of Appearance by Gary Campbell on behalf of Dennis Grizeli (Campbell, Gary) (Entered: 07/21/2022) |
| 07/21/2022 | 110 | NOTICE of Appearance by Gary Campbell on behalf of Matthew Rutledge (Campbell, Gary) (Entered: 07/21/2022) |
| 07/21/2022 | 111 | Consent MOTION to Withdraw as Attorney by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge.(Moffa, Matthew) (Entered: 07/21/2022) |
| 07/22/2022 | 112 | Judge Patti B. Saris: ELECTRONIC ORDER entered granting 111 Motion to Withdraw as Attorney. Attorney Matthew J. Moffa terminated (Geraldino-Karasek, Clarilde) (Entered: 07/22/2022) |
| 07/22/2022 | 113 | SUR-REPLY to Motion re 91 MOTION for Attorney Fees *(Leave to File Granted on June 23, 2022 (ECF No. 100))* filed by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge. (Canizares, Alexander) (Entered: 07/22/2022) |
| 08/01/2022 | 114 | ELECTRONIC NOTICE issued requesting courtesy copy for 105 Reply to Response to Motion, 93 Memorandum in Opposition to Motion, 92 Memorandum in Support of Motion, 107 Sur-Reply to Motion, 85 Memorandum in Support of Motion, 84 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 113 Sur-Reply to Motion, 101 Reply to Response to Motion, 91 MOTION for Attorney Fees , 96 Memorandum in Opposition to Motion. |

A.16

| | | |
|---|---|---|
| | | Counsel who filed these documents are requested to submit a courtesy copy of these documents to the Clerk's Office on/or before 5:00 p.m. on Tuesday, 8/2/2022. **These documents must be clearly marked as a Courtesy Copy and reflect the document number assigned by CM/ECF, and the exhibits must be tabbed.** (Geraldino-Karasek, Clarilde) (Entered: 08/01/2022) |
| 08/05/2022 | 115 | Electronic Clerk's Notes for proceedings held before Judge Patti B. Saris: Motion Hearing held on 8/4/2022 on 84 Motion to Dismiss and 91 motion for attorneys' fees. Motion to Dismiss taken under advisement. The parties will discuss resolving attorneys' fees this week. If necessary, supplemental filings on attorneys' fees, including an affidavit on UTI billing time and filings for the investigative firm, will be due by August 31, 2022. (Court Reporter: Lee Marzilli at leemarz47@gmail.com.)(Attorneys present: Alexander O. Canizares, Thomas M. Kenny, Abraham R. George) (Geraldino-Karasek, Clarilde) (Entered: 08/05/2022) |
| 08/23/2022 | 116 | Judge Patti B. Saris: MEMORANDUM AND ORDER entered. The Court DENIES the motion to dismiss (Dkt. 84 ) as to the FCA claim regarding the medically unnecessary testing allegations and DENIES the motion to dismiss the analogous state law claims. (Geraldino-Karasek, Clarilde) (Entered: 08/23/2022) |
| 08/24/2022 | 120 | Transcript of Motion Hearing held on August 4, 2022, before Judge Patti B. Saris. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Lee Marzilli at leemarz47@gmail.com. Redaction Request due 9/14/2022. Redacted Transcript Deadline set for 9/26/2022. Release of Transcript Restriction set for 11/22/2022. (Coppola, Katelyn) (Entered: 08/31/2022) |
| 08/24/2022 | 121 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/caseinfo/transcripts.htm (Coppola, Katelyn) (Entered: 08/31/2022) |
| 08/26/2022 | 117 | NOTICE OF SCHEDULING CONFERENCE : SCHEDULING CONFERENCE SET FOR 10/17/2022 02:00 PM BY VIDEO before Judge Patti B. Saris. This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible. Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html. For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov. |

A.17

| | | |
|---|---|---|
| | | (Geraldino-Karasek, Clarilde) (Entered: 08/26/2022) |
| 08/26/2022 | 118 | Joint MOTION for Extension of Time to Sept. 21, 2022/Oct. 6, 2022 to File supplemental briefs, if any, concerning the relator's motion for fees, costs, and expenses, and for Defendants to file an answer to the amended complaint, respectively by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge.(Canizares, Alexander) (Entered: 08/26/2022) |
| 08/29/2022 | 119 | Judge Patti B. Saris: ELECTRONIC ORDER entered ALLOWED re 118 Motion for Extension of Time.<br><br>RESET DEADLINES AS TO: Relator's motion for fees, costs, and expenses, including an affidavit on UTI billing time and filings for the investigative firm due by 9/21/2022.<br><br>Defendants' MD Labs & Owners answer due by 10/6/2022.<br><br>(Geraldino-Karasek, Clarilde) (Entered: 08/29/2022) |
| 09/21/2022 | 122 | Supplemental MEMORANDUM in Opposition re 91 MOTION for Attorney Fees filed by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge. (Attachments: # 1 Exhibit A)(Canizares, Alexander) (Entered: 09/21/2022) |
| 09/21/2022 | 123 | RESPONSE TO COURT ORDER re 91 MOTION for Attorney Fees filed by Omni Healthcare, Inc.<br><br>(Attachments: # 1 Affidavit of Craig K. Deligdish, M.D., # 2 Exhibit A to Declaration of Craig K. Deligdish, M.D.)(Kenny, Thomas ) Modified docket text on 9/22/2022 (Geraldino-Karasek, Clarilde). (Entered: 09/21/2022) |
| 09/26/2022 | 124 | NOTICE of Appearance by Seth B. Orkand on behalf of Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge (Orkand, Seth) (Entered: 09/26/2022) |
| 09/26/2022 | 125 | Defendants' Assented to MOTION for Extension of Time to October 27, 2022 to File Answer AND MOTION to Continue Scheduling Conference *by 21 Days by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge.(Orkand, Seth) Modified docket text on 9/29/2022 (Geraldino-Karasek, Clarilde). (Entered: 09/26/2022)* |
| 09/27/2022 | 126 | Judge Patti B. Saris: ENDORSED ORDER entered ALLOWED re 125 Defendants' Assented to Motion for Extension of Time to File Answer AND MOTION to Continue Scheduling Conference.<br><br>Defendants' ANSWER due by 10/27/2022.<br><br>(Geraldino-Karasek, Clarilde) (Entered: 09/29/2022) |
| 09/29/2022 | 127 | NOTICE RESETTING SCHEDULING CONFERENCE BY VIDEO :<br><br>SCHEDULING CONFERENCE RESET FROM 10/17/2022 TO 12/12/2022 02:00 PM BY VIDEO before Judge Patti B. Saris.<br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible.<br><br>Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html. |

A.18

For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.

(Geraldino-Karasek, Clarilde) (Entered: 09/29/2022)

| Date | No. | Description |
|---|---|---|
| 10/04/2022 | 128 | Consent MOTION to Withdraw as Attorney by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge.(Canizares, Alexander) (Entered: 10/04/2022) |
| 10/04/2022 | 129 | Consent MOTION to Withdraw as Attorney by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge.(Cohen, Barak) (Entered: 10/04/2022) |
| 10/04/2022 | 130 | Consent MOTION to Withdraw as Attorney by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge.(Campbell, Gary) (Entered: 10/04/2022) |
| 10/13/2022 | 131 | Judge Patti B. Saris: ELECTRONIC ORDER entered ALLOWED re 128 Motion to Withdraw as Attorney, 129 Motion to Withdraw as Attorney, 130 Motion to Withdraw as Attorney. Attorney Barak Cohen; Gary Campbell and Alexander O. Canizares terminated. (Geraldino-Karasek, Clarilde) (Entered: 10/13/2022) |
| 10/17/2022 | 132 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Danielle H. Tangorre Filing fee: $ 100, receipt number AMADC-9543961 by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Orkand, Seth) (Entered: 10/17/2022) |
| 10/17/2022 | 133 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Edward J. Heath Filing fee: $ 100, receipt number AMADC-9544073 by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Orkand, Seth) (Entered: 10/17/2022) |
| 10/19/2022 | 134 | Judge Patti B. Saris: ELECTRONIC ORDER entered granting 132 Motion for Leave to Appear Pro Hac Vice Added Danielle H. Tangorre. **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account.** Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. A Notice of Appearance must be entered on the docket by the newly admitted attorney. (Geraldino-Karasek, Clarilde) (Entered: 10/19/2022) |
| 10/19/2022 | 135 | Judge Patti B. Saris: ELECTRONIC ORDER entered granting 133 Motion for Leave to Appear Pro Hac Vice Added Edward J. Heath. **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account.** Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. |

A.19

| | | |
|---|---|---|
| | | A Notice of Appearance must be entered on the docket by the newly admitted attorney. (Geraldino-Karasek, Clarilde) (Entered: 10/19/2022) |
| 10/27/2022 | 136 | ANSWER to 71 Amended Complaint by MD Spine Solutions LLC.(Orkand, Seth) (Entered: 10/27/2022) |
| 10/27/2022 | 137 | ANSWER to 71 Amended Complaint by Matthew Rutledge.(Orkand, Seth) (Entered: 10/27/2022) |
| 10/27/2022 | 138 | ANSWER to 71 Amended Complaint by Dennis Grizeli.(Orkand, Seth) (Entered: 10/27/2022) |
| 12/02/2022 | 139 | NOTICE of Appearance by Julianna M. Charpentier on behalf of Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge (Charpentier, Julianna) (Entered: 12/02/2022) |
| 12/02/2022 | 140 | NOTICE of Appearance by Kevin P. Daly on behalf of Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge (Daly, Kevin) (Entered: 12/02/2022) |
| 12/02/2022 | 141 | NOTICE of Appearance by Edward J. Heath on behalf of Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge (Heath, Edward) (Entered: 12/02/2022) |
| 12/02/2022 | 142 | NOTICE of Appearance by Danielle h. Tangorre on behalf of Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge (Tangorre, Danielle) (Entered: 12/02/2022) |
| 12/06/2022 | 143 | JOINT STATEMENT re scheduling conference . (Orkand, Seth) (Additional attachment(s) added on 12/9/2022 to correct docket entry: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3) (Geraldino-Karasek, Clarilde). (Entered: 12/06/2022) |
| 12/12/2022 | 144 | Electronic Clerk's Notes for proceedings held before Judge Patti B. Saris: Scheduling Conference held on 12/12/2022 by Video Joint Statement [#143] NOT adopted Parties to submit an Amended Joint Statement by 12/19/2022 Matter referred to ADR for JANUARY/FEBRUARY 2024 (Atty Kenny, Heath, Orkand) (Court Reporter: Lee Marzilli at leemarz47@gmail.com.) (Molloy, Maryellen) (Entered: 12/12/2022) |
| 12/12/2022 | 145 | Judge Patti B. Saris: ELECTRONIC ORDER entered. ORDER REFERRING CASE to Alternative Dispute Resolution for JANUARY/FEBRUARY 2024.(Molloy, Maryellen) (Entered: 12/12/2022) |
| 12/14/2022 | 146 | Amended JOINT STATEMENT re scheduling conference . (Orkand, Seth) (Entered: 12/14/2022) |
| 12/14/2022 | 147 | Notice of assignment to ADR Provider. Judge Jennifer C. Boal appointed.(Simeone, Maria) (Entered: 12/14/2022) |
| 12/14/2022 | 148 | ADDENDUM re 91 MOTION for Attorney Fees filed by Omni Healthcare, Inc.. (Attachments: # 1 Exhibit A Unredacted Attorney Fee Statements)(Kenny, Thomas ) (Entered: 12/14/2022) |
| 12/15/2022 | 149 | ELECTRONIC NOTICE of Hearing. |

A.20

| | | |
|---|---|---|
| | | **The Alternative Dispute Resolution Hearing is set for February 9, 2024 at 10:00 a.m. in Courtroom 14 (In person only) before Magistrate Judge Jennifer C. Boal.**<br><br>**In the event this date poses a serious conflict, or any party believes that the case is not ripe for mediation, please do NOT contact the Courtroom Deputy directly regarding mediation scheduling; instead, the parties are to confer and file on CM/ECF a motion to cancel the mediation or to continue the mediation, as appropriate. In the case of motions to continue the mediation, the parties should include therein several proposed dates for which all counsel and principals are available.**<br><br>Counsel and principals are directed to be present and have full settlement authority. Each party must submit a brief (no more than 5 pages) mediation memorandum that includes a discussion of (1) the merits of the case (both strengths and weaknesses); (2) damages or other relief sought by the parties; (3) the status of discovery; and (4) the status of the parties' settlement discussions. The memoranda should be BY E-MAIL to (steve_york@mad.uscourts.gov) no later than fourteen (14) days prior to the mediation and marked "Confidential - Not for Docketing."<br><br>**Prior to the Mediation hearing, there will be a Preliminary Conference set for February 6, 2024 at 11:30 a.m. by remote proceedings before Magistrate Judge Jennifer C. Boal.**<br><br>The Preliminary Conference will be conducted by video, the clerk will provide the relative information for this conference to all parties at the email registered in CM/ECF, prior to the upcoming hearing.<br><br>If you have technical or compatibility issues with video technology, please notify the session's courtroom deputy as soon as possible.<br><br>It shall be understood (a) that all parties and counsel will participate in this court-sponsored mediation in good faith and with the interest of settling the matter on mutually acceptable terms, (b) that the entire mediation process, including all communications during any in-person, video or audio part thereof, is confidential, (c) that all statements made during the course of mediation are privileged settlement discussions, made without prejudice to any party's legal position, and inadmissible for any purpose in any legal proceeding, (d) that no party, participant, or representative shall seek in any proceeding to hereafter compel the mediator to testify and/or produce any document with respect to the mediation, and (e) that all parties, counsel and other participants agree that, by participating in this court-sponsored mediation, they are bound by these conditions and shall keep confidential all communications exchanged during the mediation process.<br><br>(York, Steve) (Entered: 12/15/2022) |
| 12/19/2022 | 150 | Joint MOTION for Protective Order by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge. (Attachments: # 1 Text of Proposed Order Exhibit 1 - Stipulated Protective Order)(Orkand, Seth) (Entered: 12/19/2022) |
| 12/21/2022 | 151 | Consent MOTION to Withdraw as Attorney *Jared L. Hubbard* by Omni Healthcare, Inc.. (Hubbard, Jared) (Entered: 12/21/2022) |
| 12/21/2022 | 152 | Judge Patti B. Saris: ELECTRONIC ORDER entered ALLOWED re 150 Joint Motion for Protective Order (Geraldino-Karasek, Clarilde) (Entered: 12/22/2022) |
| 12/21/2022 | 153 | Judge Patti B. Saris: ORDER entered. PROTECTIVE ORDER (Geraldino-Karasek, Clarilde) (Entered: 12/22/2022) |

A.21

| | | |
|---|---|---|
| 12/22/2022 | 154 | Judge Patti B. Saris: ELECTRONIC ORDER entered granting 151 Motion to Withdraw as Attorney. Attorney Jared L. Hubbard terminated (Geraldino-Karasek, Clarilde) (Entered: 12/22/2022) |
| 12/22/2022 | 155 | Judge Patti B. Saris: ELECTRONIC ORDER entered APPROVED re 146 JOINT STATEMENT re scheduling conference:<br><br>SET SCHEDULING ORDER DEADLINES:<br><br>Fact Discovery to be completed by 10/31/2023; Dispositive Motions due by 4/30/2024; Opposition due by 5/31/2024; Reply due by 6/20/2024; Sur-Reply due by 7/10/2024.<br><br>(Geraldino-Karasek, Clarilde) (Entered: 12/22/2022) |
| 12/28/2022 | 156 | NOTICE of Withdrawal of Appearance by Terrance D. Lanier *on behalf of Omni Healthcare, Inc*. (Lanier, Terrance) (Entered: 12/28/2022) |
| 12/28/2022 | 157 | NOTICE of Withdrawal of Appearance by Terrance D. Lanier *on behalf of Omni Healthcare, Inc*. (Lanier, Terrance) (Entered: 12/28/2022) |
| 02/15/2023 | 158 | Judge Patti B. Saris: MEMORANDUM AND ORDER entered.<br><br>The Court ALLOWS IN PART Plaintiff's Motion for reasonable Fees, Attorneys' Fees, and Costs (Dkt. 91 ), subject to the rulings above. Relator shall submit a form of judgment within 14 days.<br><br>(Geraldino-Karasek, Clarilde) (Entered: 02/15/2023) |
| 02/15/2023 | 159 | SET DEADLINES AS TO : Relator's Proposed Form of Judgment due by 3/1/2023. (Geraldino-Karasek, Clarilde) (Entered: 02/15/2023) |
| 02/28/2023 | 160 | Proposed Document(s) submitted by Omni Healthcare, Inc.. Document received: Proposed Judgment. (Kenny, Thomas ) (Entered: 02/28/2023) |
| 02/28/2023 | 161 | Response by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge to 160 Proposed Document(s) submitted . (Attachments: # 1 Exhibit A - Highlighted Excerpts of Lo Tignov Bills)(Orkand, Seth) (Entered: 02/28/2023) |
| 03/01/2023 | 162 | Response by Omni Healthcare, Inc. to 161 Response *to Proposed Judgment*. (Kenny, Thomas ) (Entered: 03/01/2023) |
| 03/09/2023 | 163 | Judge Patti B. Saris: ELECTRONIC ORDER entered re 160 Proposed Judgment submitted filed by Omni Healthcare, Inc.<br><br>" The Judgment shall reflect a deduction of the fees of Lo Tignow LLC related to UTI investigation. An amended proposed form of Judgment shall be filed."<br><br>(Geraldino-Karasek, Clarilde) (Entered: 03/09/2023) |
| 03/09/2023 | 164 | SET DEADLINES AS TO : Relator's Amended Proposed Form of Judgment due by 3/23/2023.(Geraldino-Karasek, Clarilde) (Entered: 03/09/2023) |
| 03/09/2023 | 165 | Proposed Document(s) submitted by Omni Healthcare, Inc.. Document received: Proposed Judgment. (Kenny, Thomas ) (Entered: 03/09/2023) |
| 03/13/2023 | 166 | MOTION for Contempt *and to Compel Compliance with Subpoena* by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge.(Charpentier, Julianna) (Entered: 03/13/2023) |

A.22

| | | |
|---|---|---|
| 03/13/2023 | 167 | MEMORANDUM in Support re 166 MOTION for Contempt *and to Compel Compliance with Subpoena* filed by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge. (Attachments: # 1 Exhibit 1 Subpoena to Melbourne Medical, # 2 Exhibit 2 Email dated 8.21.18, # 3 Exhibit 3 Melbourne Medical Annual Report, # 4 Exhibit 4 Signed Certified Mail Receipt, # 5 Exhibit 5 Notice of Subpoena, # 6 Exhibit 6 BJCS Annual Report, # 7 Exhibit 7 Letter to Melbourne Medical dated 2.9.23, # 8 Exhibit 8 FedEx Delivery Confirmation, # 9 Exhibit 9 FedEx Delivery Confirmation, # 10 Exhibit 10 Email dated 3.6.23)(Charpentier, Julianna) (Entered: 03/13/2023) |
| 03/13/2023 | 168 | Judge Patti B. Saris: ORDER entered. JUDGMENT Awarding Relator Its Reasonable Fees and Expenses. (Geraldino-Karasek, Clarilde) (Entered: 03/13/2023) |
| 03/27/2023 | 169 | RESPONSE to Motion re 166 MOTION for Contempt *and to Compel Compliance with Subpoena* filed by Omni Healthcare, Inc.. (Attachments: # 1 Exhibit A, Letter from Melbourne Medical Laboratory, LLC)(Kenny, Thomas ) (Entered: 03/27/2023) |
| 03/30/2023 | 170 | Judge Patti B. Saris: ELECTRONIC ORDER entered. REFERRING CASE to Magistrate Judge Donald L. Cabell. Referred for: 166 MOTION for Contempt *and to Compel Compliance with Subpoena*.<br><br>(Geraldino-Karasek, Clarilde) Motion referred to Donald L. Cabell. (Entered: 03/30/2023) |
| 03/31/2023 | 171 | Assented to MOTION for Leave to File *Reply in Support of Defendants' Motion for Contempt and to Compel Compliance with Subpoena* by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge. (Attachments: # 1 Exhibit A - Proposed Reply in Support of Defendants' Motion for Contempt and to Compel Compliance with Subpoena) (Orkand, Seth) (Entered: 03/31/2023) |
| 04/03/2023 | 172 | Magistrate Judge Donald L. Cabell: ELECTRONIC ORDER entered granting 171 Motion for Leave to File Document ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Russo, Noreen) (Entered: 04/03/2023) |
| 04/03/2023 | 173 | Assented to MOTION for Leave to File *Sur-Reply in Response to the Reply of Defendants in Support of Defendants Motion for Contempt and to Compel Compliance with Subpoena*. by Omni Healthcare, Inc..(Kenny, Thomas ) (Entered: 04/03/2023) |
| 04/03/2023 | 174 | MEMORANDUM in Support re 166 MOTION for Contempt *and to Compel Compliance with Subpoena (Reply Memorandum)* filed by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge. (Attachments: # 1 Exhibit 11 (Omni's 2022 Annual Report), # 2 Exhibit 12 (Melbourne Medical's Website), # 3 Exhibit 13 (CLIA Laboratory Details), # 4 Exhibit 14 (Example Requisition Form), # 5 Exhibit 15 (Omni's Responses to Defendants' First RFPD), # 6 Exhibit 16 (Email Correspondence))(Charpentier, Julianna) (Entered: 04/03/2023) |
| 04/06/2023 | 175 | Magistrate Judge Donald L. Cabell: ELECTRONIC ORDER entered granting 173 Motion for Leave to File Document ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Russo, Noreen) (Entered: 04/06/2023) |
| 04/10/2023 | 176 | SUR-REPLY to Motion re 166 MOTION for Contempt *and to Compel Compliance with Subpoena* filed by Omni Healthcare, Inc.. (Attachments: # 1 Affidavit Declaration of Dr. Craig Deligdish)(Kenny, Thomas ) (Entered: 04/10/2023) |
| 04/11/2023 | 177 | ELECTRONIC NOTICE Setting Hearing on Motion 166 MOTION for Contempt *and to Compel Compliance with Subpoena* : |

A.23

| | | This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the courtroom deputy of the session as soon as possible.<br><br>Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.<br><br>Motion Hearing set for 4/18/2023 at 02:00 PM in Remote Proceeding : Boston before Magistrate Judge Donald L. Cabell. (Russo, Noreen) (Entered: 04/11/2023) |
|---|---|---|
| 04/18/2023 | 178 | Electronic Clerk's Notes for proceedings held before Magistrate Judge Donald L. Cabell: Remote Motion Hearing by video conference held on 4/18/2023 re 166 MOTION for Contempt *and to Compel Compliance with Subpoena* filed by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge. After hearing from the parties the court asks them to confer. Omni to indicate if there is responsive material with regard to each request and if there will be an objection. The parties to file a status report two weeks from today and the court will reconvene as necessary. (Court Reporter: Digital Recording.) To order a copy of this Digital Recording, please go to https://forms.mad.uscourts.gov/Audio.html . For a transcript of this proceeding, contact the Clerk's office by email at mad_transcripts@mad.uscourts.gov.(Attorneys present: Orkand, Kenny) (Russo, Noreen) (Entered: 04/18/2023) |
| 05/09/2023 | 179 | STATUS REPORT by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge. (Orkand, Seth) (Entered: 05/09/2023) |
| 05/18/2023 | 180 | STATUS REPORT by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge. (Orkand, Seth) (Entered: 05/18/2023) |
| 05/24/2023 | 181 | Assented to MOTION to Amend *Complaint and File a Second Amended Complaint* by Omni Healthcare, Inc.. (Attachments: # 1 Exhibit A, Proposed Second Amended Complaint)(Harrison, David) (Entered: 05/24/2023) |
| 05/25/2023 | 182 | ELECTRONIC NOTICE Setting Hearing on Motion 166 MOTION for Contempt *and to Compel Compliance with Subpoena* :<br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the courtroom deputy of the session as soon as possible.<br><br>Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.<br><br>Motion Hearing set for 6/7/2023 at 02:30 PM in Remote Proceeding : Boston before Magistrate Judge Donald L. Cabell. (Russo, Noreen) (Entered: 05/25/2023) |

| | | |
|---|---|---|
| 05/26/2023 | 183 | Judge Patti B. Saris: ENDORSED ORDER entered ALLOWED re 181 Assented to Motion for Leave to File a Second Amended Complaint by Omni Healthcare, Inc. (Geraldino-Karasek, Clarilde) (Entered: 05/26/2023) |
| 05/28/2023 | 184 | AMENDED COMPLAINT *Second Amended Complaint* against All Defendants, filed by Omni Healthcare, Inc..(Harrison, David) (Entered: 05/28/2023) |
| 05/30/2023 | 185 | Summons Issued as to Doe Healthcare Providers 1-100. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (Geraldino-Karasek, Clarilde) (Entered: 05/30/2023) |
| 06/07/2023 | 186 | Electronic Clerk's Notes for proceedings held before Magistrate Judge Donald L. Cabell: Motion Hearing held on 6/7/2023 re 166 MOTION for Contempt *and to Compel Compliance with Subpoena* filed by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge. Said motion addressed; Court denied the motion for reasons stated on the record; document requests addressed; some issues with that may be resolved through supplemental responses; parties shall contact the Courtroom Deputy Clerk for the next proceeding. (Court Reporter: Digital Recording.) To order a copy of this Digital Recording, please go to https://forms.mad.uscourts.gov/Audio.html. For a transcript of this proceeding, contact mad_transcripts@mad.uscourts.gov.(Attorneys present: Daly, Heidorn, Kenny, and Orkand) (Lovett, Jarrett) (Entered: 06/07/2023) |
| 06/12/2023 | 187 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge.(Orkand, Seth) (Entered: 06/12/2023) |
| 06/12/2023 | 188 | MEMORANDUM in Support re 187 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge. (Orkand, Seth) (Entered: 06/12/2023) |
| 06/26/2023 | 189 | MEMORANDUM in Opposition re 187 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Omni Healthcare, Inc.. (Attachments: # 1 Affidavit Declaration of David B. Harrison, # 2 Exhibit A to Declaration of David B. Harrison)(Harrison, David) (Entered: 06/26/2023) |
| 06/26/2023 | 190 | Assented to MOTION for Leave to File *Reply in Support of Partial Motion to Dismiss Second Amended Complaint by July 12, 2023* by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge.(Orkand, Seth) (Entered: 06/26/2023) |
| 06/27/2023 | 191 | Judge Patti B. Saris: ELECTRONIC ORDER entered granting 190 Assented to Motion for Leave to File Reply. Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Geraldino-Karasek, Clarilde) (Entered: 06/27/2023) |
| 06/28/2023 | 192 | ELECTRONIC NOTICE OF STATUS CONFERENCE BY VIDEO : STATUS CONFERENCE SET FOR 8/16/2023 10:30 AM BY VIDEO before Judge Patti B. Saris. This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the courtroom deputy of the session as soon as possible. |

A.25

| | | |
|---|---|---|
| | | Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.<br><br>(Geraldino-Karasek, Clarilde) (Entered: 06/28/2023) |
| 07/12/2023 | 193 | REPLY to Response to 187 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge. (Orkand, Seth) (Entered: 07/12/2023) |
| 07/12/2023 | 194 | Assented to MOTION for Leave to File *Sur-Reply in Response to the Reply of Defendants in Support of Defendants' Motion to Dismiss Relator's Second Amended Complaint* by Omni Healthcare, Inc..(Kenny, Thomas ) (Entered: 07/12/2023) |
| 07/13/2023 | 195 | Judge Patti B. Saris: ELECTRONIC ORDER entered granting 194 Assented to Motion for Leave to File Sur-Reply ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (McManus, Caetlin) (Entered: 07/13/2023) |
| 07/26/2023 | 196 | SUR-REPLY to Motion re 187 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Omni Healthcare, Inc.. (Harrison, David) (Entered: 07/26/2023) |
| 07/31/2023 | 197 | ELECTRONIC NOTICE CANCELING : STATUS CONFERENCE SET FOR 8/16/2023 10:30 AM BY VIDEO before Judge Patti B. Saris. (Geraldino-Karasek, Clarilde) (Entered: 07/31/2023) |
| 07/31/2023 | 198 | ELECTRONIC NOTICE SETTING HEARING BY VIDEO ON 187 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM :<br><br>MOTION HEARING SET FOR 9/25/2023 09:30 AM BY VIDEO before Judge Patti B. Saris.<br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the courtroom deputy of the session as soon as possible.<br><br>Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.<br><br>(Geraldino-Karasek, Clarilde) (Entered: 07/31/2023) |
| 08/01/2023 | 199 | MOTION for Leave to Appear Pro Hac Vice for admission of Svjetlana Tesic, Esq., Christa McLeod, Esq. Filing fee: $ 250, receipt number AMADC-9971554 by Omni Healthcare, Inc.. (Attachments: # 1 Affidavit Certification of Svjetlana Tesic, Esq., # 2 Affidavit Certification of Christa McLeod, Esq.)(Heidorn, Scott) (Entered: 08/01/2023) |

A.26

| 08/04/2023 | 200 | Judge Patti B. Saris: ELECTRONIC ORDER entered granting 199 Motion for Leave to Appear Pro Hac Vice Added Svjetlana Tesic and Christa McLeod.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(Geraldino-Karasek, Clarilde) (Entered: 08/04/2023) |
| 08/16/2023 | 201 | NOTICE of Appearance by Christa McLeod on behalf of Omni Healthcare, Inc. (McLeod, Christa) (Entered: 08/16/2023) |
| 08/17/2023 | 202 | NOTICE of Appearance by Svjetlana Tesic on behalf of Omni Healthcare, Inc. (Tesic, Svjetlana) (Entered: 08/17/2023) |
| 08/28/2023 | 203 | MOTION to Compel *Production of Documents* by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge.(Orkand, Seth) (Entered: 08/28/2023) |
| 08/28/2023 | 204 | MEMORANDUM in Support re 203 MOTION to Compel *Production of Documents* filed by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Orkand, Seth) (Entered: 08/28/2023) |
| 08/31/2023 | 205 | Transcript of Motion Hearing held on June 7, 2023, before Chief Magistrate Judge Donald L. Cabell. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Linda Walsh at lwalshsteno@gmail.com Redaction Request due 9/21/2023. Redacted Transcript Deadline set for 10/2/2023. Release of Transcript Restriction set for 11/29/2023. (Dore, Samantha) (Entered: 09/01/2023) |
| 08/31/2023 | 206 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (Dore, Samantha) (Entered: 09/01/2023) |
| 09/08/2023 | 207 | Assented to MOTION for Extension of Time to 09/15/2023 to File Response/Reply as to 203 MOTION to Compel *Production of Documents* by Omni Healthcare, Inc..(Kenny, Thomas ) (Entered: 09/08/2023) |
| 09/08/2023 | 208 | Magistrate Judge Donald L. Cabell: ELECTRONIC ORDER entered granting 207 Assented to MOTION for Extension of Time to 09/15/2023 to File Response/Reply as to 203 MOTION to Compel *Production of Documents* . Responses due by 9/15/2023 (Russo, Noreen) (Entered: 09/08/2023) |
| 09/15/2023 | 209 | MEMORANDUM in Opposition re 203 MOTION to Compel *Production of Documents* filed by Omni Healthcare, Inc.. (Attachments: # 1 Exhibit A, Transcript of June 7, 2023 Hearing)(Kenny, Thomas ) (Entered: 09/15/2023) |
| 09/18/2023 | 210 | ELECTRONIC NOTICE Resetting Hearing on Motion 187 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM : |

A.27

This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the courtroom deputy of the session as soon as possible.

Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.

For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.

Motion Hearing RESET TO 10/2/2023 02:30 PM (Remote only) before Judge Patti B. Saris. (Molloy, Maryellen) (Entered: 09/18/2023)

| | | |
|---|---|---|
| 09/18/2023 | 211 | Judge Patti B. Saris: ELECTRONIC ORDER entered. REFERRING MOTION 203 MOTION to Compel *Production of Documents* filed by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge.<br><br>(Geraldino-Karasek, Clarilde) Motions referred to Donald L. Cabell. (Entered: 09/18/2023) |
| 09/22/2023 | 212 | Assented to MOTION for Leave to File *Reply in Support of Defendants' Motion to Compel Production of Documents* by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge. (Attachments: # 1 Exhibit A - Proposed Reply in Support of Defendants' Motion to Compel)(Orkand, Seth) (Entered: 09/22/2023) |
| 09/25/2023 | 213 | Magistrate Judge Donald L. Cabell: ELECTRONIC ORDER entered granting 212 Motion for Leave to File Document ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Russo, Noreen) (Entered: 09/25/2023) |
| 09/25/2023 | 214 | Assented to MOTION for Leave to File *Sur-Reply in Opposition to Defendants' Motion to Compel Production of Documents* by Omni Healthcare, Inc..(Kenny, Thomas ) (Entered: 09/25/2023) |
| 09/25/2023 | 215 | REPLY to Response to 203 MOTION to Compel *Production of Documents* filed by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge. (Orkand, Seth) (Entered: 09/25/2023) |
| 09/25/2023 | 216 | Magistrate Judge Donald L. Cabell: ELECTRONIC ORDER entered granting 214 Motion for Leave to File Document ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Russo, Noreen) (Entered: 09/25/2023) |
| 09/29/2023 | 217 | SUR-REPLY to Motion re 214 Assented to MOTION for Leave to File *Sur-Reply in Opposition to Defendants' Motion to Compel Production of Documents*, 203 MOTION to Compel *Production of Documents* filed by Omni Healthcare, Inc.. (Kenny, Thomas ) (Entered: 09/29/2023) |
| 10/02/2023 | 218 | Electronic Clerk's Notes for proceedings held before Judge Patti B. Saris: Motion Hearing held on 10/2/2023 by Video<br><br>Motion taken under advisement. |

A.28

| | | |
|---|---|---|
| | | (Court Reporter: Lee Marzilli at leemarz47@gmail.com.) (Entered: 10/03/2023) |
| 10/10/2023 | 219 | ELECTRONIC NOTICE Setting Hearing on Motion [203](#) MOTION to Compel *Production of Documents* : |
| | | This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the courtroom deputy of the session as soon as possible. |
| | | Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html. |
| | | For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact media@mad.uscourts.gov. |
| | | Motion Hearing set for 10/23/2023 at 02:00 PM in Remote Proceeding : Boston before Magistrate Judge Donald L. Cabell. (Russo, Noreen) (Entered: 10/10/2023) |
| 10/23/2023 | 220 | Electronic Clerk's Notes for proceedings held before Magistrate Judge Donald L. Cabell: Motion Hearing held on 10/23/2023 re [203](#) MOTION to Compel *Production of Documents* filed by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge. The court takes the matter under advisement. (Court Reporter: Digital Recording.) To order a copy of this Digital Recording, please go to https://forms.mad.uscourts.gov/Audio.html. For a transcript of this proceeding, contact mad_transcripts@mad.uscourts.gov.(Attorneys present: Kenny, Orkand) (Russo, Noreen) (Entered: 10/23/2023) |
| 10/27/2023 | 221 | Joint MOTION for Extension of Time to February 28, 2024 to Complete Discovery by Omni Healthcare, Inc..(Kenny, Thomas ) (Entered: 10/27/2023) |
| 10/30/2023 | 222 | Transcript of Motion Hearing held on October 2, 2023, before Judge Patti B. Saris. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Lee Marzilli at leemarz47@gmail.com. Redaction Request due 11/20/2023. Redacted Transcript Deadline set for 11/30/2023. Release of Transcript Restriction set for 1/29/2024. (McDonagh, Christina) (Entered: 10/30/2023) |
| 10/30/2023 | 223 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (McDonagh, Christina) (Entered: 10/30/2023) |
| 10/30/2023 | 224 | Judge Patti B. Saris: ENDORSED ORDER entered re [221](#) Joint Motion for Extension of Time to Complete Discovery. |
| | | " Denied. Given the age of this case. The requested schedule is unwarranted. I give the parties an extra 60 days on all deadlines." |
| | | (Geraldino-Karasek, Clarilde) (Entered: 10/31/2023) |
| 11/06/2023 | 225 | Magistrate Judge Donald L. Cabell: ORDER entered. MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO COMPEL granting in part and denying in part [203](#) Motion to Compel. (Russo, Noreen) (Entered: 11/06/2023) |

A.29

| | | |
|---|---|---|
| 11/06/2023 | 226 | Case no longer referred to Magistrate Judge Donald L. Cabell. (Russo, Noreen) (Entered: 11/06/2023) |
| 12/19/2023 | 227 | ELECTRONIC NOTICE OF RESCHEDULING<br><br>Preliminary Conference (previously scheduled for February 6, 2024) is reset for February 5, 2024 at 11:30 AM by remote proceedings before Magistrate Judge Jennifer C. Boal.<br><br>The parties should refer to the original notice of hearing (Docket No. 149) for all other dates and deadlines.<br><br>(Warnock, Douglas) (Entered: 12/19/2023) |
| 01/09/2024 | 228 | MOTION to Compel *Production of Documents Subject to Privilege Claim* by Omni Healthcare, Inc..(Kenny, Thomas ) (Entered: 01/09/2024) |
| 01/09/2024 | 229 | MEMORANDUM in Support re 228 MOTION to Compel *Production of Documents Subject to Privilege Claim* filed by Omni Healthcare, Inc.. (Attachments: # 1 Affidavit Declaration of Thomas M. Kenny, # 2 Exhibit A to Declaration, # 3 Exhibit B to Declaration, # 4 Exhibit C to Declaration, # 5 Exhibit D to Declaration, # 6 Exhibit E to Declaration)(Kenny, Thomas ) (Entered: 01/09/2024) |
| 01/11/2024 | 230 | Joint MOTION to Conduct February 9, 2024 Mediation Remotely by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge.(Orkand, Seth) (Entered: 01/11/2024) |
| 01/11/2024 | 231 | Judge Patti B. Saris: ELECTRONIC ORDER entered. REFERRING CASE to Magistrate Judge Donald L. Cabell Referred for: 228 MOTION to Compel *Production of Documents Subject to Privilege Claim*.<br><br>(Geraldino-Karasek, Clarilde) Motions referred to Donald L. Cabell. (Entered: 01/11/2024) |
| 01/22/2024 | 232 | Judge Patti B. Saris: MEMORANDUM AND ORDER entered on MOTION to Dismiss, Docket No. 187 .<br><br>The Court ALLOWS Defendants' motion to dismiss with respect to Relator's Anti-Kickback Statute claim (Count XXXIV), Eliminating Kickbacks in Recovery Act claim (Count XXXV), and false diagnosis code allegation. Defendants' motion to dismiss is otherwise DENIED.<br><br>(Geraldino-Karasek, Clarilde) (Entered: 01/22/2024) |
| 01/22/2024 | 233 | ELECTRONIC NOTICE Setting Hearing on Motion re 230 Joint MOTION to Conduct February 9, 2024 Mediation Remotely :<br><br>Motion Hearing is set for January 26, 2024 at 03:30 PM by remote proceedings before Magistrate Judge Jennifer C. Boal.<br><br>(Warnock, Douglas) (Entered: 01/22/2024) |
| 01/23/2024 | 234 | MEMORANDUM in Opposition re 228 MOTION to Compel *Production of Documents Subject to Privilege Claim* filed by MD Spine Solutions LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Charpentier, Julianna) (Entered: 01/23/2024) |
| 01/26/2024 | 235 | Electronic Clerk's Notes for proceedings held before Magistrate Judge Jennifer C. Boal: Motion Hearing held on 1/26/2024 re 230 Joint MOTION to Conduct February 9, 2024 Mediation Remotely filed by Dennis Grizeli, MD Spine Solutions LLC, Matthew |

A.30

| | | |
|---|---|---|
| | | Rutledge. For the reasons stated on the record, the motion to conduct the mediation remotely (Docket No. 230 ) is denied. The parties will inform the Clerk of their in-person availability for the dates discussed at the hearing<br><br>(Court Reporter: **SEALED** Digital Recording) To order a copy of this Digital Recording, **The parties should first seek leave of the Court.** If approved, please then go to https://forms.mad.uscourts.gov/Audio.html. For a transcript of this proceeding, contact mad_transcripts@mad.uscourts.gov.<br><br>(Warnock, Douglas) (Entered: 01/26/2024) |
| 01/31/2024 | 236 | ELECTRONIC NOTICE OF RESCHEDULING<br><br>Alternative Dispute Resolution Hearing is reset for March 21, 2024 at 10:00 AM in Courtroom 14 (In person only) before Magistrate Judge Jennifer C. Boal.<br><br>Preliminary Conference is reset for March 18, 2024 at 11:30 AM by remote proceedings before Magistrate Judge Jennifer C. Boal.<br><br>**Please review the earlier notice regarding rules and submissions prior to the mediation.**<br><br>(Warnock, Douglas) (Entered: 01/31/2024) |
| 02/06/2024 | 237 | ANSWER to 184 Amended Complaint by MD Spine Solutions LLC.(Charpentier, Julianna) (Entered: 02/06/2024) |
| 03/18/2024 | 238 | Electronic Clerk's Notes for proceedings held before Magistrate Judge Jennifer C. Boal: Telephone Conference held on 3/18/2024. The Court reviewed preliminary matters with the parties prior to the upcoming mediation. (Attorneys present: Tesic for the plaintiff. George for the government. Orkand and Tangorre for the defendants.)<br><br>(Court Reporter: **SEALED** Digital Recording) To order a copy of this Digital Recording, **The parties should first seek leave of the Court.** If approved, please then go to https://forms.mad.uscourts.gov/Audio.html. For a transcript of this proceeding, contact mad_transcripts@mad.uscourts.gov.<br><br>(Warnock, Douglas) (Entered: 03/18/2024) |
| 03/19/2024 | 239 | ELECTRONIC NOTICE Canceling ADR Conference<br><br>Based on the March 18, 2024 conference, the Court cancels the mediation scheduled for March 21, 2024. The parties should contact the Clerk to reschedule the mediation or to inform the Court that they do not wish to go forward with a mediation at this time.<br><br>(Warnock, Douglas) (Entered: 03/19/2024) |
| 03/25/2024 | 240 | ELECTRONIC NOTICE Setting Hearing on Motion 228 MOTION to Compel *Production of Documents Subject to Privilege Claim*: Motion Hearing set for 4/5/2024 at 02:00 PM in Remote Proceeding : Boston before Magistrate Judge Donald L. Cabell. (Russo, Noreen) (Entered: 03/25/2024) |

A.31

| | | |
|---|---|---|
| 04/05/2024 | 241 | Electronic Clerk's Notes for proceedings held before Magistrate Judge Donald L. Cabell: Motion Hearing held on 4/5/2024 re 228 MOTION to Compel *Production of Documents Subject to Privilege Claim* filed by Omni Healthcare, Inc.. (Court Reporter: Digital Recording.) To order a copy of this Digital Recording, please go to https://forms.mad.uscourts.gov/Audio.html. For a transcript of this proceeding, contact mad_transcripts@mad.uscourts.gov. (Russo, Noreen) (Entered: 05/30/2024) |
| 06/07/2024 | 242 | Magistrate Judge Donald L. Cabell: ORDER entered. MEMORANDUM AND ORDER ON RELATOR'S MOTION TO COMPEL granting 228 MOTION to Compel Production of Documents Subject to Privilege Claim. (Russo, Noreen) (Entered: 06/07/2024) |
| 06/07/2024 | 243 | Case no longer referred to Magistrate Judge Donald L. Cabell. (Russo, Noreen) (Entered: 06/07/2024) |
| 06/17/2024 | 244 | Consent MOTION for Extension of Time to July 31, 2024 to File Motions for Summary Judgment by Omni Healthcare, Inc..(Kenny, Thomas ) (Entered: 06/17/2024) |
| 06/18/2024 | 245 | Judge Patti B. Saris: ENDORSED ORDER entered ALLOWED re 244 Consent Motion for Extension of Time to File Motions for Summary Judgment. RESET SCHEDULING ORDER DEADLINES AS TO : Summary Judgment Motions due by 7/31/2024; Opposition due by 8/29/2024; Reply due by 9/18/2024; Sur-Reply due by 10/9/2024. (Geraldino-Karasek, Clarilde) (Entered: 06/21/2024) |
| 07/12/2024 | 246 | Assented to MOTION for Leave to File Excess Pages *for Memorandum of Law in Support of Summary Judgment* by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge.(Orkand, Seth) (Entered: 07/12/2024) |
| 07/15/2024 | 247 | Judge Patti B. Saris: ENDORSED ORDER entered re 246 Assented to Motion for Leave to File Excess Pages for Memorandum of Law in Support of Summary Judgment. " Denied. The parties may have an additional 5 pages." (Geraldino-Karasek, Clarilde) (Entered: 07/16/2024) |
| 07/18/2024 | 248 | Judge Patti B. Saris: ORDER entered pursuant to 28 U.S.C. § 455(a). Objections due by July 24, 2024. (Geraldino-Karasek, Clarilde) (Entered: 07/18/2024) |
| 07/29/2024 | 249 | Assented to MOTION to Seal *Confidential Document* by MD Spine Solutions LLC. (Charpentier, Julianna) (Entered: 07/29/2024) |
| 07/29/2024 | 250 | MEMORANDUM in Support re 249 Assented to MOTION to Seal *Confidential Document* filed by MD Spine Solutions LLC. (Charpentier, Julianna) (Entered: 07/29/2024) |
| 07/31/2024 | 251 | DECLARATION re 249 Assented to MOTION to Seal *Confidential Document* by MD Spine Solutions LLC. (Charpentier, Julianna) (Entered: 07/31/2024) |
| 07/31/2024 | 252 | MOTION for Summary Judgment by MD Spine Solutions LLC.(Charpentier, Julianna) (Entered: 07/31/2024) |
| 07/31/2024 | 253 | MEMORANDUM in Support re 252 MOTION for Summary Judgment filed by MD Spine Solutions LLC. (Charpentier, Julianna) (Entered: 07/31/2024) |

A.32

| | | |
|---|---|---|
| 07/31/2024 | [254](#) | Statement of Material Facts L.R. 56.1 re [252](#) MOTION for Summary Judgment filed by MD Spine Solutions LLC. (Attachments: # [1](#) Exhibit 1, # [2](#) Exhibit 2, # [3](#) Exhibit 3, # [4](#) Exhibit 4, # [5](#) Exhibit 5, # [6](#) Exhibit 6, # [7](#) Exhibit 7, # [8](#) Exhibit 8, # [9](#) Exhibit 9, # [10](#) Exhibit 10, # [11](#) Exhibit 11, # [12](#) Exhibit 12, # [13](#) Exhibit 13, # [14](#) Exhibit 14, # [15](#) Exhibit 15, # [16](#) Exhibit 16, # [17](#) Exhibit 17, # [18](#) Exhibit 18, # [19](#) Exhibit 19, # [20](#) Exhibit 20)(Charpentier, Julianna) (Additional attachment(s) added on 8/17/2024: # [21](#) Sealed - Exhibit 19) (Geraldino-Karasek, Clarilde). (Entered: 07/31/2024) |
| 07/31/2024 | [255](#) | MOTION for Partial Summary Judgment by Omni Healthcare, Inc..(Kenny, Thomas ) (Entered: 07/31/2024) |
| 07/31/2024 | [256](#) | MEMORANDUM in Support re [255](#) MOTION for Partial Summary Judgment filed by Omni Healthcare, Inc.. (Kenny, Thomas ) (Entered: 07/31/2024) |
| 08/01/2024 | 257 | ELECTRONIC NOTICE issued requesting courtesy copy for [255](#) MOTION for Partial Summary Judgment , [252](#) MOTION for Summary Judgment , [253](#) Memorandum in Support of Motion, [254](#) Statement of Material Facts L.R. 56.1,, [256](#) Memorandum in Support of Motion.<br><br>Counsel who filed this document are requested to submit a courtesy copy of this document (or documents) to the Clerk's Office by 8/12/2024. **These documents must be clearly marked as a Courtesy Copy, including any sealed filing, reflect the document number assigned by CM/ECF and exhibits must be tabbed.**<br><br>(Geraldino-Karasek, Clarilde) (Entered: 08/01/2024) |
| 08/06/2024 | 258 | Judge Patti B. Saris: ELECTRONIC ORDER entered ALLOWED re [249](#) Assented to Motion to Seal Confidential Document by MD Spine Solutions LLC.<br><br>Counsel will receive an email within twenty-four (24) hours of this order with instructions for submitting sealed documents for which leave has been granted in accordance with the Local Rules of the U.S. District Court of Massachusetts. Counsel must include - Leave to file granted on (date of order)- in the caption of the document.<br>(Geraldino-Karasek, Clarilde) (Entered: 08/06/2024) |
| 08/29/2024 | [259](#) | MEMORANDUM in Opposition re [252](#) MOTION for Summary Judgment filed by Omni Healthcare, Inc.. (Attachments: # [1](#) Exhibit A, # [2](#) Exhibit B, # [3](#) Exhibit C, # [4](#) Exhibit D, # [5](#) Exhibit E, # [6](#) Exhibit F, # [7](#) Exhibit G, # [8](#) Exhibit H, # [9](#) Exhibit I, # [10](#) Exhibit J, # [11](#) Exhibit K, # [12](#) Exhibit L, # [13](#) Exhibit M, # [14](#) Exhibit N, # [15](#) Exhibit O, # [16](#) Exhibit P, # [17](#) Exhibit Q, # [18](#) Exhibit R, # [19](#) Exhibit S, # [20](#) Exhibit T, # [21](#) Exhibit U, # [22](#) Exhibit V, # [23](#) Exhibit W, # [24](#) Exhibit X, # [25](#) Exhibit Y)(Kenny, Thomas ) (Entered: 08/29/2024) |
| 08/29/2024 | [260](#) | Statement of Material Facts L.R. 56.1 re [252](#) MOTION for Summary Judgment filed by Omni Healthcare, Inc.. (Kenny, Thomas ) (Entered: 08/29/2024) |
| 08/29/2024 | [261](#) | Opposition re [255](#) MOTION for Partial Summary Judgment filed by Dennis Grizeli, MD Spine Solutions LLC, Matthew Rutledge. (Orkand, Seth) (Entered: 08/29/2024) |
| 09/09/2024 | [262](#) | Opposition re [252](#) MOTION for Summary Judgment *Letter Filing Unsealed Exhibits* filed by Omni Healthcare, Inc.. (Attachments: # [1](#) Exhibit M (filed publicly), # [2](#) Exhibit N (filed publicly))(Kenny, Thomas ) (Entered: 09/09/2024) |
| 09/16/2024 | 263 | ELECTRONIC NOTICE issued requesting courtesy copy for [259](#) Memorandum in Opposition to Motion.<br><br>Counsel who filed this document are requested to submit a courtesy copy of this document to the Clerk's Office by 9/24/2024. **These documents must be clearly marked** |

| | | |
|---|---|---|
| | | as a Courtesy Copy and reflect the document number assigned by CM/ECF and exhibits must be tabbed. (Geraldino-Karasek, Clarilde) (Entered: 09/16/2024) |
| 09/18/2024 | 264 | REPLY to Response to 255 MOTION for Partial Summary Judgment filed by Omni Healthcare, Inc.. (Kenny, Thomas ) (Main Document 264 replaced on 9/26/2024 to correct document view for all pages) (Geraldino-Karasek, Clarilde). . (Entered: 09/18/2024) |
| 09/18/2024 | 265 | REPLY to Response to 252 MOTION for Summary Judgment filed by MD Spine Solutions LLC. (Attachments: # 1 Exhibit 21, # 2 Exhibit 22, # 3 Exhibit 23, # 4 Exhibit 24)(Charpentier, Julianna) (Main Document 265 replaced on 10/4/2024 to correct typographical error on page 13) (Geraldino-Karasek, Clarilde). (Entered: 09/18/2024) |
| 09/18/2024 | 266 | Response by MD Spine Solutions LLC to 260 Statement of Material Facts L.R. 56.1 . (Attachments: # 1 Exhibit 25, # 2 Exhibit 26)(Charpentier, Julianna) (Entered: 09/18/2024) |
| 09/27/2024 | 267 | ELECTRONIC NOTICE SETTING HEARING BY VIDEO on 252 MOTION for Summary Judgment, and 255 MOTION for Partial Summary Judgment : <br><br> (2) MOTION HEARING SET FOR 11/5/2024 09:30 AM by video before Judge Patti B. Saris. <br><br> This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the courtroom deputy of the session as soon as possible. <br><br> Audio access to the hearing may be available to the media and public. Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html. <br><br> For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact media@mad.uscourts.gov. <br><br> (Geraldino-Karasek, Clarilde) (Entered: 09/27/2024) |
| 10/04/2024 | 268 | ELECTRONIC NOTICE RESETTING HEARING BY VIDEO on 252 MOTION for Summary Judgment and 255 MOTION for Partial Summary Judgment: <br><br> (2) MOTION HEARING RESET FROM 11/5/2024 TO 11/13/2024 09:30 AM by video before Judge Patti B. Saris. <br><br> This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the courtroom deputy of the session as soon as possible. <br><br> Audio access to the hearing may be available to the media and public. Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html. <br><br> For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact media@mad.uscourts.gov. |

A.34

| | | |
|---|---|---|
| | | (Geraldino-Karasek, Clarilde) (Entered: 10/04/2024) |
| 10/09/2024 | 269 | SUR-REPLY to Motion re 252 MOTION for Summary Judgment filed by Omni Healthcare, Inc.. (Attachments: # 1 Exhibit Z, # 2 Exhibit AA, # 3 Exhibit BB)(Kenny, Thomas ) (Additional attachment(s) added on 10/10/2024: # 4 ( Sealed Exhibits)) (Geraldino-Karasek, Clarilde). (Entered: 10/09/2024) |
| 10/09/2024 | 270 | SUR-REPLY to Motion re 255 MOTION for Partial Summary Judgment filed by MD Spine Solutions LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Charpentier, Julianna) (Entered: 10/09/2024) |
| 10/17/2024 | 271 | NOTICE of Supplemental Authority and MOTION for Leave to File Supplemental Motion for Summary Judgment by MD Spine Solutions LLC. (Attachments: # 1 Exhibit A)(Charpentier, Julianna) Modified docket text on 10/25/2024 (Geraldino-Karasek, Clarilde). (Entered: 10/17/2024) |
| 10/17/2024 | 272 | MEMORANDUM in Support re 271 MOTION for Leave to File filed by MD Spine Solutions LLC. (Charpentier, Julianna) (Entered: 10/17/2024) |
| 10/22/2024 | 273 | Plaintiff's LETTER to the Court regarding Exhibits to 269 Sur-Reply Memorandum re 252 MOTION for Summary Judgment filed by Omni Healthcare, Inc. <br><br> (Attachments: # 1 Exhibit Z, # 2 Exhibit AA, # 3 Exhibit BB)(Kenny, Thomas ) Modified docket text on 10/23/2024 (Geraldino-Karasek, Clarilde). (Entered: 10/22/2024) |
| 10/24/2024 | 274 | Judge Patti B. Saris: ENDORSED ORDER entered re 271 NOTICE of Supplemental Authority and MOTION for Leave to File Supplemental Motion for Summary Judgment. <br><br> " This case is ancient. There will be no further delays. We can address this issue at the hearing. " <br><br> (Geraldino-Karasek, Clarilde) (Entered: 10/25/2024) |
| 10/31/2024 | 275 | RESPONSE to Motion re 271 MOTION for Leave to File *Supplemental Summary Judgment Motion* filed by Omni Healthcare, Inc.. (Kenny, Thomas ) (Entered: 10/31/2024) |
| 11/13/2024 | 276 | Electronic Clerk's Notes for proceedings held before Judge Patti B. Saris: <br><br> Motion Hearing held on 11/13/2024 by video. <br><br> Motions for Summary Judgment taken under advisement. <br><br> All discovery STAYED. <br><br> (Ausa George, Atty Kenny, Oakland) <br><br> (Court Reporter: Lee Marzilli at leemarz47@gmail.com.) (mm) (Entered: 11/13/2024) |
| 12/09/2024 | 277 | Transcript of Motion Hearing By Video held on November 13, 2024, before Judge Patti B. Saris. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Lee Marzilli at leemarz@aol.com. Redaction Request due 12/30/2024. Redacted Transcript Deadline set for 1/9/2025. Release of Transcript Restriction set for 3/10/2025. (Kelly, Danielle) (Main Document 277 replaced on 12/10/2024) (Kelly, Danielle). (Entered: 12/09/2024) |
| 12/09/2024 | 278 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript |

A.35

| | | |
|---|---|---|
| | | Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (Kelly, Danielle) (Entered: 12/09/2024) |
| 01/06/2025 | 279 | Judge Patti B. Saris: MEMORANDUM AND ORDER entered.<br><br>Defendants' motion for summary judgment (Dkt. 252 ) is ALLOWED, and Relator's motion for partial summary judgment (Dkt. 255 ) is DENIED as moot.<br>( Karasek ) (Entered: 01/06/2025) |
| 01/06/2025 | 280 | Judge Patti B. Saris: ORDER entered. JUDGMENT.<br>( Karasek ) (Entered: 01/06/2025) |
| 01/21/2025 | 281 | MOTION for Extension of Time to Feburary 4, 2025 to File Motion for Attorney's Fees by Dennis Grizeli, Matthew Rutledge, MD Spine Solutions LLC.(Orkand, Seth) (Entered: 01/21/2025) |
| 01/23/2025 | 282 | District Judge Patti B. Saris: ELECTRONIC ORDER entered ALLOWED re 281 Motion for Extension of Time to Feburary 4, 2025 to File Motion for Attorney's Fees.(CGK) (Entered: 01/23/2025) |
| 02/03/2025 | 283 | NOTICE OF APPEAL as to 280 Judgment, 279 Order on Motion for Summary Judgment,, Order on Motion for Partial Summary Judgment, by Omni Healthcare, Inc. Filing fee: $ 605, receipt number AMADC-10818952 Fee Status: Not Exempt. NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 2/24/2025. (Kenny, Thomas ) (Entered: 02/03/2025)** |
| 02/03/2025 | 284 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 283 Notice of Appeal. (MAP) (Entered: 02/03/2025) |
| 02/03/2025 | 285 | USCA Case Number 25-1110 for 283 Notice of Appeal, filed by Omni Healthcare, Inc.. (MAP) (Entered: 02/03/2025) |
| 02/04/2025 | 286 | MOTION for Attorney Fees by Dennis Grizeli, Matthew Rutledge, MD Spine Solutions LLC. (Attachments: # 1 Exhibit A - Deligdish Transcript, # 2 Exhibit B - February 2019 Requisition)(Orkand, Seth) (Entered: 02/04/2025) |
| 02/18/2025 | 287 | MEMORANDUM in Opposition re 286 MOTION for Attorney Fees filed by Omni Healthcare, Inc.. (Kenny, Thomas ) (Entered: 02/18/2025) |
| 02/19/2025 | 288 | Assented to MOTION for Leave to File *Reply Brief* by MD Spine Solutions LLC. (Charpentier, Julianna) (Entered: 02/19/2025) |
| 02/19/2025 | 289 | District Judge Patti B. Saris: ELECTRONIC ORDER entered ALLOWED re 288 Assented to Motion for Leave to File Reply Brief.<br><br>Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (CGK) (Entered: 02/19/2025) |
| 03/04/2025 | 290 | REPLY to Response to 286 MOTION for Attorney Fees filed by Dennis Grizeli, Matthew Rutledge, MD Spine Solutions LLC. (Attachments: # 1 Exhibit 1 - Deligdish Transcript) |

| | | (Orkand, Seth) (Entered: 03/04/2025) |
|---|---|---|
| 03/04/2025 | 291 | Assented to MOTION for Leave to File *Sur-Reply* by Omni Healthcare, Inc..(Kenny, Thomas ) (Entered: 03/04/2025) |
| 03/04/2025 | 292 | District Judge Patti B. Saris: ELECTRONIC ORDER entered ALLOWED re 291 Assented to Motion for Leave to File Sur-Reply.<br><br>Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document.<br>(CGK) (Entered: 03/04/2025) |
| 03/18/2025 | 293 | SUR-REPLY to Motion re 286 MOTION for Attorney Fees filed by Omni Healthcare, Inc.. (Kenny, Thomas ) (Entered: 03/18/2025) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/16/2025 14:35:24 | | | |
| **PACER Login:** | Todd_Lewis | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:18-cv-12558-PBS |
| **Billable Pages:** | 28 | **Cost:** | 2.80 |

A.37

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, *ex rel.* OMNI HEALTHCARE, INC.,<br><br>                    Plaintiffs,<br><br>v.<br><br>MD SPINE SOLUTIONS LLC, D/B/A MD LABS INC., DENNIS GRIZELI, MATTHEW RUTLEDGE AND DOE HEALTHCARE PROVIDERS 1 - 100,<br><br>                  Defendants. | **SECOND AMENDED COMPLAINT**<br><br><br>**No. 18-cv-12558-PBS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff-Relator OMNI Healthcare, Inc. ("OMNI" or "Relator"), through its attorneys, on behalf of the United States of America (the "Federal Government") and the States and Commonwealths of Alaska, California, Colorado, Connecticut, Delaware, the District of Columbia, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia, and Washington (hereafter, collectively, the "Plaintiff States") for its Second Amended Complaint against defendants MD Spine Solutions LLC, d/b/a MD Labs Inc. (hereafter "MD Labs"), Denis Grizelj ("Grizelj"), Matthew Rutledge ("Rutledge"), (together, MD Labs, Grizelj, and Rutledge are "MD Labs & Owners") and Doe Healthcare Providers 1 - 100 (collectively "Defendants"), alleges, based upon personal knowledge, relevant documents, and information and belief, as follows:

## I.   **INTRODUCTION**

1.      This is an action to recover damages and civil penalties on behalf of the United States and the Plaintiff States arising from false and/or fraudulent records, statements and claims

1

A.38

made and caused to be made by Defendants and/or their agents, employees, and co-conspirators in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.,* and the Plaintiff States' False Claims and insurance fraud prevention acts, as set forth below.

2.      MD Labs & Owners and their co-conspirator Defendants have engaged in a brazen scheme to take advantage of individual patients in need of clinical laboratory tests and bilk tens of millions of dollars from Medicare, Medicaid and other government-funded healthcare programs and commercial insurers across the country.

3.      To do this, MD Labs & Owners misled providers into ordering a high volume of medically unnecessary bacterial urine culture tests.

4.      At all times relevant to the scheme alleged herein, the scheme was orchestrated at the direction of Rutledge and Grizelj who, in addition to being 95% owners of MD Labs, operate MD Labs as the company's President and CEO respectively.

4.      Federal and State laws governing payment for healthcare services, as well as contractual requirements for both government-funded and commercial insurers, rely on the fundamental principle that they will only pay for healthcare services that are "medically necessary."  A service is "medically necessary" if it is "reasonable and necessary for the diagnosis or treatment of illness or injury."  42 U.S.C. § 1395y(a)(l)(A).

5.      Thus, for clinical laboratory tests to be covered, they must provide information about the patient's condition that can or will help the treating physician care for the patient. There must be clinical evidence - *e.g.,* the patient exhibiting symptoms of a disease, abnormal results on other tests- in the patient's medical record to support the decision to order any given lab test.

A.39

6.      Moreover, each test ordered, and for which the clinical laboratory seeks payment, must meet the test of medical necessity.  Labs may not bundle a group of tests together into a "panel" to pad their profits if only one, or a few, of the tests in the panel are medically necessary.  Medicare and other payers will not pay for two tests, or five tests or twenty tests, when only one was medically necessary.  And they will certainly not pay for twenty tests if none of them were medically necessary.

7.      MD Labs violated these fundamental principles, using and misusing standing orders, overly broad and rigid test requisition forms and other misleading paperwork to cause physicians to prescribe many tests at once, when only one or a few (and sometimes no) tests were medically necessary.

8.      MD Labs also misled providers about the accuracy of alternative tests, and Medicare rules governing the necessity of certain tests.

9.      Furthermore, many of the tests MD Labs included in its broad panels were substantially more expensive than standard treatment and provided no additional medically useful information beyond what was produced by the initial conventional testing methods.

10.     For example, a bacterial urine culture test is used to identify and quantify bacteria that might be causing a urinary tract infection.  The standard urine culture both shows whether bacteria are present and allows for any bacteria to be identified and the size of the colony quantified.  Medicare pays approximately $10 for this test.  If additional tests are required to identify the bacteria, Medicare pays an additional $10 for that billing code.

11.     MD Labs, on the other hand, bills Medicare and other payers for the initial bacterial culture, but then submits additional bills for sophisticated identification tests using polymerase chain reaction ("PCR") technology.  These tests do not provide any clinically

3

A.40

useful information to help treat a urinary tract infection above and beyond what is available from the conventional tests.  Yet for just one such DNA test, Medicare pays $43 - four times the cost of the standard culture and twice the cost of a standard culture plus additional conventional identification testing.

12.     But MD Labs' fraud does not stop there.  MD Labs does not bill for just one DNA identification test - its standard practice is to bill for 17 such DNA tests whenever a bacterial urine culture test is ordered for a urinary tract infection.

13.     By doing so, MD Labs gets Medicare to pay it approximately $700 for tests that produce no clinically useful information beyond what was available from the initial urine culture and conventional bacterial identification, for which Medicare reimburses approximately $10. More importantly the tests that MD Labs performs are not approved by Medicare and should be at best considered investigational.

14.     MD Labs bills for its full panel of 17 tests even if the initial culture was negative meaning there were no bacteria present to even test.  It also bills the full panel of tests when the referring physician provided no evidence that the bacterial identification was medically necessary.  MD Labs also bills for its full panel of 17 tests even when the results of the culture indicate that the sample was likely contaminated.

15.     To ensure a steady supply of patient referrals to support this over-testing scheme, MD Labs routinely pays referring physicians and other providers substantial kickbacks.  Although MD Labs does all or nearly all the work performing the lab tests, it offers to "split the profits" from the work with referring providers - in clear violation of Federal and State anti-kickback laws.

16.     MD Labs also pays providers to perform a service not covered by Medicare or other payers in connection with any pharmacogenetic test ordered for one of the provider's patients and gives referring providers free testing supplies.

17.     MD Labs uses improper billing codes to keep their fraud from being detected, and further boost their profits by violating rules governing who can bill for services and how much can be billed by a provider that did not perform the test.

18.     Each claim:

    a.  for a medically unnecessary laboratory test;

    b.  for a test resulting from a kickback-induced referral;

    c.  for a test billed by a provider legally prohibited form submitting that claim; or

    d.  that is fraudulently inflated by the use of improper billing codes or by violation of an anti-markup provision;

is a false and/or fraudulent claim within the meaning of the Federal False Claims Act and the Plaintiff State false claims and insurance fraud prevention acts.

19.     Defendants, including MD Labs & Owners, have submitted thousands of fraudulent claims to Medicare, Medicaid and other federal and state-funded health care programs and commercial insurers for these medically unnecessary, kickback-induced and otherwise improper claims for clinical laboratory services.  Each such claim for service is a false and fraudulent claim within the meaning of the Federal and Plaintiff State false claims Acts and insurance fraud prevention acts.

20.     The Federal False Claims Act (the "FCA") was originally enacted during the Civil War.  Congress substantially amended the FCA in 1986- and, again, in 2009 and 2010-

to enhance the ability of the United States Government to recover losses sustained as a result of fraud against it.

21.     The FCA was amended after Congress found that fraud in federal programs was pervasive and that the FCA, which Congress characterized as the primary tool for combating government fraud, needed modernization.  Congress intended that the amendments would create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

22.     The FCA prohibits, inter alia: (a) knowingly presenting (or causing to be presented) to the federal government a false or fraudulent claim for payment or approval; (b) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim; (c) knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government; and (d) conspiring to violate any of these three sections of the FCA.  31 U.S.C. §§3729(a)(1)(A)-(C), and (G).  Any person who violates the FCA is liable for a civil penalty of up to $22,363 for each violation, plus three times the amount of the damages sustained by the United States.  31 U.S.C. §3729(a)(1).

23.     The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery.  The FCA requires that the Complaint be filed under seal for a minimum of 60 days (without service

6

A.43

on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

24.     Based on the foregoing laws, Relator seeks, through this action, to recover damages and civil penalties arising from the false or fraudulent records, statements and/or claims that the Defendants, including MD Labs & Owners, made or caused to be made in connection with provision of medical services that were medically unnecessary or otherwise in violation of federal and state regulations.

25.     As set forth below, Defendant's actions alleged in this Complaint also constitute violations of the *qui tam* provisions of the: Alaska Medical Assistance False Claims and Reporting Act, AK Stat§ 09.58.010 *et seq.;* California False Claims Law, Cal. Gov. Code § 12650 *et seq.;* Colorado Medicaid False Claims Act, Col. Rev. Stat. 25.5-4-303.5 through 25.5- 4-310; Connecticut False Claims Act, Conn. Gen. Stat. § 4-274 *et seq.;* Delaware False Claims and Reporting Act, 6 Del. C. § 1201 *et seq.;* the District of Columbia False Claims Act, D.C. Code§ 2-381.01 *et seq.;* Florida False Claims Act, Fla. Stat.§§ 68-081-68.09; Georgia False Medicaid Claims Act, Ga. Code Ann.§ 49-4-168 *et seq.;* Hawaii False Claims Law, HRS§ 661- 21 *et seq.;* Illinois Whistleblower Reward & Protection Act, 740 Ill. Comp. Stat.§ 175/1 *et seq.;* Indiana False Claims & Whistleblower Protection Law, Ind. Code§ 5-11-5.5-1 *et seq.;* Iowa False Claims Act, LC.A.§ 685.1 *et seq.;* Louisiana Qui Tam Action Act, La. R.S. § 46:437.1 *et seq.;* Maryland False Health Claims Act, Md. Health-Gen. Code Ann.§§ 2-601 through 2-611; Massachusetts False Claims Act, ALM Ch. 12 § 5 *et seq.;* Michigan Medicaid False Claims Act, Mich. Code 400.601 *et seq.;* Minnesota False Claims Act, Minn. Stat.§ 15C.0l *et seq.;* Montana False Claims Act, Mon. Code Anno. § 17-8-401 *et seq.;* Nevada False Claims Act, Nev. Rev. Stat. Ann.§ 357.010 *et seq.;* New

A.44

Jersey False Claims Act, NJ. Stat.§ 2A:32C-l *et seq.;* New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §27-14-1 *et seq.;* New York False Claims Act, NY State Fin.§ 187 *et seq.;* North Carolina False Claims act, N.C. Gen. Stat.§ 1-605 *et seq.;* Oklahoma Medicaid False Claims Act, 63 Okla St.§ 5053 *et seq* (2011); Rhode Island False Claims Act, R.I. Gen. Laws§ 9-1.1-1 *et seq.;* Tennessee Medicaid False Claims Act, §§ 71-5-181 through 71-5-185; Texas False Claims Act, Texas Human Resources Code, § 36.001 *et seq.;* Vermont False Claims Act, 32 V.S.A. § 630 *et seq.;* Virginia Fraud Against Taxpayers Act, Va. Code Ann.§ 8.01-216.1 *et seq.;* Washington False Claims Act, RCW § 74.66.005 *et seq.;* the California Insurance Frauds Prevention Act, Cal. Ins. Code §1871 *et seq.;* and the Illinois Insurance Claims Fraud Prevention Act, 740 Ill. Comp. Stat. §92.

26.     The Plaintiff State False Claims and insurance fraud prevention acts prohibit similar conduct as that prohibited by the Federal FCA, allow plaintiffs to bring an action on the State's behalf or on behalf of private insurers, and provide analogous remedies to those provided in the Federal FCA.

27.     Based on the foregoing laws, Relator seeks, through this action, to recover damages and civil penalties arising from the false or fraudulent records, statements and/or claims that the Defendants, including MD Labs & Owners made or caused to be made to federal and state-funded insurance programs and commercial insurers in connection with provision of clinical laboratory services that were medically unnecessary, kickback-tainted and/or otherwise provided in violation of federal and state regulations and commercial insurance rules, regulations and contracts.

A.45

## II.   <u>PARTIES</u>

28.    OMNI is a multi-specialty medical professional group with seven locations, all located in Brevard County, Florida.  Formed in 1994, it practices through physicians in the central Florida region and specializes in multiple fields, including endocrinology/diabetes, family medicine, gastroenterology, general surgery, hematology/oncology, internal medicine, orthopedic surgery, pediatrics, radiation oncology, radiology, rheumatology, and urgent care. More than twenty medical professionals deliver medical services at OMNI's locations.

29.    Defendant MD Labs is a California corporation headquartered in Reno, Nevada.  It operates a clinical medical laboratory that does business under its legal name, MD Spine Solutions, as well as the d/b/a name MD Labs.

30.    Upon information and belief, Defendant Rutledge is resident of the State of Nevada and the cofounder and president of MD Labs.

31.    Upon information and belief, Defendant Grizelj is a resident of the State of California and the cofounder and CEO of MD Labs.

32.    Together, Rutledge and Grizelj own 95% of MD Labs.

33.    MD Labs provides clinical laboratory services to patients across the United States, especially specializing in bacterial urine culture testing to detect urinary tract infections, pharmacogenetic testing that identifies key genetic markers that can indicate how the patient could metabolize certain drugs, and urine toxicology testing.

34.    MD Labs was founded in 2011 as a toxicology testing facility for physicians nationwide.  It expanded to pharmacogenetic testing in 2014 with the development of its proprietary genetic test Rxight, which maps genes that affect more than 200 medications.

A.46

35.     MD Labs currently employs more than 100 sales representatives, and has more than 200 employees.

36.     One of MD Labs' senior leaders, Lab Director Alexander Stojanoff, is no stranger to healthcare fraud.  Mr. Stojanoff was Chief Executive Officer of Consolidated Laboratory Services, d/b/a, CLS, Inc. ("CLS").  On October 16, 2008, he, on behalf of CLS, pleaded guilty to two counts of felony healthcare fraud in connection with a scheme to bill for services that were not performed.  The scheme cost Medicare more than $7 million.

37.     Defendants Doe Healthcare Providers 1 to 100 are physicians, physician groups, hospitals, clinical laboratories, pharmacies and other healthcare providers who submitted or, by participating in MD Labs' fraudulent scheme, caused the submission of claims for clinical laboratory services performed by MD Labs that were medically unnecessary, kickback-tainted and/or otherwise provided in violation of federal and state regulations and commercial insurance rules, regulations and contracts.

## III.    PROCEDURAL HISTORY

38.     OMNI originally filed this action on December 12, 2018 (ECF #1).

39.     OMNI's original complaint asserted that MD Labs misled providers into ordering a high volume of medically unnecessary bacterial urine culture tests, pharmacogenetic tests, and urine drug tests ("UDTs").  *Id.* at ¶3.

40.     On or about October 20, 2021, MD Labs & Owners entered a settlement (the "Settlement Agreement") agreement with the Federal Government and OMNI.

41.     According to the Settlement Agreement, MD Labs, Grizelj, and Rutledge admitted that between 2015 and 2019, MD Labs regularly billed federal health care programs for medically unnecessary UDT.

42.     MD Labs performed and then billed federal health care programs for two types of UDT: presumptive testing, a relatively inexpensive test that quickly provides qualitative results, and confirmatory testing, an expensive test that is designed to confirm quantitatively the results of presumptive UDT.

43.     MD Labs performed both types of tests at approximately the same time and then simultaneously submitted the results to health care providers.

44.     MD Labs & Owners knew that doctors would not review presumptive UDT results when they already had the more precise confirmatory UDT results.

45.     MD Labs & Owners also knew that absent a presumptive UDT result there was often nothing to confirm, and so there was no basis to bill for a confirmatory UDT result.

46.     The Settlement Agreement makes clear that the presumptive UDT results were frequently useless and its confirmatory UDT results baseless. Yet, MD Labs billed federal health care programs for these medically unnecessary lab tests.

47.     Under the terms of the Settlement Agreement, MD Labs & Owners will pay the government and various states no less than $11.6 million and up to $16 million, depending on MD Labs' financial circumstances over time.

48.     Following the Settlement Agreement, Relator retained all claims against MD Labs & Owners for submission or causing the submission of false claims for urinary tract infection ("UTI") testing.

49.     MD Labs accepted service of OMNI's complaint on January 18, 2022.

50.     On February 4, 2022, OMNI, MD Labs and the Federal Government filed a Corrected Joint Stipulation of Dismissal dismissing the Relator's claims against MD Labs with the exception of the claims relating to UTI testing.

51.     On March 21, 2022, MD Labs filed a motion to dismiss OMNI's complaint.

52.     OMNI timely filed an amended complaint on April 4, 2022 pursuant to Federal Rule of Civil Procedure 15(a)(1)(B).

53.     MD Labs & Owners filed a motion to dismiss the amended complaint on May 18, 2022.

54.     On August 23, 2022, the Court denied MD Labs & Owners motion in its entirety.

55.     The parties filed a Joint Statement for the Initial Scheduling Conference on December 14, 2022.  In the Joint Statement, OMNI stated that it did not anticipate any future amendments to pleadings but reserves its rights under Federal Rule of Civil Procedure 15.

56.     The parties proceeded to discovery and have begun producing documents responsive to requests for production propounded by other parties.

## IV.     <u>JURISDICTION AND VENUE</u>

57.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.  In addition, 31 U.S.C. § 3732(b) vests this Court with jurisdiction over the claims under the Plaintiff State False Claims Acts asserted in this Complaint.

A.49

Jurisdiction over the claims brought pursuant to the Plaintiff State insurance fraud prevention acts is based on this Court's supplemental jurisdiction.

58.     Under 31 U.S.C. § 3730(e), and the analogous provisions of the Plaintiff State False Claims Acts, there had been no statutorily relevant public disclosure of the "allegations or transactions" in this action prior to Omni's filing of its complaint on December 12, 2018.  Even if there had been any such public disclosure, Relator is an original source of the allegations herein because it has direct, independent and material knowledge of the information that forms the basis of this complaint - especially, *inter alia,* through direct communications by Relator's employees and agents with Defendants' employees and agents, and relevant documents in the possession of Relator.  Moreover, Relator voluntarily disclosed that information to the Government before filing.

59.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because Defendants have minimum contacts with the United States.  Moreover, Defendants can be found in and have transacted business in the District of Massachusetts.

60.     Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) because Defendants can be found in and/or transact or have transacted business in this district.  At all times relevant to this Complaint, Defendants regularly conducted substantial business within this district.

V.     **APPLICABLE LAW**

A.  **Federal and State-Funded Health Care Programs**

61.     Various federal and state-funded health care programs and commercial insurers pay for clinical diagnostic testing, including bacterial urine culture tests,

13

A.50

pharmacogenetic testing and UDTs.  Examples of such payer programs include the following:

### 1.  The Medicare Program

62.     Medicare is a federally-funded health insurance program which provides for certain medical expenses for persons who are over 65, who are disabled, or who suffer from End Stage Renal Disease.  The Medicare program is administered through the Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS").

63.     The Medicare program has four parts: Part A, Part B, Part C and Part D. Medicare Part A ("Part A"), the Basic Plan of Hospital Insurance, covers the cost of inpatient hospital services and post-hospital nursing facility care.  Medicare Part B, the Voluntary Supplemental Insurance Plan, covers the cost of services performed by physicians and certain other health care providers, such as services provided to Medicare patients by physicians, laboratories, and diagnostic testing facilities.  *See* 42 U.S.C. §§ 1395k, 13951, 1395x(s). Medicare Part C covers certain managed care plans, and Medicare Part D provides subsidized prescription drug coverage for Medicare beneficiaries.

64.     The Defendants billed Medicare under Part B, which covers certain medical services, such as clinical laboratory test services, furnished by physicians and other providers and suppliers. 42 U.S.C. § 1395k(a)(2)(B).

65.     CMS administers the Medicare program.  At all times relevant to this complaint, CMS contracted with private contractors, referred to as "fiscal intermediaries," "carriers," and Medicare Administrative Contractors ("MACs"), to act as agents in reviewing and paying claims submitted by health care providers. 42 U.S.C. §§ 1395h, 1395u; 42 C.F.R. §§ 421.3, 421.100, 421.104.

14

A.51

66.     To participate in the Medicare program as a new enrollee, clinical laboratories, such as MD Labs, must submit a Medicare Enrollment Application, CMS Form-855B.

67.     Laboratories also must complete Form CMS-855B to change information or to reactivate, revalidate and/or terminate Medicare enrollment.

68.     Medicare regulations require providers and suppliers to certify that they meet, and will continue to meet, the requirements of the Medicare statute and regulations.  42 C.F.R. § 424.516(a)(l).

69.     An authorized official must sign the "Certification Section" in Section 15 of Form CMS-855B, which "legally and financially binds [the] supplier to all of the laws, regulations, and program instructions of the Medicare program," which include, but are not limited to, the Stark Law and the Anti-Kickback Statute.

70.     The National Provider Identifier ("NPI") is a standard and unique health identifier for health care providers.  All providers and practitioners must have an assigned NPI number prior to enrolling in Medicare.

71.     To obtain Medicare and Medicaid reimbursement for certain outpatient items or services, providers and suppliers submit a claim form known as the CMS 1500 form ("CMS 1500") or its electronic equivalent known as the 837P form.  Among the information the provider or supplier includes on a CMS 1500 or 837P form are certain five-digit codes, including Current Procedural Terminology Codes ("CPT codes") and Healthcare Common Procedure Coding System ("HCPCS") Level II codes, that identify the services rendered and for which reimbursement is sought, and the unique billing identification number of the "rendering provider" and the "referring provider or other source."

72.     The Medicare statute requires that each request for payment or bill submitted for an item or service payable under Medicare Part B include the name and unique physician identification number for the referring physician.  42 U.S.C. § 1395l(q)(1).

73.     Since 2012, Noridian Healthcare Solutions, LLC ("Noridian"), has been responsible for processing Medicare Part B claims in the State of Nevada.  As MD Labs performed all of its tests at facilities in Nevada, it submitted all claims to Noridian contractors.

### 2.  The Medicaid Program

74.     Medicaid is a public assistance program providing for payment of medical expenses for low-income and disabled patients.  Funding for Medicaid is shared between the Federal Government and those states participating in the program.

75.     Federal regulations require each state to designate a single state agency responsible for the Medicaid program.  The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX and with the regulations of the Secretary of HHS ("the Secretary").  Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines.  Federal statutes and regulations restrict the items and services for which the federal government will pay through its funding of state Medicaid programs.

76.     Each provider that participates in the Medicaid program must sign a provider agreement  with his or her state.

### 3.   Other Federal-Funded Health Care Programs

77.     The Federal Government administers other health care programs including, but not limited to, TRICARE/CHAMPUS, CHAMPYA, the Federal Employee Health Benefit Program, and federal workers' compensation programs.

78.     TRICARE/CHAMPUS, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the armed forces. 10 U.S.C. §§ 1971-1104; 32 C.F.R. § 199.4(a).

79.     CHAMPYA, administered by the United States Department of Veterans Affairs, is a health care program for the families of veterans with 100 percent service-connected disability.  38 U.S.C. §§ 1781-1786; 38 C.F.R. § 17.270(a).

80.     The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for federal employees, retirees, and survivors.  5 C.F.R. § 890.101 *et seq.*

81.     The Plaintiff States provide health care benefits to certain individuals, based either on the person's financial need, employment status or other factors.  To the extent those programs are covered by that State's False Claims Act, those programs are referred to in this Complaint as "state-funded health care programs."

## B.  Medical Necessity

82.     Medicare only pays for services that are "medically necessary" - i.e., Medicare requires as a condition of coverage that services be "reasonable and necessary for the diagnosis or treatment of illness or injury."  42 U.S.C. § 1395y(a)(l)(A).

A.54

83.     Providers who wish to participate in the Medicare program must ensure that their services are provided "economically and only when, and to the extent, medically necessary." 42 U.S.C. §1320c-5(a).

84.     Providers may be excluded from participation in the Medicare program and other federally-funded health care programs, if they routinely bill Medicare for medically unnecessary items or services. See 42 CFR § 1003.102.

85.     The medical necessity requirement applies not only to the fact of treatment, but also to the level of treatment provided to the patient. Medicare will not pay for more expensive services if only less expensive services were medically necessary.

### C. General Rules Governing Payment for Laboratory Services

86.     Medicare, Medicaid and other government-funded healthcare programs will only pay for laboratory tests that were ordered by the physician treating the patient for the treatment of a specific illness or injury. Laboratory test orders that are not individualized to patient need (or for which the need is not documented in the patient chart) are not covered services, and claims for such services will be denied.

87.     Under the Medicare program, laboratory services must meet all applicable requirements of the Clinical Laboratory Improvement Amendments of 1988 ("CLIA"), as set forth at 42 C.F.R. Part 493.

88.     Medicare Part B pays for covered diagnostic laboratory tests that are furnished by a laboratory. 42 C.F.R. § 410.32(d)(v). "Clinical laboratory services involve the...examination of materials derived from the human body for the diagnosis, prevention, or treatment of a disease or assessment of a medical condition." Medicare Benefit Policy Manual ("MBPM"), (Pub. 100-02), Ch. 15, § 80.1.

A.55

89.     Pursuant to 42 C.F.R. § 410.32(a), all diagnostic tests "must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem."

90.     Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary. 42 C.F.R. § 410.32{a).   The MBPM's "Requirements for Ordering and Following Orders for Diagnostic Tests" define an "order" as "a communication from the treating physician/practitioner requesting that a diagnostic test be performed for a beneficiary…[T]he physician must clearly document, in the medical record his or her intent that the test be performed."  MBPM, Ch. 15, Section 80.6.1.

91.     Clinical laboratory services must be ordered and used promptly by the physician who is treating the beneficiary as described in 42 C.F.R. § 410.32(a).  MBPM, Ch. 15, § 80.1.

92.     To assess whether those services are reasonable and necessary and whether reimbursement is appropriate, Medicare requires proper and complete documentation of the services rendered to beneficiaries. In particular, the Medicare statute provides that:

> No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period.

42. U.S.C. § 1395l(e).

93.     Medicare regulations expressly state that a laboratory's claim for a service will be denied if there is not sufficient documentation in the patient's medical record to establish that the service was reasonable and necessary.  42 C.F.R. § 410.32(d)(3).

A.56

94.     The Department of Health and Human Services, Office of Inspector General ("HHS-OIG") has published Compliance Program Guidance for Clinical Laboratories.  63 Fed Reg. 45076 (Aug. 24, 1998).  Among other things, the HHS-OIG guidance emphasizes that laboratory order forms should emphasize the need for a justification and assessment of each test ordered.

95.     Of particular concern, the guidance warns about situations where the standardized order or requisition form encourages or even misleads the physician into ordering more than one test as part of a "panel" when the full "panel" is not medically necessary and/or without giving the physician the option or enough information to understand how to order only those tests that are necessary.

96.     Specifically, the Guidance cautions:

a.  Requisition design: While [CMS] does not design or approve requisition forms, laboratories should construct the requisition form to capture the correct program information as required by Federal or private health care programs and to promote the conscious ordering of tests by physicians or other authorized individuals.  The laboratory should construct the requisition form to ensure that the physician or other authorized individual has made an independent medical necessity decision with regard to each test the laboratory will bill…"

…

4. Reliance on Standing Orders: Although standing orders are not prohibited in connection with an extended course of treatment, too often they have led to abusive practices.  Standing orders in and of themselves are not usually acceptable documentation that tests are reasonable and necessary…Medicare contractors can and may require additional documentation to support the medical necessity of the test.  As a result of the potential problems standing orders may cause, the use of standing orders is discouraged.

 *Id.* at 45079, 45081 (emphasis added).

97.     That Guidance similarly warns about the risk that non-medically necessary tests might be caused by overly broad "reflex testing" policies:

A.57

e. Reflex testing:  Reflex testing occurs when initial test results are positive or outside normal parameters and indicate that a second related test is medically appropriate.  In order to avoid performing unnecessary reflex tests, labs may want to design their requisition form in such a way which would only allow for the reflex test when necessary.  Therefore, the condition under which the reflex test will be performed should be clearly indicated on the requisition form. Laboratories may wish to adopt a similar policy for confirmation testing which may be mandatory.

*Id.*

### D.  **Common Fraudulent Schemes Involving Clinical Laboratory Service**

98.     In May of 2018, the Healthcare Fraud Prevention Partnership ("HFPP") published a report highlighting the problem of fraud in the clinical laboratory industry.  *See* EXAMINING CLINICAL LABORATORY SERVICES: A Review by the Healthcare Fraud Prevention Partnership ("HFPP Report") at: https://hfpp.ems.gov/hfpp-white-papers/hfpp-clinical-lab-services-white-paper.pdf (visited Oct. 19, 2018).

99.     The HFPP is a voluntary, public-private partnership between the Federal Government, state and local government agencies, law enforcement, private health insurance plans, employer organizations, and healthcare anti-fraud associations that seeks to identify and reduce fraud, waste, and abuse across the healthcare sector.

100.    As to the scope of the problem, the HFPP Report noted that the clinical laboratory services industry in North America generated an estimated $87.3 billion in revenue in 2017, and while "the total volume of laboratory fraud and abuse is unknown, investigations have demonstrated that the losses can be in excess of tens or even hundreds of millions of dollars."

101.    MD Labs' fraudulent scheme incorporated many of the major potential fraud and abuse schemes identified in the report, including:

a.   Use of excessively large testing panels and standing orders;

A.58

b. Excessive and improper urine drug and genetic testing;

c. Pass-through billing; and

d. Improper use of Modifier 91.

102. Although not separately identified in the report, another common illegal scheme that often underlies and coexists with the enumerated frauds is the use of illegal inducements to get providers to refer their Medicare, Medicaid and other business to the clinical lab (in violation of the Stark Law and the Anti-Kickback Statute). MD Labs' scheme depends heavily on this fraudulent means of capturing patient referrals.

103. Defendants also violate the rules that require Medicare not be charged substantially more than other payers.

**1. Improper Use of Large Testing Panels and Standing Orders**

104. As set forth above, a core principle of healthcare reimbursement is that government and commercial payers will generally only pay for medically necessary services. This requirement applies not only to the overall treatment of a patient, but to the individual services provided as well. Healthcare providers cannot evade this rule by unreasonably "bundling" medically unnecessary services with those services that are medically necessary

105. A common way that service providers such as clinical labs often try to fraudulently evade this requirement is by using standardized paperwork to mislead treating physicians into believing that they are ordering just one service when the lab actually intends to bill multiple services based on the physician's order, or that a collection of different services are medically necessary and clinically inseparable, when actually the services are easily, and in some cases, necessarily separable.

A.59

106.     As discussed above, HHS OIG raised concerns about the use of improperly

designed order forms and misuse of standing orders in its 1998 Compliance Guidance.  The

HFPP Report confirms that HHS OIG's 20-year old concerns remain valid as to the risk of

these fraudulent activities.  Specifically, the HFPP Report noted:

> A commonly reported problem is the use of more expensive, excessively
> broad panels in place of smaller panels.  For example, a 5-panel urine drug
> screening test for cannabinoids, cocaine, amphetamines, opioids, and
> phencyclidine is typically sufficient to detect the use of commonly abused
> substances, such as marijuana, cocaine/crack, heroin, and methamphetamine.
> In contrast, larger and more expensive definitive panels *(i.e.,* 12- or 14-panel)
> can be used to detect particular subsets of the substances identified in the
> smaller panels, as well as the presence of some other less-commonly abused
> substances.  While this may be clinically warranted in some cases, the use of
> overly broad panels can also be used for the purpose of maximizing
> reimbursement in the absence of medical necessity.  A related problem that
> can be difficult to control is the use of definitive drug testing for a wide range
> of substances for which the patient has no history of abuse.

HFPP Report at 11.

107.     Furthermore, the HFPP Report warned, as to standing orders:

> Standing orders refers to either a policy of prescribing a certain test or other
> medical service for all individuals that meet a specific set of inclusion criteria
> or a policy of setting up a recurring order for the course of an individual
> patient's treatment.  In the past, standing orders have been used to order
> testing for any patient that has a given condition or is a member of a specific
> population group. Current Medicare rules, which serve as the basis for rules of
> many private payers, allow for standing orders only in certain defined
> circumstances.  <u>Broad, population-based orders are not reimbursable.</u>  Despite
> existing controls and requirements, the development of practices to avoid the
> labeling of population- based testing as standing orders have been implicated
> as a driver of laboratory fraud.

*Id.* (emphasis added).

### 2.  Pass-through billing

108.     Generally, physicians may not engage in "pass through billing," where an

independent/unrelated lab performs clinical tests, and then the physician bills those tests to

Medicare as if the physician had performed them.  However, labs (which may be owned by physicians) can, under some circumstances, refer tests to a separate lab, pay the second lab for performing the services, and then bill Medicare directly for the entire service.

109.    Such arrangements, where a physician is essentially buying lab services from an unrelated clinical laboratory and then billing government or commercial payers for those services presents a substantial risk of fraud.  *See* HFPP Report at 7.

110.    A primary fraud concern for federal payers is that the "pass through" arrangement will allow the clinical lab that performs the service to funnel illegal kickbacks in violation of the Stark Law and Anti-Kickback Statute (as discussed below) to referring physicians.

111.    Another concern for both government-funded payers and commercial insurers is that the arrangement will result in unnecessary markups of the service.

112.    This risk is particularly high where the billing laboratory, because of its contractual relationship with the provider or another special status is entitled to substantially higher reimbursement than the lab that performed the services.  In such cases, the pass-through relationship is typically an improper mechanism to take care of the higher reimbursement.

113.    For this reason, many commercial payers simply prohibit pass through billing in their provider contracts.

114.    Medicare's rules address pass-through billing through a broader, if somewhat less-direct method.

115.    First, physicians are prohibited from billing for clinical laboratory services they did not provide.  *See* 42 U.S.C. § 1395l(h)(5).  Moreover, if, somehow, a physician were

24

A.61

allowed to bill for services provided by others, he or she would be barred from billing more than the amount charged by the lab that performed the service.  *See* 42 C.F.R. § 405.515.

116.    Clinical laboratories may bill for work they refer to other laboratories, but only if such outsourced work represents 30% or less of the tests referred to the billing laboratory in the year.  *Id.*

117.    Thus, a physician group could theoretically evade this restriction by billing the outsourced tests through a laboratory owned by the physicians.  However, this avenue would be barred by the Stark Law, except possibly in some limited situations where none of the profits from the clinical laboratory were passed along to the physicians who ordered the tests.  Even if the arrangement complied with the Stark Law, there is still a substantial risk that the Anti- Kickback Statute would bar it.

118.    Moreover, various state laws bar such arrangements outright *(e.g.•* Arizona, California, Colorado, Connecticut, Massachusetts, Nevada, New Jersey, New York, Rhode Island, Louisiana, Ohio, Tennessee, Indiana, Iowa, Maryland, Montana, Washington), and/or bar the billing laboratory from marking up the services *(e.g.,* California, Florida, Michigan, Virginia, Washington).

119.    For example, California Business and Professional Code § 655 prohibits providers from billing for clinical laboratory services performed by another provider unless: (1) the patient is informed; and (2) the billing provider does not markup the charge.

120.    Illinois law similarly requires physicians to disclose to patients that an anatomic pathology service was performed by someone other than the physician and the amount charged by the service provider, and prohibits the physician from marking up the

25

A.62

charges when billing the patient, an insurer or another third-party payor (except for certain limited exceptions).  *See* 410 ILCS 50/3.3.

### 3.  Fraudulent Use of Modifier 91

121.    Modifiers are a type of "suffix" appended to CPT procedure codes to provide additional information about the circumstances under which the service was provided.  They are often used to "explain" why a claim should be paid even though it might appear that the code is duplicative of another code, or otherwise would be denied.

122.    Modifier 91 should be used when the same test is performed multiple times on the same patient at different points in time.  The subsequent tests are intended to monitor the same clinical indicator over time, such as testing a patient with pneumonia's arterial blood gases in the morning and again in the afternoon on the same day.

123.    Modifier 91 is not intended to be used if the same test is performed in a different location, or for a similar but different test *(e.g.,* looking for a different type of infection) performed on the same patient.

124.    The HFPP Report explains the risk of fraudulent use of Modifier 91 as follows:

> The complexity of scanning patient claims history, matching claims, and developing different algorithmic rules for every test eligible for a 91-modifier complicates the ability of payment systems to identify potential fraud and abuse of this modifier in an automated fashion.
>
> ….
>
> Claims payment systems may be programmed to override any payment claim edit in the system when a 91-modifier is detected.  This enables the 91-modifier to be used to trick the automated payment system into paying a claim it would not otherwise pay.

HFPP Report at 7.

A.63

125. In the present case, where MD Labs performs multiple (medically unnecessary) follow up identification tests as part of its standard urine tests.  By using Modifier 91, MD Labs could potentially evade claims processing edits designed to limit the number of such follow up tests, or evade follow up analysis aimed at identifying situations where such follow up tests are being ordered too often.

126. Modifier 59, rather than Modifier 91, should be used, as in the present case, where the same test is repeated multiple times looking for different species or strains of bacteria, or for tests performed on different specimens or sites of the body.

127. Moreover, Modifier 59 may only be used to bill multiple instances of a given CPT code if multiple tests are performed.  If only one test is performed, and that one test identifies multiple bacteria, then the given CPT code may only be billed once, and modifier 59 may not be used to get additional instances of that CPT code paid.

#### 4. The Stark Law and the Anti-Kickback Statute

128. Two separate but related federal laws are designed to ensure that physicians and other healthcare providers make decisions based on their unbiased medical judgement and their patients' best interest, rather the provider's own financial interests.

#### i.    The Stark Law

129. Congress enacted the Stark Law, 42 U.S.C. § 1395nn, to address concerns that improper financial relationships between physicians and entities to which they refer patients can compromise the physician's professional judgment as to whether an item or service is medically necessary, safe, effective, and of good quality.

130. Congress relied on various academic studies consistently showing that physicians who had financial relationships with medical service providers used more of

27

A.64

those providers' services than similarly situated physicians who did not have such relationships.  *See, e.g.,* 60 FR 41914, 41923 (Aug. 14, 1995) ("There have been at least 10 studies conducted over the past few years that concluded that patients of physicians who have financial relationships with health care suppliers receive a greater number of health care services from those suppliers than do patients generally''").  The statute was designed specifically to reduce the loss suffered by the Medicare program due to such increased questionable (but often hard_ to individually identify) utilization of services.

131.    The Stark Law prohibits an entity from submitting claims to Medicare for twelve categories of "designated  health services" ("DHS"), including clinical laboratory services, if such services were referred to the entity by a physician with whom the entity had a financial relationship that did not fall within a statutory or regulatory exception.  42 U.S.C. §§ 1395nn; *see also* 42 C.F.R. §§ 411.351 *et seq.*

132.    The regulations interpreting the Stark Law require that "[a]n entity that collects payment for a designated health service that was performed pursuant to a prohibited referral must refund all collected amounts on a timely basis…." 42 C.F.R. § 411.353(d).

133.    A "financial relationship" includes a "compensation arrangement," which means any arrangement involving any "remuneration" paid to a referring physician "directly or indirectly, overtly or covertly, in cash or in kind" by the entity furnishing the DHS. *See* 42 U.S.C. §§ 1395nn(h)(l)(A) and (h)(l)(B).

134.    Under the Stark Law, an "entity is considered to be furnishing DHS if it [is the] entity that has presented a claim to Medicare for the [DHS]…." 42 C.F.R. §411.351.

135.    A "referral" includes "the request by a physician for, or ordering of, or the certifying or recertifying of the need for, any [OHS] for which payment may be made under Medicare Part B…." 42 C.F.R. § 411.351.

136.    The Stark Law and its interpretive regulations contain exceptions for certain compensation arrangements.  The statute and regulations also exempt certain items from the definition of "remuneration," including items "used solely to (I) collect, transport, process, or store specimens for the entity providing the item, device, or supply, or (II) order or communicate the result of tests or procedures for such entity." 42 U.S.C. § 1395nn(h)(l)(C)(ii); 42 C.F.R. § 411.351.

### ii.    The Anti-Kickback Statute

137.    Similarly, the Medicare and Medicaid Fraud and Abuse Statute ("Anti-Kickback Statute"), 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that payoffs to those who can influence health care decisions will result in goods and services being provided that are medically inappropriate, unnecessary, of poor quality, or even harmful to a vulnerable patient population.

138.    In a 1994 Special Fraud Alert, the Department of Health and Human Services' Office of the Inspector General ("HHS 010") addressed the issue in a question-and-answer format as follows:

> Why Is It Illegal for Hospitals to Provide Financial Incentives to Physicians for Their Referrals?
>
> ….
>
> These incentive programs can interfere with the physician's judgment of what is the most appropriate care for a patient.  They can inflate costs to the Medicare program by causing physicians to overuse inappropriately the services of a particular hospital.  The incentives may result in the delivery of inappropriate care to Medicare beneficiaries and Medicaid recipients by

A.66

inducing the physician to refer patients to the hospital providing financial incentives rather than to another hospital ( or non-acute care facility) offering the best or most appropriate care for that patient.

Federal Register Volume 59, Issue 242 (December 19, 1994).

139.    To protect the integrity of federal health care programs from these difficult to detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.

140.    The Anti-Kickback Statute prohibits any person or entity from making or accepting payment, in cash or in kind, to induce or reward any person for referring, recommending or arranging for federally-funded medical services, including services provided under the Medicare and Medicaid programs. In pertinent part, the statute provides:

(b) Illegal remunerations ...

(2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person--

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b.

### iii.    *Common Application of Stark Law and Anti-Kickback Statute*

30

A.67

141.    The two laws have somewhat different scope (the Stark Law covers only referrals of certain "Designated Health Services" where the Anti-Kickback Statute covers all healthcare services for a wider range of programs), and standards of proof (the Stark law imposes strict liability where the Anti-Kickback Statute requires proof of intent), but taken together they establish a clear policy that decisions about how, when and if to treat patients should be based on sound medical decision making rather than the referring or treating physician's financial interest.

142.    Moreover, both statutes have exceptions (called safe harbors) that exempt certain conduct from liability.  Although the safe harbors often cover similar conduct, they are not necessarily fully overlapping.  "Compliance with a Stark law exception does not immunize an arrangement under the anti-kickback statute.  Rather, the Stark law sets a minimum standard for arrangements between physicians and hospitals.  Even if a hospital-physician relationship qualifies for a Stark law exception, it should still be reviewed for compliance with the anti- kickback statute."  "OIG Supplemental Compliance Program Guidance for Hospitals," 70 Fed. Reg. 4858, 4863 (Jan. 31, 2005) (hereafter ''the 2005 Supplemental Guidance for Hospitals").

143.    Claims for payment submitted in violation of these statutes are false claims within the meaning of both the federal and Plaintiff State false claims acts.  This is true for a variety of reasons.  First, Federal law specifically provide that a violation of the Anti-Kickback Statute and/or Stark Law are violations of the respective False Claims Acts.  *See* 42 U.S.C. § 1320a-7b(g) (providing that a violation of the Anti-Kickback Statute is a violation of the Federal False Claims Act).

31

A.68

144.    Second, the Stark Law "prohibits hospitals from submitting-and Medicare from paying-any claim for a DHS if the referral of the DHS comes from a physician with whom the hospital has a prohibited financial relationship." Supplemental Compliance Program Guidance for Hospitals (70 Fed. Reg. 4858, 4862; January 31, 2005).

145.    Third, Medicare and other provider agreements establish that compliance with these laws is a condition of payment - meaning that the government will not pay for claims submitted for services provided based on a kickback-tainted referral.

### iv.    *Advisory Opinions Applying These Rules*

146.    Applying these rules, HHS has long expressed concerns that arrangements where a service provider, like a clinical laboratory, offers a physician or other referral source an opportunity to enter into a 'joint venture" that is essentially just an opportunity for clinical laboratory to trade a share of its profits for a steady stream of referrals. *See* HHS 010 Advisory Opinion 04-17 (Dec. 10, 2004) (discussing and applying HHS OIG's 1989 Special Fraud Alert on Joint Venture Arrangements and its 2003 Special Advisory Bulletin titled "Contractual Joint Ventures").

147.    HHS 010  has also expressed concern about arrangements where a clinical lab essentially gives a referral source the opportunity to earn a fee that otherwise would be earned by the lab. *See, e.g.,* HHS 010  Advisory Opinion 05-08, at *4 (Jun. 6, 2005) ("[T]he Proposed Arrangement essentially would give the physicians the opportunity to earn a fee otherwise earned by the Lab.  Because the physicians would receive a portion of the Lab's reimbursement for blood tests resulting from the physicians' referrals, the physicians have a strong incentive to order more blood tests.  As a result, there is a risk of overutilization and inappropriate higher costs to the Federal health care programs.  We discern no safeguards in

A.69

the Proposed Arrangement to rebut the inference or reduce the risk that the blood draw remuneration would be intended to induce referrals.").

148.   Similarly, HHS OIG has warned against schemes where a clinical lab gives a physician or other referral source a discount on tests that the physician itself bills to commercial providers or other health care programs (and thus where the physician stands to make a profit), in exchange for that physician referring all or a substantial portion of its government-funded business (that the physician cannot legally be the one to bill for) to the lab - a practice known as "swapping." *See* HHS OIG Advisory Opinion 99-13 (Nov. 30, 1999).

### v. *The Discount Safe Harbor*

149.   When analyzing the potential impact of the Anti-Kickback Statute to common situations such as those in the above Advisory Opinion and the present case, a common Anti-Kickback Statute Safe Harbor at issue is the one for "discounts." *See* 42 CPR §100l.952(h). This Safe Harbor provides that a discount (as defined in the regulation) does not count as "remuneration" and thus does not violate the Anti-Kickback Statute as long as both the giver and recipient of the discount (and the entity that bills Medicare, Medicaid or other Federal health care programs, if that is a third person) meet certain requirements.

150.   The discount safe harbor imposes different, but related, obligations on the buyer and seller of the services.  Key among these obligations are that: (I) "[t]he discount must be made at the time of the sale of the good or service or the terms of the rebate must be fixed and disclosed in writing to the buyer at the time of the initial sale of the good or service"; (2) if the buyer submits the claim for the service, "the seller must fully and accurately report such discount on the invoice, coupon or statement submitted to the buyer";

and (3) whoever submits a claim for the service must inform the government payer of the discount, to the extent required by law or relevant regulations. *Id.* at§§ 1001.952(h)(l)(iii), (h)(2)(iii).

151.   A "discount" is defined as "a reduction in the amount a buyer (who buys either directly or through a wholesaler or a group purchasing organization) is charged for an item or service based on an arms-length transaction." *Id.* at§ 1001.952(h)(5).

152.   A "rebate" is defined as "any discount the terms of which are fixed and disclosed in writing to the buyer at the time of the initial purchase to which the discount applies, but which is not given at the time of sale." *Id.* at§ 1001.952(h)(4).

153.   Thus, for example, a situation where - as alleged below - a seller offered to put a fixed number in a sales contract but promised to analyze the profitability of the tests after 90 or 120 days and "split the profits" on the tests, would not comply with the discount safe harbor because the price reduction is not set in advance.

154.   Also important to the present situation, the "discount" safe harbor does not apply at all to price reduction "applicable to one payer but not to Medicare, Medicaid or other Federal health care programs." *Id.* at §100l.952(h)(5)(iii).

### vi.   *State Law Anti-Kickback Statutes*

155.   Several of the Plaintiff States also have Anti-Kickback Statutes or otherwise prohibit the payment of kickbacks in connection with services reimbursed by Medicaid and/or other insurance programs, including: California (Cal. Bus. & Prof. Code§ 650; Cal. Welf. & Inst. Code §14107.2); Connecticut (Conn. Gen. Stat.§ 53a-161d; Conn. Gen. Stat.§ 53a-161c); Delaware (31 Del. C. § 1005); the District of Columbia (D.C. Code§ 4-802(c)); Florida (Fla. Stat. § 409.920; Fla. Stat. § 456.054(2); Illinois (305 ILCS 5/8A-3(b)); Indiana

A.71

(Ind. Code Ann. § 12-15-24-2); Louisiana (La. Rev. Stat. Ann.§ 46:438.2); Maryland (Md. CRIMINAL LAW Code Ann. § 8-511; Md. HEALTH OCCUPATIONS Code Ann. § 14-404); Massachusetts (ALM GL ch. 118E, § 41); Michigan (MCLS §§ 400.604, 400.606); Minnesota (Minn. Stat. § 62J.23); Montana (Mont. Code Ann. § 45-6-313); Nevada (Nev. Rev. Stat. Ann. § 422.560); New Jersey (N.J. Stat. § 30:4D-17); New Mexico (N.M. Stat. Ann.§§ 30-41-1, 30-41-2 ); New York (NY CLS Educ.§ 6530); North Carolina (N.C. Gen. Stat.§ l0SA-63); Oklahoma (56 Okla. St.§ 1005(A)(6)); Rhode Island (R.1. Gen. Laws§ 9-1.1-1 *et seq.);* Virginia (Va. Code Ann.§ 32.1-315); and Washington (Rev. Code Wash. (ARCW) § 19.68.010).

### vii.   *Providers may Not Charge Medicare "Substantially More" Than the Provider's Usual Charges*

156.   MD Labs' policy of charging referring providers substantially less than it bills to Medicare, and of routinely waiving patient copay and coinsurance amounts also violates the prohibition on charging Medicare "substantially more" than the "usual" charges.

157.   Federal law and related rules allow CMS to exclude providers from participation in Medicare or other government-funded programs if those providers charge Medicare or Medicaid substantially more than they charge other customers for the same service.  *See* 42 U.S.C. 1320a-7(6)(A).

158.   As explained in HHS OIG Advisory Opinion 99-13 (Nov. 30, 1999):

> Price reductions offered to physicians that are not offered to Medicare or Medicaid raise additional issues under section 1128(b)(6)(A) of the Act, which provides for permissive exclusion from the Federal health care programs of individuals or entities that submit or cause to be submitted bills or requests for payment (based on charges or costs) under Medicare or Medicaid that are substantially in excess of such individual's or entity's usual charges or costs, unless the Secretary finds good cause for such bills or requests.  In determining an individual's or entity's "usual" charges, we will look at the amounts charged to non-Federal pay[e]rs, <u>including physicians.</u>  If the charge

35

A.72

to Medicare or Medicaid substantially exceeds the amount the laboratory most frequently charges or has contractually agreed to accept from non-Federal pay[e]rs, the laboratory may be subject to exclusion under section 1128(b)(6)(A) of the Act.

*Id.* (emphasis added).

159.    In a later Advisory Opinion, HHS OIG reviewed its effort to provide more specific definition of the term "substantially in excess" as follows:

The OIG has attempted on numerous occasions to provide definitive guidance on this provision. However, we have not finalized definitions for 'substantially in excess' or 'usual charges.'  We have clearly stated that we would not use this authority to exclude or attempt to exclude any provider or supplier that provides discounts or free services to uninsured or underinsured patients, but this policy statement does not apply to [an arrangement where a lab] would provide free services to patients who are insured and whose services could be covered if they were to use the laboratory designated by their insurance plan.

We have also stated that "a provider need not even worry about section 1128(b)(6)(A), unless it is discounting close to half of its non-Medicare or non-Medicaid business."

160.    Ultimately, HHS OIG refused to approve the proposed arrangement under consideration in Advisory Opinion 15-04 because it:

would essentially result in a two-tiered pricing structure.  A substantial number of patients (all patients insured by Exclusive Plans) would receive services for free, regardless of financial need.  The Requestor has provided no reason to offer free services other than to remove an obstacle to the physician practices referring all of their laboratory business to the Requestor.

The substantially in excess provision is not designed to prevent providers and suppliers from negotiating their rates with private plans.  However, the Proposed Arrangement is not an example of negotiating discounts with certain private pay[e]rs that may result in rates slightly less than the rate Medicare pays.  Instead, the Proposed Arrangement would completely relieve patients and their Exclusive Plans of any obligation to pay in order to pull through all of the Federal health care program business, which would be charged at the full rate.

Advisory Opinion 15-04 (Mar. 18, 2015).

36

A.73

### 5. The Eliminating Kickbacks in Recovery Act

161. Congress enacted the Eliminating Kickbacks in Recovery Act ("EKRA") in 2018, 18 U.S.C. §220(a), to fight against patient brokering and recovery profiteering.

162. EKRA makes it illegal to knowingly and willfully (1) solicit or receive remuneration for referring a patient to a recovery home, clinical treatment facility, or laboratory, or (2) pay or offer remuneration to either induce a referral of an individual to or in exchange for an individual using the services of a recovery home, clinical treatment facility or laboratory.

163. EKRA adopts the same broad approach as the Anti-Kickback Statute, and applies to the soliciting or receiving, or paying or offering to pay remuneration, directly or indirectly, overtly or covertly, in cash or in kind.

164. EKRA applies to all laboratory business arrangements covered by all payors, whether government or commercial, regardless of the type of testing involved.

165. Penalties for violation of EKRA include fines of up to $200,000 and imprisonment of up to 10 years.

## VI.  CLINICAL BACKGROUND

166. In addition to the settled claims related to UDTs, MD Labs & Owners' fraudulent scheme primarily involves a type of clinical diagnostic test known as Bacterial Urine Culture ("BUC") test.

167. "A bacterial urine culture is a laboratory procedure performed on a urine specimen to establish the probable [cause] of a presumed urinary tract infection." *See* Medicare National Coverage Determinations Manual (''NCDM") ch. 1, part 3 §190.12. Urinary tract infections ("UTIs") are among the most common human bacterial infections, affecting almost 50% of the population at least once in their lifetime.  In the United States,

37

A.74

they account for an estimated $3.5 billion in healthcare spending every year.  UTIs are primarily treated using antibiotics.

168.    Several tests are available for screening patients for UTIs, including urine dipstick testing, urinalysis, Gram staining, and BUC.  The BUC is the "gold standard" for establishing a diagnosis of UTIs, because it allows the quantification and identification of the uropathogenic species, and subsequent testing to determine whether the bacteria in question is resistant to one or more antibiotics.

169.    "It is common practice to do a urinalysis prior to a urine culture." *Id.*  The Medicare payment policy (known as a "National Coverage Determination" or "NCD") for BUC testing explains that it may be medically necessary to conduct at BUC where:

> A patient's urinalysis is abnormal suggesting urinary tract infection, for example, abnormal microscopic (hematuria, pyuria, bacteriuria); abnormal biochemical urinalysis (positive leukocyte esterase, nitrite, protein, blood); a Gram's stain positive for microorganisms; positive bacteriuria screen by a non-culture technique; or other significant abnormality of a urinalysis.

170.    The NCD further provides, however, that it "is not essential to evaluate a urine specimen by one of these methods before a urine culture is performed."  Instead, "certain clinical presentations with highly suggestive signs and symptoms may lend themselves to an antecedent urinalysis procedure where follow-up culture depends upon an initial positive or abnormal test result." *Id.*

171.    Thus, for example, a BUC may be medically necessary if the "patient has clinical signs and symptoms indicative of a possible…UTI," such as painful or frequent urination, discolored urine, fever or chills. *See id.*

172.    As defined in the NCD, "[t]he procedure includes aerobic agar-based isolation of bacteria or other cultivable organisms present, <u>and quantification of types present based on morphologic criteria.</u>" *See id.* (emphasis added).

173.    Stated more simply, the standard practice for BUC involves putting a sample of the urine on one or more types of media that provide an opportunity for bacteria to grow. The culture is then incubated for 24 hours.  After the first 24 hours, the initial results are documented, including whether any bacteria have grown, how many different types of bacteria have grown, and how big each bacterial colony is (measured in colony forming units per milliliter of urine or CFU/ml).

174.    At this point, the type of bacteria can generally be identified based on the type of medium used, the color of the colony, and other details about the formation and shape of the colony.

175.    The presence of three or more bacteria indicates likely contamination of the urine sample.  In such cases, further testing on that culture should be discontinued and a new sample collected.

176.    Pursuant to Medicare and standard coding rules, the initial BUC test, including baseline bacteria identification and quantification, are billed using CPT Code 87086.  In 2018, Medicare paid $9.96 for this code.

177.    In some situations, additional conventional laboratory tests may be necessary to identify bacteria type.  Such additional testing should be billed using CPT Code 87077, for which Medicare paid $9.97 in 2018.

178.    If initial testing indicates the presence of bacteria, then antibiotic resistance testing can be an important part of developing a plan of care because an antibiotic to which

the bacteria is resistant will not be effective.  Even more, a major factor in the rise of antibiotic resistant bacteria is the use of antibiotics without consideration of resistance issues.  *See id.* ("Isolates deemed significant may be subjected to additional identification and susceptibility procedures as requested by the ordering physician.").

179.    Susceptibility testing is billed using CPT Code 87186, for which Medicare pays $10.67 in 2018.  This code may be billed multiple times if multiply strains of bacteria are tested for antibiotic susceptibility.

180.    Including the initial culture, the second day of incubation and susceptibility testing (if necessary) the standard BUC takes 24 to 72 hours.

## VII.    **ALLEGATIONS**

181.    Although the MD Labs & Owners' scheme is brazen, much of it is not particularly novel - as demonstrated by the fact that many elements of the fraud (although not the essential details of MD Labs & Owners' particular fraudulent scheme) were the subject of prior False Claims Act and other enforcement actions against other labs, and a recent government report describing the most pervasive and problematic fraudulent lab billing schemes.

182.    It is well established that laboratories may not use unreasonably large "panels" of tests, standing orders and other misleading paperwork to cause physicians to prescribe many tests at once, when only one or a few tests are medically necessary.  Yet that is exactly what MD Labs has done and continues to do.

183.    MD Labs also made false and misleading statements about the need for and value of its testing services to encourage such testing.

184.   MD Labs & Owners' fraudulent scheme is designed to, and does: (a) cause physicians and other providers actually treating a patient to order as many clinical laboratory tests as possible, regardless of medical necessity; (b) leverage the tests the treating providers actually do order to create a pretext to perform - and bill government and commercial insurers for - two, three, five or more times as many tests as the treating provider actually ordered; and (c) perform additional tests that provide no clinically useful information.

185.   MD Labs then bills government and commercial payers for the entire test panel, without disclosing to the government or commercial payer that only a small portion of the billed tests were medically necessary and supported by a valid physician order and other documentation in the medical record.  If these payers knew of the facts contained in the patients' medical records - especially the lack of evidence or documentation of the medical necessity for the substantial majority of the billed tests - they would not have paid the MD Labs & Owners for those tests.

186.   Often, though, such deception is not enough.  To further motivate physicians to order the tests, MD Labs offers lucrative kickbacks to the ordering physicians and other providers (including pharmacists in a position to sell MD Labs' Rxight pharmacogenetic testing in retail locations) to illegally induce them to join as co-conspirators in the fraud.

187.   To prevent patients from raising concerns about the expensive, duplicative and medically unnecessary nature of many of its tests, MD Labs makes minimal efforts to require patients to pay their share (either due to coinsurance obligations or because the test is deemed not covered by their insurance) of the costs of tests.

188.   MD Labs & Owners also routinely use improper billing code modifiers to get fraudulently- inflated claims paid.

A.78

189.     MD Labs also routinely charges Medicare and other federal government payers substantially more than its costs or its usual charges - as demonstrated by the amount it charges referring providers who bill the tests themselves and to individuals who owe some or all of the cost of the test due to a coinsurance obligation or lack of insurance coverage for the test.

190.     Finally, MD Labs also causes the submission of false claims by assisting physicians and other providers bill for services performed by MD Labs in spite of federal and state prohibitions on such pass-through billing.

191.     Numerous examples of patient laboratory test results from MD Labs and evidence of claims submission by MD labs and payment by government-funded healthcare programs are included in the statutory disclosure materials provided to the United States and the Plaintiff States simultaneous with the filing of Relator's original complaint.  To protect the confidentiality of the patients and their health care information, those records are not attached to this Complaint, but are incorporated herein by reference.

**A.  MD Labs' Fraudulent Scheme**

192.     OMNI learned of MD Labs & Owners' fraudulent scheme first-hand through its interactions with MD Labs' personnel, as those personnel attempted to enlist OMNI into MD Labs' scheme.

193.     MD Labs' personnel offered OMNI kickbacks to order tests in the form of an agreement to "split profits" on the tests OMNI ordered (BUC, pharmacogenetic and urine drug tests), payment of a $50 fee in connection with each pharmacogenetic test ordered, free testing supplies and other inducements.

42

A.79

194.    MD Labs' personnel also coached OMNI on how to bill Medicare, Medicaid and other government-funded and commercial insurers for the clinical laboratory tests, and offered to assist OMNI in billing for these tests directly in violation of Medicare rules.

195.    For example, on April 23, 2018, MD Labs' Jack Todd, Sales Manager, East Coast Region, emailed OMNI Healthcare executives and proposed an arrangement where MD Labs would charge OMNI $150 per PCR UTI test to be billed to commercial customers. Mr. Todd explained the financial assumptions underlying the proposal as follows:

- We considered a monthly volume of 200 specimens (plus or minus)
- We considered a payer mix of 35% Commercial and 65% all Federal plans to include Medicare, Medicaid and Tricare.
- You collect all specimens in your lab and we will pick up daily.
- We bill Omni their share monthly.

196.    Dr. Deligdish of OMNI responded, asking for evidence that commercial payers and/or Medicare actually paid for the test.

197.    Mr. Todd responded: "I asked for the EOBS. Hopefully I will get for you by Wed.  I also thought you should want to re-evaluate every 120 days."

198.    However, the next day, he replied:

My company felt that giving you our EOB's is not appropriate at this time. They are all over the place, even within the same Company. All of the Commercial payers and Medicare pay us. Medicaid is our problem ... generally below $100.  We are not in network with any commercial payers. We are generally reimbursed between $200 to $550 per test. There is no National Lab with this test in network with these payers, so they generally pay as [Out of Network] or as experimental.

I would propose to trial for at least 120 days so you can determine yourself. Of course you can stop at any time.

199.    On April 25, 2018, Mr. Todd provided additional information about the proposed business arrangement:

A.80

We understand completely your concern for the best billing options for this test. Our people felt that the info we could give you now would not be the best info for this region of Fla. Our data is designed for the entire country and we are constantly modifying our coding for individual plans.

We would propose that we would bill all your payers for 90 - 120 days and then give to you all the billing data for your commercial carriers in your patient population. At that time we could modify a program that works best for your billing practices.

What do you think?

If you agree to this we should set you up as an account and plan to in-service your locations with reqs and supplies. I am not sure if this would be 1 account or multiple accounts for each provider or location. I asked Dale to send us a copy of your existing Allscripts order form so we can identify if this is able to be used in our system.

200. On Jul 26, 2018, MD Labs' sales representative Dale A. Stenberg wrote to OMNI's practice administrator, offering to bring the office lunch the following week.

201. On July 30, 2018, manager Wendy Williams, the practice for OMNI's Urgent Care Clinic, asked MD Labs' Dale Stenberg how much MD Labs bills for BUC testing. Mr. Stenberg forwarded her question to Jack Todd, with the note: "This question comes up frequently, what should my response be? This is the Urgent Care Omni."

202. Mr. Stenberg forwarded Mr. Todd's response to Ms. Williams:

Our PCR based UTI is billed at 1 time Medicare rate to all. When Medicare changes so do we. (FYI. Currently it is approximately $700.00.)

We accept whatever the insurance company pays us ... no balance bill. If insurance does not pay we bill patient $50.00 only. They also get the credit for the deductible the insurance company had shared with them on their EOB.

203. On August 13, 2018, OMNI's Dr. Deligdish and Brad Smith spoke with MD Labs' Director of Sales, Howard Clausen for approximately 30 minutes. Mr. Clausen shared that he had been with MD Labs for four years. He observed that when he began working with the lab they were doing 16 samples a month and they are now doing 16,000 samples of month. He then stated that

A.81

approximately 70% of MD Labs' BUC tests are paid for by Medicare, and the remainder are covered by Medicaid or commercial insurance.

204.   After discussing the clinical aspects of the three MD Labs tests, Mr. Clausen then discussed MD Labs' billing practices.  He stated that if a patient's insurance (whether government-funded or otherwise) denied coverage for a test, MD Labs would bill the patient only $50.  However, if the patient failed to pay after MD Labs sent one or two bills, MD Labs does not further pursue the payment.

205.   He said that MD Labs has a similar policy with respect to patient coinsurance or copay amounts - charging no more than $50, and taking limited steps to actually collect these amounts.

206.   MD Labs' policy of charging referring providers substantially less than it bills to Medicare, and of routinely waiving patient copay and coinsurance amounts also violates the prohibition on charging Medicare "substantially more" than the "usual" charges.

207.   As to the business arrangements with the referring physician group, he stated that MD Labs would allow OMNI's laboratory to bill for the services, and would be willing to split the profits, with OMNI.

208.   More specifically, Mr. Clausen stated that MD Labs would initially set an "arbitrary" amount to charge OMNI - such as $100 per specimen - and then MD Labs and OMNI could reevaluate the pricing after three to four months depending on how much Medicare and commercial payers reimbursed for the tests.

209.   On August 24, 2018, Ms. Hall again emailed OMNI personnel about MD Labs' pharmacogenetic testing program, discussing the potential financial arrangement and provision of free testing supplies:

> As we discussed, I am attaching the Practice set up form which will allow us to create an account and send you kits. Please let me know where you would like the

A.82

kits sent and how many you anticipate needing for your first few weeks. We can replenish as they are utilized so you don't need to keep too many on hand.

If you decide that you would like to have us bill you and then you bill the carrier (or some combination of the 2 like you are doing with our other tests) just let me know and we can create an agreement for the amount. We have a self pay rate of $399 but when we bill a practice or a Health System, we provide a 25% discount down to $300.

210.    On August 24, OMNI personnel had a teleconference with MD Labs' Howard Clausen and Jack Todd.   Mr. Todd proposed that for the pharmacogenetic testing, MD Labs would bill commercial insurers, as directed by OMNI, and that MD Labs would charge OMNI $300 (a 25% discount below the price charged to "self-pay" patients).

211.    He also reiterated that MD Labs was willing to pay an OMNI pharmacist to provide the medication management service.

212.    Mr. Clausen then asked whether OMNI wanted to bill only for commercial payers, or for both commercial and government payers.  When OMNI personnel suggested they were interested in having OMNI bill directly for both commercial and government payers, Mr. Clausen stated that MD Labs would establish an initial price that MD Labs would charge OMNI for each test to put in the contract.

213.    Mr. Clausen stated that they would review the reimbursement received after 90 days, and then readjust the price (including for the previously billed tests) so that MD Labs would split the profit with OMNI.  He stated that the cost of the tests to OMNI was approximately $50.

214.    On August 27, 2018, MD Labs' Mr. Todd emailed OMNI personnel, reiterating that MD Labs' cost for all tests was approximately $50, and offering to review

46

A.83

"billing history to date" for BUC tests.  He then provided the CPT billing information for BUC and UDT tests (discussed below).

215.  On August 27, 2018, OMNI's Mark Bobango spoke with MD Labs' Mr. Clausen and Mr. Todd.  Mr. Bobango reported in an email summary of the call that Mr. Clausen had stated, inter alia:

> I had another conversation with Howard today regarding the pricing structure.  This is what he confirmed:
>
> 1.  They will not bill any patient anything greater than $50.00 regardless of insurance, co-pay or deductible.  They do not want patients to have to pay a lot for this service.  They do not go after the patient for any balances over $50.00.
>
> ….
>
> 3.  For UTI tests, he stated Omni will profit between $200 and $700 per claim.  The price for Omni is $250.00.  Their cost is approximately $75.00 for these tests.  After 90 days, they will take a look at EOBs and negotiate the rate as well.

216.  On August 27, 2018, Mr. Todd also emailed OMNI personnel a proposed "Clinical Testing Program Agreement," between "MD Spine Solutions, LLC dba MD Labs" and "Omni Healthcare, a practice organized and existing under the laws of the State of Florida." Although Dr. Deligdish had asked in an earlier email that any billing arrangement be "set [] up through the Melbourne Medical Laboratory," MD Labs nonetheless proposed a contract directly with OMNI, the physician group.

217.  The contract proposed that MD Labs would provide clinical laboratory testing for OMNI, and bill OMNI $250 for BUC testing.

218.  The BUC tests did not include an option or differential pricing for a smaller panel of tests than the standard, broad MD Labs panel.  Although the BUC price purported to cover "Custom UTI Panel on file," MD Labs personnel had never discussed establishing a custom panel or offering anything other than the full panel of PCR follow up tests.

A.84

219.    Moreover, although MD Labs personnel had clearly and repeatedly stated that the prices would be renegotiated after 90 days, the contract purported to provide, as to price changes: "This pricing can be re-negotiated on January 1, 2019 and each year thereafter, to take into account reimbursement changes affecting either party."

220.    OMNI did not respond to this proposed contract.

221.    On November 20, 2018,  Mr. Todd resent the same draft contract with an email stating: " Please see attached. I will call Mark next week to discuss."

222.    OMNI's Dr. Deligdish sought clarification on the proposed financial terms, responding the next day:  "I thought Howard [Clausen] proposed an arrangement whereby we split the profits."

223.    Mr. Todd replied, on December 10, 2018 making explicit in one email what had been repeatedly offered and promised (albeit often only orally) by MD Labs:

> Sorry it took so long. You asked the question about profit sharing. I spoke to Howard and he explained that we would charge you the Agreement prices for 90-120 days (your choice).  After that period you would have your collection experience and we would then split the profits 50-50.
>
> Of course we would establish and share our cost at that time for the split to be determined.  We  also expect we will continue to bill Federal Programs and you will Bill all Commercial plans.
>
> I am available to meet anytime to review the Agreement further.

(emphasis added).

224.    Any claim submitted for a service performed pursuant to a kickback-tainted referral or otherwise performed or billed in violation of federal or state laws, regulations or contracts is a false and/or fraudulent claim within the meaning of the Federal False Claims Act and Plaintiff State False Claims and insurance fraud prevention acts.

A.85

225. The detailed conversations with Omni personnel demonstrates a widespread knowledge of the practices described herein and includes admissions that MD Labs has adopted these fraudulent practices as corporate policy in their interactions with providers and their billings to the Government.

**B. MD Labs' Scheme: Medically Unnecessary BUC Tests**

226. MD Labs' scheme used common approaches to generate pretexts to perform and bill for medically unnecessary tests, but with variations depending on the particular test.

227. Any claim for payment for a clinical laboratory test that was not medically necessary, especially where MD Labs fraudulently caused it to be ordered by use of an overly broad testing panel, a misleading standard order form, or by coaching physicians to misrepresent what drug he or she was actually considering treating the patient with, is a false or fraudulent claim within the meaning of the Federal False Claims Act and Plaintiff State False Claims and insurance fraud prevention acts.

228. MD Labs provides a variation on the standard BUC test. It performs an initial culture on the urine sample, and then uses an unreasonably broad panel of expensive, medically unproven nucleic acid tests using polymerase chain reaction ("PCR") technology to identify the specific bacteria found during the standard BUC test.

229. The PCR technology identifies the bacteria based on specific tests of the bacterial DNA.

230. MD Labs claims that its testing protocol produces more comprehensive and more accurate results. For example, in an August 13, 2018 teleconference, Clausen, MD Labs' Director of Sales, told OMNI personnel that MD Labs' BUC tests were a "direct replacement for culture and sensitivity," and the same technology used to diagnose cancer.

He claimed that the MD Labs test was needed because: "cultures get it wrong 50-70% of the time." He stated that there was a clinical study supporting these points, performed by Florida Hospital in Orlando.  He offered to provide a copy of the study- but never did.

231.   Similarly, MD Labs' marketing "fact sheet" for physicians indicates that its test identifies 17 different pathogens with 100% accuracy, compared to the 5 to 6 pathogens identified with 71% accuracy in standard BUC testing.

232.   However, the "fact sheet" does not indicate that the 17 pathogens are identified using 17 different tests above and beyond the initial culture (which includes the cost of bacterial identification and colony counts), or that each of those 17 additional tests was separately billed to Medicare or other payers at nearly four times the price of the standard culture -- APIECE.  Taken together, the amount MD Labs bills (and thus far has been paid by Medicare) for its full panel BUC test is as much as 60 to 70 times more than the cost of the approved, standard BUC testing.

233.   By way of example and without limitation, on or about May 29, 2018, MD Labs performed 17 different, medically unnecessary, PCR tests on a Medicare patient to determine the presence of UTIs.  The medically unnecessary tests were received and analyzed by MD Labs at its facility in Reno, Nevada on or about May 30, 2018.  MD Labs subsequently submitted a false claim for payment of the medically unnecessary tests in the amount of $699.58, which was paid on June 15, 2018 under Medicare internal control number 18F610406900.

234.   Likewise, on or about May 29, 2018, MD Labs performed 17 different, medically unnecessary, PCR tests on a Medicare patient to determine the presence of UTIs. The medically unnecessary tests were received and analyzed by MD Labs at its facility in

Reno, Nevada on or about May 30, 2018. MD Labs subsequently submitted a false claim for payment of the medically unnecessary tests in the amount of $699.58, which was paid on June 22, 2018, under Medicare internal control number 221815903990.

235. Moreover, the fact sheet does not outline, nor has MD Labs explained to OMNI personnel or identified any medical literature that documents how or why any purported increased accuracy in identification is actually clinically useful (and thus possibly medically necessary) - let alone sixty to seventy times more accurate.

236. In fact, as outlined below, often that greater specificity and accuracy are not clinically useful (and thus not medically necessary) because any incremental information they provide does not affect the treatment the patient will receive.

237. Nor does the fact sheet indicate or did MD Labs tell OMNI that there was any option to order only a limited number of follow-up PCR tests to identify specific bacteria. Instead, the lab order form only gives the option to order a "Urinary Tract Infection Testing Panel on File."

238. MD Labs did not ask OMNI to sign or otherwise approve the MD Labs testing protocol, to set up an OMNI-specific testing panel, protocol or standing order, or in any other way offer OMNI any opportunity to establish a more limited testing panel, protocol or standing order.

239. Although MD Labs' standard order form provides a line asking for a physician signature, MD Labs processes the orders even if there is not a valid physician signature (including appropriate credentials). All that MD Labs appears to require is that a physician or other provider's name and credentials be selected from amongst a list of possible providers at the top of the form.

51

A.88

240.    Whether pursuant to protocol or otherwise, MD Labs' standard practice appears to be to perform follow up PCR tests on every bacteria culture generated during a BUC test, regardless of medical necessity.

241.    As noted above, Medicare and other payers will not pay for a clinical laboratory test unless there is an order for the test that includes documentation that the test is medically necessary.  Medicare does not pay for BUC tests for "screening" purposes *(i.e.,* without a specific clinical or laboratory reason to believe an infection exists) except in very limited circumstances not applicable here.

242.    MD Labs' own standard test results form recognizes the importance of this medical justification, not just as a matter of Medicare payment rules, but also as a clinical matter, noting: "The presence of bacteria without concordant patient symptoms is typically indicative of a false positive or a contaminated specimen."

243.    Yet, MD Labs routinely conducts BUC tests, and its full panel of follow up DNA bacterial identification tests even when the physicians' order provides no medical justification for the culture (either results of an initial urinalysis or other symptoms or reasons to perform the culture).

244.    Further, MD Labs conducts a full panel of follow up DNA-based bacterial identification tests (notwithstanding the fact that the base BUC code includes bacterial identification and quantification) even when the initial bacterial culture: (a) was negative - indicating that there were no bacteria present to identify; or (b) produced a bacterial colony count that was either too small to be clinically significant or was a contaminated culture.

A.89

245.   Conducting follow-up bacterial identification tests on negative cultures is never medically necessary - there is nothing there to test so there is no result that will give additional clinically useful information.

246.   For similar reasons, conducting follow-up bacterial identification tests when cultures yield insignificant colony count is generally not medically necessary, because bacterial species identification is itself rarely clinically significant.  The primary clinical utility of species identification is to allow antibiotic resistance testing.  But if a bacterial colony identified in the culture is too small to be clinically significant, then resistance sensitivity testing should not be performed.

247.   MD Labs' own reports indicate as much, routinely noting the futility of antibiotic susceptibility testing where an identified colony count is at or below clinical thresholds with language such as: (1) "The identified organism was detected by qPCR; due to insufficient growth, susceptibility testing cannot be performed."; or (2) *"Enterococcus faecalis* was detected by qPCR; due to no growth, susceptibility testing cannot be performed."

248.   In addition, the standard protocol for a culture that shows no growth or insufficient growth after the initial 24 hours is to wait an additional day to see if there is a slow growing bacteria.

249.   Yet MD Labs does not appear to be following this protocol regularly.  For a substantial number of the tests MD Labs did for OMNI's patients, the results of "negative" or "low growth" test results were reported within a day of the initial processing of the urine sample. (Tests that were subjected to susceptibility testing, on the other hand, typically took two or more days.)

250.    MD Labs should have allowed those cultures to incubate for an additional day before reporting them as negative or low growth - and certainly should have allowed the additional time for growth before conducting any additional bacterial identification or quantification tests (let alone their $700 mega-DNA panel).

251.    By the use of the PCR technology, MD Labs claims it can reduce the 48 to 72 hours required to conduct a standard BUC test by up to 24 hours.  Any clinical significance of such a reduction is undermined, however, by the fact that much of this promised time-savings is typically lost because the urine samples to be tested must be shipped to MD Labs in Nevada before the process can begin.  Moreover, MD Labs' apparent truncation of the standard culture period (especially the follow up period for no- or low-growth cultures) undermines the validity of any of its test results.

252.    MD Labs' standard billing practice, which is demonstrated in the claims it submitted to government and commercial payers as well as in the advice it gave OMNI, is to bill $10 for the initial culture using CPT code 87086 ("Culture, bacterial; quantitative, colony count, urine").  The Medicare allowed amount for this code was $9.96 (which was then reduced to $9.76 to reflect the effect of the federal budget sequestration law) when MD Labs was paid by Medicare for this code on June 22, 2018.

253.    For each of the follow up PCR bacterial identification tests, MD Labs bills $44. MD Labs bills three tests using CPT codes specific to those tests: 87481 ("Infectious agent detection by nucleic acid (DNA or RNA); Candida species, amplified probe"); 87500 ("Vancomycin DNA amp probe"); and 87653 ("Infectious agent detection by nucleic acid (DNA or RNA); Streptococcus, group B, amplified probe technique").  The Medicare allowed

54

A.91

amount for these codes, as well as 87798, was $43.33 (reduced to $42.46 because of sequestration) when MD Labs was paid by Medicare for this code on June 22, 2018.

254. The remaining fourteen PCR tests are billed using a catchall CPT code, 87798 ("Infectious agent detection by nucleic acid (DNA or RNA), not otherwise specified; amplified probe technique, each organism").

255. If susceptibility testing is done, MD Labs bills $11, using CPT code 87176 ("Susceptibility study"). The Medicare allowed amount for this code was $10.67 (reduced to $10.46 because of sequestration) when MD Labs was paid by Medicare for this code on June 22, 2018.

256. MD Labs also improperly uses Modifier "91" when it bills CPT code 87798. Modifiers are used on claims forms to provide addition information to justify a claim for payment. In this case, both modifiers 91 and 59 are used when the same CPT codes is billed multiple times on the same day.

C. **MD Labs' Fraudulent Scheme's Impact on Private Insurers**

257. The states of California and Illinois have enacted Insurance Fraud Prevention Acts that permit Relator to bring a qui tam action to recover for fraudulent claims submitted to *commercial* insurance companies in those states. *See* Counts XXXII and XXXIII below.

258. Although the above paragraphs focus primarily on the impact of MD Labs & Owners' practices on government-funded healthcare programs, the same fraudulent practices also defraud private insurance companies in the same manner that the practices defraud the federal and state governments.

259. The practices alleged herein are systematic, nationwide practices that defraud private insurance companies that reimburse clinical laboratory tests in every state where defendant conducts business, including California and Illinois.

A.92

**D.  MD Labs' Payments for Referrals**

260.     On April 25, 2022, the HHS-OIG issued Advisory Opinion No. 22-09 (the "Advisory Opinion").

261.     A requestor, operator of a network of clinical laboratories, sought the Advisory Opinion to determine whether an arrangement whereby the requestor would compensate hospitals for certain specimen collection services for laboratory tests furnished by the requestor would constitute grounds for the imposition sanctions under the Anti-Kickback Statute.

262.     The requestor would pay the hospitals on a per-patient-encounter basis to collect, process and handle specimens that are sent to the requestor's clinical laboratories for testing.

263.     Requestor would bill any applicable third-party payor, including Federal health care programs for testing.

264.     The Advisory Opinion concluded the proposed arrangement would generate prohibited remuneration under the Anti-Kickback Statute.

265.     The Advisory Opinion found that the arrangement would violate the Anti-Kickback Statute because it would involve remuneration from a laboratory to a party that is in a position to make referrals to the  laboratory for, or otherwise arrange for the laboratory to furnish, items and services that may be paid for in whole or in part by a Federal health care program.

266.     Similar to the facts set forth in the Advisory Opinion, documents produced in discovery by MD Labs & Owners since the beginning of 2023 demonstrate that MD Labs & Owners have been violating the Anti-Kickback Statute by entering into independent contractor service agreements ("the Service Agreements") in which MD Labs agrees to compensate marketing companies for collecting specimens.

267.    Such conduct of paying for referrals also violates EKRA.

268.    On or about December 30, 2016, MD labs entered into a Service Agreement with Pace Solutions, LLC ("Pace Solutions").

269.    The term of the Service Agreement was from January 1, 2017 to December 31, 2017.

270.    The Service Agreement called for Pace Solutions to provide the services of a Professional Sales Organization for MD Labs which requires Pace Solutions to provide direct marketing and sales of MD Labs' products.

271.    The Service Agreement stated that Pace Solutions would provide specimen collection services for identified accounts of MD Labs.

272.    The Service Agreement stated that MD Labs would pay Pace Solutions $18 per each insured specimen collected by Pace Solutions.  MD Labs would not pay Pace Solutions any amount for specimens collected without insurance.

273.    MD Labs sought reimbursement for the testing performed on these specimens from Medicare, Medicaid and other government-funded healthcare programs.

274.    On or about May 1, 2019, MD Labs entered into a Service Agreement with KDB Consulting.

275.    The term of the Service Agreement was from May 22, 2019 to December 31, 2019.

276.    The Service Agreement called for KDB Consulting to provide the services of a Professional Sales Organization for MD Labs which requires KDB Consulting to provide direct marketing and sales of MD Labs' products.

A.94

277.    The Service Agreement stated that MD Labs would pay to KDB Consulting 25 percent commissions for customer accounts assigned to KDB Consulting up to $500,000 revenue in any month and 30 percent commission paid for customer accounts to KDB Consulting in any month where revenue exceeds $500,000.

278.    MD Labs sought reimbursement for the testing performed on these specimens from Medicare, Medicaid and other government-funded healthcare programs.

### E.  No Balance Billing by MD Labs

279.    Documents produced in discovery by MD Labs & Owners indicate that MD Labs is further violating the Anti-Kickback Statute by routinely not balance billing patients.

280.    Balance billing is when a provider bills a patient for the difference between the provider's charge and the allowed amount.

281.    If a provider's charge is $100 and the allowed amount is $70, the provider may bill a patient the balance for the remaining $30.

282.    While it may be permissible to waive bill balances in certain situations, such as financial hardship or because the bill is uncollectible, the routine waiver of bill balances violates the Anti-Kickback Statute.

283.    The routine waiver of a patient's obligations to pay bill balances violates the Anti-Kickback Statute's prohibition on the offering of any remuneration to induce a person to purchase or order any service for which payment may be made under Medicare.

284.    By reducing the amount a patient pays for services, it can induce the patient to seek more services that are payable by Medicare.

58

A.95

285. The HHS OIG has stated that safe harbor protection does not apply to any discount offered to beneficiaries in the form of "a reduction in price offered to a beneficiary." 42 C.F.R. §1001.952(h)(5)(iv).

286. As a matter of practice, MD Labs routinely did not balance bill patients.

287. In a September 18, 2019 email, Chuck Dushman, Vice President for Marketing and Business Development for MD Labs, stated "we do **NOT** balance…the most your patients will pay is $50 (about the same as a specialist in many cases)".

288. In marketing materials for its Resolution testing panel, MD Labs advertises:

- **No Balance Billing**

- $50 Maximum Patient Cost

289. MD Labs' routine practice of not balance billing patients is a violation of the Anti-Kickback Statute.

### F. **MD Labs' Diagnoses When Billing to Medicare**

290. The Health Care Finance Administration ("HCFA") Claim Form 1500 enables physicians to submit health insurance claims for reimbursement from various government insurance plans including Medicare, Medicaid and Tricare.

291. The International Classification of Diseases, Tenth Revision, Clinical Modification ("ICD-10-CM") is a classification of diagnosis codes representing conditions and diseases, related health problems, abnormal findings, signs and symptoms, injuries, and external causes of injuries and diseases.

292. Used for medical claim reporting in all healthcare settings, ICD-10-CM codes are the primary means to establish medical necessity for payment of healthcare services and procedures.

A.96

293. In Box 21 of HCFA Claim Form 1500, the claimant should list the ICD-10-CM code for the diagnosis or nature of illness or injury.

294. Documents produced by MD Labs & Owners show that MD Labs submitted HCFA Claim Forms with ICD-10-CM codes which differed from the diagnosis and ICD-10-CM code listed on the requisition form submitted by the ordering physician.

295. On or about December 12, 2018, MD Labs submitted an HCFA Claim Form 1500 indicating that the code for diagnosis or nature of illness or injury was N39.0. This differed from the diagnosis used by the ordering physicians on the MD Labs' requisition form, which listed 82.90 as the ICD-10-CM code.

296. On or about December 12, 2018, MD Labs submitted an HCFA Claim Form 1500 indicating that the code for diagnosis or nature of illness or injury was N39.0. This differed from the diagnosis used by the ordering physicians on the MD Labs' requisition form did not list an ICD-10-CM code.

297. Submitting a false diagnosis is, by definition, submitting a false claim.

298. Under the FCA, no specific intent to defraud is required. The FCA defines "knowing" to include not only actual knowledge but also instances in which the person acted in deliberate ignorance or reckless disregard of the truth or falsity of the information. 31 U.S.C. §3729(b)(1).

299. MD Labs has violated the FCA by submitting false diagnoses in HCFA 1500 Claim Forms when seeking reimbursement from Medicare.

**Count I**
**Federal False Claims Act**
**31 U.S.C. §§ 3729{a)(l){A}-{C) and {G)**

300.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

301.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.,* as amended.

302.    By virtue of the acts described above, MD Labs & Owners knowingly presented, or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

303.    By virtue of the acts described above, MD Labs & Owners knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims.

304.    By virtue of the acts described above, MD Labs & Owners, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the United States and to deceive the United States for the purpose of getting the United States to pay or allow false or fraudulent claims.

305.    By virtue of the acts described above, MD Labs & Owners knowingly concealed overpayments from the United States Government and failed to remit such overpayments.

306.    The Government, unaware of the falsity of the records, statements and claims made or caused to be made by MD Labs & Owners paid and continues to pay the claims that would not be paid but for MD Labs & Owners' illegal conduct.

307.    By reason of MD Labs & Owners' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

A.98

308.    Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

**Count II**
**Alaska Medical Assistance False Claims and Reporting Act**
**AK Stat § 09.58.010**

309.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

310.    This is a claim for treble damages and penalties under the Alaska Medical Assistance False Claims and Reporting Act.

311.    By virtue of the acts described above, MD Labs & Owners knowingly presented, or caused to be presented, false or fraudulent claims to the Alaska State Government for payment or approval.

312.    By virtue of the acts described above, MD Labs & Owners knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Alaska State Government to approve and pay such false and fraudulent claims.

313.    By virtue of the acts described above, MD Labs & Owners, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Alaska State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

314.    By virtue of the acts described above, MD Labs & Owners knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Alaska State Government.

315.    The Alaska State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by MD Labs &

62

A.99

Owners, paid and continues to pay the claims that would not be paid but for MD Labs & Owners' unlawful conduct.

316.    By reason of MD Labs & Owners' acts, the State of Alaska has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

317.    Additionally, the Alaska State Government is entitled to the maximum penalty for each and every violation alleged herein.

### Count III
### California False Claims Act
### Cal. Gov't Code § 12651(a)(l}-(3), (7)

318.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

319.    This is a claim for treble damages and penalties under the California False Claims Act.

320.    By virtue of the acts described above, MD Labs & Owners knowingly presented, or caused to be presented, false or fraudulent claims to the California State Government for payment or approval.

321.    By virtue of the acts described above, MD Labs & Owners knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the California State Government to approve and pay such false and fraudulent claims.

322.    By virtue of the acts described above, MD Labs & Owners, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the California State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

A.100

323.     By virtue of the acts described above, MD Labs & Owners knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the California State Government.

324.     The California State Government,  unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by MD Labs & Owners, paid and continues to pay the claims that would not be paid but for MD Labs & Owners' unlawful conduct.

325.     By reason of MD Labs & Owners' acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

326.     Additionally, the California State Government is entitled to the maximum penalty for each and every violation alleged herein.

**Count IV**
**Colorado Medicaid False Claims Act**
**C.R.S.A. § 25.5-4-305**

327.     Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

328.     This is a claim for treble damages and penalties under the Colorado Medicaid False Claims Act.

329.     By virtue of the acts described above, MD Labs & Owners knowingly presented, or caused to be presented, false or fraudulent claims to the Colorado State Government for payment or approval.

330.     By virtue of the acts described above, MD Labs & Owners knowingly made, used, or caused to be made or used false records and statements, and omitted material facts,

A.101

to induce the Colorado State Government to approve and pay such false and fraudulent claims.

331. By virtue of the acts described above, MD Labs & Owners, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Colorado State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

332. By virtue of the acts described above, MD Labs & Owners knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Colorado State Government.

333. The Colorado State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by MD Labs & Owners, paid and continues to pay the claims that would not be paid but for MD Labs & Owners' unlawful conduct.

334. By reason of MD Labs & Owners' acts, the State of Colorado has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

335. Additionally, the Colorado State Government is entitled to the maximum penalty for each and every violation alleged herein.

### Count V
### Connecticut False Claims Act
### Conn. Gen. Stat. § 4-275

336. Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

337. This is a claim for treble damages and penalties under the Connecticut False Claims Act.

A.102

338.    By virtue of the acts described above, MD Labs & Owners knowingly presented, or caused to be presented, false or fraudulent claims to the Connecticut State Government for payment or approval.

339.    By virtue of the acts described above, MD Labs & Owners knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Connecticut State Government to approve and pay such false and fraudulent claims.

340.    By virtue of the acts described above, MD Labs & Owners, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Connecticut State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

341.    By virtue of the acts described above, MD Labs & Owners knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Connecticut State Government.

342.    The Connecticut State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by MD Labs & Owners, paid and continues to pay the claims that would not be paid but for MD Labs & Owners' unlawful conduct.

343.    By reason of MD Labs & Owners' acts, the State of Connecticut has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

344.    Additionally, the Connecticut State Government is entitled to the maximum penalty for each and every violation alleged herein.

**Count VI**
**Delaware False Claims and Reporting Act**

66

A.103

## 6. Del. C. § 1201

345.     Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

346.     This is a claim for treble damages and penalties under the Delaware False Claims and Reporting Act.

347.     By virtue of the acts described above, MD Labs & Owners knowingly presented, or caused to be presented, false or fraudulent claims to the Delaware State Government for payment or approval.

348.     By virtue of the acts described above, MD Labs & Owners knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Delaware State Government to approve and pay such false and fraudulent claims.

349.     By virtue of the acts described above, MD Labs & Owners, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Delaware State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

350.     By virtue of the acts described above, MD Labs & Owners knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Delaware State Government.

351.     The Delaware State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by MD Labs & Owners, paid and continues to pay the claims that would not be paid but for MD Labs & Owners' unlawful conduct.

A.104

352.    By reason of MD Labs & Owners' acts, the State of Delaware has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

353.    Additionally, the Delaware State Government is entitled to the maximum penalty for each and every violation alleged herein.

**Count VII**
**District of Columbia Procurement Reform Amendment Act**
**D.C. Code § 2-381.02**

354.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

355.    This is a claim for treble damages and penalties under the District of Columbia Procurement Reform Amendment Act.

356.    By virtue of the acts described above, MD Labs & Owners knowingly presented, or caused to be presented, false or fraudulent claims to the District of Columbia Government for payment or approval.

357.    By virtue of the acts described above, MD Labs & Owners knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the District of Columbia Government to approve and pay such false and fraudulent claims.

358.    By virtue of the acts described above, MD Labs & Owners, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the District of Columbia Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

A.105

359.    By virtue of the acts described above, MD Labs & Owners knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the District of Columbia Government.

360.    The District of Columbia Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by MD Labs & Owners, paid and continues to pay the claims that would not be paid but for MD Labs & Owners' unlawful conduct.

361.    By reason of MD Labs & Owners' acts, the District of Columbia Government has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

362.    Additionally, the District of Columbia Government is entitled to the maximum penalty for each and every violation alleged herein.

**Count VIII**
**Florida False Claims Act**
**Fla. Stat. Ann. § 68.082**

363.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

364.    This is a claim for treble damages and penalties under the Florida False Claims Act.

365.    By virtue of the acts described above, MD Labs & Owners knowingly presented, or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

A.106

366. By virtue of the acts described above, MD Labs & Owners knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Florida State Government to approve and pay such false and fraudulent claims.

367. By virtue of the acts described above, MD Labs & Owners, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Florida State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

368. By virtue of the acts described above, MD Labs & Owners knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Florida State Government.

369. The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by MD Labs & Owners, paid and continues to pay the claims that would not be paid but for MD Labs & Owners' unlawful conduct.

370. By reason of MD Labs & Owners' acts, the State of Florida has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

371. Additionally, the Florida State Government is entitled to the maximum penalty for each and every violation alleged herein.

### Count IX
### Georgia False Medicaid Claims Act
### Ga. Code Ann. § 49-4-168.1

372. Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

70

A.107

373.     This is a claim for treble damages and penalties under the Georgia State False Medicaid Claims Act.

374.     By virtue of the acts described above, MD Labs & Owners knowingly presented, or caused to be presented, false or fraudulent claims to the Georgia State Government for payment or approval.

375.     By virtue of the acts described above, MD Labs & Owners knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Georgia State Government to approve and pay such false and fraudulent claims.

376.     By virtue of the acts described above, MD Labs & Owners, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Georgia State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

377.     By virtue of the acts described above, MD Labs & Owners knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Georgia State Government.

378.     The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by MD Labs & Owners, paid and continues to pay the claims that would not be paid but for MD Labs & Owners' unlawful conduct.

379.     By reason of MD Labs & Owners' acts, the State of Georgia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

A.108

380.   Additionally, the Georgia State Government is entitled to the maximum penalty for each and every violation alleged herein.

## Count X
## Hawaii False Claims Act
## Haw. Rev. Stat.§ 661-21

381.   Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

382.   This is a claim for treble damages and penalties under the Hawaii False Claims Act.

383.   By virtue of the acts described above, MD Labs & Owners knowingly presented, or caused to be presented, false or fraudulent claims to the Hawaii State Government for payment or approval.

384.   By virtue of the acts described above, MD Labs & Owners knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Hawaii State Government to approve and pay such false and fraudulent claims.

385.   By virtue of the acts described above, MD Labs & Owners, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Hawaii State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

386.   By virtue of the acts described above, MD Labs & Owners knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Hawaii State Government.

387.   The Hawaii State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by MD Labs &

72

A.109

Owners, paid and continues to pay the claims that would not be paid but for MD Labs & Owners' unlawful conduct.

388.    By reason of MD Labs & Owners' acts, the State of Hawaii has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

389.    Additionally, the Hawaii State Government is entitled to the maximum penalty for each and every violation alleged herein.

**Count XI**
**Illinois Whistleblower Reward and Protection Act**
**740 Ill. Comp. Stat. § 175/3**

390.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

391.    This is a claim for treble damages and penalties under the Illinois Whistleblower Reward and Protection Act.

392.    By virtue of the acts described above, MD Labs & Owners knowingly presented, or caused to be presented, false or fraudulent claims to the Illinois State Government for payment or approval.

393.    By virtue of the acts described above, MD Labs & Owners knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Illinois State Government to approve and pay such false and fraudulent claims.

394.    By virtue of the acts described above, MD Labs & Owners, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Illinois State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

395.    By virtue of the acts described above, MD Labs & Owners knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Illinois State Government.

396.    The Illinois State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by MD Labs & Owners, paid and continues to pay the claims that would not be paid but for MD Labs & Owners' unlawful conduct.

397.    By reason of MD Labs & Owners' acts, the State of Illinois has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

398.    Additionally, the Illinois State Government is entitled to the maximum penalty for each and every violation alleged herein.

<u>**Count XII**</u>
<u>**Indiana False Claims and Whistleblower Protection Act**</u>
<u>**Ind. Code§ 5-11-5.5-2**</u>

399.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

400.    This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act.

401.    By virtue of the acts described above, MD Labs & Owners knowingly presented, or caused to be presented, false or fraudulent claims to the Indiana State Government for payment or approval.

402.    By virtue of the acts described above, MD Labs & Owners knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Indiana State Government to approve and pay such false and fraudulent claims.

74

A.111

403.    By virtue of the acts described above, MD Labs & Owners, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Indiana State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

404.    By virtue of the acts described above, MD Labs & Owners knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Indiana State Government.

405.    The Indiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by MD Labs & Owners, paid and continues to pay the claims that would not be paid but for MD Labs & Owners' unlawful conduct.

406.    By reason of MD Labs & Owners' acts, the State of Indiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

407.    Additionally, the Indiana State Government is entitled to the maximum penalty for each and every violation alleged herein.

**Count XIII**
**Iowa False Claims Act**
**I.C.A. § 685.2**

408.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

409.    This is a claim for treble damages and penalties under the Iowa False Claims Act.

A.112

410. By virtue of the acts described above, MD Labs & Owners knowingly presented, or caused to be presented, false or fraudulent claims to the Iowa State Government for payment or approval.

411. By virtue of the acts described above, MD Labs & Owners knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Iowa State Government to approve and pay such false and fraudulent claims.

412. By virtue of the acts described above, MD Labs & Owners, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Iowa State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

413. By virtue of the acts described above, MD Labs & Owners knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Iowa State Government.

414. The Iowa State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by MD Labs & Owners, paid and continues to pay the claims that would not be paid but for MD Labs & Owners' unlawful conduct.

415. By reason of MD Labs & Owners' acts, the State of Iowa has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

416. Additionally, the Iowa State Government is entitled to the maximum penalty for each and every violation alleged herein.

## Count XIV
## Louisiana Medical Assistance Programs Integrity Law
### La. R.S. § 46:437.1 *et seq.*

76

A.113

417.   Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

418.   This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law.

419.   By virtue of the acts described above, MD Labs & Owners knowingly presented, or caused to be presented, false or fraudulent claims to the Louisiana State Government for payment or approval.

420.   By virtue of the acts described above, MD Labs & Owners knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Louisiana State Government to approve and pay such false and fraudulent claims.

421.   By virtue of the acts described above, MD Labs & Owners, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Louisiana State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

422.   By virtue of the acts described above, MD Labs & Owners knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Louisiana State Government.

423.   The Louisiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by MD Labs & Owners, paid and continues to pay the claims that would not be paid but for MD Labs & Owners' unlawful conduct.

424.   By reason of MD Labs & Owners' acts, the State of Louisiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

A.114

425.    Additionally, the Louisiana State Government is entitled to the maximum penalty for each and every violation alleged herein.

**Count XV**
**Maryland False Claims Act**
**Md. Code Health General § 2-602**

426.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

427.    This is a claim for treble damages and penalties under the Maryland False Claims Act.

428.    By virtue of the acts described above, MD Labs & Owners knowingly presented, or caused to be presented, false or fraudulent claims to the Maryland State Government for payment or approval.

429.    By virtue of the acts described above, MD Labs & Owners knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Maryland State Government to approve and pay such false and fraudulent claims.

430.    By virtue of the acts described above, MD Labs & Owners, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Maryland State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

431.    By virtue of the acts described above, MD Labs & Owners knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Maryland State Government.

78

A.115

432.    The Maryland State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by MD Labs & Owners, paid and continues to pay the claims that would not be paid but for MD Labs & Owners' unlawful conduct.

433.    By reason of MD Labs & Owners' acts, the State of Maryland has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

434.    Additionally, the Maryland State Government is entitled to the maximum penalty for each and every violation alleged herein.

### Count XVI
### Massachusetts False Claims Act
### ALM Ch. 12 § 5B

435.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

436.    This is a claim for treble damages and penalties under the Massachusetts False Claims Act.

437.    By virtue of the acts described above, MD Labs & Owners knowingly presented, or caused to be presented, false or fraudulent claims to the Government of the Commonwealth of Massachusetts for payment or approval.

438.    By virtue of the acts described above, MD Labs & Owners knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Government of the Commonwealth of Massachusetts to approve and pay such false and fraudulent claims.

439.    By virtue of the acts described above, MD Labs & Owners, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the

A.116

Government of the Commonwealth of Massachusetts and to deceive the Commonwealth for the purpose of getting the Commonwealth to pay or allow false or fraudulent claims.

440.    By virtue of the acts described above, MD Labs & Owners knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Government of the Commonwealth of Massachusetts.

441.    The Government of the Commonwealth of Massachusetts, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by MD Labs & Owners, paid and continues to pay the claims that would not be paid but for MD Labs & Owners' unlawful conduct.

442.    By reason of MD Labs & Owners' acts, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

443.    Additionally, the Government of the Commonwealth of Massachusetts is entitled to the maximum penalty for each and every violation alleged herein.

## Count XVII
## Michigan Medicaid False Claims Act
## Mich. Comp. Laws§ 400.601

444.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

445.    This is a claim for treble damages and penalties under the Michigan Medicaid False Claims Act.

446.     By virtue of the acts described above, MD Labs & Owners knowingly presented, or caused to be presented, false or fraudulent claims to the Michigan State Government for payment or approval.

447.     By virtue of the acts described above, MD Labs & Owners knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Michigan State Government to approve and pay such false and fraudulent claims.

448.     By virtue of the acts described above, MD Labs & Owners, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Michigan State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

449.     By virtue of the acts described above, MD Labs & Owners knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Michigan State Government.

450.     The Michigan State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by MD Labs & Owners, paid and continues to pay the claims that would not be paid but for MD Labs & Owners' unlawful conduct.

451.     By reason of MD Labs & Owners' acts, the State of Michigan has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

452.     Additionally, the Michigan State Government is entitled to the maximum penalty for each and every violation alleged herein.

**Count XVIII**
**Minnesota False Claims Act**

81

A.118

**Minn. Stat. § 15C.02**

453.     Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

454.     This is a claim for treble damages and penalties under the Minnesota False Claims Act.

455.     By virtue of the acts described above, MD Labs & Owners knowingly presented, or caused to be presented, false or fraudulent claims to the Minnesota State Government for payment or approval.

456.     By virtue of the acts described above, MD Labs & Owners knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Minnesota State Government to approve and pay such false and fraudulent claims.

457.     By virtue of the acts described above, MD Labs & Owners, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Minnesota State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

458.     By virtue of the acts described above, MD Labs & Owners knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Minnesota State Government.

459.     The Minnesota State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by MD Labs & Owners, paid and continues to pay the claims that would not be paid but for MD Labs & Owners' unlawful conduct.

A.119

460.    By reason of MD Labs & Owners' acts, the State of Minnesota has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

461.    Additionally, the Minnesota State Government is entitled to the maximum penalty for each and every violation alleged herein.

### Count XIX
### Montana False Claims Act
### M.C.A. § 17-8-403

462.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

463.    This is a claim for treble damages and penalties under the Montana False Claims Act.

464.    By virtue of the acts described above, MD Labs & Owners knowingly presented, or caused to be presented, false or fraudulent claims to the Montana State Government for payment or approval.

465.    By virtue of the acts described above, MD Labs & Owners knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Montana State Government to approve and pay such false and fraudulent claims.

466.    By virtue of the acts described above, MD Labs & Owners, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Montana State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

A.120

467.     By virtue of the acts described above, MD Labs & Owners knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Montana State Government.

468.     The Montana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by MD Labs & Owners, paid and continues to pay the claims that would not be paid but for MD Labs & Owners' unlawful conduct.

469.     By reason of MD Labs & Owners' acts, the State of Montana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

470.     Additionally, the Montana State Government is entitled to the maximum penalty for each and every violation alleged herein.

### Count XX
### Nevada False Claims Act
### Nev. Rev. Stat. § 357.040

471.     Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

472.     This is a claim for treble damages and penalties under the Nevada False Claims Act.

473.     By virtue of the acts described above, MD Labs & Owners knowingly presented, or caused to be presented, false or fraudulent claims to the Nevada State Government for payment or approval.

474.     By virtue of the acts described above, MD Labs & Owners knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Nevada State Government to approve and pay such false and fraudulent claims.

A.121

475.     By virtue of the acts described above, MD Labs & Owners, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Nevada State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

476.     By virtue of the acts described above, MD Labs & Owners knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Nevada State Government.

477.     The Nevada State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by MD Labs & Owners, paid and continues to pay the claims that would not be paid but for MD Labs & Owners' unlawful conduct.

478.     By reason of MD Labs & Owners' acts, the State of Nevada has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

479.     Additionally, the Nevada State Government is entitled to the maximum penalty for each and every violation alleged herein.

## COUNT XXI
### New Jersey False Claims Act
### N.J.S.A. § 2A:32C-3

480.     Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

481.     This is a claim for treble damages and penalties under the New Jersey False Claims Act.

A.122

482. By virtue of the acts described above, MD Labs & Owners knowingly presented, or caused to be presented, false or fraudulent claims to the New Jersey State Government for payment or approval.

483. By virtue of the acts described above, MD Labs & Owners knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Jersey State Government to approve and pay such false and fraudulent claims.

484. By virtue of the acts described above, MD Labs & Owners, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the New Jersey State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

485. By virtue of the acts described above, MD Labs & Owners knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the New Jersey State Government.

486. The New Jersey State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by MD Labs & Owners, paid and continues to pay the claims that would not be paid but for MD Labs & Owners' unlawful conduct.

487. By reason of MD Labs & Owners' acts, the State of New Jersey has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

488. Additionally, the New Jersey State Government is entitled to the maximum penalty for each and every violation alleged herein.

**Count XXII**
**New Mexico Medicaid False Claims Act**

A.123

## N.M. Stat. Ann.§ 27-14-4

489.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

490.    This is a claim for treble damages and penalties under the New Mexico Medicaid False Claims Act.

491.    By virtue of the acts described above, MD Labs & Owners knowingly presented, or caused to be presented, false or fraudulent claims to the New Mexico State Government for payment or approval.

492.    By virtue of the acts described above, MD Labs & Owners knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Mexico State Government to approve and pay such false and fraudulent claims.

493.    By virtue of the acts described above, MD Labs & Owners, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the New Mexico State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

494.    By virtue of the acts described above, MD Labs & Owners knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the New Mexico State Government.

495.    The New Mexico State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by

A.124

MD Labs & Owners, paid and continues to pay the claims that would not be paid but for MD Labs & Owners' unlawful conduct.

496.   By reason of MD Labs & Owners' acts, the State of New Mexico has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

497.   Additionally, the New Mexico State Government is entitled to the maximum penalty for each and every violation alleged herein.

**Count XXIII**
**New York False Claims Act**
**N.Y. State Fin. Law § 189**

498.   Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

499.   This is a claim for treble damages and penalties under the New York False Claims Act.

500.   By virtue of the acts described above, MD Labs & Owners knowingly presented, or caused to be presented, false or fraudulent claims to the New York State Government for payment or approval.

501.   By virtue of the acts described above, MD Labs & Owners knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New York State Government to approve and pay such false and fraudulent claims.

502.   By virtue of the acts described above, MD Labs & Owners, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the New York State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

88

A.125

503.    By virtue of the acts described above, MD Labs & Owners knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the New York State Government.

504.    The New York State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by MD Labs & Owners, paid and continues to pay the claims that would not be paid but for MD Labs & Owners' unlawful conduct.

505.    By reason of MD Labs & Owners' acts, the State of New York has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

506.    Additionally, the New York State Government is entitled to the maximum penalty for each and every violation alleged herein.

**Count XXIV**
**North Carolina False Claims Act**
**N.C.G.S.A. § 1-607**

507.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

508.    This is a claim for treble damages and penalties under the North Carolina False Claims Act.

509.    By virtue of the acts described above, MD Labs & Owners knowingly presented, or caused to be presented, false or fraudulent claims to the North Carolina State Government for payment or approval.

510.    By virtue of the acts described above, MD Labs & Owners knowingly made, used, or caused to be made or used false records and statements, and omitted material facts,

89

A.126

to induce the North Carolina State Government to approve and pay such false and fraudulent claims.

511.    By virtue of the acts described above, MD Labs & Owners, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the North Carolina State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

512.    By virtue of the acts described above, MD Labs & Owners knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the North Carolina State Government.

513.    The North Carolina State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by MD Labs & Owners, paid and continues to pay the claims that would not be paid but for MD Labs & Owners' unlawful conduct.

514.    By reason of MD Labs & Owners' acts, the State of North Carolina has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

515.    Additionally, the North Carolina State Government is entitled to the maximum penalty for each and every violation alleged herein.

**Count XXV**
**Oklahoma Medicaid Program Integrity Act**
**56 Okla. St. Ann. § 5053.1**

516.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

517.    This is a claim for treble damages and penalties under the Oklahoma Medicaid False Claims Act.

90

A.127

518. By virtue of the acts described above, MD Labs & Owners knowingly presented, or caused to be presented, false or fraudulent claims to the Oklahoma State Government for payment or approval.

519. By virtue of the acts described above, MD Labs & Owners knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Oklahoma State Government to approve and pay such false and fraudulent claims.

520. By virtue of the acts described above, MD Labs & Owners, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Oklahoma State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

521. By virtue of the acts described above, MD Labs & Owners knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Oklahoma State Government.

522. The Oklahoma State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by MD Labs & Owners, paid and continues to pay the claims that would not be paid but for MD Labs & Owners' unlawful conduct.

523. By reason of MD Labs & Owners' acts, the State of Oklahoma has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

524. Additionally, the Oklahoma State Government is entitled to the maximum penalty for each and every violation alleged herein.

### Count XXVI
### Rhode Island State False Claims Act

91

A.128

## Gen. Laws 1956. § 9-1.1-3

525.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

526.    This is a claim for treble damages and penalties under the Rhode Island State False Claims Act.

527.    By virtue of the acts described above, MD Labs & Owners knowingly presented, or caused to be presented, false or fraudulent claims to the Rhode Island State Government for payment or approval.

528.    By virtue of the acts described above, MD Labs & Owners knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Rhode Island State Government to approve and pay such false and fraudulent claims.

529.    By virtue of the acts described above, MD Labs & Owners, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Rhode Island State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

530.    By virtue of the acts described above, MD Labs & Owners knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Rhode Island State Government.

531.    The Rhode Island State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by MD Labs & Owners, paid and continues to pay the claims that would not be paid but for MD Labs & Owners' unlawful conduct.

A.129

532.    By reason of MD Labs & Owners' acts, the State of Rhode Island has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

533.    Additionally, the Rhode Island State Government is entitled to the maximum penalty for each and every violation alleged herein.

## Count XXVII
## Tennessee Medicaid False Claims Act
## Tenn. Code Ann.§ 71-5-182

534.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

535.    This is a claim for treble damages and penalties under the Tennessee Medicaid False Claims Act.

536.    By virtue of the acts described above, MD Labs & Owners knowingly presented, or caused to be presented, false or fraudulent claims under Medicaid program to the Tennessee State Government for payment or approval.

537.    By virtue of the acts described above, MD Labs & Owners knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Tennessee State Government to approve and pay such false and fraudulent claims.

538.    By virtue of the acts described above, MD Labs & Owners, their agents, employees and other co-conspirators knowingly conspired to submit false claims under Medicaid program to the Tennessee State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

A.130

539. By virtue of the acts described above, MD Labs & Owners knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Tennessee State Government.

540. The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by MD Labs & Owners, paid and continues to pay the claims that would not be paid but for MD Labs & Owners' unlawful conduct.

541. By reason of MD Labs & Owners' acts, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

542. Additionally, the Tennessee State Government is entitled to the maximum penalty for each and every violation alleged herein.

### Count XXVIII
### Texas Medicaid Fraud Prevention Law
### Tex. Hum. Res. Code Ann. §36.002

543. Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

544. This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Law.

545. By virtue of the acts described above, MD Labs & Owners knowingly presented, or caused to be presented, false or fraudulent claims to the Texas State Government for payment or approval.

546. By virtue of the acts described above, MD Labs & Owners knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Texas State Government to approve and pay such false and fraudulent claims.

94

A.131

547.    By virtue of the acts described above, MD Labs & Owners, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Texas State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

548.    By virtue of the acts described above, MD Labs & Owners knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Texas State Government.

549.    The Texas State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by MD Labs & Owners, paid and continues to pay the claims that would not be paid but for MD Labs & Owners' unlawful conduct.

550.    By reason of MD Labs & Owners' acts, the State of Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

551.    Additionally, the Texas State Government is entitled to the maximum penalty for each and every violation alleged herein.

### Count XXIX
### Vermont False Claims Act
### 32 V.S.A. § 632

552.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

553.    This is a claim for treble damages and penalties under the Vermont False Claims Act.

A.132

554.    By virtue of the acts described above, MD Labs & Owners knowingly presented, or caused to be presented, false or fraudulent claims to the Vermont State Government for payment or approval.

555.    By virtue of the acts described above, MD Labs & Owners knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Vermont State Government to approve and pay such false and fraudulent claims.

556.    By virtue of the acts described above, MD Labs & Owners, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Vermont State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

557.    By virtue of the acts described above, MD Labs & Owners knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Vermont State Government.

558.    The Vermont State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by MD Labs & Owners, paid and continues to pay the claims that would not be paid but for MD Labs & Owners' unlawful conduct.

559.    By reason of MD Labs & Owners' acts, the State of Vermont has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

560.    Additionally, the Vermont State Government is entitled to the maximum penalty for each and every violation alleged herein.

**Count XXX**
**Virginia Fraud Against Taxpayers Act**
**Va. Code Ann. §8.01-216.3**

A.133

561.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

562.    This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act.

563.    By virtue of the acts described above, MD Labs & Owners knowingly presented, or caused to be presented, false or fraudulent claims to the Government of the Commonwealth of Virginia for payment or approval.

564.    By virtue of the acts described above, MD Labs & Owners knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Government of the Commonwealth of Virginia to approve and pay such false and fraudulent claims.

565.    By virtue of the acts described above, MD Labs & Owners, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Government of the Commonwealth of Virginia and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

566.    By virtue of the acts described above, MD Labs & Owners knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Government of the Commonwealth of Virginia.

567.    The Government of the Commonwealth of Virginia, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by MD Labs & Owners, paid and continues to pay the claims that would not be paid but for MD Labs & Owners' unlawful conduct.

A.134

568.    By reason of MD Labs & Owners' acts, the Commonwealth of Virginia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

569.    Additionally, the Virginia Commonwealth Government is entitled to the maximum penalty for each and every violation alleged herein.

**Count XXXI**
**Washington False Claims Act**
**RCW § 74.66.020**

570.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

571.    This is a claim for treble damages and penalties under the Washington False Claims Act.

572.    By virtue of the acts described above, MD Labs & Owners knowingly presented, or caused to be presented, false or fraudulent claims to the Washington State Government for payment or approval.

573.    By virtue of the acts described above, MD Labs & Owners knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Washington State Government to approve and pay such false and fraudulent claims.

574.    By virtue of the acts described above, MD Labs & Owners, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Washington State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

A.135

575.    By virtue of the acts described above, MD Labs & Owners knowingly made or used, or caused to be made or used, false records or statement to conceal, avoid or decrease obligations to pay or transmit money to the Washington State Government.

576.    The Washington State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by MD Labs & Owners, paid and continues to pay the claims that would not be paid but for MD Labs & Owners' unlawful conduct.

577.    By reason of MD Labs & Owners' acts, the State of Washington has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

578.    Additionally, the Washington State Government is entitled to the maximum penalty for each and every violation alleged herein.

**Count XXXII**
**California Insurance Frauds Prevention Act**
**California Insurance Code§ 1871.7**

579.    Relator repeats and realleges each and every allegation contained in each paragraph above as though fully set forth herein.

580.    This is a claim for treble damages and penalties under the California Insurance Frauds Prevention Act, Cal. Ins. Code§ 1871.7, as amended (referred to in this Count as "the Act").  The Act provides for civil recoveries against persons who violate the provisions of the Act or the provisions of California Penal Code sections 549 or 550, including recovery of up to three times the amount of any fraudulent insurance claims, and fines of between $5,000 and $10,000 for each such claim.  Cal. Ins. Code §1871.7(b).

581.    Subsection (e) of Cal. Ins. Code§1871.7 provides for a *qui tam* civil action in order to create incentives for private individuals who are aware of fraud against insurers to

A.136

help disclose and prosecute the fraud. Cal. Ins. Code §1871.1(e). The *qui tam* provision was patterned after the Federal False Claims Act, 31 U.S.C. §§3729-32, and the California False Claims Act, Cal. Gov't Code §§12650 *et seq.*

582. Subsection (b) of Cal. Ins. Code §1871.7 provides for civil recoveries against persons who violate the provisions of Penal Code sections 549 or 550. Section 550 of the Penal Code prohibits the following activities, among others:

> (a) It is unlawful to do any of the following, or to aid, abet, solicit, or conspire with any person to do any of the following:
>
> ***
>
> (5) Knowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim.
>
> (6) Knowingly make or cause to be made any false or fraudulent claim for payment of a health care benefit.
>
> ***
>
> (b) It is unlawful to do, or to knowingly assist or conspire with any person to do, any of the following:
>
> (1) Present or cause to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.
>
> (2) Prepare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.
>
> (3) Conceal, or knowingly fail to disclose the occurrence of, an event that affects any person's initial or continued right or entitlement to any insurance benefit or payment, or the amount of any benefit or payment to which the person is entitled.

Cal. Penal Code§ 550.

100

A.137

583.    By virtue of the acts described in this Complaint, MD Labs & Owners knowingly presented, or caused to be presented, false or fraudulent claims for health care benefits, in violation of Penal Code §550(a).

584.    By virtue of the acts described in this Complaint, MD Labs & Owners also concealed and/or failed to disclose information that would have affected their right to receive reimbursement, in violation of Penal Code §550(b).

585.    Each claim for reimbursement that was inflated as a result of defendant's illegal practices represents a false or fraudulent record or statement, and a false or fraudulent claim for payment.

586.    Private insurers, unaware of the falsity of the records, statements and claims made or caused to be made by defendant, paid and continue to pay the claims that would not be paid but for defendant's unlawful conduct.

587.    The California State Government is entitled to receive three times the amount of each claim for compensation submitted in violation of Cal. Ins. Code §1871.7. Additionally, the California State Government is entitled to the maximum penalty for each and every violation alleged herein.

**Count XXXIII**
**Illinois Insurance Claims Frauds Prevention Act**
**740 Ill. Comp. Stat. §92**

588.    Relator repeats and realleges each and every allegation contained in each paragraph above as though fully set forth herein.

589.    This is a claim for treble damages and penalties under the Illinois Insurance Claims Fraud Prevention Act, 740 Ill. Comp. Stat. §92.

101

A.138

590.    Subsection 5(b) of the Illinois Insurance Claims Fraud Prevention Act provides:

> A person who violates any provision of this Act or Article 46 of the Criminal Code of 1961 shall be subject, in addition to any other penalties that may be prescribed by law, to a civil penalty of not less than $5,000 nor more than $10,000, plus an assessment of not more than 3 times the amount of each claim for compensation under a contract of insurance.

*Id.*

591.    Article 46 of the Illinois Criminal Code, referenced in the above-quoted section, provides criminal penalties for any person who commits the offense of insurance fraud, defined in the statute as follows:

> a.    A person commits the offense of insurance fraud when he or she knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company.

720 Ill. Comp. Stat. §5/46-l(a).

592.    Subsection 15(a) of the Illinois Insurance Claims Fraud Prevention Act provides for a qui tam civil action in order to create incentives for private individuals to prosecute violations of the statute.  Subsection 15(a) provides: "An interested person, including an insurer, may bring a civil action for a violation of this Act for the person and for the State of Illinois. The action shall be brought in the name of the State."  740 Ill. Comp. Stat. §92/15(a).

593.    By virtue of the conduct described in this Complaint, MD Labs & Owners committed the following acts, or aided and abetted the commission of the following acts, in violation of the Illinois Insurance Claims Fraud Prevention Act:  knowingly obtained, attempted to obtain, and caused to be obtained, by deception, control over the property of an

102

A.139

insurance company or self- insured entity by the making of a false claim and by causing a false claim to be made on a policy of insurance issued by an insurance company, in violation of 740 Ill. Comp. Stat. §92/5(b) and 720 Ill. Comp. Stat. §5/46-l(a).

594.    As a result of such conduct, MD Labs & Owners have received illegal profits to which it was not entitled, at the expense of insurers and at the expense of the People of the State of Illinois, in substantial amount to be determined at trial.

595.    The Illinois State Government is entitled to receive three times the amount of each claim for compensation submitted by MD Labs & Owners in violation of 740 Ill. Comp. Stat. §92. Additionally, the Illinois State Government is entitled to the maximum penalty for each and every violation alleged herein.

**Count XXXIV**
**Federal Anti-Kickback Statute**
**42 U.S.C. § 1320a-7b(b)**

596.    Relator repeats and realleges each and every allegation contained in each paragraph above as though fully set forth herein.

597.    By virtue of the acts described above, MD Labs & Owners have been violating the Anti-Kickback Statute by entering into Service Agreements in which MD Labs agrees to compensate marketing companies for collecting specimens.

598.    MD Labs' Service Agreement with Pace Solutions called for MD Labs to compensate Pace Solutions $18 for each insured specimen collected by Pace Solutions.

599.    MD Labs' Service Agreement with KDB Consulting called for MD Labs to compensate KDB Consulting with 25 percent commissions for each customer account assigned to KDB Consulting up to $500,000 in revenue in any month and 30 percent

A.140

commission paid for customer accounts assigned to KDB Consulting in any month where revenue exceeds $500,000.

600.    MD Labs sought reimbursement for the testing performed on these specimens from Medicare, Medicaid and other government-funded healthcare programs.

601.    MD Labs & Owners have been further violating the Anti-Kickback Statute through their routine practice of not balance billing patients.

602.    By reducing the amount a patient pays for services, it can induce the patient to seek more services that are payable by Medicare.

603.    By virtue of the acts described above, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

604.    Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

**Count XXXV**
**Eliminating Kickbacks in Recovery Act**
**18 U.S.C. §220(a)**

605.    EKRA makes it illegal to knowingly and willfully (1) solicit or receive remuneration for referring a patient to a recovery home, clinical treatment facility, or laboratory, or (2) pay or offer remuneration to either induce a referral of an individual to or in exchange for an individual using the services of a recovery home, clinical treatment facility or laboratory.

606.    EKRA applies to all laboratory business arrangements covered by all payors, whether government or commercial, regardless of the type of testing involved.

607.    MD Labs & Owners practice of entering into the Service Agreements in which MD labs agrees to compensate marketing companies for collecting specimens is a violation of EKRA.

608.   By virtue of the acts described above, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

609.   Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

### PRAYER

WHEREFORE, Relator prays for judgment against the Defendants as follows:

1.   That Defendants cease and desist from violating 31 U.S.C. §§ 3729 *et seq.,* and the counterpart provisions of the state statutes set forth above;

2.   That Defendants cease and desist from violating 42 U.S.C. §1320a-7b(b).

3.   That Defendants cease and desist from violating 18 U.S.C. §220(a).

4.   that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of 31 U.S.C. §3729;

5.   that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Alaska has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of AK Stat§ 09.58.010(c);

6.   that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of California has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of Cal. Govt. Code §12651(a);

7.   that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Colorado has sustained because of defendant's

A.142

actions, plus the maximum civil penalty allowed for each violation of Col Rev. Stat. 25.5-4-305;

8.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Connecticut has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of Conn. Gen. Stat. § 4-275;

9.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Delaware has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of 6 Del. C. §1201(a);

10.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the District of Columbia has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of D.C. Code§ 2-381.02;

11.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Florida has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of Fla. Stat. Ann. §68.082(2);

12.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Georgia has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of Georgia Code Ann. §49-4-168.1;

13.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Hawaii has sustained because of defendant's

106

A.143

actions, plus the maximum civil penalty allowed for each violation of Haw. Rev. Stat. §661-21;

14.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Illinois has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of 740 Ill. Comp. Stat. §175/3;

15.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Indiana has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of Ind. Code §5-11-5.5-2;

16.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Iowa has sustained because of defendant's actions, plus the maximum  civil penalty allowed for each violation of I. C.A. § 685.2;

17.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Louisiana has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of La. R.S. § 46:437.1 *et seq.;*

18.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Maryland has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of Md. Health-Gen. Code Ann. §§ 2- 602;

19.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the Commonwealth of Massachusetts has sustained because of

defendant's actions, plus the maximum civil penalty allowed for each violation of ALM Ch. 12 § 5B;

20.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Michigan has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of Mich. Comp. Laws §400.601 *et seq.;*

21.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Minnesota has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of the Minn. Stat.§ 15C.02;

22.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Montana has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of Mon. Code Anno. § 17-8-403;

23.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Nevada has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of Nev. Rev. Stat. Ann. §357.040;

24.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New Jersey has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of N.J. Stat. §2A:32C-3;

25.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New Mexico has sustained because of defendant's

A.145

actions, plus the maximum civil penalty allowed for each violation of N.M. Stat. Ann. §27-14-4;

26.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New York has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of N.Y. State Fin. §189;

27.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of North Carolina has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of the NC Gen. Stat.§ 1-607;

28.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Oklahoma has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of 63 Okla. St. §5053.1;

29.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Rhode Island has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of R.I. Gen. Laws §9-1.1-3;

30.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Tennessee has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of Tenn. Code Ann.§ 71-5- 182;

31.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Texas has sustained because of defendant's actions,

A.146

plus the maximum civil penalty allowed for each violation of Tex. Hum. Res. Code Ann. §36.002;

32.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Vermont has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of 32 V.S.A. § 632;

33.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Virginia has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of Va. Code Ann. §8.01-216.3;

34.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Washington has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation Rev. Code Wash. (ARCW) § 74.66.020;

35.     that this Court enter judgment against Defendants in an amount equal to three times the amount of each claim for compensation submitted by Defendants in violation of 740 Ill. Comp. Stat. §92, plus the maximum civil penalty allowed for each violation of 740 Ill. Comp. Stat. §92;

36.     that Relator be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act, and the equivalent provisions of the state statutes set forth above;

37.     that Relator be awarded all costs of this action, including attorneys' fees and expenses; and

38.     that Relator recover such other relief as the Court deems just and proper.

May 28, 2023                                          **OMNI HEALTHCARE, INC.**
                                                     *By its attorneys,*

110

A.147

/s/ Scott M. Heidorn
SCOTT M. HEIDORN, BBO# 661787
BERGSTRESSER & POLLOCK PC
52 Temple Place
Boston, MA 02111
(617) 682-9211 / (617) 451-1070 - FAX
scott@bergstresser.com

-and-

/s/ David B. Harrison
DAVID B. HARRISON (*pro hac vice*)
SPIRO HARRISON & NELSON
363 Bloomfield Avenue, Suite 2C
Montclair, NJ 07042
(973) 232-0881 / (973) 232-0887 - FAX
dharrison@shnlegal.com

111

A.148

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands

a trial by jury on all claims so triable.

May 28, 2023

**OMNI HEALTHCARE, INC.**
*By its attorneys,*

/s/ Scott M. Heidorn
SCOTT M. HEIDORN, BBO# 661787
BERGSTRESSER & POLLOCK PC
52 Temple Place
Boston, MA 02111
(617) 682-9211 / (617) 451-1070 - FAX
scott@bergstresser.com

-and-

*/s/ David B. Harrison*
DAVID B. HARRISON (*pro hac vice*)
SPIRO HARRISON & NELSON
363 Bloomfield Avenue, Suite 2C
Montclair, NJ 07042
(973) 232-0881 / (973) 232-0887 - FAX
dharrison@shnlegal.com

112

A.149

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 28, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all registered participants identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to any current participants indicated as non-registered participants on this date.

May 28, 2023

**/S/ SCOTT M. HEIDORN**
SCOTT M. HEIDORN, BBO# 661787
BERGSTRESSER & POLLOCK PC
52 Temple Place
Boston, MA 02111
(617) 682-9211 / (617) 451-1070 - FAX
scott@bergstresser.com

-and-

*/s/ David B. Harrison*
DAVID B. HARRISON (*pro hac vice*)
SPIRO HARRISON & NELSON
363 Bloomfield Avenue, Suite 2C
Montclair, NJ 07042
(973) 232-0881 / (973) 232-0887 - FAX
dharrison@shnlegal.com

A.150

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al., ex rel.* OMNI HEALTHCARE, INC., <br><br> Plaintiffs, <br><br> v. <br><br> MD SPINE SOLUTIONS LLC, D/B/A MD LABS INC., DENIS GRIZELJ, MATTHEW RUTLEDGE AND DOE HEALTHCARE PROVIDERS 1 - 100, <br><br> Defendants. | Case No. 18-cv-12558-PBS |

### DEFENDANT MD SPINE SOLUTIONS LLC, D/B/A MD LABS INC., DENIS GRIZELJ AND MATTHEW RUTLEDGE'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, Defendants MD Spine Solutions LLC, d/b/a MD Labs Inc. ("MD Labs"), Matthew Rutledge, and Denis Grizelj (collectively, "Defendants") hereby respectfully move this Court to enter summary judgment in their favor and dismiss the remaining claims of Relator Omni Healthcare, Inc. ("Omni") in its Second Amended Complaint ("SAC") (ECF No. 184).[1]  As described herein and in further detail in Defendants' Memorandum of Law, filed herewith, Omni cannot sustain its burden on any of its theories of liability, either because the undisputed facts wholly disprove its theory, or Omni failed to conduct discovery into matters on which it bears the burden of proof.

The undisputed facts, including the testimony of Omni's own expert, disprove Omni's claim premised on the argument that polymerase chain reaction ("PCR") for urinary tract infection ("UTI") testing is never medically necessary.  As a matter of law, it is not the role of a

---

[1] Counts XXXIV and XXXV were dismissed by the Court on January 22, 2024 (ECF No. 232).

A.151

laboratory to second guess a treating provider's determination of what testing is medically necessary for a particular patient. Discovery revealed that Omni's principal, Dr. Craig Deligdish, fraudulently caused Omni to submit nearly 600 requisitions for PCR UTI testing to MD Labs, despite his claimed belief that PCR UTI testing is never medically necessary, and contrary to Omni providers' orders for a different type of UTI test for their patients. Dr. Deligdish admitted to having subverting Omni providers' orders solely to substantiate allegations in this lawsuit. Moreover, although Omni put forth a slew of theories upon which Omni purported to base its claim that Defendants violated the False Claims Act ("FCA") in Count I of the SAC, it failed to pursue most of those theories in discovery and, as such, cannot sustain its burden of proof as to those theories.

Furthermore, the theories on which Omni did explore in discovery were all revealed to be without evidentiary support.  There is, for example, no evidence that the compensation structure by which Defendants compensated sales representatives violated the federal Anti-Kickback Statute ("AKS") to render any claims false. Omni cannot establish that behavior of its MD Labs sales representatives or Omni providers' medical decisions were affected based on whether a sales representative was a W-2 employee or 1099 independent contractor. There is further no evidence that any Omni provider was improperly influenced to order PCR UTI tests from MD Labs based on MD Labs' financial hardship policy or billing practices, since Dr. Deligdish admitted that he diverted patient specimens to MD Labs in order to manufacture fodder for this litigation. And Omni conducted no discovery with respect to what caused other providers to order PCR UTI tests from MD Labs.

Finally, Counts II through XXXIII allege derivative state analogues of the FCA and fail for the same reasons as Count I.

A.152

In support of this Motion, Defendants rely upon their Memorandum of Law, Statement of Material Facts, and exhibits filed herewith.

WHEREFORE Defendants respectfully request that this Court enter summary judgment in favor of Defendants and against Omni on all remaining counts of Omni's SAC.

Dated: July 31, 2024

Respectfully submitted,

MD SPINE SOLUTIONS LLC, D/B/A MD LABS INC., DENIS GRIZELJ AND MATTHEW RUTLEDGE

By their attorneys,

*/s/ Seth B. Orkand*
Seth B. Orkand (BBO #669810)
Julianna M. Charpentier (BBO #703284)
ROBINSON & COLE LLP
One Boston Place, 25th Floor
Boston, Massachusetts 02108
Tel: (617) 557-5915
Fax: (617) 557-5999
sorkand@rc.com
jcharpentier@rc.com

Edward J. Heath (admitted *pro hac vice)*
Kevin P. Daly (BBO #675644)
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT 06103
Tel: (860) 275-8200
Fax: (860) 275-8299
eheath@rc.com
kdaly@rc.com

Danielle H. Tangorre (admitted *pro hac vice*)
ROBINSON & COLE LLP
Chrysler East Building
666 Third Avenue, 20th Fl.
New York, NY 10017
Tel: (212) 451-2900
Fax: (212) 451-2999
dtangorre@rc.com

3

A.153

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served upon

all counsel of record via ECF electronic filing on July 31, 2024.

*/s/ Seth B. Orkand*
Seth B. Orkand

4

A.154

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al., ex rel.* OMNI HEALTHCARE, INC., <br><br> Plaintiffs, <br><br> v. <br><br> MD SPINE SOLUTIONS LLC, D/B/A MD LABS INC., DENIS GRIZELJ, MATTHEW RUTLEDGE AND DOE HEALTHCARE PROVIDERS 1 - 100, <br><br> Defendants. | Case No. 18-cv-12558-PBS |

**DEFENDANT MD SPINE SOLUTIONS LLC, D/B/A MD LABS INC.,**
**DENIS GRIZELJ AND MATTHEW RUTLEDGE'S**
**STATEMENT OF MATERIAL FACTS**

**A.**   *MD Labs and PCR UTI Testing*

1.   Defendant MD Labs is an independent clinical laboratory in Reno, Nevada, founded by defendants Matthew Rutledge and Denis Grizelj in 2011. Denis Grizelj Deposition Transcript ("Grizelj Tr."), **Ex. 1**, at 16:20-17:17; Matthew Rutledge Deposition Transcript ("Rutledge Tr."), **Ex. 2**, at 10:7-12:14.

2.   MD Labs historically performed urine drug testing ("UDT"). Declaration of Matthew Rutledge ("Rutledge Decl."), **Ex. 3**, ¶ 4; Second Amended Complaint ("SAC"), ECF No. 184, ¶ 34.  In or about 2017, it added urinary tract infection ("UTI") testing using polymerase chain reaction ("PCR") technology. Rutledge Tr., **Ex. 2**, at 31:15-24; 42:21-43:1.

3.   PCR testing technology has been available since the mid-1980s. *Polymerase Chain Reaction* (*PCR*), NATIONAL LIBRARY OF MEDICINE,

https://www.ncbi.nlm.nih.gov/probe/docs/techpcr/ (last visited July 29, 2024), **Ex. 4**.

A.155

4.      PCR testing is highly accurate and amplifies copies of a segment of DNA to enable identification of genetic material belonging to a particular biological origin. Expert Report of Dr. Ko ("Ko Rpt."), **Ex. 5**, at 6-7; Dr. Dicken Ko Deposition Transcript ("Ko Tr."), **Ex. 6**,123:8-124:1.

5.      In recent years, PCR technology has become a standard test to identify a range of pathogens, including HIV, Hepatitis C, and most recently, COVID-19. Ko Rpt., **Ex. 5**, at 6; Ko. Tr., **Ex. 6**, 123:12-21

6.      By contrast the standard test for UTIs for over 60 years has been the bacterial urine culture ("BUC"), where a urine sample is placed on a growth medium in a Petri dish, and laboratories wait between 24 and 48 hours to determine if any bacteria grew, and sometimes longer for slow-growing bacteria.  Ko Rpt. **Ex. 5**, at 4; Ko. Tr. **Ex. 6**, 82:18-24.

7.      MD Labs used PCR technology to test for the presence of genetic material for 17 or 19 pathogens, depending on the time period. Grizelj Tr., **Ex. 1**, at 220:16-221:6; 226:9-16; Rutledge Decl., **Ex. 3**, ¶ 5.

8.      In addition to the PCR test, MD Labs simultaneously conducted an antibiotic susceptibility test ("AST") by culturing the urine specimen to grow any bacteria present so it could then determine whether it was susceptible to a broad array of antibiotics. Grizelj Tr., **Ex. 1**, at 198:12-24; Dr. Steven Parker Deposition Transcript ("Parker Tr."), **Ex. 7**, at 75:16-76:1; Rutledge Decl., **Ex. 3**, ¶ 8.

9.      Performing both tests simultaneously provided faster than results than would be available if the lab delayed culturing the sample for AST until PCR results were available. Rutledge Decl., **Ex. 3**, ¶ 9.

A.156

10.     If PCR testing identified pathogens, MD Labs allowed the urine culture to continue to grow and performed AST. Grizelj Tr., **Ex. 1**, at 198:12-24; 199:14-17; Rutledge Decl., **Ex. 3**, ¶ 10.

11.     If a PCR test did not detect any pathogens, MD Labs discarded and did not report or bill for the culture, instead billing only for the PCR pathogen detection test. Grizelj Tr., **Ex. 1**, at 198:12-199:2; Rutledge Decl., **Ex. 3**, ¶ 11.

12.     PCR testing produces results more quickly than BUC. Ko Rpt., **Ex. 5**, at 5-6.

13.     MD Labs could often determine if a patient had an infection 24 hours before a BUC would have produced results. Parker Tr., **Ex. 7**, at 121:24-122:3; Ko Rpt., **Ex. 5**, at 4-5; Rutledge Decl., **Ex. 3**, ¶ 12.

14.     MD Labs' faster results enabled providers to prescribe appropriate antibiotics more quickly or eliminate a UTI as the cause of patient symptoms. Ko Rpt., **Ex. 5**, at 5; Ko. Tr., **Ex. 6**, at 134:21-135:19.

15.     MD Labs offered providers the ability to receive PCR UTI results before AST results were available to further aid in the clinical decision-making process. *See*, *e.g.*, MDLabs_0008722, **Ex. 8**.

16.     PCR UTI testing is more accurate than BUC, which may miss bacteria where a patient has already started antibiotics or where there is a polymicrobial infection where a dominant organism overgrows a secondary pathogen. Parker Tr., **Ex. 7**, at 114:15-23; Ko Tr., **Ex. 6**, 94:3-20; 113:12-24.

17.     MD Labs' PCR testing provided significant clinical benefit to patients whose UTIs were caused by pathogens traditional BUC was incapable of identifying. Ko Rpt., **Ex. 5**, at 5; Ko. Tr., **Ex. 6**, 94:16-95:1; 113:12-24.

A.157

18. PCR testing, combined with AST, decreases the spread of antibiotic-resistant bacteria that can generate dangerous infections because it ensures that clinicians use an effective antibiotic the first time around, rather than potentially using an antibiotic that may not be as effective. Ko Rpt., **Ex. 5**, at 6-7.

19. At the time MD Labs offered PCR UTI testing, no local coverage determination ("LCD") or national coverage determination ("NCD") limited the use of PCR UTI testing and government and commercial payors routinely paid claims for PCR UTI testing. Rutledge Decl., **Ex. 3**, ¶ 7.

20. Both parties' experts agreed that PCR UTI testing is reasonable and necessary in certain cases. Dr. Mourtzinos Deposition Transcript ("Mourtzinos Tr."), **Ex. 9**, at 54:11-55:8; 77:4-20 Ko Tr., **Ex. 6**, at 89:4-13.

21. Omni's own medical expert agreed with a myriad of reasons that PCR testing for UTIs may be medically necessary, including: (1) Refractory UTI: failed standard therapy from urine culture/traditional empiric treatment; (2) Patients sent to urology for recurrent or refractory UTI; (3) Need for better test; (4) PCR test allows identification of specific organisms and resistance genes; (5) Repeat PCR test after treatment in symptomatic patients allows evaluation of treatment and tailoring to sterilize the urine; (5) Complicated UTI: male, fever, foreign body, stone, obstruction, etc.; (6) Empiric antibiotics started and tailored to resistance genes in 24 to 48 hours (urine culture 48-72 hours); (7) Urine Culture unable to identify extended-spectrum β-lactamase, high prevalence; and (8) Complete divergence of treatment course.  Mourtzinos Tr., **Ex. 9**, at 77:4-20, 78:7-80:16; Jonathan Rubenstein, MD & Mark Painter, *How to get reimbursed for multiplex PCR urine cultures*, 50 Urology Times Journal (2022), **Ex. 10**.

A.158

22.     Dr. Mourtzinos' opinion was consistent with that of MD Labs' expert, Dr. Ko, who testified that PCR testing was indicated for patients with a "complicated urinary tract infection or a recurrent urinary tract infection with prior negative studies or recurrent positive polymicrobial infection and a lot of antibiotic resistance," to "help the providers further define . . . what is in the urine, what is the interplay of organisms that exist in that urobiome." Ko Tr., **Ex. 6**. at 89:4-13; *see also id.* at 94:3-95:3.

23.     PCR UTI testing is also indicated for patients with persistent symptoms but for whom a standard culture does not identify the bacteria and there is a suspected inflammatory component. Ko Tr., **Ex. 6**, at 94:8-20.

24.     PCR testing is not new, novel, relatively unknown or rarely used and is the standard test for a range of pathogens. Ko Rpt., **Ex. 5**, at 6.

25.     Peer-reviewed literature notes that BUC has several limitations, including missed polymicrobial infections, false negatives, contamination of urine specimens, and prolonged turnaround times. Ko Rpt., **Ex. 5**, at 4-5.

26.     Additionally, one study found that in cases where PCR testing detected microorganisms missed by SUC, over 75 percent of those cases were "'true UTIs, as evidenced by elevated levels of urinary biomarkers in a symptomatic population with a presumptive UTI diagnosis.'" Ko Rpt., **Ex. 5**, at 6 (quoting Haley, et al., *Comparison Shows that Multiplex Polymerase Chain Reaction Identifies Infection-associated Urinary Biomarker-positive Urinary Tract Infections that are Missed by Standard Urine Culture*, 58 EUROPEAN UROLOGY OPEN SCI., 73-91 (2023)).

27.     Furthermore, "[d]ata are now emerging that using PCR instead of SUC has led to fewer recurrent infections, hospitalizations, and significantly less overall cost for complicated

A.159

urinary infections." Ko Rpt., **Ex. 5**, at 7 (citing Ko, et al., *Real-World Evidence That a Novel Diagnostic Combining Molecular Testing With Pooled Antibiotic Susceptibility Testing is Associated With Reduced Infection Severity and lower Cost Compared With Standard Urine Culture in Patients With Complicated or Persistently Recurrent Urinary Tract Infections*, 1 JU OPEN PLUS 5 (2023)).

28.     MD Labs' expert opined that PCR UTI testing is not experimental and instead is "very standard across the country." Ko Tr., **Ex. 6**, at 84:22-86:3 (noting PCR UTI testing is not included among a list of experimental UTI tests).

29.     MD Labs' test for 17 or 19 pathogens was within the range of pathogens endorsed by peer-reviewed literature, and the specific pathogens for which MD Labs tested were appropriate. Ko Rpt., **Ex. 5**, at 5.

30.     Providers not affiliated with MD Labs also recognized and praised the clinical utility of MD Labs' PCR UTI test. *See*, *e.g*., MD0211812, **Ex. 11**.

31.     Based on MD Labs' medical director's clinical expertise, Defendants believed PCR UTI testing could assist providers treating patients better than BUCs, as PCR testing could be completed more quickly and was more sensitive in identifying bacteria than BUC. Grizelj Tr., **Ex. 1**, at 73:2-16; *see also* Parker Tr., **Ex. 7**, at 81:11-82:16; 104:10-20; 121:24-122:3.

32.     Defendants were aware that several labs already offered PCR UTI testing when MD Labs began offering the testing, and that contemporaneous research indicated the superiority over BUCs. Rutledge Decl., **Ex. 3**, ¶ 6.

**B.**     *The Role of the Clinical Laboratory*

33.     Clinical laboratories do not have a role in determining the medical necessity of testing ordered by medical providers. Dr. Deligdish Deposition Transcript ("Deligdish Tr."), **Ex. 12**, at 39:18-21.

6

A.160

34. Laboratory staff are not trained medical professionals, do not examine patients to assess their medication conditions, and do not treat patients. Rutledge Decl., **Ex. 3**, ¶ 14; *see also* Brief of Amicus Curiae American Clinical Laboratory Association at 3, *U.S. ex rel. Groat v. Boston Heart Diagnostics Corp.*, 296 F. Supp. 3d 155, 165 (D.D.C. 2017), **Ex. 13** ("In the vast majority of cases, laboratories do not see the patient for whom testing is being ordered. Even in cases in which the patient comes to a laboratory facility to have a specimen drawn, the laboratory does not examine the patient to assess his or her medical condition.").

35. By contrast, providers meet with patients, assess their conditions, have knowledge of their medical histories, and determine the course of treatment appropriate for patients based on their skill and expertise. *See*, *e.g.*, Dr. Kimberly McGrath Deposition Transcript ("McGrath Tr."), **Ex. 14**, at 25:3-26:13

36. Medical providers typically send laboratories such as MD Labs only a requisition form indicating the test the *provider* determined to be medically necessary and the applicable diagnosis code provided by the provider. *See*, *e.g.*, McGrath Tr., **Ex. 14**, at 15:2-8 (testifying that only he determines what laboratory tests to order for his patients).

37. Clinical laboratories must perform the tests ordered by providers; it would be inappropriate to override their clinical decisions. Ko Rpt., **Ex. 5**, at 9.

**C.**     *MD Labs' Sales Force*

38. At all times relevant to this litigation, MD Labs used both independent contractor and W-2 employee sales representatives to promote the existence and benefits of PCR UTI testing to providers. Grizelj Tr., **Ex. 1**, at 226:17-20; Rutledge Tr., **Ex. 2**, at 96:21-97:8; Rutledge Decl., **Ex. 3**, ¶ 15.

A.161

39.     Pursuant to agreements with sales representatives, MD Labs paid commissions based on the revenue generated from the testing ordered by providers at their sales accounts. Rutledge Tr., **Ex. 2**, at 99:1-13; Rutledge Decl., **Ex. 3**, ¶ 17.

40.     These agreements did not provide for any payment to providers. Rutledge Decl., **Ex. 3**, ¶ 18.

41.     MD Labs sales representatives did not offer or pay anything of value to providers. Rutledge Decl., **Ex. 3**, ¶ 18.

42.     MD Labs trained, managed, and, if needed, disciplined its sales representatives in the same manner, regardless of whether they were independent contractors or W-2 employees. Grizelj Tr., **Ex. 1**, at 128:13-20; Rutledge Tr., **Ex. 2**, at 79:7-15;  Rutledge Decl., **Ex. 3**, ¶ 16.

43.     MD Labs trained independent contractor and W-2 employee sales representatives identically and all sales representatives were instructed to use the same marketing materials. Rutledge Decl., **Ex. 3**, ¶ 15.

44.     Roy Riley ("Riley"), owner and sales representative of Pace Solutions LLC, explicitly denies that either the way he was compensated by MD Labs or his 1099 status affected the sales message he used about the benefits of PCR testing, or that his compensation structure incentivized him to sell medically unnecessary tests. Declaration of Roy Riley ("Riley Decl.,")., **Ex. 15**, ¶ 7.

45.     Pace Solutions LLC and Riley promoted PCR UTI testing as appropriate for patients who suffer from recurrent or intractable UTIs. Riley Decl., **Ex. 15**, ¶ 5.

46.     Defendants told Riley to promote PCR UTI testing based on medical necessity and never asked him to do anything that compromised his integrity. Riley Decl., **Ex. 15**, ¶¶ 5, 8.

A.162

47.     Defendants subjectively believed that paying independent sales representatives on commission was lawful. Grizelj Tr., **Ex. 1**, at; Rutledge Tr., **Ex. 2**, at 88:16-21.

48.     Once MD Labs was instructed by its counsel that *U.S. v. Mallory*, 988 F.3d 730 (4th Cir. 2021) held that certain commission-based compensation arrangements for laboratory independent contractor sales representatives could violate the AKS MD Labs disbanded its independent sales force and hired sales representatives as W-2 employees. Rutledge Decl., **Ex. 3**, ¶ 21.

**D.     *MD Labs' Billing Practices***

49.     For approximately two years, MD Labs charged some patients $50 for PCR UTI testing if they were uninsured or their insurers denied coverage. MD Labs did so with the understanding that this was part of MD Labs' financial hardship policy for certain patients.. Rutledge Decl., **Ex. 3**, ¶ 19.

50.     The only Omni provider that the record has shown was aware of some patients being charged $50 was Deligdish (*see* OMNI00073, **Ex. 16**), who admitted that his motivation to send samples to MD Labs was based on his desire to substantiate allegations in this lawsuit. Deligdish Tr., **Ex. 12**, at 42:24-43:5; 86:14-87:3.

51.     MD Labs' intent in offering the lower charge was to relieve demonstrated financial burden on patients, and Defendants did not believe a potential benefit to *patients* was an inducement to *providers*. Rutledge Tr., **Ex. 2**, at 147:1-8; Rutledge Decl., **Ex. 3**, ¶ 19.

52.     In or about 2020, MD Labs changed its financial hardship policy to no longer offer a reduced price where the patient was not insured or their insurance denied coverage for PCR UTI tests, regardless of a patient's financial condition. Rutledge Decl., **Ex. 3**, ¶ 20.

A.163

**E.**     *Omni and Dr. Deligdish*

53.     Omni, owned by Deligdish, is a Florida medical group that also operates a physician-owned office laboratory called Melbourne Medical Laboratory. Deligdish Tr., **Ex. 12**, at 21:4-5; 23:10-18; 89:23-90:1; 91:6-8.

54.     Omni has received between $10 million and $20 million in revenue from settlements or other awards from *qui tam* actions. Deligdish Tr., **Ex. 12**, at 26:17-20.

55.     Deligdish also owns another entity, Lo Tignov, whose sole purpose is to investigate potential *qui tam* defendants and reap substantial investigatory fees through settlements with its targets. Deligdish Tr., **Ex. 12**, at 26:17-20 (Omni has received between $10 million and $20 million in settlements or other awards from *qui tam* actions); *id.* at 164:8-16 (Lo Tignov has investigated companies that it alleged engaged in Medicare and Medicaid fraud); 285:19-23 (Deligdish is the sole owner of Lo Tignov); *id.* at 286:7-9 (Lo Tignov does not conduct investigations for anyone or any entity other than Deligdish or Omni).

56.     Deligdish diverted Omni patient specimens for which Omni providers had ordered a BUC to MD Labs for PCR UTI testing in an effort to create a basis for this action. Deligdish Tr., **Ex. 12**, at 86:14-87:24; 95:23-96:3.

57.     Deligdish caused Omni to submit nearly 600 requisitions for PCR UTI testing to MD Labs, notwithstanding that patients' treating providers instead ordered a different type of test. Deligdish Tr., **Ex. 12**, at 38:1-9; 95:23-96:3.

58.     Although Deligdish asserted that Omni providers were informed that samples would be sent to MD Labs for PCR testing, he could not recall how they were informed, who informed them, whether it was verbally or in writing, or when they were informed. Deligdish Tr., **Ex. 12**, at 96:4-20.

10

A.164

59.     When an Omni provider determined that a particular laboratory test was necessary, the provider generally would choose from a list of available tests in Omni's electronic medical record and Omni medical assistants completed a requisition form for a particular lab. Deligdish Tr., **Ex. 12**, at 81:7-13; 82:5-9; 83:24-84:3.

60.     However, in 2017 and 2018, irrespective of the Omni providers' decisions to order a _BUC_ test for their patients, Deligdish instructed Omni's staff to order _PCR_ testing from MD Labs. Deligdish admitted that he did this "so that OMNI could accumulate the necessary evidence to substantiate the allegations in the Complaint." Deligdish Tr., **Ex. 12**, at 84:4-6; 86:14-87:10; 95:23-96:3.

61.     Notwithstanding the fact that Omni providers determined that a BUC was the appropriate test for each patient, Omni ordered PCR testing of these samples at Deligdish's direction. Deligdish Tr., **Ex. 12**, at 95:23-96:3.

62.     Deligdish also submitted duplicate patient samples to up to ten _other_ medical laboratories, seeking to manufacture fodder for a slew of additional _qui tam_ complaints, knowing that federal health care programs would be billed for the duplicate medically unnecessary tests. Deligdish Tr., **Ex. 12**, at 255:4-256:4.

63.     Medicare rules make clear that knowingly testing a patient with the same test multiple times on the same date of service is not medically necessary. _See_ Medicare Claims Processing Manual, ch. 16, § 100.5.1, _available at_

https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/clm104c16.pdf (citing 42 U.S.C. § 1395l(h)(5)(A)).

64.     Omni's expert witness reviewed and opined only upon claims submitted to MD Labs from Omni, representing less than 0.5% of all PCR UTI tests performed by MD Labs. Dr.

11

A.165

Arrigo Deposition Transcript ("Arrigo Tr.")., **Ex. 17**, at 82:16-83:9; Expert Report of Dr. Yiannoutsos ("Yiannoutsos Rpt."), **Ex. 18**, at 5.

65.    Deligdish's opinion is that PCR UTI testing is *never* medically necessary. Deligdish Tr., **Ex. 12**, at 267:13-16.

66.    When asked at his deposition for the basis of his assertion that MD Labs' PCR UTI testing was experimental, Deligdish was unable to reference any specific article or medical literature to support his position. Deligdish Tr., **Ex. 12**, at 239:22-240:14.

67.    Deligdish criticized another laboratory for running too *few* targets in its PCR UTI test, suggesting that a narrower panel "had a much greater likelihood of missing a diagnosis." Deligdish Tr., **Ex. 12**, at 265:24-266:14.

68.    Deligdish claimed that he believed the other lab "tests for too many, too, and at the same time, not enough" pathogens. Deligdish Tr., **Ex. 12**, at 267:10-11.

69.    MD Labs' written proposal to Omni did not include profit splitting or pass-through billing. *See generally* OMNI00075, **Ex. 19**.

70.    MD Labs and Omni never entered executed the proposed written agreement. *See* OMNI00075, **Ex. 19** (unexecuted proposal); Deligdish Tr., **Ex. 12**, at 170:22-171:9 (testifying that the proposed arrangement "never happened anyway"); *id.* at 199:6-7 (testifying that he did not believe Omni executed the agreement and that he could not recall).

71.    MD Labs contemplated entering into the proposed agreement with Melbourne Medical Laboratory, Omni's physician-owned office laboratory (commonly referred to as a "reference laboratory agreement"). Deligdish requested that any agreement be between MD Labs and Melbourne Medical Laboratory wherein Melbourne Medical Laboratory would pay MD Labs directly for laboratory testing and bill patient insurances themselves. During contract

12

A.166

negotiations with Omni, MD Labs understood that any agreement for Melbourne Medical Laboratory to refer tests to MD Labs would be a lawful reference arrangement pursuant to Medicare rules. MD Labs sent a proposed written agreement on August 27, 2018 that was never executed. *See* Rutledge Decl., **Ex. 3**, ¶ 22, Deligdish Tr., **Ex. 12**, at 89:21-91:11 (testifying that Melbourne Medical is Omni's "in-house laboratory" and that Deligdish is the 100 percent owner); OMNI00852, **Ex. 20**, (Deligdish requesting that the agreement be set up "through the Melbourne Medical Laboratory"); OMNI00075, **Ex. 19** (unexecuted proposal); Medicare Claims Processing Manual, ch. 16, § 40.1, *available at*

https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/clm104c16.pdf (citing 42 U.S.C. § 1395l(h)(5)(A)).

A.167

Dated: July 31, 2024

Respectfully submitted,

MD SPINE SOLUTIONS LLC, D/B/A MD
LABS INC., DENIS GRIZELJ AND MATTHEW
RUTLEDGE

By their attorneys,

*/s/ Seth B. Orkand*
Seth B. Orkand (BBO #669810)
Julianna M. Charpentier (BBO #703284)
ROBINSON & COLE LLP
One Boston Place, 25th Floor
Boston, Massachusetts 02108
Tel: (617) 557-5915
Fax: (617) 557-5999
sorkand@rc.com
jcharpentier@rc.com

Edward J. Heath (admitted *pro hac vice)*
Kevin P. Daly (BBO #675644)
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT 06103
Tel: (860) 275-8200
Fax: (860) 275-8299
eheath@rc.com
kdaly@rc.com

Danielle H. Tangorre (admitted *pro hac vice*)
ROBINSON & COLE LLP
Chrysler East Building
666 Third Avenue, 20th Fl.
New York, NY 10017
Tel: (212) 451-2900
Fax: (212) 451-2999
dtangorre@rc.com

14

A.168

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served upon all counsel of record via ECF electronic filing on July 31, 2024.

*/s/ Seth B. Orkand*
Seth B. Orkand

A.169

# EXHIBIT 1

Volume I  Pages 1-260

Exhibits A-N

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

_____

UNITED STATES OF AMERICA, et al., ex rel.

OMNI HEALTHCARE, INC.

    Plaintiffs                       Case No.

V.                         18-cv-12558-PBS

MD SPINE SOLUTIONS LLC, D/B/A MD LABS

INC., DENIS GRIZELJ, MATTHEW RUTLEDGE

AND DOE HEALTHCARE PROVIDERS 1-100

    Defendants

_____

VIDEOCONFERENCE DEPOSITION OF

DENIS GRIZELJ

Wednesday, December 20, 2023, 11:00 a.m.

-----REPORTER:  Sonya Lopes, RPR, CSR-----

TP One
Scheduling@TP.One
www.TP.One
800.FOR.DEPO
(800.367.3376)

A.172

A.   No.

Q.   What year did you leave at Uber?

A.   It was either end of 2010 or early 2011.

Q.   What did you do next?

A.   I took another position.

Q.   What company?

A.   NeuroTherm.

Q.   Where is that located?

A.   Their headquarters are somewhere in the East Coast as well.  I don't recall the state.

Q.   Was that also a remote position?

A.   Yes.

Q.   Was that also in sales?

A.   Yes.

Q.   Was it medical sales?

A.   Yes.

Q.   How long were you there?

A.   Yeah.  Also around a couple of years as well.

Q.   Where did you go after that?

A.   MD Labs.

Q.   Do you remember what year?

A.   2011.

Q.   2011.  Focusing on MD Labs, that refers to

MD Spine Solutions LLC doing business as MD Labs

Inc.; is that correct?

    A.  Correct.

    Q.  Okay.  What type of business is that?

    A.  It's an independent clinical laboratory.

    Q.  Where is MD Labs located?

    A.  Reno, Nevada.

    Q.  Is there more than one location?

    A.  No.

    Q.  Is it all one facility?

    A.  Yes.

    Q.  So, like, all the offices are contained to one building?

    A.  Yes.

    Q.  Okay.  Who founded MD Labs?

    A.  It was myself and my partner Matthew Rutledge.

    Q.  Is it a Nevada company or another state company?

    A.  It's a California company.

    Q.  You mentioned your cofounder.  Is that Matthew Rutledge?

    A.  Correct.

    Q.  How do you know him before that?

TP One          Scheduling TP.One          800.FOR.DEPO
                www.TP.One                 (800.367.3376)

A.175

operations of the lab, maintained equipment,

oversaw, you know, employees; whereas, Dr. Parker

was more as far as providing expertise in the

subject matter of molecular diagnostics and the --

and kind of the -- what an infectious disease

specialist does and how their practice runs and how

this type of testing could help them better take

care of their patients.

Q.  Was Dr. Parker using his expertise or

bringing his expertise with regard to urinary tract

infections specifically?

A.  I didn't hear all that.  Was any of his

expertise -- what was the rest of the question?

Q.  Was the expertise that he offered related

to urinary tract infections specifically?

A.  Yes.

Q.  Was it also related to sexually transmitted

infections?

A.  Yes.

Q.  As well as the respiratory?

A.  I believe so, yes.

Q.  What about the women's health, those group

of testing?

A.  Yeah.  I don't recall on women's health or

A.177

referring to?

A.   I mean, SOPs for, you know -- again, in the lab and in billing.  We would also have annual trainings the employees would have to complete that, you know, were compliance related with Anti-Kickback Statute, you know, HIPAA and then, you know, workplace conduct, all those kinds of things.  So those were conducted annually as well.

Q.   Did you have any annual trainings about the Stark Law?

A.   We did.

Q.   Did or didn't?

A.   We did.  Yes.  Yes.  I'm sorry.

Q.   In 20 -- currently, 2023, we discussed that there is a compliance department now at MD Labs.  When was that created for the first time?

A.   Around October of 2021.

Q.   Why was the compliance department created in October 2021?

A.   We entered into a corporate integrity agreement at that time.  That was one of the requirements of the integrity agreement.  But, you know, we also felt like it was -- it made, you know -- it was a role that we felt like needed to



A.179

your employees were trained?

A.  Oh, yeah.  We used third-party compliance training software.  And so it would record, you know, who conducted their training and when and who still needed to do it.

Q.  So, like, an online course?

A.  Correct.

Q.  Did everybody at MD Labs get the same training, or did they vary by position?

A.  I believe some positions may have had additional training.

Q.  Do you recall what those positions were?

A.  Lab, for example, I believe would also have to do bloodborne pathogens or everybody that was in the home office so if you're going to even be anywhere near the lab.  That would be one, for example.  Then sales, I believe, had -- didn't have to do the bloodborne pathogen training, for example.

Q.  What type of training did sales have to do?

A.  Anti-Kickback Statute training, Stark Law, HIPAA, workplace conduct.  There may have been others, but those four come to mind.

Q.  Did -- what software did you use for these trainings?



A.181

Q.   Okay.  But do you believe that based on your reply that you are replying to the fixed test rate argument that he -- that Phillips presented?

MR. ORKAND:  Objection.

A.   I don't know.  I mean, I don't know what my thoughts were at that date five years ago.

Q.   Do you know if there was a -- if this was in relation to an independent service contract with PathMD at that time?

A.   I don't know.

Q.   You said earlier you had a rudimentary knowledge of the safe harbor.  Did you have any knowledge of the safe harbor back in 2018?

A.   Yes.  I recall doing some research on it. And, you know, whatever time I did do the research -- I don't remember what year -- but based on my interpretation of it, our interpretation of it, we felt that, you know, our contracts fell within the safe harbor.

Q.   Okay.  Did you feel that way in 2019?

A.   Yeah, I believe so.

Q.   I'm going to go back to the CIA for just a moment.  That is Exhibit D, I believe.  Again, showing you Exhibit D.  Under the training and



A.183

somewhere?

A. Yes. We would get an e-mail notification stating that we had to complete the courses by a certain date, and then we had the link to log in and take those trainings.

Q. Did they -- did you circulate the trainings at the same time every year?

A. I don't think so. I think it had to do more with the employee's work anniversary. So it was staggered based on that, I believe.

Q. Prior to 2019, was this the only type of training regarding compliance that employees received at MD Labs?

MR. ORKAND: Objection.

A. No. We had trainings, like -- we had compliance trainings prior to 2019.

Q. Yeah. What kind?

A. We had these softwares in place before 2019.

Q. So these were all the softwares -- this is how you trained your employees --

A. Yes. Correct.

Q. -- beforehand? Okay.

A. Yeah. I don't know what year, though, we



A.185

A.   I don't recall exactly this was the final decision or what the initial approach was.

Q.   So do you know what was the final decision regarding the approach to EKRA at that time in 2019?

MR. ORKAND:  Objection.

A.   Not at that time, no.

Q.   So you don't know what MD Labs decided to do when the new law was passed?

MR. ORKAND:  Objection.  Form.

A.   Well, I'm just answering specific to what was done after this exact conversation, which I can't have, you know, a specific answer to.  I do know that MD Labs -- what we wanted to do is to always be compliant.  Any kind of agreement -- whether it be sales compensation, whatever it may be -- you know, the intent was always to be lawful and compliant.

And so we solicited opinions about potentially changing our sales compensation and how to do so in a compliant manner.  However, you know, talking to other laboratories and consultants, everybody was in the same boat.  Nobody knew how to react since this was kind of sprung upon the entire industry when it first came out.  So it was very



difficult to react to in quick fashion.

MS. TESIC:  I'm going to mark Exhibit I, MD188759.

(April 18, 2019 e-mail and attachment, Exhibit I, marked)

Q.  Sharing my screen.  Can you see this e-mail?

A.  Yes.

Q.  Okay.  At the top, it's an e-mail from April 18, 2019 from Howard Claussen to yourself and Matthew Rutledge.  Do you see that?

A.  Yes.

Q.  In the subject, it says "Forward:  2019 EKRA presentation."  And it looks like it's a PPTX, which means it's a PowerPoint; correct?

MR. ORKAND:  Objection.

MS. TESIC:  To what?  To "Did he see that?"

MR. ORKAND:  I'm sorry.

MS. TESIC:  I'm asking him does he see that.  What's the objection?

MR. ORKAND:  As to form.

Q.  Do you see on this piece of paper that I'm showing you, it says "Forward:  2019 EKRA



A.188

from the urine culture.

With respect to the PCR testing for UTIs you mentioned MD Labs offered in 2018, do you know what that process entailed as far as the testing process?

A.   Like the SOPs?   Is that what you're asking?

Q.   Not on a molecular level.   But do you know what happened once the lab received physical specimen?   Do you know the process going from there?

A.   Yes.

Q.   Okay.   What was it?

A.   Samples would be prepared and, you know, we would do the PCR analysis.   And concurrently, the specimens would also be put onto a plate for -- in the event that -- of a potentially positive result on the PCR test.

And so if we did get a positive result initially on the PCR test, then the specimen that was on the plate would then go to the antibiotics susceptibility phase.   Had there been a negative test, then that would be the conclusion of it.

And the plate -- the part of the specimen that was put under the plate, the plate would be discarded.   And we would not bill for that service,



since there was no further need for testing upon that initial negative result.

Q.   Okay.   Is there -- in that process, is there also a urine culture that's run simultaneously?

A.   No.   The culturing is not simultaneous.   I mean -- well, the processing of the specimen, putting the specimen onto the plate -- so it's put onto the plate.   I mean, if that's what you're referring to as a culture, I'm not sure.   But we did put specimens onto a separate plate, you know, in the event that the PCR test was going to be positive.

So again, my level of technical knowledge gets to about this point.   But the second test that was performed was only performed if the initial PCR test was positive and there was pathogens detected.

Q.   So you can run an antibody susceptibility test without a culture?   Is that your understanding?

MR. ORKAND:   Objection.

A.   I believe those two terms are interchangeable, if I'm not mistaken.

Q.   You're referring to a urine culture and a susceptibility testing?



A.191

Q.  Are you permitted to bill the patient if they haven't authorized this Section 5 right here where it says patient's authorization signature?

MR. ORKAND:  Objection.

A.  We're still able to bill a patient if they don't sign the form.

Q.  Okay.  So it's not required either for testing or billing purposes?

A.  Correct.

Q.  Where it says urinary tract infection testing on file here on Section 3, you mentioned that they have -- providers had an option to choose what test they're choosing.  When do they choose -- at what stage are they choosing which test they want?

A.  I'm sorry.  On this version of the req form, there wasn't an option to choose other tests. We just had one proprietary resolution test.  So that was basically all that was available.

And so the panel on file that it's referring to was our resolution panel.  That was the only one on file that could be ordered.

Q.  Okay.  Did MD Labs offer anything like a custom panel for UTI testing?

 TP One


Scheduling@TP.One
www.TP.One

A-192

800.FOR.DEPO
(800.367.3376)

A.   Are we talking about 2018 still?

Q.   Yes.

A.   I mean, no.  This was essentially it.  It was the resolution test which was the 17 pathogens. It later expanded to 19, but I don't recall when exactly that was.

Q.   Okay.  You mentioned earlier that with respect to at least Dr. Patterson, you didn't have a contract for sending specimens to MD Labs.  Was that true for other providers as well regarding UTI testing?

A.   Yes.

Q.   I'm going to scroll down to the next page. This is consistent with the same patient.  At the top of the page, reads "MD Labs results report." Have you seen a form that looks like this before?

A.   Yes.

Q.   Okay.  I'm going to zoom back in.  What do you understand this to be?

A.   This is the result of our -- or of a patient's, you know, specimen that came in.  So this is what a provider would get upon completion of the analysis performed at the lab.

Q.   Who at MD Labs prepares this results



report?

A.   I believe the format of the report itself is prepared by our lab information system that -- the software.  But as far as the data itself, it gets reviewed by our certifying scientists.

Q.   I'm going to scroll down.  Says reviewed and released under Dr. Steven Parker, MD, molecular diagnostic division medical director.  Is that what you're referring to?

A.   I don't believe he reviews -- he reviewed every single result.  But it was under, you know -- the results are reported and reviewed per the SOPs that, you know, he's basically signed off on, so.

Q.   So this doesn't mean he reviewed and released this specific MD Labs results report, this sentence reviewed and released that starts right here?

A.   Correct.  Because it's under Steven Parker, not by Steven Parker.

Q.   I see.  The results page shows right here under pathogens tested, is this what the 17 pathogen testing result looks like for PCRs?

A.   It looks to be, yes.

Q.   Obviously, there's a micro.  That's the



A.195

the request form?

A.   No.

Q.   Was there ever an option to do just a urine culture and antibiotic sensitivity test on any specimens?

A.   Are we still talking about 2018 or --

Q.   Yeah.  Yeah.  2018.

A.   It wasn't an option then.

Q.   After 2018, you mentioned that 17 tests might have expanded to 19.  Does that mean that in 2019, MD Labs continued to provide a panel for 17 pathogens?

MR. ORKAND:  Objection.

Q.   At least 17 pathogens?

A.   At least 17.  In 2019, I believe so, so -- yes.  I believe so.

Q.   Okay.  Are -- with regard to the sales representatives, are they considered employees or independent contractors at MD Labs in 2018?

A.   We had both.

Q.   You had both?

A.   Yes.

Q.   Was Howard Claussen an employee or independent contractor?



REPORTER'S CERTIFICATE

I, SONYA LOPES, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was properly identified and put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 4th day of January, 2024.

Sonya Lopes                         My Commission Expires:

Notary Public                       October 28, 2027

A.197

Notice Date: 01/05/2024

Deposition Date: 12/20/2023

Deponent: Denis Grizelj

Case Name: United States of America v.
          MD Spine Solutions LLC

| Page:Line | Now Reads | Should Read |
|---|---|---|
| 15:20 | Uber | Huber |
| 16:2 | Uber | Huber |
| 62:4 | Stroll | Strull |
| 62:9 | Stroll | Strull |
| 62:21 | Stroll | Strull |
| 63:2 | Stroll | Strull |
| 63:11 | Stroll | Strull |
| 63:15 | Stroll | Strull |
| 64:2 | Stroll | Strull |
| 71:21 | Dennis | Denis |
| 71:24 | Dennis | Denis |
| 72:1 | Dennis | Denis |
| 98:22 | Telecore | TELCOR |
| 162:11 | kickbacks and recoveries act | kickbacks in recoveries act |
| 169:3 | Craussen | Claussen |
| 220:18 | resolution | Resolution |
| 238:16 | Telecore | TELCOR |

TP One    Scheduling@TP.One
www.TP.One    800.FOR.DEPO
(800.367.3376)

Notice Date: 01/05/2024

Deposition Date: 12/20/2023

Deponent: Denis Grizelj

Case Name: United States of America v.
           MD Spine Solutions LLC

| Page:Line | Now Reads | Should Read |
|-----------|-----------|-------------|
| 238:20 | Telecore | TELCOR |
| 238:24 | Telecore | TELCOR |
| 242:11 | Telecore | TELCOR |
| 242:12 | Telecore | TELCOR |
| 242:22 | Telecore | TELCOR |
| 243:3 | Telecore | TELCOR |
| 245:1 | Telecore | TELCOR |
| 245:2 | Telecore | TELCOR |
| 245:10 | Telecore | TELCOR |
| 245:14 | Telecore | TELCOR |
| 245:22 | Telecore | TELCOR |
| 245:24 | Telecore | TELCOR |
| 248:5 | Telecore | TELCOR |
| 248:14 | Telecore | TELCOR |
| 258:7 | Some cases. | In some cases. |

TP One
Scheduling@TP.One
www.TP.One
800.FOR.DEPO
(800.367.3376)

## CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me. Any additions or corrections that I feel are necessary, I will attach on a separate sheet of paper to the original transcript.

_____
Signature of Deponent

I hereby certify that the individual representing himself/herself to be the above-named individual, appeared before me this 26th day of January, 2024, and executed the above certificate in my presence.

_____

NOTARY PUBLIC IN AND FOR

SAN MATEO, CALIFORNIA
County Name

MY COMMISSION EXPIRES: 06.16.2025



RORY BRENNAN
COMM. # 2358418
NOTARY PUBLIC • CALIFORNIA
COUNTY OF SAN MATEO
My commission expires June 16, 2025

# EXHIBIT 2

A.201

UNITED STATERS DISTRICT COURT

DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * * * * * * * * * * * *

UNITED STATES OF AMERICA, et

al, ex rel. OMNI HEALTHCARE,

INC.,

     Plaintiffs,        Case No.:

        vs.          18-cv-12558-PBS

MD SPINE SOLUTIONS LLC,

D/B/A MD LABS INC., DENIS

GRIZELJ, MATTHEW RUTLEDGE

AND DOE HEALTHCARE PROVIDERS

1-100,

Defendants

* * * * * * * * * * * * * * * * * * * * * * * * * *

Deposition of MATTHEW RUTLEDGE

Via Zoom Videoconferencing

Friday, December 22, 2023

10:59 a.m.

Reported by:

Adam D. Miller, Registered Professional Reporter

Scheduling@TP.One
www.TP.One

A.202

800.FOR.DEPO
(800.367.3376)

TP One

A.203

Page 10

Q   I'm sorry?

A   Is this better?  I'm closer to the camera.

Q   Yes.  Are you currently employed, Mr. Rutledge?

A   I am.

Q   Where you currently employed?

A   MD Spine Solutions LLC.

Q   That's the defendant in this action?

A   I believe it is.

Q   Or -- excuse me -- one of the defendants in this action?

A   I believe it is.

Q   And what is your role at MD Spine Solutions?

A   I am a managing partner.

Q   Are you an owner of MD Spine Solutions?

A   I am.

Q   What percentage of MD Spine Solutions do you own?

A   47.5.

Q   Who owns the remainder of

Page 11

MD Spine Solutions?

A   My partner, Denis Grizelj, and a Mr. Michael Lynch.

Q   What percentage of MD Spine Solutions does Mr. Grizelj own?

A   47.5 percent.

Q   And Mr. Michael Lynch, how much does he own?

A   5 percent.

Q   As a managing partner of MD Spine Solutions, what are your job duties?

A   Quite a few job duties.  Overall management of the scientific laboratory side of the house, primarily.

Q   What type of business is MD Spine Solutions?

A   We are a clinical laboratory.

Q   How does MD Spine Solutions earn revenue?

A   We analyze patient specimens sent to us by our client physicians and we bill for those services.

Q   How many employees does

Page 12

MD Spine Solutions have?

A   I don't know the exact number.

Q   What's your estimate of how many employees MD Spine Solutions has?

A   Roughly 35 to 40.

Q   How long have you been an owner of MD Spine Solutions?

A   I've been an owner of MD Spine Solutions since 2011.

Q   Was that the year MD Spine Solutions was founded, or did it exist before you became an owner?

A   That was the year that it was founded.

Q   And has your role at MD Spine Solutions always been that of managing partner, or have you had other roles or titles?

A   That's always been my ownership official title.

Q   Before you became an owner and managing partner of MD Spine Solutions, where were you employed, if you were?

A   I was employed with

Page 13

Kimberly-Clark Healthcare.

Q   And what type of business is that?

A   Kimberly-Clark is a major American corporation in the healthcare space, a manufacturer of goods.

Q   What type of goods?

A   Various healthcare-related goods.

Q   And what was your role at Kimberly-Clark?

A   I forget the exact title.

Q   What were your job duties at Kimberly-Clark?

A   Sales and customer education.

Q   How long were you employed at Kimberly-Clark?

A   I don't remember the exact duration.

Q   More than five years or less than five years?

A   It was more than five years.

Q   Before you were employed at Kimberly-Clark, where were you employed?



A.205

Page 30

Q   I can't define it any further than how it's defined in the settlement agreement.

A   Then I can't give an answer. I'm sorry.

Q   How many different types of tests does MD Labs currently perform?

A   What you mean by "types of tests"? I'm sorry.

Q   Well, how many different -- how many different types of, I guess, diseases does MD Labs test for?

A   We don't test for any diseases.

Q   How about infections? How many types of infections does MD Labs test for?

A   None.

Q   What does MD Labs test for?

A   We do chemistry and toxicology testing and we do pharmacogenomics testing.

Q   What's the purpose of the chemistry testing that MD Labs perform?

A   It's tied to urine and saliva drug testing.

Page 31

Q   And how about the toxicology testing that MD Labs performs?

A   They overlap. They're two descriptions of a similar line of testing.

Q   And how about the pharmacogenetic testing that MD Labs performs?

A   What's your question? I'm sorry.

Q   What is the purpose of the pharmacogenetic testing that it performs?

A   It's to give providers information about their patients' drug metabolism and response.

Q   Does MD Labs currently perform testing for urinary tract infections?

A   We do not.

Q   Has it ever?

A   We have.

Q   During what period did it perform testing for urinary tract infections?

A   I believe it was 2017 through 2022.

Page 32

Q   When did MD Labs begin offering testing for urinary tract infections?

A   Originally, it was because we were seeing a lot of our patient specimens be referred to us come in looking, resembling having the characteristics of an infection.

Many of the patient specimens that are referred to us are from patients that are on an opiate or some sort of and NSAID or some sort of painkiller. And those can suppress the patients responding to a lot of symptoms.

So that we thought there might be a lot of undiagnosed urinary tract infections coming through the lab. And we thought we could help a lot of people by, you know, bringing that to the provider's attention.

Q   When you say "we," whom are you referring to?

A   MD Labs.

Q   But which person specifically would make the decision to start offering

Page 33

this testing?

A   Well, when I said "we," I was referring to the company as a whole. Scientists, our staff, everyone who's able to contribute helping those patients. What's your question?

Q   I understand that. But individual persons actually had to make a decision to offer a test or not. Who at MD Labs is responsible or, you know, would take the initiative to offer this type of test?

A   It's usually a group decision.

Q   Who's in that group?

A   Executive leadership.

Q   Who's the executive leadership?

A   At the time its ownership and heads of the relevant divisions.

Q   So ownership is yourself and Mr. Grizelj?

A   And Mr. Lynch; yeah.

Q   And who were the heads of the different divisions?

A   Depends on the era you're

Page 42

Q   Is it accurate that MD Labs stopped offering UTI testing in 2022?

A   That's accurate, yes.

Q   Why did it stop offering UTI testing?

A   Several reasons.

Q   What are those reasons?

A   Primarily, a lot of our larger referring customers had started bringing realtime PCR into their clinics, no longer needed to refer specimens out.

Q   Who are MD Labs' larger customers?

A   Large urology practices, urgent cares.  I can't recall the other larger practices right now.

Q   Did MD Labs ever perform any UTI testing that was not PCR-based?

A   I don't understand the question.

Q   Well, the UTI testing that MD Labs performed was using a method that involved the PCR, polymerase chain reaction; is that correct?

Page 43

A   Part of the process involved that, yes.

Q   Okay.  Was there ever any testing that MD Labs performed that didn't involve that, didn't involve PCR?

A   Did it or did not?

Q   Did not.

A   Antibiotic susceptibility testing does not involve PCR.  We perform that.  There's also -- you know, dipstick urinalysis does not involve PCR as well, and that was sometimes performed.  Microscopy does not involve PCR.

Q   And this is all testing for urinary tract infections?

A   Yes.

Q   If a provider wanted a UTI test that did not involve a PCR, how would it request that?

A   They probably would not have used the Resolution test.  They probably would not have used MD Labs.

Q   Show you Rutledge 3.  This was produced with a Bates number OMNI00528.

Page 44

(Exhibit 3 was marked for identification.)

BY ATTORNEY KENNY:

Q   Do you recognize this document, Mr. Rutledge?

A   Would you do me the courtesy of scrolling down so I could see the entire document.

Q   It's just one page.

A   I do not recognize this document.

Q   Do you know who would have prepared a document like this?

A   Do I know who would have produced a document like this?  I do not.

Q   Was there any person or department at MD Labs that was responsible for preparing marketing materials that would be sent to providers?

A   Yes.

Q   Who was that?  Who were they?

A   We had a marketing person named Chuck Dushman for a period of time.  We've also had a graphic designer prepare

Page 45

documents, but -- no content, just graphics.

Q   Who was the graphic designer?

A   Name's Angela Bess.

Q   Is she still employed at MD Labs?

A   She's never been employed. She's been a contractor.  We use her from time to time.  We still continue to use her from time to time.

Q   And how about Mr. Dushman; was he an employee or contractor?

A   He's both.

Q   Is he currently either an employee or contractor of MD Labs?

A   He's neither.

Q   When did he last work as an employee for MD Labs?

A   I don't recall.

Q   When did he last work as a contractor to MD Labs?

A   Prior to his work as an employee.  But I don't recall the date.

Q   Was he -- did he end his

A.208

Page 78

anti-kickback law.

Q   What's the Stark Law?

ATTORNEY HEATH:  Object to form.

THE WITNESS:  It's a law that surrounds remuneration going back to referring providers, I believe.

BY ATTORNEY KENNY:

Q   And what does the Stark Law apply to, to your understanding?

A   I couldn't -- I'm not an expert on Stark Law.  I couldn't recite it on the record.

Q   Does it prohibit certain types of compensation?

A   I believe it does.

Q   What types of compensation does it prohibit?

A   I do not know precisely.

Q   How about anti-kickback; what's that referring to there?

A   That is regulations against remuneration going -- kicking back to referring providers.

Page 79

Q   And this conversation is talking about training for sales reps; is that correct?

A   I'm not sure.  It specifically mentions sales reps training around privacy and security.

Q   Did MD Labs during this time period provide training to sales reps for the Stark Law and the anti-kickback statute?

A   I believe so.

Q   What type of training did it provide?

A   Online modules, regularly scheduled trainings.

Q   Who would provide it?  Who was responsible for providing it?

A   I believe Wendy Brown was.

Q   Did she design the courses, or did she just -- I guess she's going to purchase them from services?

A   She may have designed some as well.  I'm not sure.

Q   Were you involved at all in any

Page 80

of the training that she prepared?

A   I believe so.

Q   You believe you were involved?

A   Yes.

Q   What do you recall about your involvement?

A   I recall I was asked to test out some of the modules and give my thoughts on different vendors of these training modules.

Q   Do you have sales responsibilities for MD Labs?

ATTORNEY HEATH:  Object to form.

THE WITNESS:  I do.

BY ATTORNEY KENNY:

Q   Do you have client accounts for MD Labs that you're primarily responsible for?

A   What you mean by "client accounts"?

Q   Well, do you have providers or, you know, other types of entities that provide specimens to MD Labs that you're

Page 81

responsible for?

A   That I'm responsible for the relationship?

Q   Yes.

A   Yeah, I do.  Yes.

Q   How many?

A   I don't know offhand.

Q   Is it more than ten or less than ten?

A   I'd say less than ten.

Q   Have you always had sales accounts for which you're responsible for the relationships since you started MD Labs?

A   No.

Q   But you currently do?

A   Yes.

Q   During this period in 2019, did you have any client accounts for which you were primarily responsible?

A   Yes.

Q   Approximately how many?

A   I don't know the answer to that.

TP One
Scheduling@TP.One
www.TP.One
A.200
800.FOR.DEPO
(800.367.3376)

A.210

Page 82

Q   When you say "I think we need a better course on Stark law and HIPAA for our reps," what are you referring to?

A   I don't recall.

Q   By "reps," you're referring to sales representatives?

A   Yes.

ATTORNEY KENNY:  Looking at another document.  This will be Rutledge 10. It's produced with the Bates number MD 203040.

(Exhibit 10 was marked for identification.)

BY ATTORNEY KENNY:

Q   I'll start at the bottom.  It looks like it's in a long email that begins it.

Let me know when you'd like me to scroll down.

A   Start at the bottom, at signatures and things.

It ends with Robert Phillips. Okay.  Now, scroll up to the start, please.

Page 83

Okay.  Would you scroll down a little bit.

Would you scroll down a little bit more.

Would you scroll up, please, to the signature in the header.

From Robert Phillips to Howard Claussen; okay.

Q   Robert Phillips appears to be the same person from the agreement we looked at earlier, with Path MD?

A   I believe so, yes.

Q   Do you recall this email exchange?

A   Vaguely, yes.

Q   In his email with Mr. Claussen, Mr. Phillips is referring to:  The federal anti-kickback statute -- which we discussed -- to generally prohibit percentage-based compensation arrangements in marketing agreements with independent contractors.

Is that correct?  Is that what you're seeing here in this section?

Page 84

A   I believe so.

Q   At this time did MD Labs have any percentage-based compensation arrangements in its marketing agreements with independent contractors?

A   At which time?

Q   The time this email was sent on September 27th, 2018?

A   Yes, I believe so.

Q   Was there any concern at MD Labs that such arrangements would violate the anti-kickback statutes?

ATTORNEY HEATH:  Object to form.

THE WITNESS:  We had concerns about all sorts of statutes; yes.

BY ATTORNEY KENNY:

Q   What action did MD Labs take -- did MD Labs take any action to address those concerns?

A   I don't recall.

Q   Do you recall if MD labs terminated its percentage-based compensation arrangements in marketing

Page 85

agreements with independent contractors?

A   We did.

Q   When did MD Labs terminate those agreements?

A   I believe -- it took a while to sort out those agreements.  But I believe they were all completed this year, all converted this year.

Q   So up until this year, MD Labs still had some active percentage-based compensation arrangements in its marketing agreements with independent contractors?

A   No.  We haven't had any independent contractors since 2021.

Q   So was 2021 the last time MD Labs had any active independent -- actually, excuse me -- active percentage-based compensation arrangements in marketing agreements with independent contractors?

A   I believe so.

Q   But it ceased all those arrangements; is that correct?

A   You're asking me why or --





Case 1:18-cv-12558-PBS Document 254-2 Filed 07/31/24 Page 12 of 20

Page 86

Q   No.  I'm just asking you if it did.

A   I believe we did.

Q   But you're not certain?

A   Correct.

Q   Well, to the extent that's accurate, why did MD Labs end all those arrangements?

A   There was a pivotal precedent case that made it clear that they weren't compliant.  So we -- that was the, the signal to move away from 1099 arrangements.

Q   When you say a case, you mean a court case?

A   Yes, a court case.

Q   A decision from a court finding these arrangements are not compliant?  Is that your understanding of it?

A   That was included in the overall decision; yes.

Q   What else do you understand about the decision?

ATTORNEY HEATH:  Object to the

Page 87

form.

THE WITNESS:  I'm sorry. Repeat the question.  And if you can be more clear.

BY ATTORNEY KENNY:

Q   Sure.  What else do you understand about the decision?

A   Could you be more clear into what you're asking.  Sorry.

Q   First of all, what's the -- do you know the name of this court case?

A   I believe one of the entities was Bluewave.

Q   And it's your understanding this decision found these type of percentage-based compensation arrangements in marketing agreements with independent contractors were not compliant with the anti-kickback statute?

A   No, that's not my understanding.  It was the use of independent contractors was not compliant, as part of the overall decision --

(Crosstalk.)

Page 88

Q   I'm sorry.  Finish your answer.

A   There's a lot in that case.

Q   The use of independent contractors for what?

A   Sales and marketing.

Q   So is it your current understanding that use of independent contractors for sales and marketing by labs is not allowed?

A   My current understanding is that it's not protected under any safe harbors.

Q   Safe harbors of the anti-kickback statute?

A   Correct.

Q   Before you became aware of this Bluewave decision, did you believe that using independent contractors for sales and marketing was protected by safe harbor in the antikickback statute?

A   It wasn't clear to me.

Q   So you're not sure whether these types of arrangements were permitted or not by the anti-kickback statute?

Page 89

ATTORNEY HEATH:  Object to the form.

THE WITNESS:  It was not clear to me.

BY ATTORNEY KENNY:

Q   So while it was unclear to you, MD Labs used independent contractors for sales and marketing?

A   Correct.

ATTORNEY KENNY:  Look at another document.  We'll mark this as Rutledge 11.  This is the document produced with Bates number MD 203338.

(Exhibit 11 was marked for identification.)

BY ATTORNEY KENNY:

Q   I'll share my screen.  It's three-page document.  I'll start at the bottom.  Let me know when you'd like me to scroll up.

A   Okay.  You can scroll up.

Okay.  You can scroll up.

Okay.  You can scroll up.

A.213

Page 94

not?

A   That's correct.  I do not know if I did or I did not.

Q   Do you know if anyone at MD Labs ended up reviewing those contracts?

A   I don't know.

(Discussion held off the record.)

BY ATTORNEY KENNY:

Q   Are you familiar with a statute called the Eliminating Kickbacks in Recovery Act?

A   Yes, I am.  Yes.

Q   What's your understanding of that statute?

A   That came into law in 2018 and it prohibits paying compensation for the referral of work based on specimen count or revenues from that work.

Q   When did you first become aware of -- if I call it "EKRA," will you understand that?

A   Yeah, I understand "EKRA."

Q   -- Eliminating Kickbacks In

Page 95

Recovery Act?  When did you first become aware of it?

A   I don't recall.

Q   Was it in or around 2018 when it was first enacted?

A   In that timeframe, yes.

Q   When you first became aware of it, did you have any understanding as to whether it could apply to any of the work that MD Labs did?

A   We weren't paying our referring providers.  We never have.  So it was unclear to me.

Q   Well, do you think it could potentially apply to any arrangements or contracts that MD Labs had?

A   Certainly something to be considered; yeah.

Q   Did MD Labs take any action in response to the enactment of EKRA?

A   I don't recall.

Q   You don't recall if at any point in, I guess, the last five years if MD Labs has taken any response in response

Page 96

to the enactment of EKRA?

A   In the last five years we have; yes.

Q   What actions have you taken?

A   We developed a compensation plan for our sales force that does not rely on those metrics --

Q   What metrics --

(Crosstalk.)

Go ahead.  Finish your answer. Excuse me.

A   That would be specimens, volumes, or revenues.

Q   Other than that, did the compensation of your sales force rely on volumes?

A   Not directly, no.

Q   Well, how about indirectly? Did they rely indirectly on volumes?

A   Not necessarily, no.

Q   How were those sales representatives compensated in or about 2018?

A   Our W-2s and our full-time

Page 97

employees would have a base salary plus some performance-based compensation. They'd also have a car allowance, typically a cellphone allowance, and an expense allowance.

Our independent contractors would typically not get any base salary. They'd be paid based on their performance.

Q   How would their performance be evaluated to determine compensation?

A   I believe it was revenues, percentage of revenues, based on the services they were providing.

Q   Percentage of the volume these independent contractor sales representatives generated?

A   The referring providers that they supported would send us specimens. Those specimens would be billed.  And those billings would result in revenue.

Q   So independent contractors would -- they would handle certain relationships with providers for MD Labs; is that accurate?

Page 98

A   That's accurate.

Q   So a, you know, an independent contractor would -- you know, whether it be a medical group or some other type of entity that would send specimens to MD Labs, any revenue generated from that medical group would be attributable to the sales representative for the compensation?

ATTORNEY HEATH:  Object to the form.

THE WITNESS:  Sorry.  Would you repeat that.

BY ATTORNEY KENNY:

Q   Sure.  Yeah.  So an independent contractor representative would be handling a client relationship for MD Labs with a medical group; is that correct?

A   Yes.

Q   And MD Labs would generate revenue based on specimens provided and testing performed from that certain medical group; is that correct?

A   Specimens referred to us from that medical group; yes.

Page 99

Q   And independent contractor sales representatives will be paid a percentage of the revenue generated by the medical group or other clients for whom they manage the relationship?

A   Yes.  For a period of time; yes.

Q   For what period of time?

A   Up until we stopped using independent contractors.

Q   In 2021?  Is that your understanding?

A   Correct.

ATTORNEY KENNY:  This will be Rutledge 12, I believed we're up to.  And the document was produced with the Bates number MD0247682.

(Exhibit 12 was marked for identification.)

BY ATTORNEY KENNY:

Q   It's a four-page email.  And I'll start at the bottom.  It's four pages of e-mails, rather.  The fourth page, though, just appears to be a signature.

Page 100

Let me know when you'd like to scroll up.

A   Okay.  You can scroll up.  I've completed reading that section.

Okay.  You can scroll up, please.

You can scroll up, please.

Okay.

Q   Who is Jon Harol?

A   Jon Harol is one of the owners of Lighthouse Lab Services.

Q   And what is Lighthouse Lab Services?

A   They are consultants in the laboratory space.

Q   And what services were they providing to MD Labs?

A   They are providing our lab director, Mr. Alexander Stojanoff.  We pay them -- they connected us with him originally.  We pay them a recurring fee to provide our lab direction services.

Q   You actually pay Lighthouse to pay for Mr. Stojanoff's services?

Page 101

A   Correct.

Q   When he says here "With the new EKRA legislation, we are pumping the breaks [sic] a bit on connecting labs to ensure that we can do this in a compliant way," what does he mean by "connecting labs"?

A   You're asking me to interpret an email between Jon and Denis and speak for Jon.  So I'm not really comfortable doing that.

Q   What's your understanding of what he means when he says your "connecting labs"?

A   He means putting us in touch with another laboratory.

Q   For what purpose?

A   This appears to be to find a lab that's in network with those insurance companies so we can have them do the work.

Q   Do what work?

A   The lab work.

Q   Testing?

A   Laboratory testing, yeah.

TP One

Schedule @ TP.One
www.TP.One

A.215

800.FOR.DEPO
(800.367.3376)

A.216

Page 146

numbered: We do not balance bill. The most your patients will pay is $50, about the same as a specialist co-pay in many cases.

Is that accurate that MD Labs does not balance bill. Or at least was it accurate at the time of this email, September 18th, 2019?

A   I don't know. I do not believe we balance bill. I believe that part is correct.

The part about "the most your patients will pay is $50" is not correct. I know that.

Q   What's incorrect about that?

A   That's not the most patients will be billed.

Q   What's the most a patient could be billed?

A   There is no most. There is no maximum a patient could be billed.

Q   Do you have any idea why he would have made that representation here?

A   I believe he misinterpreted

Page 147

our, our policy about patients with financial hardship.

Q   What's MD Labs' policy about patients with financial hardship?

A   If the patients have a balance due to us and they can demonstrate financial hardship, we can reduce their bill.

Q   How would a patient demonstrate financial hardship?

A   I don't know exactly. It's -- I believe there's a federal form that's used as an industry standard. But I'm not a hundred percent sure.

Q   Who at MD Labs determines whether a patient has demonstrated financial hardship?

A   I believe it's Joan Cuenca.

ATTORNEY KENNY: Rutledge 20. And it's the document produced with the Bates number OMNI 29.

(Exhibit 20 was marked for identification.)

BY ATTORNEY KENNY:

Page 148

Q   It's a one-page document. Let me know if you'd like me to scroll up or down.

A   Yeah, please scroll to the top.

Okay. Please scroll down.

Okay. Thank you.

Q   Do you recognize this document?

A   I do.

Q   Okay. From where do you recognize it?

A   I believe it's a marketing piece we've used.

Q   Did you have any role in preparing this document?

A   I believe I did review it.

Q   Who else had a role in preparing this document?

A   I don't know precisely.

Q   Do you know anyone else who had a role in preparing this document?

A   I know Chuck Dushman had a role in preparing this document.

Q   Anyone else?

A   Howard Claussen had a role in

Page 149

preparing this document.

Q   Do you know when it was prepared?

A   I do not.

Q   Do you know for what purpose it was prepared?

A   It appears to be a marketing document for urinary tract infection testing.

Q   So was it prepared to provide to providers?

A   Yes.

Q   So to your recollection, you reviewed this document and Mr. Dushman and Mr. Claussen had a role in preparing it?

A   Yes.

Q   And Mr. Claussen was vice president of sales for MD Labs at the time?

A   He was.

Q   And Mr. Dushman was vice president of marketing or had a marketing role at MD Labs at the time?

A   He had a marketing role.

Scheduling@TP.One
www.TP.One
A.217
TP One
800.FOR.DEPO
(800.367.3376)

Notice Date: 01/08/2024

Deposition Date: 12/22/2023

Deponent: Matthew Rutledge

Case Name: United States of America v.
          MD Spine Solutions LLC

| Page:Line | Now Reads | Should Read |
|---|---|---|
| 6:9 | Michai | MacKay |
| 18:13 | You talking | Are you talking |
| 20:22-24 | they're not excluded in any lists or any of the Medicare/Medicaids | make sure they're not on the exclusion list or excluded by Medicare or Medicaid. |
| 23:6 | Brown is our director of IT | Brown was our Director of IT |
| 32:12-13 | those can suppress the patients responding to a lot of symptoms | they can suppress the patients' ability to identify a lot of symptoms |
| 34:16 | There's several people | There were several people |
| 34:24 | equipment, support personnel | equipment support personnel |
| 41:9-10 | Likely be Lori Martin would know. | It is likely Lori Martin would know. |
| 42:10 | clinics, no longer | clinics and no longer |
| 43:9 | perform | performed |
| 45:13 | He's both. | He was both. |
| 51:12 | Well, and low workload and, you | Well, and my current workload. You |
| 55:7 | Martins, I am -- is no | Martins is no |
| 66:14 | reference | inference |
| 76:23-24 | of a chat | of an IT chat |

TP One

Scheduling@TP.One
www.TP.One

A.218

800.FOR.DEPO
(800.367.3376)

Notice Date: 01/08/2024

Deposition Date: 12/22/2023

Deponent: Matthew Rutledge

Case Name: United States of America v.
            MD Spine Solutions LLC

| Page:Line | Now Reads | Should Read |
|-----------|-----------|-------------|
| 114:10 | forced to legally | forced to, legally |
| 126:4 | Alexandra | Alexander |
| 133:24 | knew | now |

TP One

## CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me. Any additions or corrections that I feel are necessary, I will attach on a separate sheet of paper to the original transcript.

_____
Signature of Deponent

State of Nevada
County of Washoe

I hereby certify that the individual representing himself/herself to be the above-named individual, appeared before me this _25_ day of _January_, 20_24_, and executed the above certificate in my presence.

_____

NOTARY PUBLIC IN AND FOR

_____Washoe_____

County Name

MY COMMISSION EXPIRES: _04/16/2027_



DEANNA L CALLAHAN
Notary Public
State of Nevada
Appt. No. 19-2405-2
My Appt. Expires Apr. 16, 2027

# EXHIBIT 3

A.221

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al., ex rel.* OMNI HEALTHCARE, INC., <br><br> Plaintiffs, <br><br> v. <br><br> MD SPINE SOLUTIONS LLC, D/B/A MD LABS INC., DENIS GRIZELJ, MATTHEW RUTLEDGE AND DOE HEALTHCARE PROVIDERS 1 - 100, <br><br> Defendants. | Case No. 18-cv-12558-PBS |

**DECLARATION OF MATTHEW RUTLEDGE**

I, Matthew Rutledge, hereby declare as follows:

1.      The facts set forth herein are known to me personally, and if called upon to testify, I could and would competently testify thereto. This Declaration is offered in support of Defendants' Motion for Summary Judgment.

2.      I am co-founder and President of MD Spine Solutions LLC ("MD Labs"). MD Labs is an independent clinical laboratory in Reno, Nevada. I have been employed by MD Labs since 2011.

3.      In my role as President of MD Labs, I oversee its scientific operations, facilities, research and development, and test development.

4.      MD Labs historically performed urine drug testing ("UDT"). In or about 2017, it added urinary tract infection ("UTI") testing using highly accurate and sensitive polymerase chain reaction ("PCR") technology.

5.      MD Labs used PCR technology to test for the presence of genetic material for 17

A.222

or 19 pathogens, depending on the time period.

6. MD Labs was aware that several labs already offered PCR UTI testing when MD Labs began offering the testing, and that contemporaneous research indicated the superiority of PCR UTI testing over bacterial urine culture ("BUC").

7. At the time MD Labs offered PCR UTI testing, no local coverage determination ("LCD") or national coverage determination ("NCD") limited the use of PCR UTI testing and government and commercial payors routinely paid claims for PCR UTI testing.

8. In addition to the PCR UTI test, MD Labs simultaneously conducted an antibiotic susceptibility test ("AST") by culturing the specimen to grow any bacteria present in the urine so it could then determine whether it was susceptible to a broad array of antibiotics.

9. Performing both tests simultaneously enabled MD Labs to provide faster than results than would be available if the lab delayed culturing the sample for AST until PCR results were available.

10. If PCR testing identified pathogens, MD Labs allowed the urine culture to continue to grow and performed AST.

11. If a PCR test did not detect any pathogens, MD Labs discarded and did not report or bill for the culture, instead billing only for the PCR pathogen detection test.

12. MD Labs could often determine if a patient had an infection 24 to 48 hours before a BUC would have produced results.

13. Several of MD Labs' accounts requested that PCR UTI results be reported while AST results were still pending to further aid in the clinical decision-making process.

14. Like most laboratories, MD Labs staff are not trained medical professionals, do not examine patients to assess their medical conditions, and do not treat patients.

-2-

A.223

15. At all times relevant to this litigation, MD Labs used both independent contractor and W-2 employee sales representatives to promote the existence and benefits of PCR UTI testing to providers. MD Labs trained independent contractors and W-2 employee sales representatives identically and all sales representatives were instructed to use the same marketing materials.

16. MD Labs trained, managed, and, if needed, disciplined its sales representatives in the same manner, regardless of whether they were independent contractors or W-2 employees.

17. Pursuant to agreements with sales representatives, MD Labs paid commissions based on the revenue generated from the providers at their sales accounts.

18. MD Labs' agreements with sales representatives did not provide for any payment to providers. MD Labs sales representatives did not offer or pay anything of value to providers.

19. For approximately two years, MD Labs charged some patients $50 for PCR UTI testing if they were uninsured or their insurers denied coverage. MD Labs did so with the understanding that this was part of MD Labs' financial hardship policy for certain patients. MD Labs' intent in offering the lower charge was to relieve demonstrated financial burden on patients, and we did not believe a potential benefit to *patients* was an inducement to *providers.*

20. In or about 2020, MD Labs changed its financial hardship policy to no longer offer a reduced price for uninsured patients or when patients' insurance denied coverage for PCR UTI tests, regardless of a patient's financial condition.

21. Once we were instructed by our counsel that *U.S. v. Mallory* held that certain commission-based compensation arrangements for laboratory independent contractor sales representatives could violate the AKS, MD Labs disbanded its independent sales force and hired sales representatives as W-2 employees.

-3-

A.224

-4-

22.     In or about 2018, MD Labs contemplated entering into a proposed agreement with Melbourne Medical Laboratory, Omni's physician-owned office laboratory (commonly referred to as a "reference laboratory agreement"). Deligdish requested that any agreement be between MD Labs and Melbourne Medical Laboratory wherein Melbourne Medical Laboratory would pay MD Labs directly for laboratory testing and bill patient insurances themselves. During contract negotiations with Omni, MD Labs understood that any agreement for Melbourne Medical Laboratory to refer tests to MD Labs would be a lawful reference arrangement pursuant to Medicare rules. MD Labs sent a proposed written agreement on August 27, 2018 that was never executed.

I declare that the foregoing is true and correct to the best of my knowledge subject to the pains and penalties of perjury, this 31st day of July, 2024

_____
Matthew Rutledge

-4-

A.225

# EXHIBIT 4

| Using Probe | Probe Tools | Other Resources | |
|---|---|---|---|

# Polymerase Chain Reaction (PCR)

## Introduction

### PCR (Polymerase Chain Reaction)

is a revolutionary method developed by Kary Mullis in the 1980s. PCR is based on using the ability of DNA polymerase to synthesize new strand of DNA complementary to the offered template strand. Because DNA polymerase can add a nucleotide only onto a preexisting 3'-OH group, it needs a primer to which it can add the first nucleotide. This requirement makes it possible to delineate a specific region of template sequence that the researcher wants to amplify. At the end of the PCR reaction, the specific sequence will be accumulated in billions of copies (amplicons).

## How It Works



### Components of PCR

**DNA template** - the sample DNA that contains the target sequence. At the beginning of the reaction, high temperature is applied to the original double-stranded DNA molecule to separate the strands from each other.- a type of **DNA polymerase** enzyme that synthesizes new strands of DNA complementary to the target sequence. The first and most commonly used of these enzymes is *Taq* DNA polymerase (from *Thermis aquaticus*), whereas *Pfu* DNA polymerase (from *Pyrococcus furiosus*) is used widely because of its higher fidelity when copying DNA. Although these enzymes are subtly different, they both have two capabilities that make them suitable for PCR: 1) they can generate new strands of DNA using a DNA template and **Primers** primers, and 2) they are heat resistant.- short pieces of single-stranded DNA that are complementary to the target sequence. The polymerase begins synthesizing new DNA from the end of the primer.- single units of the bases A, **Nucleotides (dNTPs or deoxynucleotide triphosphates)** T, G, and C, which are essentially "building **RT-PCR** blocks" for new DNA strands.(Reverse Transcription PCR) is PCR preceded with conversion of sample RNA into cDNA with **reverse transcriptase** enzyme.

### Limitations of PCR and RT-PCR

The PCR reaction starts to generate copies of the target sequence exponentially. Only during the exponential phase of the PCR reaction is it possible to extrapolate back to determine the starting quantity of the target sequence contained in the sample. Because of inhibitors of the polymerase reaction found in the sample, reagent limitation, accumulation of pyrophosphate molecules, and self-annealing of the accumulating product, the PCR reaction eventually ceases to amplify target sequence at an exponential rate and a "plateau effect" occurs, making the end point quantification of PCR products unreliable. This is the attribute of PCR

## Help

- ProbeDB overview
- Announcements
- Downloading
- Glossary

## Applications

- Gene Expression
- Gene Silencing
- Variation Analysis
- Genome Mapping

## Technologies

- Bead Arrays
- Microarrays
- Morpholinos
- Overgo probes
- Resequencing
- RNAi
- PCR
- STS
- Real Time qRT-PC
- SSO probes
- RAPD
- RFLP
- AFLP
- CAPS
- dCAPS
- MPSS
- MIP
- ISH

## Projects

- GENSAT
- HapMap
- VariantSEQr
- TaqMan
- TRC
- RNAi Global

## Distributors

- Open Biosystems
- Applied Biosystem

A.227

| Last | | that makes Real-Time Quantitative RT-PCR so necessary. |
|------|---|---|

## Sample Queries

| Search Text | Probes |
|---|---|
| "gene expression"[application] | 0 |
| "primer set"[probe type] AND "mus musculus"[organism] | 0 |
| TaqMan[probe type] AND "wet lab success"[validation] | 0 |

## Resources

» "Polymerase Chain Reaction"[MAJR]

Note: [MAJR] is a Medical Subject Heading (MeSH) tag for Major Heading. The tag is used to limit the search to articles for which major subjects are represented by terms included in the NLM MeSH database.



# EXHIBIT 5

A.229

**<u>Expert Report from Dicken S. C. Ko, BSc, MD, FRCSC, FACS</u>**

I.        <u>Background</u>

I am a urological and transplant surgeon at Rhode Island Hospital and a Professor of Surgery at Warren Alpert School of Medicine at Brown University. I spent the first 22 years of my career at Massachusetts General Hospital (MGH) and Harvard Medical School. I am one of only five multi-organ transplant surgeons trained primarily in urology in North America who performed liver and pancreas transplantation. I have attached a copy of my professional curriculum vitae to this report.

I earned a Bachelor's in Physiology/Biology from the University of British Columbia and a medical degree from Queen's University. I completed my residency in urology at the University of British Columbia and my fellowship in Transplantation at MGH. I was dually appointed to the Departments of Urology and Surgery staff at the MGH in 1997. I participated in the urology and abdominal organ transplantation program (kidney, liver, and pancreas transplantation). From 2004 to 2012, I was promoted to the Surgical Director of the Renal Transplant Program. Over the initial two years, I led a strategic effort that increased annual kidney transplant volume from 60-70 transplants/year to over 100 transplants in 2005.

I was instrumental in developing a program redesign that effectively increased the number of waitlisted patients while activating those patients with complex health and socioeconomic issues that needed adjustments before Transplantation, thus providing broader accessibility of a highly constrained healthcare resource to many underserved patients.

My efforts in Transplantation crossed many medical, surgical, and departmental disciplines at MGH and were instrumental in sustaining 30% growth throughout my leadership. I carefully evaluated quality outcome metrics within the kidney transplant program, oversaw its development, and led the group to a perennial top ranking in the United States for clinical excellence. I have participated in complex financial analysis and kidney transplant program modeling while coordinating annual budgets.

With a focus on outcome, my leadership and experience in healthcare economics enabled him to be the senior author of a publication that evaluated the use of "marginal" donors for Transplantation and the realities and costs associated with the then-emerging concept. This healthcare analysis received a 2007 American Transplant Congress Award of Distinction.

Coming from single-payer insurance of universal healthcare in Canada, I have a reputation for judicious use of resources and cost analysis of medical spending.   Furthermore, my co-investigators and I leveraged economic principles of competition to examine the evolving dynamics of leadership and clinical volume in a healthcare competition model of Transplantation. The purpose was to analyze existing data and challenge whether the match is reasonable in today's complex healthcare system.

With a national reputation for top-tier expertise in urology and Transplantation, I was appointed by the Trustees of the American Board of Urology (ABU) to be a member of the

- 1 -

A.230

Written Exam Committee in 2008. Additionally, I became a Task Force Chair in 2011. I am an oral examiner for the Qualifying Examination for the ABU – a position I have held since 2013. My commitment to comprehensive medical education and the production of high-quality candidates for practice is evident in numerous trainee nominations for Harvard mentoring awards over the past 20 years at MGH. In 2015, I was awarded the inaugural Dr. W. Scott McDougal Prize for Teaching and Mentoring in the Department of Urology.

I am a pioneering surgeon co-leader of the team with Dr. Curtis Cetrulo, Jr., that performed the first successful genitourinary vascularized composite allograft (penile) transplant in the USA. I diligently led my team in working with the MGH Public Relations office months before the transplant to help orchestrate the most thorough and thoughtful responses to this new paradigm and advance in reconstructive Transplantation. My groundbreaking collaborative innovation has been featured recently in the New York Times, Time Magazine, CNN, Proto, and various media outlets worldwide. Furthermore, in 2019, my collaborators and I at the University of Belgrade and Mount Sinai Hospital in N.Y. coordinated a successful testicular transplant between identical twins in Serbia.

In my practice, quickly and accurately diagnosing infections of the urinary tract is essential.  Because I treat many transplant patients who are immunocompromised, urinary tract infection (UTI) presents a serious and potentially life-threatening risk to those patients. Prompt and effective treatment is vital for these patients. I evaluate and treat over 1,000 patients per year for suspected UTIs. I utilize standard urine cultures (SUC) and polymerase chain reaction (PCR) tests to assess whether these patients have UTIs.

In addition to my surgical practice, I have served in several administrative roles; from 2014 to 2017, I was Director of Regional Urology. He oversaw operations of affiliate sites, integrated clinical practices, developed shared academic and community programs, created lean practice programs, and explored regional growth opportunities. I expanded the practice of specialized Urology to the MGH North in Danvers, resulting in an annualized increase of 15-18% in patient volume. I then operationalized an expansion to MGH West in Waltham, creating a business model with human resource projections and equipment acquisitions to have an active program that can now form the basis of future expansions. Lastly, I was identified as the "EPIC Champion" for the Department of Urology and assisted with transitioning to the new EMR.

I left MGH in 2017 to serve as the Chief Medical Officer/Vice-President of Medical Affairs (CMO/VPMA) and Professor of Surgery (Urology) at St. Elizabeth's Medical Center (SEMC) – a teaching affiliate of Tufts University School of Medicine with accredited residency and fellowship training programs. I was directly responsible for operations and oversight of all medical and surgical departments in the hospital, medical staff office, pharmacy, and clinical laboratories. I led the clinical service lines in the hospital in the design and implementation of quality programs to comply with the standards of regulatory agencies. As Chief Medical Officer, I oversaw collaborative working relationships with physicians, departments, hospitals, and the community to ensure the smooth delivery of quality healthcare in various clinical programs. I was on the hospital's senior leadership team, guiding operating budgets, insurance manage-care agreements, acquisitions, data analytics, productivity, financial closes, and strategic growth initiatives.  I also oversaw clinical quality improvements, The Joint Commission (TJC) survey,

A.231

Accreditation Council for Graduate Medical Education (ACGME) Site Surveys, Medical Executive Committees, and Medical Staff Credentialing.

Furthermore, I had ongoing clinical affiliations with Dana Farber Cancer Institute and Spaulding Rehabilitation Hospital for programmatic improvements that streamlined patient care. As Chief of Urology, I strategically revamped the hospital's service line offerings and medical education initiatives in collaboration with the Graduate Medical Education Office. I worked with the institutional research council to reinvigorate ACGME-required academic activities for residents in training and evaluated the efforts of all faculty in this endeavor.

During the COVID-19 surge in Massachusetts, I led all hospital physicians' strategic responses to the COVID-19 pandemic - a daunting task at the beginning of the pandemic when much was unknown and further challenged by the scarcity of therapeutics and prophylactics.

My unique skillset in healthcare informatics caught the attention of the Office of Massachusetts Governor Charlie Baker, who invited me to be a member of the Health Information Technology Council in Massachusetts. I was sworn in to serve the Commonwealth of Massachusetts in 2018.

I am board-certified by the American Board of Urology and have served on national committees and boards, including the United Network for Organ Sharing's Kidney and Pancreas Committee. I continue to serve on the American Board of Urology as an examiner. My scholarly activities focus on tolerance models of Transplantation, urologic outcomes research, economics of Transplantation, and urinary tract infections. I have over 70 publications in peer-reviewed journals, including the New England Journal of Medicine, the Journal of Urology, Transplantation, and the American Journal of Transplantation. I was the 28th President of the Urological Society for Transplantation and Renal Surgery.

As a urologist and chief medical officer, I was tasked with improving the quality of hospital care in the domains of UTIs and catheter-associated urinary tract infections (CAUTIs). By examining societal guideline best practices, exploring the capacity of laboratory studies, and road-mapping how clinicians diagnose UTIs on a practical level, we were able to reduce CAUTIs significantly and promote antibiotic stewardship with infectious disease specialists collaboratively.

Due to my quarter of a century of clinical expertise in the immunocompromised host and my experience as a urologist and a transplant surgeon who deals with complex urological issues and infections, I was selected as the Chair of the Scientific Advisory Committee of Pathnostics. This CAP-accredited and CLIA-certified laboratory offers a range of unique and advanced tests for diagnostic and therapeutic dilemmas in infections, specifically for the rapid identification and precise treatment of complicated, recurrent, and persistent UTIs.

II.     Clinical Background Regarding Urinary Tract Infections

"Urinary tract infections (UTIs) are extremely common, affecting more than 10 million patients in the United States each year." (Hao et al., 2023)  Many UTIs are uncomplicated,

- 3 -

A.232

meaning that the UTI is a lower tract infection without associated anatomic abnormalities, and these uncomplicated UTIs are resolved with appropriate treatment.  By contrast, recurrent or complicated UTIs (r/cUTIs) are UTIs that fail to meet the criteria for simple UTI, including patients who have recurrent UTIs despite adequate treatment, those with underlying anatomic abnormalities, concomitant comorbidities, or recent hospitalizations. (Hao et al., 2023)  "r/cUTIs are associated with increased morbidity and frustration for patients, and it is often challenging for clinicians to develop effective plans for eradication and to prevent rapid recurrence, especially when cUTIs is caused by polymicrobial organisms or fastidious organisms." (Hao et al., 2023) Studies have estimated that over 3.3 million patients develop cUTIs annually, and hundreds of thousands of patients are hospitalized each year due to cUTIs, costing the healthcare system billions of dollars annually. (Hao et al., 2023)

III.     Limitations of Standard Urine Cultures

Over the past 60 to 70 years, the conventional gold standard for diagnosing UTIs has been using standard urine cultures (SUCs) to determine the group of bacteria plated out in growth mediums. Utilizing well-established methodologies, these cultures identify bacterial colonies that can be characterized such that we can recognize them correctly and identify them under growth conditions.

However, SUCs have several limitations and disadvantages:

1.      SUC has a more limited scope of review for testing pathogens.  SUC often misses polymicrobial infections and altered antibiotic resistance from their metabolic interactions. (Nityadarshini et al., 2022)  "In certain polymicrobial infections, where two or more competitive bacteria are present, one organism may outgrow the other in culture, thus leading to identifying and reporting only a single organism. This missed diagnosis leading to failure to treat the 'secondary' bacterial pathogen may be associated with incomplete resolution and rapid recurrence of symptoms and necessitate prolonged or multiple treatment courses." (Hao et al., 2023).

2.      Additionally, some intracellular bacteria and longer-term intracellular reservoirs may fail to grow in SUC entirely, resulting in false negatives.  It has been reported that 25 to 30% of urine cultures produce negative results in symptomatic patients.  (Naber et al., 2020) SUC may also result in false negatives due to patients starting on empirical antimicrobial therapy at the onset of symptoms before corroborating test results. (Wang et al., 2023).

3.      SUC also carries essential contamination rates and high thresholds, which may miss relevant infections. (McDonald et al., 2017)  Far from sterile, the urinary tract contains various low-biomass microbiota, some of whose members appear to protect against clinical UTIs. (Roth et al., 2023) The urine biome is complex, variable, and often not considered typical urinary pathogens, suggesting contamination of urine specimens.

4.      SUC is a lengthy process, typically requiring between 24 and 48 hours, with some slow-growing bacteria requiring even longer incubation times to grow. Prolonged turnaround times obligate the physician to initiate aggressive empiric antibiotics before (or without)

- 4 -

A.233

pathogen identification. In more severe situations, it has been estimated that each hour of delay in antimicrobial administration in patients with septic shock is associated with a mean 7.5% decrease in survival rate. (Ferrer et al., 2014)

5. Finally, the artificiality of $1 \times 10^5$ colony counts has long been questioned and is the subject of scholarly debate. (Parnell et al., 2023) (Bista & Champion, 2019).  Most recently, for diagnosis of UTI, low bacterial counts in urine culture must be considered more often. (Naber et al., 2020)

IV.    Benefits of PCR Testing

MD Labs' PCR-based testing for UTIs helped address each of these limitations by increasing the sensitivities of detecting bacteria that can be potential uropathogens, identifying pathogens that may be a source of false negatives in SUC, raising the awareness of the complexities of urine biome and their interactions; identifying uropathogens without SUC cut off values; and providing results to clinicians faster than SUCs would typically allow.

The potential clinical benefits of PCR urine testing, such as the testing offered by MD Labs, include faster turnaround times, thus enabling speedier treatment with more appropriate drug therapies.  In a prospective pilot study, PCR-based identification of pathogens was feasible for supplementing conventional culture methods to diagnose UTI. The main advantage is the time saved in identifying the pathogens. (Lehmann et al., 2010) The sensitivity and accuracy of PCR testing also have the advantage of identifying pathogens even in patients with r/cUTIs when the primary pathogens may have already been treated with sufficient antibiotics.  In 2023, Hao et al. reported that organism detection increased with expansion in PCR panel size from 5 to 25 organisms (p < 0.01).  I have reviewed MD Lab's requestion forms and noted that its panel tested for between 17 and 19 pathogens, which is within the range endorsed by Hao et al.  I have also reviewed the pathogens that were included in the MD Labs' panel, and that the specific pathogens that were tested are reasonable based on my experiences. Thus, it is my opinion that the contention in the Second Amended Complaint (the "SAC") that MD Labs' panel was unreasonably large (SAC ¶ 182) is incorrect.

As noted in Section III above, low bacterial counts do not necessarily indicate that a bacterium is not the cause of an infection.  I note that MD Lab's results report provided colony count data to give clinicians additional information to inform their patients about treatment plans.

Hao et al.'s data demonstrated that PCR testing significantly makes the overall positivity rate and the detection of individual microorganisms, polymicrobial organisms, and fastidious organisms significant. These advantages are ideally realized with a broad PCR panel. (Hao et al., 2023)  Furthermore, what had been previously considered inconsequential uropathogens may not necessarily be so when non-invasive midstream voided collection of urine specimens for microbial detection and identification in cases of presumed UTI does not result in significantly more contamination than in-and-out catheter-collected specimens. Additionally, organisms long regarded as contaminants should be reconsidered as potential uropathogens. (Wang et al., 2023)

A.234

When investigators examined real-world evidence, we found that rapid identification of uropathogens and antibiotic susceptibilities improves urologic outcomes for patients with complicated or a history of r/cUTIs. Haley et al. compared infection-associated biomarkers in patients diagnosed with UTIs against detecting microorganisms by SUC and multiple x polymerase chain reaction. (M-PCR). Investigators found that most patients with microorganisms detected by M-PCR, which SUC missed, had elevated markers of inflammation, indicating that these organisms were likely causative of UTIs. (Haley et al., 2023)  Lastly, "the findings of this study indicate that >75% of M-PCR-positive/SUC negative cases are true UTIs, as evidenced by elevated levels of urinary biomarkers in a symptomatic population with a presumptive UTI diagnosis."

Hao et al. also found that "PCR, as with any other test, should be considered information accretive to the clinician's decision-making process. As such, the treating physician may initiate, alter, continue, or discontinue treatment based on the PCR findings."  Consequentially, they conclude that "for patients with cUTI, SUC, and PCR are complementary tests that should be used in conjunction to provide clinicians with complete data on which to make diagnostic and management decisions for this difficult to treat patients." (Hao et al., 2023)

We have learned in the past decade that rapid diagnosis with PCR urine studies with identifications of uropathogens, such as the PCR UTI test offered by MD Labs, can be helpful in the appropriate management of UTIs in today's world when we have more diagnostic techniques available to be used in our clinical approach to a long-standing problem.

V.      The Role of PCR Testing in Antibiotics Stewardship

Antibiotic stewardship is critically important in treating bacterial infections, utilizing the best-coordinated efforts to ensure the responsible use of antibiotics to reduce and ultimately eliminate antibiotic resistance. UTIs are among the most common indications for antibiotic prescriptions in the outpatient setting.  Given rising rates of antibiotic resistance among uropathogens, antibiotic stewardship is critically needed. (Haldar, 2024; Manesh et al., 2021) Antibiotic stewardship strategies include: (1) promoting accurate diagnosis of uropathogens, (2) promoting appropriate prescription of correct antibiotics, and (3) preventing the spread of antibiotic-resistant infections. The goal is to preserve our current armamentarium of antibiotics to treat severe infections in the future. (Goebel et al., 2021)

In recent years, PCR technology has become a standard test in molecular biology to identify a range of pathogens, for example, HIV, Hepatitis C, COVID-19, etc. This technology amplifies a single or a few copies of a segment of DNA, thus generating a long chain of genetic material to identify the genetic material that belongs to a particular biological origin. PCR tests can be completed more quickly than standard cultures in the laboratory because they are not dependent on the growth characteristics of a bacterium in standard culture, which can take days and, in some cases, of slow-growing bacteria, weeks.

New validated PCR technologies that are faster and more sensitive in identifying bacteria have added to our arsenal of testing to diagnose and treat bacteriological infections in the urinary tract. For instance, SUCs were used to diagnose UTIs in the setting of urinary symptoms,

- 6 -

A.235

combined with urine studies that tested for elements of inflammation, such as nitrates and white blood cells. Antibiotic susceptibility testing was then conducted to help guide the appropriate use of antibiotics. PCR testing, in conjunction with urinary symptoms and urine studies showing the presence of markers of inflammation, serves the same purposes as SUCs but enables us to identify bacteria more quickly and more accurately, promoting less spread of antibiotic-resistant bacteria that can generate dangerous infections.

Data are now emerging that using PCR instead of SUC has led to fewer recurrent infections, hospitalizations, and significantly less overall cost for complicated urinary infections (Ko et al., 2023)  In UTIs, the earlier effective use of appropriate therapy will lead to better utilization of antibiotics, such that we can achieve better antibiotic stewardship and thus reduce the length of hospital stays. (Spoorenberg et al., 2014)

VI.   PCR Testing May Be More Cost-Effective Than SUC

I recently published a study suggesting that overall healthcare costs for UTI patients tested using PCR technology are significantly less than those tested with SUC despite the increased cost of PCR testing.  We compared 1-year UTI-related health care utilization and costs for UTIs diagnosed by outpatient multiplex polymerase chain reaction with pooled antibiotic susceptibility testing vs SUC among Medicare beneficiaries with r/cUTIs, using claims from a deidentified random 5% sample of beneficiaries with an index UTI in 2018 followed by 12 months during which all outpatient UTI tests were either mPCR/P-AST or SUC. (Ko et al., 2023) Outcomes were compared between 69 individuals diagnosed using mPCR/P-AST and 678 propensity-matched individuals using SUC.

Cost per subsequent UTI was significantly lower for the mPCR/P-AST cohort as compared to the SUC cohort ($767 vs $1,303, $P$ = .0013). The average total 1-year UTI-related cost was $501.85 (95% CI: $79.87, $562.08 $P$ = .004) lower per mPCR/P-AST member as compared with patients who were tested with SUC ($629.55 vs $1131.39). Non-outpatient treatment accounted for 22.5% of mPCR/P-AST vs 53.4% of SUC UTI-related costs.

The conclusion derived from this study is that for patients with r/cUTI, rapid identification of pathogens and antibiotic susceptibilities using mPCR/P-AST are associated with lower UTI-related clinical care and utilization costs compared with SUC. The r/cUTI patients with more risk factors could see more advantages with PCR testing.   The goal of having a faster laboratory test to help with the appropriate, timely treatment institution has emerging data to support its use. The retrospective analysis of Medicare claims data found that PCR ultimately costs the healthcare system less in patients with recurrent and complicated UTIs.  MD Labs and its PCR-based UTI testing address elements that may contribute to better outcomes.

VII.   Society Guidelines are not Dispositive as to Whether PCR Testing is Beneficial

PCR testing for UTIs is not currently included in the American Urology Association guidelines for UTIs.  However, the development of society guidelines in antibiotics stewardship usually takes years after peer-reviewed articles are reviewed for data relevance and whether there has been an impact on disease processes. Thus, there has always been a lag between evidence

A.236

supporting new treatments and technologies and their incorporation into society guidelines.  The lag does not suggest that the treatment or technology is experimental.  Such lags are typical of medical society guidelines. As is typical in medical practice, society guidelines for PCR UTI testing must catch up to the scientific data regarding such testing.  In a parallel example of lag time in oncology, investigators have found that clinical pathways effectively standardize patterns of care to reflect the most up-to-date clinical evidence, independent of guideline publication. (Rodriguez-Lopez et al., 2019) That is, when the most current clinical evidence that is reproducible, validated, and meaningful becomes available, waiting for its integration into a "white paper" guideline before treating patients with the most advanced and novel therapies is unnecessary.

Despite many societal guidelines for treating UTIs, practitioners do not follow these panel suggestions uniformly.  Furthermore, international studies evaluated antibiotic-prescribing practices and found low adherence to Infectious Disease Society of America (IDSA) guidelines for treating uncomplicated urinary tract infections, with only 35% of the prescribed antibiotics deemed appropriate. (Kabbara et al., 2018)  Similarly, other investigators have found that adherence to national guidelines/recommendations was inadequate for patient treatment, where 43% of the patients were culture-negative in the patients treated. The authors suggested that interventions that improve physicians' prescribing practices for uncomplicated urinary tract infections are needed for UTIs in an era of increasing bacterial resistance.  To reduce the selection of multi-drug-resistant bacteria, an improvement in the use of diagnostic criteria/tools and antibiotic drugs in primary care is necessary. (Lindback et al., 2017)

Recently, concerns have been raised that a more accurate diagnosis of bacterial biome will trigger the paradoxical use of antibiotics to treat urine infections. (Akhlaghpour et al., 2024) However, a non-sterile biome is expected in the urine. Urine is not inherently sterile, but in the past, we only found the bacteria by looking for and isolating them. Many bacteria in the urine might be commensal and interact with other bacteria, which may affect antibiotic resistance. In other words, a positive PCR, which looks for genetic material for significantly more bacteria than SUC, does not necessarily mean the patient has an active infection. Any incremental concern of overtreatment can be mitigated by utilizing good clinical judgment, clinical history, physical examination, and evaluation of the urine for evidence of inflammation.

The most recent reiteration of the American Urology Association guidelines on using PCR for urinary tract infections advises that more evidence is needed before these technologies become incorporated into the guidelines. The continued utilization of these PCR testings will contribute to evidence and experience in developing the understanding of how new validated technologies can assist in the diagnosis and treatment of urinary tract infections with a better ability to attain antibiotic stewardship. Importantly, AUA guidelines do not call for abstaining from using PCR or abandoning the use of PCR to add information to diagnose UTIs accurately.

Following these principles of adopting new validated technologies has revolutionized the field of urinary biomes and identified a potential paradigm change in understanding that urine, like skin, is not sterile. (Kogan et al., 2015)  Other investigators also found that urine is usually not sterile in healthy people. Kogan et al. suggested that the role of routinely uncultivated bacteria in healthy and diseased subjects needs to be established. It may alter the diagnostics of

A.237

infectious and inflammatory diseases of the urogenital tract. This concept will allow us to identify earlier bacteria that are more likely to be more infectious or more likely to cause infections to be recognized, particularly when combined with antibiotic susceptibility testing. All of these studies indicated that the emerging use of PCR urine studies could impact our vision as a medical community to aid in better antibiotic stewardship to reduce the likelihood of overtreatment, particularly overtreatment with the wrong antibiotics. The ability to treat earlier also decreases the duration and course of antibiotics that are additive in ways that negatively impact UTIs. The diagnosis of UTI should not exist in a vacuum where a solitary test determines infection. Still, a host of factors, primarily patient symptoms, presentation, and urinary markers of inflammation, are co-jointly essential to give a more accurate disease definition that requires antimicrobial therapy. (Cai et al., 2018)

VIII.   <u>Health Care Professional Ordering of Laboratory Studies</u>

Based on my training and experience, it is abundantly clear that a clinician with available ascertained clinical information should be responsible for determining the most appropriate lab tests or templating the lab tests based on "reflex" lab testing protocols for any patient. The clinicians know clinical information; laboratories do not see patients or make treatment directions. Instead, the laboratories must rely on the clinicians' clinical judgment and perform the test ordered by the clinician.  My professional opinion from my experiences as a Chief Medical Officer of an academic affiliated teaching hospital who oversaw over 800 full-time and part-time clinicians and the clinical laboratory under my direct oversight is that it is not the role of the clinical laboratories to override clinician decisions or second guess clinicians in the tests that they have ordered. However, it is routine for collaborative discussions in some instances where testing requires clinical input from the clinicians to the laboratories to ensure the most appropriate tests are ordered to have clinical validities in the results anticipated. It can be appropriate to order PCR-based UTI testing based on the physician's clinical presentation and sound medical judgment.  As noted above in Section VI, I published a peer-reviewed study to demonstrate that not only is it medically appropriate to order PCR-based UTI testing but that it can be cost-effective for the healthcare system as well.

_____
Dicken S. C. Ko, B.Sc., M.D., F.R.C.S.C., F.A.C.S.

- 9 -

A.238

## Bibliography

Akhlaghpour, M., Haley, E., Parnell, L., Luke, N., Mathur, M., Festa, R. A., Percaccio, M., Magallon, J., Remedios-Chan, M., Rosas, A., Wang, J., Jiang, Y., Anderson, L., & Baunoch, D. (2024). Urine biomarkers individually and as a consensus model show high sensitivity and specificity for detecting UTIs. *BMC Infect Dis*, *24*(1), 153. https://doi.org/10.1186/s12879-024-09044-2

Bista, B., & Champion, J. D. (2019). Does treatment of urinary tract infections reflect the antibiotic stewardship program guidelines? *J Am Assoc Nurse Pract*, *31*(12), 693-698. https://doi.org/10.1097/JXX.0000000000000204

Cai, T., Lanzafame, P., Caciagli, P., Migno, S., Mereu, L., Mattevi, D., Luciani, L. G., Tateo, S., Malossini, G., & Bjerklund Johansen, T. E. (2018). Role of increasing leukocyturia for detecting the transition from asymptomatic bacteriuria to symptomatic infection in women with recurrent urinary tract infections: A new tool for improving antibiotic stewardship. *Int J Urol*, *25*(9), 800-806. https://doi.org/10.1111/iju.13723

Ferrer, R., Martin-Loeches, I., Phillips, G., Osborn, T. M., Townsend, S., Dellinger, R. P., Artigas, A., Schorr, C., & Levy, M. M. (2014). Empiric antibiotic treatment reduces mortality in severe sepsis and septic shock from the first hour: results from a guideline-based performance improvement program. *Crit Care Med*, *42*(8), 1749-1755. https://doi.org/10.1097/CCM.0000000000000330

Goebel, M. C., Trautner, B. W., & Grigoryan, L. (2021). The Five Ds of Outpatient Antibiotic Stewardship for Urinary Tract Infections. *Clin Microbiol Rev*, *34*(4), e0000320. https://doi.org/10.1128/CMR.00003-20

Haldar, J. (2024). Confronting the Rising Threat of Antimicrobial Resistance: A Global Health Imperative. *ACS Infect Dis*, *10*(1), 1-2. https://doi.org/10.1021/acsinfecdis.3c00571

Haley, E., Luke, N., Mathur, M., Festa, R. A., Wang, J., Jiang, Y., Anderson, L., & Baunoch, D. (2023). Comparison Shows that Multiplex Polymerase Chain Reaction Identifies Infection-associated Urinary Biomarker-positive Urinary Tract Infections That Are Missed by Standard Urine Culture. *Eur Urol Open Sci*, *58*, 73-81. https://doi.org/10.1016/j.euros.2023.10.008

Hao, X., Cognetti, M., Patel, C., Jean-Charles, N., Tumati, A., Burch-Smith, R., Holton, M., & Kapoor, D. A. (2023). The Essential Role of PCR and PCR Panel Size in Comparison with Urine Culture in Identification of Polymicrobial and Fastidious Organisms in Patients with Complicated Urinary Tract Infections. *Int J Mol Sci*, *24*(18). https://doi.org/10.3390/ijms241814269

Kabbara, W. K., Meski, M. M., Ramadan, W. H., Maaliki, D. S., & Salameh, P. (2018). Adherence to International Guidelines for the Treatment of Uncomplicated Urinary Tract Infections in Lebanon. *Can J Infect Dis Med Microbiol*, *2018*, 7404095. https://doi.org/10.1155/2018/7404095

Ko, D. S.-C., Lukacz, E. S., Juster, I. A., Niecko, T., Ashok, A., Vollstedt, A. J., Baunoch, D., & Mathur, M. (2023). Real-World Evidence That a Novel Diagnostic Combining Molecular Testing With Pooled Antibiotic Susceptibility Testing is Associated With Reduced Infection Severity and Lower Cost Compared With Standard Urine Culture in Patients With Complicated or Persistently Recurrent Urinary Tract Infections. *JU Open Plus*, *1*(5), e00021. https://doi.org/10.1097/ju9.0000000000000025

A.239

Kogan, M. I., Naboka, Y. L., Ibishev, K. S., Gudima, I. A., & Naber, K. G. (2015). Human urine is not sterile - shift of paradigm. *Urol Int*, *94*(4), 445-452. https://doi.org/10.1159/000369631

Lehmann, L. E., Hauser, S., Malinka, T., Klaschik, S., Stuber, F., & Book, M. (2010). Real-time polymerase chain-reaction detection of pathogens is feasible to supplement the diagnostic sequence for urinary tract infections. *BJU Int*, *106*(1), 114-120. https://doi.org/10.1111/j.1464-410X.2009.09017.x

Lindback, H., Lindback, J., & Melhus, A. (2017). Inadequate adherence to Swedish guidelines for uncomplicated lower urinary tract infections among adults in general practice. *APMIS*, *125*(9), 816-821. https://doi.org/10.1111/apm.12718

Manesh, A., Varghese, G. M., Investigators, C., & Collaborators. (2021). Rising antimicrobial resistance: an evolving epidemic in a pandemic. *Lancet Microbe*, *2*(9), e419-e420. https://doi.org/10.1016/S2666-5247(21)00173-7

McDonald, M., Kameh, D., Johnson, M. E., Johansen, T. E. B., Albala, D., & Mouraviev, V. (2017). A Head-to-Head Comparative Phase II Study of Standard Urine Culture and Sensitivity Versus DNA Next-generation Sequencing Testing for Urinary Tract Infections. *Rev Urol*, *19*(4), 213-220. https://doi.org/10.3909/riu0780

Naber, K. G., Bonkat, G., & Wagenlehner, F. M. E. (2020). The EAU and AUA/CUA/SUFU Guidelines on Recurrent Urinary Tract Infections: What is the Difference? *Eur Urol*, *78*(5), 645-646. https://doi.org/10.1016/j.eururo.2020.06.032

Nityadarshini, N., Mohapatra, S., Gautam, H., Jain, V., Chaudhry, R., & Kapil, A. (2022). Polymicrobial growth in standard urine culture: Time to Act or Ignore? *Trop Doct*, *52*(2), 335-336. https://doi.org/10.1177/00494755221076909

Rodriguez-Lopez, J. L., Ling, D. C., Heron, D. E., & Beriwal, S. (2019). Lag Time Between Evidence and Guidelines: Can Clinical Pathways Bridge the Gap? *J Oncol Pract*, *15*(3), e195-e201. https://doi.org/10.1200/JOP.18.00430

Spoorenberg, V., Hulscher, M. E., Akkermans, R. P., Prins, J. M., & Geerlings, S. E. (2014). Appropriate antibiotic use for patients with urinary tract infections reduces length of hospital stay. *Clin Infect Dis*, *58*(2), 164-169. https://doi.org/10.1093/cid/cit688

Wang, D., Haley, E., Luke, N., Mathur, M., Festa, R. A., Zhao, X., Anderson, L. A., Allison, J. L., Stebbins, K. L., Diaz, M. J., & Baunoch, D. (2023). Emerging and Fastidious Uropathogens Were Detected by M-PCR with Similar Prevalence and Cell Density in Catheter and Midstream Voided Urine Indicating the Importance of These Microbes in Causing UTIs. *Infect Drug Resist*, *16*, 7775-7795. https://doi.org/10.2147/IDR.S429990

- 11 -

A.240

# EXHIBIT 6

A.241

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

No. 18-cv-12558-PBS

- - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA, et al.,

ex rel. OMNI HEALTHCARE, INC.,

                        Plaintiffs,

     v.

MD SPINE SOLUTIONS LLC d/b/a MD LABS,

INC., DENNIS GRIZELJ, MATTHEW RUTLEDGE

and DOE HEALTHCARE PROVIDERS 1-100,

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - -x

    DEPOSITION OF DICKEN SHIU-CHUNG KO, M.D.

         Conducted Remotely via Zoom

              2 Dudley Street

         Providence, Rhode Island

              April 26, 2024

                 8:26 a.m.

Daria L. Romano, RPR, CRR, and Notary Public

TP One                                    800.FOR.DEPO
                                          (800.367.3376)

A.243

of inhibition and the dosages will determine whether it's completely resistant or intermediate or fully sensitivity to the antibiotics that are given.

Q.   Okay.  So I believe you answered this.  Is urine culture and sensitivity testing synonymous with standard urine culture, or SUC?

A.   That is correct.  That is my understanding of the definition.

Q.   Okay.  Do you agree with what we just read through with regard to the answer to this question?

MR. ORKAND:  Objection.

A.   Agreement is a very -- agreement is a very simplified version, just like this statement is simplified in that it's nuanced.

It is absolutely true that PCR, the purpose of which is to identify the presence of various bacterial entities that exist in a urine specimen, and that urine specimen in the past, for the last 50 and 60 years, have been defined by a standard urine culture, plating it in a growth medium.



A.245

Q.   Okay.  I'm going to zoom out a little bit again.

Do you know who created this document?

A.   I have no idea of who created this document.  My assumption, of course, it says "MD Labs" on top and "BioMed" up there, so I suspect it's probably marketing department from those two up there.

Q.   Okay.  I'll stop sharing my screen.  Okay.

And, Doctor, some of this, what I'm going to ask next, has come up throughout our conversation so far, but I'm going to ask specifically whether you have an understanding of how many options there are for testing urine for UTI-related symptoms?

A.   Of testing that we order?

Q.   Yes.

A.   On a daily basis or in the experimental world?

Q.   Testing that you would order for a patient right now, today.

A.   On -- on the clinical front right

 TP One

Schedule@TP.One
www.TP.One

800.FOR.DEPO
(800.367.3376)

now, today, is urinalysis, urine microscopy, urine -- standard urine culture with sensitivity, a urine that's a reflex, meaning that your urinalysis is positive, it reflects -- automatically goes to urine culture even if you didn't order one, or you could order a PCR testing.

So those are the ones that are on our order menu of our electronic healthcare records.  They're very standard across the country, very standard.

Q.   Okay.  And before you just gave that answer, you asked whether I was referring to what is given to patients now or experimental.  What are the experimental tests you were referring to?

A.   Oh, meaning people are looking at interleukins, IL-6, PGAL, et cetera.  Those are the things that are inflammatory markers that are used to evaluate patients. Interleukin beta, what is it, enzyme-linked little peptides and various other -- other things.  Those are biomarkers, including neutrophil gelatinase-associated lipocalin.




Those are experimental.  Those help you understand the urine better.  But those are in the laboratory in a study setting.

Q.    Okay.

A.    Probably nothing that has ever come up here in any of these documents.

Q.    Okay.  Now, to go back to the list that you gave as to tests that are offered to patients today.  And you're going to have to forgive my ignorance on this; there are a lot of similar words in the list that you went through.

Are you able to go through one by one with me and describe the differences of the tests that you laid out?

A.    Sure.  A urine dip is provided by a patient in a clean catch manner, we think, we hope, and it's dipped to determine whether or not there's presence or absence of leucocytes, red cells, and proteins and nitrates, and those are some evidence to suggest that potentially there's an infection or not.  That's a standard dipstick urinalysis.

 TP One

Schedule at TP.One
www.TP.One

A.248

800.FOR.DEPO
(800.367.3376)

A.249

what we see, then -- then we need to do a microscopy if we're looking for something along those lines.  A urine culture is if a urinalysis is positive.  And in somebody who comes in with complicated urinary tract infection or a recurrent urinary tract infection with prior negative studies or recurrent positive polymicrobial infection and a lot of resistance and so on, then PCR would be indicated to help us further define what's there, what is in the urine, what is the interplay of organisms that exist in that urobiome.

Q.   What is your understanding of the type of information that a PCR-based UTI test will reveal?

A.   The type of information that's revealed by PCR is to take a look at whether the genetic material for the bacteria that you're understanding is potentially a pathogen or commensalism organism or a fastidious organism can exist in the urine, and that will determine whether or not there is presence or absence of such a bacteria in



A.251

what are those used to diagnose?

MR. ORKAND:  Objection.

A.    Well, PCR is to diagnose what is the bacteria that exists in the urine.  There are -- in a standard urine culture, sometimes there are false positives and there's false negatives.

Sometimes when patients persistently have symptoms and the urine culture, standard urine culture, do not identify bacteria and you suspect that there's an inflammatory component to it, and understanding in the literature that when people look at inflammatory markers of infection that included some of the interleukins and others that I've talked about previously, there is an underdetection of bacteria that is done by standard urine culture, and the PCR studies will help to identify bacteria that potentially can cause infection.

And treatment of those bacteria, fastidious or slow growing, or ones that have not been previously picked up, may help to treat the patient's symptoms and provide a





better clinical outcome for that patient.  So there is a role for that, for the utilization, in clinical practice.

Q.   We talked about what the PCR test results reveal.  A urine culture by itself, what do those test results reveal?

A.   A urine culture reveals a predominant growth of a particular bacteria that is in the urine.  And specific to that, they look at the sensitivity of some known antibiotic disk, whether it's responsive, intermediate, or resistant to -- to -- to inhibition of growth.  It doesn't tell you anything about the potential of genetic material that can cause resistance.

Q.   And does the PCR test result give you an indication of the bacterial growth, or is that just in the urine culture?

A.   Oh, the PCR tells you about bacteria.  It tells you the presence and absence of bacteria, and there are studies that are out there that suggest that once you have the bacteria in there, in the urine, those are what exist in order for the genetic



A.254

contamination.  It doesn't mean there's always a colovesical fistula.

It could mean that this is something that we're detecting in the urine and we're understanding a little bit more, time over time, in the last couple of years, in terms of a urinary biome.  Good article -- there's a good article that I quoted in there.

Q.   So in your career, have you come across an SUC missing a polymicrobial organism?

A.   I believe I've come across a lot of standard urine cultures that have missed a pathogen because of the fact that they might have been started on antibiotics already or the fact that they didn't pick it up.

There's a lot of fastidious organisms that are out there that are slow growing, and some of the enhanced urine culture methods of plating it on different things, on different amount of time, do tend to pick up organisms that the standard urine culture does not pick up in the first 24 to 72 hours.  So the nuanced answer is yes.

 TP One

Scheduling@TP.One
www.TP.One

A.255

800.FOR.DEPO
(800.367.3376)

A.256

that you don't have a PCR probe for and you're not testing it in a panel.  Then if that organism is in the urine and you are not testing for it, it will be negative.

Q.   So other -- other than that scenario, it's your opinion that a PCR is not able to give a false negative; is that right?

A.   You test what you test for and the detection of PCR is very accurate in looking at the genetic material that's there for detection.

I mean, PCR is used for hepatitis, is used for HIV, and it's used for very -- you know, it's obviously used for COVID-19. And you can see the broad utilization of these over decades and more recently, over the last three or four years, a positive and a negative test with PCR goes very well with understanding whether or not there is presence or absence of that type of pathogens.

So to take it -- a corollary outside of the urinary tract situation, you can see PCR is considered a -- a highly accurate



test.

Q.   Okay.  And just to bring it back to the urinary tract area.  The PCR results -- as you've said, I know, a few times -- identifies presence or absence of pathogens.  Now, are you able to take those results and say yes, there's a UTI versus no, there is not a UTI present in this patient?

A.   Unfortunately the answer is still not yes or no.  The answer is nuanced simply because of the fact that I have to work with the patient to determine their symptoms, determine other tests, such as urinalysis and others, to see whether or not there's any other markers.  And as we know from scientific studies, there are other inflammatory markers that are out there that are in existence that correlates with an infection.  And the ones that we're allowed to look at easily in the -- in the office or in the hospital setting is a urinalysis.

So understanding the urinalysis, understanding the clinical presentation of the patient in terms of symptomatology as



A.259

can answer.  Go ahead.

THE WITNESS:  No, go ahead and object and then I'll answer.

MR. ORKAND:  I did.  You can answer.

THE WITNESS:  Okay.

A.    I think when -- it all depends on your scenario, again.  If you look at the ICU literature, you look at the infectious disease literature, and some that I have quoted here, the more times, the more hours that it take -- let's say you have what they call a sepsis coming into the hospital, something that's related to a severe infection, all comers, not just urinary tract, if you have a severe sepsis, every hour counts.  The longer it takes for you to start treatment, the longer it takes for you to resuscitate, the more likely the higher the mortality.

So what is similar in urinary tract infection is that the longer it takes, the more, number one, the patient suffers with not being on potentially the right



antibiotics.  Number two -- or not even being started on antibiotics.  And number two, it may allow an infection to develop that have higher consequences for patients, such as immunosuppressed patients or patients with a impacted stone in an obstructed kidney system.

So the quicker the results can come back, the better it is.  It's -- it's very similar, if you were the patient and you have to wait three or four days to find out whether you truly have an infection and taking the right antibiotics, it would be better for the patient as well as the clinician treating the patient to know that here's all the tests that are done, here is a, you know, panel of pathogens that can be causing your infection, this is what you treat with.

Q.   How long does it take for PCR test results to come back?

A.    If it's drawn in the morning, it's the same day in our laboratory, but usually there's a 24-hour turnaround time.  We run



COMMONWEALTH OF MASSACHUSETTS)

SUFFOLK, SS.                    )

       I, Daria L. Romano, RPR, CRR and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 26th day of April, 2024, at 8:26 a.m., the person hereinbefore named, who was duly sworn by me, and that such deposition is a true record of the testimony given by the witness.

       I further certify that I am neither related to nor employed by any of the parties or counsel to this action, nor am I financially interested in the outcome of this action.

       In witness whereof, I have hereunto set my hand and seal this 13th day of May, 2024.

                        _Daria Romano_

                        _____
                        Notary Public
                        My Commission Expires
                        February 5, 2027



Notice Date: Monday, 6. May 2024

Attention: Dicken Shiu-Chung Ko, MD

Re:United States of America v. MD Spine Solutions LLC
Deposition of Dicken Shiu-Chung Ko, MD (4/26/2024)

NOTICE REGARDING SIGNING DEPOSITION TRANSCRIPT

The above referenced transcript is available for review. Within 30 days, or the applicable timeframe of your legal jurisdiction, the witness may read the testimony to verify its accuracy. Any changes can be noted on the following errata page.

Once the transcript has been reviewed, the witness should sign and date the certificate of deponent page. The signed certificate, errata, and original transcript (if provided) must be returned to TP.One per the rules of civil procedure.

If the transcript and errata are not returned within the alotted time, the unsigned transcript may be used as if signed by the witness.

Thank you,

TP.One Production Department
Production@tp.one



 

Deponent Errata Page

Notice Date: 05/06/2024

Deposition Date: 4/26/2024

Deponent: Dicken Shiu-Chung Ko, MD

Case Name: United States of America v. MD Spine
           Solutions LLC

Page:Line          Now Reads              Should Read

_____ _____ _____

_____ _____ _____

_____ _____ _____

_____ _____ _____

_____ _____ _____

_____ _____ _____

_____ _____ _____

_____ _____ _____

_____ _____ _____

_____ _____ _____

_____ _____ _____

_____ _____ _____

_____ _____ _____

_____ _____ _____

_____ _____ _____

_____ _____ _____

_____ _____ _____

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me. Any additions or corrections that I feel are necessary, I will attach on a separate sheet of paper to the original transcript.

_____

Signature of Deponent

I hereby certify that the individual representing himself/herself to be the above-named individual, appeared before me this _____ day of _____, 20___, and executed the above certificate in my presence.

_____

NOTARY PUBLIC IN AND FOR

_____

County Name

MY COMMISSION EXPIRES:



# EXHIBIT 7

```
          UNITED STATES DISTRICT COURT
            DISTRICT OF MASSACHUSETTS
            Case No. 18-cv-12558-PBS



UNITED STATES OF AMERICA,      )
et al., ex rel. OMNI           )
HEALTHCARE, INC.,              )
                               )
            Plaintiffs,        )
V.                             )
                               )
                               )
MD SPINE SOLUTIONS LLC,        )
D/B/A MD LABS INC.,            )
DENIS GRIZELJ, MATTHEW         )
RUTLEDGE AND DOE HEALTHCARE    )
PROVIDERS 1 - 100,             )
                               )
            Defendants.        )



       DEPOSITION OF STEVEN W. PARKER, M.D.

               APPEARING REMOTELY

                    VIA ZOOM

          Thursday, December 7, 2023

          11:01 a.m. to 2:36 p.m.
```

Reported by:

Dawn Mack-Boaden

Registered Professional Reporter; CSR# 153120

APPEARING REMOTELY FROM NORFOLK COUNTY, MA

A.267

A.268

Page 75

urine culture means we culture a bacteria,

presumably -- well, strike that.

A urine culture means we grew something.

To some people, that's all it means.   It

means also, to other people, that it

includes the sensitivity testing, as this

form does suggest.

BY MS. TESIC:

Q.   When you say this form does suggest, why do
you say that that suggested --

A.   Because that's what the form says.

Q.   Where?

A.   At -- where you just read.

Q.   But what -- what part of that is suggesting
a urine culture?  Help me understand.

A.   Okay.  It says urinary tract infection.
All right.  So now we specified the urine.  You're
doing RT/PCR for confirmation, and you're also doing
an antibiotic sensitivity testing.

Those are two different techniques.  They
can run simultaneously.  And, at MD Labs, those were
set up simultaneously.

So if you check that box up there, you got
confirmation of the bacteria and you got

A.269

Page 76

confirmation of the sensitivity.

Q.   So putting aside the PCR -- we'll do that next.

     The sensitivity portion --

A.   Okay.

Q.   -- how is that -- how is that tested?  This particular test.

A.   The organism is plated out on a plate, incubated, grown, and then put in another machine to test for sensitivities.

Q.   So the growing part is what I was asking before.  Is that considered the urine culture -- the standard urine culture?

A.   That's considered part of the urine culture, not the exclusive urine culture.

Q.   So are there -- could there be an instance where someone -- a doctor requests a urine culture without a sensitivity?

A.   You could if you wanted to.

Q.   So that's possible?

A.   Possible.  It doesn't make sense, but it's possible.

Q.   Right.  In the logistical sense, one test could happen without the other.  They're not

A.271

Page 81

A. Well, if I get the answer in 72 hours, I have the answer. I don't need to go beyond.

Q. If you -- if it's beyond 72 hours, what do you do then?

A. And if nothing's grown, you can either reculture, if possible, or you can try to do different techniques to obtain a result.

Q. What different techniques would those be?

A. Well, we're talking just about standard urine cultures --

Q. No. So in this scenario, you've gotten the culture, you waited 72 hours, 72 hours are up, and there's no growth.

You just -- you just said that you can reculture, which, just for the record, can you just explain that process?

A. You get another specimen.

Q. So essentially -- go ahead. Sorry.

A. Unfortunately, that's frequently not available. It's not possible because you probably already treated the person and now you've tainted your culture.

Q. And so would you then -- if that's not possible due to the tainting, is there an additional

A.272

Page 82

technique like the one you mentioned -- a different technique that you would go beyond a culture?

A.   You could, possibly.  Yes.  You could do a PCR test.

Q.   Can you describe what that is for me?

A.   The PCR test is actually looking for genetic material of organisms, whatever your -- your -- in this case, your PCR machine is set up for.  It doesn't -- it doesn't know every organism known to man, but you have selected in your PCR machine to be able to identify certain bacteria.

And so if the bacteria is present there but dead so it won't grow on the plate, or if it's fractured and consequently dead and won't grow, PCR can take pieces of whatever it sees and recreate the identity of the organism that was there.

Q.   With respect to the form that we were just seeing in Exhibit 1, the type of test was labeled an RT/PCR.

A.   Correct.

Q.   Is that different from a PCR?

A.   Again, a lot of that goes beyond my expertise to describe the detail of -- of how PCR works on a molecular basis.  I'm not a molecular --

A.273

A.274

Page 104

Was that discussed with Dylan at any point?

A.    He discussed with me the fact that they were looking at several different manufacturers for testing.

Q.    And then "Dr. Parker and Dylan to create a protocol validating our new UTI pathogen identification results to traditional systems."

Can you explain what "traditional systems" entails?

A.    So MD Labs was looking at using PCR to test urine for bacteria.  Traditionally, urine for bacteria was tested the way we previously discussed -- whether you want to call it a one-step or two-step process -- by growing the bacteria and then doing sensitivity testing.

So they were looking to see whether there was a potentially more useful way to provide information to doctors concerning urinary tract testing than the traditional method.  And that's what this is making reference to.

Q.    Okay.  And then it says, Update reports, requisition forms -- req forms based on feedback from Dr. Patterson's experience.

Again, was that talked about with you?

A.275

A.276

Page 114

grow equally well outside of them in a culture

sensitivity setting.

So there may be -- well, if you have an infection, you have an infection.  If it doesn't grow, that doesn't mean you don't have an infection. It just means that the organism did not grow well outside of a human being.  And so that's where you sometimes miss something.

Also, if a patient has been on an antibiotic prior to the urine specimen being corrected, as I mentioned, that can taint a urine culture because a bacteria might not grow well after it's been exposed to an antibiotic prior to collecting the specimen.

So this is making reference to the standard microbiologic method missing bacteria because of other factors.  And that's why for the detection, it says only 71 percent.  Again, whether it's 71 percent of the five or six or 71 percent of the seven, eight, nine, and ten that might have been there that didn't grow because the lab either didn't test for them or the culture medium wasn't broad enough to recover all the organisms that were there.

Q.   Right.  So how does -- I understood the

A.277

A.278

Page 121

A.   Okay.  Well, as I mentioned to you, there is a process in getting the culture and sensitivity.

I order a lab here in Reno, it gets processed in Reno, sent by airplane down to Arizona, processed in Arizona and put on a piece of paper and printed out and sent back to Reno.  The process of going and coming and all that can take two to three or four days.

Q.   I'm sorry.  I meant MD Labs.

A.   Okay.  So the question, once again?  I'm sorry.

Q.   So the question was you just said that it takes 24 hours, the PCR, because it's, you know, the faster test, as you said.

A.   Yes.

Q.   And then this page says you get -- as the provider, you get the results in two to three days from the day you ship to the -- does that mean as a provider they're waiting three days regardless of the speed of the PCR test?

A.   At MD Labs, we were working on trying to get the data back to doctors as quickly as possible.

Q.   Okay.

A.   Because the PCR machine is run in one day.

A.279

Page 122

The result is available at MD Labs at that time. The result from the standard testing won't be available for another 24 hours.

Q. So it's a 24-hour difference from PCR to standard urine culture?

A. Yes.

Q. When you said the -- when you said the -- you were working on processes to, I guess, get the PCR out faster, did that ever come to fruition?

A. We were in the process of trying to get that out faster when things shut down.

Q. When was that?

A. When -- whenever they came to me and said, I'm sorry, we're not doing this anymore. So some time in 2022, I believe.

Q. We're not doing this anymore. Does that mean, like, we're not operating the lab anymore or we're not needing you specifically?

A. It is my understanding that they were -- they were stopping urine testing.

Q. Urine testing across the board?

A. For micro -- for culture data.

Q. And that entailed PCRs as well, this RT/PCR?

A.280

Page 158

C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS
Norfolk, SS.

I, DAWN MACK-BOADEN, CSR #153120, RPR, and a Notary Public duly qualified in and for the Commonwealth of Massachusetts, do hereby certify that:

STEVEN PARKER, M.D., the witness whose testimony is hereinbefore set forth, was duly sworn by me pursuant to Mass. R. Civ. 27, 29, 30, 30A, and 31, and that such testimony is a true and correct transcription of my original stenographic notes taken in the forgoing matter, to the best of my knowledge, skill and ability.

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken; and furthermore, that I am not a relative or employee of any attorney or counsel employed by the parties thereto or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Notarial seal this 19th day of December, 2023.

                    Dawn Mack-Boaden, RPR
                    Notary Public

My Commission Expires:  August 26, 2027

THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION AND/OR DISTRIBUTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR SUPERVISION OF THE CERTIFYING COURT

REPORTER.

A.281

# EXHIBIT 8

A.282

# MD Labs Account Information for Referring Practices



## Molecular Diagnostics | Urinary Tract Infections (UTIs)

## ** Email completed form to:  supplies@mdlabs.com **

# In order to establish an account with MD LABS, please provide the following:

## Practice Information

*Please list all practice information.  Contact us if you have any question (775) 391-5221*

Practice Name: _____

Address: _____

_____

Contact Name: _____    Phone: _____

E-mail: _____    Fax: _____

MD Labs Representative/Manager: _____

Estimated Sample Volume (per week/per month/etc.): _____

## Provider Information

*Please list all providers submitting specimens along with their NPI numbers:*
*The 1st provider listed will be considered the Default Provider in the event that no provider is circled on the requisition form

| Provider: | Provider Signature: | NPI: | PECOS: |
|---|---|---|---|
| * | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

*I authorize tests to be ordered and sent for analysis to MD Labs.  Please print and sign your name here if you wish to maintain a signature on file for any requisition form(s).*

Rev. 07/18

A.283

1

Confidential

MDLabs_0008722

## MD Labs Account Information for Referring Practices
### *Molecular Diagnostics | Urinary Tract Infections (UTIs)*



| Logistics |
| --- |

Please complete the Client Supply Order Form.

Select Specimen Pickup Day(s): ☐ Mon ☐ Tues ☐ Wed ☐ Thurs ☐ Fri   Time: _____

Start Date: _____

☐ FedEx      ☐ UPS

| Special Protocols |
| --- |

Practice would like Preliminary Reports?      ☐ Yes      ☐ No

| Report Delivery |
| --- |

### *Please indicate the preferred method for report delivery.*

☐ Online (an online username and password will be provided) (Recommended)   ☐ Fax   ☐ Both

| Contact Information |
| --- |

**Patient Reports and Testing:**

Our science team is available by phone for any questions regarding patient reports/results, testing methodologies, etc.

> **MD Labs Corporate Headquarters**
> 10715 Double R Blvd, Suite 102
> Reno, NV 89521, USA
> Phone: +1 (775) 391-5221
> Fax: +1 (775) 737-9133

**Billing:**
Please be informed that insurances will only cover tests that meet their coverage criteria and are medically necessary to treat or diagnose an individual patient. Ordered tests submitted for insurance reimbursement must meet program requirements or the claim may be denied

If a patient has any questions regarding their account, please have them call us at: **(775) 391-5221.**

Rev. 07/18

A.284

2

Confidential

MDLabs_0008723

# MD Labs Account Information for Referring Practices
## *Molecular Diagnostics | Urinary Tract Infections (UTIs)*

## Specimen Collection & Shipping Directions

**Please follow all standard guidelines/precautions when working with biohazardous materials.
Wear gloves at all times when handling specimens.**

**1.** Complete the top portion of an MD Labs Requisition form (provider, patient demographics, collector initials, collection time and date).

**2.** Have the patient print and sign their name, and date the bottom of the requisition form.

**3.** Provide the patient with the collection device (see options below).  Please verbally instruct the patient on how to collect the specimen (SEE DETAIL FOR UTI COLLECTION INSTRUCTIONS)

**4.** Ensure the requisition form number matches the security seal's number.

**5.** Place the vacutainer in the biohazard bag.  Seal the bag once you have placed the collection device inside.

**6.** The requisition form, along with a **copy of the patient's demographics and insurance card**, will go in the pouch on the side of the biohazard bag.

**7.** Place the full biohazard bag(s) into the shipping pack (within the shipping pack is a liner bag). **Please seal the liner bag before shipping the shipping pack.**

Please find enclosed shipping packs for your office.  Return labels have already been prefilled. When you are ready to send a shipment to MD Labs: Call UPS at 1-800-PICK-UPS **(1-800-742-5877)** or Fed Ex at **1-800-463-3339 Option 1** depending on your shipping process and indicate that you need to **"Schedule a pick up for a RETURN service label"**.  **Please schedule pickup days and times unless this has already been completed.**

The customer service representative may request the tracking number, which is on the pre-affixed label.  The tracking number ensures that MD Labs will be billed for the shipment/pick up fee.

***If you have any questions or concerns please call us at: (775) 391-5221 x15.***

A.285

Confidential                                                                                    MDLabs_0008724

# <u>MD Labs Account Information for Referring Practices</u>
## *Molecular Diagnostics | Urinary Tract Infections (UTIs)*

**Please follow all standard guidelines/precautions when working with biohazardous materials.
Wear gloves at all times when handling specimens.**

**Urinary Tract Infection Specimen Collection**
UTI Testing Requires a Clean Catch Specimen.  Please instruct patient to clean using a towelette before providing a specimen.

A.  Unpack the components of the C&S Straw Kit according to the package's instructions.  This collection takes place after the patient has provided a urine sample using the collection cup.
**Female**
- Cleanse using towelette.
- Separate the folds of the urinary opening, cleanse using towelette wiping from front to back. While holding folds open begin to void.  Allow first urinary flow to escape (first portion of urine washes out the urethra and any debris).
- Begin to void. Allow first urinary flow to escape (first portion of urine washes out the urethra and any debris).
- Collect midstream urine specimen in the sterile container. Do not touch the inside of the container or the lid.
- Once the urine specimen is collected, finish voiding in a bed pan or toilet.
**Male**
- Cleanse using towelette.
- Begin to void. Allow first urinary flow to escape (first portion of urine washes out the urethra and any debris).
- Collect midstream urine specimen in the sterile container. Do not touch the inside of the container or the lid.
- Once the urine specimen is collected, finish voiding in a bed pan or toilet.
B.  To transfer the urine sample into the vacutainer
Place the tip of the transfer straw into the urine specimen cup.  Make sure the tip is completely submerged.



C.  Push the C&S Preservative Tube into the transfer straw.  Hold in position until the flow stops.  Remove the tube, leaving the transfer straw in the cup.  Shake the tube vigorously.



D.  Complete UTI portion of the REQ form.  **THIS SECTION MUST BE COMPLETED**

☐ **Urinary Tract Infection Testing Panel on File** (RT-PCR Confirmation & Antibiotic Resistance) **Patient Complaining of (REQUIRED FOR UTI TESTING)**

| | | | | |
|---|---|---|---|---|
| ☐ Painful Urination (R30.0) | ☐ Cloudy/Discolored Urine (R82.99) | ☐ Flank Pain/Lower Abdominal (R10.30) | ☐ Frequent Urination (R35.0) | ☐ Fever (R50.9) |
| ☐ Bloody Urine (R31.21) | ☐ Abnormal Urine Odor (R82.90) | ☐ Right Quadrant Pain (R10.31) | ☐ Left Quadrant Pain (R10.32) | ☐ Chills (R68.83) |
| ☐ Altered Mental Status (R41.82) | | | | |

E.  Place used straw into shipping pack with the sample.  **SHIP SAMPLES DAILY.  UTI specimens cannot sit overnight.**  The customer service representative may request the tracking number, which is on the pre-affixed label.  The tracking number ensures that MD Labs will be billed for the shipment/pick up fee.

Rev. 07/18

A.286

4

Confidential                                                                                    MDLabs_0008725

# EXHIBIT 9

ARTHUR P. MOURTZINOS, M.D.                    April 25, 2024

VOLUME:  I

PAGES:  1 - 116

EXHIBITS:  1 - 4

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

C.A. No. 18-cv-12558-PBS

- - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA, et al., ex rel.

OMNI HEALTHCARE, INC.,

Plaintiffs          **ORIGINAL**

v.

MD SPINE SOLUTIONS LLC d/b/a MD LABS

INC., DENIS GRIZELJ, MATTHEW RUTLEDGE and

DOE HEALTHCARE PROVIDERS 1 - 100,

Defendants

- - - - - - - - - - - - - - - - - - - - - - - - x

ZOOM VIDEOCONFERENCE DEPOSITION OF ARTHUR P. MOURTZINOS, M.D., MBA, a witness called on behalf of the Defendants, pursuant to the Federal Rules of Civil Procedure, before Jessica L. Williamson, Registered Merit Reporter, Certified Realtime Reporter, and Notary Public in and for the Commonwealth of Massachusetts, on Thursday, April 25, 2024, commencing at 8:28 a.m.

_____

A.289

ARTHUR P. MOURTZINOS, M.D.                    April 25, 2024

Page 54

A.   -- the longest amount of time.

Q.   All right.  This statement says that you're not aware of peer-reviewed scientific evidence or literature to support the routine use of PCR testing.  What did you mean by "routine"?

A.   Standard of care.

Q.   And in which patient populations, or are you referring to all patient populations?

A.   All patient populations.

Q.   Okay.  Are there circumstances, in your opinion, where PCR testing for UTIs is appropriate?

A.   Only in a rare situation where you have a multi-resistant organism in a particular patient or in someone who is not treated consistent -- who does not respond consistently to multiple courses of antibiotics because of that, assuming positive urine cultures --

Q.   (Inaudible overlap.)

A.   -- because there are -- I'm sorry, because there are many patients that are treated for recurring infections who don't actually have

ARTHUR P. MOURTZINOS, M.D.                          April 25, 2024

Page 55

infections, because the doctors -- or they just keep going to MinuteClinics over and over again, and every time you go to a MinuteClinic, if you've ever been to a MinuteClinic, they just give you an antibiotic all the time.  And that's done for medical-legal reasons, obviously, not for safety reasons.

Q.   Based on your training and experience, who determines what type of UTI testing may be appropriate for any individual patient?

A.   Yeah, the provider.

Q.   Do others in the practice have a role in determining the type of testing that may be appropriate for an individual patient?

A.   Yes.

Q.   Who?

A.   The other physicians, the advanced prac -- yeah, advanced practitioners will follow their supervising physicians.

Q.   Okay.  Based on your training and experience, does the lab have a role in determining the type of testing that is appropriate for an individual patient?

A.291

A.292

ARTHUR P. MOURTZINOS, M.D.                        April 25, 2024

Page 77

that's -- the standard of care is not to do X-ray studies to make sure that those patients don't have prostate cancer.

Q.   Okay.  So if a patient comes to you with a history of recurrent urinary tract infections and has been treated with a number of antibiotics that have not been effective, in your opinion, is PCR testing -- or, excuse me, is departing from society guidelines reasonable and necessary in those cases?

A.   Absolutely.  And not only is it reasonable, obtaining consultation with an infectious disease specialist is also the way to go, absolutely.

Q.   So am I correct that it's your opinion that there are some cases where PCR testing for urinary tract infections is reasonable and necessary but that --

A.   In some cases, yes.

Q.   Okay.

A.   Yeah.

Q.   Got it.  Thank you.  Let's go back to Exhibit 3, if you don't mind.  That's the

ARTHUR P. MOURTZINOS, M.D.                          April 25, 2024

Page 78

Urology Times article.

A.   Sure.

Q.   Okay.  If you scroll to page 5, there is a section titled "Additional guidance for others."  Do you see that?

A.   Yes.

Q.   All right.  And page 5 lists the author's guidance with respect to occasions for medically necessary and appropriate use of PCR testing for UTIs, correct?

A.   Correct.

Q.   Okay.  Can you review that list, and then I'll ask you some questions about it.

     (Witness reviews document.)

Q.   Have you read that list?

A.   Yes.

Q.   Okay.  Do you agree with the authors that these are indications for medically necessary and appropriate use of PCR testing for UTIs?

A.   I agree with most of it, yes.

Q.   Okay.  Are there any in particular that you do not agree with?

A.   (As read) need for prompt or specific

ARTHUR P. MOURTZINOS, M.D.                    April 25, 2024

Page 79

treatment due to risk.

Q.   Okay.  And why don't you agree with that
line?

A.   Treating patients with a standard course of
antibiotics per guidelines typically almost
always resolves that problem.

Q.   Okay.  Are there any other indications that
you disagree with?

A.   The one below it which says "Empiric
antibiotics started and tailored to
resistance" -- actually, no.  I'm sorry, I
don't disagree with any -- I disagree with
the statement where it says (as read)
Interstitial cystitis, pelvic pain:
traditional culture misses Ureaplasma, can
be seen with positive or negative urinalysis
result.  And the one below that which says
(as read) PCR test to help delineate IC,
which stands for interstitial cystitis,
versus embedded infection.

Q.   And why do you disagree with those two?

A.   I treat these conditions, and I've never
ordered PCR tests.  It's not in our
guidelines for treating pelvic pain at all,

A.295

Page 80

either.  Ureaplasma is a sensitive bacteria to the common antibiotics that we have. It's not a very virulent bacteria.

Q. All right.  And are there any other indications that you disagree with?

A. No.

Q. Okay.  So other than those that you pointed out, you agree that these are appropriate indications for PCR testing for UTIs?

A. Correct, but I would tell you that the key thing that it says there, for "medically necessary."

Q. Okay.  Let me restate the question.

For the indications that -- other than those that you mentioned, do you agree that they are indications for medically necessary and appropriate use of PCR --

A. It could --

Q. -- testing for UTIs?

A. It could be used as an adjuvant test.

Q. Okay.

MR. KENNY:  I'm going to need a break, a bathroom break, so if we could take five minutes now?

A.296

ARTHUR P. MOURTZINOS, M.D.                    April 25, 2024

Page 114

United States District Court

District of Massachusetts

I, Jessica L. Williamson, Registered Merit Reporter, Certified Realtime Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that ARTHUR P. MOURTZINOS, M.D., MBA, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am neither related to or employed by any of the parties in or counsel to this action, nor am I financially interested in the outcome of this action.

In witness whereof, I have hereunto set my hand and seal this 3rd day of May, 2024.

_____
Jessica L. Williamson, RMR, CRR, CRC

Notary Public, CSR No. 138795

My commission expires: 11/22/2030

KEY Discovery                                    617-348-9360
Deposition Services                        WWW.KEY-DISCOVERY.COM

A.297

ARTHUR P. MOURTZINOS, M.D.                                    April 25, 2024

Page 115

CERTIFICATE


ATTACH TO THE DEPOSITION OF ARTHUR P.

MOURTZINOS, M.D., MBA

CASE:   UNITED STATES OF AMERICA, ET AL., EX

REL. OMNI HEALTHCARE, INC. VS MD SPINE

SOLUTIONS LLC D/B/A MD LABS INC., ET AL.



        I, ARTHUR P. MOURTZINOS, M.D., MBA, do

hereby certify that I have read the

foregoing transcript of my testimony, and I

further certify that said transcript is a

true and accurate record of said testimony.


        Signed under the pains and penalties

of perjury this_____day of_____,

2024.





                    _____

                          ARTHUR P. MOURTZINOS, M.D.,

        MBA        DATE

A.298

ARTHUR P. MOURTZINOS, M.D.                        April 25, 2024

Page 116

                        DEPOSITION ERRATA SHEET
                PAGE    LINE
                _____   _____  CHANGE:  _____
                               REASON:  _____
                _____   _____  CHANGE:  _____
                               REASON:  _____
                _____   _____  CHANGE:  _____
                               REASON:  _____
                _____   _____  CHANGE:  _____
                               REASON:  _____
                _____   _____  CHANGE:  _____
                               REASON:  _____
                _____   _____  CHANGE:  _____
                               REASON:  _____
                _____   _____  CHANGE:  _____
                               REASON:  _____
                _____   _____  CHANGE:  _____
                               REASON:  _____
                _____   _____  CHANGE:  _____
                               REASON:  _____
                _____   _____  CHANGE:  _____
                               REASON:  _____
                _____   _____  CHANGE:  _____
                               REASON:  _____
                _____   _____  CHANGE:  _____
                               REASON:  _____
                _____   _____  CHANGE:  _____
                               REASON:  _____
                _____   _____  CHANGE:  _____
                               REASON:  _____
                _____   _____  CHANGE:  _____
                               REASON:  _____
                _____   _____  CHANGE:  _____
                               REASON:  _____
                _____   _____  CHANGE:  _____
                               REASON:  _____
                _____   _____  CHANGE:  _____
                               REASON:  _____

                               _____
                        ARTHUR P. MOURTZINOS, M.D.,
                MBA            DATE

A.299

# EXHIBIT 10

A.300

EXHIBIT  3
Arthur
Mourtzinos,
M.D.  4/25/24
J. Williamson, RMR


☰   *Urology Times*   🔍

# How to get reimbursed for multiplex PCR urine cultures

November 8, 2022
Jonathan Rubenstein, MD
Mark Painter

`Publication`   `Article`

**Urology Times Journal**
Vol 50 No 11
Volume **50**   Issue **11**

    

*"Although Medicare has developed previous coverage directives for several types of PCR tests outside of UTI detection and there are sound arguments for the use of PCR tests in detecting UTIs, Medicare only recently published a local coverage determination that included the use of PCR tests for UTI detection," write Jonathan Rubenstein, MD, and Mark Painter.*



*Jonathan Rubenstein, MD, is compliance officer and medical director of coding and reimbursement, United Urology Group and Chesapeake Urology, Towson, Maryland.*

**Q. I have been asked to return money because of the use of multiplex polymerase chain reaction (PCR) urine cultures for patients. For each patient, I believe the PCR test ordered was medically necessary, and there were no rules at the time regarding the use of PCR. Can you help?**

**A.** We have heard of this happening to several medical providers, and it can be a challenge. Let's start at the beginning. The multiplex (or quantitative)



*Mark Painter is CEO of PRS Urology SC in Denver, Colorado.*

PCR test has a broad application for pathogen identification in individuals with respiratory, gastrointestinal, urinary, blood, and



neurologic infections, with potential for many other applications. Focusing on PCR testing for urinary tract infections (UTIs), studies have compared PCR tests with standard urine cultures. These studies have indicated that:

PCR tests can detect bacteria that may not be able to be grown on typical agar.

PCR results are often available in less than 24 hours compared with a few days for traditional culture results.

PCR tests may be superior in some respects to typical urine cultures for detecting and identifying of bacteria.

PCR tests detected bacteria in 36% of symptomatic patients who had a negative urine culture result.

PCR tests detected more polymicrobial infections than urine cultures detected (20% of patients compared with 7% of patients).

Although Medicare has developed previous coverage directives for several types of PCR tests outside of UTI detection and there are sound arguments for the use of PCR tests in detecting UTIs, Medicare only recently published a local coverage determination (LCD) that included the use of PCR tests for UTI detection. This policy became effective June 2, 2022, requiring any PCR test set that targets more than 1 pathogen to be defined as a panel. The PCR test set is subject to LCD L39001, which is titled MolDX: Molecular Syndromic Panels for Infectious Disease Pathogen Identification Testing. Furthermore, a test panel that includes more than 5 pathogens and does not have FDA approval as a panel would require application to the MolDx program for a specific panel code.

This policy has only been adopted by half the Medicare administrative contractors (MACs), and the LCD and associated local coverage article provide limited guidance as to when these tests should be used and when they will be covered. The policy requirements have created a different set of administrative issues for billing of PCR tests for UTIs in states where the MAC has adopted the LCD.

For your question, we will focus on the lack of guidance issued in the LCD or elsewhere for PCR testing in relation to UTIs. We will start with general Medicare policy as it relates to services provided with a lack of specific guidance for appropriate use, in accordance with the Medicare Program Integrity Manual (PIM)[1] (emphasis added):

This section applies to MACs, CERT [comprehensive error rate testing], Recovery Auditors, and UPICs [united program

A.302

integrity contractors], as indicated. CMS [Centers for Medicare & Medicaid Services] issues national coverage determinations (NCDs) that specify whether certain items, services, procedures or technologies are reasonable and necessary under §1862(a)(1) (A) of the Act. **In the absence of an NCD, Medicare contractors are responsible for determining whether services are reasonable and necessary. If no local coverage determination (LCD) exists for a particular item or service, the MACs, CERT, Recovery Auditors, and UPICs shall consider an item or service to be reasonable and necessary if the item or service meets the following criteria**:

It is safe and effective;

It is not experimental or investigational; and

It is appropriate, including the duration and frequency in terms of whether the service or item is:

Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition or to improve the function of a malformed body member;

Furnished in a setting appropriate to the beneficiary's medical needs and condition;

Ordered and furnished by qualified personnel; and

One that meets, but does not exceed, the beneficiary's medical need.

Medical necessity is defined under Title XVIII of the Social Security Act[2]: "Notwithstanding any other provision of this title, no payment may be made under part A or part B for any expenses incurred for items or services which, except for items and services described in a succeeding subparagraph, are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." The Medicare statute requires that any rule or other statement of policy (other than a material coverage decision) establishing or changing a substantive legal standard must be promulgated by regulation[3]:

The terms "Medically Necessary" or "Medical Necessity" shall mean health care services that a physician, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and that are: a) in accordance with generally accepted standards of medical practice; b) clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness,

A.303

injury or disease; and c) not primarily for the convenience of the patient, physician or other health care provider, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease. For these purposes, "generally accepted standards of medical practice" means standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community or otherwise consistent with the standards set forth in policy issues involving clinical judgment. Unless the contrary is specified, the term "medical necessity" must refer to what is medically necessary *for a particular patient,* and hence entails an individual assessment rather than a general determination of what works in the ordinary case. But where, as here, the plan administrator presents sufficient evidence to show that a treatment is not medically necessary in the *usual* case, it is up to the patient and his or her physician to show that *this* individual patient is different from the usual in ways that make the treatment medically necessary for *him* or *her.*[4]

These citations constitute a legal doctrine by which evidence-based clinical standards are used to determine whether a treatment or procedure is reasonable, necessary, and/or appropriate. The definitions cited further clarify those legal citations. The answer to your question comes back to whether your care of a single patient and the services you provide to your patients more broadly represent a pattern of care that complies with medical necessity as defined under Title XVIII of the Social Security Act.

As noted, we have some guidance through peer-reviewed medical articles that support the use of PCR testing for the treatment of patients with UTIs. A practice must implement the guidance and data from these peer-reviewed articles for each patient it cares for. Additionally, chart documentation and practice policies need to demonstrate the medical necessity of the service for each case.

If Medicare or another payer has reviewed your records and found they lack support for medical necessity, you have several options to refute them, assuming you have provided appropriate medical care according to the definitions above. You are allowed to develop an appeal and provide to the payer a clear, medically based argument that supports the services you have provided.

In addition to the arguments surrounding medical necessity, you have the right to demand the credentials of the party who

A.304

has determined the services provided were not medically necessary. Developing an appropriate appeal for these types of takebacks requires careful consideration and attention to detail; in short, they require a plan and the dedication of resources to respond appropriately. You may wish to seek assistance from an organization that specializes in appeals if you are left with any questions.

## Additional guidance for others

To assist you and others in developing processes and procedures moving forward, we recommend that each practice using PCR testing develop a guideline or list of appropriate-use criteria agreed upon by your group after review of existing medical literature and discussion. You will the need to educate your professional clinic staff on what these guidelines are, how they should be implemented, and importantly, how to support the use of these tests for each patient.

Below is a sample set of indications for medically necessary and appropriate use of PCR for UTIs that represents a combination of policies developed by different groups:

Refractory UTI: failed standard therapy from urine culture/traditional empiric treatment

Patients sent to urology for recurrent or refractory UTI

Need for better test

PCR test allows identification of specific organisms and resistance genes

Repeat PCR test after treatment in symptomatic patients allows evaluation of treatment and tailoring to sterilize the urine

Complicated UTI: male, fever, foreign body, stone, obstruction, etc

Need for prompt, specific treatment due to risk

Empiric antibiotics started and tailored to resistance genes in 24 to 48 hours (urine culture 48-72 hours)

Urine culture unable to identify extended-spectrum β-lactamase, high prevalence

Interstitial cystitis (IC)/pelvic pain: traditional culture misses Ureaplasma, can be seen with positive or negative urinalysis result

PCR test to help delineate IC vs embedded infection

A.305

Complete divergence of treatment course

Incurable state vs difficult infection

We encourage you to add these types of programs to your group and develop educational policies and reviews, ensuring members of your group comply with the intention of the recommendations.

**References**

1. Medicare Program Integrity Manual. Centers for Medicare & Medicaid Services. Accessed November 4, 2022. https://go.cms.gov/3NBT1dV

2. Compilation Of The Social Security Laws. Social Security Administration. Accessed November 4, 2022. https://www.ssa.gov/OP_Home/ssact/title18/1862.htm

3. Title 42—the public health and welfare. Accessed November 4, 2022. https://bit.ly/3SZWjJe

4. *Mario v. P & C Food Markets, Inc.,* 313 F.3d 758, (C.A.2 N.Y., 2002). December 20, 2002. Accessed November 4, 2022. https://caselaw.findlaw.com/us-2nd-circuit/1463839.html

**Send coding and reimbursement questions to Jonathan Rubenstein, MD, and Mark Painter c/o *Urology Times®*, at UTeditors@mjhlifesciences.com.**

Questions of general interest will be chosen for publication. The information in this column is designed to be authoritative, and every effort has been made to ensure its accuracy at the time it was written. However, readers are encouraged to check with their individual carrier or private payers for updates and to confirm that this information conforms to their specific rules.

Download Issue PDF

Articles in this issue

A.306



Distinguishing between malignant and benign renal masses

## Related Videos



Future work in urology may look at factors influencing pursuit of the field

Study highlights need to recruit and retain URiM urologists

Study URiM

## Related Content

### How to bill for performing complex urodynamics

April 23rd 2024

Article

"To answer this question, one must know what is and is not included in the global payment for the UDS, and the definition and instructions for appropriate use of modifier 25," write Jonathan Rubenstein, MD, and Mark Painter.

### Health policy in urology: 2024 AUA Advocacy Summit recap

March 21st 2024

Podcast

In this episode of Speaking of Urology®, Eugene Rhee, MD, MBA, and Logan Galansky, MD, discuss key topics in health policy and recap the AUA's recent Annual Urology Advocacy Summit.

### Coding for bladder catheterization via a Monti channel

April 8th 2024

Article

A.307

"Use code 51702 for the routine insertion of an indwelling bladder catheter, such as a Foley," write Jonathan Rubenstein, MD, and Mark Painter.

### How APPs can bridge the gap in urologist shortages

August 28th 2023

Podcast

In this episode, Janelle Bunce, PA-C, highlights the role that advanced practice providers can play in filling the gaps created by the growing workforce shortages in urology.

### Potential code for prior authorizations on AMA CPT Editorial Panel meeting agenda

March 28th 2024

Article

"Good public and economic policy must align costs, benefits, and incentives; currently, all costs are incurred by physician practices, and all financial savings and benefits from prior authorization accrue to health insurance plans, leading to perverse incentives," says Alex Shteynshlyuger, MD.

### Expert discusses the potential for telesurgery in urology

March 23rd 2024

Article

"The implications for urology, and every specialty, are immense. It does improve care, and it helps the patient. I think this is what it will be, it just may take some time," says Vipul Patel, MD.



About Us    Advertise    Contact Us

Job Board    Terms and Conditions    Privacy

Do not sell my Personnal Information

Contact Info

2 Commerce Drive Cranbury, NJ 08512

609-716-7777

A.308

© 2024 MJH Life Sciences

All rights reserved.

A.309

# EXHIBIT 11

**From:**       Vladimir Mouraviev [mouraviev@cfcancerinst.com]
**Sent:**       1/14/2019 9:40:45 PM
**To:**         Matthew Rutledge [matthew@mdlabs.com]
**CC:**         Michael W. McDonald [uccf40@yahoo.com]; mike@collaborativefund.fund; Donald Regan [don@medisysusa.com]
**Subject:**    RE: Response from Matt; one of the owners of MD Labs
**Attachments:** AUA19_Coba_ComparisonPCRvsDNA_Accepted.pdf


Mr. Rutledge:

thank you for your interest to work with our group. We are happy to collaborate with your manager Dan Regan who did an exceptional job to implement your technique into our daily practice. We are very impressed with results and speed of diagnosis that rebounds on the treatment outcomes. Now we've collected a more than 100 samples comparing your technique with traditional culture and sensitivity, other PCR-based diagnostics and Next Generation Sequence.  Just recently we've received a notice of acceptance of our abstract on this comparison by annual American Urological Association Congress 2019 that will take place in Chicago in May- please find enclosed. We consider your technique one of the best for clinical utility in the treatment of UTI. Hence, we  have an interesting business offer to you and your company. Could you please to set a cc up upon your convenience to discuss further collaborative issues in-depth.
Thank you in advance.
Sincerely,

Vladimir Mouraviev MD, PhD

Staff urologist/Head of Urologic Oncology
Central Florida Cancer Institute
40107 Highway 27
Davenport, FL 33 837
Phone: 863-353-4572
Fax: 863-419-1695

Associate Professor of Urology
University of Central Florida College of Medicine
Orlando, FL 33328
_____
From: Don Regan []
Sent: Thursday, January 10, 2019 8:44 AM
To: Vladimir Mouraviev
Cc: Michael W. McDonald
Subject: Response from Matt; one of the owners of MD Labs

Dr. Mouraviev,

Below is the response from Matt.

His email:


Reach out to Matt directly when you are ready. I feel this will be more productive than going through me, the middleman.

Don
_____

Hi Don

That's good. Once it has been published or presented, lets set up a WebEx introduction.

Matthew Rutledge
MD Labs & Rxight Pharmacogenetics
(Sent from my phone)

Don Regan
Mobile: (407) 314-7610
www.mdlabs.com


A.311

MD0211812

# EXHIBIT 12

A.312

CRAIG K. DELIGDISH, M.D.                    December 21, 2023

Volume:      I
Pages:       1-297
Exhibits:    1-29

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * * * * * * * *
UNITED STATE OF AMERICA, et al., ex rel,
OMNI HEALTHCARE, INC.,

        Plaintiffs,
v.
MD SPINE SOLUTIONS LLC, d/b/a MD LABS, INC.,
DENIS GRIZELJ, MATTHEW RUTLEDGE AND
DOE HEALTHCARE PROVIDERS 1-100,
        Defendants.

* * * * * * * * * * * * * * * * * * * * * *


30(b) DEPOSITION OF OMNI HEALTHCARE, INC.,

(BY CRAIG K. DELIGDISH, M.D.)

AND CRAIG DELIGDISH, M.D., PERSONALLY

APPEARING REMOTELY FROM

INDIATLANTIC, FLORIDA

THURSDAY, DECEMBER 21, 2023

8:01 a.m.

Reported by:
Mary K. Corcoran
Professional Court Stenographer/Notary Public
Appearing Remotely from Norfolk County,
Massachusetts

A.313

A.314

Page 21

A.   Yes.

Q.   Do you have an ownership interest in OMNI?

A.   Yes.

Q.   What percentage of OMNI do you currently own?

A.   100 percent.

Q.   How long have you been the 100 percent owner?

A.   A couple of years.

Q.   How many?

A.   I'm sorry, a couple of years, two years, two
     to three years.

Q.   Did anyone else previously hold an ownership
     interest in OMNI?

A.   Yes.

Q.   Who else has owned an ownership interest?

A.   John Olinde.

Q.   Did you say Olinde?

A.   Yeah, O-l-i-n-d-e.

Q.   Any other -- strike that.
            Were there any other individuals who
     have ever held an ownership interest in OMNI?

A.   Yes.

Q.   Who else?

A.   Well, there were nearly 30 of them.

Q.   Were those 30 providers at OMNI?

A.316

CRAIG K. DELIGDISH, M.D.                    December 21, 2023

Page 23

A.  No.

Q.  What was the reason, as far as you're aware, of the other owners relinquishing their shares?

A.  They were different in every case.

Q.  Did you provide any compensation of any type to the other owners when they relinquished their shares?

A.  No.

Q.  When was OMNI incorporated?

A.  In 1994 as the Melbourne Medical Group, and the name was changed in 2000.

Q.  How many locations does OMNI currently have?

A.  Approximately, six physical locations, but multiple offices within some of the locations.

Q.  Okay.  And are all of those locations in the Melbourne, Florida, area?

A.  Yes.

Q.  How many providers does OMNI currently employ?

A.  Between 20 and 30.

Q.  Has the number of locations that OMNI has changed over the years?

A.  Yes.

Q.  Did OMNI previously have more locations than

A.318

Page 26

Q.   Approximately, how many qui tam cases has OMNI Healthcare filed in the past ten years?

A.   I don't know.

Q.   Can you estimate?

A.   Excuse me?

Q.   Can you estimate?

A.   Estimate?  No.

Q.   You have no sense of how many qui tam actions OMNI Healthcare has filed in the past ten years?

A.   More than five.

Q.   More than ten?

A.   I don't know.  I'd have to -- I don't know.

Q.   How many qui tam cases have you personally filed in the last ten years?

A.   None.

Q.   What is the approximate total revenue that OMNI Healthcare has received from settlements or other awards from qui tam actions?

A.   Somewhere between 10 and 20 million dollars.

Q.   Were OMNI and you personally defendants in a False Claims Act qui tam action in 2016 -- sorry -- 2006?

A.   Yes.

A.319

A.320

CRAIG K. DELIGDISH, M.D.                              December 21, 2023

Page 38

Q.   Okay.  Correct me, then.

A.   My testimony is that there is no peer-reviewed literature that provides evidence that these tests are medically necessary or that these -- that these tests are medically necessary. I'll leave it at that.

Q.   And when you're referring to these tests, you're referring to PCR-based UTI tests?

A.   Yes.

Q.   Okay.  You reference -- excuse me -- OMNI references an entire test panel in its response.

        Can you explain what that means?

A.   Sure, sure.  The use of test panels is -- I'll use the word frowned upon.  It's not permitted under Medicare billing rules, other than those that are set forth by Medicare to include CVCs, comprehensive metabolic profiles, basic metabolic profiles, etc.

Q.   So, is it your testimony that Medicare rules prohibit panels, except in enumerated circumstances?

        ATTORNEY KENNY:  Objection.

A.   There are other enumerated circumstances.

KEY Discovery                                      617-348-9360
Deposition Services                     WWW.KEY-DISCOVERY.COM

A.321

CRAIG K. DELIGDISH, M.D.                    December 21, 2023

Page 39

I've just provided some examples.

Q. Who determines medical necessity?

A. I'm not sure that question can be answered.  I mean, it's too broad.  I can't answer that question.

Q. For any particular test, who determines the medical necessity of that test for a particular patient?

A. Well, I'm not sure how you're using the word medically necessary.  If you're using it -- I mean, physicians determine what they believe to be medically necessary, but that doesn't mean that a payer agrees that a test is medically necessary just because a physician orders it or deems it to be medically necessary, so I don't have an answer to that question.

Q. Does a laboratory have a role in determining the medical necessity of a test?

ATTORNEY KENNY:  Objection.

A. Not to my knowledge.

Q. Does -- based on your training and experience, Doctor, does a provider have any way to determine the specific pathogens that may be

A.322

A.323

CRAIG K. DELIGDISH, M.D.                    December 21, 2023

Page 42

Q.   a microscope using the analysis that you just described, or whether it should not be?

A.   Most urinalyses are done with microscopic.  It would depend on what the doctor ordered.

Q.   Did the providers of OMNI have the ability to select whether to send a sample for microscopic evaluation or not?

A.   Yes.

Q.   Okay.  Now, are you familiar with the term balance billing?

A.   Yes.

Q.   What is your understanding of what balance billing means?

A.   It's the bill that remains after insurance or a third-party payer pays their portion.

Q.   In response to Interrogatory No. 4, which is the second bullet point from the bottom of page 6, it states:  Defendants have been further violating the Anti-Kickback Statute through their routine practice of not balance billing patients.

     Do you see that?

A.   Yes.

Q.   Can you explain what is meant by the

A.324

allegation that the Defendants had a routine practice of not balance billing patients?

A. Just what you just said is what it says.  They had a routine practice of not balance billing patients.

Q. So in other words, let's take a Medicare beneficiary, for example.

Is it OMNI's contention that MD Labs' failure to bill patients for the balance left over after Medicare's coverage was a violation of the Anti-Kickback Statute?

A. Well, I would answer that that's not a very good example, since Medicare pays 100 percent of your laboratory test.

Q. What would be a better example?

A. That they don't bill for deductibles and -- deductibles, coinsurance or the remaining portion of the bill for patients with commercial insurance.

Q. How is the purported failure to bill deductibles coinsurance or the remaining portion for commercial insurance in violation of the Anti-Kickback Statute in OMNI's view?

A. Well, OMNI doesn't really maintain a view.

Page 44

It's the federal government that enforces the law, and it's their view.

Q.   Well, it's OMNI's allegation, so that's what I'm referring to when I say OMNI's view.

What is OMNI's contention with respect to how your purported failure to bill for deductibles coinsurance or the remaining portion of commercial insurance is a violation of the Anti-Kickback Statute?

A.   Well, our view is basically that that's the government's position, and if it's the government's position, it's our position.  I'm not sure without a lawyer, but I mean, I don't make the laws or enforce them.  It's the government's rule of law, and they're the ones that enforce it.

Q.   What's your basis of your understanding of the government's view?

ATTORNEY KENNY:  Objection.

A.   The basis to that view is my reading of complaints filed by the government, settlement agreements, press releases from the Department of Justice, and other -- and assessments by lawyers that that practice violates the

A.326

A.327

CRAIG K. DELIGDISH, M.D.                           December 21, 2023

Page 81

testing?

**A.**   No.

**Q.**   Has OMNI ever had policies or procedures on which external testing laboratories could be used by OMNI providers?

**A.**   No.

**Q.**   Were OMNI providers during 2018 and 2019 free to use any laboratory, external laboratory, they chose?  Excuse me.  Let me rephrase that.

In 2018 and 2019, were OMNI providers free to use any external laboratory they chose?

**A.**   Yes.

**Q.**   Has OMNI ever had policies or procedures concerning which external laboratory's requisition forms could be used by medical assistants for OMNI's administration staff?

**A.**   No.

**Q.**   Has OMNI ever had policies or procedures concerning the type of UTI test that could be ordered by an OMNI provider, either a bacterial urine culture or a PCR-based UTI test?

**A.**   No.

A.328

CRAIG K. DELIGDISH, M.D.                          December 21, 2023

Page 82

Q.  Has OMNI ever had policies or procedures concerning who may fill out or how to fill out requisition forms for laboratory orders?

A.  No.

Q.  Who at OMNI is responsible for completing external laboratory requisition forms?

A.  It would either be somebody in the medical lab or somebody in the physician's office, like a medical assistant.

Q.  When an OMNI provider orders a laboratory test in the electronic medical record, how are paper requisitions then generated?

A.  I'm sorry.  Sometimes paper requisitions are used, but for the most part, it's done through the computer.  I don't know whether that answered the question.

Q.  Was that the case in 2018 and 2019?

A.  Yes.

Q.  Has OMNI ever had policies or procedures concerning the provision of missing information on requisition forms?

A.  No.

Q.  Does OMNI keep any written record of corrections to requisition forms or

A.329

CRAIG K. DELIGDISH, M.D.                    December 21, 2023

Page 83

information provided to an external laboratory that was missing on a requisition form?

A.   I don't know.  I presume so.

Q.   Where are those records located?

A.   They would be in the computer.

Q.   When you say the computer, are you referring to the electronic medical record?

A.   Yes.  We use Allscripts Professional.

Q.   Is it your understanding that if information was missing on a laboratory requisition form but later provided, that that information would be reflected in OMNI's electronic medical record for the patient?

A.   Yes.

Q.   Does the electronic medical record impose limitations on what type -- and this is, again, in 2018 or 2019 -- did OMNI's electronic medical record impose limitations on what type of UTI test could be ordered by a provider, either a bacterial urine culture or a PCR test?

A.   Yes.

Q.   What limitations did it impose?

A.   We can only order tests that are in the

A.330

CRAIG K. DELIGDISH, M.D.                            December 21, 2023

Page 84

system.  So if the test isn't in the system, it doesn't exist, you'd have to order it, you know, using the external requisitions.

Q.  In 2018 and '19, were PCR-based UTI tests available in OMNI's electronic medical record?

A.  I don't believe so.

Q.  Who is responsible for the testing options that are available in OMNI's electronic medical record?

A.  I'm sorry.  Who's responsible for the testing what?

Q.  The testing options that are available in OMNI's electronic medical record?

A.  Well, I mean, the electronic medical record provider, and OMNI can presumably modify it or request a modification.

Q.  Is there someone at OMNI whose responsibility includes modifying, requesting modifications to the tests that are available?

A.  You mean, there were a variety or people in the IT Department that would be tasked with either doing it or contacting Allscripts?

Q.  In cases when an external laboratory is used for a laboratory test, who determines which

A.331

A.332

CRAIG K. DELIGDISH, M.D.                    December 21, 2023

Page 86

Q.   Does anyone at OMNI -- again, in 2018 or 2019, did anyone at OMNI instruct its offices to use particular external laboratories?

A.   I instructed the laboratory to send the specimens to MD Labs and some other labs that we used at that time.

Q.   So when you said it was the insurance -- excuse me -- the patient's insurance company or the physician that decided which laboratory to use for a laboratory test, in fact, you instructed the laboratory to send specimens to MD Labs; is that right?

A.   Yes.

Q.   So in the case of PCR-based UTI tests, is it your testimony that the patient's insurance or physician did not determine which laboratory to use?

A.   Correct.

Q.   Is it normally -- is the laboratory that's used normally determined by a patient's insurance or by the physician?

A.   Yes.

Q.   Why was the process different in the case of MD Labs?

KEY Discovery                              617-348-9360
Deposition Services                WWW.KEY-DISCOVERY.COM

A.333

CRAIG K. DELIGDISH, M.D.                    December 21, 2023

Page 87

A.   So, we could -- so that OMNI could accumulate the necessary evidence to substantiate the allegations in the Complaint.

Q.   Was all of the testing ordered by -- strike that.

Was all of the testing ordered by OMNI providers and sent to MD Labs ordered to accumulate evidence to substantiate the allegations in the Complaint?

A.   I believe so, yes.

Q.   Did providers at OMNI know that MD Labs would be used for the laboratory tests that they ordered?

A.   Yes.

Q.   How did they know that?

A.   They filled out the requisitions, and they were informed of such, and they received the results.

Q.   Did OMNI providers know that the purpose of using MD Labs was to accumulate evidence to substantiate a complaint?

A.   No.

Q.   Why were they not informed?

A.   I don't know.

A.334

A.335

CRAIG K. DELIGDISH, M.D.                    December 21, 2023

Page 89

different laboratories for different testing, and sometimes it's determined by the administration.  Sometimes it's determined by the physician.  Sometimes it's determined by the insurance company.  It just varies.  There's no hard and fast rule.

Q.  I see, okay.

Has OMNI ever had policies concerning the role or scope of duties of medical assistants at OMNI?

A.  I don't know.  We have job descriptions.

Q.  Are medical assistants at OMNI delegated or authorized to sign laboratory requisition forms on behalf of ordering providers?

A.  I couldn't say that OMNI has any policies relative to that.

Q.  Is it up to each individual providers whether they authorize medical assistants to sign on their behalf?

A.  I don't know.

Q.  I want to focus for a moment on Melbourne Medical Laboratory.

Is Melbourne Medical Laboratory OMNI's in-house laboratory?

CRAIG K. DELIGDISH, M.D.                        December 21, 2023

Page 90

A.   Yes.

Q.   Does Melbourne Medical Laboratory have a CLIA number?

A.   Yes.

Q.   Is Melbourne Medical Laboratory authorized to perform high-complexity testing?

A.   Yes.

Q.   Does OMNI Healthcare have a CLIA number?

A.   It has multiple CLIA numbers.

Q.   Does Melbourne Medical have its own NPI number?

A.   I don't know.  I don't know, actually.  You can Google it.

Q.   Does Melbourne Medical have its own Tax ID number?

A.   No.

Q.   Does Melbourne Medical bill payers for services it performs?

A.   I don't believe so.  I mean, it bills under OMNI's Tax ID number.

Q.   Does it bill under its own NPI number or OMNI's NPI number?

A.   I presume its own NPI number, but I don't know.

A.337

CRAIG K. DELIGDISH, M.D.                    December 21, 2023

Page 91

Q. Is Melbourne Medical a separate entity from OMNI Healthcare?

A. I'm not sure how you define entity.

Q. Does it have its own corporate assistance?

A. Yes.

Q. Does that mean that you are the 100 percent owner of Melbourne Medical?

A. Yes.

Q. Who operates Melbourne Medical?

A. It's part of OMNI Healthcare.  It goes to all the answers that I answered previously.

Q. Were you the medical director of Melbourne Medical Laboratory in 2018?

A. Yeah, laboratory director.

Q. Laboratory director, okay.

Has Melbourne Medical ever entered into contracts on its own behalf?

A. Not in the last 10 or 15 years, not in the last 20 years.

Q. So, any contracts that Melbourne Medical Laboratory might have with any other party, would those be between OMNI and the other party?

A. Yes.

A.338

A.339

CRAIG K. DELIGDISH, M.D.                    December 21, 2023

Page 95

Q. through to send samples to --

A. Is it listed as one of the items?

Q. I'm asking the question.

Do you have an understanding?

A. Let me review the -- just review the Notice of Deposition. A doctor would order a urine culture, and a medical assistant would instruct the patient to collect the urine culture, and a requisition would be filled out, and it would be sent to the Melbourne Medical Lab that would then send it to whatever laboratory it was ordered from or based on the patient's -- yeah, whatever laboratory was ordered to.

Q. For the samples that were sent to MD Labs, were those samples first sent to Melbourne Medical Laboratory, which then sent them to MD Labs?

A. That's my understanding.

Q. Now, you mentioned that the doctor ordered a urine culture; is that correct?

A. Yes.

Q. Is it your understanding that in cases where a doctor ordered a urine culture, that a

A.340

CRAIG K. DELIGDISH, M.D.                    December 21, 2023

Page 96

PCR-based UTI was ordered from MD Labs?

A.   For the period in which the specimens were sent to MD Labs, yes.

Q.   Were providers informed that their orders for a urine culture would be sent for a PCR-based UTI test?

A.   Yes.

Q.   How were they informed?

A.   I don't recall.

Q.   Who informed them?

A.   I don't recall.

Q.   Were they informed verbally or in writing?

A.   I don't recall.

Q.   When were they informed?

A.   I don't recall.

Q.   So, you don't know how they were informed, when they were informed, who informed them, but you're confident that the providers were informed; is that your testimony?

A.   Yes.

Q.   And were providers informed that during the period of time when testing was conducted by MD Laboratory, by MD Labs, that providers knew that when they ordered a urine culture, the

A.342

CRAIG K. DELIGDISH, M.D.                    December 21, 2023

Page 164

on the call with Howard Claussen.  I don't know if anybody else was on the call or not.

Q.   Okay.  Who's Brad Smith?

A.   He's an individual who worked for a company of mine.

Q.   That company is LoTignov, right?

A.   Correct.

Q.   And what is LoTignov?

A.   What is it?

Q.   Yes.

A.   Well, it is or was a company that engaged in investigations.

Q.   And investigations of what, in particular?

A.   Investigation of companies who we alleged -- LoTignov allegedly engaged in Medicare and Medicaid fraud.

Q.   At the time of this conversation with Mr. Claussen, was OMNI -- well, actually, strike that.

     At the time that this call with Howard Claussen took place on August 13, 2018, was OMNI considering filing a qui tam lawsuit against MD Labs?

A.   Against who?

A.343

A.344

CRAIG K. DELIGDISH, M.D.                    December 21, 2023

Page 170

Q.   Did you have conversations prior to this August 13 conversation about a profit-splitting, profit-sharing arrangement with anybody from MD Labs?

A.   I don't recall.

Q.   Do you recall whether OMNI proposed a profit-splitting arrangement prior to this August 13 call?

A.   We would have never proposed anything like that.

Q.   At the time, you and LoTignov were investigating MD Labs; is that correct?

A.   At what time?

Q.   As of August 13, 2018.

A.   Yes.

Q.   As part of the investigation -- strike that.

     OMNI ordered PCR-based UTI tests for OMNI's patients in order to substantiate allegations that would later be made in this litigation, correct?

A.   Correct.

Q.   So, did OMNI propose an arrangement with MD Labs that it believed was unlawful in order to substantiate claims that it would later

A.345

CRAIG K. DELIGDISH, M.D.                    December 21, 2023

Page 171

make in this lawsuit?

A. No.  That's patently absurd.

Q. Why is that absurd?

A. Why would we do that?  They did it.  It's here in this memo.  I don't think there's any dispute about that, and it never happened anyway.

Q. That's my question -- did it happen?

A. No.

Q. Now, was it your understanding that what Mr. Claussen proposed was that if payers increased what they paid to OMNI or Melbourne Medical, the fee that MD Labs charged to OMNI would be adjusted in the future?

A. No.

Q. Okay.  Then what is your understanding of the sentence I've highlighted that begins with, He stated that they would settle in arbitration?

A. I don't know.  I mean, I can't speak to what he thought or what I thought at the time.  I can only speak to what it says.

Q. Did you have an understanding of what this meant at the time?

A. It appears that it's some sort of

A.346

A.347

Page 199

specimens to MD Labs, correct?

A.   Correct.

Q.   Had OMNI received any training from anyone at MD Labs?

A.   I don't know.

Q.   Did OMNI execute this agreement?

A.   I don't believe so.  I don't recall.

Q.   Did OMNI propose any revisions to this agreement?

A.   I don't know.

Q.   Did OMNI ever enter into a written clinical testing program agreement with MD Labs?

A.   I don't believe so.

Q.   Did OMNI and MD Labs ever share profits from testing performed at MD Labs?

A.   No.

Q.   Now, I want to switch gears here and ask about the testing that was performed for OMNI.

Who at OMNI filled out requisition forms for lab testing performed at MD Labs?

A.   I don't know.

Q.   And let me just clarify.  I'm not looking for specific names.  I'm looking for the categories of employees.

A.348

A.349

CRAIG K. DELIGDISH, M.D. December 21, 2023

Page 239

Q. You stated at the end of this paragraph: None of the tests performed by MD Labs have been determined to have any clinical validity, by CMA, the FDA or any 3rd party organization, which generally is utilized to confirm the accuracy of laboratory testing, as required by CLIA.

Do you see that?

A. Yes.

Q. Were the tests performed -- you already testified about the FDA. Were the tests performed by MD Labs required to be determined to be clinically valid by CMS?

A. Yes.

Q. How so?

A. To be reimbursed.

Q. Does CMS perform clinical validation testing based on your training and experience?

A. No. But CMS doesn't pay for experimental testing, and this testing was clearly experimental.

Q. And on what do you base your statement, that this testing is experimental?

A. I don't know that I can answer that question.

A.350

CRAIG K. DELIGDISH, M.D.                    December 21, 2023

Page 240

I don't think there's any question that it's an experimental test, that this testing is experimental.

Q.   What's your basis for saying that it's experimental?

A.   Just my opinion.

Q.   On what do you base that opinion?

A.   Medical literature, experience, and training.

Q.   What medical literature indicates that the test performed at MD Labs was experimental?

A.   The world, medical literature, all medical literature.  There's no medical literature that has shown this to be anything other than experimental.

Q.   Do medical studies conclude, based on your training and experience, whether a test is experimental or no?

A.   I'm not sure I can answer that question.  I'm not sure that question has an answer.

Q.   Have you ever seen a study published in medical literature concluding that a test is or is not experimental?

A.   Yes.

Q.   What type of test did that study refer to?

A.351

A.352

CRAIG K. DELIGDISH, M.D.                    December 21, 2023

Page 255

A.   Yes.

Q.   Do you recognize the handwriting on this form?

A.   No.

Q.   So, in summary, you ordered PCR-based UTI tests from ten different laboratories for REDACTED - PHI on October 21, 2021?

A.   Correct.

Q.   And at the time, you did not believe that these tests were reasonable and necessary, correct?

A.   Correct.

Q.   All right.  Did you bill for an office visit when ordering these tests?

A.   I don't know.

Q.   Now, when you ordered each of these ten tests, you knew that each of those laboratories would bill the patient's Medicare Advantage plan, correct?

A.   Well, if the patient had Medicare Advantage, yes.

Q.   Did you indicate to any of the ten labs that you were conducting comparative testing?

A.   No.

Q.   Did you inform any of the laboratories from

KEY Discovery                          617-348-9360
Deposition Services            WWW.KEY-DISCOVERY.COM

A.353

CRAIG K. DELIGDISH, M.D.                    December 21, 2023

Page 256

which you ordered testing, that you believed that the tests were not reasonable or necessary?

A.   No.

Q.   Was REDACTED - PHI a patient of yours?

A.   Yes.

Q.   Did you inform REDACTED - PHI that you submitted her urine specimen to ten different laboratories?

A.   Yes.

Q.   What did you tell REDACTED - PHI?

          ATTORNEY KENNY:  I'll instruct the witness not to answer if it's to discuss private conversations with a patient.

Q.   I'm just referring to the conversation with her, not with respect to her health care or diagnosis, but with respect to you ordering duplicate tests.

          What did you tell REDACTED - PHI about ordering duplicate tests?

          ATTORNEY KENNY:  Doctor, to the extent that you're not disclosing any confidential doctor/patient conversations, you can answer.

A.354

A.355

CRAIG K. DELIGDISH, M.D.                    December 21, 2023

Page 265

(Exhibit No. 24, OMNI11261-288, shown.)

A.   Correct.

Q.   Now, after you requested those tests, do you recall communicating with any of the 13 laboratories from which you ordered those tests?

A.   No.

Q.   Do you recall contacting Medical Diagnostic Lab about its failure to detect bacteria that other labs detected?

A.   I'm sorry, which lab?

Q.   Medical Diagnostic Laboratory?

A.   No, I don't recall having any conversations with them.

Q.   Not conversations, do you recall writing to MDL stating that their test failed to detect bacteria that other labs detected?

A.   No.

Q.   Do you recall informing MDL that it tested for the smallest number of organisms out of all of the labs to which you sent samples?

A.   No.

Q.   Did you understand at the time that Medical

KEY Discovery                            617-348-9360
Deposition Services              WWW.KEY-DISCOVERY.COM

A.356

CRAIG K. DELIGDISH, M.D.                     December 21, 2023

Page 266

Diagnostic Lab tested for fewer organisms than other laboratories?

A. Yes.

Q. Did you view that as a problem with respect to the accuracy of their test?

A. Yes.

Q. Why?

A. Well, they have -- because they tested for fewer organisms, they had a much greater likelihood of missing a diagnosis.

Q. So, are the laboratories that test for more pathogens more likely to -- less likely to miss a diagnosis?

A. Yes.

Q. Is there, in your view, an appropriate number of pathogens to test for so you don't miss a diagnosis?

A. I don't know.

Q. But you knew Medical Diagnostic Labs is testing for too few?

A. Yes.

Q. Are there any laboratories that you viewed as testing for too many?

A. I don't know that it makes much of a

A.357

Page 267

difference.

Q.   I'm asking the question.  Are there any laboratories that you believe were testing for too many organisms?

A.   All of them.

Q.   But not MDL, correct?

A.   Correct.

Q.   So, all of those, other than MDL, tested for too many?

A.   Correct, and I believe that MDL tests for too many, too, and at the same time, not enough.

Q.   Explain that.

A.   Well, because I believe the test is not medically necessary.  Billing for any would be too many, but they certainly didn't bill for enough or test for enough.

Q.   Okay.  So when you refer to the lack of medical necessity, is that based on the number of pathogens that are tested for or the number of pathogens that it bills for?

A.   Tests for.  Well, if it's not medically necessary, which results in it not being appropriate to bill for, the test itself is potentially inaccurate.  And if you were to

A.358

A.359

CRAIG K. DELIGDISH, M.D.                          December 21, 2023

Page 285

**A.** Yes.

**Q.** What are Lotignov's sources of revenue?

**A.** It is -- well, currently, it doesn't have any revenue, so it hasn't had any revenue for about five years, so I don't know that it has revenue.

**Q.** When Lotignov had revenue, what were the sources of its revenue?

**A.** I funded it, and we received funds from a litigation and financing firm.

**Q.** Have you received any funds from a litigation and financing firm for this litigation?

ATTORNEY KENNY:  Objection.  I instruct the witness not to answer.

ATTORNEY ORKAND:  Is the basis of your objection privilege?

ATTORNEY KENNY:  Yes.

BY ATTORNEY ORKAND:

**Q.** Who owned Lotignov in 2018?

**A.** I did.

**Q.** Do you still -- are you still the sole owner of Lotignov?

**A.** Yes.

**Q.** What was your role at Lotignov?

A.360

CRAIG K. DELIGDISH, M.D.                    December 21, 2023

Page 286

A.   I'm sorry?

Q.   What was your role at Lotignov?

A.   Participated in investigations and business development, worked with federal agencies, third parties, general duties, provided expertise, direction, oversight.

Q.   Did Lotignov conduct investigations for anyone or any entity other than you or OMNI?

A.   No.

Q.   Did you personally begin investigating MD Labs prior to Lotignov's involvement?

A.   Yes.

Q.   How long did you investigate MD Labs prior to Lotignov becoming involved?

A.   A short period, I don't know.

Q.   A matter of months?

A.   Yes.

Q.   Has OMNI or Melbourne Medical ever considered opening a molecular lab?

A.   Yes.

Q.   When?

A.   In the last three years.

Q.   What types of molecular testing did OMNI consider performing?

A.361

CRAIG K. DELIGDISH, M.D.                     December 21, 2023

Page 296

ATTACH TO THE DEPOSITION OF:  OMNI Healthcare
(Craig K. Deligdish, MD
CASE:  UNITED STATE OF AMERICA, et al. v. MD SPINE
SOLUTIONS LLC, d/b/a MD LABS, INC. et al.

ERRATA SHEET

INSTRUCTIONS:  After reading the transcript of your
deposition, please note any change or correction to
your testimony and the reason therefor on this
sheet.  DO NOT make any marks or notations on the
transcript volume itself.  Please sign and date
this errata sheet (before a Notary Public, if
required).

PAGE LINE CHANGE OR CORRECTION AND REASON

I have read the foregoing transcript of my
deposition taken on December 21, 2023, and except
for any corrections or changes noted above, I
hereby subscribe to the transcript as an accurate
record of the statements made by me.

(Signature of Deponent)                    (Date)

KEY Discovery                              617-348-9360
Deposition Services                   WWW.KEY-DISCOVERY.COM

A.362

Page 297

COMMONWEALTH OF MASSACHUSETTS
NORFOLK, SS

     I, Mary K. Corcoran, a Notary Public in and for the Commonwealth of Massachusetts, do hereby certify there came before me on the 21st day of December, 2023, the person hereinbefore named was duly sworn to testify to his knowledge concerning the matters in controversy in this cause; that he was thereupon examined upon oath, and that the deposition is a true record of the testimony given by the witness.

     I further certify that I am neither attorney nor counsel for, nor related to or employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed in this case, nor am I financially interested in this action.

     IN WITNESS WHEREOF, I have hereunto set my hand this 31st day of December, 2023.


                    Mary K. Corcoran

                    _____
                    Mary K. Corcoran
                    Notary Public
                    Commonwealth of Massachusetts
                    My Commission Expires
                    May 5, 2028


PLEASE NOTE:
     THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING REPORTER.

A.363

# EXHIBIT 13

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., Ex rel. TINA D. GROAT, <br><br> Plaintiffs, <br><br> v. <br><br> BOSTON HEART DIAGNOSTICS CORPORATION, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 15-487 (RBW) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## BRIEF OF AMICUS CURIAE
## AMERICAN CLINICAL LABORATORY ASSOCIATION

## TABLE OF CONTENTS

I. INTEREST OF ACLA................................................................................................ 1

II. ARGUMENT............................................................................................................. 2

    A. Introduction.................................................................................................. 2

    B. Laboratories Cannot Determine Medical Necessity. ................................. 3

    C. Laboratories Have Never Been Required To Make Medical Necessity Determinations................................................................................................ 6

    D. Requiring Laboratories to Assess Medical Necessity would Adversely Affect Patients' Ability to Obtain Necessary Testing............................................. 8

III. CONCLUSION.......................................................................................................... 10

A.365

The American Clinical Laboratory Association ("ACLA") submits this brief in support of the Motion of Defendant, Boston Heart Diagnostics Corporation, for Reconsideration of the Court's Memorandum Opinion of June 9, 2017 ("Memorandum Opinion").  As discussed more fully below, ACLA, which represents the interests of laboratories and their patients, takes the position that laboratories are not required by applicable law to determine the medical necessity of a test before submitting a claim to Medicare for the test; it would be impossible for laboratories to do so, given the sheer volume of laboratory testing that is performed daily; and enforcing such a policy would have significant deleterious effects on laboratories and on the physicians and patients who rely on the testing.  As a result, we respectfully request the Court reconsider its finding concerning the obligation of laboratories to make an independent assessment of the medical necessity of testing performed and billed for.[1]

## I.      INTEREST OF ACLA.

The American Clinical Laboratory Association is a not-for-profit organization that represents the interests of clinical laboratories and advocates for laws and regulations that support the essential role of laboratories in delivering quality health care.  ACLA also works to promote public awareness about the value of laboratory services in preventing illness, diagnosing disease, and monitoring health treatment.  ACLA actively works with Congress, the Centers for Medicare and Medicaid Services ("CMS") and Medicare contractors to promote the development of appropriate policies that protect the Medicare program and minimize the burdens on laboratories and test-ordering physicians.

---

[1] ACLA's specific concern is with Section III.A.1.b.iii. of the Memorandum Opinion, entitled "Whether Boston Heart Must Determine Medical Necessity" at pp. 15-19.

A.366

ACLA has 33 members, including local, regional, and national laboratories, and its membership includes laboratories performing both routine and esoteric testing. Defendant Boston Heart is not a member of ACLA. Every laboratory that is a member of ACLA provides services to Medicare beneficiaries and bills the Medicare program for those services. ACLA members are concerned that strict enforcement of the language in the Court's Memorandum Opinion would adversely affect laboratories and the quality of care received by Medicare beneficiaries.

## II.   ARGUMENT.

### A.   Introduction

ACLA submits this brief because it is concerned about the impact of certain conclusions reached by the Court on the ability of laboratories to provide testing services. According to the Memorandum Opinion, Boston Heart "has an obligation to establish that the tests for which it seeks government reimbursement are medically necessary" before it bills for the tests.[2] The Court also notes that the laboratory "had an independent obligation to certify that the tests for which it requested government reimbursement were medically necessary."[3]

Based on these statements, it appears the Court has concluded that laboratories must review the diagnosis codes and other information submitted by the test-ordering physician and, based on that information, assess the patient's medical condition to determine medical necessity before billing for the testing. If the laboratory determines that the tests ordered were not medically necessary, then presumably the laboratory would not perform the tests, since it is unlikely to perform tests for which it would not be paid.

---

[2]   Memorandum Opinion at 16.

[3]   *Id.* at 12. According to the Relator, "Labs have an affirmative obligation to examine the doctor's test ordering information and only perform and bill for the test if it is properly justified by the diagnosis." Relator's Opposition to Defendant's Motion to Dismiss Relator's Second Amended Complaint at 12-13.

A.367

ACLA has several concerns with this view. First, laboratories are not in a position to determine whether or not a test is medically necessary. Second, laboratories have never been required to make a determination of medical necessity before submitting a claim to Medicare. And finally, given the volume of tests that are performed for Medicare beneficiaries, such a requirement would likely slow down the testing process significantly and would have a significant adverse impact on physicians and their patients, as well as on laboratories. We discuss each of these issues in detail below.

**B.      Laboratories Cannot Determine Medical Necessity.**

The very nature of laboratory testing makes it impossible for laboratories to determine the medical necessity of testing ordered by physicians. In the vast majority of cases, laboratories do not see the patient for whom the testing is being ordered. Even in cases in which the patient comes to a laboratory facility to have a specimen drawn, the laboratory does not examine the patient to assess his or her medical condition. Laboratories receive and analyze the blood, urine, or other bodily fluid of patients. In the overwhelming majority of cases, the laboratory does not have the patient's medical record, have knowledge of the patient's condition or medical history, or have any other information related to the patient. Thus, the laboratory has no ability to determine whether a test is appropriate for the specific patient for whom it is being ordered. The physician is the health professional with access to the patient's medical record, which is why he or she is the one who must determine medical necessity.

For example, when a laboratory receives a physician order for a glucose test, a very common test, it has no way to determine independently whether or not the test is medically necessary for the patient, because it is not aware of the patient's underlying condition or medical history. Even if the diagnosis code submitted is one of the hundreds that are recognized by the

3

A.368

National Coverage Determination for this test,[4] the laboratory cannot determine if that code is the correct one for the particular patient. And, if the code submitted is not one of the codes included on a list in the National Coverage Determination, the laboratory still cannot say conclusively that the test is not medically necessary because there may be other factors that affected the physician's decision-making about ordering the test.[5] Doctors order tests for a variety of reasons, including diagnosis, screening for disease, monitoring disease progression, determining response to treatment, monitoring medication blood levels, and assessing genetic predisposition to disease. Since the laboratory cannot know what the physician's specific reason was for ordering a test, it must rely on his or her determination.

Further, expecting laboratories to judge the medical necessity of a test blurs the line between the practice of medicine and the function of a clinical laboratory. Laboratories do not order clinical diagnostic tests for Medicare patients. Under Medicare rules, the program pays for a laboratory test only when it is ordered by a physician or other health care practitioner who is treating the patient.[6] The Office of Inspector General of HHS ("OIG") has acknowledged that laboratories do not "treat patients."[7] The role of the laboratory is to analyze the specimen submitted for the presence or absence of various substances, or to quantify how much of a

---

[4] *See* Medicare Program: Negotiated Rulemaking: Coverage and Administrative Procedures for Clinical Diagnostic Laboratory Services; Final Rule, 66 Fed. Reg. 58788, 58846 (Nov. 23, 2001) ("Negotiated Rulemaking"). *See also* National Coverage Determination for Blood Glucose Testing (190.20) *available at:* www.cms.hhs.gov.

[5] As discussed below, Medicare contractors may find a service medically necessary even if the codes are otherwise not considered covered. *See, infra*, at pp. 7-8. *See also,* CMS, Medicare Claims Processing Manual, Chap. 17, § 120.1. (Even where there is an LMRP or NCD for the test, the contractor "reviews all of the diagnosis codes in making a determination regarding medical necessity of the service.")

[6] 42 C.F.R. § 410.32(a).

[7] Compliance Program Guidance for Clinical Laboratories, 63 Fed. Reg. 45076, 45079 (Aug. 24, 1998) ("Compliance Program Guidance").

particular substance is present, and to report those results back to the physician.[8]  Laboratories do not determine what use is to be made of that information; that is the decision of the physician and constitutes the practice of medicine.

For example, under Massachusetts law, where the Defendant is located, a laboratory is licensed under a state law establishing laboratory licensing requirements.  A laboratory is defined as "a facility or place, however named, the purpose of which is to make biological, serological, chemical, immunohematological, cytological, pathological or other *examinations of materials derived from a human body*."[9]  In that case, the entity is regulated and licensed by the Massachusetts Department of Health.  On the other hand, if an individual is "practicing medicine" then he or she must be licensed by the Board of Medicine.  The practice of medicine includes conduct "involving or reasonably thought to involve an assumption of responsibility for the other person's physical or mental well being: diagnosis, treatment…"[10]  Thus, if a laboratory were to make determinations concerning medical necessity, including deciding not to perform a test that had been ordered by a physician—a decision that would be inappropriate, as the laboratory has not examined the patient and has no information about the patient—then the laboratory would be assuming "responsibility for the other person's physical … well being" and treating the patient, *i.e.,* practicing medicine.

Finally, if the laboratory disregarded the judgment of the medical professional who ordered the test, did not perform it, and the patient suffered an illness or injury as a result, the

---

[8]	All laboratories must have a certificate under the Clinical Laboratory Improvement Amendments of 1988 ("CLIA").  Under the applicable regulations, a laboratory is one that conducts an "examination of materials derived from the human body for the purpose of providing information for the diagnosis, prevention, or treatment of any disease or impairment of, or the assessment of the health of, human beings."  42 C.F.R. § 493.2 (definition of "laboratory.")

[9]	105 Code Mass. Regs. § 180.010 (emphasis added).

[10]	243 Code Mass. Regs. § 2.07.

A.370

laboratory likely would be held liable for its failure to perform the test as ordered. It would be unreasonable for the Medicare program to require the laboratory to act in a way that could result in the laboratory subsequently being found liable as a result of complying with that requirement. Presumably, the laboratory could perform the test and then not bill for it, but it also is unreasonable to expect a laboratory to perform a test for which it will not be paid.

In sum, laboratories cannot determine medical necessity because they do not have the patient's medical record and have not examined the patient; doing so would require them to "practice medicine," which they are not permitted to do; and it could result in their being liable for any subsequent injury to the patient.

### C.      Laboratories Have Never Been Required To Make Medical Necessity Determinations.

The OIG, which enforces the federal health care fraud and abuse laws, has recognized that laboratories are not in a position to determine medical necessity. In its Model Compliance Plan for Laboratories, the OIG stated: "We recognize that *laboratories do not and cannot treat patients or make medical necessity determinations.*"[11] The OIG found that laboratories do have obligations to inform physicians about applicable Medicare requirements and explain the risk that Medicare may not pay for the services, but it recognized that laboratories are not in a position to make determinations regarding medical necessity.[12] Moreover, it noted that physicians must be able to order any tests that they believe are appropriate for the treatment of their patients.[13]

---

[11]      Compliance Program Guidance, 63 Fed. Reg. 45076, 45079 (Aug. 24, 1998) (emphasis added).

[12]      *Id.*

[13]      *Id.*

6

A.371

The purpose of the OIG's Compliance Program Guidance was to provide clear guidance to laboratories concerning their obligations under the fraud and abuse laws.[14]  At no point does the OIG suggest that the laboratory is to make a determination concerning medical necessity of the tests ordered.  To the contrary, it notes that laboratories cannot make that determination.  Further, it notes that physicians must be able to order any tests that they believe are appropriate.  It would be odd for the OIG to make this statement if it then expected the laboratory not to perform (or bill for) that test, a test that the OIG acknowledges the physician has the right to order.  In sum, there is no suggestion that the OIG expects laboratories to take on any kind of independent assessment of medical necessity.

Finally, it is not up to the laboratory or the physician to determine whether Medicare should pay for a service or not.  That determination is made by the Medicare Administrative Contractors ("MAC"), to whom CMS has given claims-processing responsibility.  In 2001, CMS published a regulation that resulted from a Congressionally-mandated negotiated rulemaking dealing with laboratory billing issues.[15]  That rulemaking resulted in a group of National Coverage Determinations for common laboratory tests, which included specified diagnosis codes that would be considered covered.  One commenter specifically noted concern that establishing a list of covered diagnoses would foreclose patients from obtaining coverage for diagnoses not listed.  In responding, however, CMS noted that simply because a particular code was not listed as a covered code did not eliminate potential coverage.  According to CMS, the policies were "constructed in a fashion to permit a Medicare contractor to consider coverage of additional indications on a case-by-case basis."  Further, because contractors are required to consider all

---

[14]     *Id.* at 45077 ("The following compliance program guidance is intended to assist clinical laboratories in developing effective internal controls that promote adherence to applicable" laws.)

[15]     Negotiated Rulemaking at 58788.

A.372

information accompanying the claim, CMS went on to note that even codes that were listed as not covered still could be covered when accompanied by appropriate medical justification for a particular patient's condition.[16]  Moreover, even if a code is denied by the contractor, the laboratory can always appeal that determination.[17]

In sum, CMS and the OIG have recognized that the laboratory cannot determine medical necessity and have never suggested that the laboratory must, nonetheless, make a medical necessity determination prior to billing for a test.[18]  Moreover, it is the Medicare contractor, not the laboratory, that has the final decision as to what is medically necessary.

**D.**　**Requiring Laboratories to Assess Medical Necessity Would Adversely Affect Patients' Ability to Obtain Necessary Testing.**

Requiring that laboratories review each test order to determine whether or not the information presented justifies the performance of the test would be especially difficult because of the sheer number of tests that are being performed.  According to a recent report from the OIG, in 2015, there were 474 million laboratory tests billed to Medicare by over 60,000 different laboratories.[19]  That would mean that, on average, laboratories are performing almost 1.3 million tests a day.  These tests were provided to 27 million Medicare beneficiaries annually who

---

[16]　　*Id.* at 58792.  CMS also responds to a comment seeking a process that would allow contractors to consider other justification for a test, in addition to those codes in the NCD.  CMS noted that contractors were required to consider any documentation that is submitted with the claim.  "Thus a process already exists for physicians to justify tests that are not presumed medically necessary."

[17]　　*See* 42 C.F.R. Part 405, Subpart I.

[18]　　Section 410.32(d) does not require laboratories to make an assessment of medical necessity.  It simply states that the laboratory is to maintain the documentation that it receives from the ordering physician.  42 C.F.R. § 410.32(d)(2)(ii).  While it *permits* the laboratory to seek additional information from the physician, it does not *mandate* that it do so.  *Id.* at § 410.32(d)(2)(ii).  Finally, section 410.32 states that if CMS is unable to determine medical necessity, it may request "from the ordering physician …those parts of the [patient's] medical record that are relevant" to such a determination.  *Id.* at § 410.32(d)(3)(ii).  That the medical necessity documentation is sought from the physician, rather than the laboratory, further underscores that it is the physician—not the laboratory—who is responsible for determining medical necessity.

[19]　　Office of Inspector General, Medicare Payments for Lab Tests in 2015:  Year 2 of Baseline Data (OEI-09-16-00040) at 3, (June 28, 2017), *available at* https://oig.hhs.gov/oei/reports/oei-09-16-00040.asp.

8

received at least one test during the year and were ordered by over 600,000 different medical professionals.[20]

Today, laboratory testing is designed to be done rapidly and cost-effectively, ensuring that physicians receive their patients' results as quickly as possible. Physicians routinely order tests electronically, through web-based portals established by the laboratories or third-parties. Lab couriers pick up test specimens each evening at doctors' offices and the specimens are then delivered to a laboratory where they are tested, usually overnight. Laboratories themselves also are highly automated, so that specimens can be efficiently directed to the section of the laboratory where the appropriate type of testing is performed. The results are reported back to the physician as soon as possible, and often within 24 hours. Such rapid turnaround is of great benefit to physicians, who can then quickly determine an appropriate course of treatment, and to patients, who do not have to endure the uncertainty that can accompany waiting for a test result.

Complying with the Court's requirement would necessitate that an individual within the laboratory review each of the tests ordered and the diagnosis codes submitted, assess the appropriateness of the tests ordered based on the information submitted, and then make a decision about whether or not the test should be performed. Where additional information is necessary, the laboratory would have to try to contact the physician's office. Even if such a process were somehow possible, it is difficult to see how it could be performed daily almost 1.3 million times. Any attempt to do so would slow down the processes that laboratories currently use and certainly would result in physicians and patients having to wait longer periods for their results. In instances where a physician is waiting to determine a course of treatment based on the

---

[20]    *Id.* In addition, according to the OIG, on average 3.7 laboratory tests were performed each time a Medicare beneficiary received testing. *Id.* Thus, the laboratory would have to determine the medical necessity not of a single test, but of at least three different tests for each Medicare beneficiary.

9

A.374

test results, such a delay could have a negative impact on the patient's health outcome. Furthermore, laboratory specimens cannot sit on a shelf waiting to be tested while the laboratory engages in the process detailed above. They must be tested before the quality of the specimen begins to degrade. Finally, because of the additional time and manpower that would be required to accomplish these tasks, the cost of doing the testing itself would increase, which also would lead to an increase in Medicare program costs.

In sum, ACLA respectfully submits that it is impossible for the laboratory to make an independent assessment of medical necessity before performing and billing for testing services—nor is such an assessment legally required—without also slowing down the entire testing process, risking the health of patients, and increasing testing costs.

## III.    CONCLUSION.

In sum, ACLA asks the Court to revise its Memorandum Opinion to recognize that laboratories are not expected to make a determination concerning medical necessity prior to performing tests and billing for them, and that laboratories are permitted to bill for the services, based on the diagnostic information received from the physicians who ordered the tests.

Respectfully submitted,

*/s/ Peter M. Kazon*
Peter M. Kazon, Esq. (D.C. Bar No. 271817)
peter.kazon@alston.com
Kelley C. Barnaby, Esq. (D.C. Bar No. 998757)
kelley.barnaby@alston.com
Alston and Bird, LLP
950 F Street, NW
Washington, DC 20004
(202) 756-3300
(202) 654-4834(f)

*Counsel for non-party American Clinical
Laboratory Association*

10

A.375

# EXHIBIT 14

A.376

VOLUME:  I
PAGES:  1 - 104
EXHIBITS:  See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

-----------------------------------x
UNITED STATES OF AMERICA, et al.,
Ex rel. OMNI HEALTHCARE, INC.,



              Plaintiffs

v.

MD SPINE SOLUTIONS LLC, D/B/A
MD LABS INC., DENIS GRIZELJ,
MATTHEW RUTLEDGE AND
DOE HEALTHCARE PROVIDERS 1-100,
              Defendants
-----------------------------------x

         ZOOM VIDEOCONFERENCE DEPOSITION OF KIMBERLY
MCGRATH, M.D., taken on behalf of the defendants,
pursuant to the applicable provisions of the
Massachusetts Rules of Civil Procedure, before Suzanne
M. Jantzen, a Massachusetts Shorthand Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, taken with everyone present in their
respective locations, on Tuesday, November 21, 2023
commencing at 1:16 p.m.

                  ---------

A.378

KIMBERLY MCGRATH, M.D.                          November 21, 2023

Page 15

permitted to order for any patient?

A.   No.

Q.   Who determines what laboratory tests to order for your patients?

A.   I do.

Q.   Does anybody else have influence over what tests you order for a patient?

A.   No.

Q.   Does a patient's co-pay or co-insurance factor into what tests you order for a patient?

A.   It does because some laboratories cannot -- some insurances cannot use our laboratory facilities so we have to use outside laboratories.

Q.   Does a patient's co-pay or co-insurance factor into what tests you order from an outside laboratory?

A.   No.

Q.   Who determines what outside -- excuse me, what --

MR. ORKAND:  Strike that.

Q.   Who determines what outside laboratory you might use for a given test?

A.   The patient many times will determine the laboratory facility they would like to use.  If they can get it done in-house, they prefer that; but if they

A.379

A.380

KIMBERLY MCGRATH, M.D.                        November 21, 2023

Page 23

A.    Historically, yes.

Q.    In general, what factors do you consider before ordering a laboratory test for a patient?

A.    Obviously, what the specific symptoms are for the individual patient, and then obviously you have to look at the diagnosis and make sure there is a correlation between the test being covered as well.  So that is something we look at all the time as well when we're doing the testing.

Q.    Does a patient's insurance factor into what tests you order?

A.    It does based on the ICD codes, and that varies between insurance companies.  Not everybody follows the same guidelines on diagnoses and testing for the most part.  So we do have an electronic record that tells us whether they will be covered or not in those cases.

Q.    Is that guidance available for any type of test you'd order through the electronic medical record?

A.    It is for ordering laboratory and x-ray testing, yes.

Q.    Is that guidance available for ordering testing for urinary tract infections?

A.    Based on the diagnosis code, yes.

A.381

A.382

KIMBERLY MCGRATH, M.D.                          November 21, 2023

Page 25

order?

A.   No.

Q.   In general, based on your training and experience, how do you determine if a certain laboratory test is medically necessary for a particular patient?

A.   Based on their symptoms and my experience with the symptoms and the treatment for those particular symptoms.

Q.   Based on your training and experience, who determines if a laboratory test is medically necessary for one of your patients?

A.   I do.

Q.   Does anybody else play a role in determining the medical necessity of a laboratory test for one of your patients?

A.   No.

Q.   When you determine whether a laboratory test is medically necessary, do you consider whether the test is for the purpose of preventing, diagnosing or treating an illness, injury or disease?

A.   Yes.

Q.   When you determine whether a laboratory test is medically necessary, do you consider whether the test is in accordance with generally accepted standards of

KIMBERLY MCGRATH, M.D.                              November 21, 2023

Page 26

medical practice?

A.   Correct, and that's where the medical record can automatically tell us whether it's appropriate or not based on the diagnosis.

Q.   When you determine whether a test is medically necessary, do you consider whether a test is clinically appropriate in terms of the type of test, the frequency of the test, the extent of the test or the duration of the test?

A.   Yes.

Q.   Have you ever ordered a laboratory test for a patient that in your view was not medically necessary?

A.   No.

Q.   Have you ever ordered a laboratory test for a patient and had an external laboratory refuse to conduct the test because the external laboratory believed that it was not medically necessary?

A.   No.  The only way I've had to do that is if the diagnostic code did not fit appropriately to that chemistry test, and they would ask for an alternative code.

Q.   So in those cases where the diagnosis code did not match the test, would they refuse to perform the test?

A.384

KIMBERLY MCGRATH, M.D.                    November 21, 2023

Page 103

CERTIFICATE


          I, KIMBERLY McGRATH, M.D., do hereby certify

that I have read the foregoing transcript of my

testimony, and further certify that said transcript is a

true and accurate record of said testimony.

          Dated at                              ,

this        day of                        , 2023.






                    KIMBERLY McGRATH, M.D.

                    SIGNED UNDER THE PENALTIES

                    OF PERJURY

A.385

KIMBERLY MCGRATH, M.D.                          November 21, 2023

Page 104

CERTIFICATE

Commonwealth of Massachusetts

Middlesex, ss.

I, Suzanne M. Jantzen, Massachusetts Shorthand Reporter, and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify:  that KIMBERLY McGRATH, M.D., the witness whose deposition is hereinbefore set forth, was satisfactorily identified, then duly sworn by me, and that such deposition is a true record of the testimony given by the said witness.

I further certify that I am not a relative or employee or counsel or attorney for any of the parties, or a relative or employee of such counsel or attorney, nor am I financially or otherwise interested in the outcome of the action.

IN WITNESS WHEREOF, I have hereunto set my hand and notarial seal this th day of December, 2023.

SUZANNE M. JANTZEN

My commission expires on October 13, 2028

A.386

# EXHIBIT 15

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA, *et al., ex rel.*
OMNI HEALTHCARE, INC.,

        Plaintiffs,

v.

MD SPINE SOLUTIONS LLC, D/B/A MD LABS
INC., DENIS GRIZELJ, MATTHEW
RUTLEDGE AND DOE HEALTHCARE
PROVIDERS 1 - 100,

        Defendants.

Case No. 18-cv-12558-PBS

**DECLARATION OF ROY RILEY**

I, Roy Riley, hereby depose and say:

1.    I live in Hendersonville, North Carolina. In February 2016, I founded a company called Pace Solutions. In January 2017, Pace Solutions entered into an Independent Contractor Sales Agreement with MD Spine Solutions, LLC d/b/a MD Labs.

2.    Prior to contracting with MD Labs, I had a lengthy career as a sales consultant for medical device companies specializing in spine surgery and other products. I was a 1099 independent contractor for those companies and was paid commissions based on the volume or value of the products and services I sold.

3.    After resigning from one such medical device company in or around 2016, I explored other opportunities and asked my business partner to introduce me to a laboratory that had high ethical standards. She introduced me to Howard Claussen at MD Labs.

4.    Under the terms of the Independent Contractor Sales Agreement that I eventually entered into with MD Labs, Pace Solutions performed direct marketing and sales of MD Labs'

1

A.388

products and services.  MD Labs paid Pace Solutions commissions based on the number of tests ordered by the accounts to which I was assigned.

5.   In 2017 or 2018, MD Labs trained me to sell PCR-based urinary test infection ("UTI") tests.  MD Labs instructed me to promote the use of PCR UTI testing only when it was medically necessary. I was trained that PCR UTI testing was appropriate for patients who suffered from recurrent UTIs or UTIs that were resistant to treatment.  Additionally, I was trained that such patients should typically have a positive urinalysis and signs and symptoms consistent with a UTI.  I was advised that PCR UTI testing was not necessary for every patient with symptoms of a UTI.

6.   I am aware that, throughout my tenure with MD Labs, the company used 1099 independent contractors, like myself, and W-2 employees to work as sales representatives.

7.   The structure of my agreement with MD Labs and the fact that I was paid commission based on the number of tests ordered by my accounts did not affect how I promoted PCR UTI testing.  My status as a 1099 independent contractor and my commission payments did not encourage me to promote testing for any use other than when a provider determined it was medically necessary.

8.   At all times during my tenure at MD Labs, that I promoted PCR UTI testing using a sales message that I believed was truthful.  I believed then in the benefits of PCR UTI testing and still do.  No one at MD Labs asked me to do anything that would have compromised my integrity.

2

A.389

Signed under the pains and penalties of perjury, this __29__ day of July, 2024.

DocuSigned by:

Roy Riley

3

A.390

**DocuSign**

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: 0699C0E4961548F08F2770444B231191 | | Status: Completed |
| Subject: Complete with Docusign: Declaration of Roy Riley | | |
| Source Envelope: | | |
| Document Pages: 3 | Signatures: 1 | Envelope Originator: |
| Certificate Pages: 4 | Initials: 0 | Seth Orkand |
| AutoNav: Enabled | | 280 Trumbull Street |
| EnvelopeId Stamping: Disabled | | Hartford, CT  06103 |
| Time Zone: (UTC-05:00) Eastern Time (US & Canada) | | sorkand@rc.com |
| | | IP Address: 38.97.90.130 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Seth Orkand | Location: DocuSign |
| 7/29/2024 5:03:37 PM | sorkand@rc.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Roy Riley | DocuSigned by: | Sent: 7/29/2024 5:07:25 PM |
| Rcr2105@gmail.com | *[signature]* A9CAA31915EF40F... | Viewed: 7/29/2024 9:26:03 PM |
| President | | Signed: 7/29/2024 9:26:40 PM |
| Security Level: Email, Account Authentication (None) | Signature Adoption: Drawn on Device | |
| | Using IP Address: 24.246.136.81 | |
| | Signed using mobile | |
| **Electronic Record and Signature Disclosure:** | | |
| Accepted: 7/29/2024 9:26:03 PM | | |
| ID: 40dd1ca4-5e94-4d61-8b57-b243235d0158 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 7/29/2024 5:07:25 PM |
| Certified Delivered | Security Checked | 7/29/2024 9:26:03 PM |
| Signing Complete | Security Checked | 7/29/2024 9:26:40 PM |
| Completed | Security Checked | 7/29/2024 9:26:40 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

## Electronic Record and Signature Disclosure

A.391

**ELECTRONIC RECORD AND SIGNATURE DISCLOSURE**

From time to time, Robinson & Cole LLP (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through your DocuSign, Inc. (DocuSign) Express user account. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. For such copies, as long as you are an authorized user of the DocuSign system you will have the ability to download and print any documents we send to you through your DocuSign user account for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of your DocuSign account. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use your DocuSign Express user account to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through your DocuSign user account all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

A.392

**How to contact Robinson & Cole LLP:**
You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
 To contact us by email send messages to: jmerrifield@rc.com

**To advise Robinson & Cole LLP of your new e-mail address**
To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at jmerrifield@rc.com and in the body of such request you must state: your previous e-mail address, your new e-mail address.  We do not require any other information from you to change your email address..
In addition, you must notify DocuSign, Inc to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in DocuSign.
**To request paper copies from Robinson & Cole LLP**
To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to jmerrifield@rc.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.
**To withdraw your consent with Robinson & Cole LLP**
To inform us that you no longer want to receive future notices and disclosures in electronic format you may:
> i. decline to sign a document from within your DocuSign account, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;
> ii. send us an e-mail to jmerrifield@rc.com and in the body of such request you must state your e-mail, full name, IS Postal Address, telephone number, and account number. We do not need any other information from you to withdraw consent..  The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

| Operating Systems: | Windows2000? or WindowsXP? |
|---|---|
| Browsers (for SENDERS): | Internet Explorer 6.0? or above |
| Browsers (for SIGNERS): | Internet Explorer 6.0?, Mozilla FireFox 1.0, NetScape 7.2 (or above) |
| Email: | Access to a valid email account |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | •Allow per session cookies<br><br>•Users accessing the internet behind a Proxy Server must enable HTTP 1.1 settings via proxy connection |

** These minimum requirements are subject to change. If these requirements change, we will provide you with an email message at the email address we have on file for you at that time providing you with the revised hardware and software requirements, at which time you will have the right to withdraw your consent.

A.393

**Acknowledging your access and consent to receive materials electronically**
To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.
By checking the 'I Agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify Robinson & Cole LLP as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by  Robinson & Cole LLP during the course of my relationship with you.

A.394

# EXHIBIT 16

A.396

**From:** Mark Bobango [mailto:bobangom@omnihealthcare.com]
**Sent:** Monday, August 27, 2018 12:17 PM
**To:** 'Jack Todd' <jacktodd4@gmail.com>; 'Craig Deligdish' <deligdishc@omnihealthcare.com>
**Cc:** 'Howard Claussen' <howard@mdlabs.com>
**Subject:** RE: cpt code

Jack,
12:30 or 1 pm works for me.

**From:** Jack Todd <jacktodd4@gmail.com>
**Sent:** Monday, August 27, 2018 10:54 AM
**To:** Craig Deligdish <deligdishc@omnihealthcare.com>; Mark Bobango <bobangom@omnihealthcare.com>
**Cc:** Howard Claussen <howard@mdlabs.com>; Jack Todd <JACKTODD4@gmail.com>
**Subject:** Fwd: cpt code

CPT codes for billing.

Mark give me a time on Tuesday.
We can review billing history to date with the UTI's
The $50 is the self-pay price for UTI's

---------- Forwarded message ---------
From: **Howard Claussen** <howard@mdlabs.com>
Date: Sun, Aug 26, 2018 at 11:09 AM
Subject: Fwd: cpt code
To: Jack Todd <jacktodd4@gmail.com>

Uti codes
G0483 is the tox code

Get Outlook for iOS

**From:** Molecular Diagnostics <mdmoldx@yahoo.com>
**Sent:** Tuesday, August 21, 2018 10:29 AM
**To:** Kimberli Croce; Howard Claussen
**Subject:** Re: Fwd: cpt code

Thank you

On Tuesday, August 21, 2018 08:28:46 AM EDT, Howard Claussen <howard@mdlabs.com> wrote:

Codes:

87481

87500

87653

87798 x 14 units

Lori

--
GB,
Jack

2

A.397

OMNI00074

# EXHIBIT 17

A.398

MICHAEL ARRIGO                                    May 9, 2024

Volume 1

**ORIGINAL**   Pages   1-105

THE COMMONWEALTH OF MASSACHUSETTS

No. 18-CV-12558-PBS

---------------------------------------x

UNITED STATES OF AMERICA, et al., ex rel.

OMNI HEALTHCARE, INC.,

Plaintiffs

vs.

MD SPINE SOLUTIONS LLC, D/B/A MD ABS INC.,

DENIS GRIZELJ, MATTHEW RUTLEDGE AND

DOE HEALTHCARE PROVIDERS 1-100,

Defendants

---------------------------------------x

DEPOSITION OF MICHAEL ARRIGO

Thursday, May 9, 2024, 12:30 p.m.

Held remotely via Zoom videoconference.


Stenographer: Alycia R. Mikels


KEY DISCOVERY REPORTING

40 Court Street, 2nd Floor

Boston, MA 02108

(617) 348-9360

www.key-discovery.com


KEY Discovery                          617-348-9360
Deposition Services              WWW.KEY-DISCOVERY.COM

A.399

A.400

MICHAEL ARRIGO                                    May 9, 2024

Page 82

Q    Understood.  Other than the adjacency and the criteria that you've mentioned, were there any other instructions that you provided about selecting files?

A    I would have to look at that e-mail to refresh my recollection any further.

     We've been going for just about another hour, so I'd like to take another 10 minute break, please.

          ATTORNEY HEATH:  Absolutely.  It's 2:35, we'll come back at 2:45.

                    (Brief recess)

BY ATTORNEY HEATH:

Q    Mr. Arrigo, I think I asked you this question earlier but it's been a while, and I can't remember.  Did you say that you had looked at patient claim files for patients other than those of Omni Healthcare?

A    Can you be more specific about what you mean by "claim file"?

Q    Yeah, that's fair.  You've mentioned, I think a number of different artifacts that you looked

A.401

MICHAEL ARRIGO                                    May 9, 2024

Page 83

at for a particular claim, SOAP notes and the like, did you look at those artifacts for any claims for patients who were not Omni Healthcare patients?

A   No, and that's because the HIPAA Privacy Rule would prevent that unless they've been subpoenaed and ordered by a court.  So it would only be possible for me to look at patients treated by Omni.

Q   Understood.  Understood.  I just wanted to make sure --

A   I say that -- I say that not as a legal opinion but based on my experience in doing privacy cases.

Q   I understand.  Did you know of this population of at least 100,000 claims, how many total claims came from Omni Healthcare?

A   I only have visibility into Omni and what those physicians ordered which is why I said 100,000 is a conservative high number.  It looks to me like there's a subset of a few tens of thousands that are UTI-related claims ordered by Omni physicians.

Q   Okay.  So is it your testimony that your --

A.402

MICHAEL ARRIGO                                        May 9, 2024

Page 103

THE COMMONWEALTH OF MASSACHUSETTS

----------------------------------------x

UNITED STATES OF AMERICA, et al., ex rel.

OMNI HEALTHCARE, INC., Plaintiffs

vs.

MD SPINE SOLUTIONS LLC, D/B/A MD LABS INC.,

DENIS GRIZELJ, MATHEW RUTLEDGE AND

DOE HEALTHCARE PROVIDERS 1-100, Defendants

----------------------------------------x

I, MICHAEL F. ARRIGO, do hereby certify that I have read the foregoing transcript of my testimony.

I further certify that said transcript is a true and accurate record of my testimony given at a deposition in the above-captioned matter on May 9, 2024,incorporating the corrections I have made on the attached Errata Sheet.

A.403

MICHAEL ARRIGO                                    May 9, 2024

Page 104

E R R A T A   S H E E T

PAGE   LINE                         CORRECTION

____   ____    _____

____   ____    _____

____   ____    _____

____   ____    _____

____   ____    _____

____   ____    _____

____   ____    _____

____   ____    _____

____   ____    _____

____   ____    _____

____   ____    _____

____   ____    _____

Signed under the pains and penalties this _____

day of _____, 2024.


_____

MICHAEL F. ARRIGO

A.404

MICHAEL ARRIGO                                    May 9, 2024

Page 105

                        C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS

        I, Alycia R. Mikels, a Notary Public within and

for the Commonwealth of Massachusetts do hereby

certify:

        THAT MICHAEL F. ARRIGO, the witness whose

testimony is hereinbefore set forth, was duly sworn

by me and that such testimony is a true and accurate

record of my stenotype notes taken in the foregoing

matter, to the best of my knowledge, skill and

ability; that before completion of the deposition

review of the transcript was requested.

        I further certify that I am not related to any

parties to this action by blood or marriage; and

that I am in no way interested in the outcome of

this matter.

        IN WITNESS WHEREOF, I have hereunto set my hand

this 23rd day of May, 2024.

                              _Alycia Mikels_

                              Alycia Mikels, RPR

                              Notary Public

My Commission Expires:

October 4, 2030

# EXHIBIT 18

A.406

**Report in Response to the "Expert Report of Michael F. Arrigo" in the matter of United States of America, ex rel. Omni Healthcare v. MD Spine Solutions LLC, et al." dated January 29, 2024**

I was engaged by the Defendants in this case, MD Spine Solutions LLC, D/B/A MD LABS INC., Denis Grizeli, Matthew Rutledge (Defendants). I was retained to provide opinions regarding the statistical methodology employed in the Expert Report of Michael F. Arrigo (the Arrigo Report) dated January 29, 2024. As I discuss in this Report, Mr. Arrigo's statistical methods are incomplete and non-sensical, and they do not support his conclusions (which are themselves unclearly stated). Mr. Arrigo's statistical methods reflect basic misunderstandings of theory, rely on misleading and inaccurate use of statistical terms such as "confidence level" and "margin of error", and veer into extraneous topics that are beyond the purview of sampling and statistics.

I.      **Summary and Overview**

Mr. Arrigo offers three opinions[1]. These are, to paraphrase,
1. That none of the 57 charts provided to him by counsel for the relator, Omni Healthcare Inc. ("Omni"), had any "documentation demonstrating the intent of the ordering physician to perform the … testing"
2. That 21 of 57 requisition forms provided to him by Omni's counsel had "left the box for the Urinary Tract Infection Testing Panel unchecked."
3. That 23 of 57 requisition forms provided to him by Omni's counsel "were unsigned by a health care provider".

The main concerns and deficiencies of Mr. Arrigo's opinions are as follows:
1. Mr. Arrigo's is not formally trained in statistics. As such, the application, use and interpretation of statistical methodology is beyond his training and expertise.
2. Despite not being a statistical expert, Mr. Arrigo attempts to use statistical arguments to justify the selection of the 57 charts he has opined on, which by his own admission he had no involvement in selecting, but instead, they were provided to him by Omni's counsel[2].
3. There are significant problems with the sampling approach. These include the following:
   a. Mr. Arrigo provides no description of the sampling procedure and offers no information on the manner by which the 57 medical charts he opined on were selected, except that the charts were provided to him by Omni's counsel[3]. As a result, the procedure of selection of these charts cannot be replicated.
   b. Mr. Arrigo does not define the population from which the sample was selected. This means that the population where extrapolations are to be made to is also not defined.
   c. Mr. Arrigo also makes no attempt to justify why the selected sample is in any way representative of the (undefined) population from which it was selected. As a result, conclusions from the selected sample cannot be extrapolated to *any* population.

For these reasons, and for the reasons discussed more fully below, Mr. Arrigo's statistical conclusions are unreliable as is the totality of the quasi-statistical statements in his report.

---

[1] Arrigo report, pp. 6 and pp. 37
[2] Ibid pp. 42
[3] Ibid pp. 37 and 71

**1 |** P a g e

A.407

## II.      Professional qualifications

I am a professor of Biostatistics at the Indiana University R.M. Fairbanks School of Public Health in Indianapolis, in the department of Biostatistics and Health Data Science. I received my doctoral degree in statistics at the University of Connecticut, Storrs, CT in 1991 and have worked as a statistician for over thirty years at Harvard University and Indiana University.  Attached, as Appendix A, is a copy of my academic curriculum vitae, which contains lists of publications, proceedings, appointments and affiliations.  Virtually all my research involves the development and application of statistical methodology involving sampling and making reliable inferences from the selected sample to a relevant population. I have also served as Statistical Expert in a number of legal proceedings which involved obtaining representative samples from large populations, as well as processing and extrapolating the results.

## III.      Deficiencies in the statistical statements in the Arrigo Report

In this section I describe multiple deficiencies in the statistical methodology Mr. Arrigo employs in his report. Broadly, the deficiencies fall into two categories:
1. Mr. Arrigo's lack of formal statistical education and training
2. Unsupported assertions of statistical nature offered in the Arrigo Report.

### A.   Mr. Arrigo's education, training and prior work

Mr. Arrigo is not a formally trained statistician and he misrepresents his training and qualifications.

   *1. Mr. Arrigo is not a statistician*

Mr. Arrigo does not consider using statistics as part of the scope of his purported expert opinion. This is unsurprising as Mr. Arrigo is not a formally trained statistician.  Mr. Arrigo states that he "studied" statistics at the University of California, Irvine, an institution from which he did not receive a degree. He has obtained an undergraduate degree in Business Administration from the University of Southern California and has studied in but has not graduated from the biomedical informatics program at Stanford and has studied part-time at the Bioethics program at Harvard[4], from which he also did not receive a degree.  Accordingly, the statistical methodology in Mr. Arrigo's report is beyond his expertise. Generally, a person who includes statistics as part of an expert report would be expected to have a degree in statistics or in a field with close affinity to statistics. A graduate degree in such a field would be preferable if one represents themselves as an expert in statistical methods. Further training in statistical *sampling* needs to be demonstrated, as mastering the process of obtaining, analyzing and deriving conclusions from a sample extracted from a larger population is crucial in cases like the present one. Not only does Mr. Arrigo not demonstrate any such training, but his misuse of statistical methods also makes it clear that he is both untrained in statistics and unable to apply statistical methodology.

   *2. Mr. Arrigo misrepresents his professional background*

In addition to not being a formally trained statistician, Mr. Arrigo mis-represents his prior work in his curriculum vitae, particularly with respect to his claim that he has published his work in peer-reviewed outlets.  Quotations and publications in the popular press (such as the Cape Cod Times or the Daily

---

[4] Arrigo report, pp. 8.

A.408

Beast) are not what is considered scientific peer review. Similarly, articles published in corporate web sites do not qualify as "peer reviewed" publications. Peer review is an adversarial process undertaken prior to publication of a scientific research paper, where experts in the same field of inquiry (the "peers") review an article submitted for publication and opine on its scientific rigor. They either suggest modifications or recommend rejection of the paper outright when they feel it does not cross the threshold required for inclusion into the scientific literature. Peer review thus helps separate the scientific "wheat from the chaff". The one article Mr. Arrigo lists as being "peer reviewed" was apparently assessed by "clinical and business executives at Baptist Health (a large academic medical center)"[5]. This does not qualify as a peer-reviewed publication, particularly in the field of statistics.

**A.   <u>Deficiencies in Mr. Arrigo's statistical methodology and findings</u>**

The deficiencies in Mr. Arrigo's choice and implementation of statistical methods, and fatal deficiencies in the sample selection taken together lead to the inevitable conclusion that <u>the sample of 57 medical charts on which Mr. Arrigo opined on, by virtue of not having been selected randomly, is not representative of *any* population of claims.</u>

   *1.   Lack of definition of the relevant population*

Mr. Arrigo offers the following description of the relevant claims population: "Counsel informed me that this case spans at least 100,000 claims[6]." This statement leads to two unavoidable conclusions: 1) Mr. Arrigo did not know the exact number of claims in the sampling universe when opining on the 57 medical charts; 2) he never had access to an enumerated list of all claims in the population (the so-called "sampling frame") from which the 57 medical charts were selected, but relied on counsel's opinion of what constitutes a relevant claims universe. Sampling is obtained from a population in order to extrapolate conclusions from the sample to the population the sample was selected from. <u>With no information on the population the 57 charts were selected from, it is impossible to establish to which population of claims the conclusions extracted from these 57 medical charts can be extrapolated.</u>

   *2.   Determination of the sample size*

Mr. Arrigo's attempt to justify the size of the sample of the 57 charts he has opined on has no basis on statistical theory and the methods used in support of the sample size justification are incorrect or are used incorrectly.  Mr. Arrigo prefaces section XI in his report by asserting that his findings are predicated on the "application of <u>generally accepted</u> standards, principles, methods, custom and practice" (my emphasis). As a generally accepted "standard" he states that an expert must render opinions with greater than 50% certainty[7]. The statement that it is a customary standard for expert opinion that someone be right about as frequently as being wrong, is a truly strange claim. Such a standard can be

---

[5] Mr. Arrigo states that he is "the author of a peer-reviweed [*sic*] article regarding clinical documentation improvement and accuracy to ensure the quality of documentation improvement and accuracy based on [his] research at Baptist Health, a large academic medical center in Florida … Peer review, review by clinical and business executives at Baptist Health (a large academic medical center)."
[6] Arrigo report pp. 42.
[7] Ibid pp. 42.

**3 |** P a g e

A.409

found nowhere in the statistical literature, where a "reasonable degree of certainty" is customarily defined as a probability greater than 90% or 95%[8].

Nevertheless, Mr. Arrigo states that, in order to exceed the threshold of 50% certainty, he will need 52-60 samples because this sample size will somehow enable him to obtain certainty of 57% and a margin of error of 5.5%. According to his own calculations, these two numbers will result in a "net certainty" of 51.5%. As mentioned previously, it is odd to consider as a "standard" such a low probative threshold where one could be wrong 50% of the time. But even if this methodology had the least merit, it is not possible for Mr. Arrigo to perform his own calculations, given that 1) he does not know the precise size of his population (the upper-case $N$ in this formulas), and 2) he does not offer a level of confidence that his sample size will be generating (the lower-case $c$ in his formula)[9]. So even if we momentarily suspend disbelief, we would be unable to replicate his calculations.

Combined, Mr. Arrigo's lack of clarity of presentation, poor choice of statistical methods, and erroneous calculations, result in a size of a sample that is bereft of any statistical justification.

### 3. *Misuse of statistical methods*

It should also be noted that footnote number 13[10], which Mr. Arrigo purportedly offers as supportive evidence for some of the statistical formulas provided, is not relevant. It is a brief summary of the process involved in statistical hypothesis testing. To test the so-called "working" or "null" hypothesis however, one needs to express this hypothesis and then assess, through statistical criteria, whether the collected evidence is or is not consistent with it. Mr. Arrigo, in his report, does not articulate a statistical hypothesis, so it is not clear why this footnote was included, but more importantly this is not a case involving statistical hypothesis testing. This leads to a general impression of an incoherent, non-sensical report, hastily put together from unrelated materials.

### 4. *Inappropriate selection of the sample*

Selecting a representative sample from a well-defined population is the cornerstone for inferential validity[11]. A pre-requisite for a sample to be representative of the population from which it was extracted is that the sample must be selected in a random fashion. Mr. Arrigo does not describe how the sample of medical charts he reviewed and opined on was selected. As to the provenance of the sample, Mr. Arrigo simply states that it was provided to him by Omni's counsel. He also states that he was "informed" by counsel that the size of the relevant population is "at least" 100,000 claims[12]. The conclusion is that Mr. Arrigo has had no involvement in the selection of this sample and had no access to the claims population.

---

[8] This appears to be corroborated by Mr. Arrigo himself when he states in footnote 13 in his own report (his own emphasis) that the "**significance level of the test** — is small (typically 0.01, 0.05, or 0.10)." Significance level of a statistical test is the complement of statistical confidence, so the corresponding confidence levels are 90%, 95% and 99%, not 50%.
[9] Arrigo report pp. 42
[10] Ibid pp. 78-79.
[11] Cochran WG (1977) *Sampling Techniques, 3rd Edition.* John Wiley and Sons, chapter 1.
[12] Arrigo Report pp. 42

**4 |** P a g e

A.410

In addition, there is no evidence that this sample was selected in a random fashion. To demonstrate that a sample has been selected randomly, one should include at a minimum 1) the sampling frame (in the present case this would be an enumerated list of all claims in the relevant population), 2) the sequence of random numbers used and, crucially, 3) the random number seed that launched the sequence of random numbers that resulted in the sample selection. Given that each seed results in a different random number sequence and, consequently, a different sample of selected claims, disclosure of the seed is necessary, or the sample selection cannot be replicated[13]. Mr. Arrigo provides no such information in his report.

From information included by Mr. Arrigo in his report, it appears that the provider listed in all 57 medical charts Mr. Arrigo opined on came from a single site: Omni Healthcare.  The probability of randomly selecting 57 samples from a population of "at least 100,000 claims" and multiple providers, resulting in all 57 medical charts selected belonging to a single provider is virtually zero unless the provider accounts for the vast majority of the charts in the population. This means that the 57 charts provided to Mr. Arrigo by Omni's counsel were not randomly selected from the universe of "at least" 100,000 claims. <u>Thus, any conclusions obtained from these charts cannot be extrapolated to the entire population of claims. Combined with the lack of information provided in terms of the random selection of the 57 medical charts Mr. Arrigo opined on, leads to the conclusion that these charts were not randomly selected from the universe of Omni claims.</u>

I.      **Conclusions**

Given the deficiencies discussed above, I reach the following conclusions:

1.  Mr. Arrigo makes statistical statements based on methods which are beyond his training, and education and are applied incorrectly.
2.  Mr. Arrigo had no access to the relevant universe of claims in this case and had no involvement in the selection of the 57 medical charts on which he opined
3.  The number of charts delivered to Mr. Arrigo (57) was not the same as what he defines as the size of the sample needed (which he alternatively calculates as "at least 52" or "between "52 to 60 patient charts")) and the statistical methodology behind the sample size calculations themselves is incorrect
4.  There is no information on how the relevant universe was defined and how the sample was selected and, more to the point, whether it was selected *randomly*. As such, there is no guarantee that the 57 medical charts are representative of the population they were selected from or, for that matter, *any* population

---

[13] See *Statistical Sampling: A Toolkit for MFCUs*, Office of the Inspector General, US Department of Health and Human Services, OIG 12-18-1, <u>https://oig.hhs.gov/fraud/medicaid-fraud-control-units-mfcu/files/MFCU%20Sampling%20Guidance%20Final.pdf</u>: "To ensure that the sample can be replicated, save the random seed value that was used to generate the random numbers, along with the random numbers themselves", pp. 5).

A.411

For these reasons, Mr. Arrigo's statistical conclusions are unreliable as is the totality of his statistical and quasi-statistical statements in his report.

Signed and dated 29 March 2024 in Indianapolis, IN

Constantin T. Yiannoutsos, Ph.D.

Professor, Biostatistics
Department of Biostatistics and Health Data Science
Indiana University R.M. Fairbanks School of Public Health

A.412

**Appendix A**

Yiannoutsos curriculum vitae

A.413

# CURRICULUM VITAE

NAME                    Constantin Theodore Yiannoutsos, Ph.D.

EDUCATION

  UNDERGRADUATE:    B.A. in Mathematics concentration in Actuarial Science *Central Connecticut State University, New Britain, CT*. 1986.

  GRADUATE:         M.S. in Statistics.  *University of Connecticut, Storrs, CT*. 1989
                    Ph.D. in Statistics.  *University of Connecticut, Storrs, CT*.  1991

ACADEMIC APPPOINTMENTS

  1994 – 1998:      Research Associate. Center for Biostatistics in AIDS Research, Harvard School of Public Health Boston, MA.

  1998 – 2000:      Research Scientist Center for Biostatistics in AIDS Research, Harvard School of Public Health Boston, MA.

  2000 – 2002       Senior Research Scientist Center for Biostatistics in AIDS Research, Harvard School of Public Health, Boston, MA.

  2002 – 2008       Associate professor Indiana University School of Medicine, Department of Medicine, Indianapolis, IN.

  2003 – 2010       Adjunct associate professor Biostatistics Indiana University Purdue University Indianapolis Department of Mathematical Sciences.

  2008 – present    Professor Indiana University Department of Medicine, Department of Medicine, Indianapolis, IN.

HOSPITAL
APPOINTMENTS            Not applicable

OTHER APPOINTMENTS AND PROFESSIONAL CONSULTANSHIPS

  1993 – 1994:      University Instructor. University of Indianapolis International, Athens, Greece.

  1995 – 2002       University Instructor Harvard University Department of Continuing Education, Cambridge, MA.

  2000 – 2002       University lecturer Harvard School of Public Health, Boston, MA Summer program in Public Health

  1999 – 2019       Visiting lecturer University of Athens Medical School, Athens, Greece.  Master's program in Biostatistics

A.414

| | |
|---|---|
| 2006 – 2007 | <u>Visiting professor</u> Moi School of Public Health, Eldoret, Kenya |
| 2019 – present | <u>Visiting Professor</u> National and Kapodistrian University of Athens, Department of Hygiene and Epidemiology, Athens, Greece. |

<u>SPECIALTY BOARD STATUS:</u>  Not applicable

<u>LICENSURE AND CERTIFICATIONS:</u>  Not applicable

<u>PROFESSIONAL ORGANIZATIONS:</u>

- American Statistical Association
- International Biometrics Society, Eastern North Atlantic Region and Eastern Mediterranean Region

<u>HONORS AND AWARDS:</u>

Graduated with honors, Central Connecticut State University, New Britain, CT.

<u>TEACHING ASSIGNMENTS DURING AT LEAST THE PRECEDING TWO YEARS:</u>

| | |
|---|---|
| 1993 – 1994: | <u>Introduction to probability.</u> University of Indianapolis International, Athens, Greece. |
| 1993 – 1994: | <u>Computer packages.</u> University of Indianapolis International, Athens, Greece. |
| 1995 – 2002 | <u>Introduction to Biostatistics I.</u>  Harvard University Department of Continuing Education, Cambridge, MA. |
| 2000 – 2002 | <u>Principals of Biostatistics II.</u>  Harvard School of Public Health, Boston, MA Summer program in Public Health |
| 1999 – 2001 | <u>General linear models</u>. University of Athens Medical School, Athens, Greece.  Master's program in Biostatistics |
| 2002 – 2002 | <u>Generalized linear models.</u> University of Athens Medical School, Athens, Greece.  Master's program in Biostatistics |
| 2004 – present | <u>Analysis of failure time data.</u>  University of Athens Medical School, Athens, Greece.  Master's program in Biostatistics |
| 2002 – 2004 | <u>Introduction to Biostatistics II (G652).</u>  Indiana University Department of Medicine. |
| 2003 – 2004 | <u>Short course in Biostatistics.</u>  Survival analysis.  Indiana University Department of Medicine. |
| 2006 | <u>Principals of Biostatistics I.</u>  Moi University School of Public Health, Eldoret, Kenya |

A.415

| 2008 – present | Introduction to Clinical Trials (PBHL B-582).  Indiana University Department of Medicine and Fairbanks School of Public Health. |
| --- | --- |
| 2012 – 2018 | Introduction to Survival Analysis (PHBL B-573) Indiana University Fairbanks School of Public Health |
| 2018 – present | Classical regression methods for data scientists (PBHL B-285) Indiana University Fairbanks School of Public Health |

PROFESSIONAL SERVICE:

1. National regional and international service
   a. National service

| 2004 – 2005 | Member of NIMH special emphasis panel ZMH1 ERB-X (02) S |
| --- | --- |
| 2004 | Grant reviewer, Lance Armstrong Foundation |
| 1995 – present | AIDS Clinical Trials Group Neurology subcommittee member |

   b. State and regional service

| 2003 – present DSMB leading statistician | Center for Cancer Care at Goshen Health System.  A phase III multi-institutional randomized study of immunization with gp100:209-217(210M) peptide followed by high dose IL-2 versus high dose IL-2 alone in patients with metastatic melanoma |
| --- | --- |
| 2004 DSMB leading statistician | Hoosier Oncology Group protocol GI02-38, a phase II study of capecitabine plus docetaxel combination in patients with esophageal/gastric cancer. |
| 2009 – present DSMB leading statistician | Infant Male Circumcision in Gaborone, Botswana, and Surrounding Areas: Feasibility, Safety and Acceptability |

2. University administrative service:

| 2002 – 2006 | Director, Indiana University Cancer Center Biostatistics Core. |
| --- | --- |

University committee service:

   a. Departmental.

| 2004 – 2006 | Information Technology Advisory Committee (ITAC), member. |
| --- | --- |
| 2004 – 2006 | Biostatistics class coordinator (5% full-time effort) |

   b. Campus

A.416

| 2002 – 2006 | Indiana University Cancer Center Scientific research committee (SRC), member. |
|---|---|
| 2002 – 2006 | Indiana University Cancer Center Clinical Research Committee (CRC), member |
| 2002 – 2006 | Indiana University Cancer Center Clinical Trials Monitoring Committee (CTMC), member |
| 2002 – 2007 | Indiana University AIDS Clinical Trials Unit (ACTU), member |

  c. System

    Not applicable

3. Student service

Informal biostatistics review classes with Hematology Oncology fellows (Fall 2003).

OTHER PROFESSIONAL ACTIVITIES:

1. Invited presentations
   a. Grand rounds, IU Cancer Center, June 2, 2003
   b. Invited seminar, Colleges of Engineering, Science, Agricultural Sciences, Southern Illinois University, Carbondale, IL, April 27, 2004
   c. Presentation to Surgical Research Lab Meeting, October 3, 2005
   d. Grand rounds to Orthopedic Residents, January 4, 2006
   e. PEPFAR consultation, Washington, DC, February, 2008

2. Contributed presentations
   a. 17th International Workshop in Statistical Modeling, Chania, Greece, 2002
   b. International Biometrics Society ENAR meeting, Tampa, FL, 2003.
   c. 16th conference of the Hellenic Statistical Institute, Kavala, Greece, 2003

GRANTS AND FELLOWSHIPS (PI):

Active:

| 2016 – 2026 U01 AI 69911 (Yiannoutsos, FSPH[1]) | International Epidemiologic Databases to Evaluate AIDS (IEDEA). Principal Investigator ($16,500,500) | 35% |
|---|---|---|
| 2016 – 2027 R24 AI 124872 (Duda, VUMC[2]) | Harmonist: A Scalable Toolkit for Standardizing and Coordinating Data Sharing Across International Research Networks ($8,275,232) | 2% |

---

[1] FSPH: Indiana University Fairbanks School of Public Health
[2] VUMC: Vanderbilt University Medical Center

A.417

Constantin Yiannoutsos, Ph.D.

| | | |
|---|---|---|
| 2020 – 2025<br>R01 HD 098013<br>(Wiehe, IUSOM[3]) | Leveraging Data to Identify Opportunities to Address Insecure Care Connections and Poor Health Outcomes Among People Living with HIV ($3,799,533) | 10% |
| 2020 – 2025<br>U54 CA 254518<br>(Yiannoutsos, FSPH Biostatistics Data Management Core PI) | The East Africa Consortium for HPV and Cervical Cancer in Women Living with HIV/AIDS-Biostatistics and Data Management Core ($4,705,217) | 10% |
| 2021 – 2024<br>R01 HD 079214<br>(Ciaranello, HMS[4]) | Innovation Across the Spectrum of Pediatric HIV Care ($4,140,043) | 5% |
| 2018 – 2028<br>R37 AI 131771<br>(Shepherd, VUMC) | Statistical Methods and Designs for Correlated Outcome and Covariate Errors in Studies of HIV/AIDS ($273,145) | 5% |
| 2023 – 2025<br>R21 AI 177008<br>(Zhang, UK[5]) | Developing Statistical Methods on Event History Data Subject to Data Complexities for HIV Disease Progression and Policy Evaluation ($260, 755) | 5% |

Completed:

| | | |
|---|---|---|
| 2009 – 2011<br>U01AI069911-04S209<br>(Yiannoutsos, IUSOM) | East Africa IeDEA Regional Consortium (Malaria supplement). Principal Investigator ($299,385) | 10% |
| 2008 – 2013<br>R01 MH 081772<br>(Spudich, UCSF) | The Neuropathobiology of Primary HIV-1 Infection. PI, statistical core ($255,514) | 7% |
| 2008 – 2012<br>(Yiannoutsos, IUSOM) | National NeuroAIDS Tissue Consortium (NNTC) Data Coordinating Center (U01). Principal Investigator ($3,551,612) | 20% |
| 2009 – 2011<br>U01AI069911-04S109<br>(Yiannoutsos, IUSOM) | East Africa IeDEA Regional Consortium (ARRA supplement). Principal investigator ($885,850) | 0% |
| 2009 – 2010<br>U01 AI 69911<br>(Yiannoutsos, IUSOM) | East Africa IeDEA Regional Consortium (ARRA supplement). Principal Investigator ($808,234) | 10% |
| 2009 – 2010<br>U01 AI 69911<br>(Yiannoutsos, IUSOM) | HIV-related Malignancies in the East Africa IeDEA Consortium. Principal Investigator ($230,000) | 5% |

---

[3] IUSOM: IU School of Medicine
[4] HMS: Harvard Medical School and Mass General Hospital
[5] UK: University of Kentucky

A.418

Constantin Yiannoutsos, Ph.D.

| | | |
|---|---|---|
| 2008 – 2011 Contract, The Emmes Corporation (Brandt, The Emmes Corp) | Bioinfomatics support to National NeuroAIDS Tissue Consortium (NNTC) Data Coordinating Center. PI, statistical core ($407,462) | 10% |
| 2008 – 2009 U01 AI 69911 (Yiannoutsos, IUSOM) | International Epidemiologic Databases to Evaluate AIDS (IeDEA). NIAID supplement. HIV-1 Genotypic Diversity and drug resistance in western Kenya at times of political crisis. Principal Investigator ($74,971) | 0% |
| 2007 – 2008 U01 AI 69911 (Yiannoutsos, IUSOM) | Outreach to orphans and vulnerable children (OVC) in a comprehensive HIV clinical care program in Kenya. Principal Investigator ($92,412) | 5% |
| 2005 – 2011 R01 NS 36524 (Navia, Tufts) | *In-vivo* [1]H-MRS Studies of cerebral injury in HIV Dementia. PI, statistical core ($1,033,096) | 20% |
| 2008 – 2009 R21 DA 025487 (He, IUSOM) | Drug abuse and neuroAIDS in China. Co-investigator | 3% |
| 2007 – 2008 U01 AI 69911 (Yiannoutsos, IUSOM) | International Epidemiologic Databases to Evaluate AIDS (IEDEA). NICHD supplement. Principal Investigator ($80,000) | 0% |
| 2008 – 2009 U01 AI 69911 (Yiannoutsos, IUSOM) | HIV-related Malignancies in the East Africa IeDEA Consortium. Principal Investigator ($230,000) | 5% |
| 2007 – 2008 U01 AI 69911 (Yiannoutsos, IUSOM) | HIV-related Malignancies in the East Africa IeDEA Consortium. Principal Investigator ($230,000) | 5% |
| 1999 – 2003 R03 MH 60565 (Schifitto, Rochester) | Strategies for neurological evaluation in HIV infection. Co-investigator. ($175,758)[6] | 0% |
| 2001 – 2004 DAMD     17-01-1-0725 (Williams, IUSOM) | DNA Repair & cell Cycle therapeutic targets for ovarian cancer. Co-investigator ($64,775) | 0% |
| 2002 – 2007 R01 CA 074177 (Clapp, IUSOM) | Neurofibromatosis Type 1 gene regulates myelopoiesis. Co-investigator ($92,808) | 10% |
| 2003 – 2005 R21 CA 097721 | Extracranial stereotactic radioablation in lung cancer ($18,068). Co-investigator | 5% |

---

[6] Total biostatistics budget in parenthesis

A.419

Constantin Yiannoutsos, Ph.D.

(McGarry, IUSOM)

| | | |
|---|---|---|
| 2006 – 2007<br>U01 AI 069911-01S1<br>(Yiannoutsos, IUSOM) | Monitoring and evaluation, patient surveillance and loss to follow-up. <u>Principal Investigator</u> ($123,000) | 10% |
| 2006 – 2007<br>U01 AI069911<br>(Yiannoutsos, IUSOM) | International Epidemiologic Databases to Evaluate AIDS (IEDEA). NICHD supplement. <u>Principal Investigator</u> ($60,000) | 0% |
| 2004 – 2008<br>P30 CA082709<br>(Williams, IUSOM) | Cancer Center Support Grant. Director, Biostatistics Shared Facility ($389,961). <u>Director of shared facility.</u> | 15% |
| 2004 – 2009<br>R01 CA106298<br>(Kelley, IUSOM) | Imbalancing DNA BER to enhance ovarian tumor sensitivity. <u>Co-investigator</u> ($47,063) | 5% |
| 2004 – 2009<br>W81XWH-04-0468 (Sledge, IUSOM/HOG) | Breast Cancer Center of Excellence. <u>Co-investigator</u> ($324,240) | 10% |

## PRINT AND ELECTRONIC PUBLICATIONS

I.   Teaching: None

II.  Refereed publications

1. Kuo L, and **Yiannoutsos CT**: "Empirical Bayes Risk Evaluation With Type-II Censored Data", Journal of Statistical Computation and Simulation, 48:195-206, 1994
2. Navia, BA, Dafni U, Simpson, D, Tucker T, Slasor P, McArthur JC, **Yiannoutsos CT**, Zaborski, L, and Lipton, SA: "A Phase I/II Trial of Nimodipine for the Treatment of Neurological Manifestations Associated with HIV Infection, Including AIDS Dementia Complex and Peripheral Neuropathy. Neurology, 1998; 51:221-228
3. Hall CD, Dafni U, Simpson D, Clifford D, Wetherill P, Cohen B, McArthur JC, Hollander H, **Yiannoutsos CT**[7], Major E,Millar L, Timpone J: Failure of Cytosine Arabinoside Therapy of Human Immunodeficiency Virus-I Associated Progressive Multifocal Leucoencephalopathy. New England Journal of Medicine, 1998; 338:19, 1345-51
4. Kieburtz K, Simpson D, **Yiannoutsos C**, Max MB, Hall CD, Ellis RJ, Marra CM, McKendall R, Singer E, Dal Pan GJ, Clifford DB , Tucker T, Cohen B and the ACTG 242 Protocol Team.  A randomized controlled trial of amitriptyline and mexiletine for painful neuropathy in HIV infection.  Neurology, 1998; 51:1682-8.

---

[7] The name is misspelled in the publication ("Yainnoutsos")

A.420

Constantin Yiannoutsos, Ph.D.

5. Clifford DB, **Yiannoutsos C**, Glicksman M, Simpson DM, Singer EJ, Piliero PJ, Marra CM, Francis GS, McArthur JC, Tyler KL, Tselis AC, Hyslop NE. HAART improves prognosis in HIV-associated progressive multifocal leukoencephalopathy.  Neurology 1999; 52:623-625.

6. Chen, MH, Ibrahim, JG, and **Yiannoutsos C**. Prior Elicitation, Variable Selection and Bayesian Computation for Logistic Regression Models, Journal of the Royal Statistical Society, Series B, 1999; 61:223-242.

7. Rostasy K, Monti L, Kneissl M, **Yiannoutsos CT**, Bell J, Hedreen JC, Navia BA. HIV infection, iNOS expression and microglial activation: pathogenetic relationship to the AIDS dementia complex. Annals of Neurology, 1999; 46:207-216.

8. **Yiannoutsos CT**, Major EO, Curfman B, Jensen PN, Gravell M, Hou J, Clifford DB, Hall CD.  Relation of JC virus DNA in the CSF to survival in AIDS patients with biopsy-proven Progressive Multifocal Leukoencephalopathy. Annals of Neurology, 1999; 45:816-820.

9. Price RW, **Yiannoutsos CT**, Clifford DB, Zaborski L, Tselis A, Sidtis JJ, Cohen B, Hall CD, Erice A, and Henry K. Neurological outcomes in late-stage HIV-1 infection: adverse influence of neurological impairment on Survival and protective effect of antiviral therapy.  AIDS, 1999; 13:1677-1686

10. Post MJD, **Yiannoutsos C**, Simpson D, Booss J, Clifford DB, Cohen B, McArthur JC, Hall CD and the ACTG 243 team.  PML in AIDS: An MR/Neurological/Pathological correlation.  Are there any MR or neurological findings predictive of patient survival? 1999.  Am J Neuroradiol. 1999; 20:1896-1906.

11. McArthur, JC, **Yiannoutsos C**, Simpson, DM, Adornato BT, Singer EJ, Hollander H, Marra C,  Rubin M, Cohen BA, Tucker T, Navia BA, Schifitto G, Katzenstein D. Rask C, Zaborski L, Smith ME, Shriver S, Millar L, Clifford DB. A phase II trial of nerve growth factor for sensory neuropathy associated with HIV infection.  Neurology, 2000; 54:1080-1088.

12. Fichtenbaum, CJ, Koletar S, **Yiannoutsos CT**, Holland F, Pottage J, Cohn S, Walawander AL, Frame P, Feinberg J, Saag M, Van der Horst C, Powderly WG, Refractory Mucosal Candidiasis in Advanced Human Immunodeficiency Virus Infection.  Journal of Infectious Diseases, 2000; 30:749-756

13. Hewitt RG, **Yiannoutsos CT**, Higgs ES, Carey JT, Geiseler PJ, Soave R, Rosenberg R, Vasquez GJ, Wheat LJ, Fass RJ, Antonijevic Z, Walawander AL, Flanigan TP, Bender JF.  Paromomycin for the treatment of cryptosporidiosis in patients with advanced HIV infection: a randomized, double-blind, placebo-controlled trial Journal of Infectious Diseases, 2000; 31: 1084-1092

14. Rostasy K, Monti L, **Yiannoutsos CT**, Wu J, Bell J, Hedreen J Navia BA.TNF-α expression, NF-κb activation and apoptosis in the AIDS Dementia Complex. Journal of Neurovirology, 2000; 6: 537-543

15. **Yiannoutsos CT**, De Luca A.  Designs for clinical trials to test the efficacy of therapeutics in progressive multifocal leukoencephalopathy. Journal of Neurovirology, 2001; 7: 369-374

16. Schifitto G, Simpson D, Haidich AB, **Yiannoutsos CT**, McArthur JC, for the ACTG 291 Protocol Study Team.  Long-Term Treatment with Open Label Nerve Growth Factor for HIV-Associated Sensory Neuropathy.  Neurology, 2001; 57: 1313-1316.

A.421

17. Simpson D, Katzenstein D, Haidich AB, **Yiannoutsos CT**, Millington D, McArthur JC and the ACTG 291/860 protocol study teams. Plasma Carnitine in HIV-Associated Neuropathy. AIDS, 2001; 15: 2207-2208

18. Simpson DM, Haidich AB, Schifitto G, **Yiannoutsos CT**, Geraci AP, McArthur JC, Katzenstein DA. Severity of HIV-associated Neuropathy is Associated with Plasma HIV-1 RNA Levels. AIDS, 2002; 16: 407-412.

19. Polydefkis M, **Yiannoutsos CT**, Shriver S, Simpson DM, Cohen BA, Adornato BT, Hollander H, Marra CM, Clifford DB and McArthur JC.  Intraepidermal nerve fiber density in HIV-associated sensory neuropathy. Neurology, 2002; 58: 115-119

20. Lee PL, **Yiannoutsos CT**, Ernst T, Chang L, Marra CM, Jarvik JG, Richards TL, Kwok EW, Kolson DL, Simpson D, Tang CY, Schifitto G, Ketonen LM, Meyerhoff DJ, Lenkinski RE, Gonzalez RG, Navia BA. MRS study of the AIDS dementia complex: Validation and preliminary analysis.  J Magn Reson Imaging. 2003; 17:625-33

21. Smith, KM, Daly M, Bauer L, Fischer M, **Yiannoutsos CT**, Bauer L, Barkley R, Navia BA.  Association of the Dopamine Beta Hydroxylase gene with Attention Deficit Hyperactivity Disorder: Genetic Analysis of the Milwaukee Longitudinal Study.  Am J Med Genet. 2003; 119B:77-85

22. Rostasy K, Egles C, Chauhan A, Kneissl M, Bahrani P, **Yiannoutsos C**, Hunter DD, Nath A, Hedreen JC, Navia BA. SDF-1α is expressed in astrocytes and neurons in the AIDS dementia complex: an in vivo and in vitro study.  J Neuropathol Exp Neurol. 2003; 62(6):617-26

23. Wiesenauer CA Schmidt CM, Cummings OW, **Yiannoutsos CT**, Howard TJ, Wiebke EA, Goulet RJ, McHenry L, Sherman S, Lehman GA, Cramer H, Madura JA.  Preoperative predictors of malignancy in pancreatic intraductal papillary mucinous neoplasms. Arch Surg; 2003; 138:610-618

24. Nakas C, **Yiannoutsos CT**, Bosch RJ, Moyssiadis C.  Assessment of diagnostic markers by goodness-of-fit tests. Stat Med; 2003; 22:2503-2513.

25. Vaena DA, Walker P, Pennington K, Stephens A, Stender MJ, **Yiannoutsos CT**, Young C, Stoner C, Cripe LD.  Phase II study of low-dose topotecan in myelodysplastic syndromes: a Hoosier Oncology Group (HOG) study.  Leuk Res; 2004; 28:49-52.

26. Schneider BP, Kesler KA, Brooks JA, **Yiannoutsos CT** and Einhorn LH. Outcome of patients with residual germ cell or non-germ cell malignancy after resection of primary mediastinal non-seminomatous germ cell cancer.  J Clin Oncol. 2004; 22:1195-1200

27. Goldman M, Zackin R, Fichtenbaum CJ, Skiest DJ, Koletar SL, Hafner R, Wheat LJ, Nyangweso PM, **Yiannoutsos CT**, Schnizlein-Bick CT, Owens S, Aberg JA; AIDS Clinical Trials Group A5038 Study Group.  Safety of discontinuation of maintenance therapy for disseminated histoplasmosis after immunologic response to antiretroviral therapy.  Clin Infect Dis. 2004; 38:1485-1489

28. Schmidt CM, Powell ES, **Yiannoutsos CT**, Howard TJ, Wiebke EA, Wiesenauer CA, Baumgardner JA, Cummings OW, Lillemoe KD, Jacobson L, Broadie TA, Goulet RJ, Curie EA, Cardenes H, Watkins JM, Loehrer PJ and Madura JA.  Pancreaticoduodenectomy: A twenty year experience in 516 patients. Arch Surgery 2004; 139:718-727.

29. Nakas CT, **Yiannoutsos CT**.  Ordered multiple class ROC analysis with continuous measurements.  Stat Med 2004; 23:3437-3449

A.422

30. **Yiannoutsos CT**, Ernst T, Chang L, Lee PL, Richards T, Marra C, Meyerhoff DJ, Jarvic J, Kolson D, Schifitto G, Ellis RJ, Swindells, Simpson DM, Miller EN, Gonzalez RG, Navia BA. Patterns of regional brain metabolism and diagnostic utility of proton MRS in AIDS Dementia Complex. Neuroimage 2004; 23: 928:935.

31. Chang L, Lee PL, **Yiannoutsos CT**, Ernst T, Marra CM, Schifitto G, Miller EN, Jarvik J, Kolson D, Gonzalez RG, Navia BA. A Multicenter *in-vivo* proton MRS study of HIV-associated brain injury. Neuroimage 2004; 23:1336-1347

32. Villella AD, Yao J, Getty RR Juliar BE, **Yiannoutsos CT**, Hartwell JR, Cai S, Sadat MA, Cornetta K, Williams DA, Pollok KE. Real-Time PCR: An effective tool for measuring transduction efficiency in human hematopoietic progenitor cells. Mol Ther, 2005; 11:483-491.

33. Li J, Juliar BE, **Yiannoutsos CT**, Ansari R, Fox E, Fisch MJ, Einhorn LH, Sweeney CJ. Weekly paclitaxel and gemcitabine in advanced transitional cell carcinoma of the urothelium: A Phase II Hoosier Oncology Group study. J Clin Onc, 2005; 23: 1185-1191.

34. Li L, Shi H, **Yiannoutsos CT**, Huang T-H-M, Nephew KP. Epigenetic hypothesis tests for methylation and acetylation in a triple microarray system. J Comp Biol, 2005; 12:270-390

35. Srour EF, Tong X, Sung KW, Plett PA, Rice S, Daggy J, **Yiannoutsos CT**, Abonour R, Orschell CM. Cytokine modulation of proliferation kinetics and primitive hematopoietic potential on individual $CD34^+CD38^{-/Io}$ cells in $G_0$ during successive *in vitro* cell divisions. Blood, 2005; 105:3109-16

36. Fakiris AJ, Cardenes HR, Moore DH, Reddy SR, Look KY, **Yiannoutsos CT**, Randall ME. Intraperitoneal radioactive phosphorus ($^{32}P$) and vaginal brachytherapy as adjuvant treatment for uterine papillary serous carcinoma and clear cell carcinoma: A Phase II Hoosier Oncology Group (97-1) study. Gyn Onc, 2005; 96:818-823

37. Rostasy K, Gorgun G, Kleyner Y, Garcia A, Kramer M, Melanson SM, Mathys J-M, **Yiannoutsos CT**, Skolnik PR, Navia BA. TNF-α leads to increased cell surface expression of CXCR4 in SK-N-MC cells. J Neurovirol 2005; 11:247-55.

38. Sweeney C, Liu G, **Yiannoutsos CT**, Kolesar J, Horvath D, Staab MJ, Fife K, Armstrong V, Treston A, Sidor C, Wilding G. A Phase II multicenter, randomized, double-blind, safety, PK, PD, and efficacy study of oral 2-methoxyestradiol in hormone refractory prostate cancer. Clin Cancer Res, 2005; 11: 6625-6633

39. Ellis RJ, Evans SR, Clifford DB, Moo L, McArthur JC, Collier AC, Benson C, Bosch R, Simpson D, **Yiannoutsos CT**, Yang Y, Robertson K; Neurological AIDS Research Consortium; AIDS Clinical Trials Group Study Teams A5001 and A362. J Neurovirol, 2005; 11:503-11.

40. Wools-Kaloustian K, Kimaiyo S, Diero L, Siika AM, Sidle J, **Yiannoutsos CT**, Musick BS, Einterz RM, Fife KH, Tierney, WM Viability and effectiveness of large-scale HIV treatment initiatives in sub-Saharan Africa: experience from western Kenya. AIDS, 2006; 20:41-48.

41. Kurup A, Murry DJ, Dobrolecki L, Estes D, **Yiannoutsos CT**, Mariano L, Sidor C, Hickey R, Hanna N. Recombinant human angiostatin (rhAngiostatin) in combination with paclitaxel and carboplatin in patients with advanced non-

A.423

small cell lung cancer: a phase II study from Indiana University. Ann Oncol, 2006; 17:97-103.

42. Wruck LM, **Yiannoutsos CT**, Hughes, MD.   A sequential design to estimate sensitivity and specificity of a diagnostic test. Stat Med, 2006; 25:3458-3473

43. Matei D, Emerson RE, Lai YC, Baldridge LA, Rao J, **Yiannoutsos C**, Donner DD. Autocrine activation of PDGFRalpha promotes the progression of ovarian cancer. Oncogene, 2006; 25:2060-2069

44. Schifitto G, **Yiannoutsos CT**, Simpson D, Navia BA. A Placebo-controlled study of memantine for the treatment of HIV-associated sensory neuropathy. J Neurovirol, 2006; 12:328-331

45. Nyandiko WM, Ayaya S, Nabakwe E, Tenge C, Sidle JE, **Yiannoutsos CT**, Musick BS, Kigotho E, Wools-Kaloustian K, Tierney WM.  Outcomes of HIV-infected children on anti-retroviral therapy at AMPATH HIV clinics in Western Kenya. JAIDS, 2006; 43:418-425

46. Timmerman R, McGarry R, **Yiannoutsos C**, Papiez L, Tudor K, DeLuca J, Ewing M, Abdulrahman R, DesRosiers C, Williams M, Fletcher J. Excessive toxicity when treating central tumors in a phase II study of stereotactic body radiation therapy for medically inoperable early-stage lung cancer. J Clin Oncol, 2006; 24:4833-4839.

47. Suvannasankha A, Fausel C, Juliar BE, **Yiannoutsos CT**, FisherWB, Ansari RH, Wood LL, Smith GG, Cripe LD, Abonour R.  Final report of Toxicity and Efficacy of a Phase II Study of Oral Cyclophosphamide, Thalidomide, and Prednisone (CTP) for Patients with Relapsed or Refractory Multiple Myeloma: A Hoosier Oncology Group Trial: HEM01-21. Oncologist, 2007; 12:99-106.

48. Odero, W, Rotich, J, **Yiannoutsos CT**, Ouna T, Tierney WM. Innovative approaches to application of information technology in disease injury surveillance and prevention in Western Kenya. J Biomed Inform, 2007; 40:390-397.

49. Yip-Schneider MT, Wu H, Ralstin M, **Yiannoutsos C**, Crooks PA, Neelakantan S, Noble S, Nakshatri H, Sweeney CJ, Schmidt CM.  Suppression of pancreatic tumor growth by combination chemotherapy with sulindac and LC-1 is associated with cyclin D1 inhibition *in vivo*. Mol Can Therapeutics, 2007; 6:1736-1744.

50. Schmidt CM, White PB, Waters JA, **Yiannoutsos CT**, Cummings OW, Baker M, Howard TJ, Zyromski NJ, Nakeeb A, DeWitt JM, Akisik FM, Sherman S, Pitt HA, Lillemoe KD. Intraductal Papillary Mucinous Neoplasms: Predictors of Malignant and Invasive Pathology. Ann Surg, 2007; 246: 644-654.

51. Nyandiko WM, Greenberg D, Shany E, **Yiannoutsos CT**, Musick B, Mwangi AW. Nasopharyngeal streptococcus pneumoniae among under-five year old children at the Moi Teaching and Referral Hospital, Eldoret, Kenya. East Afr Med J. 2007; 84:156-62.

52. Paul R, **Yiannoutsos CT**, Miller EN, Singer E, Lee, P-L, Chang L, Marra CM, Schifitto G, Ernst T, Richards T, Jarvik J, Price R, Meyerhoff DJ, Kolson D, Ellis RJ, Gonzalez RG, Lenkinski R, Cohen RA, Navia BA.  Proton MRS and Neuropsychological Correlates in AIDS Dementia Complex: Evidence of Subcortical Specificity. J Neuropsychiatry Clin Neurosci, 2007; 19:283-292.

53. Schifitto G, Navia BA, **Yiannoutsos CT**, Marra CM, Chang L, Ernst T, Jarvik JG, Miller EN, Singer EJ, Ellis RJ, Kolson DL, Simpson D, Nath A, Berger J, Shriver SL, Millar LL, Colquhoun D, Lenkinski R, Gonzalez RG, Lipton SA; Adult AIDS Clinical Trial Group (ACTG) 301; 700 Teams; HIV MRS

A.424

Consortium.  A phase II trial of memantine for HIV-associated cognitive impairment: A neuropsychological and proton MRS study. AIDS, 2007; 21(14):1877-1886.

54. **Yiannoutsos CT**, Nakas CT, Navia BA. Assessing multiple-group diagnostic problems with multi-dimensional receiver operating characteristic surfaces: Application to HIV-related neurological injury. Neuroimage, 2008; 40: 248-255.

55. Yu M, **Yiannoutsos CT**.  Bivariate sequential design for Phase II trials with trade-off.  J JP Biostat 2008; 1: 175-195

56. Sinclair E, Ronquillo R, Lollo N, **Yiannoutsos CT**, Deeks SG, Hunt P, Spudich S, Price RW. Antiretroviral treatment effect on immune activation reduces cerebrospinal fluid HIV-1 infection. JAIDS. 2008; 40:248-255.

57. Henderson M, McGarry R, **Yiannoutsos CT**, Fakiris A, Hoopes D, Williams M, Timmerman R. Baseline pulmonary function as a predictor for survival and decline in pulmonary Function over time in patients undergoing stereotactic body radiotherapy for the treatment of stage I non-small cell lung cancer. Int J Rad Oncol Biol Phys. 2008; 72:404-409

58. Paul RH, Ernst T, Brickman AM, **Yiannoutsos CT**, Tate DF, Cohen RA, Navia BA, for the ACTG 301 and 700 teams and the HIV MRS Consortium. Relative sensitivity of magnetic resonance spectroscopy and quantitative MRI to cognitive function among non-demented individuals infected with HIV. J Int Neuropsych Soc. 2008; 14:725-33.

59. Hanna N, Neubauer M, **Yiannoutsos C**, McGarry R,  Arseneau J, Ansari R, Reynolds C, Govindan R, Melnyk A, Fisher W, Richards D, Bruetman D, Anderson T, Chowhan N, Nattam S, Mantravadi P, Johnson C, Breen T, White A, Einhorn L. Phase III Study of Cisplatin, Etoposide, and Concurrent Chest Radiation With or Without Consolidation Docetaxel in Patients With Inoperable Stage III Non-Small-Cell Lung Cancer: The Hoosier Oncology Group and U.S. Oncology. JCO, 2008; 25:5755-5760.

60. An M-W, Frangakis CE, Musick BS, **Yiannoutsos CT**. The need for double-sampling designs in survival studies: An application to monitor PEPFAR. Biometrics, 2009; 65:301-306.

61. **Yiannoutsos CT**, An M-W, Frangakis CE, Musick BS, Braitstein P, Wools-Kaloustian K, Ochieng D, Martin JN, Bacon M, Kimaiyo S. Sampling-Based Approaches to Improve Estimation of Mortality among Patient Dropouts: Experience from a Large PEPFAR-Funded Program in Western Kenya. PLoS ONE, 2009; 3(12): e3843 doi:10.1371/journal.pone.0003843.

62. Wools-Kaloustian K, Kimaiyo S, Musick BS, Sidle J, Siika A, Nyandiko W, Einterz R, Tierney WM, **Yiannoutsos CT**. The Impact of the President's Emergency Plan for AIDS Relief (PEPFAR) on expansion of HIV care services in western Kenya.  AIDS, 2009; 23: 195-201.

63. Seebregts CJ, Mamlin BW, Biondich PG, Fraser HSF, Wolfe BA, Jazayeri D, Allen C, Miranda J, Baker E, Fourie C, Lesh N, Kanter A, **Yiannoutsos C**, Bailey C and the OpenMRS Implementers Network. The OpenMRS Implementers Network. JIMI 2009; 78: 711-720.

64. Fakiris AJ, McGarry RC, **Yiannoutsos CT**, Papiez L, Williams M, Henderson MA, Timmerman R. Stereotactic Body Radiation Therapy for Early-Stage Non-Small-Cell Lung Carcinoma: 4 Year Results of a Prospective Phase II Study. Int J Rad Onc Biol Phys. 2009; 76: 677-682

A.425

65. Alonzo TA, Nakas CT, **Yiannoutsos CT**, Bucher S. A comparison of tests for restricted in the three-class case.  Stat Med 2009; 28:1144-1158.

66. Chouliaras G, **Yiannoutsos CT**, Berdoukas V, Ladis V. Cardiac related death in thalassaemia major: Time trend and risk factors in a large Greek Unit.  2009; Eur J Haematology 2009; 82:381-387.

67. Schmidt CM, Choi J, Powell ES, Wiebke EA, Howard TJ, **Yiannoutsos CT**, Nakeeb A, Lillemoe KD, Madura JA. Predictors of Pancreaticoenteric Anastomotic Leak or Fistula and Effect on patient Outcomes Following Pancreaticoduodenectomy. HPB Surg. 2009; Article ID 404520 doi:10.1155/2009/404520

68. Joseph J, Clifford D, Douglas SD, Fox H, Gendelman HE, Gonzalez-Scarano F, Grant I, Major E, McArthur J; NeuroAIDS Research Participants. Planning future strategies for domestic and international NeuroAIDS research, July 24-25, 2008. 2009; J Neuroimmune Pharmacol, 4(3): 283-297.

69. Braitstein P, Nyandiko W, Vreeman R, Wools-Kaloustian K, Sang E, Musick B, Sidle J, **Yiannoutsos C**, Ayaya S, Carter EJ. The clinical burden of tuberculosis among human immunodeficiency virus-infected children in western Kenya and the impact of combination antiretroviral treatment. Ped Infect Dis J, 2009; 28:626-632.

70. **Yiannoutsos CT**. Modeling AIDS survival after initiation of antiretroviral treatment using Weibull models with change points. JIAS, 2009; 12:9

71. Henderson MA, Hoopes D, Fletcher J, Lin P-F, Tann M, **Yiannoutsos CT**, Williams M, Fakiris AJ, McGarry R, Timmerman R. A Pilot Trial of Serial FDG-PET in Patients with Medically Inoperable Stage I Non-Small Cell Lung Cancer Treated with Hypofractionated Stereotactic Body Radiotherapy (SBRT).  Int J Radiat Oncol Biol 2010; 76(3):789-795.

72. Ochieng-Ooko V, Ochieng D, Sidle JE, Holdsworth M, Wools-Kaloustian K, Siika AM, **Yiannoutsos CT**, Owiti M, Kimaiyo S, Braitstein P. Influence of gender and loss to follow-up in a Large HIV treatment programe in western Kenya. 2010. Bull WHO; 88(9):681-688.

73. Schifitto G; **Yiannoutsos CT**, Ernst T, Navia BA, Nath A, Sacktor N, Anderson C, Marra CM, Clifford DB, and the ACTG 5114 Team. Selegiline and Oxidative Stress in HIV - Associated Cognitive Impairment. Neurology, 2009; 73(23):1975-1981

74. Geng EH, Bangsberg DR, Musinguzi N, Emenyonu N, Mwebesa Bwana B, **Yiannoutsos CT**,  Glidden DV. Deeks SG, Martin JN. Understanding reasons for and outcomes of patients lost to follow-up in antiretroviral therapy programs in Africa through a sampling-based approach. J Acquir Immune Defic Syndr. 2010; 53: 405-411

75. Cohen R, Harezlak J, Schifitto G, Hana G, Clark U, Gongvatana A, Paul R, Singer E, Paul R, Taylor M, Thompson P, Alger J, Brown M, Zhong J, Campbell T, Singer E, McMahon D, Tso Y, **Yiannoutsos CT**, Navia B and the HIV Neuroimaging Consortium. Effects of Nadir CD4 count and duration of HIV infection on brain volumes in the HAART era; J Neurovirol, 2010, 16(1):25-32.

76. Tuboi SH, Pacheco AG, Harrison LH, Stone RA, May M, Brinkhof MW, Dabis F, Egger M, Nash D, Bangsberg D, Braitstein P, **Yiannoutsos CT**, Wood R, Sprinz E, Schechter M. Mortality associated with discordant responses to antiretroviral therapy in resource-constrained settings. J Acquir Immune Defic Syndr, 2010; 53(1):70-7.

A.426

77.   Nyandiko WM,  Nyunya B, Bucher-Yiannoutsos S, Akhaabi P, Lane K, **Yiannoutsos CT**, Musick BS, Sidle J, Wools-Kaloustian K. Outcomes of HIV-exposed children in western Kenya: Efficacy of total pMTCT in a resource-constrained setting. J Acquir Immune Defic Syndr, 2010; 54(1): 42-50.

78.   Tierney WM, Achieng M, Baker E, Bell A, Biondich P, Braitstein P, Kayiwa D, Kimaiyo S, Mamlin B, McKown B, Musinguzi N, Nyandiko W, Rotich J, Sidle J, Siika A, Were M, Wolfe B, Wools-Kaloustian K, Yeung A, **Yiannoutsos C** and the Tanzania-Uganda OpenMRS Consortium. Experience implementing electronic health records in three East African countries. Stud Health Technol Inform 2010; 160:371-375.

79.   Braitstein P, Katshcke A, Shen C, Sang E, Nyandiko W, Ochieng VO, Vreeman R, **Yiannoutsos C**, Wools-Kaloustian K, Ayaya S. Retention of HIV-infected and exposed children in a comprehensive HIV clinical care program in western Kenya. Trop Med Int Health; 2010, 15:833-41

80.   Geng EH, Glidden DV, Emenyonu N, Musinguzi N,  Bwana BM, Neilands TB, Muyindike W, **Yiannoutsos CT**, Deeks SG, Bangsberg DR, Martin JN. Tracking a sample of patients lost to follow-up has a major impact on understanding determinants of survival in HIV-infected patients on antiretroviral therapy in Africa. 2010; Trop Med Int Health, Suppl 1:63-9.

81.   Cohen RA Harezlak J, Gongvatana A, Buchthal S, Schifitto G, Clark U, Paul R, Taylor M, Thompson P, Tate D, Alger J, Brown M, Zhong J, Campbell T, Singer E, Daar E, McMahon D, Tso Y, **Yiannoutsos CT**, Navia B, for the HIV Neuroimaging Consortium. Cerebral metabolite abnormalities in HIV are associated with cortical and subcortical volumes. J Neurovirol, 2010; 16:25-32.

82.   Nakas CT, Alonzo TA, **Yiannoutsos CT**. Accuracy and cut-off point selection in three-class classification problems using a generalization of the Youden index. Stat Med, 2010; 29:2946-2955.

83.   Turrini O, Waters JA, Schnelldorfer T, Lillemoe KD, **Yiannoutsos CT**, Farnell MB, Sarr MG, Schmidt CM. Invasive intraductal papillary mucinous neoplasm: predictors of survival and role of adjuvant therapy; HPB, 2010; 12:447-455.

84.   Harezlak J, Buchthal S, Taylor M, Schifitto G, Zhong J, Daar E, Alger J, Brown M, Singer E, Campbell  T, McMahon D, Tso Y, Matesan J,  Ernst T, **Yiannoutsos C**, Cohen R, Navia BA  and the HIV Neuroimaging Consortium. Persistence of HIV- associated cognitive impairment, inflammation and neuronal injury in the HAART era; AIDS, 2011; 25:625-633

85.   Brinkhof M, Spycher B, **Yiannoutsos C**, Weigel R, Wood R, Messou E, Boulle A, Sterne J. Adjusting Mortality for Loss to Follow-up: Analysis of five ART programmes in sub-Saharan Africa.  PLoS ONE, 2010; 5(11):e14149.

86.   Zhu T, Hu R, Qiu X, Gaugh M, Taylor M, Tso Y, **Yiannoutsos CT**, Navia BA, Mori S, Schifitto G, Zhong J. Evaluation of Accuracy and Precision of Multi-Center DTI Measurements: Neuroimage; 2011; 56:1398-1411

87.   Tate, DF, Sampat M, Harezlak J, Fiecas, M, Hogan J, Dewey J McCaffrey D, Branson D, Russell T, Conley J, Taylor M, Schifitto G. Zhong J, Daar ES, Alger J, Brown M, Singer E, Campbell T, McMahon D, Tso Y, Matesan J, Letendre S, Paulose S, Gaugh, Tripoli C, **Yiannoutsos C,** Bigler ED, Cohen RA, Guttmann CRG, Navia B. Regional Areas and Widths of the Midsagittal Corpus Callosum Among HIV-Infected Patients on Stable Antiretroviral Therapies. J Neurovirol, 2011; 17:368-379.

88.   Waters JA, Schnelldorfer T, Aguilar-Saavedra JR, Chen J-H, **Yiannoutsos CT**, Lillemoe KD, Farnell MB, Sarr, MG; Schmidt CM.  Survival after resection for

A.427

Invasive intraductal papillary mucinous neoplasm and for pancreatic adenocarcinoma: A Multi-institutional comparison according to American Joint Committee on Cancer Stage. J Am Coll Surg, 2011; 213:275-83.

89. Zhu T, Hu R, Qiu X, Taylor M, Tso Y, **Yiannoutsos C**, Navia B, Mori S, Schifitto G, Zhong J.  Quantification of accuracy and precision of multi-center DTI Measurements: A diffusion phantom and human brain study. Neuroimage, 2011; 56(3):1398-411.

90. Letendre S, Zheng J, Kaul M, Lopez A, **Yiannoutsos CT**, Ellis RJ, Taylor M, Marquie-Beck J, Zimmerman J, Lipton S, Gendelman H, Navia BA and the ACTG 301 and 700 Teams. Chemokines in cerebrospinal fluid correlate with patterns of cerebral injury as measured by magnetic resonance spectroscopy. J Neurovirol, 2011; 17:63-69

91. Braithwaite RS, Nucifora KA, **Yiannoutsos CT**, Musick BS, Kimaiyo S, Diero L, Bacon M, Wools-Kaloustian K. Alternative antiretroviral monitoring strategies for HIV-infected patients in resource-limited settings: Opportunities to save more lives? J Int AIDS Soc. 2011;14:38.

92. Braitstein P, Songok J, Vreeman R, Wools-Kaloustian K, Koskei P, Walusuna L, Ayaya S, Nyandiko W, **Yiannoutsos C**.  'Wamepotea' (They have become lost): Outcomes of HIV-positive and HIV-exposed children lost to follow-up from a large HIV treatment program in western Kenya. J Acquir Immune Defic Syndr. 2011; 57:e40-46.

93. Chi BH, **Yiannoutsos C**, Westfall AO, Newman JE, Zhou J, Brinkhof MWG, Mwango A, Balestre E, Carriquiry, G, Sirisanthana T, Mukumbi H, Martin JN, Grimsrud A. Bacon M, Thiebaut R. Universal definition of loss to follow-up in HIV treatment programs: a statistical analysis of 111 facilities in Africa, Asia, and Latin America.. PLoS Medicine, 2011; 8:e1001111.

94. Geng, EH, Hunt PW, Diero LO, Somi GR, Kimaiyo S, Okong P, Bangsberg DR, Bwana MB, Cohen CR, Otieno JA, Wabwire D, Elul B, Nash D, Easterbrook PJ, Braitstein P, Musick BS, Martin JN, **Yiannoutsos CT**, Wools-Kaloustian K. Trends Trends in the clinical characteristics of HIV-infected patients initiating antiretroviral therapy in Kenya, Uganda and Tanzania between 2002 and 2009.J Int AIDS Soc, 2011; 14:46.

95. Moore DM, **Yiannoutsos CT,** Musick BS, Tappero J, Degerman R, Campbell J, Were W, Kaharuza F, Alexander LN, Downing R, Mermin J. Determinants of early and late mortality among HIV-infected individuals receiving home-based antiretroviral therapy in rural Uganda. Acquir Immune Defic Syndr. 2011 58:289-96.

96. Geng EH, Glidden DV, Bwana MB, Musinguzi N, Emenyonu N, Muyindike W, Christopoulos KA, Neilands TB, **Yiannoutsos CT**, Deeks SG, Bangsberg DR, Martin JN. Retention in care and connection to care among HIV-infected patients on antiretroviral therapy in Africa: Estimation via a sampling-based approach. PLoS One. 2011; 6:e21797.

97. Leroy, V, Malateste K, Rabie H, Lumbiganon P, Ayaya S, Dicko F, Davies MA, Kariminia A, Wools-Kaloustian K, Aka A, Phiri S, Aurpibul, L, **Yiannoutsos, CT**, Signaté-Sy H, Dabis F for the International IeDEA Pediatric Working Group. 18-month mortality and loss-to-follow-up in antiretroviral treated children in Asia and Africa. The IeDEA pediatric multiregional collaboration. JAIDS. 2013; 62(2):208-19.

A.428

98. Geng EH, Glidden DV, Bangsberg DR, Bwana MB, Musinguzi N, Nash D, Metcalfe JZ, **Yiannoutsos CT**, Martin JN, Petersen ML. A causal framework for understanding the effect of losses to follow-up on epidemiologic analyses in clinic-based cohorts: the case of HIV-infected patients on antiretroviral therapy in Africa.  Am J Epidemiol. 2012;175:1080-1087

99. **Yiannoutsos CT**, Johnson LF, Boulle A, Musick BS, Gsponer T, Balestre E, Law M, Shepherd BE, Egger M for the International Epidemiologic Databases to Evaluate AIDS (IeDEA) Collaboration. Estimated mortality of adult HIV-infected patients starting treatment with combination antiretroviral therapy. JSTI. 2012; 88 Suppl 2:i33-43.

100. Gelman BB, Lisinicchia JG, Morgello S, Masliah E, Commins D, Achim CL, Fox HS, Kolson DL, Grant I,  Moore DJ, Singer E, **Yiannoutsos CT**, Sherman S, Gensler G, Chen T, Soukup VM. Neurovirological correlation with HIV-associated neurocognitive disorders and encephalitis in a HAART-era cohort JAIDS, 2013; 62:487-495.

101. Siika AM, **Yiannoutsos CT**, Wools-Kaloustian KK, Musick BS, Mwangi AW, Diero LO, Kimaiyo SN, Tierney WM, Carter JE. Tuberculosis is associated with  worse clinical outcomes in HIV-infected African patients on antiretroviral therapy. PLoS ONE, 2013; 8:e53022

102. Geng EH, Muyindike W, Glidden DV, Bangsberg DR, Neilands TB, Bernheimer I, Bwana MB, Musinguzi N, **Yiannoutsos CT**, Martin JN.  Failure to Initiate ART, Loss to Follow-up and Mortality among HIV-infected Patients during the pre-ART period in Uganda. JAIDS, 2013**;**63:e64-71.

103. Yilmaz A, **Yiannoutsos CT**, Fuchs D, Price RW, Hagberg L, Spudich S, and Gisslén M. Cerebrospinal fluid neopterin decay after initiation of antiretroviral therapy. J Neuroinflammation, 2013; 10:62

104. Gongvatana A, Harezlak J, Buchthal S, Daar E, Schifitto G, Campbell T, Taylor M, Singer E, Algers J, Zhong J, Brown M, McMahon D, So YT, Mi D, Heaton R, Robertson K, **Yiannoutsos** C, Cohen RA, Navia B; HIV Neuroimaging Consortium. Progressive cerebral injury in the setting of chronic HIV infection and antiretroviral therapy. J Neurovirol. 2013;19:209-18

105. Kagaris D, **Yiannoutsos CT**.  A multi-index ROC-based methodology for high throughput experiments in gene discovery. Int J Data Min Bioinform. 2013; 8:42-65.

106. Hua X, Boyle CP, Harezlak J, Tate DF, **Yiannoutsos CT**, Cohen R, Schifitto G, Gongvatana A, Zhong J, Zhu T, Taylor MJ, Campbell T, Daar E, Alger JR, Singer E, Navia B, Thompson PM and the HIV Neuroimaging Consortium. Disrupted cerebral metabolite levels and lower nadir CD4+ counts are linked to brain volume deficits in 210 HIV-infected patients on stable treatment. Neuroimage Clinical, 2013. 3:132-42.

107. Hahn N, **Yiannoutsos C**, Kirkpatrick K,Sharma J, Sweeney C.  Failure to suppress makers of bone turnover on first line hormonal therapy for metastatic prostate cancer is associated with shorter time to skeletal related event. Clin Genitourin Cancer, 2013. 12(1):33-40.e4.

108. Ciaranello A, Lu Z, Ayaya S, Losina E, Musick BS, Vreeman R, Freedberg KA, Abrams EJ, Dillabaugh L, Doherty K, Ssali J, **Yiannoutsos CT**, Wools-Kaloustian K. Incidence of WHO Stage 3 and 4 events, tuberculosis, and mortality in untreated, HIV-infected children enrolling in care before 1 year of

A.429

age: An IeDEA (International Epidemiologic Databases to Evaluate AIDS) East Africa regional analysis. Pediatr Infect Dis J, 2014;33(6):623-629.

109. An M-W, Frangakis CE, **Yiannoutsos CT**. Choosing profile double-sampling designs with application to PEPFAR evaluation.  Stat Med, 2014; 33: 2017-2029.

110. Gold JA, Grill M, Peterson J, Pilcher C, Lee E, Hecht FM, Fuchs D, **Yiannoutsos CT**, Price RW, Robertson K, Spudich S. Longitudinal Characterization of Depression and Mood States Beginning in Primary HIV Infection. J AIDS Beh, 2014; 18: 1124-1132.

111. Kiragga AN, Castelnuovo B, Musomba R, Levin J, Kambugu A, Manabe YC, **Yiannoutsos** CT, Kiwanuka N. Comparison of Methods for Correction of Mortality Estimates for Loss to Follow-Up after ART Initiation: A Case of the Infectious Diseases Institute, Uganda. PLoS One. 2013 Dec 31;8(12):e83524.

112. Poulopoulou S, Karlis D, **Yiannoutsos CT,** Dafni U. Phase II design with sequential testing of hypotheses within each stage. J Biopharm Stat, 2014. 24:768-84

113. Petersen ML, **Yiannoutsos CT**, Justice J, Egger M. Observational research on NCDs in HIV-positive populations: Conceptual and methodological considerations. JAIDS, 2014. 67 Suppl 1:S8-S16.

114. Young AC, **Yiannoutsos CT**, Hegde M, Lee E, Peterson J, Walter R, Price RW, Meyerhoff DJ, Spudich S. Cerebral Metabolite Changes Prior to and After Antiretroviral Therapy in Primary HIV Infection. Submitted. Neurology.  2014. 83: 1592-1600.

115. Harezlak J, Cohen R, Gongvatana A, Taylor M, Buchthal S, Schifitto G, Zhong J, Daar ES, Alger J, Brown M, Singer E, Campbell TB, McMahon D, So YT, **Yiannoutsos CT**, Navia BA and the HIV Neuroimaging Consortium. Predictors of CNS injury as measured by proton magnetic resonance spectroscopy in the setting of chronic HIV infection and CART. J NeuroVirology, 2014. 20(3):294-303.

116. Petersen ML, Tran L, Geng E, Deeks SG, Reynolds SJ, Kambugu A, Wood R, Bangsberg D, **Yiannoutsos CT**, Martin J. Delayed switch of antiretroviral therapy after virologic failure associated with elevated mortality among HIV-infected adults in Africa.AIDS. 2014 ;28(14):2097-107

117. Yu M, **Yiannoutsos CT**. Marginal and conditional distribution estimation from double-sampled semi-competing risks data. J Scand Stat. 2014.

118. Kiragga AN, Lok JJ, Musick BS, Bosch RJ, Mwangi A, **Yiannoutsos CT** for the East Africa IeDEA Regional Consortium. CD4 trajectory adjusting for dropout among HIV-positive patients receiving combination antiretroviral therapy in an East African HIV care centre. JIAS. Int AIDS Soc. 2014 Aug 14;17

119. Peterson J, Gisslen M, Zetterberg H, Fuchs D, Shacklett BL, Hagberg L, **Yiannoutsos CT**, Spudich SS, Price RW. Cerebrospinal Fluid (CSF) neuronal biomarkers across the spectrum 1 of HIV infection: Hierarchy of injury and detection. PLoS ONE. 2014. Dec 26;9(12):e116081. doi: 10.1371/journal.pone.0116081. eCollection 2014.

120. Anderson AM, Harezlak J, Bharti A, Mi D, Taylor MJ, Daar ES, Schifitto G, Zhong J, Matesan J, Alger JR, Brown M, Singer E, Campbell TB, McMahon DD, Tso Y, Siqueiros L, Paulose S, Gaugh M, Tripoli C, Buchthal S, Gualtieri L, Cohen R, **Yiannoutsos C**, Letendre SL, Navia BA for the HIV Neuroimaging Consortium. Plasma and cerebrospinal fluid biomarkers are

A.430

independently predictive of cerebral injury in HIV-Infected individuals on stable combination antiretroviral therapies. J Acquir Immune Defic Syndr; 2015; 69: 29-35.

121. Duda SN, Farr AM, Lindegren ML, Blevins M, Wester CW, Wools-Kaloustian K, Ekouevi DK, Egger M, Hemingway-Foday J, Cooper DA, Moore RD, McGowan CC, Nash D; International Epidemiologic Databases to Evaluate AIDS (IeDEA) Collaboration. Characteristics and comprehensiveness of adult HIV care and treatment programmes in Asia-Pacific, sub-Saharan Africa and the Americas: results of a site assessment conducted by the International epidemiologic Databases to Evaluate AIDS (IeDEA) Collaboration. J Int AIDS Soc. 2014 Dec 15;17:19045. doi: 10.7448/IAS.17.1.19045. eCollection 2014.

122. Ballif M, Nhandu V, Wood R, Dusingize JC, Carter EJ, Cortes CP, McGowan CC, Diero L, Graber C, Renner L, Hawerlander D, Kiertiburanakul S, Du QT, Sterling TR, Egger M, Fenner L; International epidemiological Databases to Evaluate AIDS (IeDEA). Detection and management of drug-resistant tuberculosis in HIV-infected patients in lower-income countries. Int J Tuberc Lung Dis. 2014 Nov;18(11):1327-36. doi: 10.5588/ijtld.14.0106.

123. Huis in 't Veld D, Balestre E, Buyze J, Menten J, Jaquet A, Cooper DA, Dabis F, **Yiannoutsos CT**, Diero L, Mutevedzi P, Fox MP, Messou E, Hoffmann CJ, Prozesky HW, Egger M, Hemingway-Foday JJ, Colebunders R, for the International Epidemiologic Databases to Evaluate AIDS (IeDEA). Determinants of weight evolution among HIV-positive patients initiating antiretroviral treatment in low resource settings. JAIDS. 2015. 70(2):146-54

124. Geng EH, Odeny TA, Lyamuya RE, Nakiwogga-Muwanga A, Diero L, Bwana M, Muyindike W, Braitstein P, Somi GR, Kambugu A, Bukusi EA, Wenger M, Wools-Kaloustian KK, Glidden DV, **Yiannoutsos** CT, Martin J. Estimation of Mortality among HIV-infected people on antiretroviral therapy treatment in east Africa: a sampling based approach in an observational, multisite, cohort study. Lancet HIV. 2015;2(3):e107-e116.

125. Geng EH, Neilands TB, Thièbaut R, Bwana MB, Nash D, Moore RD, Wood R, Zannou DM, Althoff KN, Lim PL, Nachega JB, Easterbrook PJ, Kambugu A, Little F, Nakigozi G, Nakanjako D, Kiggundu V, Ki Li PC, Bangsberg DR, Fox MP, Prozesky H, Hunt PW, Davies MA, Reynolds SJ, Egger M, **Yiannoutsos CT**, Vittinghoff EV, Deeks SG, Martin JN. CD41 T cell recovery during suppression of HIV replication: an international comparison of the immunological efficacy of antiretroviral therapy in North America, Asia and Africa. Int J Epidemiol. 2015 Feb;44(1):251-63.

126. Ballif M, Renner L, Claude Dusingize J, Leroy V, Ayaya S, Wools-Kaloustian K, Cortes CP, McGowan CC, Graber C, Mandalakas AM, Mofenson LM, Egger M, Kumara Wati KD, Nallusamy R, Reubenson G, Davies MA, Fenner L; International Epidemiologic Databases to Evaluate AIDS (IeDEA); International Epidemiologic Databases to Evaluate AIDS IeDEA. Tuberculosis in Pediatric Antiretroviral Therapy Programs in Low- and Middle-Income Countries: Diagnosis and Screening Practices. J Pediatric Infect Dis Soc. 2015;4:30-8.

127. Bakoyannis G, **Yiannoutsos CT**. Impact of and correction for outcome misclassification in cumulative incidence estimation. PLoS One. 2015; 10:e0137454

128. Saito S, Mpofu P, Carter EJ, Diero L, Wools-Kaloustian KK, **Yiannoutsos CT**, Musick BS, Tsiouris S, Somi GR, Ssali J, Nash D, Elul B. Declining

A.431

Tuberculosis Incidence among People Receiving HIV Care and Treatment Services in East Africa, 2007-2012. J Acquir Immune Defic Syndr. 2016;71:e96-e106

129. Elul B, Wools-Kaloustian, KK, Wu Y, Musick BS, Nuwagba-Biribonwoha H, Nash D, **Yiannoutsos CT**. Untangling the relationship between antiretroviral therapy use and incident pregnancy: Data from 47,313 HIV-positive women in East Africa. J Acquir Immune Defic Syndr, 2016; 72:324-32.

130. Semeere A, Wenger M, Busakhala N, Buziba N, Bwana M, Muyindike W, Amerson E, Maurer T, McCalmont T, LeBoit P, Musick B, **Yiannoutsos C**, Lukande R, Castelnuovo B, Laker-Oketta M, Kambugu A, Glidden D, Wools-Kaloustian K, Martin J. A prospective ascertainment of cancer incidence in sub-Saharan Africa: The case of Kaposi sarcoma. J. Cancer Med. 2016 May;5(5):914-28

131. Geng EH, Odeny TA, Lyamuya R, Nakiwogga-Muwanga A, Diero L, Bwana M, Braitstein P, Somi G, Kambugu A, Bukusi E, Wenger M, Neilands TB, Glidden DV, Wools-Kaloustian K, **Yiannoutsos** C, Martin J; East Africa International Epidemiologic Databases to Evaluate AIDS Consortium. Retention in Care and Patient-Reported Reasons for Undocumented Transfer or Stopping Care Among HIV-Infected Patients on Antiretroviral Therapy in Eastern Africa: Application of a Sampling-Based Approach. Clin Infect Dis. 2016; 62:935-44

132. Rachlis B, Bakoyannis G, Easterbrook P, Genberg B, Braithwaite RS, Cohen CR, Bukusi EA, Kambugu A, Bosco Bwana M, Somi GR, Geng EH, Musick B, **Yiannoutsos CT**, Wools-Kaloustian K, Braitstein P. Facility-level factors influencing retention of patients in HIV care in East Africa. PLoS One. 2016 Aug 10;11(8):e0159994

133. Nakanjako D, Kiragga AN, Musick BS, **Yiannoutsos CT**, Wools-Kaloustian K, Diero L, Oyaro P, Lugina E, Ssali JC, Kambugu A, Easterbrook P. Frequency and impact of suboptimal immune recovery on first-line antiretroviral therapy within the International Epidemiologic Databases to Evaluate AIDS in East Africa. AIDS. 2016 Jul 31; 30(12):1913-22

134. Tran L, **Yiannoutsos C**, Musick B, Wools-Kaloustian, K, Siika A, Kimaiyo S, van der Laan M, Petersen M. Evaluating the Impact of a HIV Low-Risk Express Care task-shifting program: A case study of the targeted learning roadmap.  Epi Methods. 2016; 5(1):69-91

135. Mahy M, Penazzato M, Ciaranello A, Mofenson L, **Yianoutsos CT[8]**, Davies M-A, Stover J. Improving estimates of children living with HIV from the Spectrum AIDS Impact Model. AIDS. 2017. Suppl 1:S13-S22

136. Anderegg N, Johnson LF, Zaniewski E, Althoff K, Balestre, E, Law M, Nash D, Shepherd B, **Yiannoutsos CT**, Egger M for the IeDEA and MESH consortia.  All-cause mortality in HIV-positive adults starting combination antiretroviral therapy: correcting for loss to follow-up. AIDS. 2017. Suppl 1:S31-S40

137. Brennan AT, Davies M-A, Bora J, Wandelere G, Stinson K, Wood R, Prozesky H, Tanser F, Fatti G, Boulle A, Sikazwe I, Wools-Kaloustian K, **Yuannoutsos C[9]**, Leroy V, de Rekeneire N, Fox MP. Has the phasing out of stavudine in

---

[8] My name has been misspelled as "Yianoutsos".
[9] My name has been misspelled as "Yuannoutsos".

A.432

accordance with changes in WHO guidelines led to a decrease in single-drug substitutions in first-line antiretroviral therapy for HIV in sub-Saharan Africa? AIDS. 2017;31(1):147-157

138. Freeman E, Semeere A, Wenger M, Bwana M, Chite Asirwa F, Busakhala N, Oga E, Jedy-Agba E, Kwaghe V, Iregbu K, Jaquet A, Dabis F, Yumo HA, Dusingize JC, Bangsberg D, Hoover D, Anastos K, Phiri S, Bohlius J, Egger M, **Yiannoutsos C**, Wools-Kaloustian K, Martin J. Pitfalls of practicing cancer epidemiology in resource-limited settings: The case of survival and loss to follow-up after a diagnosis of Kaposi's sarcoma in five countries across sub-Saharan Africa. BMC Cancer. 2016;16:65

139. Rebeiro PF, Bakoyannis G, Musick BS, Braithwaite RS, Wools-Kaloustian KK, Nyandiko W, Some F, Braitstein P, **Yiannoutsos CT**. Observational study of the effect of patient outreach on return to care: The earlier the better. J Acquir Immune Defic Syndr. 2017; 76(2):141-148

140. Bershetyn A, Odeny TA, Lyamuya R, Nakiwogga-Muwanga A, Diero L, Bwana M, Braitstein P, Somi G, Kambugu A, Bukusi E, Hartogensis W, Glidden DV, Wools-Kaloustian K, **Yiannoutsos** C, Martin J, Geng EH; East Africa International Epidemiologic Databases to Evaluate AIDS (EA-IeDEA) Consortium.  The causal effect of tracing by peer health workers on return to clinic among patients who were lost to follow-up from antiretroviral therapy in Eastern Africa: A "natural experiment" arising from surveillance of lost patients.  Clin Infect Dis. 2017 Jun 1;64(11):1547-1554.

141. Bakoyannis G, Yu M, **Yiannoutsos CT**. Semiparametric regression on cumulative incidence function with interval-censored competing risks data. Stat Med. 2017; 36(23):3683-3707

142. Semeere A, Freeman E, Busakhala N, Wenger M, Glidden D, Bwana M, Kanyesigye M, Asirwa FC, Rotich E, Oga E, Jedy-Agba E, Kwaghe V, Iregbu K, Adebamowo C, Jaquet A, Dabis F, Phiri S, Bohlius K, Egger E, **Yiannoutsos C**, Wools-Kaloustian K, Martin K. Updating vital status by tracking in the community among patients with epidemic Kaposi sarcoma who are lost to follow-up in sub-Saharan Africa. BMC Cancer 2017;17(1):611.

143. Tran L, **Yiannoutsos** CT, Musick BS, Wools-Kaloustian KK, Siika A, Kimaiyo S, van der Laan MJ, Petersen M.  Evaluating the Impact of a HIV Low-Risk Express Care Task-Shifting Program: A Case Study of the Targeted Learning Roadmap. Epidemiol Methods. 2016 Dec;5(1):69-91. doi: 10.1515/em-2016-0004. Epub 2016.

144. Greene MS, Chambers RA, **Yiannoutsos** CT, Wright ER, Steele GK, Zollinger TW.  Assessment of risk behaviors in patients with opioid prescriptions: A study of Indiana's Inspect data. Am J Addict. 2017; 26(8):822-829. doi: 10.1111/ajad.12639. Epub 2017 Nov 16.

145. Ferretti F, Longo V, **Yiannoutsos CT**, Musick BS, Passeri L, Bossolasco S, Boschini A, Franciotta D, Lazzarin A, Cinque P. JC virus DNA in plasma as a diagnostic and prognostic marker in Progressive Multifocal Leukoencephalopathy. CID, 2018; 18;67(1):65-72.

146. Holmes CB, **Yiannoutsos CT**, Elul B, Bukusi E, Ssali,J, Kambugu A, Musick BS, Cohen C, Williams C, Diero L, Padian N, Wools-Kaloustian KK.Increased prevalence of pregnancy and comparative risk of program attrition among

individuals starting HIV treatment in East Africa. PLoS ONE, 2018; 13(1):e0190828.

147. Nuwagaba-Biribonwoha H, Kiragga AN, **Yiannoutsos CT**, Musick BS, Wools-Kaloustian KK, Ayaya S, Wolf H, Lugina E, Ssali J, Abrams EJ, Elul B, for the International Epidemiology Databases to Evaluate AIDS (IeDEA) East Africa Collaboration. Adolescent pregnancy: a critical barrier to retention on antiretroviral therapy (ART). JIAS; 2018; Under revision

148. Vreeman RC, Ayaya SO, Musick BS, **Yiannoutsos CT**, Cohen CR, Nash D, Wabwire D, Wools-Kaloustian K, Wiehe SE. Adherence to antiretroviral therapy in a clinical cohort of HIV-infected children in East Africa. PLoS ONE, 2018; 21; 13(2):e0191848.

149. Bakoyannis, G, Zhang, Y, **Yiannoutsos, CT**. Nonparametric inference for Markov processes with missing absorbing state. Stat Sin. 2019; 29(4):2083-2104.

150. Kagaris D, Khamesipour A, **Yiannoutsos CT**. AUCTSP: an improved biomarker gene pair class predictor. BMC Bioinformatics. 2018 Jun 26;19(1):244

151. Desmonde S, Tanser F, Vreeman R, Takassi E, Edmonds A, Lumbiganon P, Pinto J, Malateste K, McGowan C, Kariminia A, Yotebieng M, Dicko F, **Yiannoutsos** C, Mubiana-Mbewe M, Wools-Kaloustian K, Davies MA, Leroy V; International Epidemiology Databases to Evaluate AIDS (IeDEA) Pediatric Working Group. Access to antiretroviral therapy in HIV-infected children aged 0-19 years in the International Epidemiology Databases to Evaluate AIDS (IeDEA) Global Cohort Consortium, 2004-2015: A prospective cohort study. PLoS Med. 2018 May 4;15(5):e1002565.

152. Tymejczyk O, Brazier E, **Yiannoutsos** C, Wools-Kaloustian K, Althoff K, Crabtree-Ramírez B, Van Nguyen K, Zaniewski E, Dabis F, Sinayobye JD, Anderegg N, Ford N, Wikramanayake R, Nash D; IeDEA Collaboration. HIV treatment eligibility expansion and timely antiretroviral treatment initiation following enrollment in HIV care: A metaregression analysis of programmatic data from 22 countries.  PLoS Med. 2018 Mar 23;15(3):e1002534.

153. Wools-Kaloustian K, Marete I, Ayaya S, Sohn AH, Van Nguyen L, Li S, Leroy V, Musick BS, Newman JE, Edmonds A, Davies MA, Eboua FT, Obama MT, Yotebieng M, Sawry S, Mofenson LM, **Yiannoutsos** CT. Time to First-Line ART Failure and Time to Second-Line ART Switch in the IeDEA Pediatric Cohort. J Acquir Immune Defic Syndr. 2018 Jun 1;78(2):221-230.

154. Apondi E, Humphrey JM, Sang E, Mwangi A, Keter A, Musick BS, Nalugoda FK, Ssali J, Bukusi E, **Yiannoutsos CT**, Wools-Kaloustian K, Ayaya S. Trends Over Time for Adolescents Enrolling in HIV Care in Kenya, Tanzania, and Uganda from 2001-2014. J Acquir Immune Defic Syndr. 2018;79(2):164-172.

155. Nuwagaba-Biribonwoha H, Kiragga AN, **Yiannoutsos CT**, Musick BS, Wools-Kaloustian KK, Ayaya S, Wolf H, Lugina E, Ssali J, Abrams EJ, Elul B, for the International epidemiologic Databases to Evaluate AIDS (IeDEA) East Africa Collaboration. Adolescent pregnancy at antiretroviral therapy (ART) initiation: a critical barrier to retention on ART. J Int AIDS Soc. 2018. 21(9):e25178.

156. Gbolahan OB, Porter RF, Salter JT, **Yiannoutsos** C, Burns M, Chiorean EG, Loehrer PJ Sr. A Phase II Study of Pemetrexed in Patients with Recurrent

A.434

Thymoma and Thymic Carcinoma. J Thorac Oncol. 2018 Dec;13(12):1940-1948.

157. Yotebieng M, Brazier E, Addison D, Kimmel AD, Cornell M, Keiser O, Parcesepe AM, Onovo A, Lancaster KE, Castelnuovo B, Murnane PM, Cohen CR, Vreeman RC, Davies MA, Duda SN, **Yiannoutsos** CT, Bono RS, Agler R, Bernard C, Syvertsen JL, Sinayobye JD, Wikramanayake R, Sohn AH, von Groote PM, Wandeler G, Leroy V, Williams CF, Wools-Kaloustian K, Nash D; IeDEA Treat All in sub-Saharan Africa Consensus Statement Working Group. Research priorities to inform "Treat All" policy implementation for people living with HIV in sub-Saharan Africa: a consensus statement from the International epidemiology Databases to Evaluate AIDS (IeDEA). J Int AIDS Soc. 2019 Jan;22(1):e25218.

158. Edwards JK, Bakoyannis G**, Yiannoutsos CT**, Mburu MW, Cole SR. Nonparametric estimation of the cumulative incidence function under outcome misclassification using external validation data. Stat Med. 2019;38(29):5512-5527

159. Park J, Bakoyannis G, **Yiannoutsos CT**. Semiparametric Competing Risks Regression under Interval Censoring: The R Package intccr. Comput Methods Programs Biomed. 2019;173:167-176

160. Tran L, **Yiannoutsos CT**, Wools-Kaloustian KK, Siika A, van der Laan MJ, Petersen M. Double robust efficient estimators of longitudinal treatment effects: Comparative performance in simulations and a case study. Int J Biostat. 2019 Feb 26.

161. Greene MS, Vest JR, Chambers RA, **Yiannoutsos CT**,  Wright ER, Steel GK, Zollinger TW. Increasing Incidence and Geographic Patterns of Neonatal Abstinence Syndrome across the U.S., 2008-2014. Maternal Child Health Journal. Biometrical Journal. Under revision.

162. Qian T, Frangakis C, **Yiannoutsos C**. Deductive semiparametric estimation in double-sampling designs. SIBS. Accepted.

163. Johnson LF, Anderegg N, Zaniewski E, Eaton JW, Rebeirod PF, Carriquiry G, Nash D, Yotebieng M, Ekouevi DK, Holmes CB, Choi JY, Jiamsakulo A, Bakoyannis G, Althoff KN, Sohn AH, **Yiannoutsos C**, Eggera M, for the International epidemiology Databases to Evaluate AIDS (IeDEA) Collaboration. Global variations in mortality in adults after initiating antiretroviral treatment: an updated analysis of the International epidemiology Databases to Evaluate AIDS cohort collaboration. AIDS 2019; 33 Suppl 3:S283-S294

164. Stover J, Glaubius R, Mofenson L, Dugdale CM, Davies M-A, Patten G, **Yiannoutsos C**. Updates to the Spectrum/AIM model for estimating key HIV indicators at national and sub-national levels. AIDS 2019; 33, Suppl 3:S227-S234

165. Mpofu P, Bakoyannis G, **Yiannoutsos CT**. A pseudo-likelihood method for estimating misclassification probabilities when outcome data are partially observed.  Biometrical Journal. 2020: 1747-1768.

166. Brazier E, Maruri F, Duda SN, Tymejczyk O, Wester CW, Somi G, Ross J, Freeman A, Cornell M, Poda A, Musick BS, Zhang F, Althoff KN, Mugglin C, Kimmel AD, Yotebieng M, Nash D; IeDEA Consortium. Implementation of "Treat-all" at adult HIV care and treatment sites in the Global IeDEA

A.435

Consortium: results from the Site Assessment Survey. J Int AIDS Soc. 2019 Jul; Ballif 22(7):e25331.

167. Patsis I, Goodrich S, Yiannoutsos CT, Brown SA, Musick BS, Diero L, Kulzer J, Bwana M, Oyaro P, Wools-Kaloustian KK. Prevalence and Impact of Alcohol Use in Patients Enrolling in HIV Care in East Africa. PLoS ONE. 2020; Accepted

168. Del Amo J, Jarrín I; IeDEA and COHERE in EuroCoord Cohort Collaboration. All-cause mortality after ART initiation in HIV-positive women from Europe, Sub-Saharan Africa and the Americas. AIDS. 2019 Nov 11. doi: 10.1097/QAD.0000000000002399. [Epub ahead of print]

169. Zürcher K, Ballif M, Kiertiburanakul S, Chenal H, Yotebieng M, Grinsztejn B, Michael D, Sterling TR, Ngonyani KM, Mandalakas AM, Egger M, Pettit AC, Fenner L; International Epidemiology Databases to Evaluate AIDS (IeDEA) consortium. Diagnosis and clinical outcomes of extrapulmonary tuberculosis in antiretroviral therapy programmes in low- and middle-income countries: a multicohort study. J Int AIDS Soc. 2019; 22(9):e25392.

170. Patel RC, Jakait B, Thomas K, **Yiannoutsos** C, Onono M, Bukusi EA, Wools-Kaloustian KK, Cohen CR; Implant/Efavirenz Study Group. Increasing body mass index or weight does not appear to influence the association between efavirenz-based antiretroviral therapy and implant effectiveness among HIV-positive women in western Kenya. Contraception. 2019 Oct;100(4):288-295.

171. Humphrey JM, Mpofu P, Pettit AC, Musick B, Carter EJ, Messou E, Marcy O, Crabtree-Ramirez B, Yotebieng M, Anastos K, Sterling TR, **Yiannoutsos** C, Diero L, Wools-Kaloustian K. Mortality Among People With HIV Treated for Tuberculosis Based on Positive, Negative, or No Bacteriologic Test Results for Tuberculosis: The IeDEA Consortium. Open Forum Infect Dis. 2020; 7(1):ofaa006.

172. Yotebieng M, Brazier E, Addison D, Kimmel AD, Cornell M, Keiser O, Parcesepe AM, Onovo A, Lancaster KE, Castelnuovo B, Murnane PM, Cohen CR, Vreeman RC, Davies MA, Duda SN, **Yiannoutsos** CT, Bono RS, Agler R, Bernard C, Syvertsen JL, Sinayobye JD, Wikramanayake R, Sohn AH, von Groote PM, Wandeler G, Leroy V, Williams CF, Wools-Kaloustian K, Nash D; IeDEA Treat All in sub-Saharan Africa Consensus Statement Working Group.Research priorities to inform "Treat All" policy implementation for people living with HIV in sub-Saharan Africa: a consensus statement from the International epidemiology Databases to Evaluate AIDS (IeDEA). J Int AIDS Soc. 2019; 22(1):e25218

173. Bakoyannis G, Zhang Y, **Yiannoutsos** CT.  Semiparametric regression and risk prediction with competing risks data under missing cause of failure.  Lifetime Data Anal. 2020 Jan 25. doi: 10.1007/s10985-020-09494-1. [Epub ahead of print]

174. Jesson, J, Desmonde S, **Yiannoutsos CT**, Patten G, Malateste K, Duda SN, Kumarasamy N, Yotebieng M, Davies M-A, Musick B, Leroy V, Ciaranello A on behalf of IeDEA. Weight-for-age distributions among children with HIV on antiretroviral therapy in the International epidemiology Databases to Evaluate AIDS (IeDEA) multiregional consortium. BMC Research Notes, 2020; 13:249.

175. Nyakato P, Schomaker M, Sirpambo N, Technau K-G, Fatti, G, Rabie H, Tanser F, Eley B, Euvrard J, Wood R, Tsondai PR, **Yiannoutsos CT**, Cornell

M, Davies M-A. Virologic response of adolescents living with perinatally acquired HIV receiving antiretroviral therapy in the period of early adolescence (10-14 years) in South Africa. AIDS. 2020: deve35(6):971-978.

176. Menachemi N, **Yiannoutsos CT**, Dixon BE, Duszynski TJ, Fadel WF, Wools-Kaloustian KK, Needleman NU, Box K, Caine V, Norwood C, Weaver L, Halverson PK. Population Point Prevalence of SARS-CoV-2 Infection Based on a Statewide Random Sample — Indiana, April 25–29, 2020. MMWR Morb Mortal Wkly Rep. 2020; 69:960-964.

177. Bakoyannis G, **Yiannoutsos CT**, Diero L, Mwangi A, Wools-Kaloustian KK. A semiparametric method for the analysis of outcomes after a gap in HIV care under incomplete outcome ascertainment Stat Meth Inf Dis.. 2020. Accepted.

178. Blackburn J, **Yiannoutsos CT**, Carroll AE, Halverson PK, Menachemi N. Infection fatality ratios for COVID-19 among noninstitutionalized persons 12 and older: results of a random-sample prevalence study. *Ann Int Med* 2021: 135-136.

179. **Yiannoutsos CT**, Halverson P, Menachemi N. Post-stratification and adjustments for imperfect testing: Analysis of the Indiana SARS-CoV-2 testing data. Proc Nat Acad Sci. 2021: 118(5):e2013906118.

180. Park J, Bakoyannis G, Zhang Y, **Yiannoutsos CT.** Semiparametric Regression on Cumulative Incidence Function with Interval-Censored Competing Risks Data and Missing Event Types.  Biostatistics. 2021: Online ahead of print.

181. Johnson LF, Kariminia A, Trickey A, **Yiannoutsos CT**, Ekouevi DK, Minga AK, Pascom ARP, Han WM, Zhang L, Althoff KN, Rebeiro PF, Murenzi G, Ross J, Hsiao N-Y, Marsh K. Progress towards the 'third 90': Achieving consistency in measures of HIV-1 viral suppression across countries. J Int AIDS Soc, 2021: Suppl 5:e25776.

182. Dixon BE, Wools-Kaloustian K, Fadel WF, Duszynski TJ, **Yiannoutsos CT**, Halverson PK, Menachemi N. Symptoms and symptom clusters associated with SARS-CoV-2 infection in community-based populations: Results from a statewide epidemiological study. PLOS ONE 2021: 16(3):e0241875.

183. Nyakato P, Schomaker M, Sipambo N, Technau KG, Fatti G, Rabie H, Tanser F, Eley B, Euvrard J, Wood R, Tsondai PR, **Yiannoutsos CT**, Cornell M, Davies MA. Virologic response of adolescents living with perinatally acquired HIV receiving antiretroviral therapy in the period of early adolescence (10-14 years) in South Africa. AIDS. 2022. 25:e25870

184. Goodrich S, Siika A, Mwangi A, Nyambura M, Naanyu V, **Yiannoutsos C**, Spira T, Bateganya M, Toroitich-Ruto C, Otieno-Nyunya B, Wools-Kaloustian K. J Development, assessment and outcomes of a community-based model of anti-retroviral care in western Kenya through a cluster-randomized control trial. J Acquir Immune Defic Syndr. 2021. 87:e198-e206

185. Duszynski TJ, Fadel W, Wools-Kaloustian KK, Dixon BE, **Yiannoutsos CT**, Halverson PK, Menachemi N. Association of health status and nicotine consumption with SARS-CoV-2 positivity rates. BMC Public Health. 2021 Oct 3;21(1):1786

186. Gisslen M, Keating SM, Spudich S, Arechiga V, Stephenson S, Zetterberg H, Di Germanio C, Blennow K, Fuchs D, Hagberg L, Norris P, Peterson J, Shacklett BL, **Yiannoutsos CT**, Price RW.  Cerebrospinal Fluid Inflammation

A.437

across the Spectrum of Untreated HIV-1 Infection, Central Nervous System Injury and Viral Suppression. 2021. Accepted PLoS ONE.

187. Menachemi N, Dixon BE, Wools-Kaloustian KK, Yiannoutsos CT, Halverson PK. How Many SARS-CoV-2-Infected People Require Hospitalization? Using Random Sample Testing to Better Inform Preparedness Efforts. J Public Health Manag Pract. 2021 May-Jun 01;27(3):246-250

188. Brazier E, Tymejczyk O, Zaniewski E, Egger M, Wools-Kaloustian K, **Yiannoutsos CT**, Jaquet A, Althoff KN, Lee JS, Caro-Vega Y, Luz PM, Tanuma J, Niyongabo T, Nash D. Effects of national adoption of Treat-All guidelines on pre-ART CD4 testing and viral load monitoring after ART initiation: A regression discontinuity analysis. Clin Infect Dis. 2021 73:e1273-e1281

189. Kiragga AN, Twinomuhwezi E, Banturaki G, Achieng M, Nampala J, Bagaya I, Kigozi J, Castelnuovo B, Musick BS, Hazra R, **Yiannoutsos CT**, Wools-Kaloustian KK for the International Epidemiology Databases to Evaluate AIDS (IeDEA) East Africa Collaboration. Outcomes of Retained and Disengaged Pregnant Women Living with HIV in Uganda. 2021: PLoS ONE, 16(5):e0251413

190. Goodrich S, Siika A, Mwangi A, Nyambura M, Naanyu V, **Yiannoutsos C**, Spira T, Bateganya M, Toroitich,-Ruto C, Otieno-Nyunya B, Wools-Kaloustian K. Development, assessment and outcomes of a community-based model of anti-retroviral care in western Kenya. J Acquir Immune Defic Syndr. 2021: 87:e198-e206

191. Zhou W, Bakoyannis G, Zhang Y, **Yiannoutsos CT**. Semiparametric Marginal Regression for Clustered Competing Risks Data with Missing Cause of Failure. Biostatistics; 2022, online ahead of print.

192. Patel RC, Amorim G, Jakait B, Shepherd BE, Mocello AR, Musick B, Bernard C, Onono M, Bukusi EA, Wools-Kaloustian K, Cohen CR, **Yiannoutsos CT**, on behalf of the Implant/Efavirenz Study Group and the East Africa IeDEA regional consortium. Pregnancies among women living with HIV using contraceptives and antiretroviral therapy in western Kenya: a retrospective, cohort study. BMC Medicine, 2021. 19:178.

193. Duszynski,T, Fadel W, Wools-Kaloustian K, Dixon B, **Yiannoutsos C**, Halverson P, Menachemi N. Association of health status and smoking behaviors with SARS-CoV-2 positivity rates; BMC Public Health; 2021 Oct 3;21(1):1786

194. Kassanjee R, Johnson LF, Zaniewski E, Ballif M, Christ B, **Yiannoutsos CT**, Nyakato P, Demonde S, Edmonds A, Sudjaritruk T, Pinto J, Vreeman R, Dahourou DL, Twizere C, Kariminia A, Carlucci JG, Kasozi C, Davies M-A, on behalf of the International epidemiology Databases to Evaluate AIDS (IeDEA) Collaboration. Global HIV mortality trends among children on antiretroviral treatment corrected for under-reported deaths: An updated analysis of the International epidemiology Databases to Evaluate AIDS collaboration. J Int AIDS Soc, 2021. Suppl 5:e25780.

195. Humphrey J, Alera M, Kipchumba B, Pfeiffer EJ, Songok J, Mwangi W, Musick B, **Yiannoutsos C**, Wachira J, Wools Kaloustian K. A qualitative study of the barriers and enhancers to retention in care for pregnant and postpartum women living with HIV. PLOS Global Health; Accepted

A.438

196. Duszynski TJ, Fadel W, Dixon BE, **Yiannoutsos C**, Halverson PK, Menachemi N. J.  Successive Wave Analysis to Assess Nonresponse Bias in a Statewide Random Sample Testing Study for SARS-CoV-2. Public Health Manag Pract. 2022. Online ahead of print

197. Head KJ, Zimet GD, **Yiannoutsos CT**, Silverman RD, Sanner L, Menachemi N.Factors that differentiate COVID-19 vaccine intentions among Indiana parents: Implications for targeted vaccine promotion. Prev Med. 2022; 158:107023.

198. Nyakato P, Schomaker M, Fatti G, Tanser F, Euvrard J, Sipambo N, Fox MP, Haas AD, **Yiannoutsos CT**, Davies MA, Cornell M. Virologic non-suppression and early loss to follow up among pregnant and non-pregnant adolescents aged 15-19 years initiating antiretroviral therapy in South Africa: a retrospective cohort study. J Int AIDS Soc. 2022, 25:e25870

199. Han WM, Law MG, Egger M, Wools-Kaloustian K, Moore R, McGowan C, Kumarasamy N, Desmonde S, Edmonds A, Davies MA**, Yiannoutsos C**, Althoff KN, Cortes CP, Mohamed TJ, Jaquet A, Anastos K, Euvrard J, Castelnuovo B, Salters K, Coelho LE, Ekouevi DK, Eley B, Diero L, Zaniewski E, Ford N, Sohn AH, Kariminia A; IeDEA collaboration. Global estimates of viral suppression in children and adolescents and adults on antiretroviral therapy adjusted for missing viral load measurements: a multiregional, retrospective cohort study in 31 countries. Lancet HIV. 2021; 8:e766-e775

200. Patel RC, Amorin G, Jakait B, Shepherd BE, Mocello AR, Musick B, Bernard C, Onono M, Bukusi EA, Wools-Kaloustian K, Cohen CR, **Yiannoutsos CT**, on behalf of the Implant/Efavirenz Study Group and the East Africa IeDEA regional consortium. Validating incident pregnancies among women living with HIV using contraceptives and antiretroviral therapy in western Kenya: a retrospective, cohort study. BMC Med. 2021; 19:178

201. Tong Y, Orang'o E, Nakalembe M, Tonui P, Itsura P, Muthoka K, Titus M, Kiptoo S, Mwangi A, Ong'echa J, Tonui R, Odongo B, Mpamani C, Rosen B, Moormann A, Cu-Uvin S, Bailey JA, Oduor CI, Ermel A, **Yiannoutsos C**, Musick B, Sang E, Ngeresa A, Banturaki G, Kiragga A, Zhang J, Song Y, Chintala S, Katzenellenbogen R, Loehrer P Brown DR. The East Africa Consortium for human papillomavirus and cervical cancer in women living with HIV/AIDS, Ann Med 2022, 54:1, 1202-12

202. Thomadakis C, Meligkotsidou L, **Yiannoutsos** CT, Touloumi G. Joint modeling of longitudinal and competing-risks data using cumulative incidence functions for the failure submodels accounting for potential failure cause misclassification through double sampling. Biostatistics 2022. Online ahead of print.

203. Bourgi K, Ofner S, Musick B, Griffith B, Diero L, Wools-Kaloustian K, **Yiannoutsos CT**, Gupta SK. Weight Gain Among Treatment-Naïve Persons With HIV Receiving Dolutegravir in Kenya. J Acquir Immune Defic Syndr. 2022 Dec 15;91(5):490-496.

204. Nyakato P, Christ B, Anderegg N, Muhairwe J, Jefferys L, van Dijk J, Vinikoor MJ, van Lettow M, Chimbetete C, Phiri SJ, Egger M, Ballif M, **Yiannoutsos CT**, Schomaker M, Kassanjee R, Davies MA, Cornell M; International epidemiology Databases to Evaluate AIDS Southern Africa (IeDEA-SA). High Unreported Mortality in Children and Youth (<25 Years) Living With HIV Who Were Lost to Care From Antiretroviral Therapy Programs in Southern

A.439

Africa: Results From a Multicountry Tracing Study. J Acquir Immune Defic Syndr. 2022 Dec 15;91(5):429-433.

205. Stalter RM, Amorim G, Mocello AR, Jakait B, Shepherd BE, Musick B, Bernard C, Bukusi EA, Wools-Kaloustian K, Cohen CR, **Yiannoutsos CT**, Patel RC; Implant/Efavirenz Study Group and the East Africa IeDEA regional consortium. Contraceptive implant use duration is not associated with breakthrough pregnancy among women living with HIV and using efavirenz: a retrospective, longitudinal analysis. J Int AIDS Soc. 2022 Sep;25(9):e26001

206. Wada PY, Kim A, Jayathilake K, Duda SN, Abo Y, Althoff KN, Cornell M, Musick B, Brown S, Sohn AH, Chan YJ, Wools-Kaloustian KK, Nash D, **Yiannoutsos CT**, Cesar C, McGowan CC, Rebeiro PF. Site-Level Comprehensiveness of Care Is Associated with Individual Clinical Retention Among Adults Living with HIV in International Epidemiology Databases to Evaluate AIDS, a Global HIV Cohort Collaboration, 2000-2016. AIDS Patient Care STDS. 2022 Sep;36(9):343-355

207. Humphrey JM, Songok J, Ofner S, Musick B, Alera M, Kipchumba B, McHenry MS, Carlucci JG, Park J, Mwangi W, **Yiannoutsos C**, Bakoyannis G, Wools-Kaloustian K. Retention in care and viral suppression in the PMTCT continuum at a large referral facility in western Kenya. AIDS Behav. 2022, 26:3494-3505.

208. Justice AC, Goetz MB, Stewart CN, Hogan BC, Humes E, Luz PM, Castilho JL, Nash D, Brazier E, Musick B, **Yiannoutsos C**, Malateste K, Jaquet A, Cornell M, Shamu T, Rajasuriar R, Jiamsakul A, Althoff KN. Delayed presentation of HIV among older individuals: a growing problem. Lancet HIV. 2022;9:e269-e280

209. Abogazalah N, **Yiannoutsos C**, Martinez-Mier EA, Tantawy M, Yepes JF. The Saudi Arabian national demographic and health survey, 2017: Study design and oral health-related influences. Saudi Dent J. 2023 Jan;35(1):80-89.

210. Ross J, Brazier E, Fatti G, Jaquet A, Tanon A, Haas AD, Diero L, Castelnuovo B, **Yiannoutsos CT**, Nash D, Anastos KM, Yotebieng M. Same-Day Antiretroviral Therapy Initiation as a Predictor of Loss to Follow-up and Viral Suppression Among People With Human Immunodeficiency Virus in Sub-Saharan Africa.  Clin Infect Dis. 2023 Jan 6;76(1):39-47.

211. Buzibye A, Wools-Kaloustian K, Olagunju A, Twinomuhwezi E, **Yiannoutsos C**, Owen A, Neary M, Matovu J, Banturaki G, Castelnuovo B, Lamorde M, Khoo S, Waitt C Kiragga A. Relating CYP2B6 genotype and efavirenz resistance among post-partum women living with HIV with high viremia in Uganda: a nested cross-sectional study. AIDS Res Ther, 2023: 20:20.

212. Humphrey JM, Alera M, Enane LA, Kipchumba B, Goodrich S, Scanlon M, Songok J, Musick B, Diero L, **Yiannoutsos C**, Wools-Kaloustian K.  Effects of the COVID-19 pandemic on late postpartum women living with HIV in Kenya. PLOS Glob Public Health. 2023; 3:e0001513.

213. Vreeman RC, **Yiannoutsos CT**, Yusoff NKN, Wester CW, Edmonds A, Ofner S, Davies MA, Leroy V, Lumbiganon P, de Menezes Succi RC, Twizere C, Brown S, Bolton-Moore C, Takassi OE, Scanlon M, Martin R, Wools-Kaloustian K; IeDEA. Global HIV prevention, care and treatment services for children: a cross-sectional survey from the International Epidemiology Databases to Evaluate AIDS (IeDEA) consortium. BMJ Open. 2023 Mar 13;13(3):e069399.

A.440

214. Thomadakis C, **Yiannoutsos CT**, Pantazis N, Diero L, Mwangi A, Musick BS, Wools-Kaloustian K, Touloumi G. The Effect of HIV Treatment Interruption on Subsequent Immunological Response  Am J Epidemiol. 2023 Jul 7;192(7):1181-1191

215. Nabukalu D, **Yiannoutsos CT**, Semeere A, Musick BS, Murungi T, Namulindwa V, Waswa F,  Nakigozi G, Serwadda D, Sewankambo NK, Reynolds SJ, Lutalo T, Makumbi F, Kigozi G, Nalugoda F, Wools-Kaloustian KK. Mortality among HIV-infected adults on antiretroviral therapy in southern Uganda. J Acquir Immune Defic Syndr. 2024; 95(3):268-274

216. Thomadakis C, Meligkotsidou L, **Yiannoutsos, CT**, Touloumi G. Joint modeling of longitudinal and competing-risks data using cumulative incidence functions for the failure submodels accounting for potential failure cause misclassification through double sampling. 2023. Biostatistics. Dec 15;25(1):80-97. doi: 10.1093/biostatistics/kxac043

217. Mungo C, Orang'o O, Ofner S, Musick B, **Yiannoutsos C**, Cohen CR, Brown D, Wools-Kaloustian K, Semeere A. Real-world cervical cancer screening uptake and predictors of visual inspection with acetic acid positivity among women living with HIV in care programs in western Kenya. JCO Glob Oncol. 2024 Feb;10:e2300311. doi: 10.1200/GO.23.00311.

218. Bourgi K, Ofner S, Musick B, Wools-Kaloustian K, Humphrey JM, Diero L, Yiannoutsos CT, Gupta SK.  Preswitch Regimens Influence the Rate of Weight Gain After Switch to Tenofovir Disoproxil Fumarate, Lamivudine, and Dolutegravir (TLD): Study From an East African Cohort. Open Forum Infect Dis. 2023 Dec 12;10(12):ofad581. doi: 10.1093/ofid/ofad581.

219. **Yiannoutsos CT**, Wools-Kaloustian K, Musick BS, Kosgei R, Kimaiyo S, Siika A. Assessing HIV-infected patient retention in a program of differentiated care in sub-Saharan Africa: A G-estimation approach. 2023.  Int J Biostat. Online ahead of print.

220. Nyakato P, Boulle A, Wood R, Eley B, Rabie H, Egger M, **Yiannoutsos CT**, Davies MA, Cornell M. Self-transfers, hospital admissions and mortality among children and adolescents lost to follow-up from antiretroviral therapy programs in the Western Cape, South Africa Between 2004 and 2019: Linkage to provincial records. Pediatr Infect Dis J. 2024 Feb 21. doi: 10.1097/INF.0000000000004281

221. Bakoyannis G, Elul B, Wools-Kaloustian KK, Brown S, Diero L, Sameere A, Castelnuovo B, Nakigozi G, Lyamuya R, **Yiannoutsos CT**. Modeling the HIV cascade of care using routinely collected clinical data to guide programmatic interventions and policy decisions. J Acquir Immune Defic Syndr. 2024. In press.

**Non-refereed publications**

222. **Yiannoutsos CT**, and Gelfand, AE: "Simulation Approaches for Calculations in Directed Graphical Models".  University of Connecticut Technical Report, 21, 1991

223. **Yiannoutsos CT**, and Gelfand AE: "Subgraph Approximations for Large Directed Graph Models", Statistical Decision Theory and Related Topics, V., 441-452, 1994

A.441

224. Hall CD, **Yiannoutsos C**, Clifford D. Progressive multifocal leukoencephalopathy, HIV, and highly active antiretroviral therapy. Letter. New England Journal of Medicine, 1998; 339:849.

225. Miller LC, **Yiannoutsos CT** and Hughes MD.  Diagnostic test validation: Optimal designs.  Proceedings of the 17th International Workshop in Statistical Modeling, Chania, Greece.  D Stasinopoulos and G Touloumi editors; 2002; 463-469.

226. Nakas CT, **Yiannoutsos CT**.  Ordered Multiple Class ROC Analysis. In the Encyclopedia of Biopharmaceutical Statistics, S-C Chow editor; Decker Encyclopedias. 2006; DOI: 10.1081/E-EBS-120041740, Dekker – NY.

227. **Yiannoutsos CT**. Neurologic outcomes in HIV infection: Clinical events and surrogate markers.  In *The Spectrum of Neuro-AIDS Disorders: Pathophysiology, Diagnosis, and Treatment* Edited by K. Goodkin et al. ASM Press, Washington, DC 2008.

228. Geng EH, Nash D, Kambugu A, Zhang Y,  Braitstein P, Christopoulos KA, Muyindike W, Bwana MB, **Yiannoutsos CT**, Petersen ML, Martin JN. Retention in Care among HIV-Infected Patients in Resource-Limited Settings: Emerging Insights and New Directions. Curr HIV/AIDS Rep; 2010, 7:234–244

229. **Yiannoutsos CT**, Wools-Kaloustian KK, Musick BS, Elul B. Rejoinder to "Lost Opportunities Concerning Loss-to-Follow-Up: A Response to Elul et al." by Strassle and colleagues J Acquir Immune Defic Syndr. 2017 Jun1;75(2):e56-e57

III. Manuscripts in preparation

230. Duda SN, Musick BS, Davies M-A, Sohn AH, Ledergerber B, Kaloustian K, McGowan CC, Maxwell NJ, Kariminia A, Ostinelli CHD, Hogan BC, Shi Q, Malateste K, Goodall RL, Kristensen DK, Hansen EV, Williams CFM, Lewis JT, **Yiannoutsos CT.** The IeDEA Data Exchange Standard: a common data model for global HIV cohort collaboration. Submitted JMIA.

231. Lok JJ, **Yiannoutsos CT**, Kiragga A, Bosch RJ. Inverse Probability of Censoring Weights under Missing Not At Random with application to CD4 outcomes in HIV-positive patients in Kenya.

232. Syriopoulou E, Lok JJ, Musick BS, Martin JN, Wools-Kaloustian KK, **Yiannoutsos CT**. Adherence to combination antiretroviral therapy in sub-Saharan Africa: Estimation adjusted for non-random loss to program. BMC Infect Dis

233. Kwobah EK, Goodrich S, Kulzer JL, Kanyesigye M, Obatsa S, Cheruiyot J Kiprono L, Kibet C, Ochieng F, Ofner S, Brown SA, **Yiannoutsos CT**, Atwoli, Wools-Kaloustian K. Adaptation of the Client Diagnostic Questionnaire for East Africa. Submitted

**Date:**  March 13, 2024         **Signature** _____

A.442

# EXHIBIT 20

A.443

| | |
|---|---|
| **From:** | Craig Deligdish |
| **To:** | "Jack Todd" |
| **Cc:** | "Howard Claussen" |
| **Subject:** | RE: OMNI Healthcare |
| **Date:** | Wednesday, August 22, 2018 1:54:35 PM |

*I don't know exactly what he had in mind. He mentioned reconciling quarterly, and sharing in the benefit/profit.  Let me know what works.*

---

**From:** Jack Todd [mailto:jacktodd4@gmail.com]
**Sent:** Wednesday, August 22, 2018 10:08 AM
**To:** Omni Health Care Dr Delignish <deligdishc@omnihealthcare.com>
**Cc:** Howard Claussen <howard@mdlabs.com>
**Subject:** Fwd: OMNI Healthcare

Got it. I am waiting for Howard Claussen to get back to me regarding the "pro bill" pricing for you on UTI's, Tox, and PGX. We are under the impression that you will bill all Commercial plans and we will bill all Government plans directly.

It is my understanding this must be done first before setting up the Tox and PGX testing.

Please confirm my understanding.

Thanks & GB,
Jack Todd

Begin forwarded message:

> **From:** "Craig Deligdish" <deligdishc@omnihealthcare.com>
> **Date:** August 21, 2018 at 2:21:29 PM EDT
> **To:** "Jack Todd" <jacktodd4@gmail.com>
> **Cc:** <smithb@omnihealthcare.com>, "'Mark Bobango'" <bobangom@omnihealthcare.com>
> **Subject: OMNI Healthcare**
>
> Jack,
>
> Brad Smith and I recently met telephonically with Kelly Hall and subsequently with Howard Claussen regarding urine drug toxicology and pharmacogenomics. We would like to begin referring patients for pharmacogenomics testing and urine drug testing.
>
> Mr. Claussen indicated that there is an opportunity to partner in these areas with MD Labs and in the profit from UTI testing (and urine drug testing and pharmacogenomics)  which would allow OMNI Healthcare to share in some of the revenue generated by these tests.
>
> Can you please arrange to set this up through the Melbourne Medical Laboratory

A.444

OMNI00852

and provide OMNI Healthcare with whatever forms, requisitions, billing information (ICD9 codes, etc) and other agreements, if any, that need to be executed, so that we can move forward.  I have copied Mark Bobango and Brad Smith, who will be assisting in this initiative.

Craig Deligdish, MD

A.445

OMNI00853

# EXHIBIT A

A.446

SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into among the United States of America, acting through the United States Department of Justice and on behalf of the Office of Inspector General of the Department of Health and Human Services ("OIG-HHS") and the United States Department of Veterans Affairs (collectively, the "United States"), MD Spine Solutions LLC, d/b/a MD Labs Inc. ("MD Labs"), Denis Grizelj ("Grizelj"), Matthew Rutledge ("Rutledge") (together, MD Labs, Grizelj, and Rutledge are "MD Labs & Owners") and Omni Healthcare, Inc., ("Omni" or "Relator") (hereafter collectively referred to as "the Parties"), through their authorized representatives.

RECITALS

A.      MD Labs is a California corporation headquartered in Reno, Nevada.  MD Labs operates a clinical laboratory and offers clinical laboratory services to health care providers and patients across the United States, specializing in urine drug testing ("UDT"), urinary tract infection testing ("UTI"), and pharmacogenetic testing ("PGT").

B.      Denis Grizelj and Matthew Rutledge are co-founders, owners, and operators of MD Labs.  Grizelj and Rutledge each own approximately 47.5% of MD Labs.

C.      On or about December 11, 2018, Omni filed a qui tam action in the United States District Court for the District of Massachusetts captioned *United States et al., ex rel. Omni Healthcare, Inc. v. MD Spine Solutions LLC, D/B/A MD Labs Inc. and Doe Healthcare Providers 1-100*, No. 18-cv-12558, pursuant to the qui tam provisions of the False Claims Act, 31 U.S.C. § 3730(b) (the "Civil Action").

D.      Relator alleges, among other things, that MD Labs billed Federal Health Care Programs for medically unnecessary laboratory services including UDT, UTI, and PGT, in violation of 42 U.S.C. § 1395y(a)(1)(A), and the False Claims Act, 31 U.S.C. §§ 3729-33.

A.447

E.      The United States contends that it has certain civil claims against MD Labs & Owners for submitting false claims for payment for medically unnecessary UDT to the Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395lll ("Medicare"), the Medicaid Program, 42 U.S.C. §§ 1396-1396w-5 ("Medicaid"), and the Veterans Health Administration Program, 38 U.S.C. Chapter 17 ("VA") (collectively, "Federal Health Care Programs").

F.      On April 13, 2021, the Centers for Medicare & Medicaid Services ("CMS") suspended MD Labs' Medicare payments pursuant to 42 C.F.R. § 405.371(a)(2) ("CMS Suspension").  The CMS Suspension remains in effect.  The term "CMS Suspended Amount" refers to the funds that CMS has held in suspense of payment to MD Labs from the date of implementation of the suspension through October 6, 2021.  As of October 6, 2021, the CMS Suspended Amount was approximately $1,644,826.28.

G.      MD Labs & Owners admit, acknowledge, and accept their responsibility for the following facts.  From January 1, 2015 through December 31, 2019, MD Labs offered its health care provider ("HCP") clients UDT, including presumptive UDT via an enzyme immuno-assay method and confirmatory UDT via a liquid chromatography mass spectrometry method.  For those HCP clients who submitted orders to MD Labs for presumptive and confirmatory UDT, MD Labs performed both tests at or around the same time, and simultaneously reported the results of both tests to the HCP clients.  For drug targets that are reliably detected by both presumptive and definitive testing methods, MD Labs & Owners knew, as defined by 31 U.S.C. § 3729(b)(1), that in certain situations HCPs would not use such presumptive test results in their medical decision-making because MD Labs reported more precise confirmatory test results to the HCPs at the same time.  Although the laboratory is not responsible for ordering tests, MD Labs & Owners also knew, as defined by 31 U.S.C. § 3729(b)(1), that in certain situations HCP clients could not have

2

A.448

reviewed such presumptive test results for those drug targets for which presumptive testing was available prior to ordering confirmatory UDT.  Absent HCP-designated reflex orders in certain situations or clear orders from HCPs, for example, this confirmatory testing was not medically reasonable and necessary.  Yet, from January 1, 2015 through December 31, 2019, MD Labs & Owners improperly billed, or caused to be billed, Federal Health Care Programs for presumptive and confirmatory UDT that MD Labs simultaneously reported to HCP clients, without HCP-designated reflex orders in place.  The foregoing conduct in Paragraph G is hereinafter referred to as the "Covered Conduct."

H.      Relator claims entitlement under 31 U.S.C. § 3730(d) to a share of the proceeds of this Settlement Agreement and to Relator's reasonable expenses, attorneys' fees, and costs.

I.      MD Labs & Owners have entered or will enter into separate settlement agreements described in Paragraph 1 below (the "Medicaid State Settlement Agreements"), with the states (the "Medicaid Participating States") in settlement of the conduct released in those separate Medicaid State Settlement Agreements.

In consideration of the mutual promises and obligations of this Settlement Agreement, the Parties agree and covenant as follows:

<u>TERMS AND CONDITIONS</u>

1.      MD Labs & Owners shall pay to the United States and the Medicaid Participating States (the "Government Plaintiffs") the sums specified in this paragraph (collectively, the "Settlement Amount"), pursuant to the terms and conditions specified herein.

      a. MD Labs & Owners shall make an initial payment of $3,000,000 (the "Initial Payment") within ten (10) days of the Effective Date of this Agreement. The Initial Payment shall not be paid with any funds from the CMS Suspended

3

A.449

Amount.  Of the Initial Payment, MD Labs & Owners shall pay $2,287,010 to the United States and $712,990 to the Medicaid Participating States;

b. MD Labs & Owners shall forfeit any and all right or claim to the CMS Suspended Amount, and the United States shall apply this full amount towards the Minimum Guaranteed Payment, as defined below.  MD Labs & Owners expressly relinquish any and all rights of any kind they have with respect to the CMS Suspended Amount, including but not limited to: any and all rights to have an overpayment determined under any statute, regulation, or rule; any and all rights to payment of the CMS Suspended Amount; any and all rights to appeal, whether formally or informally and whether administratively or judicially, the right of the United States and/or CMS to retain the CMS Suspended Amount; and any other rights MD Labs & Owners may have to challenge the withholding of the CMS Suspended Amount or the CMS Suspension in any respect;

c. MD Labs shall pay the Government Plaintiffs ten percent (10%) of its annual revenues derived from laboratory testing operations, as MD Labs reports revenue in its annual federal tax returns, each year for five years from 2022 through 2026, beginning one year from the Effective Date of this Agreement, and shall do so regardless of whether payments by MD Labs & Owners— including the Initial Payment and payment under subparagraph 1.b—exceed the Minimum Guaranteed Payment (as defined below). At the same time that it makes each payment described in this subparagraph, MD Labs shall submit to the U.S. Attorney's Office for the District of Massachusetts documents

4

A.450

sufficient to show how it calculated each such payment (including by providing a copy of the underlying annual federal tax returns);

d. No later than five years from the Effective Date of this Agreement, MD Labs & Owners, collectively, shall pay to the Government Plaintiffs no less than $11,600,000 plus interest as set forth in subparagraph 1.f (the "Minimum Guaranteed Payment"). Payments made in accordance with subparagraphs 1.a, 1.b, and 1.c shall be credited towards the Minimum Guaranteed Payment;

e. Under no circumstances shall MD Labs & Owners, individually or collectively, pay more than $16,000,000 plus interest, as described in subparagraph 1.f, to the Government Plaintiffs (the "Maximum Payment");

f. MD Labs & Owners, individually or collectively, shall make a separate annual interest payment on the unpaid balance of $11,600,000 with interest accruing at an annual rate of 1.5% from May 17, 2021, beginning one year from the Effective Date of this Agreement and continuing, if necessary, until 2026. However, if MD Labs & Owners' payments in accordance with subparagraphs 1.a, 1.b, and 1.c exceed $11,600,000, MD Labs & Owners, individually or collectively, shall pay interest annually on the difference between $11,600,000 and any amount owed pursuant to subparagraphs 1.a, 1.b, and 1.c in excess of $11,600,000 (up to and including $16,000,000), until and including their final payment. Such interest shall accrue at an annual rate of 1.5% from May 17, 2021. Amounts paid pursuant to 1.a, 1.b, and 1.c do not constitute interest payments.

g. Following MD Labs' payment of the fifth and final payment to the Government Plaintiffs in 2026 (as described in subparagraph 1.c), if MD Labs has not paid

5

A.451

the Government Plaintiffs the Minimum Guaranteed Payment, Grizelj and Rutledge, jointly and severally, shall pay the Government Plaintiffs the difference between the Minimum Guaranteed Payment and all payments made pursuant to subparagraphs 1.a, b, and c;

h.  Any funds CMS suspends after October 6, 2021, until the termination of the CMS Suspension, shall be applied towards the Minimum Guaranteed Payment and the Maximum Payment, but will not be considered "annual revenues derived from laboratory testing operations" for purposes of subparagraph 1.c; and

i.  Within five years of the Effective Date of this Agreement, if MD Labs & Owners obtain any insurance coverage for any payments relating to the substance of litigation, disputes, or claims relating to the United States' investigation and/or the Covered Conduct (excluding coverage for legal fees and expenses), MD Labs & Owners shall also pay to the Government Plaintiffs seventy-five percent (75%) of the amount of each such insurance payment, within ten (10) business days of the date that the payment is made to, or on behalf of, MD Labs & Owners.  MD Labs & Owners will request coverage under any applicable insurance policy.  Following the Effective Date of this Agreement and for five years thereafter, MD Labs & Owners will annually notify the U.S. Attorney's Office for the District of Massachusetts, c/o Affirmative Civil Enforcement Chief, in writing of each such request under this subparagraph.

j.  For any such payment any one or more of MD Labs & Owners make pursuant to Paragraph 1 subparagraphs a-i, MD Labs & Owners shall pay 84.83% of such

6

A.452

payment to the United States and 15.17% of such payment to the Medicaid Participating States. The federal share of the first payment shall be decreased in accordance with the CMS Suspended Amount.

k. If MD Labs is sold, merged, or transferred, or all or substantially all of MD Labs' assets are sold, merged, or transferred into another non-affiliated entity, MD Labs & Owners shall promptly notify the United States, and all remaining payments owed pursuant to the Settlement Agreement shall be accelerated and become immediately due and payable upon consummation of such transaction.

l. Of the total $16,000,000 settlement amount, $8,000,000 is restitution, and of that amount $6,786,400 is restitution to the United States, and the remainder is restitution to the Medicaid Participating States.

2. MD Labs & Owners, as applicable pursuant to Paragraph 1, shall make all payments in Paragraph 1 owed to the United States (the "Federal Settlement Amount") by electronic funds transfer pursuant to written instructions to be provided by the United States Attorney's Office for the District of Massachusetts. Further, MD Labs & Owners, as applicable pursuant to Paragraph 1, shall make all payments in Paragraph 1 to the Medicaid Participating States (the "State Settlement Amount") pursuant to the terms of the Medicaid State Settlement Agreements that MD Labs & Owners have entered or will enter into with the Medicaid Participating States. The entire balance of the Settlement Amount, or any portion thereof, may be prepaid without premium or penalty. If MD Labs & Owners elect to prepay the Settlement Amount, or any portion thereof, interest shall accrue through the date on which MD Labs & Owners make said prepayment.

3. Conditioned upon the United States receiving the Federal Settlement Amount payments from MD Labs & Owners, and as soon as feasible after receipt, the United States shall

7

A.453

pay by electronic funds transfer to Relator 15% of each such payment, including the CMS Suspended Amount, (the "Relator's Share") as soon as feasible after receipt of the payment.

4.     Subject to the exceptions in Paragraph 7 (concerning reserved claims) below, and upon the United States' receipt of the Federal Settlement Amount, the United States releases MD Labs & Owners, their predecessors, their current and former parents, divisions, subsidiaries, successors, and assigns ("MD Labs & Owners Releasees"), from any and all civil or administrative monetary claims the United States has for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-33, the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a, the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-12, or the common law theories of payment by mistake, unjust enrichment, and fraud.

5.     Upon the United States' receipt of the Federal Settlement Amount, Relator, for itself and for its heirs, successors, attorneys, agents, and assigns, releases MD Labs & Owners Releasees from any and all claims and potential claims, including but not limited to all claims included in the qui tam complaint filed in the Civil Action, any other claims the Relator has on behalf of the United States under the False Claims Act, 31 U.S.C. §§ 3729-3733, and any common law claims; provided, however, that the Relator retains any and all claims based on MD Labs & Owners' submission or causing the submission of false claims for urinary tract infection testing, subject to any applicable defenses MD Labs & Owners otherwise retain (the "Non-Released UTI Claims").

6.     In consideration of the obligations of MD Labs & Owners in this Agreement and the Corporate Integrity Agreement (CIA), entered into between OIG-HHS and MD Labs, Denis Grizelj, and Matthew Rutledge, and upon the Government Plaintiffs' receipt of full payment of the Settlement Amount, plus interest due under Paragraph 1, the OIG-HHS shall release and refrain from instituting, directing, or maintaining any administrative action seeking exclusion

8

A.454

from Medicare, Medicaid, and other Federal health care programs (as defined in 42 U.S.C. § 1320a-7b(f)) against MD Labs, Denis Grizelj, and Matthew Rutledge under 42 U.S.C. § 1320a-7a (Civil Monetary Penalties Law) or 42 U.S.C. § 1320a-7(b)(7) (permissive exclusion for fraud, kickbacks, and other prohibited activities) for the Covered Conduct, except as reserved in this paragraph and in Paragraph 7 (concerning reserved claims), below.  The OIG-HHS expressly reserves all rights to comply with any statutory obligations to exclude MD Labs, Denis Grizelj, and Matthew Rutledge from Medicare, Medicaid, and other Federal health care programs under 42 U.S.C. § 1320a-7(a) (mandatory exclusion) based upon the Covered Conduct.  Nothing in this paragraph precludes the OIG-HHS from taking action against entities or persons, or for conduct and practices, for which claims have been reserved in Paragraph 7, below.

7.      Notwithstanding the releases given in Paragraphs 4, 5, and 6 of this Agreement, or any other term of this Agreement, the following claims and rights of the United States are specifically reserved and are not released:

a.      Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

b.      Any criminal liability;

c.      Except as explicitly stated in this Agreement, any administrative liability or enforcement right, including mandatory exclusion from Federal Health Care Programs;

d.      Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

e.      Any liability based upon obligations created by this Agreement; and

f.      Any liability of individuals not released pursuant to this Agreement.

8.      Relator and its heirs, successors, attorneys, agents, and assigns shall not object to this Agreement but agree and confirm that this Agreement is fair, adequate, and reasonable under

9

A.455

all the circumstances, pursuant to 31 U.S.C. § 3730(c)(2)(B). Conditioned upon Relator's receipt of the Relator's Share, Relator and its heirs, successors, attorneys, agents, and assigns fully and finally release, waive, and forever discharge the United States, its agencies, officers, agents, employees, and servants, from any claims arising from the filing of the Civil Action or under 31 U.S.C. § 3730, and from any claims to a share of the proceeds of this Agreement and/or the Civil Action.

9.      Relator, for itself, and for its heirs, successors, attorneys, agents, and assigns, fully and finally releases MD Labs & Owners Releasees, and their officers, agents, and employees, from any liability to Relator arising from the filing of the Civil Action, except as to liability arising out of the Non-Released UTI Claims.

10.     MD Labs & Owners have provided sworn financial disclosures and supporting documents ("Financial Disclosures") to the United States, and the United States has relied on the accuracy and completeness of those Financial Disclosures in reaching this Agreement. MD Labs & Owners warrant that the Financial Disclosures are complete, accurate, and current as of the date provided. If, after the Effective Date of this Agreement, the United States learns of asset(s) in which MD Labs & Owners had an interest of any kind as of the date of the disclosures (including, but not limited to, promises by insurers or other third parties to satisfy MD Labs & Owners' obligations under this Agreement) that were not disclosed in the Financial Disclosures, or if the United States learns of any false statement or misrepresentation by MD Labs & Owners on, or in connection with, the Financial Disclosures, and if such nondisclosure, false statement, or misrepresentation changes the estimated net worth set forth in the Financial Disclosures by $1.6 million or more, the United States may at its option: (a) rescind this Agreement and reinstate its suit or file suit based on the Covered Conduct, or (b) collect the Maximum Payment in accordance with the Agreement plus one hundred percent (100%) of the net value of MD Labs

10

A.456

& Owners' previously undisclosed assets.  MD Labs & Owners agree not to contest any collection action undertaken by the United States pursuant to this provision, and agree that they will immediately pay the United States (i) a ten-percent (10%) surcharge of the amount collected in the collection action, or (ii) the United States' reasonable attorneys' fees and expenses incurred in such an action, in each case, to the extent allowed by 28 U.S.C. § 3011.  In the event that the United States, pursuant to this Paragraph, rescinds this Agreement, MD Labs & Owners waive and agree not to plead, argue, or otherwise raise any defenses under the theories of statute of limitations, laches, estoppel, or similar theories, to any civil or administrative claims that (a) are filed by the United States within 120 calendar days of written notification to MD Labs & Owners that this Agreement has been rescinded, and (b) relate to the Covered Conduct, except to the extent these defenses were available on December 11, 2018.

11. MD Labs & Owners waive and shall not assert any defenses MD Labs & Owners may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action.

12. MD Labs & Owners fully and finally release the United States, its agencies, officers, agents, employees, and servants, from any claims (including for attorneys' fees, costs, and expenses of every kind and however denominated) that MD Labs & Owners have asserted, could have asserted, or may assert in the future against the United States, its agencies, officers, agents, employees, and servants, related to the Covered Conduct or the United States' investigation or prosecution thereof.

11

A.457

13.      MD Labs & Owners fully and finally release the Relator from any claims (including for attorneys' fees, costs, and expenses of every kind and however denominated) that MD Labs & Owners have asserted, could have asserted, or may assert in the future against Relator, related to the Civil Action, except for the Non-Released UTI Claims, and Relator's investigation and prosecution of the Covered Conduct.

14.      Subject to the provisions of Paragraph 1 above, the Settlement Amount shall not be decreased as a result of the denial of claims for payment now being withheld from payment by any Medicare contractor (*e.g.*, Medicare Administrative Contractor, fiscal intermediary, carrier) or any state payer, related to the Covered Conduct; and MD Labs & Owners agree not to resubmit to any Medicare contractor or any state payer any previously denied claims related to the Covered Conduct, agrees not to appeal any such denials of claims, and agrees to withdraw any such pending appeals.

15.      MD Labs & Owners agree to the following:

a.      <u>Unallowable Costs Defined</u>: All costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47; and in Titles XVIII and XIX of the Social Security Act, 42 U.S.C. §§ 1395-1395lll and 1396-1396w-5; and the regulations and official program directives promulgated thereunder) incurred by or on behalf of MD Labs & Owners, its present or former officers, directors, employees, shareholders, and agents in connection with:

(1)      the matters covered by this Agreement;

(2)      the United States' audit(s) and civil investigation(s) of the matters covered by this Agreement;

(3)      MD Labs & Owners' investigation, defense, and corrective actions undertaken in response to the United States' audit(s) and civil

12

A.458

investigation(s) in connection with the matters covered by this Agreement (including attorneys' fees);

(4)      the negotiation and performance of this Agreement;

(5)      the payment MD Labs & Owners make to the United States pursuant to this Agreement and any payments that MD Labs & Owners may make to Relator, including costs and attorney's fees; and

(6)      the negotiation of, and obligations undertaken pursuant to the CIA to:  (i) retain an independent review organization to perform annual reviews as described in Section III of the CIA; and (ii) prepare and submit reports to the OIG-HHS;

are unallowable costs for government contracting purposes and under the Medicare Program, Medicaid Program, and VA Program (hereinafter referred to as Unallowable Costs).  However, nothing in paragraph 15.a.(6) that may apply to the obligations undertaken pursuant to the CIA affects the status of costs that are not allowable based on any other authority applicable to MD Labs & Owners.

b.      Future Treatment of Unallowable Costs:   Unallowable Costs shall be separately determined and accounted for by MD Labs & Owners, and MD Labs & Owners shall not charge such Unallowable Costs directly or indirectly to any contracts with the United States or any State Medicaid program, or seek payment for such Unallowable Costs through any cost report, cost statement, information statement, or payment request submitted by MD Labs & Owners or any of their subsidiaries or affiliates to the Medicare, Medicaid, or VA Programs.

c.      Treatment of Unallowable Costs Previously Submitted for Payment:   MD Labs & Owners further agree that within 90 days of the Effective Date of this Agreement it shall identify to applicable Medicare fiscal intermediaries, carriers, and/or contractors, and Medicaid or

13

A.459

VA fiscal agents, any Unallowable Costs (as defined in this Paragraph) included in payments previously sought from the United States, or any State Medicaid program, including, but not limited to, payments sought in any cost reports, cost statements, information reports, or payment requests already submitted by MD Labs & Owners or any of their subsidiaries or affiliates, and shall request, and agree, that such cost reports, cost statements, information reports, or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the Unallowable Costs.  MD Labs & Owners agree that the United States, at a minimum, shall be entitled to recoup from MD Labs & Owners any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously submitted cost reports, information reports, cost statements, or requests for payment.

Any payments due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice and/or the affected agencies.  The United States reserves its rights to disagree with any calculations submitted by MD Labs & Owners or any of their subsidiaries or affiliates on the effect of inclusion of Unallowable Costs (as defined in this Paragraph) on MD Labs & Owners' or any of their subsidiaries' or affiliates' cost reports, cost statements, or information reports.

d.      Nothing in this Agreement shall constitute a waiver of the rights of the United States to audit, examine, or re-examine MD Labs & Owners' books and records to determine that no Unallowable Costs have been claimed in accordance with the provisions of this Paragraph.

16.     MD Labs & Owners agree to cooperate fully and truthfully with the United States' investigation of entities not released in this Agreement and not affiliated with MD Labs & Owners. Upon reasonable notice, MD Labs & Owners shall encourage, and agree not to impair, the cooperation of MD Labs' directors, officers, and employees, and shall use its best efforts to make

14

A.460

available, and encourage, the cooperation of former directors, officers, and employees for interviews and testimony, consistent with the rights and privileges of such individuals. MD Labs & Owners further agree to furnish to the United States, upon request, complete and unredacted copies of all non-privileged documents, reports, memoranda of interviews, and records in its possession, custody, or control concerning any investigation of the Covered Conduct that it has undertaken, or that has been performed by another on its behalf.

17.     This Agreement is intended to be for the benefit of the Parties only. The Parties do not release any claims against any other person or entity, except to the extent provided for in Paragraph 18 (waiver for beneficiaries paragraph), below.

18.     MD Labs & Owners agree that they waive and shall not seek payment for any of the health care billings covered by this Agreement from any health care beneficiaries or their parents, sponsors, legally responsible individuals, or third-party payors based upon the claims defined as Covered Conduct.

19.     The Settlement Amount represents the amount the United States is willing to accept in compromise of its civil claims arising from the Covered Conduct due solely to MD Labs & Owners' financial condition as reflected in the Financial Disclosures referenced in Paragraph 10.

a.     In the event that MD Labs & Owners fail to pay any portion of the Settlement Amount in accordance with the terms and conditions in Paragraph 1 of this Agreement, MD Labs & Owners shall be in default of their payment obligations ("Payment Default"). The United States will provide a written Notice of Payment Default, and MD Labs & Owners shall have an opportunity to cure such Payment Default within seven (7) business days from the date of receipt of the Notice of Payment Default by making the payment due under the payment schedule and paying any additional interest accruing under the Agreement up to the

15

A.461

date of payment.  Notice of Payment Default will be delivered to any one of MD Labs &

Owners, or to such other representative as they shall designate in advance in writing.  If MD

Labs & Owners fail to cure the Payment Default within seven (7) business days of receiving the

Notice of Payment Default and in the absence of an agreement with the United States to a

modified payment schedule ("Uncured Payment Default"), the remaining unpaid balance of the

Settlement Amount shall become immediately due and payable, and interest on the remaining

unpaid balance shall thereafter accrue at the rate of 12% per annum, compounded daily from the

date of Payment Default, on the remaining unpaid total (principal and interest balance).

   b.  In the event of an Uncured Payment Default, MD Labs & Owners agree

that the United States, at its sole discretion, may (i) retain any payments previously made,

rescind this Agreement and pursue the Civil Action, or bring any civil and/or administrative

claim, action, or proceeding against MD Labs & Owners for the claims that would otherwise be

covered by the releases provided in Paragraphs 4, 5, 6, and 9 above, with any recovery reduced

by the amount of any payments previously made by MD Labs & Owners to the United States

under this Agreement; (ii) take any action to enforce this Agreement in a new action or by

reinstating the Civil Action; (iii) offset the remaining unpaid balance from any amounts due and

owing to MD Labs & Owners and/or affiliated companies by any department, agency, or agent

of the United States at the time of Payment Default or subsequently; and/or (iv) exercise any

other right granted by law, or under the terms of this Agreement, or recognizable at common law

or in equity.  The United States shall be entitled to any other rights granted by law or in equity by

reason of Payment Default, including referral of this matter for private collection.  In the event

the United States pursues a collection action, MD Labs & Owners agree immediately to pay the

United States (i) a ten-percent (10%) surcharge of the amount collected in the collection action,

or (ii) the United States reasonable attorneys' fees and expenses incurred in such an action, in

16

A.462

each case, to the extent allowed by 28 U.S.C. § 3011.  In the event that the United States opts to rescind this Agreement pursuant to this Paragraph, MD Labs & Owners waive and agree not to plead, argue, or otherwise raise any defenses of statute of limitations, laches, estoppel or similar theories, to any civil or administrative claims that are (i) filed by the United States against MD Labs & Owners within 120 days of written notification that this Agreement has been rescinded, and (ii) relate to the Covered Conduct, except to the extent these defenses were available on December 11, 2018.  MD Labs & Owners agree not to contest any offset, recoupment, and/or collection action undertaken by the United States pursuant to this Paragraph, either administratively or in any state or federal court, except on the grounds of actual payment to the United States.

      c.     In the event of an Uncured Payment Default, OIG-HHS may exclude MD Labs & Owners from participating in all Federal Health Care Programs until MD Labs & Owners pay the Settlement Amount, with interest, and reasonable costs as set forth above ("Exclusion for Default").  OIG-HHS will provide written notice of any such exclusion to MD Labs & Owners.  MD Labs & Owners waive any further notice of the exclusion under 42 U.S.C. § 1320a-7(b)(7), and agree not to contest such exclusion either administratively or in any state or federal court.  Reinstatement to program participation is not automatic.  If at the end of the period of exclusion, MD Labs & Owners wish to apply for reinstatement, each must submit a written request for reinstatement to OIG-HHS in accordance with the provisions of 42 C.F.R. §§ 1001.3001-.3005.  MD Labs & Owners will not be reinstated unless and until OIG-HHS approves such request for reinstatement.  The option for Exclusion for Payment Default is in addition to, and not in lieu of, the options identified in this Agreement or otherwise available.

20.     Subject to Paragraph 7 and the remedies accorded the United States in Paragraphs 10 and 19, (a) upon receipt of the Initial Payment described in Paragraph 1, above, the Parties

shall promptly sign and file in the Civil Action a Joint Stipulation of Dismissal of the Civil Action, pursuant to the terms of this Settlement Agreement, pursuant to Rule 41(a)(1), which shall be without prejudice to the United States as to all claims in the Civil Action and with prejudice to Relator as to all claims in the Civil Action, except the Non-Released UTI Claims, and (b) upon receipt and deposit of the final Payment as set forth in Paragraph 1, above, and the passage of 91 days, the United States agrees to submit to MD Labs & Owners a Stipulation of Dismissal with Prejudice for the Covered Conduct.

21.     Each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

22.     Each Party and signatory to this Agreement represents that it freely and voluntarily enters into this Agreement without any degree of duress or compulsion.

23.     This Agreement is governed by the laws of the United States.  The exclusive jurisdiction and venue for any dispute relating to this Agreement is the United States District Court for the District of Massachusetts.  For purposes of construing this Agreement, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

24.     This Agreement constitutes the complete agreement between the Parties.  This Agreement may not be amended except by written consent of the Parties.

25.     The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.

26.     This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

27.     This Agreement is binding on MD Labs & Owners' successors, transferees, heirs, and assigns.

A.464

28. This Agreement is binding on Relator's successors, transferees, heirs, and assigns.

29. All Parties consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

30. This Agreement is effective on the date of signature of the last signatory to the Agreement (Effective Date of this Agreement). Facsimiles and electronic transmissions of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

19

A.465

**THE UNITED STATES OF AMERICA**

DATED: 10/20/2021      BY:      ABRAHAM GEORGE    Digitally signed by ABRAHAM GEORGE
Date: 2021.10.20 09:46:22 -04'00'

ABRAHAM R. GEORGE
CHARLES B. WEINOGRAD

Assistant United States Attorneys
United States Attorney's Office
District of Massachusetts

DATED: 10/19/2021      BY:      *Lisa M. Re*
LISA M. RE
Assistant Inspector General for Legal Affairs
Office of Counsel to the Inspector General
Office of Inspector General
United States Department of Health and Human Services

20

A.466

**MD SPINE SOLUTIONS LLC, d/b/a MD LABS INC.**

DATED: 10/14/2021   BY: _____

DENIS GRIZELJ
MATT RUTLEDGE
Co-Founders MD Spine Solutions, LLC,
d/b/a MD Labs, Inc.

DATED: 10/14/2021   BY: _____

BARAK COHEN
BRIA COCHRAN
Counsel for MD Labs, Inc.

A.467

**DENIS GRIZELJ**

DATED: 10/14/2021       BY: _____

DENIS GRIZELJ
Co-Founder MD Spine Solutions, LLC,
d/b/a MD Labs, Inc.

DATED: 10/14/2021       BY: _____

BARAK COHEN
BRIA COCHRAN
Counsel for Denis Grizelj

22

A.468

A.469

OMNI HEALTHCARE, INC. - RELATOR

DATED: 10/15/2021      BY: _____
                            CRAIG DELIGDISH
                            Omni Healthcare, Inc., Founder

DATED: 10/18/21      BY: _____
                            JESSE HOYER ESTES
                            Counsel for Omni Healthcare, Inc.

A.470

# EXHIBIT B

A.471

# STILL USING STANDARD UTI CULTURE AND SENSITIVITY TESTING?

**STANDARD MICROBIOLOGY CULTURING LOOKS FOR ONLY 5 OR 6 PATHOGENS WITH A 29% ERROR RATE[1]**

**STANDARD MICROBIOLOGY SENSITIVITY TESTING EVALUATES ONLY 6 OR 7 ANTIBIOTICS, WHILE ANTIBIOTIC RESISTANCE TO PATHOGENS CONTINUES TO INCREASE[2]**



## MD Labs Genotypes UTIs to Reduce Antibiotic Resistance and ACCURATELY Treat UTIs the First Time

| | STANDARD MICROBIOLOGY PATHOGEN CULTURE TESTING | MD LABS DNA-GENOTYPING PATHOGEN DETECTION WITH REAL-TIME PCR ANALYSIS |
|---|---|---|
| Techonology | Microscope | Real-Time DNA PCR Analysis |
| Pathogens | only 5 or 6 | 17 |
| Detection | only 71% | 100% specificity |

| | STANDARD SENSITIVITY TESTING | ADVANCED SENSITIVITY TESTING |
|---|---|---|
| Antibiotics | 6 or 7 | up to 35 |
| Cost Differential | None | None |

☑ Results in 2-3 days from specimen arrival at lab
☑ Easy to interpret 1-page report
☑ Covered by most insurance carriers
☑ Infectious Disease specialist available for support

[1] Van der Zee A, Roorda L, Bosman G, Ossewaarde JM. Molecular Diagnosis of Urinary Tract Infections by Semi-Quantitative Detection of Uropathogens in a Routine Clinical Hospital Setting. Lin B, ed. PLoS ONE. 2016;11(3):e0150775. doi:10.1371/journal.pone.0150755.

[2] Sanchez GV, Master RN, Karlowsky JA, Bordon JM. In Vitro Antimicrobial Resistance of Urinary Escherichia coli Isolates among U.S. Outpatients from 2000 to 2010. Antimicrobial Agents and Chemotherapy. 2016;56(4):2181-2183. doi:10.1128/AAC.06060-11

### DETECT AND TREAT WITH CERTAINTY



*Identification of **17** Specific Pathogens using Real-time PCR DNA Analysis*



*Rapid and Accurate Antibiotic Sensitivity of up to **35** Antibiotics Targeting the Specific UTI Pathogen(s)*



*Optimal Treatment Plan Based On:*
- *Allergies (self reported)*
- *UTI Pathogens*
- *Antibiotic Resistance*

## MD Labs Direct
## 1-775-391-5221



MOLECULAR DIAGNOSTICS

mdlabs.com/moleculardiagnostics

A.472

## Please Contact Your MD Labs Representative Today

OMNI00029

# EXHIBIT C

A.473

Case 1:18-cv-12558-PBS   Document 259-3   Filed 08/29/24   Page 2 of 6



## Coverage Determination Process

Local Coverage Determinations

How to Request an NCD

Contact CAG

Listserv

Medicare Coverage Guidance Documents

Public Comments

Reports

Medicare coverage

Technology & innovation

A.474

# Medicare Coverage Determination Process

Medicare coverage is limited to items and services that are reasonable and necessary for the diagnosis or treatment of an illness or injury (and within the scope of a Medicare benefit category). National coverage determinations (NCDs) are made through an evidence-based process, with opportunities for public participation. In some cases, CMS' own research is supplemented by an outside technology assessment and/or consultation with the Medicare Evidence Development & Coverage Advisory Committee (MEDCAC). In the absence of a national coverage policy, an item or service may be covered at the discretion of the Medicare contractors based on a local coverage determination (LCD).

The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 amended several portions of the NCD development process with an effective date of January 1, 2004.

## Current

On Wednesday, August 7, 2013, the Centers for Medicare & Medicaid Services (CMS) published a Federal Register notice, (78 FR 48164-69), updating the process used for opening, deciding or reconsidering national coverage determinations (NCDs) under the Social Security Act (the Act). The notice replaces the September 26, 2003 Federal Register notice (68 FR 55634) and further outlines an expedited administrative process, using specific criteria, to remove certain NCDs older than 10 years since their most recent review, thereby enabling local Medicare contractors to determine coverage under the Act.

This notice does not alter or amend our regulations that establish rules related to the administrative review of NCDs.

## Historical

On and after January 1, 2004, the following changes to the NCD process will be effective:

A.475

- For NCD requests not requiring an external technology assessment (TA) or Medicare Evidence Development & Coverage Advisory Committee (MEDCAC) review, the decision on the request shall be made not later than 6 months after the date the completed request is received; (§731(a)(2)(A))

- For those NCD requests requiring either an external TA and/or MEDCAC review, and in which a clinical trial is not requested, the decision on the request shall be made not later than 9 months after the date the completed request is received; (§731(a)(2)(B))

- Not later than the end of the 6 or 9 month period described above, the proposed decision shall be made available on the CMS website (or other appropriate means) for public comment. This comment period shall last 30 days, and comments will be reviewed and a final decision issued not later than 60 days after the conclusion of the comment period. A summary of the public comments received and responses to the comments will continue to be included in the final NCD. (§731(a)(3)(A))

- An Annual Report shall be issued listing the national coverage determinations made in the previous year and explaining how to get more information on those determinations. (§953(b))

**NCD Dashboard** (PDF)

## Expedited Process to Remove National Coverage Determinations

 **Downloads**

Medicare Modernizaton Act (MMA) Coverage Flowchart (PDF, 19KB) (PDF)

Federal Register Notice: Revised Process for Making Medicare National Coverage Determinations (PDF)

Federal Register Notice: Procedures for Making National Coverage Decisions 04/27/1999 (PDF, 41KB) (PDF)

[Federal Register Proposed Rule: Review of National and Local Coverage Determinations 08/22/2002 (PDF, 220KB) (PDF)](#)

[Federal Register Final Rule: Medicare Program: Review of National Coverage Determinations and Local Coverage Determination 11/24/2003 (PDF, 267KB) (PDF)](#)

[Federal Register Notice: Medicare Program; Revised Process for Making National Coverage Determinations 8/7/2013 (PDF)](#)

 **Related Links**

[Section 1861 of The Act](#)

[Search the Medicare Coverage Database](#)

[Medicare Coverage Center](#)

[Contact CAG](#)

Page Last Modified:   01/31/2024 08:03 AM

[Help with File Formats and Plug-Ins](#)

 

    

A.477

A federal government website managed and paid for by the U.S. Centers for Medicare & Medicaid Services.

7500 Security Boulevard, Baltimore, MD 21244

A.478

# EXHIBIT D

A.479

Case 1:18-cv-12558-PBS Document 259-4 Filed 08/29/24 Page 2 of 32

## AUA Cookie Policy and Agreement

We use cookies and other tracking technologies to improve your browsing experience on our website, to show you personalized content and targeted ads, to analyze our website traffic, and to understand where our visitors are coming from in an effort to continue to serve your needs.

I agree    I decline    Change my preferences

AUA Websites ∨


American Urological Association

Search …

**SYSTEM UPGRADE NOTICE**

We have made some exciting digital upgrades! All members and customers will need to reset their passwords to access their accounts in our new system. Doing so will allow you to complete transactions and access all AUA websites, including UrologyHealth.org, *The Journal of Urology* and AUA*University,* as well as all mobile apps.

Attention: Restrictions on use of AUA, AUAER, and UCF content in third party applications, including artificial intelligence technologies, such as large language models and generative AI.

You are prohibited from using or uploading content you accessed through this website into external applications, bots, software, or websites, including those using artificial intelligence technologies and infrastructure, including deep learning, machine learning and large language models and generative AI.

Home   |   Guidelines & Quality   |   Guidelines   |   Recurrent UTI

**Guidelines**

# Recurrent Uncomplicated Urinary Tract Infections in Women: AUA/CUA/SUFU Guideline (2022)

### USING AUA GUIDELINES

This AUA guideline is provided free of use to the general public for academic and research purposes. However, any person or company accessing AUA guidelines for promotional or commercial use must obtain a licensed copy. To obtain the licensable copy of this guideline, please contact Keith Price at kprice@auanet.org.

*PUBLISHED 2019, REVIEWED AND VALIDITY CONFIRMED 2022*

Unabridged version of this guideline (2022) [pdf]
Algorithm associated with this guideline [pdf]
Canadian French translated guideline courtesy of Canadian Urological Association (CUA). [pdf]


A.480

# Panel Members

Jennifer Anger, MD, MPH; Una Lee, MD; A. Lenore Ackerman, MD, PhD; Roger Chou, MD; Bilal Chughtai, MD; J. Quentin Clemens, MD; Duane Hickling, MD, MSCI; Anil Kapoor, MD; Kimberly S. Kenton, MD, MS; Melissa R. Kaufman, MD, PhD; Mary Ann Rondanina, Yahir A. Santiago-Lastra, MD; Ann Stapleton, MD; Lynn Stothers, MD; Toby C. Chai, MD

## PURPOSE

Over the past few decades, our ability to diagnose, treat, and manage recurrent urinary tract infection (rUTI) long-term has evolved due to additional insights into the pathophysiology of rUTI, a new appreciation for the adverse effects of repetitive antimicrobial therapy ("collateral damage"), rising rates of bacterial antimicrobial resistance, and better reporting of the natural history and clinical outcomes of acute cystitis and rUTI. For the purposes of this guideline, the Panel considers only recurrent episodes of uncomplicated cystitis in women. This guideline does not apply to pregnant women, patients who are immunocompromised, those with anatomic or functional abnormalities of the urinary tract, women with rUTIs due to self-catheterization or indwelling catheters or those exhibiting signs or symptoms of systemic bacteremia, such as fever and flank pain. This guideline also excludes those seeking prevention of urinary tract infections (UTIs) in the operative or procedural setting. In this document, the term UTI will refer to acute bacterial cystitis unless otherwise specified. This document seeks to establish guidance for the evaluation and management of patients with rUTIs to prevent inappropriate use of antibiotics, decrease the risk of antibiotic resistance, reduce adverse effects of antibiotic use, provide guidance on antibiotic and non-antibiotic strategies for prevention, and improve clinical outcomes and quality of life for women with rUTIs by reducing recurrence of UTI events.

## METHODOLOGY

The systematic review utilized to inform this guideline was conducted by a methodology team at the Pacific Northwest Evidence–based Practice Center (EPC). Scoping of the report and review of the final systematic review to inform guideline statements was conducted in conjunction with the rUTI Panel. A research librarian conducted searches in Ovid MEDLINE (1946 to January Week 1 2018), Cochrane Central Register of Controlled Trials (through December 2017) and Embase (through January 16, 2018). Searches of electronic databases were supplemented by reviewing reference lists of relevant articles. An updated literature search was conducted on September 20, 2018. In 2022, the EPC conducted an update review assessing abstracts from new studies published since the publication of the 2019 Guideline. The AUA asked the EPC to further assess a subset of studies included in the update report, to support potential changes to the 2019 guideline.

## GUIDELINE STATEMENTS

**Evaluation**

1. Clinicians should obtain a complete patient history and perform a pelvic examination in women presenting with rUTIs. (Clinical Principle)

2. To make a diagnosis of rUTI, clinicians must document positive urine cultures associated with prior symptomatic episodes. (Clinical Principle)

3. Clinicians should obtain repeat urine studies when an initial urine specimen is suspect for contamination, with consideration for obtaining a catheterized specimen. (Clinical Principle)

4. Cystoscopy and upper tract imaging should not be routinely obtained in the index patient presenting with a rUTI. (Expert Opinion)

5. Clinicians should obtain urinalysis, urine culture and sensitivity with each symptomatic acute cystitis episode prior to initiating treatment in patients with rUTIs. (Moderate Recommendation; Evidence Level: Grade C)

6. Clinicians may offer patient-initiated treatment (self-start treatment) to select rUTI patients with acute episodes while awaiting urine cultures. (Moderate Recommendation; Evidence Level: Grade C)

**Asymptomatic Bacteriuria**

7. Clinicians should omit surveillance urine testing, including urine culture, in asymptomatic patients with rUTIs. (Moderate Recommendation; Evidence Level: Grade C)

8. Clinicians should not treat ASB in patients. (Strong Recommendation; Evidence Level: Grade B)

**Antibiotic Treatment**



A.481

9. Clinicians should use first-line therapy (i.e., nitrofurantoin, TMP-SMX, fosfomycin) dependent on the local antibiogram for the treatment of symptomatic UTIs in women. (Strong Recommendation; Evidence Level: Grade B)

10. Clinicians should treat rUTI patients experiencing acute cystitis episodes with as short a duration of antibiotics as reasonable, generally no longer than seven days. (Moderate Recommendation; Evidence Level: Grade B)

11. In patients with rUTIs experiencing acute cystitis episodes associated with urine cultures resistant to oral antibiotics, clinicians may treat with culture-directed parenteral antibiotics for as short a course as reasonable, generally no longer than seven days. (Expert Opinion)

**Antibiotic Prophylaxis**

12. Following discussion of the risks, benefits, and alternatives, clinicians may prescribe antibiotic prophylaxis to decrease the risk of future UTIs in women of all ages previously diagnosed with UTIs. (Conditional Recommendation; Evidence Level: Grade B)

**Non–Antibiotic Prophylaxis**

13. Clinicians may offer cranberry prophylaxis for women with rUTIs. (Conditional Recommendation; Evidence Level: Grade C)

**Follow–up Evaluation**

14. Clinicians should not perform a post-treatment test of cure urinalysis or urine culture in asymptomatic patients. (Expert Opinion)

15. Clinicians should repeat urine cultures to guide further management when UTI symptoms persist following antimicrobial therapy. (Expert Opinion)

**Estrogen**

16. In peri– and post–menopausal women with rUTIs, clinicians should recommend vaginal estrogen therapy to reduce the risk of future UTIs if there is no contraindication to estrogen therapy. (Moderate Recommendation; Evidence Level: Grade B)

# Introduction

## PURPOSE

rUTI is a highly prevalent, costly, and burdensome condition affecting women of all ages, races, and ethnicities without regard for socioeconomic status, or educational level.[2] The incidence and prevalence of rUTI depend on the definition used. Approximately 60% of women will experience symptomatic acute bacterial cystitis in their lifetime.[3] An estimated 20-40% of women who have had one previous cystitis episode are likely to experience an additional episode, 25-50% of whom will experience multiple recurrent episodes.[4,5] The exact numbers are unclear, as most epidemiologic studies utilize diagnosis codes that may overestimate true numbers due to overuse of UTI and rUTI codes in patients who have not yet undergone culture or evaluation.[3] Regardless of the definition, the evaluation and treatment of UTI costs several billion dollars globally per year, reaching approximately $2 billion per year in the United States alone.[6]

## TERMINOLOGY AND DEFINITIONS

For the purposes of this guideline, the Panel considers only recurrent episodes of uncomplicated cystitis in women. "Uncomplicated" means that the patient has no known factors that would make her more susceptible to develop a UTI, while "complicated" indicates that other complicating factors may put one at higher risk for UTI and decreased treatment efficacy. Such complicating factors may include an anatomic or functional abnormality of the urinary tract (e.g., stone disease, diverticulum, neurogenic bladder), an immunocompromised host, or infection with multi-drug resistant (MDR) bacteria. In this guideline, the term UTI will refer to culture-proven acute bacterial cystitis and associated symptoms unless otherwise specified. While most providers have confidence in making a diagnosis of acute cystitis, diagnostic criteria are imprecise and vary considerably. Strong evidence suggest that the diagnosis of acute cystitis should include the combination of laboratory confirmation of significant bacteriuria with endorsement of acute-onset symptoms referable to the urinary tract.[7,8] Without symptoms, bacteriuria of any magnitude is considered asymptomatic bacteriuria (ASB).

While there are multiple definitions for rUTI,[9] this Guideline endorses the two most commonly used definitions of two episodes of acute bacterial cystitis within six months or three episodes within one year. These definitions typically consider these episodes to be separate infections with the resolution of symptoms between episodes, and do not include those who require more than one treatment or multiple antibiotic courses for symptomatic resolution, as can occur with inappropriate initial or empiric treatment. Any patient experiencing episodes of symptomatic acute cystitis after previous resolution of similar

A.482

symptoms meets the criteria for rUTI. However, it should be noted that those patients initially treated for uncomplicated bacterial cystitis who recur rapidly (i.e. within two weeks of initial treatment) after symptom resolution or display bacterial persistence without symptom resolution may be reclassified as complicated and require imaging, cystoscopy, or other further investigation for bacterial reservoirs. The definitions used in this guideline can be found in Table 1.

**Table 1: Guideline Definitions** The index patient for this guideline is an otherwise healthy adult female with an uncomplicated recurrent urinary tract infection

| Term | Definition |
|---|---|
| Acute bacterial cystitis | A culture-proven infection of the urinary tract with a bacterial pathogen associated with acute-onset symptoms such as dysuria in conjunction with variable degrees of increased urinary urgency and frequency, hematuria, and new or worsening incontinence |
| Uncomplicated urinary tract infection | An infection of the urinary tract in a healthy patient with an anatomically and functionally normal urinary tract and no known factors that would make her susceptible to develop a UTI |
| Complicated urinary tract infection | An infection in a patient in which one or more complicating factors may put her at higher risk for development of a UTI and potentially decrease efficacy of therapy. Such factors include the following: <br><br> • Anatomic or functional abnormality of the urinary tract (e.g., stone disease, diverticulum, neurogenic bladder) <br><br> • Immunocompromised host <br><br> • Multi–drug resistant bacteria |
| Recurrent urinary tract infection | Two separate culture-proven episodes of acute bacterial cystitis and associated symptoms within six months or three episodes within one year |
| Asymptomatic bacteriuria | Presence of bacteria in the urine that causes no illness or symptoms |

**The index patient for this guideline is an otherwise healthy adult female with an uncomplicated recurrent urinary tract infection**

## INDEX PATIENT

The index patient for this guideline is an otherwise healthy adult female with an uncomplicated rUTI. The infection is culture-proven and associated with acute-onset symptoms as discussed below. This guideline does not apply to pregnant women, patients who are immunocompromised, those with anatomic or functional abnormalities of the urinary tract, women with rUTIs due to self-catheterization or indwelling catheters or those exhibiting signs or symptoms of systemic bacteremia, such as fever and flank pain.[4] This guideline also excludes those with neurological disease or illness relevant to the lower urinary tract, including peripheral neuropathy, diabetes, and spinal cord injury. Further, this guideline does not discuss prevention of UTI in operative or procedural settings.

## SYMPTOMS

In UTI, acute-onset symptoms attributable to the urinary tract typically include dysuria in conjunction with variable degrees of increased urinary urgency and frequency, hematuria, and new or worsening incontinence. *Dysuria is central in the diagnosis of UTI*; other symptoms of frequency, urgency, suprapubic pain, and hematuria are variably present. Acute-onset dysuria is a highly specific symptom, with more than 90% accuracy for UTI in young women in the absence of concomitant vaginal irritation or increased vaginal discharge.[10,11]



A.483

Case 1:18-cv-12558-PBS Document 259-4 Filed 08/29/24 Page 6 of 32

In older adults, the symptoms of UTI may be less clear. Given the subjective nature of these symptoms, careful evaluation of their chronicity becomes an important consideration when the diagnosis of UTI is in doubt. Acute-onset dysuria, particularly when associated with new or worsening storage symptoms, remains a reliable diagnostic criterion in older women living both in the community and in long-term care facilities.[12–14] Older women frequently have nonspecific symptoms that may be perceived as a UTI, such as dysuria, cloudy urine, vaginal dryness, vaginal/perineal burning, bladder or pelvic discomfort, urinary frequency and urgency, or urinary incontinence, but these tend to be more chronic in nature. The lack of a correlation between symptoms and the presence of a uropathogen on urine culture was discussed in a systematic review of studies evaluating UTI in community-dwelling adults older than 65 years. Symptoms such as chronic nocturia, incontinence, and general sense of lack of well-being (e.g., fatigue, malaise, weakness), were common and not specific for UTI.[15] While these guidelines do not include women with chronic symptoms common in urology, such as overactive bladder (OAB), guidelines from the American Geriatrics Society (AGS) and the Infectious Diseases Society of America (IDSA) agree that evaluation and treatment for suspected UTI should be reserved for acute-onset (<1 week) dysuria or fever in association with other specific UTI-associated symptoms and signs, which primarily include gross hematuria, new or significantly worsening urinary urgency, frequency and/or incontinence, and suprapubic pain.[16–19]

## DIAGNOSIS

Typically, for a diagnosis of cystitis, acute-onset symptoms should occur in conjunction with the laboratory detection of a uropathogen from the urine, typically *E. coli* (75-95%), but occasionally other pathogens such as other Enterobacteriaceae, *P. mirabilis, K. pneumoniae,* and *S. saprophyticus*. Other species are rarely isolated in uncomplicated UTI.[20,21]

Urine culture remains the mainstay of diagnosis of an episode of acute cystitis; urinalysis provides little increase in diagnostic accuracy.[22] There are significant limitations that constrain the ability of this guideline to recommend strict cut-off definitions correlating with clinically meaningful results. Standard agar-based clinical culture has been used since the 19th century with few technical refinements; more recent studies demonstrate that a large proportion of urinary bacteria are not cultivatable using these standard conditions. The definition for clinically-significant bacteriuria of $10^5$ colony-forming units (CFU)/mL was published more than 60 years ago and likely represents an arbitrary cut-off.[23–27] The origin of this cut-off derives from evidence that the use of this threshold in asymptomatic individuals is relevant to reducing the overdetection of contaminating organisms. More than 95% of subjects with >$10^5$ CFU/mL bacteria in a clean-catch specimen had definite bacteriuria on a catheterized specimen, while only a minority of patients with lower bacterial counts exhibited bacterial growth from a catheterized urine sample.[23] These data were obtained from asymptomatic women, however, and do not reflect the population in whom there is a suspicion of UTI.

In symptomatic women, however, several studies have identified subsets of women with pyuria and symptoms consistent with a UTI but colony counts <$10^5$ CFU/mL in voided urine.[28–35] One study of more than 200 pre-menopausal, non-pregnant women who presented with at least two symptoms of acute cystitis compared colony counts in a midstream, clean-catch urine sample to specimens obtained by urethral catheterization. Approximately 40% of the women who had *E. coli* grow from a catheterized specimen had colony counts <$10^5$ CFU/mL in the voided sample.[35] In multiple studies, a threshold of $\geq 10^2$ CFU/mL *E. coli* from voided specimens had 88-93% positive predictive value for bladder bacteriuria **in patients with a high suspicion of UTI**.[31,35] Lower midstream urine colony counts (>$10^2$ CFU/mL) have been associated with bladder bacteriuria on catheterization in symptomatic women with pyuria, suggesting that $\geq 10^2$ CFU/mL of a single uropathogen may be a more appropriate cut-off in appropriately selected patients in whom there is strong suspicion of infection.[36,37]

Many laboratories, however, will not report colony counts <$10^3$ CFU/mL. In addition, it is likely that the strict use of a low threshold will lead to overdiagnosis. As such, clinical judgment determining when a culture result represents clinically significant bacteriuria must factor in the clinical presentation of a patient, the urine collection method used, and the presence of other suggestive factors such as pyuria. Although a $10^5$ CFU/mL threshold for bacterial growth on midstream voided urine may help distinguish bladder bacteriuria from contamination in **asymptomatic**, pre-menopausal women, a lower $10^2$ CFU/mL threshold may be appropriate in **symptomatic** individuals. Further, no specific threshold for urinary colony count has been demonstrated to identify those symptomatic patients at risk for progression to pyelonephritis or those who would benefit from more aggressive antimicrobial management.

## MOLECULAR DIAGNOSTICS

Sensitive culture-dependent and -independent techniques have revealed that the lower urinary tract, even in asymptomatic, healthy individuals, hosts a complex microbial community that is likely important in the maintenance of normal bladder function.[22,38,39] Thus, in the strictest definition, all individuals are likely "bacteriuric." In fact, it has been suggested that ASB may protect patients with rUTI from additional symptomatic episodes.[40] Thus, more sensitive culture-based or molecular bacterial detection methods (e.g., high-throughput sequencing, polymerase chain reaction-based detection methods) are not necessarily beneficial in the diagnostic evaluation of patients with suspected bacterial cystitis. Sensitive detection of microorganisms will likely be associated with increased diagnostic confusion and dilemmas, including overdiagnosis and associated overtreatment. While there is some early evidence that molecular diagnostic methods to rapidly identify

A.484

Case 1:18-cv-12558-PBS  Document 259-4  Filed 08/29/24  Page 7 of 32

uropathogen antibiotic susceptibility may help to avoid delayed or inappropriate antimicrobial treatment,[41] the impact of such tests on the accuracy of diagnosis is not documented and cannot yet be recommended for incorporation into clinical practice. While the current definitions of UTI rely on the unlikely principle that only those organisms detectable with agar-based culture are clinically concerning, the converse that all detectable organisms are pathogenic is also inaccurate. Thus, despite a growing desire for the accurate diagnosis of UTI in patients with suggestive symptoms, particularly those who lack positive urine cultures or who have vague lower urinary tract symptoms (LUTS), the utility of this technology remains unproven and the potential for overtreatment with antibiotics remains significant.

## ANTIMICROBIAL STEWARDSHIP AND THE CONSIDERATION OF COLLATERAL DAMAGE

In the past 20 years, antimicrobial resistance among uropathogens has increased dramatically. For example, increases in extended-spectrum β-lactamase (ESBL)-producing isolates has been described among patients with acute simple cystitis worldwide.[1,42,43] Uncomplicated UTI is one of the most common indications for antimicrobial exposure in otherwise healthy women. Fluoroquinolones have been linked to infection with methicillin-resistant *S. aureus* and increasing fluoroquinolone resistance in gram-negative bacilli, such as *P. aeruginosa*, while broad spectrum cephalosporins have been linked to subsequent infections with vancomycin-resistant Enterococci, ESBL–producing *K. pneumoniae*, β-lactam-resistant Acinetobacter species, and *C. difficile*.[1]

Adhering to a program of antimicrobial stewardship with attempts to reduce inappropriate treatment, decrease broad-spectrum antibiotic use, and appropriately tailor necessary treatment to the shortest effective duration, may significantly mitigate increasing fluoroquinolone and cephalosporin resistance.[44] Non-adherence to guidelines for the treatment of acute cystitis, however, is more common in patients who have rUTIs than patients with an isolated episode of acute cystitis.[45] When patients present with acute cystitis and a history of rUTIs, many providers will employ strategies of lengthening antimicrobial course, broadening antibiotic treatment, or increasing antibiotic doses for each episode, despite the absence of evidence to support such practices. Sometimes patients pressure providers to give non-guideline-based treatments with the hope that the number of recurrent episodes will be reduced or the time between acute cystitis episodes will be lengthened. These strategies have not been demonstrated to be efficacious and have the potential for harm to the individual and community, directly contradicting the principles of antibiotic stewardship.[46,47] As antimicrobial resistance patterns vary regionally, the specific treatment recommendations for acute cystitis episodes and rUTI prophylaxis may not be appropriate in every community. Providers should combine knowledge of the local antibiogram with the selection of antimicrobial agents with the least impact on normal vaginal and fecal flora. An antibiogram provides a profile of the local results of antimicrobial sensitivity testing for specific microorganisms. Aggregate data from single hospital or healthcare systems are cumulatively summarized, usually annually, providing the percentage of a given organism sensitive to a particular antimicrobial.

In a study of more than 25 million emergency department visits during which a UTI was diagnosed, urinary symptoms were only identified in 32%. In the subset of older individuals (aged 65 to 84 years), this prevalence of symptoms fell to 24%.[48] The prevalence of antibiotic-resistant bacteria, risk of continued rUTIs as well as progression to later pyelonephritis is enhanced by unnecessary antibiotic treatment of ASB without any demonstrable benefit. These data demonstrate the important role of rUTI overtreatment in promoting antimicrobial resistance. While the Panel recognizes that there are financial and time costs associated with obtaining urinary cultures, such studies remain an important aspect of care, as culture-directed, not empiric, therapies are associated with fewer UTI-related hospitalizations and lower rates of intravenous antibiotic use.[49] The diligence of obtaining cultures for each symptomatic episode, which is associated with reduced rates of overtreatment and more appropriate antibiotic selection, is thought to be beneficial through minimizing collateral damage and the potential need for further treatment in the event of inappropriate empiric therapy.

Collateral damage describes ecological adverse effects of antimicrobial therapy, such as alterations of the normal gut microbiome that can help select drug-resistant organisms and promote colonization or infection MDR organisms.[1] The effects of specific antibiotics on the normal fecal flora promote drug resistance and increased pathogenicity. E. coli isolates continue to demonstrate high in vitro susceptibility to nitrofurantoin, fosfomycin, and mecillinam.[32,50] These antimicrobials have minimal effects on the normal fecal microbiota.[51–53] In contrast, antimicrobials that alter the fecal flora more significantly, such as trimethoprim-sulfamethoxazole (TMP-SMX) and fluoroquinolones, promote increased rates of antimicrobial resistance.[53,54]

Continued intermittent courses of antibiotics in rUTI patients are associated with significant adverse events, which may include allergic reactions, organ toxicities, future infection with resistant organisms, and *C. difficile* infections, particularly in older adults. Thus, substantial effort should be made to avoid unnecessary treatment unless there is a high suspicion of an acute cystitis episode.[55] Even with short courses of more targeted antibiotics, multiple treatments over time may in aggregate impact both the individual and community. Indeed, asymptomatic women with a history of rUTIs randomized to treatment for ASB in a placebo-controlled trial were more likely to have additional symptomatic cystitis episodes in a year of follow-up than those randomized to placebo.[40] In a longer study of over two years of follow up, women with rUTIs treated with the goal of eradicating residual bacteriuria demonstrated a higher prevalence of antibiotic resistance, a higher incidence of pyelonephritis, and a poorer quality of life in comparison to those in the non-treatment group.[56]

**A.485**

Case 1:18-cv-12558-PBS   Document 259-4   Filed 08/29/24   Page 8 of 32

## EDUCATION AND INFORMED DECISION MAKING

The prevalence of antibiotic-resistant bacteria is enhanced by the unnecessary antibiotic treatment of ASB.[56] Given the subjectivity of patient-reported symptoms and the lack of clear diagnostic criteria on laboratory testing, the diagnosis of UTI is highly imprecise. While no evidence exists to support the concept of withholding antimicrobials to patients with rUTIs, providers must bear in mind that continued intermittent courses of antibiotics are associated with significant adverse events, particularly in older patients. Substantial effort should be made to avoid unnecessary treatment unless there is a high suspicion of UTI.

For uncomplicated patients with episodes of acute cystitis, there is minimal risk of progression to tissue invasion or pyelonephritis. Additionally, urinary tract symptoms do not reliably indicate risk or presence of "bacteremic bacteriuria" ("urosepsis") or pyelonephritis. In a representative study of older patients with bacteremia who had the same bacterial species cultured from the urine, ascertainment of the patients' symptoms at the time of infection revealed that only one of 37 participants aged 75 and older had symptoms consistent with UTI, such as dysuria.[57] Multiple randomized placebo-controlled trials have demonstrated that antibiotic treatment for acute cystitis offers little but mildly faster symptomatic improvement compared to placebo in patients with acute dysuria and significant bacteriuria.[58–61] However, the incidence of pyelonephritis in these patients is low and is not substantially different in individuals receiving antibiotics versus those treated with supportive care of analgesics and hydration.[62] As deferring treatment is associated with a small risk of progression to pyelonephritis,[59] antibiotic treatment of suspected UTI remains common practice, but expectant management with analgesics while awaiting culture results is likely underutilized. Indeed, this evidence suggests that supportive care can be reasonably attempted with antibiotic treatment reserved for those patients in whom it would be anticipated to impact prognosis.

In a large clinical trial, a substantial proportion of women agreed to placebo randomization[63] without other treatments to ameliorate symptoms. This suggests that many women may be willing to attempt temporizing measures with symptomatic and non-antimicrobial management when the benefits and potential harms of intermittent antimicrobial treatment are adequately discussed. It is reasonable to consider an approach to the diagnosis and treatment of rUTI as one of shared decision-making, in which patients are educated about the inaccuracy of diagnostic testing, the benefits and potential risks of antimicrobial use, and the alternatives to standard antibiotic treatment. It is likely that far fewer patients will opt for more aggressive treatments when counseled appropriately. Many patients and providers do not know that uncomplicated cystitis typically is self-limited and rarely progresses to more severe disease.[15,63,64] If this were explained, the goals of care could be more clearly defined as the amelioration of symptoms, the prevention of long-term complications, and the more appropriate use of antibiotics to those situations in which it is likely to improve outcomes.[10]

The Panel also supports discussion with patients regarding certain modifiable behaviors, including changing mode of contraception and increasing water intake, that have been shown to reduce the risk of rUTI. Sexually active women may consider changing their mode of contraception if using either barrier contraceptives or spermicidal products.[65] The increased risk of UTI associated with spermicidal use is likely due to the deleterious effect on lactobacillus colonization and/or the vaginal microbiome.[66] Increased water intake should be recommended to those consuming less than 1.5 L per day as a recent study showed that increased water intake was also associated with a lower likelihood of having at least 3 UTI episodes over 12 months (<10% versus 88%) and a greater interval between UTI episodes (143 versus 84.4 days, p<0.001).[67] Unfortunately, there are many commonly held myths surrounding rUTI lifestyle modification. Case-control studies clearly demonstrate that changes in hygiene practices (e.g., front to back wiping), pre- and post-coital voiding, avoidance of hot tubs, tampon use, and douching do not play a role in rUTI prevention.[65,68] This reframing of the discussion surrounding UTI is likely to benefit both individual patients and the health care system as a whole.

# Methodolgy

The systematic review utilized to inform this guideline was conducted by a methodology team at the Pacific Northwest Evidence-based Practice Center (EPC). Determination of the guideline scope and review of the final systematic review to inform guideline statements was conducted in conjunction with the rUTI Panel.

## PANEL FORMATION

The rUTI Panel was created in 2017 by the American Urological Association Education and Research, Inc. (AUAER). This guideline was developed in collaboration with the Canadian Urological Association (CUA) and the Society of Urodynamics, Female Pelvic Medicine & Urogenital Reconstruction (SUFU). The Practice Guidelines Committee (PGC) of the AUA selected the Panel Chairs who in turn appointed the additional panel members with specific expertise in this area in conjunction with CUA and SUFU. Additionally, the Panel included patient representation. Funding of the Panel was provided by the AUA with contributions from CUA and SUFU; panel members received no remuneration for their work.

In 2022, a small update panel was formed to review literature published since the original release of the guideline in 2019.

## SEARCHES AND ARTICLE SELECTION



A.486

A research librarian conducted searches in Ovid MEDLINE (1946 to January Week 1 2018), Cochrane Central Register of Controlled Trials (through December 2017) and Embase (through January 16, 2018). Searches of electronic databases were supplemented by reviewing reference lists of relevant articles. An update search was conducted for additional publications on September 20, 2018.

The methodology team developed criteria for inclusion and exclusion of studies based on the Key Questions and the populations, interventions, comparators, outcomes, timing, types of studies and settings (PICOTS) of interest. For populations, inclusion focused on women with rUTIs (defined as ≥3 UTIs in a 12-month period or ≥2 UTIs in a 6-month period; studies were also included in which rUTI was not defined, but the mean or median number of UTIs in a 12 months period was ≥3). Exclusions included pregnant women, women with rUTIs due to self-catheterization or indwelling catheters, and prevention of UTI in operative or procedural settings. Subgroups of interest were based on age, history of pelvic surgery, and the presence of diabetes mellitus. For interventions, evaluations included diagnostic tests for rUTI (urine dipstick, urinalysis with microscopy, urine culture, urine or serum biomarkers), antibiotics for treatment of acute UTI and prevention, cranberry, lactobacillus, estrogen, and other preventive treatments. For studies on treatment and prevention of UTI, outcomes were UTI recurrence, UTI related symptoms, recurrence rate, hospitalization, antimicrobial resistance, and adverse effects associated with interventions. The Panel included randomized and non-randomized clinical trials of treatments for acute UTI and preventive interventions in women with rUTIs, studies on the diagnostic accuracy of tests for rUTI, and prospective studies on the association between risk factors and progression to symptomatic UTI in women with ASB. For questions related to treatment of acute UTI, methodologists included systematic reviews, supplemented by primary studies published after the reviews.

Using the pre-specified criteria, two investigators independently reviewed titles and abstracts of all citations. The methodology team used a two-phase method for screening full-text articles identified during review of titles and abstracts. In the first phase, investigators reviewed full-text articles to identify systematic reviews for inclusion. In the second phase they reviewed full-text articles to address key questions not sufficiently answered by previously published systematic reviews, or recent publications to update previously published systematic reviews. Database searches resulted in 6,153 potentially relevant articles. After dual review of abstracts and titles, 214 systematic reviews and individual studies were selected for full-text dual review, and 65 studies in 67 publications were determined to meet inclusion criteria and were included in this review. An additional 10 publications were identified in the updated literature search and added to the review.

For the update review in 2022, the EPC team extracted Summary of Evidence tables from the 2019 review for the relevant Key Questions, added assessments of new studies to them, and combined results of old and new studies where appropriate. They updated or assessed the strength of evidence (SOE) for key comparisons and outcomes, using the approach described in the AHRQ EPC Methods Guide for Comparative Effectiveness Reviews.[69] The EPC reviewed abstracts from 19 studies in 21 publications. Full text assessment was conducted on 11 of those studies for further review.[70-80]

## DATA ABSTRACTION

For each study that met inclusion criteria, a single investigator abstracted information on study design, year, setting (inpatient or outpatient), country, sample size, eligibility criteria, dose and duration of the intervention, population characteristics (age, race, UTI history, diabetes, prior genitourinary surgery, and other treatments), results, and source of funding. For included systematic reviews, a single investigator abstracted study characteristics (number and design of included studies, definition of rUTI, study settings, study dates, treatment and follow up duration), population characteristics (age, diabetes history, surgical history, prior treatments), interventions, methods and ratings for the risk of bias, synthesis methods, and results. The methodology team calculated relative risks and 95% confidence intervals if necessary for included outcomes, from data reported in the studies. All data abstractions were reviewed by a second investigator for accuracy. Discrepancies were resolved through discussion and consensus.

## RISK OF BIAS ASSESSMENT

Two investigators independently assessed risk of bias using predefined criteria. Disagreements were resolved by consensus. For clinical trials, we adapted criteria for assessing risk of bias from the U.S. Preventive Services Task Force.[81] Criteria included use of appropriate randomization and allocation concealment methods, clear specification of inclusion criteria, baseline comparability of groups, blinding, attrition, and use of intention-to-treat analysis. Methodologists assessed systematic reviews using AMSTAR 2 (Assessing the Methodological Quality of Systematic Reviews) criteria.[82] Studies were rated as "low risk of bias," "medium risk of bias," or "high risk of bias" based on the presence and seriousness of methodological shortcomings.

Studies rated "low risk of bias" are generally considered valid. "Low risk of bias" studies include clear descriptions of the population, setting, interventions, and comparison groups; a valid method for allocation of patients to treatment; low dropout rates and clear reporting of dropouts; blinding of patients, care providers, and outcome assessors; and appropriate analysis of outcomes.

A.487

Studies rated "medium risk of bias" are susceptible to some bias, though not necessarily enough to invalidate the results. These studies do not meet all the criteria for a rating of low risk of bias, but any flaw present is unlikely to cause major bias. Studies may be missing information, making it difficult to assess limitations and potential problems. The "medium risk of bias" category is broad, and studies with this rating vary in their strengths and weaknesses. Therefore, the results of some medium risk of bias studies are likely to be valid, while others may be only possibly valid.

Studies rated "high risk of bias" have significant flaws that may invalidate the results. They have a serious or "fatal" flaw in design, analysis, or reporting; large amounts of missing information; discrepancies in reporting; or serious problems in the delivery of the intervention. The results of high risk of bias studies could be as likely to reflect flaws in study design and conduct as true difference between compared interventions. Methodologists did not exclude studies rated high risk of bias *a priori*, but high risk of bias studies were considered to be less reliable than low or medium risk of bias studies, and methodologists performed sensitivity analyses without high risk of bias studies to determine how their inclusion impacted findings.

## DATA SYNTHESIS AND RATING THE BODY OF EVIDENCE

The methodology team constructed evidence tables with study characteristics, results, and risk of bias ratings for all included studies, and summary tables to highlight the main findings.

For interventions to prevent rUTIs, investigators performed meta-analysis using the random effects DerSimonian and Laird model in RevMan 5.3.5 (Copenhagen, Denmark) when there were at least three studies that could be pooled. Investigators stratified analyses of antibiotics by the specific antibiotic and stratified analyses of estrogen according to whether they were administered systemically or topically. Sensitivity analysis was performed by excluding high risk of bias trials. For antibiotic treatment of acute UTI, investigators reported pooled estimates from systematic reviews. Heterogeneity is reported via $I^2$ calculations. Investigators did not update meta-analyses from prior reviews with the results of new trials, but examined whether the findings of new trials were consistent with the reviews. For other Key Questions, there were too few studies to perform meta-analysis.

## DETERMINATION OF EVIDENCE STRENGTH

The categorization of evidence strength is conceptually distinct from the quality of individual studies. Evidence strength refers to the body of evidence available for a particular question and includes not only individual study quality but consideration of study design, consistency of findings across studies, adequacy of sample sizes, and generalizability of samples, settings, and treatments for the purposes of the guideline. Investigators graded the strength of evidence for key comparisons and outcomes for each Key Question, using the approach described in the Agency for Healthcare Research and Quality (AHRQ) EPC *Methods Guide for Comparative Effectiveness and Effectiveness Reviews*.[69] Strength of evidence assessments were based on the following domains:

- Study limitations, based on the overall risk of bias across studies (low, medium, or high)

- Consistency of results across studies (consistent, inconsistent, or unable to determine when only one study was available)

- Directness of the evidence linking the intervention and health outcomes (direct or indirect)

- Precision of the estimate of effect, based on the number and size of studies and confidence intervals for the estimates (precise or imprecise)

- Reporting bias, based on whether the studies defined and reported primary outcomes and whether we identified relevant unpublished studies (suspected or undetected)

The AUA categorizes body of evidence strength as Grade A (well-conducted and highly-generalizable randomized controlled trials [RCTs] or exceptionally strong observational studies with consistent findings), Grade B (RCTs with some weaknesses of procedure or generalizability or moderately strong observational studies with consistent findings), or Grade C (RCTs with serious deficiencies of procedure or generalizability or extremely small sample sizes or observational studies that are inconsistent, have small sample sizes, or have other problems that potentially confound interpretation of data). By definition, Grade A evidence is evidence about which the Panel has a high level of certainty, Grade B evidence is evidence about which the Panel has a moderate level of certainty, and Grade C evidence is evidence about which the Panel has a low level of certainty.[83]

## AUA NOMENCLATURE: LINKING STATEMENT TYPE TO EVIDENCE STRENGTH



A.488

The AUA nomenclature system explicitly links statement type to body of evidence strength, level of certainty, magnitude of benefit or risk/burdens, and the Panel's judgment regarding the balance between benefits and risks/burdens (Table 2). *Strong Recommendations* are directive statements that an action should (benefits outweigh risks/burdens) or should not (risks/burdens outweigh benefits) be undertaken because net benefit or net harm is substantial. *Moderate Recommendations* are directive statements that an action should (benefits outweigh risks/burdens) or should not (risks/burdens outweigh benefits) be undertaken because net benefit or net harm is moderate. *Conditional Recommendations* are non-directive statements used when the evidence indicates that there is no apparent net benefit or harm or when the balance between benefits and risks/burden is unclear. All three statement types may be supported by any body of evidence strength grade. Body of evidence strength Grade A in support of a Strong or Moderate Recommendation indicates that the statement can be applied to most patients in most circumstances and that future research is *unlikely to change confidence*. Body of evidence strength Grade B in support of a Strong or Moderate Recommendation indicates that the statement can be applied to most patients in most circumstances but that better evidence *could change confidence*. Body of evidence strength Grade C in support of a Strong or Moderate Recommendation indicates that the statement can be applied to most patients in most circumstances but that better evidence is *likely to change confidence*. Body of evidence strength Grade C is only rarely used in support of a Strong Recommendation. Conditional Recommendations also can be supported by any evidence strength. When body of evidence strength is Grade A, the statement indicates that benefits and risks/burdens appear balanced, the best action depends on patient circumstances, and future research is *unlikely to change confidence*. When body of evidence strength Grade B is used, benefits and risks/burdens appear balanced, the best action also depends on individual patient circumstances and better evidence could change confidence. When body of evidence strength Grade C is used, there is uncertainty regarding the balance between benefits and risks/burdens, alternative strategies may be equally reasonable, and better evidence is *likely to change confidence*.

Where gaps in the evidence existed, the Panel provides guidance in the form of **Clinical Principles** or **Expert Opinions** with consensus achieved using a modified Delphi technique if differences of opinion emerged.[84] A Clinical Principle is a statement about a component of clinical care that is widely agreed upon by urologists or other clinicians for which there may or may not be evidence in the medical literature. Expert Opinion refers to a statement, achieved by consensus of the Panel, that is based on members' clinical training, experience, knowledge, and judgment for which there is no evidence.

**Table 2: AUA Nomenclature Linking Statement Type to Level of Certainty, Magnitude of Benefit or Risk/Burden, and Body of Evidence Strength**

| | Evidence Strength A (High Certainty) | Evidence Strength B (Moderate Certainty) | Evidence Strength C (Low Certainty) |
|---|---|---|---|
| **Strong Recommendation** (Net benefit or harm substantial) | Benefits > Risks/Burdens (or vice versa) Net benefit (or net harm) is substantial Applies to most patients in most circumstances and future research is unlikely to change confidence | Benefits > Risks/Burdens (or vice versa) Net benefit (or net harm) is substantial Applies to most patients in most circumstances but better evidence could change confidence | Benefits > Risks/Burdens (or vice versa) Net benefit (or net harm) is substantial Applies to most patients in most circumstances but better evidence is likely to change confidence (rarely used to support a Strong Recommendation) |
| **Moderate Recommendation** (Net benefit or harm moderate) | Benefits > Risks/Burdens (or vice versa) Net benefit (or net harm) is moderate Applies to most patients in most circumstances and future research is unlikely to change confidence | Benefits > Risks/Burdens (or vice versa) Net benefit (or net harm) is moderate Applies to most patients in most circumstances but better evidence could change confidence | Benefits > Risks/Burdens (or vice versa) Net benefit (or net harm) appears moderate Applies to most patients in most circumstances but better evidence is likely to change confidence |

A.489

8/12/24, 12:04 PM
Recurrent Uncomplicated Urinary Tract Infections in Women: AUA/CUA/SUFU Guideline (2022) - American Urological Association

Case 1:18-cv-12558-PBS    Document 259-4    Filed 08/29/24    Page 12 of 32

| Conditional Recommendation (No apparent net benefit or harm) | Benefits = Risks/Burdens Best action depends on individual patient circumstances Future research unlikely to change confidence | Benefits = Risks/Burdens Best action appears to depend on individual patient circumstances Better evidence could change confidence | Benefits = Risks/Burdens Alternative strategies may be equally reasonable Better evidence likely to change confidence |
|---|---|---|---|
| Clinical Principle | A statement about a component of clinical care that is widely agreed upon by urologists or other clinicians for which there may or may not be evidence in the medical literature | | |
| Expert Opinion | A statement, achieved by consensus of the Panel, that is based on members clinical training, experience, knowledge, and judgment for which there is no evidence | | |

## PEER REVIEW AND DOCUMENT APPROVAL

An integral part of the guideline development process at the AUA is external peer review. The AUA conducted a thorough peer review process to ensure that the document was reviewed by experts in the diagnosis and treatment of UTIs in women. In addition to reviewers from the AUA PGC, Science and Quality Council (SQC), and Board of Directors (BOD), the document was reviewed by representatives from CUA and SUFU as well as external content experts. Additionally, a call for reviewers was placed on the AUA website from November 19-30, 2018 to allow any additional interested parties to request a copy of the document for review. The guideline was also sent to the Urology Care Foundation to open the document further to the patient perspective. The draft guideline document was distributed to 114 peer reviewers. All peer review comments were blinded and sent to the Panel for review. In total, 50 reviewers provided comments, including 38 external reviewers. At the end of the peer review process, a total of 622 comments were received. Following comment discussion, the Panel revised the draft as needed. Once finalized, the guideline was submitted for approval to the AUA PGC, SQC and BOD as well as the governing bodies of CUA and SUFU for final approval.

# Evaluation and Testing

## GUIDELINE STATEMENT 1

Clinicians should obtain a complete patient history and perform a pelvic examination in women presenting with rUTIs. (Clinical Principle)



## GUIDELINE STATEMENT 2

To make a diagnosis of rUTI, clinicians must document positive urine cultures associated with prior symptomatic episodes. (Clinical Principle)



## GUIDELINE STATEMENT 3

Clinicians should obtain repeat urine studies when an initial urine specimen is suspect for contamination, with consideration for obtaining a catheterized specimen. (Clinical Principle)



## GUIDELINE STATEMENT 4

Cystoscopy and upper tract imaging should not be routinely obtained in the index patient presenting with a rUTI. (Expert Opinion)

A.490

8/12/24, 12:04 PM

Case 1:18-cv-12558-PBS   Document 259-4   Filed 08/29/24   Page 13 of 32

Recurrent Uncomplicated Urinary Tract Infections in Women: AUA/CUA/SUFU Guideline (2022) - American Urological Association



## GUIDELINE STATEMENT 5

Clinicians should obtain urinalysis, urine culture and sensitivity with each symptomatic acute cystitis episode prior to initiating treatment in patients with rUTIs. (Moderate Recommendation; Evidence Level: Grade C)



## GUIDELINE STATEMENT 6

Clinicians may offer patient-initiated treatment (self-start treatment) to select rUTI patients with acute episodes while awaiting urine cultures. (Moderate Recommendation; Evidence Level: Grade C)



# Asymptomatic Bacteriuria

## GUIDELINE STATEMENT 7

Clinicians should omit surveillance urine testing, including urine culture, in asymptomatic patients with rUTIs. (Moderate Recommendation; Evidence Level: Grade C)



## GUIDELINE STATEMENT 8

Clinicians should not treat ASB in patients. (Strong Recommendation; Evidence Level: Grade B)



# Antibiotic Treatment

## GUIDELINE STATMENT 9

Clinicians should use first-line therapy (i.e., nitrofurantoin, TMP-SMX, fosfomycin) dependent on the local antibiogram for the treatment of symptomatic UTIs in women. (Strong Recommendation; Evidence Level: Grade B)



## GUIDELINE STATEMENT 10

Clinicians should treat rUTI patients experiencing acute cystitis episodes with as short a duration of antibiotics as reasonable, generally no longer than seven days. (Moderate Recommendation; Evidence Level: Grade B)



## GUIDELINE STATEMENT 11

A.491

8/12/24, 12:04 PM

Recurrent Uncomplicated Urinary Tract Infections in Women: AUA/CUA/SUFU Guideline (2022) - American Urological Association

Case 1:18-cv-12558-PBS Document 259-4 Filed 08/29/24 Page 14 of 32

In patients with rUTIs experiencing acute cystitis episodes associated with urine cultures resistant to oral antibiotics, clinicians may treat with culture-directed parenteral antibiotics for as short a course as reasonable, generally no longer than seven days. (Expert Opinion)



## Antibiotic Prophylaxis

### GUIDELINE STATEMENT 12

Following discussion of the risks, benefits, and alternatives, clinicians may prescribe antibiotic prophylaxis to decrease the risk of future UTIs in women of all ages previously diagnosed with UTIs. (Conditional Recommendation; Evidence Level: Grade B)



## Non-Antibiotic Prophylaxis

### GUIDELINE STATEMENT 13

Clinicians may offer cranberry prophylaxis for women with rUTIs. (Conditional Recommendation; Evidence Level: Grade C)



## Follow-Up Evaluation

### GUIDELINE STATEMENT 14

Clinicians should not perform a post-treatment test of cure urinalysis or urine culture in asymptomatic patients. (Expert Opinion)



### GUIDELINE STATEMENT 15

Clinicians should repeat urine cultures to guide further management when UTI symptoms persist following antimicrobial therapy. (Expert Opinion)



## Estrogen

### GUIDELINE STATEMENT 16

In peri- and post-menopausal women with rUTIs, clinicians should recommend vaginal estrogen therapy to reduce the risk of future UTIs if there is no contraindication to estrogen therapy. (Moderate Recommendation; Evidence Level: Grade B)





A.492

Case 1:18-cv-12558-PBS   Document 259-4   Filed 08/29/24   Page 15 of 32

# Future Directions

A better understanding of rUTI pathophysiology will greatly aid in our ability to design more effective, mechanistically-based treatments. Critical expansion of our understanding of both host and pathogen factors that result in rUTI is mandated. Additionally, refinement of how UTI is defined must be considered. Indeed, delineating differences between ASB with concomitant non-specific LUTS secondary to storage dysfunction or diverse conditions such as IC/BPS and OAB versus true rUTI may eventually rely on development of innovative urine or serum biomarkers that can differentiate between these entities.[213] Relying on results from the urinary dipstick test, including leukocyte esterase and nitrate, lacks the necessary level of sensitivity and specificity for diagnostic accuracy. In this context, defining initiatives for partnering with our primary care colleagues and patients to provide education regarding rUTI definitions, evaluation, and treatment will provide an impactful narrative for the future.

Urine culture results, even those from extended quantitative urine culture techniques, do not reflect any aspect of the host response. Investigations of more defined host biomarkers, such as cytokines or serum inflammatory markers, may allow more precise analysis of the host response which reflects a true UTI. Further refinements of bacterial molecular genetic technologies may help point-of-care testing with faster identification of potential uropathogens. By extension, the types and content of bacteria which inhabit the urinary tract as part of the native microbiome will change our understanding of how host-bacterial interactions contribute to development of rUTI.

Advanced molecular technologies give a more complete characterization of genito-urinary microbes. PCR and next-generation sequencing (NGS) provide a direct assessment of urinary DNA to identify the bacteria present.  PCR involves rapid DNA amplification and matching of that DNA to a small set of pre-selected known organisms.[214] PCR testing is very sensitive, provided that the causal organism of interest is present in the PCR test panel. NGS analyzes all microbial DNA within a urine sample and compares it to a database of species, further increasing sensitivity. In studies of patients with and without UTI, PCR has shown good concordance with culture. However, while symptomatic culture-negative patients were frequently found to have E. coli in their urine by quantitative PCR (qPCR), but so were a significant number of controls.[215,216] Studies comparing NGS to urine culture showed that NGS detects more bacteria and a greater range of organisms within a given urine sample.  However, these studies do not examine the positivity rates in culture-negative patients.  In a recent study, 44 patients with suspected acute UTI were randomized to treatment based on either culture or NGS. Although the NGS group had a greater improvement in their symptoms, 21 of 22 asymptomatic subjects recruited as controls were also positive for bacteria by NGS.[217] Molecular testing technologies have the potential to provide accurate and rapid information, and hold promise for the future.  To date, more evidence is needed before these technologies become incorporated into the guideline, as there is concern is that adoption of this technology in the evaluation of lower urinary tract symptoms may lead to over treatment with antibiotics.

Emerging data regarding the microbiome of the human bladder, bowel, and vagina, including the contribution of both traditional and viable but non-culturable bacteria, viruses, bacteriophages, fungi, and helminths, will define a more accurate portrait of the healthy balance, as well as pathogenic dysbiosis that may contribute to rUTIs. Depletion or alteration of the normal host microbiome and host innate barriers and innate immune system may lead to development of rUTI. A better understanding of the relationship between the urinary microbiome and bladder health may fundamentally transform our earlier belief that urine is "sterile." Indeed, the reconstitution of our native immune system, potentially by changing the microbiome of the gut with the use of probiotics and even fecal transplants, may be a pathway to resolution of rUTI for select patients. Modulation of the host response to bacterial infection is a key dynamic for which limited information currently exists.

A worldwide crisis has emerged due to rapid expansion of MDR bacteria, foreshadowing the devastating implications of the eventual inefficacy of many of our broad-spectrum antimicrobial agents.[187] Current concepts of antibiotic stewardship have provoked a further initiative to develop agents outside the traditional pipeline of antibiotics. On a more immediate time frame is the need for comprehensive randomized controlled trials for non-antibiotic prevention therapies, including probiotics and cranberry formulations. The influence of our environments including the foods we eat, how they are prepared, and their source may become increasingly important as the area of food science expands. Future efforts may uncover other food sources with preventative mechanisms.

Implementation of novel technologies, such as vaccines for urinary pathogens, may represent a future direction for prevention strategies. Use of mannosides as therapeutic entities to prevent bacterial adhesion to the urothelium may represent a narrow-spectrum treatment strategy associated with few systemic manifestations.[218] Modulation of host responses, such as the use of non-steroidal anti-inflammatory agents, have been suggested as a useful adjunct in both preclinical and clinical studies.[219,220]

We must also expand our perspective of rUTI to include prevention. There currently exists an NIH-funded research consortium addressing this mission- the Prevention of Lower Urinary Tract Symptoms (PLUS) Research Consortium.[221] The PLUS consortium is dedicated to promoting prevention of LUTS (including UTIs) across the woman's life spectrum, including

A.493

UTIs, utilizing a socioecologic construct.[222] Critical to these investigative efforts is the discovery of methods to suppress symptoms without use of antibiotics and direct studies that support a broader view of rUTI from the host-pathogen perspective. The PLUS consortium also seeks to identify modifiable risk factors for acute cystitis which can be tested in a prospective prevention trial. Through multiple efforts, which include identifying modifiable socioecological risk factors, understanding host responses involved in UTI and understanding pathogen virulence factors, we will discover new methods in diagnosis and treatment of rUTI.

# Tools and Resources



[Urinary Tract Infections Fact Sheet](#)

# Abbreviations

| 1. AHRQ | Agency for Healthcare Research and Quality |
|---|---|
| 2. AMR | Antimicrobial resistance |
| 3. ASB | Asymptomatic bacteriuria |
| 4. ASM | American Society for Microbiology |
| 5. AUA | American Urological Association |
| 6. CUA | Canadian Urological Association |
| 7. EPC | Evidence–based Practice Center |
| 8. ESBL | Extended–spectrum –lactamase |
| 9. IDSA | Infectious Diseases Society of America |
| 10. IVU | Intravenous urography |
| 11. LUTS | Lower urinary tract symptoms |
| 12. MDR | Multi–drug resistant |
| 13. OAB | Overactive bladder |
| 14. PAC | Proanthocyanidins |
| 15. PGC | Practice Guidelines Committee |
| 16. RCT | Randomized controlled trial |
| 17. rUTI | Recurrent urinary tract infection |
| 18. SQC | Science & Quality Council |
| 19. SUFU | Society of Urodynamics, Female Pelvic Medicine & Urogenital Reconstruction |
| 20. TMP-SMX | Trimethoprim–sulfamethoxazole |
| 21. UTI | Urinary tract infection |

# Recurrent Urinary Tract Infection Panel, Consultants, and Staff

**Panel 2019**

Jennifer Anger, MD, MPH (Chair)

Cedars-Sinai Medical Center

Toby C. Chai, MD (Vice Chair)

Yale School of Medicine



A.494

Melissa R. Kaufman, MD, PhD (PGC Rep)

Vanderbilt University Medical Center


Mary Ann Rondanina (Pt. Advocate)

A. Lenore Ackerman, MD, PhD

Cedars-Sinai Medical Center


Bilal Chughtai, MD

Weill Cornell Medicine

J. Quentin Clemens, MD

University of Michigan


Duane Hickling, MD, MSCI

University of Ottawa


Anil Kapoor, MD

McMaster University


Kimberly S. Kenton, MD, MS

Northwestern Medicine


Una Lee, MD

Virginia Mason


Ann Stapleton, MD

University of Washington


Lynn Stothers, MD

The University of British Columbia


**Panel 2022 (Update)**

Jennifer Anger, MD, MPH (Chair)

US San Diego Health

A.495

Una Lee, MD

Virginia Mason

Yahir A. Santiago-Lastra, MD

UC San Diego Health

**Consultants 2019**

Roger Chou, MD

Jessica Griffin, MS

**Consultants 2022**

Shelley S. Selph, MD, MPH

Rebecca S. Holmes, MD, MS

**Staff**

Erin Kirkby, MS

Leila Rahimi, MHS

Brooke Bixler, MPH

Sennett Kim, BS

# CONFLICT OF INTEREST DISCLOSURES 2019

All panel members completed COI disclosures.  Disclosures listed include both topic– and non-topic-related relationships.

**Consultant/Advisor:  Toby Chai,** Avadel; **A. Lenore Ackerman**, Aquinox Pharmaceuticals; **Bilal Chughtai**, Boston Scientific; **J. Quentin Clemens**, Aquinox, Medtronic; **Duane Hickling**, Astellas, Pfizer, Allergan; **Anil Kapoor**, Pfizer, Bayer Oncology, Novartis Oncology; **Melissa Kaufman**, Boston Scientific; **Kimberly Kenton**, Boston Scientific; **Ann Stapleton**, Paratek

**Meeting Participant or Lecturer:  Bilal Chughtai,** Allergan; **J. Quentin Clemens**, Allergan; **Duane Hickling**, Astellas, Pfizer, Allergan; **Anil Kapoor**, Pfizer, Bayer Oncology, Novartis Oncology; **Una Lee**, Medtronic

**Scientific Study or Trial: Jennifer Anger,** Boston Scientific, AMS; **Bilal Chughtai**, American Urological Association, Boston Scientific; **Duane Hickling**, Astellas; **Anil Kapoor**, Pfizer, Novartis Oncology; **Kimberly Kenton**, Boston Scientific; **Lynn Stothers**, IPSEN

**Investment Interest: J. Quentin Clemens,** Merck

**Health Publishing: J. Quentin Clemens,** UpToDate

**Other: Jennifer Anger**, Boston Scientific; **Melissa Kaufman**, Boston Scientific, Cook Myosite; **Mary Ann Rondanina**, Theravance Biopharma



A.496

# CONFLICT OF INTEREST DISCLOSURES 2022

All panel members completed COI disclosures.  Disclosures listed include both topic– and non-topic-related relationships.

**Scientific Study or Trial: Jennifer Anger,** Medtronic ; **Una Lee**, Patient-Centered Outcomes Research Institute

**Meeting Participant or Lecturer: Una Lee,** Medtronic, Contura, Axonics

**Consultant or Advisor: Una Lee**, Laborie

# Peer Reviewers

We are grateful to the persons listed below who contributed to the Guideline by providing comments during the peer review process. Their reviews do not necessarily imply endorsement of the Guideline.

**AUA (Board of Directors, Science and Quality Council, Practice Guidelines Committee, Journal of Urology)**

Peter C. Albertsen, MD

Linda Baker, MD

Peter E. Clark, MD

Robert C. Flanigan, MD

David Ginsberg, MD

David F. Green MD

Louis R. Kavoussi, MD

Kevin McVary, MD

Roger E. Schultz, MD

Anthony Smith, MD

Thomas F. Stringer, MD

Martha Terris, MD

**External Reviewers (Non-AUA Affiliates)**

Sarah Adelstein, MD

Rahul Bansal, MD

Brook Brown, MD

Linda Brubaker, MD

Benjamin Brucker, MD

Anne Cameron, MD

Laura Chang Kit, MD

Kimberly L. Cooper, MD

Elodi Dielubanza, MD

A.497

Case 1:18-cv-12558-DBS   Document 259-4   Filed 08/29/24   Page 20 of 32

Roger Dmochowski, MD

Karyn Eilber, MD

Ekene Enemchukwu, MD

Howard Goldman, MD

Alexander Gomelsky, MD

Gary Gray, MD

Michael Kennelly, MD

Kathleen Kobashi, MD

Shahid Lambe, MD

Gary  Lemack, MD

Sara Lenherr, MD

Rena Malik, MD

Dena Moskowitz, MD

Laura Nguyen, MD

J. Curtis Nickel, MD

Lee Richter, MD

Eric Rovner, MD

Matthew Rutman, MD

Anthony Schaeffer, MD

Angela Schang, MD

Anne Suskind, MD

Suzette Sutherland, MD

Jannah Thompson, MD

Christian Twiss, MD

Sandip Vasavada, MD

Blayne Welk, MD

Chris Wu, MD


**Public Commenters (Via public notice on AUA website)**

Kirll Shiranov, MD

Jordan Dimitrakoff, MD

A.498

8/12/24, 12:04 PM

Case 1:18-cv-12558-PBS Document 259-4 Filed 08/29/24 Page 21 of 32

Recurrent Uncomplicated Urinary Tract Infections in Women: AUA/CUA/SUFU Guideline (2022) - American Urological Association

# DISCLAIMER

This document was written by the Recurrent Urinary Tract Infection Guideline Panel of the American Urological Association Education and Research, Inc., which was created in 2017. The Practice Guidelines Committee (PGC) of the AUA selected the committee chair. Panel members were selected by the chair in coordination with the Canadian Urological Association (CUA) and the Society of Urodynamics, Female Pelvic Medicine & Urogenital Reconstruction (SUFU). Membership of the panel included specialists with specific expertise on this disorder. The mission of the panel was to develop recommendations that are analysis-based or consensus-based, depending on panel processes and available data, for optimal clinical practices in the diagnosis and treatment of recurrent urinary tract infection.

Funding of the panel was provided by the AUA with contributions from CUA and SUFU. Panel members received no remuneration for their work. Each member of the panel provides an ongoing conflict of interest disclosure to the AUA.

While these guidelines do not necessarily establish the standard of care, AUA seeks to recommend and to encourage compliance by practitioners with current best practices related to the condition being treated.   As medical knowledge expands and technology advances, the guidelines will change. Today these evidence-based guidelines statements represent not absolute mandates but provisional proposals for treatment under the specific conditions described in each document. For all these reasons, the guidelines do not pre-empt physician judgment in individual cases.

Treating physicians must take into account variations in resources, and patient tolerances, needs, and preferences. Conformance with any clinical guideline does not guarantee a successful outcome.  The guideline text may include information or recommendations about certain drug uses ('off label') that are not approved by the Food and Drug Administration (FDA), or about medications or substances not subject to the FDA approval process. AUA urges strict compliance with all government regulations and protocols for prescription and use of these substances. The physician is encouraged to carefully follow all available prescribing information about indications, contraindications, precautions and warnings. These guidelines and best practice statements are not in-tended to provide legal advice about use and misuse of these substances.

Although guidelines are intended to encourage best practices and potentially encompass available technologies with sufficient data as of close of the literature review, they are necessarily time-limited.  Guidelines cannot include evaluation of all data on emerging technologies or management, including those that are FDA-approved, which may immediately come to represent accepted clinical practices.

For this reason, the AUA does not regard technologies or management which are too new to be addressed by this guideline as necessarily experimental or investigational.

# References

1. Paterson DL: "Collateral damage" from cephalosporin or quinolone antibiotic therapy. Clin Infect Dis 2004; **38:** S341.

2. Wagenlehner F, Wullt B, Ballarini S et al: Social and economic burden of recurrent urinary tract infections and quality of life: a patient web-based study (GESPRIT). Expert Rev Pharmacoecon Outcomes Res 2018; **18:** 107.

3. Foxman B: Urinary tract infection syndromes: occurrence, recurrence, bacteriology, risk factors, and disease burden. Infect Dis Clin North Am 2014; **28:** 1.

4. Geerlings SE: Clinical presentations and epidemiology of urinary tract infections. Microbiol Spectr 2016; **4**.

5. Gupta K, Trautner BW: Diagnosis and management of recurrent urinary tract infections in non-pregnant women. BMJ 2013; **346:** f3140.

6. Foxman B: Epidemiology of urinary tract infections: incidence, morbidity, and economic costs. Am J Med 2002; **113:** 5S.

7. Dason S, Dason JT, Kapoor A: Guidelines for the diagnosis and management of recurrent urinary tract infection in women. Can Urol Assoc J 2011; **5:** 316.

8. Finucane TE: "Urinary Tract Infection" –requiem for a heavyweight. J Am Geriatr Soc 2017; **65:** 1650.

9. Malik RD, Wu YR, Zimmern PE: Definition of recurrent urinary tract infections in women: which one to adopt? Female Pelvic Med Reconstr Surg 2018; **24:** 424.

10. Hooton TM: Clinical practice. Uncomplicated urinary tract infections. N Engl J Med 2012; **366;** 1028.

11. Bent S, Nallamothu BK, Simel DL et al: Does this woman have an acute uncomplicated urinary tract infection? JAMA 2002; **287;** 2701.

A.499

12. Juthani-Mehta M, Quagliarello V, Perrelli E et al: Clincial features to identify urinary tract infection in nursing home residents: a cohort study. J Am Geriatr Soc 2009; **57;** 963.

13. Medina-Bombardo D, Segui-Diaz M, Roca-Fusalba C et al: What is the predictive value of urinary symptoms for diagnosing urinary tract infection in women? Fam Pract 2003; **20;** 103.

14. Mody L and Juthani-Mehta M: Urinary tract infections in older women: a clinical review. JAMA 2014; **311;** 844.

15. Boscia JA, Kobasa WD, Abrutyn E et al: Lack of association between bacteriuria and symptoms in the elderly. Am J Med 1986; **81;** 979.

16. Stone ND, Ashraf MS, Calder J et al: Surveillance definitions of infections in long-term care facilities: revisiting the McGeer criteria. Infect Control Hosp Epidemiol 2012; **33:** 965.

17. High KP, Bradley SF, Gravenstein S et al: Clinical practice guideline for the evaluation of fever and infection in older adult residents of long-term care facilities: 2008 update by the Infectious Disease Society of America. J Am Geriatr Soc 2009; **57:** 375.

18. Loeb M, Bentley DW, Bradley S et al: Development of minimum criteria for the initiation of antibiotics in residents of long-term care facilities: results of a consensus conference. Infect Control Hosp Epidemiol 2001; **22:** 120.

19. AGS Choosing Wisely Workgroup: American Geriatrics Society identifies another five things that healthcare providers and patients should question. J Am Geriatr Soc 2014; **62:** 950

20. Behzadi P, Behzadi E, Yazdanbod H et al: A survey on urinarty tract infections associated with the three most common uropathogenic bacteria. Maedica (Buchar) 2010; **5:** 111.

21. Colgan R, Williams M: Diagnosis and treatment of acute uncomplicated cystitis. Am Fam Physician 2011; **84:** 771.

22. Hilt EE, McKinley K, Pearce MM et al: Urine is not sterile: use of enhanced urine culture techniques to detect resident bacterial flora in the adult female bladder. J Clin Microbiol 2014; **52:** 871.

23. Kass EH: Asymptomatic infections of the urinary tract. Trans Assoc Am Physicians 1956; **69:** 56.

24. Platt R: Quantitative definition of bacteriuria. Am J Med 1983; **75:** 44.

25. Pollock HM: Laboratory techniques for detection of urinary tract infection and assessment of value. Am J Med 1983; **75:** 79.

26. Sanford JP, Favour CB, Mao FH et al: Evaluation of the positive urine culture; an approach to the differentiation of significant bacteria from contaminants. Am J Med 1956; **20:** 88.

27. Tapsall JW, Taylor PC, Bell SM et al: Relevance of "significant bacteriuria" to aetiology and diagnosis of urinary-tract infection. Lancet 1975; **2:** 637.

28. Stamm WE, Wagner KF, Amsel R et al: Causes of the acute urethral syndrome in women. N Engl J Med 1980; **303:** 409.

29. Kunin CM, White LV, Hua TH: A reassessment of the importance of "low-count" bacteriuria in young women with acute urinary symptoms. Ann Intern Med 1993; **119:** 454.

30. Komaroff AL: Acute dysuria in women. N Engl J Med 1984; **310:** 368.

31. Stamm WE, Counts GW, Running KR et al: Diagnosis of coliform infection in acutely dysuric women. N Engl J Med 1982; **307:** 463.

32. Naber KG, Schito G, Botto H et al: Surveillance study in Europe and Brazil on clinical aspects and Antimicrobial Resistance Epidemiology in Females with Cystitis (ARESC): implications for empiric therapy. Eur Urol 2008; **54:** 1164.

33. De Backer D, Christiaens T, Heytens S et al: Evolution of bacterial susceptibility pattern of Escherichia coli in uncomplicated urinary tract infections in a country with high antibiotic consumption: a comparison of two surveys with a 10 year interval. J Antimicrob Chemother 2008; **62:** 364.

34. Heytens S, Boelens J, Claeys G et al: Uropathogen distribution and antimicrobial susceptibility in uncomplicated cystitis in Belgium, a high antibiotics prescribing country: 20-year surveillance. Eur J Clin Microbiol Infect Dis 2017; **36:** 105.



A.500

35. Hooton TM, Roberts PL, Cox ME et al: Voided midstream urine culture and acute cystitis in premenopausal women. N Engl J Med 2013; **369:** 1883.

36. Giesen LG, Cousins G, Dimitrov BD et al: Predicting acute uncomplicated urinary tract infection in women: a systematic review of the diagnostic accuracy of symptoms and signs. BMC Fam Pract 2010; **11:** 78.

37. Kunin, C., Urinary tract infections, in Detection, prevention and management. 1997, Lea & Febiger: Philadelphia.

38. Whiteside SA, Razvi H, Dave S et al: The microbiome of the urinary tract—a role beyond infection. Nat Rev Urol 2015; **12:** 81.

39. Ackerman AL, Underhill DM: The mycobiome of the human urinary tract: potential roles for fungi in urology. Ann Transl Med 2017; **5:** 31.

40. Cai T, Mazzoli S, Mondaini N et al: The role of asymptomatic bacteriuria in young women with recurrent urinary tract infections: to treat or not to treat? Clin Infect Dis 2012; **55:** 771.

41. Tchesnokova V, Avagyan H, Rechkina E et al: Bacterial clonal diagnostics as a tool for evidence-based empiric antibiotic selection. PLoS One 2017; **12:** e0174132.

42. Schito GC, Naber KG, Botto H et al: The ARESC study: an international survey on the antimicrobial resistance of pathogens involved in uncomplicated urinary tract infections. Int J Antimicrob Agents 2009; **34:** 407.

43. Ho PL, Yip KS, Chow KH et al: Antimicrobial resistance among uropathogens that cause acute uncomplicated cystitis in women in Hong Kong: a prospective multicenter study in 2006 to 2008. Diagn Microbiol Infect Dis 2010; **66:** 87.

44. Linder JA, Huang ES, Steinman MA et al: Fluoroquinolone prescribing in the United States: 1995 to 2002. Am J Med 2005; **118:** 259.

45. Zatorski C, Zocchi M, Cosgrove SE et al: A single center observational study on emergency department clinician non-adherence to clinical practice guidelines for treatment of uncomplicated urinary tract infections. BMC Infect Dis 2016; **16:** 638.

46. Chappidi MR, Kates M, Stimson CJ et al: Causes, timing, hospital costs and perioperative outcomes of index vs nonindex hospital readmissions after radical cystectomy: implications for regionalization of care. J Urol 2017; **197:** 296.

47. Barlam TF, Cosgrove SE, Abbo LM et al: Implementing an antibiotic stewardship program: guidelines by the Infectious Diseases Society of America and the Society for Healthcare Epidemiology of America. Clin infect Dis 2016; **62:** e51.

48. Caterino JM, Ting SA, Sisbarro SG et al: Age, nursing home residence, and presentation of urinary tract infection in U.S. emergency departments, 2001-2008. Acad Emerg Med 2012; **19:** 1173.

49. Suskind AM, Saigal CS, Hanley JM et al: Incidence and management of uncomplicated recurrent urinary tract infections in a national sample of women in the United States. Urology 2016; **90:** 50.

50. Kahlmeter G, ECO.SENS: An international survey of the antimicrobial susceptibility of pathogens from uncomplicated urinary tract infections: the ECO.SENS Project. J Antimicrob Chemother 2003; **51:** 69.

51. Graninger W: Pivmecillinam—therapy of choice for lower urinary tract infection. Int J Antimicrob Agents 2003; **22:** 73.

52. Knothe H, Schafer V, Sammann A et al: Influence of fosfomycin on the intestinal and pharyngeal flora of man. Infection 1991; **19:** 18.

53. Mavromanolakis E, Maraki S, Samonis G et al: Effect of norfloxacin, trimethoprim-sulfamethoxazole and nitrofurantoin on fecal flora of women with recurrent urinary tract infections. J Chemother 1997; **9:** 203.

54. Sullivan A, Edlund C, Nord CE: Effect of antimicrobial agents on the ecological balance of human microflora. Lancet Infect Dis 2001; **1:** 101.

55. Koves B, Cai T, Veeratterapillay R et al: Benefits and harms of treatment of asymptomatic bacteriuria: a systematic review and meta-analysis by the European Association of Urology Urological Infection Guideline Panel. Eur Urol 2017; **72:** 865.

56. Cai T, Nesi G, Mazzoli S et al: Asymptomatic bacteriuria treatment is associated with a higher prevalence of antibiotic resistant strains in women with urinary tract infections. Clin Infect Dis 2015; **61:** 1655.

A.501

57. Woodford JH, Graham C, Meda M et al: Bacteremic urinary tract infection in hospitalized older patients- are any currently available diagnostic criteria sensitive enough? J Am Geriatr Soc 2011; **59:** 567.

58. Ferry SA, Holm SE, Stenlund H et al: Clinical and bacteriological outcome of different doses and duration of pivmecillinam compared with placebo therapy of uncomplicated lower urinary tract infection in women: the LUTIW project. Scand J Prim Health Care 2007; **25:** 49.

59. Christiaens TC, De Meyere M, Verschraegen G et al: Randomised controlled trial of nitrofurantoin versus placebo in the treatment of uncomplicated urinary tract infection in adult women. Br J Gen Pract 2002; **52:** 729.

60. Falagas ME, Kotsantis IK, Vouloumanou EK et al: Antibiotics versus placebo in the treatment of women with uncomplicated cystitis: a meta-analysis of randomized controlled trials. J Infect 2009; **58:** 91.

61. Foxman B: The epidemiology of urinary tract infection. Nat Rev Urol 2010; **7:** 653.

62. Gagyor I, Hummers-Pradier E, Kochlen MM et al: Immediate versus conditional treatment of uncomplicated urinary tract infection-a randomize-controlled comparative effectiveness study in general practices. BMC Infect Dis 2012; **12:** 146.

63. Ferry SA, Holm SE, Stenlund H et al: The natural course of uncomplicated lower urinary tract infection in women illustrated by a randomized placebo controlled study. Scand J Infect Dis 2004; **36:** 296.

64. Finucane ET: 'Urinary tract infection' and the microbiome. Am J Med 2017; **130:** e97.

65. Scholes DM, Hooton TM, Roberts RL et al: Risk factors for recurrent urinary tract infection in young women. J Infec Dis 2000; **182**: 1177.

66. Abbo LM, Hooton TM: Antimicrobial stewardship and urinary tract infections. Antibiotics (Basel) 2014; **3**: 174.

67. Hooton TM, Vecchio M, Iroz A et al. Effect of increased daily water intake in premenopausal women with recurrent urinary tract infections. JAMA Intern Med 2018; **178:** 1509.

68. Scholes DM, Hawn TR, Roberts PL et al: Family history and risk of recurrent cystitis and pyelonephritis in women. J Urol; **184**: 564.

69. Methods Guide for Effectiveness and Comparative Effectiveness Reviews. AHRQ Publication No. 10(14)-EHC063-EF. Rockville, MD: Agency for Healthcare Research and Quality. January 2014. Chapters available at: www.effectivehealthcare.ahrq.gov.

70. Koradia P, Kapadia S, Trivedi Y et al: A. Probiotic and cranberry supplementation for preventing recurrent uncomplicated urinary tract infections in premenopausal women: a controlled pilot study. Expert Rev Anti Infect Ther 2019; **17**: 733.

71. Murina F, Vicariotto F and Lubrano C: Efficacy of an orally administered combination of Lactobacillus paracasei LC11, cranberry and D-mannose for the prevention of uncomplicated, recurrent urinary tract infections in women. Urologia 2021; **88**, 64.

72. Babar A, Moore L, Leblac V et al. High dose versus low dose standardized cranberry proanthocyanidin extract for the prevention of recurrent urinary tract infection in healthy women: a double-blind randomized controlled trial. BMC Urol 2021; **21**: 44.

73. Bruyere F, Azzouzi AR, Lavigne JP et al: A multicenter, randomized, placebo-controlled study evaluating the efficacy of a combination of propolis and cranberry (*Vaccinium macrocarpon*) (DUAB®) in preventing low urinary tract infection recurrence in women complaining of recurrent cystitis. Urol Int 2019; **103**, 41.

74. Iroz A, Dornic Q, Seksek I et al: Increased water intake for the prevention of recurrent urinary tract infections does not affect quality of life in women. Nephrol Dial Transplant 2018; **33**.

75. Lenger SM, Chu CM, Chetti C et al: D-mannose for recurrent urinary tract infection prevention in post-menopausalwomen using vaginal estrogen: a randomized controlled trial feasibilityand interim analysis. Female pelvic med 2020; 26: S104.

76. Lenger SM, Bradley MS, Thomas DA et al: D-mannose vs other agents for recurrent urinary tract infection prevention in adult women: a systematic review and meta-analysis. Am J Obstet Gynecol 2020; **223**: 265.

77. Botros C, Lozo S, Iyer S et al: Methenamine hippurate compared with trimethoprim for the prevention of recurrent urinary tract infections: a randomized clinical trial. Int Urogyneco J 2021; **11**: 11.

A.502

8/12/24, 12:04 PM Recurrent Uncomplicated Urinary Tract Infections in Women: AUA/CUA/SUFU Guideline (2022) - American Urological Association

Case 1:18-cv-12558-PBS Document 259-4 Filed 08/29/24 Page 25 of 32

78. Bakhit M, Krzyzaniak N, Hilder J et al. Use of methenamine hippurate to prevent urinary tract infections in community adult women: a systematic review and meta-analysis. Br J Gen Pract 2021; **71**: e528.

79. Chen YY, Su TS, Lau HH: Estrogen for the prevention of recurrent urinary tract infections in postmenopausal women: a meta-analysis of randomized controlled trials. Int Urogynecol J 2021; **32**, 17.

80. Ferrante KL, Wasenda EJ, Jung CE et al: Vaginal estrogen for the prevention of recurrent urinary tract infection in postmenopausal women: A randomized clinical trial. Female pelvic med 2021; **27**: 112.

81. Harris RP, Helfand M, Woolf SH et al. Current methods of the US Preventive Services Task Force: a review of the process. Am J Prev Med 2001;**20**:21.

82. Shea BJ, Reeves BC, Wells G et al: AMSTAR 2: a critical appraisal tool for systematic reviews that include randomised or non-randomised studies of healthcare interventions, or both. BMJ 2017;**358**:j4008.

83. Faraday M, Hubbard H, Kosiak B et al: Staying at the cutting edge: a review and analysis of evidence reporting and grading; the recommendations of the American Urological Association. BJU Int 2009; **104**: 294.

84. Hsu C and Sandford BA: The Delphi technique: making sense of consensus. Practical Assessment, Research & Evaluation 2007; **12**: 1.

85. Weiss JM: Pelvic floor myofascial trigger points: manual therapy for interstitial cystitis and the urgency-frequency syndrome. J Urol 2001; **166**: 2226.

86. McCarter YS, Burd EM, Hall GS, Zervos M, Sharp SE. 2009.Cumitech 2C. Laboratory diagnosis of urinary tract infections. Coordinating ed, Sharp SE. ASM Press, Washington, DC

87. Blake DR, Doherty LF: Effect of perineal cleansing on contamination rate of mid-stream urine culture. J Pediatr Adolesc Gynecol 2006; **19**: 31.

88. Bradbury SM: Collection of urine specimens in general practice: to clean or not to clean? J R Coll Gen Pract 1988; **38**: 363.

89. Holliday G,Strike PW, Masterton RG: Perineal cleansing and midstream urine specimens in ambulatory women. J Hosp Infect 1991; **18**: 71.

90. Schlager TA, Smith DE, Donowitz LG: Perineal cleansing does not reduce contamination of urine samples from pregnant adolescents. Pediatr Infect Dis J 1995; **14**: 909.

91. Schneeberger C, van den Heuvel ER, Erwich JJ et al: Contamination rates of three urine-sampling methods to assess bacteriuria in pregnant women. Obstet Gynecol 2013; **121**: 299.

92. Lifshitz E, Kramer L: Outpatient urine culture: does collection technique matter? Arch Intern Med 2000; **160**: 2537.

93. Beeson PB: The case against the catheter. Am J Med 1958; **24**: 1.

94. Boshell BR, Sanford JP: A screening method for the evaluation of urinary tract infections in female patients without catheterization. Ann Intern Med 1958; **48**: 1040.

95. Hooton TM, Scholes D, Hughes JP et al: A prospective study of risk factors for symptomatic urinary tract infection in young women. N Engl J Med 1996; **335**: 468.

96. Walter FG, Knopp RK: Urine sampling in ambulatory women: midstream clean-catch versus catheterization. Ann Emerg Med 1989; **18**: 166.

97. Immergut MA, Gilbert EC, Frensilli FJ: The myth of the clean catch urine specimen. Urology 1981; **17**: 339.

98. Lemieux G, St-Martin M: Reliability of clean-voided mid-stream urine specimens for the diagnosis of significant bacteriuria in the female patient. Can Med Assoc J 1968; **98**: 241.

99. Bekeris GL, Jones BA, Walsh MK et al: Urine culture contamination: a College of American Pathologists Q-Probes study of 127 laboratories. Arch Pathol Lab Med 2008; **132**: 913.

100. Valenstein P, Meier F: Urine culture contamination: a College of American Pathologists Q-Probes study of contaminated urine cultures in 906 institutions. Arch Pathol Lab Med 1998; **122**: 123.

A.503

8/12/24, 12:04 PM   Recurrent Uncomplicated Urinary Tract Infections in Women: AUA/CUA/SUFU Guideline (2019) - American Urological Association

Case 1:18-cv-12558-PBS   Document 259-4   Filed 08/29/24   Page 26 of 32

101. Nicolle LE, Bradley S, Colgan R et al: Infectious Diseases Society of America guidelines for the diagnosis and treatment of asymptomatic bacteriuria in adults. Clin Infect Dis 2005; **40;** 643.

102. Gupta K, Hooton TM, Naber KG et al: International clinical practice guidelines for the treatment of acute uncomplicated cystititis and pyelonephritis in women: a 2010 update by the Infectious Diseases Society of America and the European Society for Microbiology and Infectious Diseases. Clin Infect Dis 2011; **52:** e103.

103. Miller JM, Binnicker MJ, Campbell S et al: A guide to utilization of the microbiology laboratory for diagnosis of infectious diseases: 2018 update by the Infectious Diseases Society of America and the American Society for Microbiology. Clin Infect Dis 2018; **67:** 813.

104. Porter IA, Brodie J: Boric acid preservation of urine samples. Br Med J 1969; **2:** 353.

105. Hindman R, Tronic B, Bartlett R: Effect of delay on culture of urine. J Clin Microbiol 1976; **4:** 102.

106. Lum KT, Meers PD: Boric acid converts urine into an effective bacteriostatic transport medium. J Infect 1989; **18:** 51.

107. Wright DN, Boshard R, Ahlin P et al: Effect of urine preservation on urine screening and organism identification. Arch Pathol Lab Med 1985; **109:** 819.

108. Hubbard WA, Shalis PJ, McClatchey KD: Comparison of the B-D urine culture kit with a standard culture method and with the SM-2. J Clin Microbiol 1983; **17:** 327.

109. Weinstein MP: Evaluation of liquid and lyophilized preservatives for urine culture. J Clin Microbiol 1983; **18:** 912.

110. Baerheim A, Digranes A, Hunskaar S: Evaluation of urine sampling technique: bacterial contamination of samples from women students. Br J Gen Pract 1992; **42:** 241.

111. Moore T, Hira NR, Stirland RM: Differential urethrovesical urinary cell-count. A method of accurate diagnosis of lower-urinary-tract infections in women. Lancet 1965; **1:** 626.

112. Pagano MJ, Barbalat Y, Theofanides MC et al: Diagnostic yield of cystoscopy in the evaluation of recurrent urinary tract infection in women. Neurourol Urodyn 2017; **36:** 692.

113. Santoni N, Ng Am Skews R et al: Recurrent urinary tract infections in women: What is the evidence for investigating with flexible cystoscopy, imaging, and urodynamics? Urol Int 2018; **101:** 373.

114. Little MA: The diagnostic yield of intravenous urography. Nephrol Dial Transplant 2000; 15: 200.

115. Fair WR, McClennan BL, Jost RG: Are excretory urograms necessary in evaluating women with urinary tract infection? J Urol 1979; **121**: 313.

116. Nickel JC, Wilson J, Morales A: Value of urologic investigation in a targeted group of women with recurrent urinary tract infections. Can J Surg 1991; **34**: 591.

117. Johnson JD, O'Mara HM, Durtschi HF et al: Do urine cultures for urinary tract infections decrease follow-up visits? J Am Board Fam Med 2011; **24:** 647.

118. Melekos MD, Asbach HW, Gerharz E et al: Post-intercourse versus daily ciprofloxacin prophylaxis for recurrent urinary tract infections in premenopausal women. J Urol 1997; **157**: 935.

119. Zhong YH, Fang Y, Zhou JZ et al: Effectiveness and safety of patient initiated single-dose versus continuous low-dose antibiotic prophylaxis for recurrent urinary tract infections in postmenopausal women: a randomized controlled study. J Int Med Res 2011; **39**: 2335.

120. Wong ES, McKevitt M, Running K et al: Management of recurrent urinary tract infections with patient-administered single-dose therapy. Ann Intern Med 1985; **102** 302.

121. Dull RB, Friedman SK, Risoldi ZM et al: Antimicrobial treatment of asymptomatic bacteriuria in noncatheterized adults: a systematic review. Pharmacotherapy 2014; **34**: 941.

122. Coussement J, Scemla A, Abramowicz D et al: Antibiotics for asymptomatic bacteriuria in kidney transplant recipients. Cochrane Database Syst Rev. 2018; CD011357.

123. Wolf JS, Bennett CJ, Dmochowski RR et al: Urologic surgery antimicrobial prophylaxis. 2012.



A.504

124. Zalmanovici Trestioreanu A, Green H, Paul M et al: Antimicrobial agents for treating uncomplicated urinary tract infection in women. Cochrane Database Syst Rev 2010; CD007182.

125. Knottnerus BJ, Grigoryan L, Geerlings SE et al: Comparative effectiveness of antibiotics for uncomplicated urinary tract infections: network meta-analysis of randomized trials. Fam Pract 2012; **29:** 659.

126. Huttner A, Kowalczyk A, Turjeman A et al: Effect of 5-day nitrofurantoin vs single-dose fosfomycin on clinical resolution of uncomplicated lower urinary tract infection in women: a randomized clinical trial. JAMA 2018; **319:** 1781.

127. Faltinsen EG, Storebo OJ, Jakobsen JC et al: Network meta-analysis: the highest level of medical evidence? BMJ Evid Based Med 2018; **23:** 56.

128. U.S. Food and Drug Administration: FDA drug safety communication: FDA updates warnings for oral and injectable fluoroquinolone antibiotics due to disabling side effects. https://www.fda.gov/downloads/Drugs/DrugSafety/UCM513019.pdf

129. Milo G, Katchman EA, Paul M et al: Duration of antibacterial treatment for uncomplicated urinary tract infection in women. Cochrane Database Syst Rev 2005; CD004682.

130. Katchman EA, Milo G, Paul M et al: Three-day vs longer duration of antibiotic treatment for cystitis in women: systematic review and meta-analysis. Am J Med 2005; **118:**1196.

131. Lutters M, Vogt-Ferrier NB: Antibiotic duration for treating uncomplicated, symptomatic lower urinary tract infections in elderly women. Cochrane Database Syst Rev 2008:Cd001535.

132. Bailey RR, Roberts AP, Gower PE et al: Prevention of urinary-tract infection with low-dose nitrofurantoin. Lancet 1971; **2:**1112.

133. Beerepoot MA, ter Riet G, Nys S et al: Cranberries vs antibiotics to prevent urinary tract infections: a randomized double-blind noninferiority trial in premenopausal women. Arch Intern Med 2011; **171:**1270.

134. Beerepoot MA, den Heijer CD, Penders J et al: Predictive value of Escherichia coli susceptibility in strains causing asymptomatic bacteriuria for women with recurrent symptomatic urinary tract infections receiving prophylaxis. Clin Microbiol Infect 2012; **18:** E84.

135. Beerepoot MA, ter Riet G, Nys S et al: Lactobacilli vs antibiotics to prevent urinary tract infections: a randomized, double-blind, noninferiority trial in postmenopausal women. Arch Intern Med 2012; **172:**704.

136. Brumfitt W, Cooper J, Hamilton-Miller JM: Prevention of recurrent urinary infections in women: a comparative trial between nitrofurantoin and methenamine hippurate. J Urol 1981; **126:**71.

137. Brumfitt W, Hamilton-Miller JM: A comparative trial of low dose cefaclor and macrocrystalline nitrofurantoin in the prevention of recurrent urinary tract infection. Infection 1995;**23:**98.

138. Brumfitt W, Hamilton-Miller JM, Gargan RA et al: Long-term prophylaxis of urinary infections in women: comparative trial of trimethoprim, methenamine hippurate and topical povidone-iodine. J Urol 1983;**130:**1110.

139. Brumfitt W, Hamilton-Miller JM, Smith GW et al: Comparative trial of norfloxacin and macrocrystalline nitrofurantoin (Macrodantin) in the prophylaxis of recurrent urinary tract infection in women. Q J Med 1991;**81:**811.

140. Brumfitt W, Smith GW, Hamilton-Miller JM et al: A clinical comparison between Macrodantin and trimethoprim for prophylaxis in women with recurrent urinary infections. J Antimicrob Chemother 1985;**16:**111.

141. Costantini E, Zucchi A, Salvini E et al: Prulifloxacin vs fosfomycin for prophylaxis in female patients with recurrent UTIs: a non-inferiority trial. Int Urogynecol J 2014;**25:**1173.

142. Gower PE: The use of small doses of cephalexin (125 mg) in the management of recurrent urinary tract infection in women. J Antimicrob Chemother 1975; **1:**93.

143. Guibert J, Humbert G, Meyrier A et al: Antibioprevention of recurrent cystitis. A randomized double-blind comparative trial of 2 dosages of pefloxacin. Presse Med 1995;**24:**213.

144. Kranjcec B, Papes D, Altarac S: D-mannose powder for prophylaxis of recurrent urinary tract infections in women: a randomized clinical trial. World J Urol 2014;**32:**79.



A.505

145. Martens MG, Finkelstein LH: Daily cinoxacin as prophylaxis for urinary tract infections in mature women: A prospective trial. Adv Ther 1995;**12**:207.

146. Martorana G, Giberti C, Damonte P: Preventive treatment of recurrent cystitis in women. Double-blind randomized study using cinoxacin and placebo. Minerva Urol Nefrol 1984; **36**:43.

147. McMurdo ME, Argo I, Phillips G et al: Cranberry or trimethoprim for the prevention of recurrent urinary tract infections? A randomized controlled trial in older women. J Antimicrob Chemother 2009;**63**:389.

148. Mozdzan M, Ruxer J, Siejka A et al: The efficacy of chronic therapy of recurrent lower urinary tract infections with fosfomycin and nitrofurantoin in type 2 diabetic patients. Adv Clin Exp Med 2007;**16**:777.

149. Nicolle LE, Harding GK, Thompson M et al: Prospective, randomized, placebo-controlled trial of norfloxacin for the prophylaxis of recurrent urinary tract infection in women. Antimicrob Agents Chemother 1989;**33**:1032.

150. Nunez U, Solis Z: Macrocrystalline nitrofurantoin versus norfloxacin as treatment and prophylaxis in uncomplicated recurrent urinary tract infection. Curr Ther Res Clin Exp 1990;**48**:234.

151. Porru D, Parmigiani A, Tinelli C et al: Oral D-mannose in recurrent urinary tract infections in women: A pilot study. J Clin Urol 2014;**7**:208.

152. Raz R, Colodner R, Rohana Y et al: Effectiveness of estriol-containing vaginal pessaries and nitrofurantoin macrocrystal therapy in the prevention of recurrent urinary tract infection in postmenopausal women. Clin Infect Dis 2003;**36**:1362.

153. Rugendorff E, Haralambie E: Low-dose norfloxacin versus placebo for long-term prophylaxis of recurrent uncomplicated urinary tract infection. Chemioterapia 1987;**6**:533.

154. Schaeffer AJ, Jones JM, Flynn SS: Prophylactic efficacy of cinoxacin in recurrent urinary tract infection: biologic effects on the vaginal and fecal flora. J Urol 1982;**127**:1128.

155. Scheckler WE, Burt RA, Paulson DF: Comparison of low-dose cinoxacin therapy and placebo in the prevention of recurrent urinary tract infections. J Fam Pract 1982;**15**:901.

156. Seppanen J: Cinoxacin vs trimethoprim--safety and efficacy in the prophylaxis of uncomplicated urinary tract infections. Drugs Exp Clin Res 1988;**14**:669.

157. Stamm WE, Counts GW, Wagner KF et al: Antimicrobial prophylaxis of recurrent urinary tract infections: a double-blind, placebo-controlled trial. Ann Intern Med 1980;**92**:770.

158. Stapleton A, Latham RH, Johnson C et al: Postcoital antimicrobial prophylaxis for recurrent urinary tract infection. A randomized, double-blind, placebo-controlled trial. JAMA 1990; **264**:703.

159. U.S. Food and Drug Administration: FDA drug safety communication. 2016. https://www.fda.gov/downloads/Drugs/DrugSafety/UCM500591.pdf. Accessed: February 6, 2019.

160. Kouyos RD, Abel Zur Wiesch P, Bonhoeffer S: Informed switching strongly decreases the prevalence of antibiotic resistance in hospital wards. PLoS Computational Biol 2011; **7**: e1001094.

161. Brown EM, Nathwani D: Antibiotic cycling or rotation: a systematic review of the evidence of efficacy. J Antimicrob Chemother 2005; **55**: 6.

162. Holmberg L, Boman G, Böttiger LE et al: Adverse reactions to nitrofurantoin. Analysis of 921 reports. Am J Med 1980; **69**:733.

163. Linnebur SA, Parnes BL: Pulmonary and hepatic toxicity due to nitrofurantoin and fluconazole treatment. Ann Pharmacother 2004; **38**:612.

164. Mulberg AE, Bell LM: Fatal cholestatic hepatitis and multisystem failure associated with nitrofurantoin. J Pediatr Gastroenterol Nutr 1993; **17**:307.

165. Sherigar JM, Fazio R, Zuang M et al: Autoimmune hepatitis induced by nitrofurantoin. The importance of the autoantibodies for an early diagnosis of immune disease. Clin Pract 2012;**2**:e83.

166. D'Arcy PF: Nitrofurantoin. Drug Intell Clin Pharm 1985; **19**:540.



A.506

167. Huttner A, Verhaegh EM, Harbarth S et al: Nitrofurantoin revisited: a systematic review and meta-analysis of controlled trials. J Antimicrob Chemother 2015; **70**:2456.

168. Claussen K, Stocks E, Bhat D et al: How Common Are Pulmonary and Hepatic Adverse Effects in Older Adults Prescribed Nitrofurantoin? J Am Geriatr Soc 2017; **65**: 1316.

169. American Geriatrics Society: 2015 Updated Beers Criteria for potentially inappropriate medication use in older adults. J Am Geriatr Soc 2015; **63**: 2227.

170. Holmberg L, Boman G: Pulmonary reactions to nitrofurantoin. 447 cases reported to the Swedish adverse Drug Reaction Committee 1966–1976. Eur J Respir Dis 1981; **62**:180.

171. Schattner A, Von der WAlde J, Kozak N et al: Nitrofurantoin-Induced Immune-Mediated lung and liver disease. Am J Med Sci 1999; **317**:336.

172. Padley SP, Adler B, Hansell DM et al: High resolution computed tomography of drug induced lung disease. Clin Radiol 1992; **46**:232.

173. Sovijari AR, Lemola M, Stenius B et al: Nitrofurantoin-induced acute, subacute and chronic pulmonary reactions. Scand J Respir Dis 1977; **58**:41.

174. Hainer BL, White AA: Nitrofurantoin pulmonary toxicity. J Fam Pract 1981;**13**:817.

175. Goemaere NN, Grijm K, van Hal P et al: Nitrofurantoin-induced pulmonary fibrosis: a case report. J Med Case Rep 2008; **2**:169.

176. Reynolds TD, Thomas J: Nitrofurantoin related pulmonary disease: a clinical reminder. BMJ Case Rep 2013; pii: bcr2013009299.

177. Martin WJ, II: Nitrofurantoin: potential direct and indirect mechanisms of lung injury. Chest 1983;**83**:51S.

178. Bernstein LS: Adverse reactions to trimethoprim-sulfamethoxazole, with particular reference to long-term therapy. Can Med Assoc J 1975; **112**: 96.

179. Iarikov D, Wassel R, Farley J et al: Adverse events associated with fosfomycin use: review of the literature and analysis of the FDA adverse event reporting system database. Infect Dis Ther 2015; **4**: 433.

180. Gleckman R, Blagg N, Joubert DW: Trimethoprim: mechanisms of action, antimicrobial activity, bacterial resistance, pharmacokinetics, adverse reactions, and therapeutic indications. Pharmacotherapy 1981; **1**: 14.

181. Ho JM, Juurlink DN: Considerations when prescribing trimethoprim-sulfamethoxazole. CMAJ 2011; **183**: 1851.

182. Costelloe C, Metcalfe C, Lovering A et al: Effect of antibiotic prescribing in primary care on antimicrobial resistance in individual patients: systematic review and meta-analysis. BMJ 2010; **340**: c2096.

183. Vosti KL: Recurrent urinary tract infections. Prevention by prophylactic antibiotics after sexual intercourse. JAMA 1975; **231**:934.

184. Pfau A, Sacks T, Engelstein D: Recurrent urinary tract infections in premenopausal women: prophylaxis based on an understanding of the pathogenesis. J Urol 1988;**129**:1153.

185. Pfau A, Sacks TG, Shapiro M: Prevention of recurrent urinary tract infections in premenopausal women by post-coital administration of cinoxacin. J Urol 1988;**139**:1250.

186. Pfau A, Sacks TG: Effective prophylaxis of recurrent urinary tract infections in premenopausal women by postcoital administration of cephalexin. J Urol 1989;**142**:1276.

187. World Health Organization: Antimicrobial resistance. 2018. http://www.who.int/antimicrobial-resistance/en/.

188. Kontiokari T, Sundqvist K, Nuutinen M et al: Randomised trial of cranberry-lingonberry juice and Lactobacillus GG drink for the prevention of urinary tract infections in women. BMJ 2001; **322**:1571.

189. Maki KC, Kaspar KL, Khoo C et al: Consumption of a cranberry juice beverage lowered the number of clinical urinary tract infection episodes in women with a recent history of urinary tract infection. Am J Clin Nutr 2016; **103**:1434.

A.507

190. Stothers L: A randomized trial to evaluate effectiveness and cost effectiveness of naturopathic cranberry products as prophylaxis against urinary tract infection in women. Can J Urol 2002;**9**:1558.

191. Takahashi S, Hamasuna R, Yasuda M et al: A randomized clinical trial to evaluate the preventive effect of cranberry juice (UR65) for patients with recurrent urinary tract infection. J Infect Chemother 2013;**19**:112.

192. Vostalova J, Vidlar A, Simanek V et al: Are high proanthocyanidins key to cranberry efficacy in the prevention of recurrent urinary tract infection? Phytother Res 2015;**29**:1559.

193. Walker EB, Barney DP, Mickelsen JN et al: Cranberry concentrate: UTI prophylaxis. J Fam Pract 1997;**45**:167.

194. Baerheim A, Larsen E, Digranes A: Vaginal application of lactobacilli in the prophylaxis of recurrent lower urinary tract infection in women. Scand J Prim Health Care 1994; **12:** 239.

195. Czaja CA, Stapleton AE, Yarova-Yarovaya Y et al: Phase I trial of a lactobacillus crispatus vaginal suppository for prevention of recurrent urinary tract infection in women. Infect Dis Obstet Gynecol 2007; **2007:** 35387.

196. Reid G, Bruce A, Taylor M: Instillation of lactobacillus and stimulation of indigenous organisms to prevent recurrence of urinary tract infections. Microecol Ther 1995; 32.

197. Stapleton AE, Au-Yeung M, Hooton TM et al: Randomized, placebo-controlled phase 2 trial of a lactobacillus crispatus probiotic given intravaginally for prevention of recurrent urinary tract infection. Clin Infect Dis 2011; **52**: 1212.

198. Albrecht U, Goos KH, Schneider B: A randomised, double-blind, placebo-controlled trial of a herbal medicinal product containing Tropaeoli majoris herba (Nasturtium) and Armoraciae rusticanae radix (Horseradish) for the prophylactic treatment of patients with chronically recurrent lower urinary tract infections. Curr Med Res Opin 2007; **23**: 2415.

199. Genovese C, Davinelli S, Mangano K et al: Effects of a new combination of plant extracts plus d-mannose for the management of uncomplicated recurrent urinary tract infections. J Chemother 2018; **30:** 107.

200. Damiano R, Quarto G, Bava I et al: Prevention of recurrent urinary tract infections by intravesical administration of hyaluronic acid and chondroitin sulphate: a placebo-controlled randomised trial. Eur Urol 2011; **59:** 645.

201. De Vita D, Giordano S: Effectiveness of intravesical hyaluronic acid/chondroitin sulfate in recurrent bacterial cystitis: a randomized study. Int Urogynecol J 2012; **23:** 1707.

202. Wagenlehner FM, Ballarini S, Pilatz A et al: A randomized, double-blind, parallel-group, multicenter clinical study of Escherichia coli-lyophilized lysate for prophylaxis of recurrent uncomplicated urinary tract infections. Urol Int 2015; **95:** 167.

203. Minardi D, d'Anzeo G, Parri G et al: The role of uroflowmetry biofeedback and biofeedback training of the pelvic floor muscles in the treatment of recurrent urinary tract infections in women with dysfunctional voiding: a randomized controlled prospective study. Urology 2010; **75:** 1299.

204. Rahn D, Carberry C, Sanses TV et al: Vaginal estrogen for genitourinary syndrome of menopause: a systematic review. Obstet Gynecol 2014;**124**;1147.

205. Perotta C, Aznar M, Mejia R et al: Oestrogens for preventing recurrent urinary tract infection in postmenopausal women. Cochrane Database Syst Rev 2008; CD005131.

206. Cardozo L, Benness C, Abbott D: Low dose oestrogen prophylaxis for recurrent urinary tract infections in elderly women. Br J Obstet Gynaecol 1998;**105**:403.

207. Kirkengen AL, Andersen P, Gjersoe E et al: Oestriol in the prophylactic treatment of recurrent urinary tract infections in postmenopausal women. Scand J Prim Health Care 1992; **10**:139.

208. Eriksen B: A randomized, open, parallel-group study on the preventive effect of an estradiol-releasing vaginal ring (Estring) on recurrent urinary tract infections in postmenopausal women. Am J Obstet Gynecol 1999;**180**:1072.

209. Raz R, Stamm WE: A controlled trial of intravaginal estriol in postmenopausal women with recurrent urinary tract infections. N Engl J Med 1993; **329**:753.

210. Ponzone R, Biglia N, Jacomuzzi ME et al: Vaginal oestrogen therapy after breast cancer: is it safe? Eur J Cancer 2005;**41**:2673.



A.508

Case 1:18-cv-12558-PBS Document 259-4 Filed 08/29/24 Page 31 of 32

211. Le Ray I, Dell'Aniello S, Bonnetain F et al: Local estrogen therapy and risk of breast cancer recurrence among hormone-treated patients: a nested case-control study. Breast Cancer Res Treat 2012;**135**:603.

212. O'Meara ES, Rossing MA, Dailing JR et al: Hormone replacement therapy after a diagnosis of breast cancer in relation to recurrence and mortality. J Natl Cancer Inst 2001;**93**:754.

213. Averbeck, MA, Rantell, A, Ford, A et al: Current controversies in urinary tract infections: ICI-RS 2017. Neurourol Urodynam 2018; **37**: 586.

214. Urology Times: Next-generation sequencing: A reliable tool for the diagnosis and treatment of complicated and recurrent urinary tract infections. 2022. https://www.urologytimes.com/view/next-generation-sequencing-a-reliable-tool-for-the-diagnosis-and-treatment-of-complicated-and-recurrent-urinary-tract-infections. Accessed May 17, 2022.

215. van der Zee A, Roorda L, Bosman G et al: Molecular diagnosis of urinary tract infections by semi-quantitative detection of uropathogens in a routine clinical hospital setting. PLoS One 2016; **11**: e0150755.

216. Heytens S, De Sutter A, Coorevits L et al: Women with symptoms of a urinary tract infection but a negative urine culture: PCR-based quantification of Escherichia coli suggests infection in most cases. Clin Microbiol Infect 2017; **23**: 647.

217. McDonald M, Kameh D, Johnson ME et al: A head-to-head comparative phase II study of standard urine culture and sensitivity versus DNA next-generation sequencing testing for urinary tract infections. Rev Urol 2017; **19**: 213.

218. Spaulding CN, Klein RD, Schreiber HL 4th et al: Precision antimicrobial therapeutics: the path of least resistance? NPJ Biofilms Microbiomes 2018; **4**: 4.

219. Hannan TJ, Roberts PL, Riehl TE et al: Inhibition of cyclooxygenase-2 prevents chronic and recurrent cystitis. EBioMedicine 2014;**1**:46.

220. Gágyor I, Bleidorn J, Kochen MM et al: Ibuprofen versus fosfomycin for uncomplicated urinary tract infection in women: randomised controlled trial. BMJ 2015; **351**:h6544.

221. Harlow, BL, Bavendam, TG et al: The Prevention of Lower Urinary Tract Symptoms (PLUS) Research Consortium: A transdiciplinary approach toward promoting bladder health and preventing lower urinary tract symptoms in women across the life course. J Womens Health 2018; **27**283.

222. Brady SS, Bavendam TG, Berry A et al: Prevention of Lower Urinary Tract Symptoms (PLUS) Research Consortium. The Prevention of Lower Urinary Tract Symptoms (PLUS) in girls and women: Developing a conceptual framework for a prevention research agenda. Neurourol Urodyn 2018;**37**:2951.

     

American Urological Association

1000 Corporate Boulevard
Linthicum, MD 21090
Phone: 410-689-3700
Toll-Free: 1-800-828-7866
Fax: 410-689-3912
Email: aua@AUAnet.org

About AUA

AUA Overview

Quick Links

AUA Sections



A.509

Case 1:18-cv-12558-PBS   Document 259-4   Filed 08/29/24   Page 32 of 32

Annual Report
Mission & Vision
Leadership
Governance
Careers at the AUA

Contact Us
Donate
Press/Media
Privacy Policy
Industry Relations
Interest-Based Advertising

© 2024 American Urological Association | All Rights Reserved.

A.510

# EXHIBIT E

A.511



# Transcript of **Dicken Shiu-Chung Ko, MD**

Friday, April 26, 2024

*United States of America v. MD Spine Solutions LLC*

www.TP.One
800.FOR.DEPO (800.367.3376)
Scheduling@TP.One

Reference Number: 141113

A.512

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

No. 18-cv-12558-PBS

- - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA, et al.,

ex rel. OMNI HEALTHCARE, INC.,

                    Plaintiffs,

     v.

MD SPINE SOLUTIONS LLC d/b/a MD LABS,

INC., DENNIS GRIZELJ, MATTHEW RUTLEDGE

and DOE HEALTHCARE PROVIDERS 1-100,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - -x

DEPOSITION OF DICKEN SHIU-CHUNG KO, M.D.

Conducted Remotely via Zoom

2 Dudley Street

Providence, Rhode Island

April 26, 2024

8:26 a.m.

Daria L. Romano, RPR, CRR, and Notary Public

**TP One**

A.514

Q.   Are you familiar with a company called "Pathnostics"?

A.   Yes, I am.

Q.   Do you know what that company does?

A.   Yes.

Q.   What does it do?

A.   It -- it's in the molecular diagnostic world.  It has a urinary test called "Guidance" by which is a proprietary test, and it's paired with a pooled antibiotics susceptibility testing for rapid testing of urinary tract infections.

Q.   Okay.  So I want to unpack that a little bit.

The test is called Guidance; is that right?

A.   That is correct.

Q.   What type of test is this?

A.   It's a preliminary chain reaction, PCR, test.

Q.   Okay.  And so I'll continue to refer to a preliminary chain reaction test as "PCR" throughout the deposition, and you'll understand what I mean?



A.   I will.

Q.   Okay.  And then you referenced a sensitivity test as well; is that correct?

A.   Yes, I have.

Q.   So your understanding is that Pathnostics conducts PCR testing as well as sensitivity testing?

A.   That is correct.

Q.   And how is it that you became familiar with Pathnostics?

A.   I am on their -- I'm the chair of their scientific advisory committee.  I was chief medical officer of a hospital running 900 faculty and a couple hundred beds from 2017 to 2020.

At that time one of my charges is to deal with urinary tract infections as a hospital-acquired complication, so I was very versed in the field of urinary tract infection specific to a huge practice in the -- academic and community practice in the Boston area.

And in the year 2020, my mother had a very significant infection that was



A.517

infections.  Most common diagnosis for a referral to a urologist.

Q.   Okay.  You just mentioned "recurrent"; "can be" is what you said.  About what portion of the UTI symptom patients are recurrent UTI symptom patients?

A.   You'll get different answers from different people.  If you talk to a primary care, they're going to see uncomplicated more.  If you talk to a urologist or subspecialist such as myself in the area, most of our referrals are recurrent or recalcitrant or persistent urinary tract infections, primarily recurrent or complicated urinary tract infections.

Q.   Okay.  So I'm asking specific to you, Doctor, your practice, what portion -- you just brought up recurrent.  Am I understanding you correctly that you would say most of the patients you treat with UTI symptoms are --

A.   Most -- most of them.  Most of them, that's correct.  That's why they get a referral to a urologist.



Case 1:18-cv-12558-PBS   Document 259-5   Filed 08/29/24   Page 9 of 17

A.519

quality, in terms of results, and in terms of timing.

It's the clinicians who's seeing the patient, who has contact with the patient, that orders the test in order for the lab to perform the tests.  So it's two very separate functions.

Q.   How many times over the course of your career have you used a PCR to test for a UTI?

A.   Oh, hundreds, I would say, absolutely.

Q.   And in approximately -- go ahead. Sorry to interrupt.

A.   I would say in the three figures, three digits, I would have to assume.  I have not counted, so I do not know.

Q.   Fair enough.

For about how long have you been doing PCR testing for UTI symptoms, if you recall?

A.   Since I found out the availability was here at Brown.

Q.   Which was approximately when?



A.    In June 2020.

Q.    And they had --

A.    Almost four years.

Q.    And they had PCR testing available in 2020 when you started?

A.    Absolutely, yes.

Q.    Approximately how many times have you used an SUC to test for a UTI over the course of your career?

A.    Well, it has to be hundreds of thousands, I would assume, simply because it's not depending on the individual patients that I see.  I see them in continuity, so even though I may not see 100,000, 200,000 patients in my career, the fact that they come back and for follow-up, each one of these sometimes gets more than one test. Sometimes they get confirmatory tests, sometimes they get repeated tests, so it's certainly in the hundreds of thousands I would -- I would guesstimate, to the best of my knowledge, to the best of my abilities.

I have been in practice for 28 years, so I'm an old guy.  That's why I need



A.522

A.   That is -- that is the purpose of looking at it because those are the patients we urologists see the most, so it's a specific area that I'm interested in.

Q.   Okay.  Understood.  But it doesn't speak to the potential long-term costs for UTI patients that are not recurrent or complicated, right?

A.   That was not the intent of the study or the objective of the study.

Q.   And, again, we touched on this earlier, but are you able to give me a percentage of approximately how many of your UTI patients do face recurrent or complicated UTI symptoms?

MR. ORKAND:  Objection.

A.   Hard to estimate.  I see the most complicated of them all simply because of what I do.  I'm sure my colleagues would see something less.

Q.   Are you aware of any other studies that have reached similar conclusions on overall cost saving with PCR testing for UTI?

A.   I'm aware this is the -- one of the



seminal articles that have come out in the last year that looked at cost related.

I think you have to do some prospective studies to determine whether or not that's going to be further confirmatory over time, and I have not, in my review, seen currently any other studies.  But they may be being done right now that I'm not aware of, so I can only comment on what's been published up to this time.

Q.   There was an article written publishing the results of the study that you conducted, right?

A.   Yes.

Q.   Are you aware of an article that was published regarding your study and its results?

MR. ORKAND:  Objection.

A.   I mean, I published it.  It's in the journals.  So, yeah, I'm aware that it was publish because I had to sign for it.

Q.   Are you familiar with the American urology association?

A.   Yes, I'm a part of the American



A.525

I don't think your question has any relevance because the guidelines is based on looking at what has been used, here is what we can potentially teach because these are some of the guidelines of practices.

Q.   Okay.  So are you suggesting that there are situations when you believe that clinicians should deviate from the AUA guidelines?

A.   I think the AUA guideline is something that's presented so that potentially you could take a look at in a standardized patient.

Any patient that's not standardized and have nuances that are in their clinical presentation can absolutely deviate from the guideline as seen necessary for best practice in the best interest of the patient with a concerted effort to ensure the patient receives the best care.

Q.   Are you also aware of the fact that the AUA guidelines specifically say that more evidence is needed before it includes using PCRs to treat UTIs within the guidelines?

 

A.    That's a clear message that I am fully aware of and that's why we're trying to collect evidence and that's why I'm in this research field.  That's why I'm in this area to try to collect the information so that people could help various patients to have a better diagnostic in terms of figuring out how to treat infection.

And I told you, it's not only on a hospital-based system in which I was the chief medal officer, but it was also on a personal basis.  My mother was treated with standard guidelines of what -- she had a wound infection.

So if you think about it, you really want to advance beyond what a culture has been doing for the last 60 years.  That's what science is about.  This is what clinicians do.  This is what clinicians and scientists and academics do.  This is what I do.

MS. McLEOD:  Okay.  Let me take five, if that's okay, just see if I have anything else, but we're near the end.  Pop



# EXHIBIT F

A.528

[May 2023 - Volume 1 - Issue 5](#)

- [Previous Article](#)

- Outline
  - ○ Materials and Methods
  - ○ Identifying UTI Diagnostics
  - ○ Identifying r/cUTI
  - ○ Constructing r/cUTI Episodes
  - ○ Statistical Analyses
  - ○ RESULTS
  - ○ Demographics and Patient Characteristics
  - ○ Additional UTIs
  - ○ MRU
  - ○ UTI-Related Cost
  - ○ Mean Cost Per aUTI
  - ○ Discussion
  - ○ Strengths of This Analysis
  - ○ Limitations
  - ○ Directions for Further Investigations
  - ○ Conclusions
  - ○ References
- Images
  - ○ Slideshow
  - ○ Gallery
  - ○ Export PowerPoint file
- Download
  - ○ PDF
  - ○ EPUB
- Cite
  - ○
  - ○ Copy
  - ○ Export to RIS
  - ○ Export to EndNote
- Share
  - ○ Email
  - ○ Facebook
  - ○ Twitter
  - ○ LinkedIn
- Favorites
- Permissions
- More
  - ○ Cite
  - ○ Permissions
  - ○ Image Gallery



Original Research Article

# Real-World Evidence That a Novel Diagnostic Combining Molecular Testing With Pooled Antibiotic Susceptibility Testing is Associated With Reduced Infection Severity and Lower Cost Compared With Standard Urine Culture in Patients With Complicated or Persistently Recurrent Urinary Tract Infections

Ko, Dicken Shiu-Chung[1]; Lukacz, Emily S.[2]; Juster, Iver Allen[3]; Niecko, Timothy[4]; Ashok, Aparna[1]; Vollstedt, Annah Jean[5]; Baunoch, David[6]; Mathur, Mohit[6]



Author Information

[1]Department of Surgery, Division of Urology, Warren Alpert Medical School of Brown University, Providence, Rhode Island

[2]Department of Obstetrics, Gynecology & Reproductive Sciences, University of California San Diego, La Jolla, California

[3]Consulting Health Informatics, San Rafael, California

[4]Timothy Niecko, Niecko Health Economics, LLC, Tierra Verde, Florida

[5]Department of Urology, University of Iowa Healthcare, Iowa City, Iowa

[6]Pathnostics, Irvine, California

Corresponding Author: Dicken Shiu-Chung Ko, Warren Alpert Medical School of Brown University, Providence, RI (dicken_ko@brown.edu)

This is an open access article distributed under the terms of the Creative Commons Attribution-Non Commercial-No Derivatives License 4.0 (CCBY-NC-ND), where it is permissible to download and share the work provided it is properly cited. The work cannot be changed in any way or used commercially without permission from the journal.

JU Open Plus 1(5):e00021, May 2023. | DOI: 10.1097/JU9.0000000000000025

- Open
- Erratum

Metrics

# Abstract

## Purpose:

Develop real-world evidence that rapid identification of uropathogens and susceptibilities improves urologic outcomes for patients with complicated or history of recurrent urinary tract infections (r/cUTIs). Standard urine culture (SUC) is slow, often missing polymicrobial infections and altered antibiotic resistance from their metabolic interactions.

## Materials and Methods:

We compared 1-year UTI-related health care utilization and costs for UTIs diagnosed by outpatient multiplex polymerase chain reaction/pooled antibiotic susceptibility testing (mPCR/P-AST) vs SUC among Medicare beneficiaries with r/cUTIs, using claims from a deidentified random 5% sample of beneficiaries with an index UTI in 2018 followed by 12 months during which all outpatient UTI tests were either mPCR/P-AST or SUC. Outcomes were compared between 69 individuals diagnosed using mPCR/P-AST and 678 propensity-matched individuals using SUC. Regression models modeled cost differences with 95% confidence intervals (CIs).

## Results:

Of 1,654,548 enrollees in 2018, 11.6%, 0.06%, and 9.6% had claims for UTI, mPCR/P-AST, and SUC, respectively. The matched mPCR/P-AST and SUC cohorts were statistically equivalent at baseline. The mPCR/P-AST cohort was nonsignificantly less likely than the SUC cohort to have a postindex UTI (65.2% vs 72.0%, $P = .24$). Cost per subsequent UTI was significantly lower for mPCR/P-AST ($767 vs $1,303, $P = .0013$). Average total 1-year UTI-related cost was $501.85 (95% CI: $79.87, $562.08 $P = .004$) lower per mPCR/P-AST member vs SUC ($629.55 vs $1131.39). Nonoutpatient treatment accounted for 22.5% of mPCR/P-AST vs 53.4% of SUC UTI-related costs.

## Conclusions:

In patients with r/cUTI, rapid identification of pathogens and antibiotic susceptibilities using mPCR/P-AST is associated with lower UTI-related clinical care and utilization costs compared with SUC.

### Erratum

Volume 1, Issue 5, Page e00021: The author contributions statement, conflict of interest statement, funding statement, and reporting standard statements are

### Author Contributions:

*Conception and design:* Juster, Ko, Lukacz, Vollstedt, Mathur, Baunoch.

*Drafting the manuscript:* Juster, Ko, Lukacz.

*Critical revision of the manuscript for scientific and factual content:* Juster, Ko, Lukacz, Vollstedt, Mathur, Baunoch, Ashok.

*Statistical analysis:* Niecko.



*Data analysis and interpretation:* Niecko.

**Conflict of Interest Disclosures:** Drs Mathur and Baunoch are employees of Pathnostics. Drs Ko, Lukacz, and Vollstedt serve on Pathnostics' science advisory board. Drs Juster and Niecko are independent consultants in health economics.

**Funding/Support:** Funding for this project was provided by Pathnostics, the developer of the mPCR/PAST test.

**Reporting Standard:** STROBE.

The online and PDF versions of the article have been updated.

JU Open Plus. 2(5):e00040, May 2024.

Urinary tract infections (UTIs) can cause substantial morbidity, health care utilization, and cost. In 2019, Medicare reported 1,201,524 emergency and 148,215 inpatient UTI events, resulting in $13.5 billion in charges.[1] Particularly in high-risk patients, swift and accurate identification of uropathogens and their antimicrobial susceptibilities have the potential to improve clinical outcomes and improve antibiotic stewardship.[2]

UTIs in patients with functional or anatomic abnormalities of the urinary tract, who are immunocompromised, have recently undergone urinary tract instrumentation; history of pelvic radiotherapy, diabetes, pyelonephritis, or urinary tract abscess; or male sex are considered to be *complicated* UTIs (cUTIs), predisposing to poor treatment outcomes, such as emergency services, hospitalization, urosepsis, and recurrence.[3] In addition, it is unclear whether new UTIs in patients with a recent history of recurrent UTIs (rUTI) should be considered complicated.

The conventional diagnostic approach, *standard urine culture* (SUC), returns antibiotic susceptibilities to common pathogens with a typical turnaround of 2 to 4 days, frequently resulting in initial empiric treatment.[4] Patients with cUTIs frequently have atypical or multi–drug-resistant organisms. Furthermore, polymicrobial infections are more common and potentially problematic in cUTIs.[5] However, SUC fails to detect slow-growing, fastidious, or nonaerobic organisms, missing more than 80% of polymicrobial UTIs.[6,7] Inaccurate identification of pathogens and metabolic interactions among pathogens and normal urinary microflora[8] risks imprecise SUC-based treatment.[9] Partially treated polymicrobial infections may also lead to persistent UTIs, increasing severity, or recurrence.

Improving cUTI outcomes requires addressing underlying risk factors and long-term urobiome control.[10] Multiplex polymerase chain reaction (mPCR) has emerged as a diagnostic strategy because it identifies a wider range of microbes than SUC, with results within hours.[11] mPCR also identifies genes associated with antibiotic resistance. However, this technology fails to address susceptibilities in polymicrobial infections arising from organisms' metabolic interactions, and there can be significant discordance between resistance gene results and phenotypic antibiotic susceptibility results.[12-14]

Combining pooled antibiotic susceptibility testing with mPCR (mPCR/P-AST) outperformed SUC microbiologically.[15] Among patients with UTIs enrolled in a time series multistate study of home care patients, consistent use of mPCR/P-AST was associated with 13.7% fewer UTI emergency and hospital events compared with SUC.[16]

To gain insight into the real-world generalizability of these findings in patients with cUTI or a new UTI following a recent history of rUTI—which together we will refer to as r/cUTI—we compared UTI-related outcomes of 1 year's consistent outpatient use of mPCR/P-AST vs SUC in a retrospective claims analysis of Medicare beneficiaries.

# Materials and Methods

We retrospectively compared UTI-related clinical, utilization, and cost outcomes among Original Medicare beneficiaries with cUTI or a recent history of rUTI and a newly occurring UTI—r/cUTI—whose outpatient infections were diagnosed using only SUC vs only mPCR/P-AST over the course of 1 year.

A limited data set (LDS) of a deidentified 5% random sample of Medicare beneficiaries from 2017 to 2019 was obtained from the Centers for Medicare and Medicaid Services' Research Data Assistance Center[17] (ResDAC) with appropriate data use permissions. An outpatient drug file was not obtained. The LDS contained files for Medicare enrollment, limited demographics, and claims for professional and health care facility services, from which a longitudinal picture of health care services could be constructed. Only beneficiaries with both Parts A and B (and no Part C) during the contiguous 12-month baseline and observation periods referenced below, and no hospice claims or deaths, were eligible for this analysis.

## Identifying UTI Diagnostics

The analysis compared UTI-related health care utilization and cost outcomes of 1 year of UTI treatment informed by SUC vs mPCR/P-AST, where only SUC or only mPCR/P-AST were used for UTI diagnosis in outpatient settings. Current Procedural Terminology (CPT) codes identified SUC tests.

The mPCR/P-AST diagnostic (Guidance UTI, Pathnostics, Irvine, CA) consisted of 3 parts: PCR to identify 27 individual organisms and 3 bacterial groups, 32 resistance genes against 6 classes of antibiotics, and pooled antibiotic susceptibility testing, which involves



simultaneously growing all bacteria together in the presence of antibiotics and then measuring susceptibilities, thus considering intermicrobial interactions that may alter susceptibilities. Performance of P-AST requires living organisms.

As a recently developed diagnostic, mPCR/P-AST lacked a specific CPT code, but the 9 laboratories performing mPCR/P-AST during lab-specific time frames during 2017 to 2019 billed existing PCR codes appropriate for identification of urinary tract pathogens. Because all UTI PCR tests performed by the laboratories during these periods were mPCR/P-AST, we identified mPCR/P-AST tests from a combination of CPT codes, laboratory National Provider Identifiers, and claim date of service. Figure 1 shows an illustrative test results report.



Figure 1.:

Example mPCR/P-AST results report. mPCR, multiplex polymerase chain reaction; P-AST, pooled antibiotic susceptibility testing.

## Identifying r/cUTI

As shown in Table 1, the first outpatient claim with an ICD-10-CM code for UTI after 12 months of continuous eligibility was considered r/cUTI if the individual met any of the following criteria: (1) the enrollee was male; (2) the principal diagnosis on the index claim was considered inherently complicated (eg, pyelonephritis, urinary tract abscess, or currently or recently catheter-associated); or (3) the enrollee was found during the prior 12 months to have diabetes, rUTI (defined as 2 UTIs in 6 months or 3 or more in 1 year,[18] based on the codes in Table 1), an anatomic or functional urinary tract problem, history of pelvic radiotherapy, recent urinary tract instrumentation, or immunocompromise.

Table 1. - Identifying the r/cUTI-Qualifying Index UTI Event✖

| ICD-10-CM codes | Description |
| --- | --- |
| Criterion A: Principal diagnosis inherently cUTI regardless of baseline risk factors | |
| N10 | Acute pyelonephritis |
| N15.1 | Renal and perinephric abscess |
| N34.0 | Urethral abscess |
| N41.0 | Acute prostatitis |
| N41.2 | Abscess of prostate |
| T83.51xA | Infection and inflammatory reaction urinary catheter types, initial encounter |
| T83.59xA | Infection and inflammatory reaction due to implanted or indwelling urinary catheter or device |
| Criterion B: Principal diagnosis acute cystitis with at least 1 cUTI risk factor in baseline | |
| N30.0x | Acute cystitis |
| Criterion C: Principal or second diagnosis was irradiation cystitis *and* test for UTI within 3 d of the claim | |
| N30.4x | Irradiation cystitis |
| Criterion D: Principal or second diagnosis *and* test for UTI within 3 d *and* at least 1 risk factor in baseline | |
| N34.1 | Nonspecific urethritis |
| N40.1 | Benign prostatic hyperplasia with lower urinary tract symptoms |
| N40.3 | Nodular prostate with lower urinary tract symptoms |
| N41.1 | Chronic prostatitis |
| N41.3 | Prostatocystitis |
| N30.2x | Other chronic cystitis |
| N30.8x | Other cystitis |
| N30.9x | Cystitis, unspecified |
| N39.0 | Urinary tract infection, site not specified |

cUTI, complicated urinary tract infection; r/cUTI, complicated urinary tract infection or UTI after previous rUTI; ICD-10-CM, International Classification of Diseases, Clinical Modification version 10; UTI, urinary tract infection.

The first outpatient claim for UTI on or after January 1, 2018, after at least 12 mo of continuous enrollment in both Medicare Parts A and B, was considered to indicate an index event if at least 1 of the 4 listed criteria was met. "x" in an ICD-10-CM code indicates that the position may be any whole number 0 through 9 or blank. *Baseline period* risk factors included male sex, recurrent UTI (2 in 6 mo or 3 in 12 mo), diabetes, immunocompromising conditions, pelvic radiotherapy, anatomic or functional urinary tract problems, and recent urinary tract instrumentation.

A-532

## Constructing r/cUTI Episodes

The initial UTI claim ("index") initiated a UTI episode in the r/cUTI population if (1) there were no UTI claims in the preceding 7 days, (2) the individual had a SUC or mPCR/P-AST test within 3 days of the index, (3) the enrollee had at least 365 days' continuous Medicare coverage following the index, and (4) all outpatient UTI tests during the 1-year episode were SUC or mPCR/P-AST. Figure 2 illustrates the design of the 12-month episodes.



Figure 2.:
Design of 12-month r/cUTI episodes. A 12-month cUTI episode was initiated on the date of the first claim qualifying as r/cUTI in 2018, provided the individual was covered with Medicare Parts A and B for 12 months before and 12 months after the cUTI index date; had no UTI claims in the prior 7 days; had an outpatient SUC or mPCR/P-AST test within 3 days of the index date; and all outpatient UTI tests during the episode were either SUC or mPCR/P-AST. cUTI, complicated urinary tract infection; mPCR, multiplex polymerase chain reaction; P-AST, pooled antibiotic susceptibility testing; r/cUTI, complicated urinary tract infection or UTI after previous rUTI; SUC, standard urine culture; UTI, urinary tract infection.

Individuals from the overall SUC cohort were matched to members of the mPCR/P-AST cohort by closest-neighbor propensity scores based on age, sex, ethnicity, baseline year recurrent UTI, diabetes, functional or anatomic urinary tract problems, immunosuppression, and the ICD-10 Elixhauser definitions[19] of heart failure, cardiac arrhythmia, cardiac valvular disease, peripheral vascular disease, complicated hypertension, paralysis, other neurological disorders, chronic obstructive pulmonary disease, kidney failure, liver disease, lymphoma, metastatic cancer, solid nonmetastatic cancers, metastatic cancers, obesity, drug abuse, psychosis, and depression. Propensity-based matching aims to neutralize differences in observable variables that could explain between-cohort differences in outcomes by assigning each individual in the data set a probability of being diagnosed using mPCR/P-AST, and for each mPCR/P-AST member, selecting a set of individuals with SUC episodes whose probability scores are closest (nearest neighbor technique).[20] Matching was considered valid when the differences in all criteria were not statistically significant at the $P$ .05 level.

*Outcome measures* included *additional UTIs* (aUTI, postindex unique UTIs defined as a claim with UTI following at least 7 days free of UTI claims); *UTI-related medical resource utilization (MRU)* for outpatient, urgent care, emergency, acute inpatient, and skilled nursing facility (SNF); and *total UTI-related cost*. The costs of mPCR/P-AST and SUC were not included in the health care outcomes analysis because they vary widely among payers for mPCR/P-AST, and our intent for this analysis was to test the null hypothesis about UTI-related utilization and associated costs. An SNF stay was considered UTI-related if it immediately followed a UTI-related hospital stay, and its principal or second diagnosis was UTI. We developed a composite MRU measure as at least one of urgent care, emergency, acute inpatient, or SNF event. Costs were standardized as Medicare-allowable (total reimbursed to provider) amounts.

## Statistical Analyses

Event rates were compared between cohorts using generalized linear modeling (GLM) with a negative binomial distribution. Proportions of cohort members with at least 1 event were compared using a binary logit model. One dollar was added to each individual's cost for the episode year and then analyzed using GLM with a gamma distribution and log-link function to transform the dependent variable (allowed cost). The resulting cost was exponentiated and the dollar subtracted out to yield point estimates and 95% confidence intervals for the between-cohort differences. Statistical significance was set at $P < .05$. All Centers for Medicare and Medicaid Services (CMS) data use prescriptions on reporting values from 1 to 10 were followed.[21] Statistical calculations were performed using SAS v. 9.4.

# RESULTS

The 2017 to 2019 5% data sample contained 3,484,616 Medicare beneficiaries with Parts A, B, or C—3,147,696 in 2018, representing 1,654,548 Parts A + B enrollee years. Among those continuously enrolled in 2018, 11.6% had a claim for UTI, 9.6% had a claim for SUC, and 0.06% had a claim for mPCR/P-AST.

Eighteen thousand seven hundred fifty-four one-year r/cUTI episodes (regardless of testing strategy) were identified (1.13 per 100 enrollee years) initiating in 2018 of which 76.5% had only SUC testing in the outpatient setting. All 69 identified mPCR/P-AST–only episodes were propensity-matched to 678 SUC episodes (Figure 3).



Figure 3.:
Waterfall from the 5% sample to the matched r/cUTI episodes. r/cUTI, complicated urinary tract infection or UTI after previous rUTI.

## Demographics and Patient Characteristics



The propensity score–matched 1-year episodes met statistical nonsignificance on all criteria (Table 2). The mean age for mPCR/P-AST episodes was 74.28 vs 74.79 years for SUC episodes ($P$ = .69). Male patients represented 60.9% of mPCR/P-AST vs 60.2% of SUC episodes ($P$ = .91).

Table 2. - Matched 1-Year Episodes✖

| | mPCR/P-AST | | SUC | | $P$ value |
|---|---|---|---|---|---|
| | N | % | N | % | |
| N | 69 | | 678 | | |
| Average age | 74.28 | | 74.79 | | .69 |
| Male | 42 | 60.9% | 408 | 60.2% | .91 |
| Race: White | 58 | 84.1% | 594 | 87.6% | .41 |
| Race: non-White | 11 | 15.9% | 84 | 12.4% | |
| rUTI | 14 | 20.3% | 192 | 28.3% | .16 |
| Immunosuppression | a | a | a | a | .74 |
| Anatomic and functional | 22 | 31.9% | 239 | 35.3% | .56 |
| Diabetes | 16 | 23.2% | 138 | 20.4% | .58 |
| **Heart failure** | 15 | 21.7% | 139 | 20.5% | .81 |
| **Cardiac arrhythmia, valvular** | 26 | 37.7% | 238 | 35.1% | .67 |
| **Peripheral vascular disease** | 17 | 24.6% | 126 | 18.6% | .22 |
| **HTN complicated** | 13 | 18.8% | 155 | 22.9% | .45 |
| **Paralysis, other neuro** | a | a | a | a | .60 |
| **Renal failure, liver dz, COPD** | 21 | 30.4% | 211 | 31.1% | .90 |
| **Cancers** | 13 | 18.8% | 160 | 23.6% | .37 |
| **Obesity** | a | a | a | a | .42 |
| **Drug abuse, psychoses, depression** | 12 | 17.4% | 86 | 12.7% | .27 |

COPD, chronic obstructive pulmonary disease; HTN, hypertension; mPCR, multiplex polymerase chain reaction; P-AST, pooled antibiotic susceptibility testing; SUC, standard urine culture; rUTI, recurrent urinary tract infection.
Conditions in bold text represent Elixhauser definitions, as described in the text.
To conform to the CMS cell-size suppression policy, variables were combined.
[a]Indicates cell values that are or could be inferred to be between 1 and 10.

Compared with the entire r/cUTI population (N = 18,754), the 747 matches (69 mPCR/P-AST, 678 SUC) were similar in race, baseline history of rUTI, functional urinary tract problems, history of pelvic radiotherapy, and renal failure and tended to be older, male, diagnosed with heart failure, had anatomic risk factors, and were less likely to have diabetes (Table 3).

Table 3. - Comparison of All vs Matched r/cUTI Episodes✖

| N | All 1-y episodes | | Matches | | $P$ value |
|---|---|---|---|---|---|
| | 18,754 | | 747 | | |
| Age (mean) | 73.1 | | 74.7 | | |
| Younger than 65 y | 2268 | 12.1% | 84 | 11.2% | .70 |
| Male | 9270 | 49.4% | 450 | 60.2% | <.001 |
| White | 16,207 | 86.4% | 652 | 87.3% | .50 |
| Non-White | 2547 | 13.6% | 95 | 12.7% | |
| Baseline rUTI | 5323 | 28.4% | 206 | 27.6% | .63 |
| Diabetes | 7040 | 37.5% | 154 | 20.6% | <.001 |
| Anatomic risk | 3186 | 17.0% | 166 | 22.2% | .002 |
| Functional risk | 2190 | 11.7% | 95 | 12.7% | .38 |
| Immunosuppression | 1023 | 5.5% | 29 | 3.9% | .060 |
| Recent instrumentation | 1138 | 6.1% | 56 | 7.5% | .11 |
| Hx radiotherapy | 65 | 0.3% | a | a | .40 |
| Elix heart failure | 2202 | 11.7% | 154 | 20.6% | <.001 |
| Elix renal failure | 2572 | 13.7% | 107 | 14.3% | .64 |

Elix, Elixhauser variable; Hx, history of; rUTI, recurrent UTI.
Comparison of all valid 1-year r/cUTI episodes (regardless of test strategy) with 747 (69 mPCR/P-AST, 678 SUC) propensity-matched episodes for the outcome study.
[a]Indicates values between 1 and 10, which are proscribed from reporting in the CMS cell-size suppression policy.

Of the matched cohorts, 57.1% of mPCR/P-AST and 55.6% of SUC male patients had no additional r/cUTI risk factors identifiable in claims ($P$ = .85).

A-534

## Additional UTIs

Individuals with mPCR/P-AST episodes were nonsignificantly less likely to have a second unique UTI (65.2% vs 72.0%, $P$ = .24). The mean number of additional UTIs (aUTIs) was 1.83 for mPCR/P-AST vs 2.23 for SUC ($P$ = .17) (Table 4).

Table 4. - Frequency and Cost of Additional UTIs in the Matched Cohorts✖

| | mPCR/P-AST | SUC | P value |
|---|---|---|---|
| Total N in cohort | 69 | 678 | |
| N aUTIs | 126 | 1513 | |
| N patients with aUTIs | 45 | 488 | |
| % with ≥1 aUTI | 65.2% | 72.0% | .24 |
| Mean aUTIs/cohort | 1.83 | 2.23 | .17 |
| Excess aUTI rate | | 0.41 | |
| % of total episode cost | 79.5% | 82.9% | |
| Mean cost for patients with aUTIs | $767.48 | $1303.20 | .049 |
| Mean cost per aUTI | $274.10 | $420.33 | .001 |

aUTI, additional urinary tract infection; mPCR/P-AST, multiplex PCR with pooled antibiotic susceptibility testing; SUC, standard urine culture.
aUTIs beyond the index cUTI separated by at least 7 d. Costs include outpatient, urgent care, emergency, inpatient, and skilled nursing facilities and professional costs, but not outpatient labs or pharmacies.

## MRU

The mPCR/P-AST cohort's composite outcome event rate was 41.3% lower ($P$ = .25) than that of the SUC cohort. The mPCR/P-AST cohort had no urosepsis events.

## UTI-Related Cost

The Medicare-allowable mean UTI-related cost for mPCR/P-AST episodes ($629.55) was $501.84 (44.4%) lower than for SUC episodes ($1131.30) (95% CI of the difference: $192.25, $709.18, $P$ = .004). The mPCR/P-AST cohort also experienced lower emergency department visits cost ($50.50 vs $94.71) ($P$ = .031) and trended toward lower inpatient cost, while nonurgent/nonemergency outpatient costs were very similar (Table 5). The composite MRU portion of the total was 76.6% lower for mPCR/P-AST vs SUC: $141.60 vs $605.06 ($P$ = .043). The remaining cost comparison—for nonurgent outpatient care—was similar—$487.95 (mPCR/P-AST) vs $526.33 (SUC), $P$ = .67. Thus, urgent, emergency, and inpatient care accounted for a greater proportion of costs in SUC (53.5%) than in mPCR/P-AST (22.5%) episodes, while nonurgent outpatient care costs were similar.

Table 5. - UTI-Related Cost in the mPCR/P-AST and SUC Cohorts✖
Scroll left or right to view entire table.

| Category | mPCR/P-AST | | | SUC | | | Differences | | |
|---|---|---|---|---|---|---|---|---|---|
| | Mean | Median | IQR | Mean | Median | IQR | Point estimate | (95% CI) | P value |
| Total | $629.55 | $182.73 | (63.37, 375.48) | $1131.39 | $205.52 | (79.87, 562.08) | $501.84 | (192.25, 709.18) | .004 |
| Outpatient nonurgent | $487.95 | $172.56 | (63.37, 369.37) | $526.33 | $169.34 | (72.75, 391.30) | $38.38 | (−168.51, 183.74) | .67 |
| Urgent care | $0.00 | $0.00 | (0.00, 0.00) | $3.20 | $0.00 | (0.00, 0.00) | $3.20 | (−1.02, 4.01) | .089 |
| Emergency | $50.50 | $0.00 | (0.00, 0.00) | $94.71 | $0.00 | (0.00, 0.00) | $44.21 | (5.40, 66.33) | .031 |
| Inpatient | $91.10 | $0.00 | (0.00, 0.00) | $391.75 | $0.00 | (0.00, 0.00) | $300.65 | (−28.35, 372.62) | .062 |
| With urosepsis | $0.00 | $0.00 | (0.00, 0.00) | $127.13 | $0.00 | (0.00, 0.00) | $127.13 | (117.58, 128.03) | <.001 |
| SNF | $0.00 | $0.00 | (0.00, 0.00) | $115.40 | $0.00 | (0.00, 0.00) | $115.40 | a | |
| Composite | $141.60 | $0.00 | (0.00, 0.00) | $605.06 | $0.00 | (0.00, 0.00) | $463.46 | (27.83, 570.91) | .043 |
| % of cost from composite | 22.5% | | | 53.5% | | | | | |

CI, confidence interval; mPCR/P-AST, multiplex PCR with pooled antibiotic susceptibility testing; SNF, skilled nursing facility; SUC, standard urine culture and sensitivities.
Costs include facility and professional components, but not outpatient laboratory testing or outpatient pharmacy. *Composite measure* includes UTI-related costs for urgent, emergency, inpatient, and SNF care.
[a]Indicates that the regression model was unable to produce valid confidence intervals. The 25th, median, and 75th percentiles are 0 when no cohort members have costs at these percentile marks.

## Mean Cost Per aUTI

aUTI was $146.23 lower with mPCR/P-AST than SUC ($274.10 vs $420.33, $P$ = .0013). In addition, the mean cost per cohort member with any aUTIs was $575.32 lower in the mPCR/P-AST cohort ($767.48 vs $1303.20, $P$ = .049). Because the outpatient care component of aUTI cost was similar between the cohorts, the higher cost per aUTI with SUC was driven by higher-acuity care (Figure 4). These postindex UTIs and their accompanying health care can be considered a measure of potentially preventable UTI events.

A_535

 

[Figure 4.:](#)
Proportions of outpatient and non-outpatient UTI care, mPCR/P-AST versus SUC cohorts. Non-outpatient care accounted for a larger proportion of UTI-related cost in the SUC than in the mPCR/P-AST cohort. Composite care represents costs from urgent, emergency, inpatient, and SNF care. mPCR/P-AST, multiplex PCR with pooled antibiotic susceptibility testing; SUC: standard urine culture.

# Discussion

In this real-world retrospective claims analysis of Medicare beneficiaries with complicated UTIs or new UTIs after a recent history of recurrence (r/cUTIs), we found significantly lower overall mean UTI-related costs for patients over 1 year (44.4%) and significantly lower mean cost per UTI event for individuals whose outpatient UTIs were diagnosed using multiplex PCR with pooled antibiotic susceptibility testing (mPCR/P-AST), compared with using a standard urine culture (SUC). This was accompanied by 76.6% lower costs for a composite of UTI-related urgent, emergency, hospital, and skilled nursing care services. The cost difference stemmed from reductions in both the usage and unit cost of UTI-related urgent, emergency, and inpatient services in the mPCR/P-AST cohort. This analysis was designed to compare event outcomes and their costs so did not include testing costs.

Considering the composite measure to represent clinically advanced UTI, we attribute the lower costs in the mPCR/P-AST cohort to the rapid and accurate diagnostic strategy allowing for early intervention and avoiding delays in treatment resulting from the typical 2 to 4 days of SUC result reporting.

When we extrapolated the $501.84 per-episode lower cost to the entire 2020 Medicare Parts A + B r/cUTI population as defined for this analysis, there was a projected savings of ~$181 million per year (1.13/100 enrollee years × 31,934,411 enrollees × $501.84), not counting outpatient lab or pharmacy cost difference.

Although we could not evaluate the test results microbiologically, these findings are consistent with previous studies[22] that demonstrated the ability of mPCR/P-AST to identify pathogens and susceptibilities that SUC does not, including polymicrobial infections, in which intermicrobe metabolic interactions can alter antibiotic susceptibilities, and where PCR identification of drug resistance genes may be inaccurate.[14] Combined with the rapid turnaround of molecular testing, this would enable r/cUTI more likely to be successfully managed in an outpatient setting.

A 2022 analysis by Lodise et al[23] of 1-year cUTI costs using MarketScan Commercial and retiree Medicare Supplemental medical and pharmacy claims found greater complicated UTI (cUTI) costs among individuals aged 65 and older with outpatient index cUTI claims. Lodise's inclusion of testing and outpatient pharmacy costs may, in part, be associated with their greater cUTI costs. Consistent with our aim to compare health care outcomes, the outpatient testing costs of the novel mPCR/P-AST and SUC were not included in our analyses. Differences in cUTI definition and risk distribution of the cohorts may have also accounted for the higher UTI-related emergency and inpatient events by Lodise et al and possibly costs not as easily discernible in Medicare LDS data. Nonetheless, both our data and Lodise's data point to the high cost of cUTIs and the importance of interventions that can reduce their frequency and severity.

## Strengths of This Analysis

Strengths of this analysis include (1) real-world evidence on the economic advantages of a novel diagnostic test for complicated urinary tract infections, use of research-quality data enabling outcome assessment across a variety of Medicare beneficiaries and clinical practices, regardless of physician or patient behavior subsequent to the choice of diagnostic test; (2) one-year observation periods of propensity score–matched cohorts during which all outpatient diagnostics were solely SUC or mPCR/P-AST; and (3) a definition of r/cUTI that reflects the realities of outpatient clinical decision-making based on patient risk factors (including occurrence of a new UTI following a recent history of rUTI) as well as the nature of the infection. Other published definitions of cUTI vary from prima facie evidence (emergency or inpatient UTI),[24] pathogen-based or multidrug-resistance–based,[25] to UTI in the face of anatomic or functional urinary tract abnormalities,[26] among others.[27]

## Limitations

Limitations include caveats inherent in claims data, such as coding errors, use of diagnosis codes for rule-out situations, and findings from laboratory, imaging, and pathology studies. We were unable to determine whether an outpatient antibiotic was dispensed or taken, although antibiotics may be prescribed empirically awaiting culture and sensitivities, and the fact that one is prescribed does not necessarily offer stronger support for a UTI diagnosis than the combination of ICD codes for UTI and a test on claim. Our results should therefore be regarded as intention-to-diagnose comparisons.

Although we included all 69 valid mPCR/P-AST episodes in our analysis, the relatively low frequency of UTI-related emergency and inpatient events makes it difficult to achieve the statistical power needed to detect a true difference in individual event types, although the cost differences were significant. In addition, the low frequency of events in the mPCR/P-AST cohort precludes reporting individual event types per CMS requirement to exclude details related to Medicare beneficiaries when these data could possibly be used to identify individuals. Future investigations with larger sample sizes are needed to address this issue.

A-536

The potential for unknown confounders exists in any observational study.[28] For example, physicians may have chosen mPCR/P-AST based on their assessment of patient factors that are not identifiable in claims. We aimed to neutralize the impact of observable confounders by using propensity score–based matching.

### Directions for Further Investigations

Prospective trials should be conducted to further explore the value of mPCR/P-AST in patients with cUTI across appropriate real-world settings and to inform budget impact modeling.

## Conclusions

Rapid and accurate detection of urinary tract pathogens and their associated pooled antibiotic susceptibilities in Medicare beneficiaries with complicated or persistently recurrent urinary tract infections has the potential to reduce health care utilization costs while improving patient care.

**Author Contributions:** *Conception and design:* Juster, Ko, Lukacz, Vollstedt, Mathur, Baunoch. *Drafting the manuscript:* Juster, Ko, Lukacz. *Critical revision of the manuscript for scientific and factual content:* Juster, Ko, Lukacz, Vollstedt, Mathur, Baunoch, Ashok. *Statistical analysis:* Niecko. *Data analysis and interpretation:* Niecko.

**Conflict of Interest Disclosures:** Drs Mathur and Baunoch are employees of Pathnostics. Drs Ko, Lukacz, and Vollstedt serve on Pathnostics' Science Advisory Board. Juster and Niecko are independent consultants in health economics.

**Funding/Support:** Funding for this project was provided by Pathnostics, the developer of the mPCR/P-AST test.

**Reporting Standard:** STROBE

## References

1. HCUPNet, Healthcare Cost and Utilization Project. Agency for Healthcare Research and Quality. Accessed October 25, 2022. https://datatools.ahrq.gov/hcupnet.

- Cited Here

2. Abbo LM, Hooton TM. Antimicrobial stewardship and urinary tract infections. Antibiotics (Basel). 2014;3(2):174-192.

- Cited Here |
- Google Scholar

3. Carreno JJ, Tam IM, Meyers JL, et al. Longitudinal, nationwide, cohort study to assess incidence, outcomes, and costs associated with complicated urinary tract infection. Open Forum Infect Dis. 2019;6(11):ofz446.

- Cited Here |
- View Full Text | PubMed | CrossRef |
- Google Scholar

4. Urine Culture, Routine. https://www.labcorp.com/tests/008847/urine-culture-routine. Accessed October 25, 2022.

- Cited Here |
- Google Scholar

5. Wagenlehner FM, Naber KG. Current challenges in the treatment of complicated urinary tract infections and prostatitis. Clin Microbiol Infect. 2006;12(suppl 3):67-80.

- Cited Here |
- View Full Text | PubMed | CrossRef |
- Google Scholar

6. Xu R, Deebel N, Casals R, et al. A new gold rush: a review of current and developing diagnostic tools for urinary tract infections. Diagnostics (Basel). 2021;11(3):479.

- Cited Here |
- Google Scholar

7. Wojno KJ, Baunoch D, Luke N, et al. Multiplex PCR based urinary tract infection (UTI) analysis compared to traditional urine culture in identifying significant pathogens in symptomatic patients. Urology. 2020;136:119-126.

- Cited Here |
- PubMed | CrossRef |
- Google Scholar



8. Gaston JR, Johnson AO, Bair KL, et al. Polymicrobial interactions in the urinary tract: is the enemy of my enemy my friend? Infect Immun. 2021;89(4).

- Cited Here |
- Google Scholar

9. Wojno KJ, Baunoch D, Luke N, et al. Multiplex PCR based urinary tract infection (UTI) analysis compared to traditional urine culture in identifying significant pathogens in symptomatic patients. Urology. 2020;136:119-126.

- Cited Here |
- PubMed | CrossRef |
- Google Scholar

10. Hilt EE, McKinley K, Pearce MM, et al. Urine is not sterile: use of enhanced urine culture techniques to detect resident bacterial flora in the adult female bladder. J Clin Microbiol. 2014;52(3):871-876.

- Cited Here |
- PubMed | CrossRef |
- Google Scholar

11. Price TK, Hilt EE, Dune TJ, et al. Urine trouble: should we think differently about UTI? Int Urogynecol J. 2018;29(2):205-210.

- Cited Here |
- PubMed | CrossRef |
- Google Scholar

12. Bottery MJ, Pitchford JW, Friman VP. Ecology and evolution of antimicrobial resistance in bacterial communities. ISME J. 2021;15(4):939-948.

- Cited Here |
- PubMed |
- Google Scholar

13. de Vos MGJ, Zagorski M, McNally A, Bollenbach T. Interaction networks, ecological stability, and collective antibiotic tolerance in polymicrobial infections. Proc Natl Acad Sci U S A. 2017;114(40):10666-10671.

- Cited Here |
- PubMed | CrossRef |
- Google Scholar

14. Baunoch D, Luke N, Wang D, et al. Concordance between antibiotic resistance genes and susceptibility in symptomatic urinary tract infections. Infect Drug Resist. 2021;14:3275-3286.

- Cited Here |
- PubMed |
- Google Scholar

15. Vollstedt A, Baunoch D, Wolfe A, et al. Bacterial interactions as detected by pooled antibiotic susceptibility testing (P-AST) in polymicrobial urine specimens. J Surg Urol. 2020;1:101.

- Cited Here |
- Google Scholar

16. Daly A, Baunoch D, Rehling K, et al. Utilization of M-PCR and P-AST for diagnosis and management of urinary tract infections in home-based primary care. JOJ Uro Nephron. 2020;7(2):555707.

- Cited Here |
- Google Scholar

17. Research Data Assistance Center. https://resdac.org/. Accessed October 25, 2022.

- Cited Here |
- Google Scholar

18. Anger J, Lee U, Ackerman AL, et al. Recurrent uncomplicated urinary tract infections in women: AUA/CUA/SUFU guideline. J Urol. 2019;202(2):282-289.

- Cited Here |
- View Full Text | PubMed |
- Google Scholar

19. Quan H, Sundararajan V, Halfon P, et al. Coding algorithms for defining comorbidities in ICD-9-CM and ICD-10 administrative data. Med Care. 2005;43(11):1130-1139.

A.538

- Cited Here |
- View Full Text | PubMed | CrossRef |
- Google Scholar

20. Rosenbaum PR, Rubin DB. The central role of the propensity score in observational studies for causal effects. Biometrika. 1983;70(1):41-55.

- Cited Here |
- CrossRef |
- Google Scholar

21. Research Data Assistance Center. CMS Cell Size Suppression Policy. https://resdac.org/articles/cms-cell-size-suppression-policy.Accessed October 25, 2022.

- Cited Here |
- Google Scholar

22. Szlachta-McGinn A, Douglass KM, Chung UYR, et al. Molecular diagnostic methods versus conventional urine culture for diagnosis and treatment of urinary tract infection: a systematic review and meta-analysis. Eur Urol Open Sci. 2022;44:113-124.

- Cited Here |
- Google Scholar

23. Lodise TP, Manjelievskaia J, Marchlewicz EH, Rodriguez M. Retrospective cohort study of the 12-month epidemiology, treatment patterns, outcomes, and health care costs among adult patients with complicated urinary tract infections. Open Forum Infect Dis. 2022;9(7):ofac307.

- Cited Here |
- View Full Text | PubMed | CrossRef |
- Google Scholar

24. Turner RM, Wu B, Lawrence K, et al. Assessment of outpatient and inpatient antibiotic treatment patterns and health care costs of patients with complicated urinary tract infections. Clin Ther. 2015;37(9):2037-2047.

- Cited Here |
- PubMed | CrossRef |
- Google Scholar

25. Rubin RH, Shapiro ED, Andriole VT, et al. Evaluation of new anti-infective drugs for the treatment of urinary tract infection. Clin Infect Dis. 1992;15(suppl_1):S216-S227.

- Cited Here |
- PubMed | CrossRef |
- Google Scholar

26. Carreno JJ, Tam IM, Meyers JL, et al. Longitudinal, nationwide, cohort study to assess incidence, outcomes, and costs associated with complicated urinary tract infection. Open Forum Infectious Dis. 2019;6(11):ofz446.

- Cited Here |
- Google Scholar

27. Wagenlehner FME, Bjerklund Johansen TE, Cai T, et al. Epidemiology, definition, and treatment of complicated urinary tract infections. Nat Rev Urol. 2020;17(10):586-600.

- Cited Here |
- PubMed |
- Google Scholar

28. Konrad R, Zhang W, Bjarndóttir M, Proaño R. Key considerations when using health insurance claims data in advanced data analyses: an experience report. Health Syst. 2019;9(4):317-325.

- Cited Here |
- Google Scholar

View full references list

**Keywords:**

health expenditures; costs and cost comparison; diagnostic techniques; urological; urinary tract infections; molecular diagnostic technique

© 2023 The Author(s). Published on behalf of the American Urological Association, Education and Research, Inc.

View full article text

# Related Articles



- **Real-World Evidence That a Novel Diagnostic Combining Molecular Testing With Pooled Antibiotic Susceptibility Testing is Associated With Reduced Infection Severity and Lower Cost Compared With Standard Urine Culture in Patients With Complicated or Persistently Recurrent Urinary Tract Infections: Erratum**

- **Real-World Evidence That a Novel Diagnostic Combining Molecular Testing With Pooled Antibiotic Susceptibility Testing is Associated With Reduced Infection Severity and Lower Cost Compared With Standard Urine Culture in Patients With Complicated or Persistently Recurrent Urinary Tract Infections**

- **Potential System Utilization and Cost Savings of Advanced Microbial Testing for Urinary Tract Infections**

- **Changes in Education and Consistency Needed in Recurrent Urinary Tract Infection Care: Patient and Expert Physician Perspectives**

- **Variability of Commercial Saw Palmetto–Based Supplements for the Management of Benign Prostatic Hyperplasia/Lower Urinary Tract Symptoms**

- **Vasectomy has No Impact on Future Lower Urinary Tract Symptoms Diagnoses: A Retrospective Cohort Claims Database Analysis**

# Most Popular

- **Prevalence, Incidence, and Determinants of Kidney Stones in a Nationally Representative Sample of US Adults**

- **Partial Versus Radical Nephrectomy: Comparison of Postoperative Complications and Contribution to Mortality**

- **Saw Palmetto Treatment for Prostatitis: A Systematic Review of the Literature**

- **The Clinical Impact of the 4Kscore Test on Prostate Biopsy Decision Making in the Setting of MRI**

- **Variability of Commercial Saw Palmetto–Based Supplements for the Management of Benign Prostatic Hyperplasia/Lower Urinary Tract Symptoms**

∧Back to Top



**Never Miss an Issue**

Get new journal Tables of Contents sent right to your email inbox   [Type your email]   [Get New Issue Alerts]

**Browse Journal Content**

- Register on the website

**Customer Service**

A 540

- Contact us at:
  - Support:
    Submit a Service Request
  - TEL:
    800-638-3030 (within the USA)
    301-223-2300 (outside of the USA)

- Manage Cookie Preferences

- Privacy Policy
- Legal Disclaimer
- Terms of Use
- Open Access Policy
- Your California Privacy Choices

- Copyright © 2024
- Wolters Kluwer Health, Inc. and/or its subsidiaries. All rights reserved.

# EXHIBIT G

A.542

Written comments and recommendations concerning the proposed information collection should be sent within 30 days of this notice to: Laura Oliven, Human Resources and Housing Branch, Office of Management and Budget, New Executive Office Building, Room 10235, Washington, D.C. 20503.

Dated: August 17, 1998.

**Jane Harrison,**

*Director, Division of Policy Review and Coordination.*

[FR Doc. 98–22575 Filed 8–21–98; 8:45 am]

**BILLING CODE 4160–15–P**

---

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## Health Resources and Services Administration

### Advisory Council; Notice of Meeting

In accordance with section 10(a)(2) of the Federal Advisory Committee Act (Pub. L. 92–463), announcement is made of the following National Advisory body scheduled to meet during the month of September 1998.

*Name:* National Advisory Council on the National Health Service Corps (NHSC).

*Date and Time:* September 9, 1998; 6:00 p.m.–9:00 p.m.; September 10–12, 1998; 9:00 a.m.–5:00 p.m.; September 13, 1998; 8:00 a.m.–11:00 a.m.

*Place:* Sheraton National Hotel, 900 South Orme Street, Arlington, VA 22204, (703) 521–1900.

The meeting is open to the public.

*Agenda:* Items will include, but not be limited to: In preparation for the year 2000 reauthorization the National Advisory Council has developed a draft position paper, ''The National Health Service Corps for the 21st Century.'' Reactions, suggestions and criticisms to this paper will be heard from public and private partners and other interested organizations on September 10–12. Copies of the draft paper will be available at the meeting. Other agenda items include updates on the NHSC program.

For further information, call Ms. Eve Morrow at (301) 594–4144.

Agenda items are subject to change as priorities dictate.

Dated: August 17, 1998.

**Jane M. Harrison,**

*Director, Division of Policy Review and Coordination.*

[FR Doc. 98–22574 Filed 8–21–98; 8:45 am]

**BILLING CODE 4160–15–P**

---

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## Health Resources and Services Administration

### Advisory Council; Notice of Meeting

In accordance with section 10(a) (2) of the Federal Advisory Committee Act (Pub. L. 92–463), announcement is made of the following National Advisory body scheduled to meet during the month of September 1998.

*Name:* National Advisory Committee on Rural Health.

*Date and Time:* September 13, 1998; 5:00 p.m.–6:30 p.m.; September 14–15, 1998; 8:30 a.m.–5:00 p.m.; September 16, 1998; 8:30 p.m.–11:30 a.m.

*Place:* Holiday Inn, Georgetown, 2101 Wisconsin Avenue, Washington, DC 20007, Phone: (202) 338–4600, FAX: (202) 333–6113.

The meeting is open to the public.

*Agenda:* A special session will be conducted on Sunday, September 13, for orientation of new members who were just appointed. Monday will include a panel discussion of ''Rural Researchers' Access to National Health Survey Data,'' a presentation and discussion of the new guidelines for designating HPSAs, and a report on ''Critical Access Hospitals.'' Tuesday will include legislative, telehealth, and regulatory updates. A presentation and discussion on the ''National Bipartisan Commission on the Future of Medicare'' will be followed by a discussion of Department interests and priorities for FY 1999. Agenda items are subject to change as priorities dictate.

Anyone requiring information regarding the subject Committee should contact Ms. Arlene A. Granderson, Office, or Rural Health Policy, Health Resources and Services Administration, Room 9–05, Parklawn Building, Rockville, Maryland 20857; telephone (301) 443–0835, FAX (301) 443–2803. Persons interested in attending any portion of the meeting or having questions regarding the meeting should contact Ms. Arlene Granderson or Ms. Lilly Smetana, Office of Rural Health Policy, Health Resources and Services Administration, telephone (301) 443–0835.

Dated: August 17, 1998.

**Jane M. Harrison,**

*Director, Division of Policy Review and Coordination.*

[FR Doc. 98–22576 Filed 8–21–98; 8:45 am]

**BILLING CODE 4160–15–P**

---

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## Office of Inspector General

### Publication of OIG Compliance Program Guidance for Clinical Laboratories

**AGENCY:** Office of Inspector General (OIG), HHS.

**ACTION:** Notice.

---

**SUMMARY:** This **Federal Register** notice sets forth the OIG's recently-issued Compliance Program Guidance for Clinical Laboratories. The OIG had previously developed and published a model compliance plan for the clinical laboratory industry on March 3, 1997. This Compliance Program Guidance for Clinical Laboratories is intended to be more consistent with compliance program guidances issued by the OIG with respect to the hospital industry and to home health agencies, and serves to clarify various aspects of the original model plan. As with previously-issued compliance program guidances, we believe that the development of this guidance for clinical laboratories will continue as a positive step towards promoting a higher level of ethical and lawful conduct throughout the entire health care community.

**FOR FURTHER INFORMATION CONTACT:** Christine Saxonis, Office of Counsel to the Inspector General, (202) 619–2078.

**SUPPLEMENTARY INFORMATION:** As part of a major initiative to engage the private health care community in combating fraud and abuse, the OIG developed and published in the **Federal Register** a model compliance plan for the clinical laboratories (62 FR 9435; March 3, 1997). The compliance plan was intended to provide clear guidance to that aspect of the clinical laboratory industry that was interested in reducing fraud and abuse within their organizations. Since that issuance, the OIG has developed and issued specific compliance program guidance for the hospital industry and for home health agencies.

This compliance program guidance is intended to refine and build on the original model guidance plan for clinical laboratories. In developing an effective compliance program, the OIG has identified 7 fundamental elements. They are:
- Implementing written policies, procedures and standards of conduct;
- Designing a compliance officer and compliance committee;
- Conducting effective training and education;
- Developing effective lines of communication;
- Enforcing standards through well-publicized disciplinary guidelines;
- Conducting internal monitoring and auditing; and
- Responding promptly to detected offenses and developing corrective action.

The development of this new Compliance Program Guidance for Clinical Laboratories has been enhanced

A.543

based upon changes in Health Care Financing Administration (HCFA) policy, private industry's comments on the original model plan and additional comments submitted by HCFA and the Department of Justice.

While the key components of the original plan are still included, this Compliance Program Guidance sets forth a number of clarifying elements. Specifically, the compliance guidance:

• Focuses on the fact that while physicians can order any tests they believe are appropriate, Medicare will only pay for those tests which are covered, reasonable and necessary;

• Recognizes that individuals other than physicians may be authorized to order tests in some States;

• Recognizes additional claim information, such as requesting the diagnosis information contained in the medical record, can be obtained from an authorized person rather than directly from the physician;

• Notes that physicians are required to submit diagnostic information to the laboratory when ordering many— although not all—laboratory tests;

• Emphasizes the need for the tests performed in accordance with standing orders to be reasonable and necessary; and

• Clarifies laboratories should not charge physicians a price below fair market value for non-federal health program tests in order to include their Federal health care business.

In addition, while the original model laboratory compliance plan focused on the billing of automated multichannel chemistry tests, the American Medical Association has since deleted these codes from the 1998 CPT coding handbook, and HCFA no longer recognizes these as billable or reimbursable codes. As a result, physicians now must individually order tests that once compromised a chemistry profile. This guidance specifically reflects this policy change.

A reprint of the OIG's Compliance Program Guidance for Clinical Laboratories follows.

**OIG Compliance Program Guidance for Clinical Laboratories**

*Introduction*

The Office of Inspector General (OIG) of the Department of Health and Human Services (HHS) continues in its efforts to promote voluntarily developed and implemented compliance programs for the health care industry. The following compliance program guidance is intended to assist clinical laboratories in developing effective internal controls that promote adherence to applicable Federal and State law, and the program requirements of Federal, State, and private health plans.[1] The adoption and implementation of voluntary compliance programs significantly advance the prevention of fraud, abuse, and waste in the clinical laboratory industry while at the same time further the fundamental mission of all health care providers, which is to provide quality services and care to patients.

Within this document, the OIG intends to provide first, its general views on the value and fundamental principles of clinical laboratory compliance programs, and second, specific elements that each clinical laboratory should consider when developing and implementing an effective compliance program. While this document presents basic procedural and structural guidance for designing a compliance program, it is not in itself a compliance program. Rather, it is a set of guidelines for consideration by a clinical laboratory interested in implementing a compliance program. The recommendations and guidelines provided in this document must be considered depending upon their applicability to each particular clinical laboratory.

Fundamentally, compliance efforts are designed to establish a culture within a clinical laboratory that promotes prevention, detection and resolution of instances of conduct that do not conform to Federal and State law, and Federal, State and private payor health care program requirements, as well as the clinical laboratory's ethical and business policies. In practice, the compliance program should effectively articulate and demonstrate the organization's commitment to the compliance process. The existence of benchmarks that demonstrate implementation and achievements are essential to any effective compliance program.

Eventually, a compliance program should become part of the fabric of routine clinical laboratory operations.

Specifically, compliance programs guide a clinical laboratory's governing body (e.g., Board of Directors), Chief Executive Officer (CEO), managers, technicians, billing personnel, and other employees in the efficient management and operation of a clinical laboratory. These employees are especially critical

as an internal control in the reimbursement and payment areas, where claims and billing operations are often the source of fraud and abuse and, therefore, historically have been the focus of Government regulation, scrutiny and sanctions.

It is incumbent upon a clinical laboratory's corporate officers and managers to provide ethical leadership to the organization and to assure that adequate systems are in place to facilitate ethical and legal conduct. Indeed, many clinical laboratories and clinical laboratory organizations have adopted mission statements articulating their commitment to high ethical standards. A formal compliance program, as an additional element in this process, offers a clinical laboratory a further concrete method that may improve quality of services and reduce waste. Compliance programs also provide a central coordinating mechanism for furnishing and disseminating information and guidance on applicable statutes, regulations and other requirements of Federal, State and private health plans.

Adopting and implementing an effective compliance program requires a substantial commitment of time, energy and resources by senior management and the clinical laboratory's governing body.[2] Programs hastily constructed and implemented without appropriate ongoing monitoring will likely be ineffective. While it may require significant additional resources or reallocation of existing resources to implement an effective compliance program, the OIG believes that the long term benefits of implementing the program outweigh the costs.

*A. Benefits of a Compliance Program*

In addition to fulfilling its legal duty to ensure that it is not submitting false or incorrect claims to Government and private payors, a clinical laboratory may gain numerous additional benefits by implementing an effective compliance program. Such programs make good business sense in that they help a clinical laboratory fulfill its fundamental mission of providing quality services as well as assisting clinical laboratories in identifying weaknesses in internal systems and management. Other important potential benefits include the ability to:

---

[1] This guidance is a republication of the model clinical laboratory compliance plan issued by the OIG on February 27, 1997. This guidance has been amended to reflect HCFA policy changes and to be consistent with the OIG's Compliance Program Guidance for Hospitals. See 63 FR 8987 (February 23, 1998) and the OIG's web site at http://www.dhhs.gov/progorg/oig.

[2] Indeed, recent case law suggests that the failure of a corporate Director to attempt in good faith to institute a compliance program in certain situations may be a breach of a Director's fiduciary obligation. See, e.g., *In re Caremark International Inc. Derivative Litigation,* 698 A.2d 959 (Ct. Chanc. Del. 1996).

A.544

**45078**      **Federal Register** / Vol. 63, No. 163 / Monday, August 24, 1998 / Notices

- Concretely demonstrate to employees and the community at large the clinical laboratory's strong commitment to honest and responsible corporate conduct;
- Provide a more accurate view of employee behavior relating to fraud and abuse;
- Identify and prevent criminal and unethical conduct;
- Improve the quality, efficiency and consistency of services;
- Create a centralized source for distributing information on health care statutes, regulations and other program directives related to fraud and abuse and related issues;
- Develop a methodology that encourages employees to report potential problems;
- Develop procedures that allow the prompt, thorough investigation of alleged misconduct by corporate officers, managers and other employees;
- Initiate immediate, appropriate, and decisive corrective action; and
- Through early detection and reporting, minimize the loss to the Government from false claims, and thereby reduce the clinical laboratory's exposure to civil damages and penalties, criminal sanctions, and administrative remedies, such as program exclusion. [3]

Overall, the OIG believes that an effective compliance program is a sound investment on the part of a clinical laboratory.

The OIG recognizes that the implementation of a compliance program may not entirely eliminate fraud, abuse and waste from the clinical laboratory system. However, a sincere effort by clinical laboratories to comply with applicable Federal and State standards, as well as the requirements of private health care programs, through the establishment of an effective compliance program, significantly reduces the risk of unlawful or improper conduct.

*B. Application of Compliance Program Guidance*

There is no single ''best'' clinical laboratory compliance program, given the diversity of laboratories within the industry. The OIG understands the variances and complexities within the clinical laboratory industry and is sensitive to the differences among large and small clinical laboratories. However, elements of this guidance can be used by all clinical laboratories, regardless of size, location or corporate structure, to establish an effective compliance program. We recognize that some clinical laboratories may not be able to adopt certain elements to the same comprehensive degree that others with more extensive resources may achieve. This guidance represents the OIG's suggestions on how a clinical laboratory can best establish internal controls and monitoring to correct and prevent fraudulent activities. By no means should the contents of this guidance be viewed as an exclusive discussion of the advisable elements of a compliance program.

In drafting this guidance, we took into consideration the Model Compliance Plan for Clinical Laboratories issued by the OIG in February 1997, the clinical laboratory industry's comments on that plan, changes in HCFA policy and the OIG's Compliance Program Guidance for Hospitals.

As appropriate, this guidance may be further modified and expanded as more information and knowledge is obtained by the OIG, and as changes in the rules, policies and procedures of the Federal, State and private health plans occur. We recognize that clinical laboratories are already accountable for complying with an extensive set of statutory and other legal requirements, far more specific and complex than what we have referenced in this document. We also recognize that the development and implementation of compliance programs in clinical laboratories often raise sensitive and complex legal and managerial issues.[4] However, the OIG wishes to offer what it believes is critical guidance for providers who are sincerely attempting to comply with the relevant health care statutes, regulations and other requirements of Federal, State and private health plans.

**Compliance Program Elements**

The elements proposed by these guidelines are similar to those of the compliance program guidance for hospitals that was published by the OIG in February 1998 and of our corporate integrity agreements.[5] The elements represent a guide—a process that can be used by clinical laboratories, whether an independent national laboratory, a hospital laboratory, or a small, regional laboratory. Moreover, the elements can be incorporated into the managerial structure of the clinical laboratory. As we stated in our compliance program guidance for hospitals, these suggested guidelines can be tailored to fit the needs and financial realities of a particular laboratory. The OIG is cognizant that with regard to compliance programs, one model is not suitable to every clinical laboratory. Nonetheless, the OIG believes that every clinical laboratory, regardless of size or structure, can benefit from the principles espoused in this guidance.

The OIG believes that every effective compliance program must begin with a formal commitment by the clinical laboratory's governing body to include *all* of the applicable elements listed below. These elements are based on the seven steps of the Federal Sentencing Guidelines.[6] We recognize that full implementation of all elements may not be immediately feasible for all clinical laboratories. However, as a first step, a good faith and meaningful commitment on the part of the clinical laboratory will substantially contribute to a program's successful implementation.

At a minimum, comprehensive compliance programs should include the following 7 elements:

(1) The development and distribution of written standards of conduct, as well as written policies and procedures that promote the clinical laboratory's commitment to compliance (e.g., by including adherence to compliance as an element in evaluating managers and employees) and that address specific areas of potential fraud, such as marketing schemes, CPT/HCPCs coding issues, improper ICD–9 coding, and improper claims submission;

(2) The designation of a chief compliance officer and other appropriate bodies (e.g., a corporate compliance committee) charged with the responsibility of operating and monitoring the compliance program, and who report directly to the CEO and the governing body;

(3) The development and implementation of regular, effective education and training programs for all affected employees;

(4) The maintenance of a process, such as a hotline, to receive complaints, and the adoption of procedures to protect the anonymity of complainants

---

[3] The OIG, for example, will consider the existence of an *effective* compliance program that pre-dated any governmental investigation when addressing the appropriateness of administrative penalties. Further, the False Claims Act, 31 U.S.C. 3729–3733, provides that a person who has violated the Act, but who voluntarily discloses the violation to the Government, in certain circumstances will be subject to not less than double, as opposed to treble, damages. See 31 U.S.C. 3729(a).

[4] Nothing stated herein should be substituted for, or used in lieu of, competent legal advice from counsel.

[5] Corporate integrity agreements are executed as part of a civil settlement agreement between the health care provider and the Government to resolve a case based on allegations of health care fraud or abuse. These OIG-imposed programs are in effect for a period of 3 to 5 years and require many of the elements included in this compliance program guidance.

[6] See United States Sentencing Commission Guidelines, *Guidelines Manual*, 8A1.2 comment. (n.3(k)).

A.545

and to protect whistleblowers from retaliation;

(5) The development of a system to respond to allegations of improper/illegal activities and the enforcement of appropriate disciplinary action against employees who have violated internal compliance policies, applicable statutes, regulations or requirements of Federal, State or private health plans;

(6) The use of audits and/or other evaluation techniques to monitor compliance and assist in the reduction of identified problem areas; and

(7) The investigation and remediation of identified systemic problems and the development of policies addressing the non-employment or retention of sanctioned individuals.

*A. Written Procedures and Policies*

Laboratory compliance programs should require the development and distribution of written compliance policies. These policies should be developed under the supervision and direction of the chief compliance officer or the equivalent and should, at a minimum, be provided to all individuals who are affected by the specific policy at issue. One convenient method of achieving this goal is to create a three-ring compliance policy notebook. This format permits the filing of new and amended or revised compliance policies and ensures that affected individuals have easy access to the laboratory's written policies. A master index should show when policies are changed.

1. Standards of Conduct

Laboratories should develop standards of conduct for all employees that clearly delineate the policies of the laboratory with regard to fraud, waste and abuse and adherence to all statutes, regulations and other program requirements governing Federal, State and private health benefit plans. These standards should be made available to all employees; translated, interpreted (e.g., may be signed for hard of hearing or deaf employees) or put into Braille as necessary, and regularly updated as the policies and regulations are modified.

When an employee first begins working for the clinical laboratory, and each time new standards of conduct are issued, employees should be asked to sign a statement certifying that they have received, read, and understood the standards of conduct. All employee certifications should be retained by the laboratory.

2. Medical Necessity

Laboratory compliance programs, to be effective, should communicate to physicians that claims submitted for services will only be paid if the service is covered, reasonable, and necessary for the beneficiary, given his or her clinical condition. Laboratories should take all reasonable steps to ensure that it is not submitting claims for services that are not covered, reasonable and necessary.[7] Upon request, a laboratory should be able to produce or obtain from the treating physician (test ordering), authorized person on the physician's staff or other individual authorized by law to order tests the documentation to support the medical necessity of the service the laboratory has provided and billed to a Federal or private health care program. We recognize that laboratories do not and cannot treat patients or make medical necessity determinations. However, there are steps that such facilities can take to assure compliance with the applicable statutes, regulations and the requirements of Federal, State and private health plans.

As a preliminary matter, the OIG recognizes that physicians or other authorized individuals must be able to order any tests that they believe are appropriate for the treatment of their patients. However, we believe that physicians must be made aware by the billing laboratory that Medicare will only pay for tests that meet the Medicare coverage criteria and are reasonable and necessary to treat or diagnose an individual patient. Section 1862(a)(1)(A) of the Social Security Act states, ''no payment may be made under Part A or Part B for any expenses incurred for items or services which * * * are not reasonable and necessary for the diagnosis or treatment of an illness or injury or to improve the functioning of a malformed body member.'' Therefore, Medicare may deny payment for a test that the physician believes is appropriate, but which does not meet the Medicare coverage criteria (e.g., done for screening purposes) or where documentation in the entire patient record, including that maintained in the physician's records, does not support that the tests were reasonable and necessary for a given patient.

_____

[7] In limited instances, HCFA does allow laboratories to submit claims when the lab believes the test may be denied. Such instances include, but are not limited to: when the beneficiary has signed an Advance Beneficiary Notice (ABN) (See *Medicare Carriers Manual* § 7300.5) (Part D in this section further addresses ABN issues) and when the beneficiary requests the provider submit the claim (See *Medicare Carriers Manual* § 3043). In the first instance the lab should include modifier GA on the claim which indicates the beneficiary has signed an ABN and in the latter instance the lab should note on the claim their belief that the service is noncovered and that it is being submitted at the beneficiary's insistence.

Laboratories can and should advise their clients that tests submitted for Medicare reimbursement must meet program requirements[8] or the claim may be denied.

Laboratories may implement the following steps through their compliance programs or some other appropriate mechanism to ensure that the claims they submit to Federal or private health care programs meet the appropriate program requirements:

*a. Requisition design:* While HCFA does not design or approve requisition forms, laboratories should construct the requisition form to capture the correct program information as required by Federal or private health care programs and to promote the conscious ordering of tests by physicians or other authorized individuals. The laboratory should construct the requisition form to ensure that the physician or other authorized individual has made an independent medical necessity decision with regard to each test the laboratory will bill. Laboratories should encourage physicians or other authorized individuals to submit diagnosis information for all tests ordered, as documentation of the medical necessity of the service. The form should contain a statement indicating that Medicare generally does not cover routine screening tests.

*b. Notices to physicians:* While HCFA does not impose educational requirements upon the laboratories, labs are in a unique position to educate their physician clients. Therefore, laboratories should provide all of their physician clients with annual written notices that set forth: (1) The Medicare national policy and Medicare contractor local medical review policy for lab tests; (2) that organ or disease related panels will only be paid and will only be billed when all components are medically necessary; and (3) the Medicare laboratory fee schedule and a statement informing the physician that the Medicaid reimbursement amount will be equal to or less than the amount of Medicare reimbursement. The notice must also provide the phone number of the clinical consultant. The clinical consultant is required under the Clinical Laboratory Improvement Amendment (CLIA) certification (42 CFR 493.1453).

In addition to the general notices above, laboratories that continue to offer clients the opportunity to request customized profiles should provide annual written notices that: (1) Explain the Medicare reimbursement paid for each component of each such profile; (2) inform physicians that using a

_____

[8] See fn. 7.

A.546

customized profile may result in the ordering of tests which are not covered, reasonable or necessary and that tests will not be billed;[9] and (3) inform physicians that the OIG takes the position that an individual who knowingly causes a false claim to be submitted may be subject to sanctions or remedies available under civil, criminal and administrative law.

*c. Physician acknowledgments:* Although HCFA does not require physicians to sign acknowledgments, laboratories should have the physician sign an acknowledgment stating he or she understands the potential implications of ordering customized profiles.

*d. Use of Advance Beneficiary Notices:* Advance Beneficiary Notices (ABNs) are used when there is a likelihood that an ordered service will not be paid. Before the service is furnished, the beneficiary should be notified, in writing, of the likelihood that the specific service will be denied. After being so informed the beneficiary has the choice to either (1) decide to receive the service and sign the agreement to pay on the ABN or (2) decide not to receive the service and therefore does not sign the ABN. Beneficiaries should not be asked to sign blank ABNs.

As the entity furnishing and billing for services, it is ultimately the laboratory's responsibility to produce the ABN, upon request. In many cases, it is difficult for the laboratories to directly obtain an ABN from the beneficiary. Therefore, laboratories may wish to educate physicians on the appropriate use of ABNs.

The notice must be in writing, must clearly identify a particular service, must state that payment for the particular service likely will be denied and must give the reason(s) for the belief that payment is likely to be denied.

Routine notices to beneficiaries which do no more than state that denial of payment is possible or that they never know whether payment will be denied are not considered acceptable evidence of advance notice. Notices should not be given to beneficiaries unless there is some genuine doubt regarding the likelihood of payment as evidenced by the reasons stated on the ABN. Giving notice for all claims or services is not an acceptable practice.

*e. Test utilization monitoring:* The OIG believes that laboratories can and should take the steps described in this compliance guidance to help ensure appropriate billing of lab tests. We also believe that there are steps laboratories

can take to determine whether physicians or other individuals authorized to order tests are being encouraged to order medically unnecessary tests. More importantly, if the laboratory discovers that it has in some way contributed to the ordering of unnecessary tests, the OIG believes the laboratory has a duty to modify its practices, as well as notify the physician(s) or other authorized individual(s) of its concerns and recommend corrective action.

There are many methods by which a laboratory may determine excessive utilization of laboratory services. One approach to self-monitoring is to hire an outside consultant to analyze the laboratory's patterns of utilization, and investigate any potential problems or aberrancies.

Another approach is to analyze test utilization data by CPT or HCPCS code, for the top 30 tests performed each year. Laboratories could do this by keeping track of the number of tests performed by CPT or HCPCS code or of the number of claims submitted for each test. The laboratories would then compute the percentage growth in the number of tests or claims submitted for each of the top 30 tests from one year to the next. We believe that if a test's utilization grows more than 10 percent, the laboratory should undertake a reasonable inquiry to ascertain the cause of such growth. If the laboratory determines that the increase in test utilization occurred for a benign reason, such as the acquisition of a new laboratory facility, then the laboratory need not take any action. However, if the laboratory determines that the increase in utilization was caused by a misunderstanding or ignorance by the ordering physicians or other authorized individuals regarding the billing consequences of the tests they ordered or an action on the part of the facility, the laboratory should take any steps that it deems reasonably necessary to address the issue and to ensure misconduct is not occurring.

### 3. Billing

Laboratory compliance policies should ensure that all claims for testing services submitted to Medicare or other Federal health care programs correctly identify the services ordered by the physician or other authorized individual and performed by the laboratory.

*a. Selection of CPT or HCPCS Codes:* Laboratory compliance policies should ensure that the CPT or HCPCS code that is used to bill, accurately describes the service that was ordered and performed. Laboratories cannot alter the physician's

order in any way either increasing or decreasing the number of services performed without the express consent of the ordering physician or other authorized individual. To ensure code accuracy, laboratories should require that individuals with technical expertise in laboratory testing review the appropriateness of the codes before the claims are submitted. Intentional or knowing upcoding (i.e., the selection of a code to maximize reimbursement when such code is not the most appropriate descriptor of the service) could violate the False Claims Act and/ or other civil laws, and criminal law.

*b. Selection of ICD–9–CM codes:* Medicare carriers and fiscal intermediaries have the authority to develop and implement Local Medical Review Policy (LMRP) which specify when, and under what circumstances, a service will be considered covered, reasonable and necessary and what documentation will support the need for the service. In some cases, LMRPs may limit coverage for specified laboratory tests to specific medical diagnoses. Laboratory compliance policies should ensure that the lab can support tests billed to Medicare with documentation obtained from the physician ordering the test, an authorized person on the physician's staff or other individual authorized by law to order tests. Laboratories should not: (1) Use information provided by the physician or other authorized individual from earlier dates of service (other than standing orders, as discussed below at paragraph 4); (2) create diagnosis information that has triggered reimbursement in the past; (3) use computer programs that automatically insert diagnosis codes without receipt of diagnostic information from the ordering physician or other authorized individual; or (4) make up information for claim submission purposes. Laboratories should: (1) Contact the ordering physician, authorized person on the physician's staff or other individual authorized to order tests to obtain information in the event that such information was not provided; and (2) accurately translate narrative diagnoses obtained from the physician or other authorized individual to ICD– 9–CM codes. Where medical documentation is obtained from a physician or other authorized individual after receipt of the specimen and the requisition form, it should be maintained.

*c. Tests covered by claims for reimbursement:* Only those tests that are ordered by an authorized individual or physician, are performed and meet Medicare's conditions of coverage are

---

[9] See fn. 7.

reimbursable by Medicare. If a laboratory receives a specimen without a valid test order or with a test order which is ambiguous, the laboratory must verify the tests which the physician wants and perform them before submitting a claim for reimbursement to Medicare. In this way, if the physician or other authorized individual did not order the test, the laboratory will not erroneously bill for it.

Similarly, if a laboratory did not perform an ordered test due to, for example, a laboratory accident or insufficient quantities of specimen, the laboratory should not submit a claim to Medicare. Medicare payment is made for tests that are ordered, performed, and covered. The submission of a claim for tests that were either not ordered or were not performed could subject a provider to sanctions under administrative, civil or criminal law.

*d. Billing of calculations:* Consistent with Medicare coverage rules, laboratory compliance policies should ensure that the laboratory does not bill both for calculations (e.g., calculated LDLs, T7s, and indices) and the tests that are performed to derive such calculations. In many situations, physicians are not offered a choice about whether to receive such calculations, nor are they aware of the practice of some laboratories to bill Medicare for such calculations in addition to the underlying tests. The fact that a separate CPT code exists does not mean that Medicare separately reimburses for the service assigned to the code. Billing both for the calculations and the underlying tests constitutes double billing, which may subject a laboratory to sanctions and other remedies available under civil, criminal, and administrative law.

*e. Reflex testing:* Reflex testing occurs when initial test results are positive or outside normal parameters and indicate that a second related test is medically appropriate. In order to avoid performing unnecessary reflex tests, labs may want to design their requisition form in such a way which would only allow for the reflex test when necessary. Therefore, the condition under which the reflex test will be performed should be clearly indicated on the requisition form. Laboratories may wish to adopt a similar policy for confirmation testing which may be mandatory.

### 4. Reliance on Standing Orders

Although standing orders are not prohibited in connection with an extended course of treatment, too often they have led to abusive practices. Standing orders in and of themselves

are not usually acceptable documentation that tests are reasonable and necessary. Accordingly, the insurer may reject standing orders as evidence that a test is reasonable and necessary. Medicare contractors can and may require additional documentation to support the medical necessity of the test. As a result of the potential problems standing orders may cause, the use of standing orders is discouraged.

Thus, while laboratory compliance programs may permit the use of standing orders executed in connection with an extended course of treatment, the compliance program should require the laboratory to periodically monitor standing orders. Standing orders should have a fixed term of validity and must be renewed at their expiration. We suggest that, consistent with State law requirements, a laboratory should contact all nursing homes from which the laboratory has received such standing orders and request that they confirm in writing the validity of all current standing orders. In addition, in accordance with State law, laboratories should verify standing orders relied upon at draw stations with the physician, authorized person on the physician's staff, or other authorized individual who has provided the standing orders to the laboratory. With respect to patients with End Stage Renal Disease (ESRD), at least once annually laboratories should contact each ESRD facility or unit to request confirmation in writing of the continued validity of all existing standing orders.

### 5. Compliance With Applicable HHS Fraud Alerts

The OIG and HCFA periodically issue fraud alerts [10] setting forth activities believed to raise legal and enforcement issues. Laboratory compliance programs should require that any and all fraud alerts issued by OIG and HCFA are carefully considered by the legal staff, chief compliance officer, or other appropriate personnel. Moreover, the compliance programs should require that a laboratory cease and correct any conduct criticized in such a fraud alert, if applicable to laboratories, and take reasonable action to prevent such conduct from reoccurring in the future. If appropriate, a laboratory should take the steps described in Section G regarding investigations, reporting and correction of identified problems.

### 6. Marketing

Laboratory compliance programs should require honest, straightforward, fully informative and non-deceptive marketing. It is in the best interests of patients, physicians, laboratories, the Government and private health plans that physicians and other individuals authorized to order tests fully understand the services offered by the laboratory, the services that will be provided when tests are ordered, and the financial consequences for Medicare, as well as other payors, when tests are billed. Accordingly, laboratories that market their services should ensure that their marketing information is clear, correct, non-deceptive and fully informative.

### 7. Prices Charged to Physicians

Laboratories are paid for their services by a variety of payors in addition to Medicare and other Federal health care programs. Such payors often include private health insurers, other health care providers, and physicians. We believe it is essential that the physician take into account the patient's best interest when deciding where to refer the patient's specimen.

The prices that laboratories charge physicians for certain laboratory services raise issues that should be addressed in a laboratory's written compliance policies. These policies should ensure that laboratories are not providing any inducements to gain a physician's business,[11] including charging physicians a price below fair market value for their non-Federal health care program tests. Laboratories that charge physicians a price below fair market value to induce them to refer their Federal health care program business may be risking anti-kickback enforcement and false claims actions.

### 8. Retention of Records

Compliance programs should ensure that all records required either by Federal or State law or by the compliance program are created and maintained. Adequate documentation of compliance efforts are essential in the event that a laboratory comes under Government scrutiny.

### 9. Compliance as an Element of a Performance Plan

Clinical laboratories should make the promotion of and adherence to

----

[10] Both OIG and HCFA fraud alerts can be located on the internet. The OIG web site address is: http://www.dhhs.gov/progorg/oig. The HCFA web site address is: http://www.hcfa.gov.

[11] The OIG has published ''Special Fraud Alert: Arrangements for the Provision of Clinical Lab Services'' that addresses how the anti-kickback statute relates to arrangements for the provision of clinical lab services. See 59 FR 65377 (December 19, 1994); OIG's web site at http://www.dhhs.gov/progorg/oig.

compliance an element in evaluating the performance of managers, supervisors and all other employees. They, along with other employees, should be periodically trained in new compliance policies and procedures. In addition, all managers and supervisors involved in the sale, marketing, or billing of laboratory services, and those who oversee phlebotomists should (1) discuss with all supervised employees the compliance policies and legal requirements applicable to their function; (2) inform all supervised personnel that strict compliance with these policies and requirements is a condition of employment; and (3) disclose to all supervised personnel that the laboratory will take disciplinary action up to and including termination for violation of these policies or requirements. In addition to making performance of these duties an element in evaluations, the compliance officer or laboratory management may also choose to include in the laboratory's compliance program a policy that managers and supervisors may be sanctioned for failure to adequately instruct their subordinates or for failing to detect non-compliance with applicable policies and legal requirements, where reasonable diligence on the part of the manager or supervisor would have led to the discovery of any problems or violations and given the laboratory the opportunity to correct them earlier.

*B. Designation of a Compliance Officer and a Compliance Committee*

1. Compliance Officer

   Every clinical laboratory should designate a compliance officer to serve as the focal point for compliance activities. This responsibility may be the individual's sole duty or added to other management responsibilities, depending upon the size and resources of the clinical laboratory and the complexity of the task. Designating a compliance officer with the appropriate authority is critical to the success of the program, necessitating the appointment of a high-level official in the organization with direct access to the governing body and the CEO.[12] The officer should have

sufficient funding and staff to perform his or her responsibilities fully. Coordination and communication are the key functions of the compliance officer with regard to planning, implementing, and monitoring the compliance program.

   The compliance officer's primary responsibilities should include:

   • Overseeing and monitoring the implementation of the compliance program;[13]

   • Reporting on a regular basis to the clinical laboratory's governing body, CEO and compliance committee on the progress of implementation, and assisting these components in establishing methods to improve the clinical laboratory's efficiency and quality of services, and to reduce the clinical laboratory's vulnerability to fraud, abuse and waste;

   • Developing and distributing to all affected employees all written compliance policies and procedures. These policies and procedures should be readily understandable by all employees (e.g., translated into other languages, interpreted in sign language, and/or put into Braille as necessary);

   • Periodically revising the program in light of changes in the needs of the organization, and in the law, policies and procedures of Government and private payor health plans;

   • Developing, coordinating, and participating in a multifaceted educational and training program that focuses on the elements of the compliance program, and seeks to ensure that all appropriate employees and management are knowledgeable of, and comply with, pertinent Federal, State and private payor standards;

   • Ensuring that physicians who order services from the clinical laboratory are informed of the clinical laboratory's compliance program standards with respect to coding, billing, and marketing, among other things;

   • Assisting the clinical laboratory's financial management in coordinating internal compliance review and monitoring activities, including annual or periodic reviews of policies;

   • Independently investigating and acting on matters related to compliance, including the flexibility to design and coordinate internal investigations (e.g., responding to reports of problems or suspected violations) and any resulting corrective action; and

• Developing policies and programs that encourage managers and employees to report suspected fraud and other improprieties without fear of retaliation.

   The compliance officer must have the authority to review all documents and other information that are relevant to compliance activities, including, but not limited to, requisition forms, billing information, claim information, and records concerning the marketing efforts of the clinical laboratory and its arrangements with its clients. This policy enables the compliance officer to review contracts and obligations (seeking the advice of legal counsel, where appropriate) that may contain referral and payment issues that could violate the anti-kickback statute, as well as the physician self-referral prohibition and other legal or regulatory requirements.

2. Compliance Committee

   The OIG recommends that a compliance committee be established to advise the compliance officer and assist in the implementation of the compliance program.[14] The committee's functions should include:

   • Analyzing the organization's regulatory environment, the legal requirements with which it must comply, and specific risk areas;

   • Assessing existing policies and procedures that address these areas for possible incorporation into the compliance program;

   • Working within the clinical laboratory to develop standards of conduct and policies and procedures to promote compliance;

   • Recommending and monitoring the development of internal systems and controls to implement the clinical laboratory's standards, policies and procedures as part of its daily operations;

   • Determining the appropriate strategy/approach to promote compliance with the program and detection of any potential violations, such as through hotlines and other fraud reporting mechanisms; and

   • Developing a system to solicit, evaluate and respond to complaints and problems.

   The committee may also assume other functions as the compliance concept becomes part of the overall clinical laboratory operating structure and daily routine.

---

[12] The OIG believes that it is not advisable for the compliance function to be subordinate to the clinical laboratory's general counsel, or comptroller or similar officer. Free standing compliance functions help to ensure independent and objective legal reviews and financial analyses of the institution's compliance efforts and activities. By separating the compliance function from the key management positions of general counsel or chief financial officer (where the size and structure of the clinical laboratory make this a feasible option), a system of checks and balances is established to

more effectively achieve the goals of the compliance program.

[13] For clinical laboratory chains, the OIG encourages coordination with each affiliate owned by the company through the use of a headquarter's compliance officer, communicating with the designated compliance officers in each facility, or regional office, as appropriate.

[14] The OIG recommends the compliance committee consist of individuals with varying perspectives and responsibilities in the organization.

*C. Conducting Effective Training and Education*

The proper education, training and retraining of corporate officers, managers, and all other employees are significant elements of an effective compliance program. As part of its compliance program, a clinical laboratory should require all affected employees to attend specific training when they are first hired and on a periodic basis thereafter, including appropriate training in Federal and State statutes, regulations, program requirements, the policies of private payors, and corporate ethics. The training should emphasize the organization's commitment to compliance with these legal requirements and policies.

These training programs should include sessions highlighting the organization's compliance program, summarizing fraud and abuse laws, and discussing coding requirements, claim development and claim submission process and marketing practices that reflect current legal and program standards. The clinical laboratory must take steps to communicate effectively its standards and procedures to all affected employees ( e.g., by requiring participation in training programs and disseminating publications that explain in a practical manner specific requirements).[15] Managers of specific departments can assist in identifying areas that require training and in carrying out such training. Training instructors may come from outside or inside the organization. New employees should be targeted for training early in their employment.[16] The compliance officer should document the attendees, the subjects covered, and the material distributed at the training sessions sponsored by the clinical laboratory as part of the compliance program.

A variety of teaching methods, such as interactive training, and training in several different languages, particularly where a clinical laboratory has a culturally diverse staff, should be implemented so that all affected employees are knowledgeable of the

clinical laboratory's standards of conduct and procedures for alerting senior management to problems and concerns. Targeted training should be provided to corporate officers, managers and other employees whose actions affect the accuracy of the claims submitted to Government and private payors, such as employees involved in the coding, billing, and marketing processes. For example, for certain employees involved in the billing and coding functions, periodic training in proper CPT/HCPCs and ICD–9 coding and documentation should be required. In addition to specific training in the areas identified in section II.A, above, basic training for appropriate corporate officers, managers and other employees should include such topics as:

• Government and private payor reimbursement principles;

• General prohibitions on paying or receiving remuneration to induce referrals;

• Proper translation of narrative diagnoses;

• Only billing for services ordered, performed and reported;

• Physician approved amendments to requisition forms;

• Proper documentation or confirmation of services rendered; and

• Duty to report misconduct.

Clarifying and emphasizing these areas of concern through training and educational programs are particularly relevant to a clinical laboratory's marketing representatives, in that the pressure to meet business goals may render these employees vulnerable to engaging in prohibited practices.

The OIG suggests that all affected employees be made part of the clinical laboratory's various educational and training programs. Employees should be required to have a minimum number of educational hours per year, as appropriate, as part of their employment responsibilities.[17] In departments with high employee turnover, periodic training updates are critical.

The OIG recommends that attendance and participation in training programs be made a condition of continued employment and that failure to comply with training requirements should result in disciplinary action, including possible termination, when such failure is serious. Adherence to the provisions of the compliance program, such as training requirements, should be a factor in the annual evaluation of each employee. The clinical laboratory

should retain adequate records of its training of employees, including attendance logs and material distributed at training sessions.

*D. Developing Effective Lines of Communications*

1. Access to the Compliance Officer

An open line of communication between the compliance officer and clinical laboratory employees is equally important to the successful implementation of a compliance program and the reduction of any potential for fraud, abuse and waste. Written confidentiality and non-retaliation policies should be developed and distributed to all employees to encourage communication and the reporting of incidents of potential misconduct.[18] The compliance committee should also develop several independent reporting paths for an employee to report fraud, waste or abuse so that such reports cannot be diverted by supervisors or other personnel.

The OIG encourages the establishment of a procedure so that clinical laboratory employees may seek clarification from the compliance officer or members of the compliance committee in the event of any confusion or question with regard to a laboratory policy or procedure. Questions and responses should be documented and dated and, if appropriate, shared with other staff so that standards, policies and procedures can be updated and improved to reflect any necessary changes or clarifications. The compliance officer may want to solicit employee input in developing these communication and reporting systems.

2. Hotlines and Other Forms of Communication

The OIG encourages the use of hotlines (including anonymous hotlines), e-mails, written memoranda, newsletters, and other forms of information exchange to maintain these open lines of communication. If the clinical laboratory establishes a hotline, the telephone number should be made readily available to all employees possibly by conspicuously posting the telephone number in common work areas.[19] Employees should be permitted

---

[15] Some publications, such as the OIG's Special Fraud Alerts, audit and inspection reports, and advisory opinions are readily available from the OIG and could be the basis for standards and educational courses for appropriate clinical laboratory employees. These documents can be found on the OIG's web site at http://www.dhhs.gov/progorg/oig.

[16] Certain positions, such as those involving the coding of medical services, create a greater organizational legal exposure, and therefore require specialized training. One recommendation would be for a clinical laboratory to attempt to fill such positions with individuals who have the appropriate educational background and training.

[17] In its corporate integrity agreements, the OIG usually requires a minimum number of hours annually for basic training in compliance areas. More hours are required for specialty fields such as billing and coding.

[18] The OIG believes that whistleblowers should be protected against retaliation, a concept embodied in the provisions of the False Claims Act. In many cases, employees sue their employers under the False Claims Act's *qui tam* provisions out of frustration because of the company's failure to take action when a questionable, fraudulent or abusive situation was brought to the attention of senior corporate officials.

[19] Clinical laboratories should also post in a prominent, available area the HHS–OIG Hotline
Continued

A.550

to report matters on an anonymous basis. Matters reported through the hotline or other communication sources that suggest substantial violations of compliance policies, regulations, statutes or program requirements of Federal, State and private insurers should be documented and investigated promptly to determine their veracity. A log should be maintained by the compliance officer that records such calls, including the nature of any investigation and its results. Such information should be included in reports to the governing body, the CEO and compliance committee. Further, while the clinical laboratory should always strive to maintain the confidentiality of an employee's identity, it should also explicitly communicate that there may be a point where the individual's identity may become known or may have to be revealed in certain instances when governmental authorities become involved.

The OIG recognizes that assertions of fraud and abuse by employees who may have participated in illegal conduct or committed other malfeasance raise numerous complex legal and management issues that should be examined on a case-by-case basis. The compliance officer should work closely with legal counsel, who can provide guidance regarding such issues.

### E. Enforcing Standards Through Well-Publicized Disciplinary Guidelines

#### 1. Discipline Policy and Actions

An effective compliance program should include guidance regarding disciplinary action for corporate officers, managers, and other employees who have failed to comply with the clinical laboratory's standards of conduct, policies and procedures, or Federal and State laws, or those who have otherwise engaged in wrongdoing, which have the potential to impair the clinical laboratory's status as a reliable, honest and trustworthy health care provider.

The OIG believes that the compliance program should include a written policy statement setting forth the degrees of disciplinary actions that may be imposed upon corporate officers, managers, and other employees for failing to comply with the clinical laboratory's standards and policies and applicable statutes and regulations. Intentional or reckless noncompliance should subject transgressors to significant sanctions. Such sanctions

could range from oral warnings to suspension or termination. The written standards of conduct should elaborate on the procedures for handling disciplinary problems and those who will be responsible for taking appropriate action. Some disciplinary actions can be handled by department managers, while others may have to be resolved by a senior manager. Disciplinary action may be appropriate where a responsible employee's failure to detect a violation is attributable to his or her negligence or reckless conduct. Employees should be advised by the clinical laboratory that disciplinary action will be taken on a fair and equitable basis. Managers and supervisors should be made aware that they have a responsibility to discipline employees in an appropriate and consistent manner.

It is vital to publish and disseminate the range of disciplinary standards for improper conduct and to educate corporate officers, managers and other employees regarding these standards. The consequences of noncompliance should be consistently applied and enforced, in order for the disciplinary policy to have the required deterrent effect. All levels of employees should be subject to the same disciplinary action for the commission of similar offenses. The commitment to compliance applies to all personnel levels within a clinical laboratory. The OIG believes that corporate officers, managers, and other employees should be held accountable for failing to comply with, or for the foreseeable failure of their subordinates to adhere to, the applicable standards, laws, and procedures.

#### 2. New Employee Policy

For all new employees who have discretionary authority to make decisions that may involve compliance with the law or compliance oversight, clinical laboratories should conduct a reasonable and prudent background investigation, including a reference check, as part of every such employment application.[20] The application should specifically require the applicant to disclose any criminal

conviction, as defined by 42 U.S.C. 1320a–7(i), or exclusion action. Pursuant to the compliance program, clinical laboratory policies should prohibit the employment of individuals who have been recently convicted of a criminal offense related to health care or who are listed as debarred, excluded or otherwise ineligible for participation in Federal health care programs (as defined in 42 U.S.C. 1320a–7b(f)).[21] In addition, pending the resolution of any criminal charges or proposed debarment or exclusion, the OIG recommends that such individuals should be removed from direct responsibility for or involvement in any Federal health care program.[22] With regard to current employees, physicians or other individuals authorized to order tests, if resolution of the matter results in conviction, debarment or exclusion, the clinical laboratory should terminate its employment or other contract arrangement with the individual or physician.

### F. Auditing and Monitoring

An ongoing evaluation process involving thorough monitoring and regular reporting to the clinical laboratory's corporate officers is critical to a successful compliance program. Compliance reports created by this ongoing monitoring, including reports of suspected noncompliance, should be maintained by the compliance officer and shared with the clinical laboratory's corporate officers and the compliance committee.

Although many monitoring techniques are available, one effective tool to promote and ensure compliance is the performance of regular compliance audits by internal or external auditors who have expertise in Federal and State health care statutes, regulations and the program requirements of Federal, State and private insurers. At a minimum, these audits should be designed to address the clinical laboratory's compliance with laws governing kickback arrangements, the physician self-referral prohibition, CPT/HCPCS coding and billing, ICD–9 coding, claim development and submission, reimbursement, marketing, reporting and record keeping. In

---

telephone number, 1–800–HHS–TIPS (447–8477), in addition to any company hotline number that may be posted.

[20] The Cumulative Sanction Report is an OIG-produced report available on the Internet at http://www.dhhs.gov/progorg/oig. It is updated on a regular basis to reflect the status of health care providers who have been excluded from participation in the Medicare and Medicaid programs. In addition, the General Services Administration maintains a monthly listing of debarred contractors on the Internet at http://www.arnet.gov/epls. Also, once the data base established by the Health Care Fraud and Abuse Data Collection Act of 1996 is fully operational, the hospital should regularly request information from this data bank as part of its employee screening process.

[21] Likewise, clinical laboratory compliance programs should establish standards prohibiting the execution of contracts with physicians or other individual authorized to order tests that have been recently convicted of a criminal offense related to health care or that are listed by a Federal agency as debarred, excluded, or otherwise ineligible for participation in Federal health care programs.

[22] Prospective employees who have been officially reinstated into the Medicare and Medicaid programs by the OIG may be considered for employment upon proof of such reinstatement.

addition, the audits and reviews should inquire into the clinical laboratory's compliance with specific rules and policies that have been the focus of particular attention on the part of the Medicare fiscal intermediaries or carriers, and law enforcement, as evidenced by OIG Special Fraud Alerts, OIG audits and evaluations, and publically announced law enforcement initiatives and also should focus on any areas of concern that have been identified by any entity, (i.e., Federal, State, or internally) specific to the individual clinical laboratory.

Monitoring techniques may include sampling protocols that permit the compliance officer to identify and review variations from an established baseline.[23] Significant variations from the baseline should trigger a reasonable inquiry to determine the cause of the deviation. If the inquiry determines that the deviation occurred for legitimate, explainable reasons, the compliance officer, corporate officer or manager may want to limit any corrective action or take no action. If it is determined that the deviation was caused by improper procedures, misunderstanding of rules, including fraud and systemic problems, the clinical laboratory should take prompt steps to correct the problem. If potential fraud or violations of the False Claims Act are involved, the laboratory should report the potential violation to the OIG or the Department of Justice (see discussion in Section G.2, below). Any repayment of an overpayment which results from such a violation should be made as part of the discussion with law enforcement.

When making any overpayment, the clinical laboratory should inform the payor of the following information (1) the refund is being made pursuant to a voluntary compliance program; (2) a description of the complete circumstances surrounding the overpayment; (3) the methodology by which the overpayment was determined; (4) any claim-specific information used to determine the overpayment and; (5) the amount of the overpayment.

The OIG believes that the compliance officer needs to be made aware of these overpayment patterns, violations or deviations and look for trends that may demonstrate a systemic problem.

An effective compliance program should also incorporate periodic (at least annual) reviews of whether the program's compliance elements have been satisfied, e.g., whether there has been appropriate; (1) dissemination of the program's standards; (2) training; (3) ongoing educational programs; and (4) disciplinary actions, among others. This process will verify actual conformance with the compliance program. The review also should look into whether appropriate records have been created and maintained to document the implementation of an effective program. However, when monitoring discloses that deviations were not detected in a timely manner due to program deficiencies, appropriate modifications must be implemented. Such evaluations, when developed with the support of management, can help ensure compliance with the clinical laboratory's policies and procedures.

As part of the review process, the compliance officer or reviewers should consider techniques such as:

• On-site visits;

• Interviews with personnel involved in management, marketing/sales, operations, coding/billing, claim development and submission, and other related activities;

• Questionnaires developed to solicit impressions of a broad cross-section of the clinical laboratory's employees and referring clients;

• Review of requisition forms and other documents that support claims for reimbursement;

• Review of written materials and documentation produced by the laboratory and used by physicians and other individuals authorized to order tests; and

• Trend analyses, or longitudinal studies, that seek deviations in billing or ordering patterns over a given period.

The reviewers should:

• Be independent of line management;

• Have access to existing audit resources, relevant personnel and all relevant areas of operation;

• Present written evaluative reports on compliance activities to the CEO, governing body and members of the compliance committee on a regular basis, but no less than annually; and

• Specifically identify areas where corrective actions are needed.

With these reports, the clinical laboratory management can take whatever steps are necessary to correct past problems and prevent them from recurring. In certain cases, subsequent reviews or studies would be advisable to ensure that the recommended corrective actions have been implemented successfully.

The clinical laboratory should document its efforts to comply with applicable statutes, regulations and the program requirements of Federal, State and private payors. For example, where a clinical laboratory, in its efforts to comply with a particular statute, regulation or program requirement, requests advice from a Government agency (including a Medicare fiscal intermediary or carrier) charged with administering a Federal health care program, the clinical laboratory should document and retain a record of the request and any written or oral response. This step is particularly important if the clinical laboratory intends to rely on that response. The laboratory should memorialize its determination as to whether reliance on any such advice is reasonable, and its efforts to develop procedures based upon such advice.

## G. Responding to Detected Offenses and Developing Corrective Action Initiatives

### 1. Violations and Investigations

Violations of a clinical laboratory's compliance program, failures to comply with applicable Federal or State law, and other requirements of Government and private health plans, and other types of misconduct threaten a clinical laboratory's status as a reliable, honest and trustworthy provider capable of participating in Federal health care programs. Detected but uncorrected misconduct can seriously endanger the mission, reputation, and legal status of the clinical laboratory. Consequently, upon reports or reasonable indications of suspected noncompliance, it is important that the chief compliance officer or other management officials initiate prompt steps to investigate the conduct in question to determine whether a material violation of applicable law or the requirements of the compliance program has occurred, and if so, take steps to correct the problem.[24] As appropriate, such steps

---

[23] The OIG recommends that when a compliance program is established in a clinical laboratory, the compliance officer, with the assistance of corporate officers, should take a ''snapshot'' of their operations from a compliance perspective. This assessment can be undertaken by outside consultants, law or accounting firms, or internal staff, with authoritative knowledge of health care compliance requirements. This ''snapshot,'' often used as part of benchmarking analyses, becomes a baseline for the compliance officer and other corporate officers to judge the clinical laboratory's progress in reducing or eliminating potential areas of vulnerability. For example, it has been suggested that a baseline level include the frequency and percentile levels of each CPT code in relation to the clinical laboratory's overall billing.

[24] Instances of non-compliance must be determined on a case-by-case basis. The existence, or amount, of a monetary loss to a health care program is not solely determinative of whether or not the conduct should be investigated and reported to governmental authorities. In fact, there may be instances where there is no monetary loss at all, but corrective action and reporting are still necessary to

Continued

may include an immediate referral to criminal and/or civil law enforcement authorities, a corrective action plan,[25] a report to the Government,[26] and the submission of any overpayments, if applicable.

Depending upon the nature of the alleged violations, an internal investigation will probably include interviews and a review of relevant documents. Some clinical laboratories should consider engaging outside counsel, auditors, or health care experts to assist in an investigation. Records of the investigation should contain documentation of the alleged violation, a description of the investigative process, copies of interview notes and key documents, a log of the witnesses interviewed and the documents reviewed, the results of the investigation, e.g., any disciplinary action taken, and the corrective action implemented. While any action taken as the result of an investigation will necessarily vary depending upon the clinical laboratory and the situation, clinical laboratories should strive for some consistency by utilizing sound practices and disciplinary protocols. Further, after a reasonable period, the compliance officer should review the circumstances that formed the basis for the investigation to determine whether similar problems have since been uncovered.

If an investigation of an alleged violation is undertaken and the compliance officer believes the integrity of the investigation may be at stake because of the presence of employees under investigation, those subjects should be removed from their current work activity until the investigation is completed (unless otherwise requested by law enforcement). In addition, the compliance officer should take

appropriate steps to secure or prevent the destruction of documents or other evidence relevant to the investigation. If the clinical laboratory determines that disciplinary action is warranted, it should be prompt and imposed in accordance with the clinical laboratory's written standards of disciplinary action.

### 2. Reporting

If the compliance officer, compliance committee or management official discovers credible evidence of misconduct from any source and, after a reasonable inquiry, has reason to believe that the misconduct may violate criminal, civil or administrative law, then the clinical laboratory promptly should report the matter to the appropriate governmental authority[27] within a reasonable period, but not more than 60 days[28] after determining that there is credible evidence of a violation.[29] Prompt reporting will demonstrate the clinical laboratory's good faith and willingness to work with governmental authorities to correct and remedy the problem. In addition, reporting such conduct will be considered a mitigating factor by the OIG in determining administrative sanctions (e.g., penalties, assessments, and exclusion), if the reporting provider becomes the target of an OIG investigation.[30]

When reporting misconduct to the Government, a clinical laboratory should provide all evidence relevant to the potential violation of applicable Federal or State law(s) and potential cost impact. The compliance officer,

under advice of counsel, and with guidance from the governmental authorities, could be requested to continue to investigate the reported violation. Once the investigation is completed, the compliance officer should be required to notify the appropriate governmental authority of the outcome of the investigation, including a description of the impact of the alleged violation on the operation of the applicable health care programs or their beneficiaries. If the investigation ultimately indicates that criminal or civil violations may have occurred, the appropriate Federal and State officials[31] should be notified immediately.

As previously stated, the clinical laboratory should take appropriate corrective action, including the imposition of proper disciplinary action, and prompt identification and restitution of any overpayment to the affected payor. In cases where potential fraud or violations of the False Claims Act are involved payment should be made as part of discussions with law enforcement. Failure to repay overpayments within a reasonable period of time could be interpreted as an intentional attempt to conceal the overpayment from the Government, thereby establishing an independent basis for a criminal violation with respect to the clinical laboratory, as well as any individuals who may have been involved.[32] For this reason, clinical laboratory compliance programs should emphasize that overpayments obtained from Medicare or other Federal health care programs should be promptly returned to the payor that made the erroneous payment. Section F details the information which should be provided to the contractor when making a repayment.

### Conclusion

Through this document, the OIG has attempted to provide a foundation for development of an effective and cost-efficient clinical laboratory compliance program. As previously stated, however, each program must be tailored to fit the needs and resources of an individual clinical laboratory, depending upon its

---

protect the integrity of the applicable program and its beneficiaries.

[25] Advice from the clinical laboratory's in-house counsel or an outside law firm may be sought to determine the extent of the clinical laboratory's liability and to plan the appropriate course of action.

[26] The OIG currently maintains a voluntary disclosure program that encourages providers to report suspected fraud. The concept of voluntary self-disclosure is premised on a recognition that the Government alone cannot protect the integrity of the Medicare and other Federal health care programs. Health care providers must be willing to police themselves, correct underlying problems and work with the Government to resolve these matters. The OIG's voluntary self-disclosure program has four prerequisites (1) the disclosure must be on behalf of an entity and not an individual; (2) the disclosure must be truly voluntary (i.e., no pending proceeding or investigation); (3) the entity must disclose the nature of the wrongdoing and the harm to the Federal programs; and (4) the entity must not be the subject of a bankruptcy proceeding before or after the self-disclosure.

[27] I.e., Federal and/or State law enforcement having jurisdiction over such matter. Such governmental authority would include DOJ and OIG with respect to Medicare and Medicaid violations giving rise to causes of actions under various criminal, civil and administrative false claims statutes.

[28] To qualify for the ''not less than double damages'' provision of the False Claims Act, the report must be provided to the Government within thirty days after the date when the laboratory first obtained the information. 31 U.S.C. 3729(a).

[29] The OIG believes that some violations may be so serious that they warrant immediate notification to governmental authorities, prior to, or simultaneous with, commencing an internal investigation, e.g., if the conduct (1) is a clear violation of criminal law; (2) has a significant adverse effect on the quality of care provided to program beneficiaries (in addition to any other legal obligations regarding quality of care); or (3) indicates evidence of a systemic failure to comply with applicable laws, an existing corporate integrity agreement, or other standards of conduct, regardless of the financial impact on Federal health care programs.

[30] The OIG has published criteria setting forth those factors that the OIG takes into consideration in determining whether it is appropriate to exclude a health care provider from program participation pursuant to 42 U.S.C. 1320a–7(b)(7) for violations of various fraud and abuse laws. See 62 FR 67392 (12/24/97).

[31] Appropriate Federal and State authorities include the Criminal and Civil Divisions of the Department of Justice, the U.S. Attorney in the clinical laboratory's district, and the investigative arms for the agencies administering the affected Federal or State health care programs, such as the State Medicaid Fraud Control Unit, the Defense Criminal Investigative Service, and the Offices of Inspector General of the Department of Health and Human Services, the Department of Veterans Affairs and the Office of Personnel Management (which administers the Federal Employee Health Benefits Program).

[32] See 42 U.S.C. 1320a–7b(a)(3).

A.553

particular corporate structure, mission, size and employee composition. The statutes, regulations and guidelines of the Federal and State health insurance programs, as well as the policies and procedures of the private health plans, should be integrated into every clinical laboratory's compliance program.

The OIG recognizes that the health care industry in this country, which reaches millions of beneficiaries and expends about a trillion dollars annually, is constantly evolving. As stated throughout this guidance, compliance is a dynamic process that helps to ensure that clinical laboratories and other health care providers are better able to fulfill their commitment to ethical behavior, as well as meet the changes and challenges being imposed upon them by Congress and private insurers. Ultimately, it is OIG's hope that a voluntarily created compliance program will enable clinical laboratories to meet their goals, improve the quality of services and control of claims submission, and substantially reduce fraud, waste and abuse, as well as the cost of health care to Federal, State and private health insurers.

Dated: August 14, 1998.

**June Gibbs Brown,**

*Inspector General.*

[FR Doc. 98–22559 Filed 8–21–98; 8:45 am]

**BILLING CODE 4150–04–P**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Substance Abuse and Mental Health Services Administration

### Center for Mental Health Services; Notice of Meeting

Pursuant to Pub. L. 92–463, notice is hereby given of a teleconference meeting of the Center for Mental Health Services (CMHS) National Advisory Council on August 24, 1998.

The meeting will include the review, discussion, and evaluation of individual grant applications and contract proposals. Therefore, the meeting will be closed to the public as determined by the Administrator, SAMHSA, in accordance with Title 5 U.S.C. 552b(c) (3), (4) and (6) and 5 U.S.C. App. 2, Section 10(d).

An agenda and a roster of Council members may be obtained from Ms. Patricia Gratton, Committee Management Officer, CMHS, Room 11C–26, Parklawn Building, Rockville, Maryland 20857, Telephone (301) 443–7987.

Substantive program information may be obtained from the contact whose name and telephone number is listed below.

*Committee Name:* CMHS National Advisory Council.

*Meeting date:* August 24, 1998.

*Place:* CMHS Conference Room 5600 Fishers Lane, Room 15–94, Rockville, MD 20857.

*Closed:* August 24, 1998, 12:00 p.m.–1:30 p.m.

*Contact:* Anne Mathews-Younes, Ed.D., Executive Secretary, Room 18C–05, Parklawn Building, Telephone: (301) 443–0554 and FAX (301) 443–7912.

This notice is being published less than 15 days prior to the meeting due to the urgent need to meet timing limitations imposed by the review and funding cycle.

Dated: August 18, 1998.

**Dee Herman,**

*Committee Management Officer, Substance Abuse and Mental Health Services Administration.*

[FR Doc. 98–22573 Filed 8–21–98; 8:45 am]

**BILLING CODE 4162–20–P**

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–4211–FA–03]**

### Lead-Based Paint Hazard Control in Privately Owned Housing: Fiscal Year 1997: Announcement of Funding Awards

**AGENCY:** Office of the Secretary—Office of Lead Hazard Control.

**ACTION:** Announcement of funding awards.

**SUMMARY:** In accordance with section 102(a)(4)(C) of the Department of Housing and Urban Development Reform Act of 1989, this announcement notifies the public of funding decisions made by the Department in a competition for funding under the NOFA for Lead-Based Paint Hazard Control in Privately Owned Housing. This announcement contains the names and addresses of the award recipients and the amounts of awards.

**FOR FURTHER INFORMATION CONTACT:** Ellis G. Goldman, Department of Housing and Urban Development, 451 Seventh Street, SW, Washington, DC 20410, telephone (202) 755–1785, ext 112. Hearing-and speech-impaired persons may access the number above via TTY by calling the toll free Federal Information Relay Service at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:** The purpose of the competition was to award grant funding for $50,000,000 for the grant program for lead-based paint hazard control in low income private housing.

The 1997 awards announced in this Notice were selected for funding in a competition announced in a **Federal Register** notice published on June 6, 1997 (62 FR 30380). Applications were scored and selected on the basis of selection criteria contained in that Notice.

A total of $50,000,000 has been awarded to twenty-five grantees. In accordance with section 102(a)(4)(C) of the Department of Housing and Urban Development Reform Act of 1989 (103 Stat. 1987, 42 U.S.C. 3545), Department is publishing the names, addresses, and amounts of those awards as follows.

**Category A Grants**

City of Phoenix

Lead Hazard Control Program, 200 West Washington, Phoenix, AZ 85003, $2,000,000

City of Long Beach

Department of Health & Human Services, 2525 Grand Avenue, Long Beach, CA 90815–1765, $2,000,000

City of Los Angeles

Los Angeles Housing Department, 400 Main St., Los Angeles, CA 90013, $2,900,000

City of Richmond

Richmond Redevelopment Agency, 330 25th St., Richmond, CA 94804, $2,300,000

Town of Manchester

Manchester Lead Abatement Project, 63 East Center St., Suite 2A, Manchester, CT 06040, $2,000,000

District of Columbia

Department of Health, 800 9th St., SW., Washington, DC 20024, $2,200,000

City of Lawrence

Community Development Department, 225 Essex St., Lawrence, MA 01840, $2,900,000

City of Springfield

Office of Housing, 81 State Street, Springfield, MA 01103, $1,800,000

City of Baltimore

Baltimore City Health Department, 210 Guilford Ave., Baltimore, MD 21044, $2,000,000

City of Portland

Portland Lead-Safe Housing Program, 389 Congress St., Portland, ME 04101, $1,400,000

A.554

# EXHIBIT H

A.555

UNITED STATES OF AMERICA, *et al., ex rel.* OMNI HEALTHCARE v. MD SPINE SOLUTIONS LLC, et al. Case No. 18-cv-12558-PBS - **Expert report of Michael F. Arrigo January 29, 2024**

### MD Labs Results

The MD Lab Result Report was reviewed for each patient.  The UTI test results are noted in the spreadsheet.  The report lists pathogens tested with RT-PCR.  If antimicrobial susceptibility testing was performed any antimicrobial resistance is documented.

These test results are important as they should correlate with the claim form submitted.

### Healthcare Claim

For each patient the health care claim submitted was analyzed.  The tests listed on the claim form should have appropriate documentation.   This consists of a signed progress note in the medical record documenting the medical necessity and the intent to perform the specific diagnostic test.  The requisition should list the health care professional ordering the test, an order for the test (the box for the panel should be checked), and the indication for the test (diagnoses/symptoms).[15]

The spreadsheet for the 57 patients is shown here:

**CONFIDENTIAL CONTAINS HIPAA PROTECTED HEALTH INFORMATION (PHI)**
Portions Copyright © Michael F. Arrigo and No World Borders, Inc. CPT is a Registered Trademark of the American Medical Association

A.556

UNITED STATES OF AMERICA, *et al., ex rel.* OMNI HEALTHCARE v. MD SPINE SOLUTIONS LLC, et al. Case No. 18-cv-12558-PBS - **Expert report of Michael F. Arrigo January 29, 2024**



*Figure 15 - High level view of patient chart review; red areas show deficiencies (1 of 2)*

**CONFIDENTIAL CONTAINS HIPAA PROTECTED HEALTH INFORMATION (PHI)**
Portions Copyright © Michael F. Arrigo and No World Borders, Inc. CPT is a Registered Trademark of the American Medical Association

A.557

UNITED STATES OF AMERICA, *et al., ex rel.* OMNI HEALTHCARE v. MD SPINE SOLUTIONS LLC, et al. Case No. 18-cv-12558-PBS - **Expert report of Michael F. Arrigo January 29, 2024**



*Figure 16 - High-level view of patient chart review; red areas show deficiencies (2 of 2)*

### FINDINGS

7. The most significant finding is that in **all 57 charts** there was no documentation in the medical chart demonstrating the intent of the ordering physician to perform the PCR diagnostic testing and antimicrobial susceptibility testing.

8. 21 of the 57 MD Labs Requisition Forms left the box for the Urinary Tract Infection Testing Panel unchecked.

9. 23 of the 57 MD Labs Requisition Forms were unsigned by a health care provider.

### B.  Detail Narrative Regarding Five of the 57 Patients

The application of the methodology described is illustrated in detail in the discussion regarding five patients below.

**CONFIDENTIAL CONTAINS HIPAA PROTECTED HEALTH INFORMATION (PHI)**
Portions Copyright © Michael F. Arrigo and No World Borders, Inc. CPT is a Registered Trademark of the American Medical Association

48

A.558

# EXHIBIT I

A.559

| From: | Redman, Anne M. (Perkins Coie) [ARedman@perkinscoie.com] |
|---|---|
| **Sent:** | 12/9/2016 8:07:49 PM |
| **To:** | Denis Grizelj [denis@mdlabs.com] |
| **CC:** | Schneiderman, Jason (Perkins Coie) [JSchneiderman@perkinscoie.com]; Ripke, Jill (Perkins Coie) [Jripke@perkinscoie.com]; Hanna, Cindy (Perkins Coie) [CHanna@perkinscoie.com] |
| **Subject:** | MD Labs - BAA; Sales Rep Agreement |
| **Attachments:** | MD Labs BAA (2) 12.9.16.DOC; Slideserve.co.uk-Draft Ccla Lab Compliance Matrix 3 17 2015 Dwt.pdf; 141072 Kickbacks bribes or rebates punishment.pdf |

Denis,

Here is the BAA.  I have removed the statement giving permission to de-identify information and simplified the first paragraph to refer to the date of execution of the BAA as the effective date.

Also attached is a summary of the federal and California authorities we discussed and separately the Medi-Cal Anti-Kickback Law, Cal. Welf. & Insti. Code § 1407.2(a) and (b).

Please let me know if you have questions.

Have a good weekend. Anne

**Anne Redman | Perkins Coie LLP**
PARTNER
1201 Third Avenue Suite 4900
Seattle, WA 98101-3099
D. +1 206.359.6750
F. +1.206.359.7750
E  ARedman@perkinscoie.com

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents  Thank you.

A.560

MD0167563

### 1. Commission (%) - based Independent Contractor Marketing of Laboratory Testing

| Federal Law | California Law |
|---|---|
| According to the OIG and various federal cases, payment of percentage of sales commissions to contract sales personnel implicates the federal AKS, and is not protected by an AKS safe harbor. | A lab's payment of percentage of sales commissions to contract sales personnel has been held by California courts to violate the Medi-Cal AKS. |

| Federal Law | California Law |
|---|---|
| **FEDERAL ANTI-KICKBACK STATUTE (AKS):** Prohibits knowing and willful solicitation, offer, payment or acceptance of any remuneration … directly or indirectly, overtly or covertly, in cash or in kind: (1) for referring an individual for a service or item covered by a federal health care benefit program, or (2) for purchasing, leasing, ordering, or **arranging for or recommending** the purchase, lease, or order of any good, facility, service or item reimbursable under a federal health care benefit program. **[See, 42 U.S.C. § 1320-a-7(b)]** | **CALIFORNIA ANTI-KICKBACK LAW [PHYSICIAN OWNERSHIP AND REFERRAL ACT ("PORA"):** Prohibits *"[t]he offer, delivery, receipt, or acceptance by any person licensed under this division … of any … commission … or other consideration … as compensation or inducement for **referring** patients, clients, or customers to any person …"* **[Cal. Bus. & Prof. Code § 650(a)]** |
| **SAFE HARBORS:** AKS safe harbor regulations exempt practices HHS deems unlikely to result in fraud or abuse. **[See, 42 C.F.R. § 1001.952]** | **PORA Safe Harbor:** Permits *"[t]he payment or receipt of consideration for services other than the referral of patients which is based on a percentage of gross revenue or similar type of contractual arrangement shall not be unlawful if the consideration is commensurate with the value of the services furnished or with the fair rental value of any premises or equipment leased or provided by the recipient to the payer."* |
| **_Bona Fide_ Employee:** AKS exception and safe harbor **[see, 42 U.S.C. § 1320-a-7b (b)(3)(B); 42 C.F.R. § 1011.952(i)]** for payments to (W-2) sales "employee", as defined by IRS at 26 U.S.C. § 3121(d)(2) -- | |
| *"This statutory exemption permits an employer to pay an employee in whatever manner he or she chooses for having that employee assist in the solicitation of Medicare or State health care program business...."* **[54 Fed. Reg. 3088, 3093 (Jan. 23, 1989)]** | **MEDI-CAL ANTI-KICKBACK LAW (Medi-Cal AKS):** Prohibits any person from soliciting or receiving, offering or paying, any remuneration in any form directly or indirectly, overtly or covertly in cash or in kind in return for the referral, or promised referral, of any individual to a person for the *"(a) furnishing or arranging for the furnishing of any service or merchandise for [the Medi- Cal program]; or (b) purchasing, leasing, ordering, or **arranging for or recommending** the purchasing, leasing, or ordering of any goods, facility, service or merchandise for [the Medi-Cal program]."* **[See, Cal. Welf. & Inst. Code § 14107.2 (a) + (b)]** |
| **Personal Services and Management Contracts Safe Harbor:** Protects arrangements with (1099) non-employee sales representatives **ONLY IF** there is a written agreement (i) signed by the parties; (ii) for a term of at least 1 year; (iii) for specified and necessary services (which do not violate federal or state laws); (iv) with a set schedule for any part-time services--and (v) aggregate (total) compensation **MUST**: | |
| • be fair market value, <br>• be fixed in advance for the contract term; and <br>• NOT take into account (vary with) volume or value of any federal program referrals.**[See, 42 C.F.R. § 1001.952 (d)]** | **Medi-Cal AKS Safe Harbor:** Exempts payments by an employer to a *bona fide* employee. **[See, Cal. Welf. & Inst. Code § 14107.2 (c)]** |
| **OIG GUIDANCE:** OIG has consistently warned that commission-based contract marketing does not meet safe harbors and implicates AKS: | **CA CASE LAW:** |
| *[M]any commenters suggested that we broaden the [employment] exemption to apply to independent contractors paid on a commission basis. We have declined to adopt this approach because we are aware of many examples of abusive practices by sales personnel who are paid as independent contractors and who are not under appropriate supervision. We believe that if individuals and entities desire to pay a salesperson on the basis of the amount of business they generate, then to be exempt from civil or criminal prosecution, they should make these salespersons employees where they can and should exert appropriate supervision for the individual's acts.* **[54 Fed. Reg. 3088, 3093 (1989)]** | People v. Duz-Mor Diagnostic Laboratory found that payment of sales commissions to an independent contractor sales agent to market laboratory services to physicians violates the Medi-Cal AKS: |
| *Commission-based compensation to contract sales force will not meet the personal services and management contracts safe harbor because it is "not fixed in advance and is determined in a manner that takes into account the value or volume of business generated between the parties, including Federal health care program business. * * *"* | *"[T]he statute prohibits payment of a commission to someone who **arranges**, through marketing activities, for services to be furnished to Medi-Cal beneficiaries [and] the statute prohibits payment for **recommendations** of services, quite clearly encompassing [that] kind of marketing...."***[68 Cal.App.4th 654, 671 (1998)(emphasis added)]** |
| *Percentage compensation arrangements are potentially abusive, however, because they provide financial incentives that may encourage overutilization of items and services and may increase program costs.* **[See, OIG Advisory Opinion No. 98-1 (Mar. 25, 1998)]** | [See, also, People v. Palma, 40 Cal.App.4th 1559 (Cal. Ct. App. 1995) (contract sales agent paid by medical supply company to market to nursing homes)]. |
| *Payments for marketing services involving Federal health care program business warrant close scrutiny under the anti-kickback statute. Marketing fees paid on the basis of successful orders for items or services are inherently subject to abuse because they are linked to business generated by the marketer.* **[See, OIG Advisory Opinion No. 10-23 (Oct. 28, 2010)]** | However, Duz-Mor concluded that the contract sales agent's conduct did not violate PORA because the conduct of the independent sales agent fell within the PORA Safe Harbor: |
| **FEDERAL CASE LAW - %-BASED CONTRACT MARKETING VIOLATES AKS:** | *"payment or receipt of consideration for services **other than the referral of patients** which is based on a percentage of gross revenue or similar type of contractual arrangement shall not be unlawful if the consideration is commensurate with the value of the services furnished...."* **[68 Cal.App.4th at 667 (emphasis added)]** |
| • U.S. v. Polin, 194 F.3d 863 (7th Cir. 1999)(sales agent paid by physician for each Medicare referral to physician's cardiac monitoring company) <br>• U.S. v. Starks, 157 F. 3d 833 (11th Cir. 1998)(contractors paid marketing expenses by drug treatment provider to influence patient referrals) <br>• Zimmer v. NuTech Medical, 54 F. Supp. 2d (N.D.Ind.1999)(medical supplier paid by medical supply manufacturer to market products to physicians) | People v. Guiamelon upheld the conviction of Dr. Guiamelon under PORA for her payment of $20 per patient to contracted marketers in exchange for the marketers' **referring** patients to her office, "by either driving them to her office, or directing them there." The court clarified that its holding did not conflict with Duz-Mor, |

*This guide is published by the California Clinical Laboratory Association (CCLA) for the purpose of providing its membership with a resource when navigating various issues in the laboratory industry. This guide is not intended to provide an interpretation of the legal principles cited, does not constitute a legal opinion, and does not represent a statement of standardized or uniform practices of CCLA's membership.

A-561

MD0167571

| 1. Commission (%) - based Independent Contractor Marketing of Laboratory Testing | |
| --- | --- |
| **Federal Law** | **California Law** |
| • Nursing Home Consultants v. Quantum Health Services, 926 F. Supp. 835 (E.D. Ark. 1996)(marketing company paid by medical suppliers to market to nursing home residents)<br>• Joint Technology v. Weaver, CIV-11-846-M (W.D. Okla. Jan. 23, 2013)(contract sales agent to paid by DME company)<br>• Modern Medical Laboratories v. Smith-Kline Beecham Clinical Laboratories, 1994 U.S. Dist. LEXIS 11525 (N.D. Ill. Aug. 16, 1994)(management agreement for SKBCL to market MML's laboratory business)<br><br>**RECENT FEDERAL SETTLEMENTS:**<br>**[OIG - Kickback and Physician Self-Referral (08-21-2014)]** Zimmer-Deptula (ZDI) entered into a $123,000 settlement agreement with OIG to resolve allegations that two ZDI independent contractors paid third parties to recommend products to Florida physicians. OIG contends that ZDI knowingly and willfully offered and paid the kickbacks to the 3rd parties to induce them to recommend and arrange for the purchase of products paid for by Federal health care programs.<br><br>**[OIG - Kickback and Physician Self-Referral (10-21-2013)]** In resolution of FCA liability, two owners of a DME company agreed to be excluded from Federal health care programs for 20 years. OIG alleged that the owners, through their company, entered into contracts with marketing companies whereby, in violation of the Anti-Kickback Statute, the company paid for referrals from marketing companies when Medicare beneficiaries ordered diabetic supplies.<br><br>**[OIG Archives - Kickback and Physician Self-Referral (02-15-2005)]** Tender Loving Care Health Care Services (TLC), a nationwide home health agency, paid $130,000 to resolve CMP liability for false claims and kickbacks. OIG alleged that one of TLC's franchisees paid commissions to non-employees for marketing services, for each patient referred by the contract sales agents. | stating: "Guiamelon argues the facts of her case are 'not materially different' from the payments by a laboratory to a marketer in Duz-Mor…. We disagree." **[205 Cal.App.4th 383, 413, 140 Cal.Rptr.3d 584 (2012)]**<br><br>**LEGISLATIVE COUNSEL OPINION:** California Legislative Counsel Bureau Opinion # 1128674, "Clinical Laboratory Referral Practice" (Apr. 20, 2012), addresses the legality under both state and federal law of a commission-based contract marketing arrangement between a clinical lab and a middleman entity<br><br>*"to arrange for physician referrals to the clinical laboratory in return for a fee or other consideration [while pursuant to] a separate agreement, the [middleman] agrees to provide a physician with staff…, supplies, or other goods or services at less than fair market rates … in return for an agreement that the physician will refer laboratory tests to the clinical laboratory that has the arrangement with the [middleman]."*<br><br>The Legislative Counsel concluded that PORA *"prohibits any arrangement in which consideration is offered or delivered for the purpose of inducing a referral to a particular licensed health care professional, regardless of whether that consideration is paid directly to the referring physician or is paid to another entity that induces the referral. Thus, we believe that the clinical laboratory would violate [PORA] by indirectly compensating the physician for making referrals."* |

2

*This guide is published by the California Clinical Laboratory Association (CCLA) for the purpose of providing its membership with a resource when navigating various issues in the laboratory industry. This guide is not intended to provide an interpretation of the legal principles cited, does not constitute a legal opinion, and does not represent a statement of standardized or uniform practices of CCLA's membership.

A.562

MD0167572

## 2.  In-Office Phlebotomists

| Federal Law | California Law |
|---|---|
| **According to OIG and CMS, a lab's placement of personnel in a physician practice <u>solely</u> to collect and process lab specimens to be tested by the lab is permitted under federal law, so long as lab personnel do not perform services ordinarily provided by the physician's staff.** | **According to the California Legislative Counsel, a lab's placement of personnel in a physician practice is prohibited by California law.** |
| *[I]f the phlebotomist is purely performing laboratory functions for the laboratory that places the phlebotomist, then <u>there would be no remuneration to the physician or group practice</u>...However, if the phlebotomist performs services that are not directly related to the collection or processing of laboratory specimens for the laboratory that has provided the phlebotomist, he or she may be providing a benefit to the physician or group practice, thus creating a [prohibited] compensation arrangement...*[**See, CMS Commentary to Final Stark II Regs., 66 Fed. Reg. 856, 948-49 (Jan. 4, 2001)].** | California's Legislative Counsel provided a Legal Opinion in 1996 that CA AKS prohibits placing clinical lab personnel in a physician's office: |
| *When permitted by state law, a laboratory may make available to a physician's office a phlebotomist who collects specimens from patients for testing by the outside laboratory ... While the mere placement of a laboratory employee in the physician's office would not necessarily serve as an inducement prohibited by the anti-kickback statute, the statute is implicated when the phlebotomist performs additional tasks that are normally the responsibility of the physician's office staff...These tasks can include taking vital signs or other nursing functions, testing for the physician's office laboratory, or performing clerical services.... Furthermore, the mere existence of a contract between the laboratory and the health care provider that prohibits the phlebotomist from performing services unrelated to specimen collection does not eliminate OIG's concern, where the phlebotomist is not closely monitored by his [or her] employer or where the contractual prohibition is not rigorously enforced.* | *The placement by a clinical laboratory of a phlebotomist or other clinical laboratory personnel in the office of a physician who refers patients to the laboratory would violate the Physician Ownership and Referral Act of 1993.* [**See, Legislative Counsel of California, Clinical Laboratory Personnel: Placement in Physician's Offices - #2433 (Feb. 29, 1996)]** |
| **[See, OIG Special Fraud Alert: Special Arrangements for the Provision of Clinical Lab Services (Issued Oct. 1994), 59 Fed. Reg. 65372 (Dec. 19, 1994)]** | California Department of Public Health, Laboratory Field Services Division (LFS) repeated the guidance on the issue in 1997: |
| | *(5) What about phlebotomists provided by laboratories to work in physician offices?* |
| | <u>*Answer:*</u> *Refer to the Legislative Counsel Opinion #2433, dated February 29, 1996, which addressed the issue of phlebotomists in a physician office. This document, entitled "Clinical Laboratory Personnel: Placement in Physicians' Offices", stated that the placement by a clinical laboratory of a phlebotomist or other clinical laboratory personnel in the office of a physician who refers patients to the laboratory would violate the Physician Ownership and Referral Act of 1993. While not specifically addressing BPC Section 650, the Legislative Counsel report states that a physician accepting the services of a phlebotomist provided by a laboratory may be considered to be accepting an inducement. Likewise, a laboratory providing the services of a phlebotomist in order to gain that physician's test referrals, would be considered as providing an inducement to the physician.* [**See, Memorandum re: Legal opinions regarding phlebotomy issues from Karen Nickel, Ph.D., Chief, LFS (July 11, 1997)]** |

## 3.  Use of Mobile Phlebotomists

| Federal Law | California Law |
|---|---|
| **Neither OIG nor CMS has provided guidance specific to "Mobile Phlebotomy" beyond the guidance (described above) regarding restrictions against phlebotomists performing tasks that are normally the responsibility of the physician's office staff.** | **California LFS has opined that PORA prohibits providing a "roving phlebotomist" to a physician practice.** |
| Laboratories do have responsibility under CLIA for specimen collection as part of the pre-analytical phase of laboratory testing. [**See, 42 C.F.R. § 493.1242 (2)]** | California Department of Public Health, Laboratory Field Services Division (LFS) addressed the question of "roving phlebotomists" in 1997: |
| | *(4) Is a roving phlebotomist provided a physician's office for the purpose of collecting blood specimens by a clinical laboratory considered an inducement and a violation of BPC section 650?* |
| | <u>*Answer:*</u> *BPC section 650 specifically prohibits any inducement to the physician for referral of patients to their laboratory. If the physician is receiving any benefit from the laboratory, such as the laboratory paying the phlebotomist to draw the specimen or if the phlebotomist is on "standby time", awaiting calls from the physician, then section 650 would be violated. If, however, the phlebotomy service is paid for by the physician, then section 650 is not violated and the arrangement would be permitted, provided the laboratory accepting the specimen assumes responsibility for the collection procedures.* [**See, Memorandum re: Legal opinions regarding phlebotomy issues from Karen Nickel, Ph.D., Chief, Laboratory Field Services]** |
| | "Only people who are authorized can perform phlebotomy in California. Generally those authorized are licensed physicians, registered nurses, licensed vocational nurses, licensed clinical lab scientists and certified phlebotomists" Specifically, phlebotomy may only be performed by: |
| | ▪ persons licensed under Cal. Bus. & Prof. Code § 650, Chapter 3 – (Clinical Consultant, General Supervisor, Technical Consultant, Technical Supervisor) **(Cal. Bus. & Prof. Code § 1242)** |
| | ▪ RN, LVN, and RCP **(Cal. Bus. & Prof. Code § 1242.6)** |
| | ▪ a certified phlebotomist who must be **employed by** a laboratory **(Cal. Bus. & Prof. Code § 1246)** |

3

*This guide is published by the California Clinical Laboratory Association (CCLA) for the purpose of providing its membership with a resource when navigating various issues in the laboratory industry.  This guide is not intended to provide an interpretation of the legal principles cited, does not constitute a legal opinion, and does not represent a statement of standardized or uniform practices of CCLA's membership.

A.563

MD0167573

| 4. Leasing Office Space from Physicians | |
|---|---|
| **Federal Law** | **California Law** |
| **Leasing office space from physicians is permitted by federal law, subject to meeting the requirements of the Stark law exception and AKS safe harbor for leases.** | **Leasing office space from physicians is permitted by California law, subject to meeting the PORA lease exception requirements.** |
| Leases with physicians are governed by the federal Stark Law and Anti-Kickback Statute.  To the extent the lab leases such locations from a referring provider the lease must meet the under the AKS space rental safe harbor **[42 C.F.R. 10001.952(b)]**, as well as the Stark law space rental exception when the leasing provider is a physician. **[42 U.S.C. § 1395nn (e) (1)(A); 42 C.F.R. § 411.357(a)]**. | Leases with physicians are governed by Cal. Bus. & Prof. Code § 650.01 and 650.02(b)(2): |
| | **Cal. Bus. & Prof. Code § 650.01:** |
| A lease with a physician must meet the following requirements: | *(a) Notwithstanding Section 650, or any other provision of law, it is unlawful for a licensee to refer a person for laboratory… services if the licensee or his or her immediate family has a financial interest with the person or in the entity that receives the referral.* |
| ▪ There is a written lease for a minimum term of one year.<br>▪ The lease is fully signed by both parties before the lease begins.<br>▪ Rent is set in advance, and is consistent with fair market value—OIG says not more than pass-thru rent for sub-lease.<br>▪ The lease is commercially reasonable without taking into account the volume or value of the referrals between the parties.<br>▪ Lab has exclusive use of dedicated space.<br>▪ Shared space has been carefully and accurately measured and documented in accordance with OIG 2000 Guidelines/formula.<br>▪ Renewal terms are carefully followed. | *(b)(2) A "financial interest" includes … any type of … lease….*<br><br>**Cal. Bus. & Prof. Code § 650.02(b)(2):**<br><br>*The prohibition of Section 650.01 shall not apply to or restrict …*<br><br>*(b) A licensee, when the licensee or his or her immediate family has one or more of the following arrangements with another licensee, a person, or an entity, is not prohibited from referring a patient to the licensee, person, or entity because of the arrangement: (2) A lease of space or equipment between a licensee and the recipient of the referral, if the lease is written, has commercially reasonable terms, has a fixed periodic rent payment, has a term of one year or more, and the lease payments are not affected by either party's referral of any person or the volume of services provided by either party.* |
| **[See, OIG Special Fraud Alert, Rental of Office Space in Physician Offices by Persons or Entities to which Physicians Refer (Feb. 2000)]** | |

*This guide is published by the California Clinical Laboratory Association (CCLA) for the purpose of providing its membership with a resource when navigating various issues in the laboratory industry.  This guide is not intended to provide an interpretation of the legal principles cited, does not constitute a legal opinion, and does not represent a statement of standardized or uniform practices of CCLA's membership.

A.564

MD0167574

| 5. Laboratory Pricing Practices | |
| --- | --- |
| **Federal Law** | **California Law** |
| **Medicare Usual Charge Rule.** A provider may be excluded if its charges to Medicare or Medicaid are "substantially in excess of its usual charges."**[See, 42 U.S.C. §1320a-7(b)(6)(A)]** However, OIG stated in 2000 that "we do not believe that the [the rule] is implicated unless a provider's charge to Medicare is substantially in excess of its median non-Medicare / Medicaid charge. In other words, a provider need not even worry about [the rule], unless it is discounting close to half of its non-Medicare / Medicaid business." **[Letter from Kevin G. McAnaney, Chief, Industry Guidance Branch, HHS Office of Inspector General, dated April 26, 2000].** | **Cal. Bus. & Prof. Code § 655.5** prohibits physicians (and other licensed healing arts), hospitals and clinical laboratories from marking up of the price charged for a clinical laboratory test, and requires any such person or entity, when billing for a lab test that they have not actually rendered, to disclose "the name, address, and charges of the clinical laboratory performing the service." |
| **Federal AKS:** In Advisory Opinion 99-13, OIG concluded that discounted pathology services might constitute prohibited remuneration under the anti-kickback statute because the discounts were offered with the possible improper motive of exchanging lower priced laboratory services (which the physicians would re-bill to patients) in exchange for referred high priced laboratory services which the laboratory billed to payors. | **Cal. Bus. & Prof. Code § 655.7 (direct billing for anatomic pathology)** |
| OIG set forth a test for evaluating discounts: | **Medi-Cal "Lowest Charge Rule":** Title 22, California Code of Regulations, Section 51501(a), states: |
| In evaluating whether an improper nexus exists between a discount and referrals of Federal business in a particular arrangement, neither the size nor structure of the discount is determinative of an anti-kickback violation. Rather, the appropriate question to ask is whether the discount -- regardless of its size or structure -- is tied or linked directly or indirectly to referrals of other Federal health care program business. Evidence that the discount is not commercially reasonable in the absence of other, non-discounted business is highly probative. In this regard, discounts on account billing business that are particularly suspect include, but are not limited to: | "Notwithstanding any other provisions of these regulations, no provider shall charge for any service or any article more than would have been charged for the same service or article to other purchasers of comparable services or articles under comparable circumstances." |
| discounted prices that are below the laboratory's cost, and discounted prices that are lower than the prices that the laboratory offers to a buyer that: (i) generates a volume of business for the supplier that is the same or greater than the volume of account billing business generated by the physician, but (ii) does not have any potentially available Federal health care program business. | The Medi-Cal "lowest charge rule" has been the subject of legal action, including most recently, *State of California ex rel. Hunter Laboratories v. Quest Diagnostic Laboratories*, prosecuted by State of California under the California false claims act, and settled in 2011. In the wake of the settlements, the California Legislature in 2012 adopted legislation (AB 1494) to cut Medi-Cal reimbursement rates by 10%; and to direct the Department of Health Care Services (DHCS) to develop a new methodology for setting Medi-Cal rates for lab testing, to be based on the lowest amounts other payers are paying for similar lab services. AB 1494 provides that once the new rate methodology is put in place, labs will be exempt from the "lowest charge rule." AB 1494 also effected a temporary exemption while DHCS implements the new rate methodology—that temporary exemption is scheduled to expire on July 1, 2015, unless the methodology is implemented prior to that date, or unless the date is extended by the legislature (as it has been thus far, with DHCS support). |
| This is an illustrative, not exhaustive, list of suspect discounts; other arrangements may be equally suspect. Each of the above pricing arrangements independently gives rise to an inference that the laboratory and the physicians may be "swapping" discounts on account billing business in exchange for profitable non-discounted Federal health care program business. | |
| Following up on this Advisory Opinion, OIG clarified: | |
| An anti-kickback statute violation is not determined by the size of the discount; rather, a violation arises if the discount - whatever its size - is implicitly or explicitly tied to referrals of Federal business. Advisory Opinion 99-13 specifically addressed the issue of a laboratory giving deep discounts to physicians for business that the physicians pay for out of their own pockets, in return for the referral of more lucrative Medicare Part B business for which the laboratories receive direct reimbursement from Medicare. Our concern was that the proposed conduct potentially involved purposeful discounting of private pay business to induce the referral of Federal health care program business - prohibited conduct under the Federal anti-kickback statute. ..... | |
| In order to establish a violation, there must be evidence to support a linkage between the discounts and the referral of non-discounted Federal health care program business. In order to determine if a discount is linked to the referral of other Federal program business, such as Medicare, we would first look to see if there is any Medicare business referred by the facility to the laboratory, and if so, if it is substantial enough in relation to the discounted business to infer a connection between the two. | |
| Where there is evidence of a connection between the two, the size of a discount may provide further indicia of intent. | |

*This guide is published by the California Clinical Laboratory Association (CCLA) for the purpose of providing its membership with a resource when navigating various issues in the laboratory industry. This guide is not intended to provide an interpretation of the legal principles cited, does not constitute a legal opinion, and does not represent a statement of standardized or uniform practices of CCLA's membership.

A.565

MD0167575

# EXHIBIT J

| From: | Denis Grizelj [denis@mdlabs.com] |
|---|---|
| **Sent:** | 3/1/2017 9:44:47 PM |
| **To:** | Matthew Rutledge [matthew@mdlabs.com] |
| **Subject:** | Re: Follow-up to Call - California Workers Comp Question |

When we discussed the Work Comp opportunity that was proposed to us, we agreed to ask our legal team about it.

I don't feel good about our current comp plan and would rather pay money now to get it right than face consequences later. We are non-compliant on the state level in CA and I haven't asked about other states because of costs.  I am not willing to overlook this and feel this deserves serious consideration.

I'm more than happy to turn this over to you since I am far from a legal expert but I have concerns over all this based on what I have learned over the last couple months and the fact that there doesn't seem to be a lab out there that I know of paying reps as 1099s.


Denis Grizelj
MD Labs



From: Matthew Rutledge
Sent: Wednesday, March 1, 5:50 PM
Subject: Re: Follow-up to Call - California Workers Comp Question
To: Denis Grizelj


Dude, we are asking her to do a lot of expensive work...

**Matthew Rutledge**

775-391-LAB1 (5221)

415-834-8721 CA Cell



On Wed, Mar 1, 2017 at 4:32 PM, Denis Grizelj <denis@mdlabs.com> wrote:

Adding Matt to the thread as well.



Anne,

A.567

MD0148357

Looking at the 4th AKS bullet.  Is there a black and white definition for bona fide employment relationships?  Also, do you have a copy of the CA law in regards to this topic as well?

In regards to the Work Comp opportunity, I think we will likely pass based on the information you found.

Thanks for the summary,

**Denis Grizelj**



**From:** Redman, Anne M. (Perkins Coie) [mailto:ARedman@perkinscoie.com]
**Sent:** Wednesday, March 01, 2017 4:02 PM
**To:** Denis Grizelj <denis@mdlabs.com>
**Cc:** Schneiderman, Jason (Perkins Coie) <JSchneiderman@perkinscoie.com>; Hanna, Cindy (Perkins Coie) <CHanna@perkinscoie.com>
**Subject:** FW: Follow-up to Call - California Workers Comp Question

Attorney – Client Privileged - Confidential

Denis

Seems like there are two outstanding requests from our recent conversation.

**AKS**. You asked for some additional information on the anti-kickback statute. I hope the following are helpful and not confusing.

Federal Anti-Kickback:  The federal anti-kickback statute prohibits offering payment, soliciting or receiving anything of value to induce or reward referrals or general federal health care program business (medicare,

A.568

MD0148358

medicaid, TriCare, etc.)The statute is a criminal statute, and intent must be proven.Possible penalties can be harsh. See the <u>Training Sheet</u> from the federal department of HHS on penalties:

o   The AKS has a statutory and rule exception for "bona fide" employment relationships.

See also the <u>Lab Compliance summary</u> . It's old but still helpful.

Regarding the Stark Law mentioned in the two links, this could apply where there is a financial relationship between MD Labs and a physician referring federal medicare lab business.  The Stark Law is a civil statute with stiff financial penalties and does not require intent. Generally this law should not apply to your sales arrangements so long as MDLabs does not have any written or other arrangements with physicians referring for lab services or, if it does, that the MDLabs – Physician arrangement/contract fits within a statutory exception. Any lab-physician agreement should be reviewed by counsel to make sure it fits within a Stark Law exception.

I've attached the information we provided on the California AKS law we've discussed previously

**Workers' Comp Opportunity.** You also asked about a possible contract with an MSO organization in California that would like to arrange for the purchase and "direct client" billing of lab tests for Workman's Comp patients.

Unfortunately, there is a <u>California law</u> (California Business and Professions code Section 655.5) that requires disclosure of the name, address and charges of the lab performing the test where the licensed professional billing for the test has not performed the test (or supervised it). This law also prohibits a mark-up of the test, see subsection (c) of the law.

It's not clear what the billing arrangement being proposed would be. We assume that there would be a mark-up, and that the referring physician/medical practice would be billing for the test. It's also not clear whether the required disclosure would be made.

The risk of violating the California law would fall on the billing physician and not directly on the lab. Nonetheless, this does not add up to risk free for MDLabs – unless there will be compliance with the statute. Probably worth asking?

A.569

MD0148359

Please let me know if there are questions or you'd like to talk.


Anne


**Anne Redman | Perkins Coie LLP**

**PARTNER**

1201 Third Avenue Suite 4900

Seattle, WA 98101-3099

D. +1.206.359.6750

F. +1.206.359.7750

E. ARedman@perkinscoie.com


NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

A.570

MD0148360

# EXHIBIT K

A.571

| | |
|---|---|
| **From**: | Denis Grizelj [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=66FB5C815A854E229BF0180C81FF3952-DENIS] |
| **Sent**: | 2/17/2017 12:49:06 PM |
| **To**: | Redman, Anne M. (Perkins Coie) [ARedman@perkinscoie.com] |
| **Subject**: | RE: Contracted Sales Rep Agreement. |

Will do.  I also have a quick question for you in regards to a third party billing scenario that has been proposed to us.  That should only take a couple of minutes, I think our risk is non-existent but wanted to make sure since we will be speaking in a bit.

Thanks,

Denis Grizelj



---

**From:** Redman, Anne M. (Perkins Coie) [mailto:ARedman@perkinscoie.com]
**Sent:** Friday, February 17, 2017 9:39 AM
**To:** Denis Grizelj <denis@mdlabs.com>
**Subject:** RE: Contracted Sales Rep Agreement.

Great. You can call me at the number below.  Thanks.

**Anne Redman | Perkins Coie LLP**
PARTNER
1201 Third Avenue Suite 4900
Seattle, WA 98101-3099
D. +1.206.359.6750
F. +1.206.359.7750
E. ARedman@perkinscoie.com

---

**From:** Denis Grizelj [mailto:denis@mdlabs.com]
**Sent:** Friday, February 17, 2017 9:15 AM
**To:** Redman, Anne M. (SEA)
**Subject:** RE: Contracted Sales Rep Agreement.

That'll work.

Thank you,

Denis Grizelj



---

**From:** Redman, Anne M. (Perkins Coie) [mailto:ARedman@perkinscoie.com]
**Sent:** Friday, February 17, 2017 9:05 AM
**To:** Denis Grizelj <denis@mdlabs.com>
**Subject:** RE: Contracted Sales Rep Agreement.

Hi Denis, does 11:00 Pacific time work for you?

**Anne Redman | Perkins Coie LLP**
PARTNER

A.572

MD0147845

1201 Third Avenue Suite 4900
Seattle, WA 98101-3099
D. +1.206.359.6750
F. +1.206.359.7750
E. ARedman@perkinscoie.com

**From:** Denis Grizelj [mailto:denis@mdlabs.com]
**Sent:** Thursday, February 16, 2017 5:23 PM
**To:** Redman, Anne M. (SEA)
**Cc:** Schneiderman, Jason (PAO); Hanna, Cindy (SEA)
**Subject:** RE: Contracted Sales Rep Agreement.

Sorry for the confusion, I re-read the highlighted comment in point #1 and realized that I thought you said doesn't instead of does.  I have some time in the morning tomorrow available.  When are you free?

Thanks,

Denis Grizelj



**From:** Redman, Anne M. (Perkins Coie) [mailto:ARedman@perkinscoie.com]
**Sent:** Thursday, February 16, 2017 4:48 PM
**To:** Denis Grizelj <denis@mdlabs.com>
**Cc:** Schneiderman, Jason (Perkins Coie) <JSchneiderman@perkinscoie.com>; Hanna, Cindy (Perkins Coie) <CHanna@perkinscoie.com>
**Subject:** RE: Contracted Sales Rep Agreement.

Denis.

Is there a good time for a call. I am not sure I follow your comment. I am available tomorrow, times Monday morning and later next week. Anne

**Anne Redman | Perkins Coie LLP**
PARTNER
1201 Third Avenue Suite 4900
Seattle, WA 98101-3099
D. +1.206.359.6750
F. +1.206.359.7750
E. ARedman@perkinscoie.com

**From:** Denis Grizelj [mailto:denis@mdlabs.com]
**Sent:** Saturday, February 11, 2017 8:21 AM
**To:** Redman, Anne M. (SEA)
**Cc:** Schneiderman, Jason (PAO); Hanna, Cindy (SEA)
**Subject:** RE: Contracted Sales Rep Agreement.

Anne,

Based on the highlighted comment below, our current model where we pay a percentage based commission for all business should be fine then, correct?

Thanks for the thorough response.  It may be best to talk it through sometime next week and we can put it on the meter.

Denis Grizelj

A.573

MD0147846



**From:** Redman, Anne M. (Perkins Coie) [mailto:ARedman@perkinscoie.com]
**Sent:** Friday, February 10, 2017 5:05 PM
**To:** Denis Grizelj <denis@mdlabs.com>
**Cc:** Schneiderman, Jason (Perkins Coie) <JSchneiderman@perkinscoie.com>; Hanna, Cindy (Perkins Coie) <CHanna@perkinscoie.com>
**Subject:** RE: Contracted Sales Rep Agreement.

Hi Denis,

To respond to your questions:

1.      On the issue of paying sales commissions to independent contractors, does it affect the anti-kickback risk associated with percentage compensation if the contractor with MDLabs is an individual rep or a firm (entity) that employs or contracts with individual reps.

Probably not. I don't see mention of this distinction in the OIG opinions and cases. The OIG does count direct contact between the rep and the ordering physician or beneficiary as negative factors. I don't see this concern is reduced by contracting with a company rather than directly with the rep.

The regulators' rationale for distinguishing between employed sales reps and independent contractors is that the supplier of the test can have control and responsibility for its employed reps, whereas the supplier probably has very little control over a contracted rep.

There may be other reasons to prefer contracting with a company rather than an individual rep.

2.      How about a "flat commission" rather than a percentage for the government program business?
3.      How about no commission on government program business? Or just a monthly retainer?

I am not sure a "flat commission" is better than a percentage if it is based on the number of tests. E.g. $X per test.

Also, carving out government program business for "employment" may not be a good strategy. The bona fide employment exception under the federal law requires the relationship to be "bona fide" with control by the employer. It seems unlikely the sales reps would be employees for some payors and not for others and that there would in fact be a different degree of control. If the sales rep misbehaves, the distinction might be a speed bump, but not a barrier to legal liability.

See below regarding not paying commissions on government program business referred by a rep.

The regulatory concern here is that MDLabs not indirectly provide remuneration/ freebies/ benefits to the referring physician (or other source of business) on the account to induce referrals of tests paid for by government health programs. MDLabs choices:

*       Not accepting government program business - obviously, bad for business.
*       Not paying commissions on government program business. This implies that the rep is getting a commission indirectly on the commercial business. The regulators are distrustful of these carve out arrangements.
*       Paying a monthly retainer/flat fee for each account seems less likely to induce referrals of this business but is this practical for you.
*       Employing sales reps.

Please advise if you'd like to talk about this. I realize you want to be economical with legal fees, but I'll save some time for call off the meter.

Best regards, Anne


**Anne Redman | Perkins Coie LLP**
PARTNER
1201 Third Avenue Suite 4900

A.574

MD0147847

Seattle, WA 98101-3099
D. +1.206.359.6750
F. +1.206.359.7750
E. ARedman@perkinscoie.com

---

**From:** Denis Grizelj [mailto:denis@mdlabs.com]
**Sent:** Thursday, February 09, 2017 2:58 PM
**To:** Redman, Anne M. (SEA)
**Subject:** RE: Contracted Sales Rep Agreement.

Anne,

A third question that I thought of in the meantime is if for whatever reason we had to pay them as employees for federal business, what if we just put in our contracts that we are only going to pay them as independent contractors and not pay for federal business?  In this case, would it be OK to give them a monthly retainer if needed?

Thanks,

Denis Grizelj



---

**From:** Redman, Anne M. (Perkins Coie) [mailto:ARedman@perkinscoie.com]
**Sent:** Tuesday, February 07, 2017 9:28 PM
**To:** Denis Grizelj <denis@mdlabs.com>
**Subject:** Re: Contracted Sales Rep Agreement.

Denis I'll get back to you tomorrow - good question. Anne

Sent from my iPhone

On Feb 7, 2017, at 3:18 PM, Denis Grizelj <denis@mdlabs.com> wrote:

Hi Anne,

I wanted to circle in regards to the highlighted bullet below.  I don't want to spend too much time on this initially but was wondering if it made a difference if it were individual reps or if the same held true for business entities?  We only contracted with distributor companies that have a sales team below them so I am wondering if this would pertain to us from what you have reviewed.
If they are lumped together then would it be ok to pay a flat rate commission for those specimens instead of a percentage?  While a multi-tiered compensation plan would not be ideal, I would much rather keep our sales force on as independent contractors since we can't enforce what they do (or sell besides our services) on a regular basis.

Thanks,

Denis Grizelj

<image001.png>

---

**From:** Redman, Anne M. (Perkins Coie) [mailto:ARedman@perkinscoie.com]
**Sent:** Tuesday, December 06, 2016 5:10 PM
**To:** Denis Grizelj (denis@mdlabs.com) <denis@mdlabs.com>
**Cc:** Schneiderman, Jason (Perkins Coie) <JSchneiderman@perkinscoie.com>; Ripke, Jill (Perkins Coie)

A.575

MD0147848

<Jripke@perkinscoie.com>; Hanna, Cindy (Perkins Coie) <CHanna@perkinscoie.com>
**Subject:** Contracted Sales Rep Agreement.

Confidential – Attorney Client Privileged

Denis,

Following up on our call last week, we have further revised the sales representative agreement. A marked and clean copy are attached.  Changes made include:

- Additional description of specimen collection services and charges on an Addendum A. We can be more specific once you decide how to pay for these services, or leave it to be determined.
- Compensation for services moved to Addendum B.
- Provision for execution of a Business Associate Agreement at the same time as this agreement.
- Law and venue are blank – see comment below.

We also have done some additional review regarding specimen collection and regarding the federal and state anti-kickback laws as they apply to the contracted sales rep arrangements. We have tried to be efficient in our legal research and reviews to minimize your costs and not repeat work you may have done previously on these issues.

Please consider the following issues in reviewing this agreement and let's discuss the best approach:

- There are federal and state anti-kickback statute issues associated with compensation of independent contractor marketing representatives on a commission (volume of business generated) basis. We looked at California law.  Percentage based compensation has been found to violate the California anti-kickback statute as it applies to MediCal business.  At a federal level, the Office of the Inspector General has expressed concern about percentage based compensation for independent marketing agents, and particularly where there is direct contact between the marketing rep and the referring physicians; this federal law impacts medicaid and medicare business.  These statutes (federal and state) generally contain an exception for sales reps that are employed by the seller of the service.

- As you mentioned to us, some states prohibit the placement of specimen collectors in physician offices. We did check California law, and it does restrict the placement of "phlebotomists" in physician offices – which we believe would also apply to urine specimen collectors.

Let's have a call after you have reviewed the revised agreement.  We look forward to talking with you.  Anne

**Anne Redman | Perkins Coie LLP**
PARTNER
1201 Third Avenue Suite 4900
Seattle, WA 98101-3099
D. +1 206.359.6750
F. +1.206.359.7750
E. ARedman@perkinscoie.com

NOTICE. This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

A.576

MD0147849

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

A.577

MD0147850

# EXHIBIT L

A.578

| From: | Howard Claussen [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=85B530516E874C8FAD7845A97ED9EDD0-HOWARD] |
| --- | --- |
| Sent: | 4/18/2019 1:04:15 PM |
| To: | Denis Grizelj [denis@mdlabs.com]; Matthew Rutledge [matthew@mdlabs.com] |
| Subject: | Fwd: 2019 EKRA Presentation (O0362474xD07F1) (1).PPTX (1).pdf |
| Attachments: | 2019 EKRA Presentation (O0362474xD07F1) (1).PPTX (1).pdf |

Get Outlook for iOS

**From:** Doctors Connection Support <support@drsconnection.com>
**Sent:** Thursday, April 18, 2019 5:24:34 AM
**To:** Howard Claussen
**Subject:** 2019 EKRA Presentation (O0362474xD07F1) (1).PPTX (1).pdf

Howard,
I'm sure you have already seen the rules on this but the attached presentation mentions imprisonment for the rep and lab and sounds kind of scary.

Kim Kugler
President & CEO
info@drsconnection.com
Cell: 210.392.7155
Fax: 800.655.5079
www.drsconnection.com

**Doctors + Connection**

Clinical Solutions for the Medical Field

Kim Kugler
Support Team support@drsconnection.com
Office: 512.840.8906
Fax: 800.655.5079
www.drsconnection.com

**Doctors + Connection**

Clinical Solutions for the Medical Field

A.579

MD0188759



LIGHTHOUSE LAB SERVICES PRESENTS

# EKRA WEBINAR

Is your lab prepared for the new Anti-Kickback Law?

A.580

MD0188760



RECRUITING   CONSULTING   BUYER/SELLER

services for clinical laboratories + professionals

www.lighthouselabservices.com

A.581

MD0188761



Eliminating KICKBACKS In Recovery – *What You Need To Know*

Danielle E. Holley, JD, MS

O'CONNELL ARONOWITZ
ATTORNEYS AT LAW

A.582

MD0188762

# INTRODUCTION to the Eliminating Kickbacks in Recovery Act ("EKRA")



MD0188763

# INTRODUCTION to the Eliminating Kickbacks in Recovery Act



A.584

MD0188764

# DEFINITIONS

✓ "clinical treatment facility means a medical setting , other than a hospital, that provides detoxification, risk reduction, outpatient treatment and care, residential treatment, or rehabilitation for substance use, pursuant to licensure or certification under State law"  18 USC 220(e)(2)


✓ "laboratory has the meaning given the term in section 353 of the Public Health Service Act (42 U.S.C. 263a)" 18 USC 220(e)(4)


✓ "recovery home" means a shared living environment that is, or purports to be, free from alcohol and illicit drug use and centered on peer support and connection to services that promote sustained recovery from substance use disorders."  18 USC 220(e)(5)



O'CONNELL   ARONOWITZ
ATTORNEYS AT LAW

A.585

MD0188765



**Whoever…knowing and willfully** solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind, in return for referring a *patient or patronage to a recovery home, clinical treatment facility, or laboratory*; or

**Whoever knowingly and willfully** solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind--
(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program…

O'CONNELL ARONOWITZ
ATTORNEYS AT LAW

A.586

MD0188766

# EKRA VS AKS

| **Whoever...knowing and willfully** | **Whoever knowingly and willfully** |
|---|---|
| (2) pays or offers any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind— <br> (A) to induce *a referral of an individual to a recovery home, clinical treatment facility, or laboratory; or* <br> (B) *in exchange for an individual using the services of that recovery home, clinical treatment facility, or laboratory,* | offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person— <br> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or <br> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, |



O'CONNELL ARONOWITZ
ATTORNEYS AT LAW

A.587

MD0188767

# EXCEPTIONS

## EKRA

## VS

## AKS

discount or other reduction in price obtained by a provider of services or other entity under a health care benefit program if the reduction in price is properly disclosed and appropriately reflected in the costs claimed or charges made by the provider or entity;

a discount or other reduction in price obtained by a provider of services or other entity under a Federal health care program if the reduction in price is properly disclosed and appropriately reflected in the costs claimed or charges made by the provider or entity under a Federal health care program;



O'CONNELL ARONOWITZ
ATTORNEYS AT LAW

A.588

MD0188768

# EXCEPTIONS

## EKRA

**VS**

payment made by a principal to an agent as compensation for the services of the agent under a personal services and management contract that meets the requirements of [AKS Safe Harbors], as in effect on the date of enactment of this section;

## AKS

Personal Service Safe Harbor 42 CFR 1001.952(d)
- In writing and signed
- Covers all the services and specifies the services
- If part-time or sporadic, the agreement sets out the exact schedule
- Term of at least one year
- Compensation set in advance, consistent with FMV, and does not take into account volume or value of any referrals or business generated
- Does not violate state or federal law
- Aggregate services are reasonably necessary



O'CONNELL · ARONOWITZ

ATTORNEYS AT LAW

A.589

MD0188769

# EXCEPTIONS

## EKRA   VS   AKS

### EKRA

a waiver or discount ([as defined under the AKS Safe Harbors], or any successor regulation) of any coinsurance or copayment by a health care benefit program if--

(A) the waiver or discount is not routinely provided; and

(B) the waiver or discount is provided in good faith;

### AKS

Discounts Safe Harbor 42 CFR 1001.952(h)(5)



O'CONNELL ARONOWITZ
ATTORNEYS AT LAW

A.590

MD0188770

# EXCEPTIONS

## EKRA

VS

## AKS

a remuneration described in section 1128B(b)(3)(I) of the Social Security Act (42 U.S.C. 1320a-7b(b)(3)(I)) [i.e. AKS]

any remuneration between a health center entity described under clause (i) or (ii) of section 1396d(I)(2)(B) of this title and any individual or entity providing goods, items, services, donations, loans, or a combination thereof, to such health center entity pursuant to a contract, lease, grant, loan, or other agreement, if such agreement contributes to the ability of the health center entity to maintain or increase the availability, or enhance the quality, of services provided to a medically underserved population served by the health center entity;



O'CONNELL ARONOWITZ
ATTORNEYS AT LAW

A.591

MD0188771

# EXCEPTIONS

## EKRA    VS    AKS

a remuneration made pursuant to an alternative payment model (as defined in section 1833(z)(3)(C) of the Social Security Act) or pursuant to a payment arrangement used by a State, health insurance issuer, or group health plan if the Secretary of Health and Human Services has determined that such arrangement is necessary for care coordination or value-based care; or



O'CONNELL ARONOWITZ
ATTORNEYS AT LAW

A.592

MD0188772

# EXCEPTIONS

**EKRA**    VS    **AKS**

Others not mirrored in EKRA



O'CONNELL ARONOWITZ
ATTORNEYS AT LAW

A.593

MD0188773

# EXCEPTIONS

## EKRA  VS  AKS

**EKRA**

a payment made by an employer to *an employee or independent contractor* (who has a bona fide employment or contractual relationship with such employer) for employment, if the employee's payment is not determined by or does not vary by:
(A) the number of individuals referred to a particular recovery home, clinical treatment facility, or laboratory;
(B) the number of tests or procedures performed; or
(C) the amount billed to or received from, in part or in whole, the health care benefit program from the individuals referred to a particular recovery home, clinical treatment facility, or laboratory;

**AKS**

(B) *any amount paid by an employer to an employee* (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services;

i.e. in Safe Harbor:
(i) Employees. …"remuneration" does not include any amount paid by an employer to an employee, who has a bona fide employment relationship with the employer…



O'CONNELL ARONOWITZ
ATTORNEYS AT LAW

A.594

MD0188774

# EKRA        VS        AKS

## Whoever... "knowing and willfully"

*[silent]*

## Whoever "knowingly and willfully"

**(h) Actual knowledge or specific intent not required**

> With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section.



O'CONNELL ARONOWITZ
ATTORNEYS AT LAW

A.595

MD0188775

# Penalties

| EKRA | AKS |
|------|-----|



✓ Fined not more than $200,000, imprisoned not more than 10 years, or both, for each occurrence

✓ Guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 year, or both.



O'CONNELL ARONOWITZ
ATTORNEYS AT LAW

A.596

MD0188776

# Preemption?



(d) **Preemption.--**
**Federal law.--**This section shall not apply to conduct that is prohibited under [the Anti-Kickback Statute]

i.e. there is a conflict between the statutes



O'CONNELL ARONOWITZ
ATTORNEYS AT LAW

A.597

MD0188777

# Marketing & Sales Arrangements

**What does this mean in a nutshell?**

✓ To not be violative of EKRA, can no longer pay percentage commissions even to a W-2 employee

✓ This applies not only to federal healthcare payors but to COMMERCIAL payors too

✓ There will likely be more scrutiny over arrangements

✓ Compensation can no longer vary by:

**(A)** the number of individuals referred to a particular recovery home, clinical treatment facility, or laboratory;
**(B)** the number of tests or procedures performed; or
**(C)** the amount billed to or received from, in part or in whole, the health care benefit program from the individuals referred to a particular recovery home, clinical treatment facility, or laboratory

✓ Can pay flat fee for W-2 employees and add in performance bonuses if performance metrics do not vary on the above



O'CONNELL ARONOWITZ
ATTORNEYS AT LAW



A.598

MD0188778



Questions?

Danielle E. Holley, JD, MS

Partner

O'Connell & Aronowitz, P.C.

dholley@oalaw.com

518-462-5601



A.599

MD0188779



## JOIN AS A MEMBER:

### Open to both clinical laboratories and vendors.

### WWW.NILA-USA.ORG

As a trade association for community, regional, and health system clinical laboratories. NILA serves as a platform for laboratory owners and senior executives to share business expertise, focus on legislative and regulatory issues, work together to address industry concerns, and to improve the operations of NILA's member laboratories.

A.600

MD0188780

# EXHIBIT M

A.601

Message
_____

| | |
|---|---|
| **From:** | Chuck Dushman [chuck@rxight.com] |
| **Sent:** | 9/20/2019 1:57:00 PM |
| **To:** | Maureen Mathis [mmathis@mcso-llc.com] |
| **Subject:** | Re: Real-time PCRq UTI testing Follow-up |

Hi Maureen … I hope your week was a good one.

When can we get a lunch on the calendar?

Thank you for your help!

Chuck


**Chuck Dushman**
*Vice President*
*Marketing and Business Development*
**MD Labs / Rxight**
Chuck@Rxight.com
Cell:    773-919-4138
Fax:    847-374-1355
MDLabs.com
Rxight.com




On Sep 18, 2019, at 10:46 AM, Maureen Mathis <mmathis@mcso-llc.com> wrote:

Thank U chuck for the info have a good day

Sent from my iPhone

On Sep 18, 2019, at 8:03 AM, Chuck Dushman <chuck@rxight.com> wrote:

Hi Maureen,

Here are the highlights for Dr. Randazzo … it is all about better patient care AND easier for staff:

1.      **Urine Cultures** date back to 1890's with well documented **30% false negative rate on pathogen detection, even for E. coli**

2.      **MCSO Physicians** choose MD Labs **Realtime PCRq** Testing with <u>Concurrent</u> Culturing because:

1.              we accept **ALL** insurance

2.              we do **NOT** balance bill … the most your patients will pay is $50 (about the same as a specialist copay in many cases)

A.602

MDLabs_0001714

3.	Preliminary report in **24 hours** from receipt of specimen at lab

1.	if non-common pathogen detected, reflex to panel of 360+ gram positive/negative organisms

2.	Final report with Susceptibility results generally **24 hours** after Preliminary report

- **Gold Standard Susceptibility testing** using culture

4.	**NOW** also provide **STI** testing using RT PCRq (for your staff's convenience we will also handle your UA testing needs)

5.	**NO STAFF PAPERWORK** (simply place pre-printed stickers on tube and on lab order printed from Athena)

6.	**ATHENA INTEGRATION**

7.	**I take great care of the staff**

I would refer you to Dr. Vaselopulos, or if you want someone closer to Schaumburg, Dr. Sadah, for independent confirmation of our strong service levels and dedication to your office.

I look forward to serving you.

<PCRq for UTI - MCSO and MD Labs v9-18-19.pdf>

<MD Labs Sample UTI Report 8.1.19.pdf>

All the best,

Chuck

**Chuck Dushman**
*Vice President*
*Marketing and Business Development*
**MD Labs / Rxight**
Chuck@Rxight.com
Cell:	773-919-4138
Fax:	847-374-1355
MDLabs.com
Rxight.com

<PastedGraphic-1.png>

<PastedGraphic-2.png>

Begin forwarded message:

**From:** Chuck Dushman <chuck@rxight.com>

A.603

CONFIDENTIAL

**Subject: For Maureen: Real-time PCR UTI testing Follow-up**
**Date:** August 8, 2018 at 12:31:51 PM CDT
**To:** office@woodfieldurology.com

Hello Maureen,

We now provide preliminary results within 24 hours and automatic reflex to a 200 pathogen panel if presence of gram positive/negative pathogens are found.

This advanced testing will eliminate the false negatives and help you provide better patient care.

Other MCSO offices are already using our real-time PCR test.

Is this something that we can get started with for your patients?

<Prelim Report - Findings.pdf>


Thank you!

All the best,

Chuck


Chuck Dushman
MD Labs
Vice President
Marketing and Business Development
LinkedIn | 773-919-4138


<PastedGraphic-22.tiff>


Rxight.com

Watch the Rxight Video Now


On Aug 2, 2018, at 1:00 PM, Chuck Dushman <chuck@rxight.com> wrote:

Hello Dr. Randazzo,

How does Wednesday August 8th work for me to conduct an in-service for your team for the real-time PCR program?

All the best,

A.604

CONFIDENTIAL

MDLabs_0001716

Chuck

Chuck Dushman
MD Labs
Vice President
Marketing and Business Development
LinkedIn | 773-919-4138

<PastedGraphic-22.tiff>

Rxight.com

Watch the Rxight Video Now

On Jul 3, 2018, at 10:08 AM, Chuck Dushman <chuck@rxight.com> wrote:

Hello Dr. Randazzo,

It was great meeting you a couple weeks ago.  Did you have a chance to speak with Dr. Vaselopulos?

When would you like me to come in to on-board the team to get started with our real-time PCR testing for UTIs?

All the best,

Chuck

Chuck Dushman
MD Labs
Vice President
Marketing and Business Development
LinkedIn | 773-919-4138

<PastedGraphic-22.tiff>

Rxight.com

Watch the Rxight Video Now

On May 24, 2018, at 2:43 PM, Chuck Dushman <chuck@rxight.com> wrote:

Hello Maureen,

A.605

CONFIDENTIAL

MDLabs_0001717

Thank you for seeing me today; patients always come first, so I really appreciate the bit of time we had.

Here are the cliff notes to share with Dr. Randazzo about our real-time PCR Molecular Diagnostic test coupled with Advanced Susceptibility testing for <u>patients presenting with UTI symptoms</u> and for <u>pre-op patients for whom you need to ensure have no infection</u>.

- Your patients expect the most up-to-date testing technology
- Urine Culture test dates back to the 1890's and has a well-documented 20-30% error rate (clinicals in packet)

Real-time PCR coupled with Advanced Susceptibility Testing is:

- **more thorough** (17 pathogens vs the 5-7 usually looked at with Urine Culture)
- **more accurate** (100% specificity vs 20-30% error rate with Urine Culture)
- **better treatment plans** (pathogens subjected to menu of 35 antibiotics to identify any resistance and sensitivity levels)
- **quicker turnaround time** (next day after lab receives specimen vs 4-5 days with Urine Culture)
- **better patient outcomes** (clinical in packet)
- **same process for staff** (clean catch/mid-stream using vaccutainer)
- **saves staff, physicians, and patients time** (less patient complaints, calls, and return visits)
- **Covered by Insurance** (we NEVER balance bill and the largest invoice a patient will see from us is $50)
- **UPS lock box with overnight shipping** (so staff does not need to wait around)

I know your lunches are booked-up for a while … Urology practices across Chicagoland are adopting this new testing and I would love to get your practice onboard as soon as we can.

What is the best way to move forward? I am available early mornings and early evenings.

Thank you so much Maureen!

Enjoy the Memorial Day weekend.

All the best,

Chuck (the yellow m&m guy)


Chuck Dushman
MD Labs
Vice President
Marketing and Business Development
LinkedIn | 773-919-4138

<PastedGraphic-22.tiff>

A.606

CONFIDENTIAL

Rxight.com

Watch the Rxight Video Now

A.607

CONFIDENTIAL

MDLabs_0001719

# EXHIBIT N

A.608



# RES⊚LUTION™

## Real-time PCRq with Concurrent Culturing

- **NOW** with optional Preliminary Report available within 24 hours of lab receiving specimen
  - Pathogen Identification
  - Specific Colony Count
- **NOW** with reflex to panel of > 320 gram positive/negative organisms
- Final Report with susceptibility results generally 1 day after Preliminary Report
  - Automated Sensitivity testing of up to 35 antimicrobials
    - Identify **MIC-specific** antibiotic resistance to that pathogen(s)
    - Enable optimal treatment plan for each identified pathogen(s)
- **NOW Resolution In Action** integrates the Sanford Guide into our results report, just one click away from the industry standard source for antimicrobial stewardship
- **NOW** STI testing
- We accept all insurance
  - **No Balance Billing**
  - $50 Maximum Patient Cost
- **NOW no more forms** for staff to complete; simple account-specific pre-printed stickers
- **NOW Athena Integration**

### Local Urologists Using MD Labs/Resolution™

| | |
|---|---|
| ACTIVE | ALLEN M. CHERNOFF, MD |
| ACTIVE | FADI A. HABIB, MD |
| ACTIVE | JOHN LEYLAND, MD |
| ACTIVE | ALAN SADAH, MD |
| ACTIVE | NITIN SHARMA, MD |
| ACTIVE | GEORGE SOSENKO, MD |
| ACTIVE | PETER T. VASELOPULOS, MD |

CONFIDENTIAL

MDLabs_0001700

A.609



## MD Labs

MD Labs, a privately-held high complexity clinical laboratory, founded in 2011 in Reno, Nevada has the mission to create a more provider-friendly testing service that prides itself on delivering prompt, accurate, reliable and easy to understand results using state-of-the-art technology.

| Testing Services: | ➤ Prescription Monitoring Toxicology (2011) <br> ➤ Pharmacogenetics (2014) <br> ➤ Urinalysis with Microbiology (2018) <br> ➤ Molecular Diagnostic PCRq UTI (2018) <br> ➤ Molecular Diagnostic PCRq STI (2019) |
|---|---|
| Accreditation: | CLIA Certified High Complexity Laboratory. MD Labs utilizes triplicate quality assurance measures incorporating College of American Pathologists (CAP) Certification, Reference Proficiency Testing and Internal Proficiency Testing to ensure accuracy and reproducibility. |
| Laboratory Director and Credentials: | Manoj Tyagi, Ph.D. F AACC/ FACB, NRCC <br> Laboratory Director with 15 + years of experience in Quality management systems, clinical laboratory regulatory affairs and accreditation. |
| Chicago Contact: | Chuck Dushman, chuck@rxight.com, 773-919-4138 |

# RES☺LUTION™

### Real-time PCRq with Concurrent Culturing

MD Labs improves outcomes by **replacing Urine Culture testing for UTI detection and identification** with our real-time PCRq technology that evaluates 17 common pathogens with 100% specificity faster and <u>without</u> the 20-30% false negatives from urine culture.

**Culturing is still the Gold Standard for detecting non-common pathogens and for specificity testing.** Which is why, upon receipt, we also immediately culture the specimen which enables us to detect any other growing organisms which, if found, are reflexed to a panel of over 180 gram positive/negative organisms for positive identification.

The culture is also used to apply our automated Sensitivity testing from a menu of 35 antimicrobials, to identify antibiotic resistance <u>with MIC specificity</u> to the identified pathogen(s) for that patient.

CONFIDENTIAL

MDLabs_0001701

A.610

# EXHIBIT O

A.611



**RESOLUTION**

## Please Circle Requesting Provider Below

Andrea Leathers-Burmer, MD    Kimberly McArath  MD
Cecil Robertson, MD    Lindsey Buesober, ARNP    Scott Sentiner, MD
Craig Deligdish, MD    Maglay VillaFradez-Diaz, MD    Sheenasha Referente, ARNP
Elaine Kondroski, MD    Michele Gray, ARNP    Thomas Martinho, MD
Elaine McKee, MD-FAAP    Peter Taraschi, DO    Thomas Scheer, MD
Ellen Altenburg, MD    Reinaldo Tirado-Bernardini,    Yared Vazquez, MD
Jodi Larsen, ARNP    MD    ~~Olena Viasil, MD~~ (circled)
John Olinde, MD

*17206M*

**Omni Health Care-
Melbourne Medical Lab**
95 bulldog blvd  Ste 202
Melbourne, FL  32901
Account: 300530 (VBEP)

**REQUIRED - PLEASE COMPLETE ALL YELLOW HIGHLIGHTED SECTIONS**

10715 Double R Blvd Suite 102
Reno, Nevada 89521
Phone: (775) 391-5221
Fax: (775) 737-9133
CLIA#:29D2032647

### 1. Patient Information:

**Patient's Name:** ████████████

**Date of Birth:** ████████

**Collector's Name:**

**Collection Date:** 8/9/18

**Time:**

☐ Catheter patient

Sex:  M  F

### 2. Point-Of-Care(P.O.C.) - Please Circle Positives

☐ **ALL POSITIVE**(R82.90)    ☐ **ALL NEGATIVE**

(Leukocytes) ← circled
Nitrates
Protein
Blood

### 3. Urinary Tract Infection Testing on File (RT-PCR Confirmation & Antibiotic Resistance)

**Patient Complaining of (REQUIRED FOR UTI TESTING)**

☐ **Urinary Tract Infection Testing Panel on File** (RT-PCR Confirmation & Antibiotic Resistance)

☐ Painful Urination (R30.0)    ☐ Cloudy/Discolored Urine (R82.99)    ☐ Flank Pain/Low Abdominal (R10.30)    ☐ Frequent Urination (R35.0)

☐ Bloody Urine (R31.21)    ☐ Abnormal Urine Odor (R82.90)    ☐ Right Quadrant Pain (R10.31)    ☐ Left Quadrant Pain (R10.32)

☐ Fever (R50.9)    ☐ Chills (R68.83)    ☐ Altered Mental Status (R41.82)

### 4. Provider's Authorization (Optional):

*I hereby authorize MD Labs to perform the custom test panel indicated above*

**Provider's Authorization Signature:** _(signature)_    Date: 8/9/18

### 5. Patient's Authorization:

*Patient Consent to Testing and Use of Results/Financial and Insurance Authorization*

By signing, I certify that I have provided an unadulterated and fresh urine sample to be analyzed by MD Labs and that the information on this form is accurate. I authorize MD Labs to release the results of this testing to the treating physician or facility. I hereby authorize my insurance benefits to be paid directly to MD Labs for services I receive on this or any Date Of Service moving forward. If MD Labs is an out-of-network provider with my insurer, I agree to endorse the insurance payment check and forward to MD Labs within 30 days of receipt or my account may be subject to collections proceedings and reported to the Credit Bureau.

**\*Patient's Authorization Signature:** _(signature)_    Date: 8/9/18

## PLEASE SHIP UTI SAMPLES DAILY



17206M

A.612

### 6. Patient Demographics & Insurance:

**PLEASE SEND TOP COPY TO MD LABS WITH SAMPLE & ATTACH A COPY OF PATIENT FACE SHEET AND INSURANCE CARD**

HIGHLY CONFIDENTIAL – PHI

# EXHIBIT P

A.613

ARTHUR P. MOURTZINOS, M.D.                        April 25, 2024

VOLUME:  I

PAGES:  1 - 116

EXHIBITS:  1 - 4

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

C.A. No. 18-cv-12558-PBS

- - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA, et al., ex rel.

OMNI HEALTHCARE, INC.,

Plaintiffs

v.

MD SPINE SOLUTIONS LLC d/b/a MD LABS

INC., DENIS GRIZELJ, MATTHEW RUTLEDGE and

DOE HEALTHCARE PROVIDERS 1 - 100,

Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - x

ZOOM VIDEOCONFERENCE DEPOSITION OF ARTHUR P. MOURTZINOS, M.D., MBA, a witness called on behalf of the Defendants, pursuant to the Federal Rules of Civil Procedure, before Jessica L. Williamson, Registered Merit Reporter, Certified Realtime Reporter, and Notary Public in and for the Commonwealth of Massachusetts, on Thursday, April 25, 2024, commencing at 8:28 a.m.

_____

A.614

ARTHUR P. MOURTZINOS, M.D.                    April 25, 2024

Page 98

Q.  Well, I wasn't going to, but do you recall reviewing that study?

A.  I do not.

Q.  Okay.  And so you don't know if that study concluded that PCR-based identification of pathogens, the main advantage of PCR-based identification of pathogens was the time saved in identifying pathogens?

MR. KENNY:  Objection.

A.  You know, there's -- it may have concluded that, but the question is, does it change medical management?  You know, we could do -- I could do 17 tests on every patient that walks in the door, but is it going to change the way I manage them?  And the answer to that question is no, okay?

So I think that's what we have to keep in mind here, because, you know, if somebody comes in to me because they're worried about -- you know, because their friend got diagnosed with prostate cancer and is dying, and they're worried about prostate cancer, am I going to, you know, order an prostate biopsy and MRI and subject the patient to

A.615

ARTHUR P. MOURTZINOS, M.D.                           April 25, 2024

Page 99

harm because their friend -- you know, because they -- those are the things you've got to -- as a clinician, these are the decisions you have to make, and that's why we have standards of care, and that's why we order certain tests that we need, and we order only the tests that we need that are clinically relevant.

Q.   Right.

A.   And that's -- that's the determination.

Q.   So I'm trying to -- because you're identified as an expert witness I'm trying to --

A.   Yes.

Q.   -- separate out what you typically do in your practice from what peer-reviewed literature supports that other clinicians might do, and so with respect to this BJUI article by Lehmann, et al. in 2010, are you aware of whether that study determines that the main advantage is the time saved in identifying pathogens?

A.   I'm just not aware of the study.

Q.   Okay.  In the course of your research for

ARTHUR P. MOURTZINOS, M.D.                          April 25, 2024

Page 100

this report, did you review a study published by Hao, et al. in the International Journal of Molecular Sciences in 2023 and is titled "The Essential Role of PCR and PCR Panel Size in Comparison With Urine Culture in Identification of Polymicrobial Fastidious Organisms in Patients With Complicated Urinary Tract Infections"?

A.   I can't recall the study.  I'm sorry.

Q.   Are there circumstances, in your expert opinion, when it would be clinically useful to have increased accuracy in determining microorganisms in the urine?

A.   In some cases, correct.

Q.   What are those cases?

A.   Again, complex patients with recurrent infections who have significant underlying comorbidities, you know, the complicated patient that walks in.

Q.   Got it.  Does PCR testing for UTIs offer increased accuracy over SUC in detecting microorganisms?

A.   It may where it may help determine medical

Page 101

treatment, yes.

Q. So PCR testing for UTIs may help determine appropriate medical treatment based on its increased accuracy?

A. For a complex patient it may.  It hasn't in my practice.

Q. Okay.

A. And this is a tertiary care referral center, so I mean, I'm seeing the complex patients that come from all over the place.  So in private practice, you're not, Seth, you're not -- I'm sorry, counselor, so it's a different ballgame in that regard.

Q. Are there -- let me ask this:  Does PCR testing have an ability to detect a broader spectrum of pathogens as compared to SUC?

A. Yes.

Q. Are there circumstances when it would be clinically useful to detect a broader spectrum of microorganisms?

A. Again, very rarely.  I've only used it once in my practice in 17 years, so...

Q. Again, I'm sort of separating out your practice versus, you know, the peer-reviewed

A.618

# EXHIBIT Q



# Transcript of **Matthew Rutledge**

Friday, December 22, 2023

*United States of America v. MD Spine Solutions LLC*

www.TP.One
www.aldersonreporting.com
www.accutrancr.com
800.FOR.DEPO (800.367.3376)
Scheduling@TP.One

Reference Number: 136679

A.620

UNITED STATERS DISTRICT COURT

DISTRICT OF MASSACHUSETTS

***************************

UNITED STATES OF AMERICA, et

al, ex rel. OMNI HEALTHCARE,

INC.,

     Plaintiffs,              Case No.:

          vs.                 18-cv-12558-PBS

MD SPINE SOLUTIONS LLC,

D/B/A MD LABS INC., DENIS

GRIZELJ, MATTHEW RUTLEDGE

AND DOE HEALTHCARE PROVIDERS

1-100,

Defendants

***************************


          Deposition of MATTHEW RUTLEDGE


          Via Zoom Videoconferencing

          Friday, December 22, 2023

               10:59 a.m.


               Reported by:

Adam D. Miller, Registered Professional Reporter

A     Part of the process involved that, yes.

Q     Okay.  Was there ever any testing that MD Labs performed that didn't involve that, didn't involve PCR?

A     Did it or did not?

Q     Did not.

A     Antibiotic susceptibility testing does not involve PCR.  We perform that.  There's also -- you know, dipstick urinalysis does not involve PCR as well, and that was sometimes performed.  Microscopy does not involve PCR.

Q     And this is all testing for urinary tract infections?

A     Yes.

Q     If a provider wanted a UTI test that did not involve a PCR, how would it request that?

A     They probably would not have used the Resolution test.  They probably would not have used MD Labs.

Q     Show you Rutledge 3.  This was produced with a Bates number OMNI00528.



# EXHIBIT R

A.623



# Transcript of **Alexander Stojanoff**

Wednesday, November 15, 2023

*United States of America v. MD Spine Solutions LLC*

www.TP.One
www.aldersonreporting.com
www.accutrancr.com
800.FOR.DEPO (800.367.3376)
Scheduling@TP.One

Reference Number: 135507

A.624

UNITED STATERS DISTRICT COURT
DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * * * * * * * * * * * *

UNITED STATES OF AMERICA, et al, ex rel. OMNI HEALTHCARE, INC.,

      Plaintiffs,

vs.

MD SPINE SOLUTIONS LLC, D/B/A MD LABS INC., DENIS GRIZELJ, MATTHEW RUTLEDGE AND DOE HEALTHCARE PROVIDERS 1-100,

      Defendants

Case No.:
18-cv-12558-PBS

* * * * * * * * * * * * * * * * * * * * * * * * * *

DEPOSITION of ALEXANDER STOJANOFF, PH.D.

via Zoom

Wednesday, November 15, 2023

1:00 p.m. Easter Standard Time

Judith McGovern Williams, CSR, CRR
Registered Professional Reporter

Williams & Associates Court Reporters
177 Beach Avenue
Hull, Massachusetts  02045
781-760-6619
judithmwilliams@gmail.com

 TP One

Scheduling@TP.One
www.TP.One

A-625

800.FOR.DEPO
(800.367.3376)

that it is -- it is -- it is actually quite confusing looking at this -- looking at this document.  I am confused actually.

Q. All right.

A. There is something that -- there is a cross over "Fever."  In the same breath, it says "Urinary tract infection on file."  I'm not sure.  I am totally confused.

Q. Can you explain what is confusing about it?

A. Well, it's -- it seems to be referring to some sort of diagnosis, you know, painful urination, bloody urine, fever.  There is a cross over fever.  But in the same breath it says "Urinary tract infection testing panel."  I don't know where that panel is.  It just -- it just is all of these different diagnoses.  So that is what is confusing.

Q. Do you know what a testing panel refers to?

A. A testing panel?

Q. A testing panel.



# EXHIBIT S

A.627



# EXAMINING CLINICAL LABORATORY SERVICES

A Review by the Healthcare
Fraud Prevention Partnership

**MAY 2018**



HEALTHCARE FRAUD PREVENTION PARTNERSHIP

A.628



# TABLE OF CONTENTS

Executive Summary ....................................................................................................... 2

Background, Introduction, and Objectives ...................................................................... 3

The Laboratory Testing Industry in the Context of Fraud ............................................... 4

    Laboratory Industry .................................................................................................... 4

    Regulation and Oversight ........................................................................................... 4

    Estimates of the Cost of Fraud and Abuse ................................................................ 5

Systemic Challenges ..................................................................................................... 6

Major Fraud and Abuse Schemes ................................................................................. 7

    Abuse of Billing Standards ......................................................................................... 7

    Improper Laboratory Relationships ............................................................................ 8

    Medically Unnecessary Testing .................................................................................. 9

Conclusion ..................................................................................................................... 13

References ...................................................................................................................... 14

THE FOLLOWING DISCLAIMER APPLIES: All Healthcare Fraud Prevention Partnership (HFPP) communications and activities are purely voluntary. All HFPP activities, including all committees and the Executive Board, are to be used solely as venues for discussion whereby individual partners can voluntarily share facts, information, or individual expertise. Group consensus, advice, recommendations, policy-making, or decision-making will be sought or performed as a result of HFPP activities. The Secretary and the Attorney General or their designees will make final policies or other decisions.

A.629



# EXECUTIVE SUMMARY

Clinical laboratory services generated an estimated $87.3 billion in revenue in 2017, totaling 2.6% of annual healthcare spending in North America. This represents a large target for potential fraud and abuse. While the typical laboratory claim is relatively low in cost (less than $200), the sheer volume of laboratory services performed provides an opportunity for potential losses related to fraud and abuse in these services to reach the hundreds of millions of dollars. In addition, because claims for potentially fraudulent or abusive services can be made either by individuals or disseminated networks of providers and laboratories, fraud in this area can be particularly challenging for private and public payers, law enforcement, and other responsible entities to identify and investigate.

While accounts of specific fraud schemes and vulnerabilities related to clinical laboratory services exist, few resources are found that provide a comprehensive summary of the issues involved in this area. The Healthcare Fraud Prevention Partnership (HFPP), a public-private partnership of healthcare payers and allied organizations, seeks to use this paper to provide foundational information and to set the stage for additional discussions and interventions to address fraud and abuse in this area. Specifically, this paper identifies several systemic challenges that can lead to the potential for fraud and abuse in clinical laboratory services, including the:

- Number and variability of laboratories
- High-volume, low-dollar nature of ordering, providing, and billing for clinical laboratory services
- Technical complexity and continuing evolution of clinical laboratory services

This paper also provides high-level discussions of specific areas of concern identified by HFPP Partner organizations related to abuse of billing standards, improper laboratory relationships, and medically unnecessary testing.

The HFPP intends this paper to provide a starting point to a long-term project to combat fraud and abuse in laboratory services. Particular areas for future work may include:

- Review of and recommendations for payer oversight and analytics of laboratory services
- Efforts to foster collaboration and information sharing to enhance the proactive detection of potential fraud and abuse
- Development, refinement, and delivery of provider monitoring and education programs to reduce fraud and abuse
- Development of organized, cross-industry responses to urine drug testing schemes and other areas of high concern

THE FOLLOWING DISCLAIMER APPLIES: All Healthcare Fraud Prevention Partnership (HFPP) communications and activities are purely voluntary. All HFPP activities, including all committees and the Executive Board, are to be used solely as venues for discussion whereby individual partners can voluntarily share facts, information, or individual opinion. No group consensus, advice, recommendations, policy-making, or decision-making will be sought or performed as a result of HFPP activities. The Secretary and the Attorney General or their designees will make final policies or other decisions.

A.630

# BACKGROUND, INTRODUCTION, & OBJECTIVES

The HFPP is a voluntary, public-private partnership between the Federal Government, state and local government agencies, law enforcement, private health insurance plans, employer organizations, and healthcare anti-fraud associations that seeks to identify and reduce fraud, waste, and abuse across the healthcare sector.[1] To advance this effort, entities that participate in the HFPP, known as Partners, regularly collaborate, share information and data, and conduct studies using a unique cross-payer data set. Additionally, the HFPP's broad membership provides a platform to address healthcare issues. This paper examines the challenges associated with the prevention and identification of fraud and abuse in the area of clinical laboratory services, a problem that can negatively impact the financial health of organizations and physical health of patients.

Clinical laboratory services, when appropriately applied, can assist to diagnose illness or disease, monitor risk factors for serious illness, detect the presence of foreign substances such as illicit drugs or toxic agents, or monitor disease progression. In contrast, fraudulent or abusive laboratory services and claims increase healthcare expenditures and can result in medical errors, false positive or false negative test results, incorrect diagnoses, and unnecessary and potentially invasive medical procedures.[2] In some instances, fraud schemes have resulted in the victimization and harm of patients, as well as financial bankruptcy of legitimate organizations.

The appropriate use of laboratory monitoring and diagnostic testing is an essential component of medical services. However, potentially fraudulent and abusive billing for laboratory services has become an area of growing concern, particularly for tests that are subject to minimal regulatory oversight.

There is broad consensus among the HFPP Partners on the need to do more to combat potential fraud and abuse in laboratory service billing. This paper seeks to accomplish the following:

- Describe laboratory services in a way that highlights the service vulnerabilities susceptible to fraud and abuse

- Define systemic challenges that can enable fraud and abuse

- Describe specific types of potential fraud or abuse that have been identified by HFPP Partner organizations

The section that follows will provide an overview of the clinical laboratory service industry with a specific focus on aspects of the industry that create opportunities for potential fraud and abuse (*see The Laboratory Testing Industry In The Context Of Fraud, on page 4*). Next, the paper outlines some of the systemic challenges that may contribute to or enable clinical laboratory services fraud and abuse (*see Systemic Challenges, on page 6*), followed by a description of specific, potentially fraudulent or abusive problems or practices reported by the HFPP Partners (*see Major Fraud and Abuse Schemes, on page 7*).

THE FOLLOWING DISCLAIMER APPLIES: All Healthcare Fraud Prevention Partnership (HFPP) communications and activities are purely voluntary. All HFPP activities, including all committees and the Executive Board, are to be used solely as venues for discussion whereby individual partners can voluntarily share facts, information, or individual (but not group) consensus, advice, recommendations, policy-making, or decision-making will be sought or performed as a result of HFPP activities. The Secretary and the Attorney General or their designees will make final policies or other decisions.

A.631

③

# THE LABORATORY TESTING INDUSTRY
# IN THE CONTEXT OF FRAUD

Clinical pathology, or laboratory medicine, involves the analysis of blood, urine, and other bodily fluids and tissues, as well as microscopic examination of individual cells, to provide information that supports the diagnosis, prevention, or treatment of human health disorders, diseases, and infections. The field of clinical pathology is characterized by common processes, procedures, specimen collection, and transport practices across all healthcare service providers.

Although some laboratory tests can be quite expensive, the majority of tests performed are paid at a low dollar amount, usually well below $200. For example, a 2017 Department of Health and Human Services (HHS) Office of Inspector General (OIG) review of laboratory services found that in 2010 over 60% of Medicare laboratory payments, or $4.29 billion, were paid to cover 25 routine tests.[3] For 19 of the 25 tests, Medicare payment rates ranged from $5.36 to $79.24, with half being less than $25.[3] The top six tests ordered accounted for 35% of all Medicare payments, and all six were associated with Medicare payments below $41 per test.[3]

## The Laboratory Industry

Medicare payment data offers a general picture of where clinical laboratory services are performed.[4] Predominantly, laboratory services are conducted as patient point-of-care tests in hospital outpatient or physician offices (44.2% of Medicare Part B payments).[4] Point-of-care testing allows simple tests to be performed during the patient encounter, enabling the results to inform clinical decision-making in real-time. Another 38.1% of Medicare Part B payments are for clinical laboratory services performed in non-patient settings by independent laboratories that may specialize in specific types of testing or clientele.[4] The two largest U.S. commercial laboratory companies make up almost half of independent laboratory payments.[4] The remaining laboratory services covered by Medicare Part B include tests performed by critical access hospitals, skilled nursing, and other facilities.[4]

## Regulation and Oversight

Laboratories are primarily regulated based on the complexity of the tests they conduct to assure the accuracy and reliability of test results and protect patient safety. Laboratory tests are classified as waived, moderate, or high complexity, as defined under the implementing regulations for the Clinical Laboratory Improvement Amendments (CLIA) legislation of 1988, as amended.

Tests with waived status are those listed in the implementing regulations or determined by the U.S. Food & Drug Administration (FDA) to be simple laboratory examinations or procedures having a low risk of an erroneous result. Laboratories performing only tests with waived status have less regulatory scrutiny than laboratories conducting moderate to high complexity tests.

Approximately 100 tests have been granted waived status, including all of the most commonly paid laboratory tests.[5] The waived status allows the performance of point-of-care testing to support clinical

THE FOLLOWING DISCLAIMER APPLIES: All Healthcare Fraud Prevention Partnership (HFPP) communications and activities are purely voluntary. All HFPP activities, including all committees and the Executive Board, are to be used solely as venues for discussion whereby individual partners can voluntarily share facts, information, or individual views. No group consensus, advice, recommendations, policy-making, or decision-making will be sought or performed as a result of HFPP activities. The Secretary and the Attorney General or their designees will make final policies or other decisions.

A.632

④

decision-making in a variety of settings, including physician offices, drug rehabilitation centers, and sober living facilities.

Manufacturers have competed to develop easily performed, waived point-of-care tests in order to tap the large market of providers who perform waived laboratory tests. The large volume of waived tests creates specific challenges for fraud and abuse prevention, which will be discussed later in this paper.

Laboratory ownership, billing, and referral practices are subject to criminal and civil law at the federal [e.g. Federal False Claims Act (42 U.S.C. § 1320a-7b), Anti-Kickback Statute (42 U.S.C. § 1320a-7b), Physician Self-Referral (Stark) Law (42 U.S.C § 1359 and 42 CFR Part 411 Subpart J)] and state levels, many of which broadly apply to fraud, waste, and abuse and not solely to laboratory services. Many payers also rely on coverage policies to limit the potential for fraud and abuse. For example, Medicare generally only covers items and services that are within the scope of a Medicare benefit category and are reasonable and necessary for the diagnosis or treatment of an illness or injury.[6] More specific coverage criteria under the Medicare program is detailed in statutes, regulations, and sub-regulatory guidance such as Local Coverage Determination (LCDs), and National Coverage Determinations (NCDs).

## Estimates of the Costs of Fraud and Abuse

The clinical laboratory services industry in North America generated an estimated $87.3 billion in revenue in 2017, which presents a large potential for fraud and abuse.[7] Although the total volume of laboratory fraud and abuse is unknown, investigations have demonstrated that the losses can be in excess of tens or even hundreds of millions of dollars. For example, according to the Department of Justice (DOJ), Millennium Health agreed to pay a settlement of $256 million in 2015, of which $237 Million was paid to resolve alleged violations of the False Claims Act for billing Medicare, Medicaid, and other federal health care programs for medically unnecessary urine drug and genetic testing and for providing free items to physicians who agreed to refer expensive laboratory testing business to Millennium. The United States alleged that Millennium caused physicians to order excessive numbers of urine drug tests, in part through the promotion of "custom profiles," which, instead of being tailored to individual patients, were in effect standing orders that caused physicians to order large numbers of tests without an individualized assessment of each patient's needs.[8] Although the financial impact of these allegations to the Federal Government was not fully assessed, the size of the settlement indicates the potential magnitude of the cost of the scheme.

THE FOLLOWING DISCLAIMER APPLIES: All Healthcare Fraud Prevention Partnership (HFPP) communications and activities are purely voluntary. All HFPP activities, including all committees and the Executive Board, are to be used solely as venues for discussion whereby individual partners can voluntarily share facts, information, or individual input. No group consensus, advice, recommendations, policy-making, or decision-making will be sought or performed as a result of HFPP activities. The Secretary and the Attorney General or their designees will make final policies or other decisions.

A.633

⑤



# SYSTEMIC
# CHALLENGES

The clinical laboratory services industry presents several systematic challenges for detecting fraud and abuse. These include:

- **The number and variability of laboratories.** There are a variety of possible settings and provider types that provide laboratory services which can make abnormal behavior more difficult to detect. Provider relationships with, and ownership of, laboratories can also create opportunities for waste or fraud that are difficult to spot from analysis of claims payments alone. For example, while referrals to physician-owned point-of-care laboratories are permissible in some circumstances, bad actors may attempt to take advantage of the relationship to maximize financial returns. In such cases, providers may divert their clinical testing to a new laboratory or dismantle and re-establish the laboratory to avoid detection.

- **The high-volume, low-dollar nature of ordering, providing, and billing for clinical laboratory services.** Payers are naturally inclined to focus their limited fraud prevention resources on claims with higher individual costs and that are easier to analyze. The generally low dollar value of individual laboratory tests means that laboratories typically run a low risk of being audited for any one claim. Payer organizations also have varying capabilities to detect wasteful or abusive practices and the number of possible billing combinations makes identification of aberrancies difficult using automated or routine monitoring. Common laboratory practices that aim to streamline medical practice, such as the use of laboratory/physician customized panels and auto-confirmatory testing, can exasperate these detection challenges for payers as well.

- **The technical complexity and continuing evolution of clinical laboratory services.** Clinical pathology is a large, complex, and ever-evolving field that requires specialized knowledge to evaluate the quality and necessity of specific tests performed. Fraudulent or abusive practices can be developed around newly covered tests before payers are able to fully understand the pathology and billing risks.

In short, these challenges often combine to create opportunities for bad actors to exploit. The next section discusses specific fraud and abuse schemes that have been identified by HFPP Partner organizations as particularly concerning in recent years.

THE FOLLOWING DISCLAIMER APPLIES: All Healthcare Fraud Prevention Partnership (HFPP) communications and activities are purely voluntary. All HFPP activities, including all committees and the Executive Board, are to be used solely as venues for discussion whereby individual partners can voluntarily share facts, information, or individual group consensus, advice, recommendations, policy-making, or decision-making will be sought or performed as a result of HFPP activities. The Secretary and the Attorney General or their designees will make final policies or other decisions.

A.634

# MAJOR FRAUD &
# ABUSE SCHEMES

This section describes major potential fraud and abuse schemes that have been identified by HFPP Partners.[1] The intent was to consolidate a list of potential problems that can guide future discussions and interventions. This list is divided into three sections for clarity: (1) abuse of billing standards, (2) improper laboratory relationships, and (3) medically unnecessary testing. Dividing problems into sections is not intended to make distinctions between them or imply that any one form of problem is necessarily worse than any other. The HFPP also notes that many of the activities listed below may occur in combination.

## Abuse of Billing Standards

HFPP Partners identified many tests, services, or other categories of care that are particularly susceptible to fraudulent or abusive billing practices. This includes misusing established billing conventions and seeking additional or unearned reimbursement for tests that were performed for medically necessary reasons. Practices identified as particular areas of concern by the HFPP partners are described below.

- **Improper use of Modifier 91:** The Current Procedural Terminology (CPT) code Modifier 91 is used to indicate when a test needs to be repeated on the same day to monitor the health of a patient. Improper and potentially abusive uses of the 91-modifier occur when it is used to indicate something other than a follow-up test or to bill for an additional test that was never performed. The modifier is sometimes incorrectly used to code additional tests performed on another day in another location or to code a test that has no same day prior test. For a 91-modifier to be valid, it must be preceded by a claim for the same billing code, without the 91-modifier, for the same patient, on the same day and at the same laboratory.

> **MODIFIER 91:**
>
> Claims payment systems may be programmed to override any payment claim edit in the system when a 91-modifier is detected. This enables the 91-modifier to be used to trick the automated payment system into paying a claim it would not otherwise pay.

The complexity of scanning patient claims history, matching claims, and developing different algorithmic rules for every test eligible for a 91-modifier complicates the ability of payment systems to identify potential fraud and abuse of this modifier in an automated fashion.

- **Unbundling of Laboratory Panels:**
Multiple related tests can often be combined into testing panels that are requested with a single testing order, completed with a single biological specimen, and billed using a single code. Testing panels are typically less costly to complete and are reimbursed at a lower rate than if each test were ordered and performed individually. Unbundling occurs when a laboratory bills

---

[1] This section discusses a wide range of potentially fraudulent or abusive behaviors noted by HFPP Partners. These behaviors are generally described as schemes in this section, but use of this word is not intended to conflate illicit activity with wasteful or abusive actions that may not otherwise violate the law.

THE FOLLOWING DISCLAIMER APPLIES: All Healthcare Fraud Prevention Partnership (HFPP) communications and activities are purely voluntary. All HFPP activities, including all committees and the Executive Board, are to be used solely as venues for discussion whereby individual partners can voluntarily share facts, information, or individual inputs. No group consensus, advice, recommendations, policy-making, or decision-making will be sought or performed as a result of HFPP activities. The Secretary and the Attorney General or their designees will make final policies or other decisions.

A.635

## LAB TEST **UNBUNDLING:**

A Comprehensive Metabolic Panel (CMP) consists of 14 tests that can provide information about a patient's kidneys, liver, electrolytes, acid/base balance, blood sugar, and blood proteins. In unbundling, a laboratory would perform some or all of the 14 tests and bill for them individually in order to recoup higher payments than would be paid for the panel.

separately for some or all tests analyzed as part of a panel. Tests may be unbundled unnecessarily in an effort to maximize reimbursement. In some cases of unbundling, laboratories may claim that their facility only performs some and not all of the tests in a panel and uses that as the justification to bill individually for a subset of tests that result in higher reimbursement than the full panel.

## Improper Laboratory Relationships

Improper laboratory relationships refers to illicit referral, billing, or ownership arrangements between multiple laboratories or between laboratories and physicians. These arrangements can either be established with the intent to defraud or represent the corruption of a formerly legitimate laboratory or organization. Specific potential schemes of concern to HFPP Partners are listed below.

- **Pass-through Billing:** Pass-through billing schemes occur when a provider, such as a physician or hospital, pays a laboratory to perform their tests and then files the claims as though they had performed the tests themselves. This activity occurs outside the appropriate practices for reference-laboratory billing between laboratories, and is often done to work around the lack of contractual relationships between a laboratory and payer organizations, to avoid scrutiny of the laboratory in question, or to allow the provider to recoup some of the financial benefits of in-office testing without requiring them to operate a laboratory themselves. This may result in double billing to payer organizations if both the laboratory and the provider submit claims for payment. Pass-through billing can undermine the intent and purpose in point-of-care testing. Of note, this scheme can also occur when such referral and billing arrangements are made between laboratories.

- **Rural Health Pass-through Billing:** Rural health pass-through billing, a variation of the pass-through billing scenario described above, represents another serious scheme of high concern to HFPP Partners. Some rural providers and suppliers are reimbursed at a higher rate to create incentives for the provision of services in traditionally underserved areas. Rural health pass-through billing schemes specifically target rural facilities to take advantage of these higher reimbursements.

Schemes include sending or billing lab work from non-rural settings through rural providers for higher reimbursement.



THE FOLLOWING DISCLAIMER APPLIES: All Healthcare Fraud Prevention Partnership (HFPP) communications and activities are purely voluntary. All HFPP activities, including all committees and the Executive Board, are to be used solely as venues for discussion whereby individual partners can voluntarily share facts, information, or individual opinions. No group consensus, advice, recommendations, policy-making, or decision-making will be sought or performed as a result of HFPP activities. The Secretary and the Attorney General or their designees will make final policies or other decisions.

A.636

In some schemes, an individual claiming to represent a private consulting company will approach a rural facility and offer to set up a laboratory or use the facility's existing laboratory to provide the testing services. The plan is often described as a legitimate method to process laboratory tests, and the rural facility - often financially strapped - is offered inducements to participate either in the form of partial ownership of the laboratory or by collecting direct kickbacks from the consulting company. The company then send samples collected in non-rural communities to the laboratory for processing at the higher reimbursement rate. In other instances, the samples are processed in non-rural laboratories but billed to payers as though they were conducted in the rural facility laboratory. In still other instances, laboratory samples are never tested at all and are only billed as though they were conducted in the rural facility.

## RURAL HEALTH **PASS THROUGH:**

**A 15-bed Missouri hospital received nearly $90 million in payments associated with laboratory services ordered in other U.S. locations.[9] In another example, a private payer reported that it had received $33.8 million in laboratory test claims ($9.8 million had been paid) from providers who had no staff privileges at the rural health clinic from which the claims were billed.[10]**

One HFPP Partner described an episode in which hundreds of laboratory orders from urban Philadelphia were billed as having been processed in a laboratory in rural Kansas. Situations like this may result in lower quality healthcare if essential and time sensitive laboratory results are delayed or samples are contaminated because they are being transported for processing in rural areas.

In addition to having a financial impact on the payer, hospitals that participate in the scheme can go bankrupt or incur severe financial penalties. In either case, patients may suffer harm as rural providers either close or limit their available services to save costs.

- **Physician Partial Ownership of Laboratories and Co-referral Networks:** Another mechanism of suspected laboratory fraud is physician partial ownership of laboratories combined with possible conspiracies to refer testing to select laboratories in exchange for reciprocal referrals. In this scheme, physicians are approached by outside parties, often presenting themselves as representatives of a healthcare consulting company, and asked to set up their own laboratories in partnership with a larger laboratory. Physicians are offered a stake in the laboratory and are encouraged to refer testing to laboratories owned by other physicians involved in the scheme to conceal the fact that they are directly profiting from self-referrals.

In a variation on this scheme, physicians are paid sample processing fees in exchange for referrals to laboratories that the consulting company suggests. By 2016, laboratory fraud schemes involving physician partial laboratory ownership, illegal parent company kickbacks, and co-referral networks had proliferated to many parts of the U.S.[11]

## Medically Unnecessary Testing

Medically unnecessary testing refers to the excessive or improper use of clinical laboratory services for reasons not related to the medical needs of a patient. These schemes can be costly and may result in actual danger to the patients, such as when they lead to additional invasive interventions that run the risk of patient harm.

THE FOLLOWING DISCLAIMER APPLIES: All Healthcare Fraud Prevention Partnership (HFPP) communications and activities are purely voluntary. All HFPP activities, including all committees and the Executive Board, are to be used solely as venues for discussion whereby individual partners can voluntarily share facts, information, or individual input. No group consensus, advice, recommendations, policy-making, or decision-making will be sought or performed as a result of HFPP activities. The Secretary and the Attorney General or their designees will make final policies or other decisions.

A.637

⑨

Specific potential schemes of high concern and importance to HFPP Partners are described below.

- **Use of Excessively Large Panels:** A commonly reported problem is the use of more expensive, excessively broad panels in place of smaller panels. For example, a 5-panel urine drug screening test for cannabinoids, cocaine, amphetamines, opioids, and phencyclidine is typically sufficient to detect the use of commonly abused substances, such as marijuana, cocaine/crack, heroin, and methamphetamine. In contrast, larger and more expensive definitive panels (i.e., 12- or 14-panel) can be used to detect particular subsets of the substances identified in the smaller panels, as well as the presence of some other less-commonly abused substances. While this may be clinically warranted in some cases, the use of overly broad panels can also be used for the purpose of maximizing reimbursement in the absence of medical necessity. A related problem that can be difficult to control is the use of definitive drug testing for a wide range of substances for which the patient has no history of abuse.

- **Standing Orders for Laboratory Tests:** Standing orders refers to either a policy of prescribing a certain test or other medical service for all individuals that meet a specific set of inclusion criteria or a policy of setting up a recurring order for the course of an individual patient's treatment. In the past, standing orders have been used to order testing for any patient that has a given condition or is a member of a specific population group. Current Medicare rules, which serve as the basis for rules of many private payers, allow for standing orders only in certain defined circumstances.[12] Broad, population-based orders are not reimbursable. Despite existing controls and requirements, the development of practices to avoid the labeling of population-based testing as standing orders have been implicated as a driver of laboratory fraud. For example, in settlement agreements with Millennium Health, the DOJ alleged that the company promoted a practice they called custom profiles to create a system of standing orders that violated federal healthcare payment rules.[8]

- **Excessive or Improper Urine Drug Testing:** Urine drug testing to detect drug or alcohol use is widely used and frequently billed to payer organizations even when used outside of traditional clinical settings. Virtually all HFPP Partners reported concerns about the widespread fraud and abuse associated with excessive urine drug testing being performed primarily to increase provider reimbursement. Partners note that urine drug testing has become a major source of revenue for many providers, thereby encouraging potential fraud and abuse.

## EXCESSIVE URINE **TESTING:**

In Maryland, four men were convicted or pled guilty to conspiring to defraud the government through billing for excessive urine testing.[14] The men provided opioid prescriptions to patients in exchange for patients agreeing to excessive urine testing, and then sent the urine samples to an external lab in exchange for illegal kickbacks.[15] In addition to those convicted, an additional defendant fled the country, and another defendant committed suicide before standing trial.

In addition to monitoring that patients are appropriately using prescribed opioids, some providers may be required to test more regularly to comply with state laws or may be testing defensively as a way to minimize malpractice risks. The increased testing may also be as a result of concern regarding inappropriate prescribing given the increasing intensity of the opioid epidemic and the attention paid to the role of provider prescribing practices. The CDC currently recommends that patients who are prescribed opioids be tested to identify prescribed substances and undisclosed use at least annually.[13]

THE FOLLOWING DISCLAIMER APPLIES: All Healthcare Fraud Prevention Partnership (HFPP) communications and activities are purely voluntary. All HFPP activities, including all committees and the Executive Board, are to be used solely as venues for discussion whereby individual partners can voluntarily share facts, information, or individual views. No group consensus, advice, recommendations, policy-making, or decision-making will be sought or performed as a result of HFPP activities. The Secretary and the Attorney General or their designees will make final policies or other decisions.

A.638

⑩

The routine use of definitive (quantitative) urine drug testing, in place of lower-cost presumptive (qualitative) testing, was another major concern described by Partners. Presumptive drug screening detects the presence of a suspected substance or demonstrates adherence to pharmacotherapy treatment by providing a "yes or no" answer regarding whether the substance has been consumed. Definitive drug screenings are used to assess the levels or quantity of a specific substance that was detected during screening. Some HFPP Partners suggested that definitive testing in the absence of a presumptive test result should trigger a clinical record exam or be unallowable.

## SOBER HOMES PROFITING FROM URINE TESTING:

Four defendants were sentenced to jail for criminal behavior associated with the fraudulent management of a sober living facility.[16] Criminal activities included bribery and kickbacks to patients, falsification of medical records, conspiracy to bill for services that were never rendered, and threats of violence to residents who asked to leave the facility.

- **Sober Living Facilities (Sober Homes) That Profit From Urine Drug Testing.** HFPP Partners are concerned about evidence of widespread abuse by sober homes engaging in excessive urine drug testing. Sober homes are group homes for individuals recovering from drug and alcohol problems. When appropriately run, sober homes offer those in recovery a stable, relatively low-cost housing environment with limited recovery services, a structured set of rules to ensure a safe and healthy environment, and random drug and alcohol urine testing to assure adherence to the facilities' alcohol and substance use policy. Although sober home living services are not reimbursable by insurance, the urine drug testing conducted at the facility can be submitted for reimbursement to insurance.

  Sober home schemes may involve the intentional creation and ongoing management of a sober home facility in order to profit from urine drug testing. In most cases, the scheme involves either the establishment of a laboratory capable of conducting and billing for urine drug testing within the facility or collusion with a capable co-owned or conspiring facility. In some instances, an existing sober home facility or low-income residence, such as an extended stay hotel, may be purchased by a fraudulent entity and converted into a sober home scheme. The scheme may be facilitated by bribes, free rent, or even the payment of insurance premiums for individuals who agree to reside in the facility, ultimately violating multiple laws.

  On a larger level, while some sober homes provide needed services for the persons residing within, Partners report that in several documented instances, facilities provided only the lowest level of supportive services possible to be considered a sober home – such as resident self-organized 12-step meetings – and demonstrated a pattern of indifference to the use of alcohol or substances by their residents. Improperly or fraudulently operated sober home facilities can create patient health hazards that include substance abuse relapse, opioid overdose, interpersonal violence within a facility, and resident death.

- **Pain Clinics That Profit From Urine Testing:** Several instances of fraud have been reported in which providers at pain management clinics have provided cash or opioid prescriptions for no medical purpose in exchange for patient agreement to regularly attend the clinic and agree to medical tests.[17] These arrangements put patients at risk for substance use disorders and overdose death solely in order to enrich the pain clinic's owners.

THE FOLLOWING DISCLAIMER APPLIES: All Healthcare Fraud Prevention Partnership (HFPP) communications and activities are purely voluntary. All HFPP activities, including all committees and the Executive Board, are to be used solely as venues for discussion whereby individual partners can voluntarily share facts, information, or individuals. No group consensus, advice, recommendations, policy-making, or decision-making will be sought or performed as a result of HFPP activities. The Secretary and the Attorney General or their designees will make final policies or other decisions.

A.639

- **Excessive or Improper Genetic Testing:** When used correctly, genetic testing may offer opportunities to reshape the way healthcare is delivered and can potentially lead to substantial improvements in population health and individual health outcomes. Currently, most genetic tests are only applicable in specific circumstances and all genetic tests are generally only needed one time, as the results would typically not be expected to change in the absence of a new disease process.

HFPP Partners described existing problems with the use of genetic testing that are not related to actual or potential medical diagnoses, overuse of genetic testing where the tests have no clinical value (possibly related to an actual or potential medical diagnosis, but not germane to treatment decisions), and repeated genetic testing of the same person for the same genetic pattern, by the same provider facility. Genetic testing results generally do not change over time, but Partners have described situations where individual patients received the same genetic test multiple times. Multiple Partners noted that direct-to-consumer marketing increased patient demand for potentially unnecessary genetic testing. In some instances, physicians obliged by ordering the unnecessary test. One HFPP Partner reported high volumes of claims for new highly reimbursed genetic tests immediately after the tests are released. In other cases, test orders were provided despite an absence of a clinical relationship between the patient and the ordering physician.

> ## IMPROPER GENETIC **TESTING:**
>
> One Partner described a situation in which a provider was systematically screening men for the BRCA1 and BRCA2 genetic mutation that places an individual at higher risk for breast cancer. Male breast cancer is rare and usually occurs in older men.[18]

THE FOLLOWING DISCLAIMER APPLIES: All Healthcare Fraud Prevention Partnership (HFPP) communications and activities are purely voluntary. All HFPP activities, including all committees and the Executive Board, are to be used solely as venues for discussion whereby individual partners can voluntarily share facts, information, or individual opinions. No group consensus, advice, recommendations, policy-making, or decision-making will be sought or performed as a result of HFPP activities. The Secretary and the Attorney General or their designees will make final policies or other decisions.

A.640

12

# CONCLUSION

This paper represents a first attempt to organize and present the vast wealth of informal information on potential fraud and abuse known by HFPP Partners but that has not been commonly shared across all individuals or organizations. This paper aims to explore the susceptibility of clinical laboratory services to fraud and abuse by describing the systemic challenges involved in identifying and addressing current and emerging issues impacting HFPP Partners. It also provides a starting point to a long-term project to combat fraud and abuse in laboratory services. Particular areas of focus for future work may include review of and recommendations for payer oversight and analytics of laboratory services; efforts to foster collaboration and information sharing to enhance the proactive detection of potential fraud and abuse; development, refinement, and delivery of provider monitoring and education programs to reduce fraud and abuse; and the development of organized, cross-industry responses to urine drug testing schemes and other areas of high concern. With determination and collaboration, future work can lead to specific, coordinated actions by the HFPP and its Partners to combat fraud and abuse in clinical laboratory services.

THE FOLLOWING DISCLAIMER APPLIES: All Healthcare Fraud Prevention Partnership (HFPP) communications and activities are purely voluntary. All HFPP activities, including all committees and the Executive Board, are to be used solely as venues for discussion whereby individual partners can voluntarily share facts, information, or individual input. No group consensus, advice, recommendations, policy-making, or decision-making will be sought or performed as a result of HFPP activities. The Secretary and the Attorney General or their designees will make final policies or other decisions.

A.641

# REFERENCES

1. CMS. *Healthcare Fraud Prevention Partnership: About the Partnership.* 2017 [cited 2017 10/3]; Available from: https://hfpp.cms.gov/about/index.html.

2. Zhi, M., et al., *The landscape of inappropriate laboratory testing: a 15-year meta-analysis.* PLoS One, 2013. 8(11): p. e78962.

3. Murrin S, *Medicare Payments for Clinical Diagnostic Laboratory Tests in 2016: Year 3 of Baseline* Data. OEI-09-17-00140. 2017, Office of the Inspector General.

4. Kandilov AMG, Pope GC, Kautter J, Healy D. *The national market for Medicare clinical laboratory testing: implications for payment reform. Medicare & Medicaid Research Review.* 2012;2(2). Available from: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4006399/.

5. CMS. *Medicare Coverage Determination Process.* 2015 [cited 2018 2/15]; Available from: https://www.cms.gov/Medicare/Coverage/DeterminationProcess/. CMS. *Pub 100-04 Medicare Claims Processing, Transmittal 3666, SUBJECT: New Waived Tests.* 2016 [cited 2017 10/6]; Available from: https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R3666CP.pdf.

6. CMS. *Medicare Coverage Determination Process.* 2015 [cited 2018 2/15]; Available from: https://www.cms.gov/Medicare/Coverage/DeterminationProcess/.

7. Transparency Market Research. *Global Clinical Laboratory Services Market: Companies Focus on Technological Advancements to Surge Ahead, observes TMR.* 2017 [cited 2017 11/13]; Available from: https://www.transparencymarketresearch.com/pressrelease/clinical-laboratory-services-market.htm.

8. Department of Justice Office of Public Affairs. *Millennium Health Agrees to Pay $256 Million to Resolve Allegations of Unnecessary Drug and Genetic Testing and Illegal Remuneration to Physicians.* 2015 [cited 2017 11/7]; Available from: https://www.justice.gov/opa/pr/millennium-health-agrees-pay-256-million-resolve-allegations-unnecessary-drug-and-genetic.

9. Ellison, A. *Auditor: 15-bed Missouri hospital at heart of $90M billing fraud scheme.* 2017 [cited 2017 10/2]; Available from: https://www.beckershospitalreview.com/finance/auditor-15-bed-missouri-hospital-at-heart-of-90m-billing-fraud-scheme.html.

10. Graf, R. *Blue Cross Says Labs Submitted $33.8M In Bogus Claims.* 2017 [cited 2017 4/2]; Available from: https://www.law360.com/articles/920904/blue-cross-says-labs-submitted-33-8m-in-bogus-claims.

THE FOLLOWING DISCLAIMER APPLIES: All Healthcare Fraud Prevention Partnership (HFPP) communications and activities are purely voluntary. All HFPP activities, including all committees and the Executive Board, are to be used solely as venues for discussion whereby individual partners can voluntarily share facts, information, or individual input. No group consensus, advice, recommendations, policy-making, or decision-making will be sought or performed as a result of HFPP activities. The Secretary and the Attorney General or their designees will make final policies or other decisions.

A.642

11.  Husten, L. *The Wild West Of New Laboratory Scams*. 2016 [cited 10/4 2017]; Available from: http://www.cardiobrief.org/2016/07/11/the-wild-west-of-new-laboratory-scams/.

12.  Scott M and Nguyen D, *Clinical Laboratory Compliance: Something Old, Something New* Laboratory Medicine, 2009. 40(7): p. 428-35.

13.  CDC. *Guideline for prescribing opioid for chronic pain*. 2016 [cited 2017 12/14]; Available from: https://www.cdc.gov/drugoverdose/pdf/Guidelines_Factsheet-a.pdf.

14.  The United State Attorney's Office Southern District of Florida. *Four Defendants Sentenced to Prison in Multi-Million Dollar Health Care Fraud Scheme Involving Sober Homes and Alcohol and Drug Addiction Treatment Centers*. 2017 [cited 2017 10/4]; Available from: https://www.justice.gov/usao-sdfl/pr/four-defendants-sentenced-prison-multi-million-dollar-health-care-fraud-scheme.

15.  The United State Attorney's Office District of Maryland Office. Five Defendants Face Federal Charges in Pain Management Clinic Kickback Scheme. 2016 [cited 2017 10/4]; Available from: https://www.justice.gov/usao-md/pr/five-defendants-face-federal-charges-pain-management-clinic-kickback-scheme.

16.  Loos K. Doctor with Frederick practice convicted on kickback charges, false billing. 2017 [cited 2017 12/16]; Available from: https://www.fredericknewspost.com/news/crime_and_justice/courts/doctor-with-frederick-practice-convicted-on-kickback-charges-false-billing/article_1bf3c137-5aaf-51fc-b0c1-77f1724e6156.html

17.  Blue Cross Blue Shield Network. *Pain management doctor convicted of paying kickbacks*. 2009 [cited 2017 10/2]; Available from: http://www.bcbsm.com/health-care-fraud/fraud-files/archive/pain-management-doctor-convicted-paying-kickbacks.html.

18.  National Cancer Institute at the National Institutes of Health, *BRCA Mutations: Cancer Risk and Genetic Testing.* [cited 2018 3/28]; Available from: https://www.cancer.gov/about-cancer/causes-prevention/genetics/brca-fact-sheet#q8

A.643

THE FOLLOWING DISCLAIMER APPLIES: All Healthcare Fraud Prevention Partnership (HFPP) communications and activities are purely voluntary. All HFPP activities, including all committees and the Executive Board, are to be used solely as venues for discussion whereby individual partners can voluntarily share facts, information, or individual views. No group consensus, advice, recommendations, policy-making, or decision-making will be sought or performed as a result of HFPP activities. The Secretary and the Attorney General or their designees will make final policies or other decisions.

# EXHIBIT T

A.644

## Timothy P. McCormack

| | |
|---|---|
| **From:** | Jack Todd <jacktodd4@gmail.com> |
| **Sent:** | Tuesday, April 24, 2018 2:32 PM |
| **To:** | Craig Deligdish |
| **Cc:** | Jack Todd; Dale Stenberg; Howard Claussen |
| **Subject:** | Re: MD Labs proposal for PCR UTI testing |

My company felt that giving you our EOB's is not appropriate at this time. They are all over the place, even within the same Company. All of the Commercial payers and Medicare pay us. Medicaid is our problem ... generally below $100.  We are not in network with any commercial payers. We are generally reimbursed between $200 to $550 per test. There is no National Lab with this test in network with these payers, so they generally pay as OON or as experimental.

I would propose to trial for at least 120 days so you can determine yourself. Of course you can stop at any time.

Thoughts?

GB
Jack

On Mon, Apr 23, 2018 at 5:13 PM, Craig Deligdish <deligdishc@omnihealthcare.com> wrote:

> Seems fine. Can you send sample EOBS demonstrating that either commercial insurances, i.e. United, Aetna, Cigna, BCBS or others or even Medicare or Medicare Advantage actually pay for these tests.
>
>
> **From:** Jack Todd [mailto:jacktodd4@gmail.com]
> **Sent:** Monday, April 23, 2018 4:53 PM
> **To:** deligdishc@omnihealthcare.com
> **Cc:** bobangom@omnihealthcare.com; Dale Stenberg <stenbergdalea@gmail.com>; Howard Claussen <howard@mdlabs.com>
> **Subject:** MD Labs proposal for PCR UTI testing
>
>
> Sorry it took so long to get back to you.
>
> - We considered a monthly volume of 200 specimens (plus or minus)
> - We considered a payer mix of 35% Commercial and 65% all Federal plans to include Medicare, Medicaid and Tricare.
> - You collect all specimens in your lab and we will pick up daily.
> - We bill Omni their share monthly.
>
> The price we would prefer for your commercial plans would be $150.00 per specimen.
>
>
> May I have your thoughts?

--

GB,

Jack

--
GB,
Jack

A.646

# EXHIBIT U

A.647

A.648

**From:** Wendy Williams <williamsw@omnihealthcare.com>
**Sent:** Friday, August 03, 2018 12:52 PM
**To:** Mark Bobango <bobangom@omnihealthcare.com>
**Subject:** Fwd: Lunch

This is the answer that I got from them when I asked.

---------- Forwarded message ----------
From: **Dale A Stenberg** <stenbergdalea@gmail.com>
Date: Fri, Aug 3, 2018 at 11:05 AM
Subject: Fwd: Lunch
To: Wendy Williams <williamsw@omnihealthcare.com>

Begin forwarded message:

**From:** Jack Todd <jacktodd4@gmail.com>
**Subject: Re: Lunch**
**Date:** July 30, 2018 at 2:41:25 PM EDT
**To:** Dale A Stenberg <stenbergdalea@gmail.com>

Our PCR based UTI is billed at 1 time Medicare rate to all. When Medicare changes so do we. (FYI. Currently it is approximately $700.00.)

We accept whatever the insurance company pays us ... no balance bill. If insurance does not pay we bill patient $50.00 only. They also get the credit for the deductible the insurance company had shared with them on their EOB.
If you need additional information, Mark Bobingo has EOBs.

GB,
Jack Todd

On Jul 30, 2018, at 1:49 PM, Dale A Stenberg <stenbergdalea@gmail.com> wrote:

> This question comes up frequently, what should my response be? This is the Urgent Care Omni

A.648

OMNI00015

On Jul 30, 2018, at 9:44 AM, Wendy Williams <williamsw@omnihealthcare.com> wrote:

Good morning-

My Doctor wants to know the price that Insurances are being billed for urine cultures?  Can you please provide this information.
Thank you

On Thu, Jul 26, 2018 at 11:58 AM, Dale A Stenberg <stenbergdalea@gmail.com> wrote:

> Good Afternoon Wendy,
>    Getting lunch for you and your crew next week.
> Anything in particular?
>      Best,
>    Dale

--
*Wendy Williams*
Practice Administrator
OMNI HealthCare/Urgent Care
2501 W. New Haven Ave.
Melbourne, FL 32904
(321)723-9411 Office
(321)724-8749 Fax
williamsw@omnihealthcare.com

--
*Wendy Williams*
Practice Administrator
OMNI HealthCare/Urgent Care
2501 W. New Haven Ave.
Melbourne, FL 32904
(321)723-9411 Office
(321)724-8749 Fax
williamsw@omnihealthcare.com

2

A.649

OMNI00016

# EXHIBIT V

A.650

**MEMO**              AUGUST 13, 2018
FROM:             CRAIG DELIGDISH, M.D.
RE:               CONVERSATION WITH HOWARD CLAUSSEN, DIRECTOR OF SALES AT MD LABS.

Brad Smith and I spoke with Howard Claussen for 30 minutes today.  Mr. Claussen has been with MD Labs for 4 years.  When he began working with the lab they were doing 16 samples a month and they are now doing 16,000 samples of month.  They UTI business is 70% of Medicare and the remainder Medicaid and commercial, were as their urine toxicology and pharmacogenomics business is apparently 35% Medicare, 30% Medicaid and the remainder commercial.  They are an out-of-network lab.  They bill Medicare at 1 times the Medicare allowable.  Their philosophy has been to be the last man standing in a space that is full of crooked competitors.  They are absolutely a straight arrow, and they are convinced that everyone else will fail.  They practice to stay in the business.  They have bought no other laboratories. They have grown by engaging experienced reps and they provide service directly to hospitals and clinics.  They believe they provide good sales services.  Howard Claussen previously worked with Medtox, and subsequent to that Solstas.  At Medtox was doing 15,000 specimens/day.

Howard Claussen stated that Quest and LabCorp do screening and confirm positive screens.  He indicated that Dr. Jeeter tried to prevent labs from doing confirmations.  He indicated that screening has a false positive rate of 30% on opioids, so they confirm all of their urine toxicology testing without any cutoffs, and do confirmations with LCMS on 50 drugs in 60 minutes on every specimen.  They only do screening if a customer requests it.  They receive $317.00 from Medicare for a full LCMS confirmation.  Medicaid pays them 40-70% of the Medicare allowable, but the Medicaid carries pay differently.

We began the conversation about urinary tract infection testing.  Mr. Claussen stated that this is a "direct replacement for culture and sensitivity".  He stated that this is the same technology used to diagnose cancer.  He stated that "cultures get it wrong 50-70% of the time".  He stated this was a study performed by Florida Hospital in Orlando and he has a copy which he will provide to us. He stated that if Medicare does not like the test, they wouldn't pay for it when we asked whether or not the test was a Medicare approved/allowable test, and whether the test was medically necessary.  He stated that if the test was not medically necessary, Medicare would not pay for it.  He stated that if a patient's denies payment or anyone denies payment, they bill the patient $50.  If the patient doesn't pay on the 1st or 2nd bill, they write off the test.  He said they don't bill deductibles and do not bill co-pays.  He stated that because they are an out-of-network lab they bill Medicare 1 times the allowable, and they bill everyone the same amount.  He said their goal is to be fair on the price.  He also stated that he would allow our laboratory to bill, and would be happy to split the profits with us.  He stated that they would set up a arbitrary amount to charge us, which was stated to be $100 per specimen by Jack Todd, and if Medicare and commercial payers increased what they paid to us, we would reevaluate on an annual basis and they would adjust what they charge us, and in which case they would agree to split the profits.He stated that after 3-4 months of billing us and having us bill Medicare, we could renegotiate based on what we were paid by Medicare and renegotiate at 3-4 months.
CD/msh  F: 180813

A.651

OMNI00089

# EXHIBIT W

A.652

| | |
|---|---|
| **From:** | Craig Deligdish |
| **To:** | Craig Deligdish MD |
| **Subject:** | FW: Memo of conversation with Jack Todd and Mark Clausen |
| **Date:** | Monday, August 27, 2018 7:42:39 PM |

**From:** Mark Bobango [mailto:bobangom@omnihealthcare.com]
**Sent:** Monday, August 27, 2018 6:06 PM
**To:** Brad Smith <bsmith@thewhistleblower.net>; Craig Deligdish <cdeligdish@thewhistleblower.net>
**Subject:** RE: Memo of conversation with Jack Todd and Mark Clausen

Brad, Dr. Deligdish,

I had another conversation with Howard today regarding the pricing structure. This is what he confirmed:

1.  They will not bill any patient anything greater than $50.00 regardless of insurance, co-pay or deductible.  They do not want patients to have to pay a lot for this service. They do not go after the patient for any balances over $50.00.

2.  For Tox tests, the billing code is G0483.  This is for a panel of 22-25 drug tests, Medicare will pay approximately $300 as will commercial plans.  They will bill Omni $150.00 for these tests and renegotiate in 90 days based on the profitability. Their cost for these tests is approximately $50.00.

3.  For UTI tests, he stated Omni will profit between $200 and $700 per claim. The price for Omni is $250.00.  Their cost is approximately $75.00 for these tests. After 90 days, they will take a look at EOBs and negotiate the rate as well.

**From:** Brad Smith <bsmith@thewhistleblower.net>
**Sent:** Friday, August 24, 2018 12:41 PM
**To:** Craig Deligdish <cdeligdish@thewhistleblower.net>; Mark Bobango <bobangom@omnihealthcare.com>
**Subject:** Memo of conversation with Jack Todd and Mark Clausen

A.653

OMNI00897

# EXHIBIT X

A.654



# Transcript of **John Todd**

Tuesday, November 28, 2023

*United States of America v. MD Spine Solutions LLC*

www.TP.One
www.aldersonreporting.com
www.accutrancr.com
800.FOR.DEPO (800.367.3376)
Scheduling@TP.One

Reference Number: 135952

A.655

PAGES 1-87

EXHIBITS 1-13

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Case No. 18-cv-12558-PBS

**********************************************

United States of America, et al.,

ex. rel. OMNI Healthcare Inc.,

    Plaintiffs

vs.

MD Spine Solutions LLC, d/b/a MD Labs Inc.,

Denis Grizelj, Matthew Rutledge, and

DOE Healthcare Providers 1-100,

    Defendants

**********************************************

Deposition of John Todd

November 28, 2023

Via Videoconference

------Kristen C. Krakofsky------

Stenographer

Alderson Reporting Company, Inc./Trustpoint

1111 14th Street NW, Suite 1050

Washington, DC 20005

TP One   Schedule@TP.One   www.TP.One   800.FOR.DEPO (800.367.3376)

this guidance or shared this email with Mr. Grizelj

or Mr. Rutledge?

A.   I have no idea.

Q.   Did you ever speak to Mr. Grizelj or

Mr. Rutledge about it?

A.   I don't recall ever doing that.

Q.   Did you ever speak to anyone else at

MD Labs besides Mr. Claussen about this email?

A.   No.   It was a moment in time when I was

just starting.   It was a nonissue with me.   I didn't

talk to anybody else about it.

Q.   Why was it a nonissue?

A.   Because I was working under the MD Labs

policy.

Q.   And what was the MD Labs policy?

A.   Independent reps.

Q.   Is it accurate that the policy was that all

sales reps worked as independent contractors?

A.   That is what I assumed.

Q.   Did you know of any reps who worked for

MD Labs as employees?

A.   Not that I'm aware of.   At least while I

was there, I was not aware of anything.

Q.   I believe you testified earlier that you

 TP One

Schedule a @ TP.One
www.TP.One

A-657

800.FOR.DEPO
(800.367.3376)

# EXHIBIT Y

A.658

**From**: Denis Grizelj [denis@mdlabs.com]
**Sent**: 1/2/2018 5:02:05 PM
**To**: Matthew Rutledge [matthew@mdlabs.com]
**Subject**: RE: Noridian Email on UTI billing & coding

I think we should wait on this and instead of asking them to modify their rates, we should ask them to give us guidance on medical necessity instead. I don't think we are going to a significant amount of testing that would reach Millennium-like levels so we still may end up being a blip. I am not sure how many Pathnostics is currently doing but I am hoping that they are at least aware of this testing currently.

The other reasons I want to wait are 1) I want some time to leverage this on some of the commercials carriers we are not in network in yet to hopefully backdoor a tox contract and 2) I would like for them to re-visit looking at Rxight and adopting a similar model that Pathway Genomics (or whoever it was) has in their Medicare jurisdiction.

I get what you are trying to do but I would like to wait at least 6 months if that's cool with you. We haven't even made a dent yet.

Denis Grizelj



---

**From:** Matthew Rutledge
**Sent:** Tuesday, January 02, 2018 1:22 PM
**To:** Denis Grizelj <denis@mdlabs.com>
**Subject:** Noridian Email on UTI billing & coding

Hey Dude,

What do you think about this letter to Dr Lurvey at Noridian to give them a heads-up on our new molecular diagnostic testing? I think it would be a prudent move to at least document that we told CMS of this new technology and advised them to modify their billing and coding. I think it's our duty, in a way.

Lemme know what you think of this first draft...

Hi Dr Lurvey,

Happy New Year. I hope this email finds you well.

I'm writing to let you and Noridian know of some new clinical laboratory testing we are now offering which is becoming very popular in the area of urinary tract infections (UTI's).

Genetic analytical technology is now allowing us to pinpoint DNA signatures from various infectious pathogens in order to positively identify them with almost 99% certainty very quickly and relatively affordably. We couple this with antibiotic susceptibility testing here at the lab and the result is a report provided to physicians that positively identifies the infecting agent and what antimicrobials will be most effective at killing it and treating the infection.

We are finding physicians are excited about this test and starting to order it in greater numbers. Thus, you will be seeing an increasing number of claims submitted by our laboratory and labs around the country for this testing in 2018 and beyond.

A.659

MD0222266

But... the current CPT coding system doesn't adequately describe this testing very well and the fee schedule payment is quite robust for the work being performed.  New technology is able to do this work much more affordably than it could in the past.

I'd recommend we have a discussion on how to best change the current payment system to best accommodate this new testing technology so that CMS can develop a fair compensation system and simplified coding system that makes billing easy and avoids future overpayments to labs.

I'd strongly advise having this discussion sooner, rather than later.  Let me know when you are available.

-Matthew Rutledge
President
MD Labs

Fyi... you are still listed on the Noridian site as the Contractor Medical Director:

## Contractor Medical Director (CMD) Contact

The Contractor Medical Director (CMD) is a physician with expertise in Medicine and Medicare who works collaboratively with all contractor teams. The CMD is primarily responsible for clinical coverage determinations, such as Local Coverage Determinations (LCDs) and staff trainings on clinical matters, determinations regarding Investigational Device Exemption (IDE) requests, and collaborating with medical societies and peer groups to share information and provide education.

**Arthur Lurvey, MD, FACP, FACE**
Noridian, LLC
900 42nd Street S
PO Box 6781
Fargo, ND 58108-6781
Arthur.Lurvey@Noridian.com
**Phone:** 701-715-9598

A.660

MD0222267

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, *ex rel.* OMNI HEALTHCARE, INC., <br><br> Plaintiffs, <br><br> v. <br><br> MD SPINE SOLUTIONS LLC, D/B/A MD LABS INC., DENNIS GRIZELI, MATTHEW RUTLEDGE AND DOE HEALTHCARE PROVIDERS 1 - 100, <br><br> Defendants. | No. 18-cv-12558-PBS |

**PLAINTIFF-RELATOR OMNI HEALTHCARE, INC.'S RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Plaintiff-Relator OMNI Healthcare, Inc. ("OMNI" or "Relator") submits the following response to Defendants' Statement of Material Facts (ECF #254) and Statement of Facts as to Which There Exists a Genuine Issue to be Tried.

**A.     *MD Labs and PCR UTI Testing***

1.     Defendant MD Labs is an independent clinical laboratory in Reno, Nevada, founded by defendants Matthew Rutledge and Denis Grizelj in 2011. Denis Grizelj Deposition Transcript ("Grizelj Tr."), **Ex. 1**, at 16:20-17:17; Matthew Rutledge Deposition Transcript  ("Rutledge Tr."), **Ex. 2**, at 10:7-12:14.

**RESPONSE:** Admit that Grizelj and Rutledge testified that Defendant MD Labs is an independent clinical laboratory in Reno, Nevada, founded by defendants Matthew Rutledge and Denis Grizelj in 2011.

SHN\848220.1

A.661

2.      MD Labs historically performed urine drug testing ("UDT"). Declaration of Matthew Rutledge ("Rutledge Decl."), **Ex. 3**, ¶ 4; Second Amended Complaint ("SAC"), ECF No. 184, ¶ 34. In or about 2017, it added urinary tract infection ("UTI") testing using polymerase chain reaction ("PCR") technology. Rutledge Tr., **Ex. 2**, at 31:15-24; 42:21-43:1.

**RESPONSE:** Admit that Rutledge testified that in or about 2017, MD Labs added UTI testing using PCR technology.

3.      PCR testing technology has been available since the mid-1980s. *Polymerase Chain Reaction* (*PCR*), NATIONAL LIBRARY OF MEDICINE,

https://www.ncbi.nlm.nih.gov/probe/docs/techpcr/ (last visited July 29, 2024), **Ex. 4**.

**RESPONSE:** Admit that the cited exhibit states that the PCR method was developed in the 1980s.

4.      PCR testing is highly accurate and amplifies copies of a segment of DNA to enable identification of genetic material belonging to a particular biological origin. Expert Report of Dr. Ko ("Ko Rpt."), **Ex. 5**, at 6-7; Dr. Dicken Ko Deposition Transcript ("Ko Tr."), **Ex. 6**, 123:8-124:1.

**RESPONSE:** Relator objects to paragraph 4 on the grounds that it contains legal arguments or arguments of counsel which are not properly part of a Local Rule 56.1 statement.  *See Dukanci v. Ann Inc. Retail*, 117 F. Supp. 3d 115, 117 n.2 (D. Mass. 2015) ("proffered statements fail to comply with Local Rule 56.1 as they ... consist largely of legal argument"); *Matt v. HSBC Bank USA*, 968 F. Supp. 2d 351, 354 n.2 (D. Mass. 2013) (plaintiff "offered paragraphs of legal argument that have no place in a party's concise statement of facts"); *see also Neponset Landing Corp. v. Northwest Mut. Life Ins. Co.*, 902 F. Supp. 2d 149, 153 (D. Mass. 2012) (not crediting as facts LR. 56.1 statements that "merely reflect the arguments of counsel").

5.      In recent years, PCR technology has become a standard test to identify a range of pathogens, including HIV, Hepatitis C, and most recently, COVID-19. Ko Rpt., **Ex. 5**, at 6; Ko. Tr., **Ex. 6**, 123:12-2

SHN\848220.1

A.662

**RESPONSE:** Relator objects to paragraph 5 on the grounds that it contains legal arguments or arguments of counsel which are not properly part of a Local Rule 56.1 statement. *See Dukanci v. Ann Inc. Retail*, 117 F. Supp. 3d 115, 117 n.2 (D. Mass. 2015) ("proffered statements fail to comply with Local Rule 56.1 as they ... consist largely of legal argument"); *Matt v. HSBC Bank USA*, 968 F. Supp. 2d 351, 354 n.2 (D. Mass. 2013) (plaintiff "offered paragraphs of legal argument that have no place in a party's concise statement of facts"); *see also Neponset Landing Corp. v. Northwest Mut. Life Ins. Co.*, 902 F. Supp. 2d 149, 153 (D. Mass. 2012) (not crediting as facts LR. 56.1 statements that "merely reflect the arguments of counsel").

6.      By contrast the standard test for UTIs for over 60 years has been the bacterial urine culture ("BUC"), where a urine sample is placed on a growth medium in a Petri dish, and laboratories wait between 24 and 48 hours to determine if any bacteria grew, and sometimes longer for slow-growing bacteria. Ko Rpt. **Ex. 5**, at 4; Ko. Tr. **Ex. 6**, 82:18-24.

**RESPONSE:** Admit only that Defendants' expert, Dr. Dicken Ko, made these statements. OMNI further states that Dr. Ko serves on the Scientific Advisory Board of Pathnostics, a laboratory which has developed its own PCR-based test for UTIs and thus stands to benefit directly from the expanded use of PCR-based UTI testing. *See* Exh. E, Ko Dep. Tr. at 18:1-19:15. In publishing Dr. Ko's research into PCR-based UTI testing, the Journal of Urology has acknowledged Dr. Ko's potential conflict of interest due to his affiliation with Pathnostics. *See* Exh. F at 9.

7.      MD Labs used PCR technology to test for the presence of genetic material for 17 or 19 pathogens, depending on the time period. Grizelj Tr., **Ex. 1**, at 220:16-221:6; 226:9-16; Rutledge Decl., **Ex. 3**, ¶ 5.

**RESPONSE:** Admit that Grizelj and Rutledge testified that MD Labs used PCR technology to test for the presence of genetic material for 17 or 19 pathogens, depending on the time period.

8.      In addition to the PCR test, MD Labs simultaneously conducted an antibiotic susceptibility test ("AST") by culturing the urine specimen to grow any bacteria present so it could then determine whether it was susceptible to a broad array of antibiotics. Grizelj Tr., **Ex. 1**, at 198:12-24; Dr. Steven Parker Deposition Transcript ("Parker Tr."), **Ex. 7**, at 75:16-76:1; Rutledge Decl., **Ex. 3**, ¶ 8.

SHN\848220.1

A.663

**RESPONSE:** Admit that Grizelj and Parker testified that MD Labs simultaneously conducted an AST by culturing the urine specimen to grow any bacteria present so it could then determine whether it was susceptible to a broad array of antibiotics.

9.      Performing both tests simultaneously provided faster than results than would be available if the lab delayed culturing the sample for AST until PCR results were available. Rutledge Decl., **Ex. 3**, ¶ 9.

**RESPONSE:** Relator objects to paragraph 9 on the grounds that it contains legal arguments or arguments of counsel which are not properly part of a Local Rule 56.1 statement.  *See Dukanci v. Ann Inc. Retail*, 117 F. Supp. 3d 115, 117 n.2 (D. Mass. 2015) ("proffered statements fail to comply with Local Rule 56.1 as they ... consist largely of legal argument"); *Matt v. HSBC Bank USA*, 968 F. Supp. 2d 351, 354 n.2 (D. Mass. 2013) (plaintiff "offered paragraphs of legal argument that have no place in a party's concise statement of facts"); *see also Neponset Landing Corp. v. Northwest Mut. Life Ins. Co.*, 902 F. Supp. 2d 149, 153 (D. Mass. 2012) (not crediting as facts LR. 56.1 statements that "merely reflect the arguments of counsel").

10.      If PCR testing identified pathogens, MD Labs allowed the urine culture to continue to grow and performed AST. Grizelj Tr., **Ex. 1**, at 198:12-24; 199:14-17; Rutledge Decl., **Ex. 3**, ¶ 10.

**RESPONSE:** Admit that Grizelj and Rutledge testified that if PCR testing identified pathogens, MD Labs allowed the urine culture to continue to grow and performed AST.

11.      If a PCR test did not detect any pathogens, MD Labs discarded and did not report or bill for the culture, instead billing only for the PCR pathogen detection test. Grizelj Tr., **Ex. 1**, at 198:12-199:2; Rutledge Decl., **Ex. 3**, ¶ 11.

**RESPONSE:** Admit that Grizelj and Rutledge testified that if a PCR test did not detect any pathogens, MD Labs discarded and did not report or bill for the culture, instead billing only for the PCR pathogen detection test.

12.      PCR testing produces results more quickly than BUC. Ko Rpt., **Ex. 5**, at 5-6.

**RESPONSE:** Admit only that Defendants' expert stated that PCR testing produces results more quickly than BUC.

SHN\848220.1

A.664

13.     MD Labs could often determine if a patient had an infection 24 hours before a BUC would have produced results. Parker Tr., **Ex. 7**, at 121:24-122:3; Ko Rpt., **Ex. 5**, at 4-5; Rutledge Decl., **Ex. 3**, ¶ 12.

**RESPONSE:** Admit only that Defendants testified that MD Labs could often determine if a patient had an infection 24 hours before a BUC would have produced results.

14.     MD Labs' faster results enabled providers to prescribe appropriate antibiotics more quickly or eliminate a UTI as the cause of patient symptoms. Ko Rpt., **Ex. 5**, at 5; Ko. Tr., **Ex. 6**, at 134:21-135:19.

**RESPONSE:** Admit only that Defendants' expert stated that PCR testing produces results more quickly than BUC.

15.     MD Labs offered providers the ability to receive PCR UTI results before AST results were available to further aid in the clinical decision-making process. *See, e.g.*, MDLabs_0008722, **Ex. 8**.

**RESPONSE:** Admit that MD Labs order form for UTI testing stated providers could receive PCR UTI results before AST results were available.

16.     PCR UTI testing is more accurate than BUC, which may miss bacteria where a patient has already started antibiotics or where there is a polymicrobial infection where a dominant organism overgrows a secondary pathogen. Parker Tr., **Ex. 7**, at 114:15-23; Ko Tr., **Ex. 6**, 94:3-20; 113:12-24.

**RESPONSE:** Relator objects to paragraph 16 on the grounds that it contains legal arguments or arguments of counsel which are not properly part of a Local Rule 56.1 statement. *See Dukanci v. Ann Inc. Retail*, 117 F. Supp. 3d 115, 117 n.2 (D. Mass. 2015) ("proffered statements fail to comply with Local Rule 56.1 as they ... consist largely of legal argument"); *Matt v. HSBC Bank USA*, 968 F. Supp. 2d 351, 354 n.2 (D. Mass. 2013) (plaintiff "offered paragraphs of legal argument that have no place in a party's concise statement of facts"); *see also Neponset Landing Corp. v. Northwest Mut. Life Ins. Co.*, 902 F. Supp. 2d 149, 153 (D. Mass. 2012) (not crediting as facts LR. 56.1 statements that "merely reflect the arguments of counsel").

5

17.     MD Labs' PCR testing provided significant clinical benefit to patients whose UTIs were caused by pathogens traditional BUC was incapable of identifying. Ko Rpt., **Ex. 5**, at 5; Ko. Tr., **Ex. 6**, 94:16-95:1; 113:12-24.

**RESPONSE:** Relator objects to paragraph 17 on the grounds that it contains legal arguments or arguments of counsel which are not properly part of a Local Rule 56.1 statement. *See Dukanci v. Ann Inc. Retail*, 117 F. Supp. 3d 115, 117 n.2 (D. Mass. 2015) ("proffered statements fail to comply with Local Rule 56.1 as they ... consist largely of legal argument"); *Matt v. HSBC Bank USA*, 968 F. Supp. 2d 351, 354 n.2 (D. Mass. 2013) (plaintiff "offered paragraphs of legal argument that have no place in a party's concise statement of facts"); *see also Neponset Landing Corp. v. Northwest Mut. Life Ins. Co.*, 902 F. Supp. 2d 149, 153 (D. Mass. 2012) (not crediting as facts LR. 56.1 statements that "merely reflect the arguments of counsel").

OMNI further admits only that Defendants' expert, Dr. Dicken Ko, made these statements. OMNI further states that Dr. Ko serves on the Scientific Advisory Board of Pathnostics, a laboratory which has developed its own PCR-based test for UTIs and thus stands to benefit directly from the expanded use of PCR-based UTI testing. *See* Exh. E, Ko Dep. Tr. at 18:1-19:15.  In publishing Dr. Ko's research into PCR-based UTI testing, the Journal of Urology has acknowledged Dr. Ko's potential conflict of interest due to his affiliation with Pathnostics.  Exh. F at 9.

18.     PCR testing, combined with AST, decreases the spread of antibiotic-resistant bacteria that can generate dangerous infections because it ensures that clinicians use an effective antibiotic the first time around, rather than potentially using an antibiotic that may not be as effective. Ko Rpt., **Ex. 5**, at 6-7.

**RESPONSE:** Relator objects to paragraph 18 on the grounds that it contains legal arguments or arguments of counsel which are not properly part of a Local Rule 56.1 statement. *See Dukanci v. Ann Inc. Retail*, 117 F. Supp. 3d 115, 117 n.2 (D. Mass. 2015) ("proffered statements fail to comply with Local Rule 56.1 as they ... consist largely of legal argument"); *Matt v. HSBC Bank USA*, 968 F. Supp. 2d 351, 354 n.2 (D. Mass. 2013) (plaintiff "offered paragraphs of legal argument that have no place in a party's concise statement of facts"); *see also Neponset Landing Corp. v. Northwest Mut. Life Ins. Co.*, 902 F. Supp. 2d 149, 153 (D. Mass. 2012) (not crediting as facts LR. 56.1 statements that "merely reflect the arguments of counsel").

OMNI further admits only that Defendants' expert, Dr. Dicken Ko, made these statements. OMNI further states that Dr. Ko serves on the Scientific Advisory Board of Pathnostics, a laboratory which has developed its own PCR-based test for UTIs and thus stands to benefit directly from the expanded use of PCR-based UTI testing.  *See* Exh. E, Ko Dep.

6

A.666

Tr. at 18:1-19:15.  In publishing Dr. Ko's research into PCR-based UTI testing, the Journal of Urology has acknowledged Dr. Ko's potential conflict of interest due to his affiliation with Pathnostics.  Exh. F at 9.

19.     At the time MD Labs offered PCR UTI testing, no local coverage determination

("LCD") or national coverage determination ("NCD") limited the use of PCR UTI testing and

government and commercial payors routinely paid claims for PCR UTI testing. Rutledge Decl.,

**Ex. 3**, ¶ 7.

**RESPONSE:** Denied.  At the time MD Labs began performing UTI testing using PCR technology in 2017, Centers for Medicare & Medicaid Services ("CMS") had not issued any National Coverage Determination ("NCD") or Local Coverage Determination ("LCD") for PCR-based UTI testing.  Medicare issues NCDs for items and services that are reasonable and necessary for the diagnosis or treatment of an illness or injury.  *See* Exh. C.  CMS makes NCDs through an evidence-based process, with opportunities for public participation.  *Id.*  In the absence of a national coverage policy, an item or service may be covered at the discretion of the Medicare contractors based on a LCD. *Id.*  CMS has never issued a NCD for the type of PCR-based UTI testing performed by MD Labs and only published a LCD in June 2022, which only half of Medicare contractors have adopted to date.  *See* ECF #254-10 at 3.

20.     Both parties' experts agreed that PCR UTI testing is reasonable and necessary in

certain cases. Dr. Mourtzinos Deposition Transcript ("Mourtzinos Tr."), **Ex. 9**, at 54:11-55:8;

77:4-20 Ko Tr., **Ex. 6**, at 89:4-13.

**RESPONSE:** Admit that OMNI's medical expert, Dr. Arthur Mourtzinos, testified that only once in his 17 years of practice did he find it appropriate to order a PCR-based test for a suspected UTI even though he practices in a tertiary care referral center which sees complex patients as opposed to a private practice like OMNI.  Exh. P, Mourtzinos Dep. Tr. at 101:2-22.  He emphasized that while he "could do 17 tests on every patient that walks in the door", it is not appropriate to perform those tests if it is not going to affect patient care.  *Id.* at 98:10-16.

21.     Omni's own medical expert agreed with a myriad of reasons that PCR testing for

UTIs may be medically necessary, including: (1) Refractory UTI: failed standard therapy from

urine culture/traditional empiric treatment; (2) Patients sent to urology for recurrent or refractory

SHN\848220.1

A.667

UTI; (3) Need for better test; (4) PCR test allows identification of specific organisms and resistance genes; (5) Repeat PCR test after treatment in symptomatic patients allows evaluation of treatment and tailoring to sterilize the urine; (5) Complicated UTI: male, fever, foreign body, stone, obstruction, etc.; (6) Empiric antibiotics started and tailored to resistance genes in 24 to 48 hours (urine culture 48-72 hours); (7) Urine Culture unable to identify extended-spectrum β-lactamase, high prevalence; and (8) Complete divergence of treatment course. Mourtzinos Tr., **Ex. 9**, at 77:4-20, 78:7-80:16; Jonathan Rubenstein, MD & Mark Painter, *How to get reimbursed for multiplex PCR urine cultures*, 50 Urology Times Journal (2022), **Ex. 10**.

**RESPONSE:** Denied.  Dr. Mourtzinos testified that PCR testing for UTIs could be reasonable and necessary in situations where a patient has a history of recurrent UTIs and has been treated with a number of antibiotics that have not been effective.  ECF #254-9 at 77:4-20.

22.   Dr. Mourtzinos' opinion was consistent with that of MD Labs' expert, Dr. Ko, who testified that PCR testing was indicated for patients with a "complicated urinary tract infection or a recurrent urinary tract infection with prior negative studies or recurrent positive polymicrobial infection and a lot of antibiotic resistance," to "help the providers further define . . . what is in the urine, what is the interplay of organisms that exist in that urobiome." Ko Tr., **Ex. 6**. at 89:4-13; *see also id.* at 94:3-95:3.

**RESPONSE:** Admit only that Defendants' expert stated that PCR testing was indicated for patients with a "complicated urinary tract infection or a recurrent urinary tract infection with prior negative studies or recurrent positive polymicrobial infection and a lot of antibiotic resistance," to "help the providers further define . . . what is in the urine, what is the interplay of organisms that exist in that urobiome."

23.   PCR UTI testing is also indicated for patients with persistent symptoms but for whom a standard culture does not identify the bacteria and there is a suspected inflammatory component. Ko Tr., **Ex. 6**, at 94:8-20.

**RESPONSE:** Admit only that Defendants' expert stated that PCR UTI testing is also indicated for patients with persistent symptoms but for whom a standard culture does not identify the bacteria and there is a suspected inflammatory component.

24.     PCR testing is not new, novel, relatively unknown or rarely used and is the standard test for a range of pathogens. Ko Rpt., **Ex. 5**, at 6.

**RESPONSE:** Denied.  The most recent American Urological Association guidelines issued in 2022 found that more sensitive culture-based or molecular bacterial detection methods (e.g., polymerase chain reaction-based detection methods) are not necessarily beneficial in the diagnostic evaluation of patients with a suspected UTI.  *See* Exh. D.

25.     Peer-reviewed literature notes that BUC has several limitations, including missed polymicrobial infections, false negatives, contamination of urine specimens, and prolonged turnaround times. Ko Rpt., **Ex. 5**, at 4-5.

**RESPONSE:** Admit only that Defendants' expert stated that BUC testing has limitations.

26.     Additionally, one study found that in cases where PCR testing detected microorganisms missed by SUC, over 75 percent of those cases were "'true UTIs, as evidenced by elevated levels of urinary biomarkers in a symptomatic population with a presumptive UTI diagnosis.'" Ko Rpt., **Ex. 5**, at 6 (quoting Haley, et al., *Comparison Shows that Multiplex Polymerase Chain Reaction Identifies Infection-associated Urinary Biomarker-positive Urinary Tract Infections that are Missed by Standard Urine Culture*, 58 EUROPEAN UROLOGY OPEN SCI., 73-91 (2023)).

**RESPONSE:** Admit that one study found as such.

27.     Furthermore, "[d]ata are now emerging that using PCR instead of SUC has led to fewer recurrent infections, hospitalizations, and significantly less overall cost for complicated urinary infections." Ko Rpt., **Ex. 5**, at 7 (citing Ko, et al., *Real-World Evidence That a Novel Diagnostic Combining Molecular Testing With Pooled Antibiotic Susceptibility Testing is*

9

A.669

*Associated With Reduced Infection Severity and lower Cost Compared With Standard Urine Culture in Patients With Complicated or Persistently Recurrent Urinary Tract Infections*, 1 JU OPEN PLUS 5 (2023)).

**RESPONSE:** OMNI admits only that Defendants' expert, Dr. Dicken Ko, made these statements.  OMNI further states that Dr. Ko serves on the Scientific Advisory Board of Pathnostics, a laboratory which has developed its own PCR-based test for UTIs and thus stands to benefit directly from the expanded use of PCR-based UTI testing.  *See* Exh. E, Ko. Dep. Tr. at 18:1-19:15.  In publishing the article cited in paragraph 27, the Journal of Urology has acknowledged Dr. Ko's potential conflict of interest due to his affiliation with Pathnostics.  Exh. F at 9.

28.     MD Labs' expert opined that PCR UTI testing is not experimental and instead is "very standard across the country." Ko Tr., **Ex. 6**, at 84:22-86:3 (noting PCR UTI testing is not included among a list of experimental UTI tests).

**RESPONSE:** Admit only that Defendants' expert, Dr. Dicken Ko, made these statements. OMNI further states that Dr. Ko serves on the Scientific Advisory Board of Pathnostics, a laboratory which has developed its own PCR-based test for UTIs and thus stands to benefit directly from the expanded use of PCR-based UTI testing.  *See* Exh. E, Ko. Dep. Tr. at 18:1-19:15.  In publishing the article cited in paragraph 27, the Journal of Urology has acknowledged Dr. Ko's potential conflict of interest due to his affiliation with Pathnostics.  Exh. F at 9.

29.     MD Labs' test for 17 or 19 pathogens was within the range of pathogens endorsed by peer-reviewed literature, and the specific pathogens for which MD Labs tested were appropriate. Ko Rpt., **Ex. 5**, at 5.

**RESPONSE:** Admit only that Defendants' expert, Dr. Dicken Ko, made these statements. OMNI further states that Dr. Ko serves on the Scientific Advisory Board of Pathnostics, a laboratory which has developed its own PCR-based test for UTIs and thus stands to benefit directly from the expanded use of PCR-based UTI testing.  *See* Exh. E, Ko. Dep. Tr. at 18:1-19:15.  In publishing the article cited in paragraph 27, the Journal of Urology has acknowledged Dr. Ko's potential conflict of interest due to his affiliation with Pathnostics.  Exh. F at 9.

SHN\848220.1

A.670

30.     Providers not affiliated with MD Labs also recognized and praised the clinical utility of MD Labs' PCR UTI test. *See*, *e.g.*, MD0211812, **Ex. 11**.

**RESPONSE:** Denied.  The cited evidence does not support the statement in paragraph 30.

31.     Based on MD Labs' medical director's clinical expertise, Defendants believed PCR UTI testing could assist providers treating patients better than BUCs, as PCR testing could be completed more quickly and was more sensitive in identifying bacteria than BUC. Grizelj Tr., **Ex. 1**, at 73:2-16; *see also* Parker Tr., **Ex. 7**, at 81:11-82:16; 104:10-20; 121:24-122:3.

**RESPONSE:** Relator objects to paragraph 31 on the grounds that it contains legal arguments or arguments of counsel which are not properly part of a Local Rule 56.1 statement.  *See Dukanci v. Ann Inc. Retail*, 117 F. Supp. 3d 115, 117 n.2 (D. Mass. 2015) ("proffered statements fail to comply with Local Rule 56.1 as they ... consist largely of legal argument"); *Matt v. HSBC Bank USA*, 968 F. Supp. 2d 351, 354 n.2 (D. Mass. 2013) (plaintiff "offered paragraphs of legal argument that have no place in a party's concise statement of facts"); *see also Neponset Landing Corp. v. Northwest Mut. Life Ins. Co.*, 902 F. Supp. 2d 149, 153 (D. Mass. 2012) (not crediting as facts LR. 56.1 statements that "merely reflect the arguments of counsel").

32.     Defendants were aware that several labs already offered PCR UTI testing when MD Labs began offering the testing, and that contemporaneous research indicated the superiority over BUCs. Rutledge Decl., **Ex. 3**, ¶ 6.

**RESPONSE:** Admit only that Rutledge stated that Defendants were aware that several labs already offered PCR UTI testing when MD Labs began offering the testing.

**B.**     ***The Role of the Clinical Laboratory***

33.     Clinical laboratories do not have a role in determining the medical necessity of testing ordered by medical providers. Dr. Deligdish Deposition Transcript ("Deligdish Tr."), **Ex. 12**, at 39:18-21.

**RESPONSE:** Relator objects to paragraph 33 on the grounds that it contains legal arguments or arguments of counsel which are not properly part of a Local Rule 56.1 statement.  *See Dukanci v. Ann Inc. Retail*, 117 F. Supp. 3d 115, 117 n.2 (D. Mass. 2015) ("proffered statements fail to comply with Local Rule 56.1 as they ... consist largely of legal argument"); *Matt v. HSBC Bank*

*USA*, 968 F. Supp. 2d 351, 354 n.2 (D. Mass. 2013) (plaintiff "offered paragraphs of legal argument that have no place in a party's concise statement of facts"); *see also Neponset Landing Corp. v. Northwest Mut. Life Ins. Co.*, 902 F. Supp. 2d 149, 153 (D. Mass. 2012) (not crediting as facts LR. 56.1 statements that "merely reflect the arguments of counsel").

OMNI further states that the Compliance Program Guidance for Clinical Laboratories published by the Office of Inspector General ("OIG") of the Department of Health and Human Services ("HHS") makes clear though that "[l]aboratories should take all reasonable steps to ensure that it is not submitting claims for services that are not covered, reasonable and necessary." Exh. G at 45079. The OIG's Guidance states that "[w]e recognize that laboratories do not and cannot treat patients or make medical necessity determinations. However, there are steps that such facilities can take to assure compliance with applicable statutes, regulations and the requirements of Federal, State and private health plans." *Id.*

34.    Laboratory staff are not trained medical professionals, do not examine patients to assess their medication conditions, and do not treat patients. Rutledge Decl., **Ex. 3**, ¶ 14; *see also* Brief of Amicus Curiae American Clinical Laboratory Association at 3, *U.S. ex rel. Groat v. Boston Heart Diagnostics Corp.*, 296 F. Supp. 3d 155, 165 (D.D.C. 2017), **Ex. 13** ("In the vast majority of cases, laboratories do not see the patient for whom testing is being ordered. Even in cases in which the patient comes to a laboratory facility to have a specimen drawn, the laboratory does not examine the patient to assess his or her medical condition.").

**RESPONSE:** Relator objects to paragraph 34 on the grounds that it contains legal arguments or arguments of counsel which are not properly part of an Local Rule 56.1 statement. *See Dukanci v. Ann Inc. Retail*, 117 F. Supp. 3d 115, 117 n.2 (D. Mass. 2015) ("proffered statements fail to comply with Local Rule 56.1 as they ... consist largely of legal argument"); *Matt v. HSBC Bank USA*, 968 F. Supp. 2d 351, 354 n.2 (D. Mass. 2013) (plaintiff "offered paragraphs of legal argument that have no place in a party's concise statement of facts"); *see also Neponset Landing Corp. v. Northwest Mut. Life Ins. Co.*, 902 F. Supp. 2d 149, 153 (D. Mass. 2012) (not crediting as facts LR. 56.1 statements that "merely reflect the arguments of counsel").

OMNI further states that the Compliance Program Guidance for Clinical Laboratories published by the Office of Inspector General ("OIG") of the Department of Health and Human Services ("HHS") makes clear though that "[l]aboratories should take all reasonable steps to ensure that it is not submitting claims for services that are not covered, reasonable and necessary." Exh. G at 45079. The OIG's Guidance states that "[w]e recognize that laboratories do not and cannot treat patients or make medical necessity determinations. However, there are steps that such facilities

12

SHN\848220.1

A.672

can take to assure compliance with applicable statutes, regulations and the requirements of Federal, State and private health plans." *Id.*

35.     By contrast, providers meet with patients, assess their conditions, have knowledge of their medical histories, and determine the course of treatment appropriate for patients based on their skill and expertise. *See*, *e.g.*, Dr. Kimberly McGrath Deposition Transcript ("McGrath Tr."), **Ex. 14**, at 25:3-26:13

**RESPONSE:** Admit that providers meet with patients.

36.     Medical providers typically send laboratories such as MD Labs only a requisition form indicating the test the *provider* determined to be medically necessary and the applicable diagnosis code provided by the provider. *See*, *e.g.*, McGrath Tr., **Ex. 14**, at 15:2-8 (testifying that only he determines what laboratory tests to order for his patients).

**RESPONSE:** Admit only that the OIG recommends that laboratories "construct the requisition form to capture the correct program information as required by Federal or private healthcare programs and to promote ordering of tests by physicians or other authorized individuals." Exh. G at 45079.  The MD labs requisition form only offered the option to order its "Urinary Tract Infection Panel on File."  Exh. O (patient identifying information redacted).  There was no option to order only a limited number of follow-up PCR tests to identify specific bacteria.  *Id.*

37.     Clinical laboratories must perform the tests ordered by providers; it would be inappropriate to override their clinical decisions. Ko Rpt., **Ex. 5**, at 9.

**RESPONSE:** Admit that Defendants' expert made these statements. OMNI further states that MD Labs frequently performed PCR-based UTI tests even if there was no documentation in the medical chart demonstrating the intent of the ordering physician to perform the PCR diagnostic testing and antimicrobial susceptibility testing.  Exh. H. MD Labs often performed PCR-based UTI testing even when the MD Labs requisition Forms were not signed by the health care provider and/or where the MD Labs requisition form left the box for the PCR-based UTI testing panel unchecked.  *Id.*

**C.     *MD Labs' Sales Force***

SHN\848220.1

A.673

38.     At all times relevant to this litigation, MD Labs used both independent contractor and W-2 employee sales representatives to promote the existence and benefits of PCR UTI testing to providers. Grizelj Tr., **Ex. 1**, at 226:17-20; Rutledge Tr., **Ex. 2**, at 96:21-97:8; Rutledge Decl., **Ex. 3**, ¶ 15.

**RESPONSE:** Admit that MD Labs used independent contractor sales representatives to sell PCR-based UTI testing.

39.     Pursuant to agreements with sales representatives, MD Labs paid commissions based on the revenue generated from the testing ordered by providers at their sales accounts. Rutledge Tr., **Ex. 2**, at 99:1-13; Rutledge Decl., **Ex. 3**, ¶ 17.

**RESPONSE:** Admit that MD Labs paid commissions based on the revenue generated from the testing ordered by providers at their sales accounts.

40.     These agreements did not provide for any payment to providers. Rutledge Decl., **Ex. 3**, ¶ 18.

**RESPONSE:** Denied.  Defendants' citation to Rutledge's declaration, and not to the agreements themselves, is not sufficient evidence to substantiate the assertion in paragraph 40.

41.     MD Labs sales representatives did not offer or pay anything of value to providers. Rutledge Decl., **Ex. 3**, ¶ 18.

**RESPONSE:** Denied.  Defendants' citation to Rutledge's declaration is not sufficient evidence to substantiate the assertion in paragraph 41.

42.     MD Labs trained, managed, and, if needed, disciplined its sales representatives in the same manner, regardless of whether they were independent contractors or W-2 employees. Grizelj Tr., **Ex. 1**, at 128:13-20; Rutledge Tr., **Ex. 2**, at 79:7-15; Rutledge Decl., **Ex. 3**, ¶ 16.

**RESPONSE:** Denied.  Defendants' citation to Rutledge's testimony and declaration and Grizelj's testimony is not sufficient evidence to substantiate the assertion in paragraph 42.

14

A.674

43.     MD Labs trained independent contractor and W-2 employee sales representatives identically and all sales representatives were instructed to use the same marketing materials. Rutledge Decl., **Ex. 3**, ¶ 15.

**RESPONSE:** Denied.  Defendants' citation to Rutledge's declaration is not sufficient evidence to substantiate the assertion in paragraph 43.

44.     Roy Riley ("Riley"), owner and sales representative of Pace Solutions LLC, explicitly denies that either the way he was compensated by MD Labs or his 1099 status affected the sales message he used about the benefits of PCR testing, or that his compensation structure incentivized him to sell medically unnecessary tests. Declaration of Roy Riley ("Riley Decl.,")., **Ex. 15**, ¶ 7.

**RESPONSE:** Admit only that Riley made this otherwise uncorroborated statement in the declaration he provided on behalf of Defendants.

45.     Pace Solutions LLC and Riley promoted PCR UTI testing as appropriate for patients who suffer from recurrent or intractable UTIs. Riley Decl., **Ex. 15**, ¶ 5.

**RESPONSE:** Admit only that Riley made this otherwise uncorroborated statement in the declaration he provided on behalf of Defendants.

46.     Defendants told Riley to promote PCR UTI testing based on medical necessity and never asked him to do anything that compromised his integrity. Riley Decl., **Ex. 15**, ¶¶ 5, 8.

**RESPONSE:** Admit only that Riley made this otherwise uncorroborated statement in the declaration he provided on behalf of Defendants.

47.     Defendants subjectively believed that paying independent sales representatives on commission was lawful. Grizelj Tr., **Ex. 1**, at; Rutledge Tr., **Ex. 2**, at 88:16-21.

**RESPONSE:** Relator objects to paragraph 47 on the grounds that it contains legal arguments or arguments of counsel which are not properly part of a Local Rule 56.1 statement.  *See Dukanci v. Ann Inc. Retail*, 117 F. Supp. 3d 115, 117 n.2 (D. Mass. 2015) ("proffered statements fail to comply with Local Rule 56.1 as they ... consist largely of legal argument"); *Matt v. HSBC Bank*

SHN\848220.1

A.675

*USA*, 968 F. Supp. 2d 351, 354 n.2 (D. Mass. 2013) (plaintiff "offered paragraphs of legal argument that have no place in a party's concise statement of facts"); *see also Neponset Landing Corp. v. Northwest Mut. Life Ins. Co.*, 902 F. Supp. 2d 149, 153 (D. Mass. 2012) (not crediting as facts LR. 56.1 statements that "merely reflect the arguments of counsel").

OMNI further states that MD Labs used independent contractors for sales and marketing through at least 2021, even though Grizelj and Rutledge were made aware numerous times by counsel and their own employees that such conduct violated the Anti-Kickback Statute and could violate EKRA.  As early as 2016, MD Labs' counsel provided a fact sheet which advised that "payment of percentage of sales commissions to contract sales personnel implicates the federal AKS, and is not protected by an AKS safe harbor." Exh. I.  In 2017, Grizelj stated that he had concerns about paying sales representatives as independent contractors "based on what I have learned over the past couple of months and the fact that there doesn't seem to be a lab out there that I know of paying reps as 1099s."  Exh. J.  Also in 2017, MD Labs' counsel advised Grizelj that the OIG "has expressed concern about percentage based compensation for independent marketing agents, and particularly where there is direct contact between the marketing rep and referring physicians."  Exh. K.  Similarly, regarding EKRA, Grizelj and Rutledge were made aware in 2019, shortly after EKRA was enacted, that fines and imprisonment were potential penalties for commission-based payments to independent contractor sales representatives.  Exh. L.

48.    Once MD Labs was instructed by its counsel that *U.S. v. Mallory*, 988 F.3d 730 (4th Cir. 2021) held that certain commission-based compensation arrangements for laboratory independent contractor sales representatives could violate the AKS MD Labs disbanded its independent sales force and hired sales representatives as W-2 employees. Rutledge Decl., **Ex. 3**, ¶ 21.

**RESPONSE:** Admit only that Rutledge stated that MD Labs ceased using independent contractor sales representatives in 2021.

## D.    *MD Labs' Billing Practices*

49.    For approximately two years, MD Labs charged some patients $50 for PCR UTI testing if they were uninsured or their insurers denied coverage. MD Labs did so with the understanding that this was part of MD Labs' financial hardship policy for certain patients. Rutledge Decl., **Ex. 3**, ¶ 19.

SHN\848220.1

A.676

**RESPONSE:** Admit only that as a matter of practice, MD Labs routinely did not balance bill patients. *See* Exhs. M and N.

50.     The only Omni provider that the record has shown was aware of some patients being charged $50 was Deligdish (*see* OMNI00073, **Ex. 16**), who admitted that his motivation to send samples to MD Labs was based on his desire to substantiate allegations in this lawsuit. Deligdish Tr., **Ex. 12**, at 42:24-43:5; 86:14-87:3.

**RESPONSE:** Denied. MD Labs' widely distributed marketing materials to promote its PCR-based UTI specifically state, in bold, "No Balance Billing."  Exh. N.

51.     MD Labs' intent in offering the lower charge was to relieve demonstrated financial burden on patients, and Defendants did not believe a potential benefit to *patients* was an inducement to *providers*. Rutledge Tr., **Ex. 2**, at 147:1-8; Rutledge Decl., **Ex. 3**, ¶ 19.

**RESPONSE:** Admit only that Rutledge testified to these otherwise unsubstantiated statements.

52.     In or about 2020, MD Labs changed its financial hardship policy to no longer offer a reduced price where the patient was not insured or their insurance denied coverage for PCR UTI tests, regardless of a patient's financial condition. Rutledge Decl., **Ex. 3**, ¶ 20.

**RESPONSE:** Admit only that Rutledge testified to these otherwise unsubstantiated statements.

**E.     *Omni and Dr. Deligdish***

53.     Omni, owned by Deligdish, is a Florida medical group that also operates a physician-owned office laboratory called Melbourne Medical Laboratory. Deligdish Tr., **Ex. 12**, at 21:4-5; 23:10-18; 89:23-90:1; 91:6-8.

**RESPONSE: Admitted.**

54.     Omni has received between $10 million and $20 million in revenue from settlements or other awards from *qui tam* actions. Deligdish Tr., **Ex. 12**, at 26:17-20.

SHN\848220.1

A.677

**RESPONSE: Admitted.**

55.     Deligdish also owns another entity, Lo Tignov, whose sole purpose is to investigate potential *qui tam* defendants and reap substantial investigatory fees through settlements with its targets. Deligdish Tr., **Ex. 12**, at 26:17-20 (Omni has received between $10 million and $20 million in settlements or other awards from *qui tam* actions); *id.* at 164:8-16 (Lo Tignov has investigated companies that it alleged engaged in Medicare and Medicaid fraud); 285:19-23 (Deligdish is the sole owner of Lo Tignov); *id.* at 286:7-9 (Lo Tignov does not conduct investigations for anyone or any entity other than Deligdish or Omni).

**RESPONSE:** Admit that Dr. Deligdish owns Lo Tignov, which investigates companies it suspects are committing Medicare and Medicaid fraud.

56.     Deligdish diverted Omni patient specimens for which Omni providers had ordered a BUC to MD Labs for PCR UTI testing in an effort to create a basis for this action. Deligdish Tr., **Ex. 12**, at 86:14-87:24; 95:23-96:3.

**RESPONSE:** Denied that Dr. Deligdish "diverted" any patient specimens as OMNI providers had not requested a specific lab perform the test.

57.     Deligdish caused Omni to submit nearly 600 requisitions for PCR UTI testing to MD Labs, notwithstanding that patients' treating providers instead ordered a different type of test. Deligdish Tr., **Ex. 12**, at 38:1-9; 95:23-96:3.

**RESPONSE:** Admit that OMNI submitted nearly 600 requisitions to MD Labs.

58.     Although Deligdish asserted that Omni providers were informed that samples would be sent to MD Labs for PCR testing, he could not recall how they were informed, who informed them, whether it was verbally or in writing, or when they were informed. Deligdish Tr., **Ex. 12**, at 96:4-20.

SHN\848220.1

A.678

**RESPONSE:** Admit that Dr. Deligdish testified that OMNI providers were informed that samples would be sent to MD Labs.

59.     When an Omni provider determined that a particular laboratory test was necessary, the provider generally would choose from a list of available tests in Omni's electronic medical record and Omni medical assistants completed a requisition form for a particular lab. Deligdish Tr., **Ex. 12**, at 81:7-13; 82:5-9; 83:24-84:3.

**RESPONSE:** Admitted.

60.     However, in 2017 and 2018, irrespective of the Omni providers' decisions to order a *BUC* test for their patients, Deligdish instructed Omni's staff to order *PCR* testing from MD Labs. Deligdish admitted that he did this "so that OMNI could accumulate the necessary evidence to substantiate the allegations in the Complaint." Deligdish Tr., **Ex. 12**, at 84:4-6; 86:14-87:10; 95:23-96:3.

**RESPONSE:** Admit that OMNI ordered testing from MD Labs to substantiate the allegations in its complaint against Defendants.

61.     Notwithstanding the fact that Omni providers determined that a BUC was the appropriate test for each patient, Omni ordered PCR testing of these samples at Deligdish's direction. Deligdish Tr., **Ex. 12**, at 95:23-96:3.

**RESPONSE:** Admit that OMNI ordered testing from MD Labs to substantiate the allegations in its complaint against Defendants.

62.     Deligdish also submitted duplicate patient samples to up to ten *other* medical laboratories, seeking to manufacture fodder for a slew of additional *qui tam* complaints, knowing that federal health care programs would be billed for the duplicate medically unnecessary tests. Deligdish Tr., **Ex. 12**, at 255:4-256:4.

SHN\848220.1

A.679

**RESPONSE:** Admit that Dr. Deligdish stated he ordered PCR-based UTI testing from 10 different laboratories on October 21, 2021.

63.     Medicare rules make clear that knowingly testing a patient with the same test multiple times on the same date of service is not medically necessary. *See* Medicare Claims Processing Manual, ch. 16, § 100.5.1, *available at* https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/clm104c16.pdf (citing 42 U.S.C. § 1395l(h)(5)(A)).

**RESPONSE:** Admit that the cited document states that "[w]hen it is necessary to obtain multiple results in the course of treatment, the modifiers 59 or 91 are used to indicate that a test was performed more than once on the same day for the same patient."

64.     Omni's expert witness reviewed and opined only upon claims submitted to MD Labs from Omni, representing less than 0.5% of all PCR UTI tests performed by MD Labs. Dr. Arrigo Deposition Transcript ("Arrigo Tr.")., **Ex. 17**, at 82:16-83:9; Expert Report of Dr. Yiannoutsos ("Yiannoutsos Rpt."), **Ex. 18**, at 5.

**RESPONSE:** Admit that OMNI's expert opined on claims where he had access to the patient's medical record.

65.     Deligdish's opinion is that PCR UTI testing is *never* medically necessary. Deligdish Tr., **Ex. 12**, at 267:13-16.

**RESPONSE:** Admit that Dr. Deligdish testified that he believed the PCR UTI test is not medically necessary.

66.     When asked at his deposition for the basis of his assertion that MD Labs' PCR UTI testing was experimental, Deligdish was unable to reference any specific article or medical literature to support his position. Deligdish Tr., **Ex. 12**, at 239:22-240:14.

**RESPONSE:** Admit that Dr. Deligdish testified that "[t]here's no medical literature that has shown [PCR UTI testing] to be anything other than experimental."

SHN\848220.1

A.680

67.     Deligdish criticized another laboratory for running too *few* targets in its PCR UTI test, suggesting that a narrower panel "had a much greater likelihood of missing a diagnosis." Deligdish Tr., **Ex. 12**, at 265:24-266:14.

**RESPONSE:** Admit that Dr. Deligdish testified that "because they tested for fewer organisms, they had a much greater likelihood of missing a diagnosis."

68.     Deligdish claimed that he believed the other lab "tests for too many, too, and at the same time, not enough" pathogens. Deligdish Tr., **Ex. 12**, at 267:10-11.

**RESPONSE:** Admit that Dr. Deligdish testified that "because I believe the test is not medically necessary.  Billing for any would be too many, but they certainly didn't bill for enough or test for enough."

69.     MD Labs' written proposal to Omni did not include profit splitting or passthrough billing. *See generally* OMNI00075, **Ex. 19**.

**RESPONSE:** Admit that MD Labs' proposed "Clinical Testing Program Agreement", which was not executed by any party, did not include profit splitting or passthrough billing.

70.     MD Labs and Omni never entered executed the proposed written agreement. *See* OMNI00075, **Ex. 19** (unexecuted proposal); Deligdish Tr., **Ex. 12**, at 170:22-171:9 (testifying that the proposed arrangement "never happened anyway"); *id.* at 199:6-7 (testifying that he did not believe Omni executed the agreement and that he could not recall).

**RESPONSE:** Admitted.

71.     MD Labs contemplated entering into the proposed agreement with Melbourne Medical Laboratory, Omni's physician-owned office laboratory (commonly referred to as a "reference laboratory agreement"). Deligdish requested that any agreement be between MD Labs and Melbourne Medical Laboratory wherein Melbourne Medical Laboratory would pay MD Labs directly for laboratory testing and bill patient insurances themselves. During contract

SHN\848220.1

A.681

negotiations with Omni, MD Labs understood that any agreement for Melbourne Medical Laboratory to refer tests to MD Labs would be a lawful reference arrangement pursuant to Medicare rules. MD Labs sent a proposed written agreement on August 27, 2018 that was never executed. *See* Rutledge Decl., **Ex. 3**, ¶ 22, Deligdish Tr., **Ex. 12**, at 89:21-91:11 (testifying that Melbourne Medical is Omni's "in-house laboratory" and that Deligdish is the 100 percent owner); OMNI00852, **Ex. 20**, (Deligdish requesting that the agreement be set up "through the Melbourne Medical Laboratory"); OMNI00075, **Ex. 19** (unexecuted proposal); Medicare Claims Processing Manual, ch. 16, § 40.1, *available at*

https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/clm104c16.pdf (citing 42 U.S.C. § 1395l(h)(5)(A)).

**RESPONSE:** Admit that on August 27, 2018, Jack, Todd, OMNI's Sales Manager, East Coast Region, also emailed OMNI personnel a proposed "Clinical Testing Program Agreement," between "MD Spine Solutions, LLC dba MD Labs" and "Omni Healthcare, a practice organized and existing under the laws of the State of Florida." Although Dr. Deligdish had asked in an earlier email that any billing arrangement be "set [] up through the Melbourne Medical Laboratory," MD Labs nonetheless proposed a contract directly with OMNI, the physician group.

**F.    Statement of Additional Facts as to Which There Exists a Genuine Issue to be Tried**

1.    The most recent AUA guidelines issued in 2022 found that more sensitive culture-based or molecular bacterial detection methods (e.g., polymerase chain reaction-based detection methods) are not necessarily beneficial in the diagnostic evaluation of patients with a suspected UTI.  *See* Exh. D ("Recurrent Uncomplicated Urinary Tract Infections in Women: AUA/CUA/SUFU Guideline (2022), *available at*

https://www.auanet.org/guidelines-and-quality/guidelines/recurrent-uti, last accessed August 27, 2024).

SHN\848220.1

A.682

2.      Often greater specificity and accuracy are not clinically useful because any incremental information they provide does not affect the treatment the patient will receive.  *Id.*

3.      AUA guidelines state that "[s]ensitive detection of microorganisms will likely be associated with increased diagnostic confusion and dilemmas, including overdiagnosis and associated overtreatment."  *Id.*

4.      While the AUA guidelines acknowledge that "[m]olecular testing technologies have the potential to provide accurate and rapid information, and hold promise for the future," they advise that "more evidence is needed before these technologies become incorporated into the guideline, as there is concern is that adoption of this technology in the evaluation of lower urinary tract symptoms may lead to over treatment with antibiotics."  *Id.*

5.      AUA guidelines state that "[t]he impact of such tests on the accuracy of diagnosis is not documented and cannot yet be recommended for incorporation into clinical practice."  *Id.*

6.      The guidelines conclude that "despite a growing desire for the accurate diagnosis of UTI in patients with suggestive symptoms, particularly those who lack positive urine cultures or who have vague lower urinary tract symptoms (LUTS), the utility of this technology remains unproven and the potential for overtreatment with antibiotics remains significant."  *Id.*

7.      As Defendants' own expert acknowledged, PCR testing for UTIs is not generally accepted by the medical community, and certainly was not generally accepted

SHN\848220.1

A.683

when Defendants began employing it as MD Labs' exclusive test for UTIs in 2017.  Dr. Ko did not begin using PCR testing for UTIs until June 2020, several years after MD Labs introduced it.  *See* Exh. E, Ko Dep. Tr. at 107:19-108:3.

8.     He also acknowledged that the research around the PCR testing for UTIs was ongoing, stating: "that's why we're trying to collect evidence and that's why I'm in this research field.  That's why I'm in this area to try to collect the information so that people could help various patients to have a better diagnostic in terms of how to treat infection." *Id.* at 175:1-8.

9.     It is well established that laboratories may not use unreasonably large "panels" of tests to cause physicians to prescribe many tests at once, when only one or a few tests are medically necessary.

10.     The HHS-OIG's laboratory guidance warns about situations where the standardized order or requisition form encourages or even misleads the physician into ordering more than one test as part of a "panel" when the full "panel" is not medically necessary and/or without giving the physician the option or enough information to understand how to order only those tests that are necessary.

11.     Specifically, the Guidance cautions:

a.  Requisition design: While [CMS] does not design or approve requisition forms, laboratories should construct the requisition form to capture the correct program information as required by Federal or private health care programs and to promote the conscious ordering of tests by physicians or other authorized individuals.  The laboratory should construct the requisition form to ensure that the physician or other authorized individual has made an independent medical necessity decision with regard to each test the laboratory will bill…"

Exh. G at 45079.

24

A.684

12.     MD Labs' requisition form did not give physicians the option to make an independent medical necessity decision with regard to each test.  Exh. O.

13.     MD Labs' own Laboratory Director, Alexander Stojanoff, testified that he was "totally confused" by MD Labs' requisition form, stating, "I don't know where the panel is. It just – it just is all of thee different diagnoses.  So that is what is confusing."  Exh. R, Stojanoff Dep. Tr. at 37:5-20.

14.     Additionally, in May of 2018, the Healthcare Fraud Prevention Partnership, a public-private partnership between the Federal Government, state and local government agencies, law enforcement, private health insurance plans, employer organizations, and healthcare anti-fraud associations, published a report highlighting the problem of fraud in the clinical laboratory industry.  Exh. S.

15.     The report specifically warned about the use of excessively large testing panels:

> A commonly reported problem is the use of more expensive, excessively broad panels in place of smaller panels.  For example, a 5-panel urine drug screening test for cannabinoids, cocaine, amphetamines, opioids, and phencyclidine is typically sufficient to detect the use of commonly abused substances, such as marijuana, cocaine/crack, heroin, and methamphetamine. In contrast, larger and more expensive definitive panels *(i.e.,* 12- or 14-panel) can be used to detect particular subsets of the substances identified in the smaller panels, as well as the presence of some other less-commonly abused substances.  While this may be clinically warranted in some cases, the use of overly broad panels can also be used for the purpose of maximizing reimbursement in the absence of medical necessity.  A related problem that can be difficult to control is the use of definitive drug testing for a wide range of substances for which the patient has no history of abuse.

Exh. S.

25

16.     MD Labs argues that its UTI testing for 17-19 pathogens was "within the range of pathogens endorsed by peer-reviewed literature."  The only authority it cites for this statement though is its own expert's report, not any independent analysis.  *See* ECF #254 at ¶29.

17.     Defendants' expert acknowledged that he was not aware of any other studies besides own that reached similar conclusions on the purported value of PCR UTI testing.  Exh. E, Ko Dep. Tr. at 163:21-164:2.

18.     MD Labs' independent contractor sales representatives made extensive efforts to cause providers like those at OMNI to order PCR UTI testing, especially since this was the only type of UTI testing that MD Labs offered.

19.     MD Labs, through its independent contractor sales representatives like Todd, approached OMNI, and Dr. Deligdish, to encourage them to use MD Labs' medically unnecessary PCR UTI testing.  *See* Exh. T.

20.     On April 23, 2018, MD Labs' Jack Todd, Sales Manager, East Coast Region, an independent contractor, emailed OMNI Healthcare executives and proposed an arrangement where MD Labs would charge OMNI $150 per PCR UTI test to be billed to commercial customers.

21.     Todd explained the financial assumptions underlying the proposal as follows:

> We considered a monthly volume of 200 specimens (plus or minus)
> We considered a payer mix of 35% Commercial and 65% all Federal plans
> to include Medicare, Medicaid and Tricare.
> You collect all specimens in your lab and we will pick up daily.
> We bill Omni their share monthly.

Exh. T.

22.     On Jul 26, 2018, MD Labs' sales representative Dale A. Stenberg, an independent contractor, wrote to OMNI's practice administrator, offering to bring the office lunch the following week.  On July 30, 2018, manager Wendy Williams, the practice for OMNI's Urgent Care Clinic, asked Stenberg how much MD Labs bills for UTI testing. Stenberg forwarded her question to Todd, with the note: "This question comes up frequently, what should my response be? This is the Urgent Care Omni."  Stenberg forwarded Todd's response to Williams:

> Our PCR based UTI is billed at 1 time Medicare rate to all. When Medicare changes so do we. (FYI. Currently it is approximately $700.00.)
>
> We accept whatever the insurance company pays us ... no balance bill. If insurance does not pay we bill patient $50.00 only. They also get the credit for the deductible the insurance company had shared with them on their EOB.

Exh. U.

23.     On August 13, 2018, OMNI's Dr. Craig Deligdish and Brad Smith spoke with MD Labs' Director of Sales, Howard Clausen.  Clausen shared that he had been with MD Labs for four years.  He observed that when he began working with the lab they were doing 16 samples a month and they are now doing 16,000 samples a month. He then stated that approximately 70% of MD Labs' UTI tests are paid for by Medicare, and the remainder are covered by Medicaid or commercial insurance.  Exh. V.

24.     On August 27, 2018, OMNI's Mark Bobango spoke with MD Labs' Clausen and Todd.  Bobango reported in an email summary of the call that Clausen had stated, inter alia:

> I had another conversation with Howard today regarding the pricing structure. This is what he confirmed:

27

A.687

1. They will not bill any patient anything greater than $50.00 regardless of insurance, co-pay or deductible. They do not want patients to have to pay a lot for this service. They do not go after the patient for any balances over $50.00.

….

3. For UTI tests, he stated Omni will profit between $200 and $700 per claim. The price for Omni is $250.00. Their cost is approximately $75.00 for these tests. After 90 days, they will take a look at EOBs and negotiate the rate as well.

Exh. W.

25.     On August 27, 2018, Todd also emailed OMNI personnel a proposed "Clinical Testing Program Agreement," between MD Labs and OMNI. The contract proposed that MD Labs would provide clinical laboratory testing for OMNI, and bill OMNI $250 for UTI testing. The UTI tests did not include an option or differential pricing for a smaller panel of tests than the standard, broad MD Labs panel. *See* ECF #254-19.

26.     Although the UTI price purported to cover "Custom UTI Panel on file," MD Labs personnel had never discussed establishing a custom panel or offering anything other than the full panel of PCR follow up tests

27.     In early January 2018, as MD Labs was beginning to roll out PCT UTI testing, Grizelj recommended to Rutledge that they seek "guidance on medical necessity" from Noridian, a Medicare Administrative Contractor. *See* Exh. Y.

August 29, 2024                                  **OMNI HEALTHCARE, INC.**
                                                *By its attorneys,*

                                                */s/ Thomas M. Kenny*
                                                DAVID B. HARRISON (*pro hac vice*)
                                                THOMAS M. KENNY (*pro hac vice*)
                                                SVJETLANA TESIC (*pro hac vice*)
                                                SPIRO HARRISON & NELSON

SHN\848220.1

A.688

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 29, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all registered participants identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

August 29, 2024

**OMNI HEALTHCARE, INC.**
*By its attorneys,*

*/s/ Thomas M. Kenny*
THOMAS M. KENNY (*pro hac vice*)
SPIRO HARRISON & NELSON

SHN\848220.1

A.689

# EXHIBIT 21

A.690

CRAIG K. DELIGDISH, M.D.                    December 21, 2023

Volume:     I
Pages:     1-297
Exhibits:  1-29

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * * * * * * * *

UNITED STATE OF AMERICA, et al., ex rel,
OMNI HEALTHCARE, INC.,

Plaintiffs,
v.
MD SPINE SOLUTIONS LLC, d/b/a MD LABS, INC.,
DENIS GRIZELJ, MATTHEW RUTLEDGE AND
DOE HEALTHCARE PROVIDERS 1-100,
Defendants.

* * * * * * * * * * * * * * * * * * * * * *

30(b) DEPOSITION OF OMNI HEALTHCARE, INC.,

(BY CRAIG K. DELIGDISH, M.D.)

AND CRAIG DELIGDISH, M.D., PERSONALLY

APPEARING REMOTELY FROM

INDIATLANTIC, FLORIDA

THURSDAY, DECEMBER 21, 2023

8:01 a.m.

Reported by:
Mary K. Corcoran
Professional Court Stenographer/Notary Public
Appearing Remotely from Norfolk County,
Massachusetts

A.691

A.692

CRAIG K. DELIGDISH, M.D.                    December 21, 2023

Page 262

A.   Correct, yes.

Q.   Did you order a test for the same patient on the same date of service from KorPath?

A.   Yes.

Q.   And again, you believe it was not reasonable or necessary, correct?

A.   Correct.

Q.   Did you order a test for the same patient, same date of service from Solaris Diagnostics?

A.   Yes.

Q.   You believed it was not reasonable or necessary, correct?

A.   Correct.

Q.   Okay.  I won't you bore with each of these documents, but in summary, did you order a PCR-based UTI test from ten different laboratories for REDACTED - PHI on October 28, 2021?

A.   Yes.

Q.   And you did so knowing that these tests or believing these tests were not reasonable or necessary?

A.   Yes.

Q.   And you did so knowing that this patient was

A.693

CRAIG K. DELIGDISH, M.D.                    December 21, 2023

Page 263

the beneficiary of a federal healthcare

program, correct?

A.   Correct.

Q.   And you knew that each of those laboratories

would bill a federal healthcare program for

each of these tests, correct?

A.   Correct.

Q.   Again, did you tell any of these laboratories

that you were doing comparative testing?

A.   No.

Q.   Did you tell any of these laboratories not to

bill federal healthcare programs?

A.   No.

Q.   Now, were you REDACTED - PHI treating provider

when you performed this comparative testing?

A.   No.

Q.   Did you tell REDACTED - PHI treating provider

that you were conducting comparative testing?

A.   No.

Q.   Did you tell --

A.   I don't know if I did or not, actually.

Q.   Okay.  Did you tell REDACTED - PHI that you

submitted her specimens to multiple

laboratories?

A.694

A.695

Page 297

COMMONWEALTH OF MASSACHUSETTS
NORFOLK, SS

I, Mary K. Corcoran, a Notary Public in and for the Commonwealth of Massachusetts, do hereby certify there came before me on the 21st day of December, 2023, the person hereinbefore named was duly sworn to testify to his knowledge concerning the matters in controversy in this cause; that he was thereupon examined upon oath, and that the deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney nor counsel for, nor related to or employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed in this case, nor am I financially interested in this action.

IN WITNESS WHEREOF, I have hereunto set my hand this 31st day of December, 2023.

*Mary K. Corcoran*

Mary K. Corcoran
Notary Public
Commonwealth of Massachusetts
My Commission Expires
May 5, 2028

PLEASE NOTE:
THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING REPORTER.

A.696

# EXHIBIT 22

Volume I  Pages 1-260

Exhibits A-N

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

_____

UNITED STATES OF AMERICA, et al., ex rel.

OMNI HEALTHCARE, INC.

    Plaintiffs                                Case No.

V.                                    18-cv-12558-PBS

MD SPINE SOLUTIONS LLC, D/B/A MD LABS

INC., DENIS GRIZELJ, MATTHEW RUTLEDGE

AND DOE HEALTHCARE PROVIDERS 1-100

    Defendants

_____

VIDEOCONFERENCE DEPOSITION OF

DENIS GRIZELJ

Wednesday, December 20, 2023, 11:00 a.m.

-----REPORTER:  Sonya Lopes, RPR, CSR-----

Scheduling@TP.One
www.TP.One

A-698

800.FOR.DEPO
(800.367.3376)

TP One

A.699

Q.   Okay.   Just so you're aware, this was produced in discovery by MD Labs.   But it's your position that you don't believe this was created by MD Labs.   Is that accurate?

A.   I don't believe it was approved by myself or Matthew.

Q.   Okay.

A.   There may have been an employee of MD Labs who did create it but certainly not something that we were a part of the discussion about.

Q.   Okay.   Did you and Matthew Rutledge, did you approve marketing materials on a regular basis for MD Labs?

A.   Yes.

Q.   Were they required to be approved by you before they could be disseminated?

A.   Yes.

Q.   Both of you or just one of you?

A.   Both of us.

Q.   Where it says right here culturing is still the gold standard for detecting non-common pathogens and for specificity testing, do you agree with that statement?

A.   I feel like the term "gold standard" is an



A.701

Q.   Okay.   He wrote our PCR-based UTI is billed at one-time Medicare rate to all.   When Medicare changes, so do we.   Currently, it's $700.

Then he goes on to say we accept whatever insurance company pays us, no balance bill.   If insurance does not pay, we bill patient $50 only. They also get the credit for the deductible the insurance company had shared with them on their EOB.

So based on your reading of that, do you maintain your earlier statement that MD Labs has always done balance billing?

MR. ORKAND:   Objection.

A.   Yeah.   This statement is inaccurate.

Q.   So this statement was communicated, it appears, in an August 3, 2018 e-mail, this is the answer I got from them when I asked.   So it looks like Dale forwarded this to Wendy Williams.   So it's your testimony that Jack Todd was incorrect when he said no balance bill?

MR. ORKAND:   Objection.   Asked and answered.

A.   Correct.

Q.   You can answer.   So in the event -- in 2018, if insurance did not pay what was submitted by

 

A.703

REPORTER'S CERTIFICATE

I, SONYA LOPES, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was properly identified and put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 4th day of January, 2024.

Sonya Lopes                    My Commission Expires:

Notary Public                  October 28, 2027

A.704

Notice Date: 01/05/2024

Deposition Date: 12/20/2023

Deponent: Denis Grizelj

Case Name: United States of America v.
          MD Spine Solutions LLC

| Page:Line | Now Reads | Should Read |
|-----------|-----------|-------------|
| 15:20 | Uber | Huber |
| 16:2 | Uber | Huber |
| 62:4 | Stroll | Strull |
| 62:9 | Stroll | Strull |
| 62:21 | Stroll | Strull |
| 63:2 | Stroll | Strull |
| 63:11 | Stroll | Strull |
| 63:15 | Stroll | Strull |
| 64:2 | Stroll | Strull |
| 71:21 | Dennis | Denis |
| 71:24 | Dennis | Denis |
| 72:1 | Dennis | Denis |
| 98:22 | Telecore | TELCOR |
| 162:11 | kickbacks and recoveries act | kickbacks in recoveries act |
| 169:3 | Craussen | Claussen |
| 220:18 | resolution | Resolution |
| 238:16 | Telecore | TELCOR |

TP One

Scheduling@TP.One
www.TP.One

A.705

800.FOR.DEPO
(800.367.3376)

Notice Date: 01/05/2024

Deposition Date: 12/20/2023

Deponent: Denis Grizelj

Case Name: United States of America v.
             MD Spine Solutions LLC

| Page:Line | Now Reads | Should Read |
|-----------|-----------|-------------|
| 238:20 | Telecore | TELCOR |
| 238:24 | Telecore | TELCOR |
| 242:11 | Telecore | TELCOR |
| 242:12 | Telecore | TELCOR |
| 242:22 | Telecore | TELCOR |
| 243:3 | Telecore | TELCOR |
| 245:1 | Telecore | TELCOR |
| 245:2 | Telecore | TELCOR |
| 245:10 | Telecore | TELCOR |
| 245:14 | Telecore | TELCOR |
| 245:22 | Telecore | TELCOR |
| 245:24 | Telecore | TELCOR |
| 248:5 | Telecore | TELCOR |
| 248:14 | Telecore | TELCOR |
| 258:7 | Some cases. | In some cases. |

TP One

Scheduling@TP.One
www.TP.One

A-706

800.FOR.DEPO
(800.367.3376)

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me. Any additions or corrections that I feel are necessary, I will attach on a separate sheet of paper to the original transcript.

_____

Signature of Deponent

I hereby certify that the individual representing himself/herself to be the above-named individual, appeared before me this 26th day of January, 2024, and executed the above certificate in my presence.

_____

NOTARY PUBLIC IN AND FOR

SAN MATEO, CALIFORNIA

County Name

MY COMMISSION EXPIRES: 06.16.2025



RORY BRENNAN
COMM. # 2358418
NOTARY PUBLIC • CALIFORNIA
COUNTY OF SAN MATEO
My commission expires June 16, 2025

A.707

# EXHIBIT 23

A.708

Page 1

Volume II  Pages 1-27

Exhibit O

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

_____

UNITED STATES OF AMERICA, et al., ex rel.

OMNI HEALTHCARE, INC.

　　Plaintiffs　　　　　　　　　　　　Case No.

V.　　　　　　　　　　　　　　18-cv-12558-PBS

MD SPINE SOLUTIONS LLC, D/B/A MD LABS

INC., DENIS GRIZELJ, MATTHEW RUTLEDGE

AND DOE HEALTHCARE PROVIDERS 1-100

　　Defendants

_____

VIDEOCONFERENCE DEPOSITION OF

DENIS GRIZELJ

Friday, July 26, 2024, 3:00 p.m.

-----REPORTER:  Sonya Lopes, RPR, CSR-----

A.709

A.710

But from the first page, do you recall receiving this document?

A.   I do not.

Q.   If Ms. Redman had sent you an e-mail attachment, would it have been your typical practice to read e-mail attachments that she sent to you?

A.   I don't remember all the attachments she sent me.  But, you know, I would imagine -- I guess it would just depend on the attachment and what her direction was on the e-mail, so.

Q.   Do you recall why at this specific time -- December of 2016 -- Ms. Redman was sending you information about, you know, as this document says, independent contractor marketing of laboratory testing and summary of, what appears, federal law and California law?

A.   I recall reaching out to her for her legal opinion on overall compensation of the sales reps that we had.

Q.   And do you recall what her opinion was?

A.   I don't believe she gave us any real direction.  I know she expressed that there's risk but didn't really give us any sort of direction.

Q.   Look at another document.  This will be -- we left off, it appears, at your last deposition --

A.711

A.712

Page 14

A.   I don't know if I had an opinion.  I think my belief was that it was permissible.  And I kept trying to figure out whether it was or not based on, you know, my persistence on trying to get clarity on this matter.  But, you know, unfortunately, we never really seemed to get it from, you know, from this counsel.

Q.   Scrolling down to a specific portion of Ms. Redman's e-mail right here where she says "At a federal level, the Office of Inspector General has expressed concern about percentage-based compensation for independent marketing agents, particularly where there is direct contact between the marketing rep and the referring physicians" -- excuse me -- "this federal law impacts Medicaid and Medicare business."

Is it the case that sales reps for MD Labs had direct contact with referring physicians?

A.   I believe they did, yes.

Q.   And did Ms. Redman's advice or the information she provides here, did it give you any concern that the arrangements that MD Labs had with 1099 contractors could potentially be improper or violative of the federal Anti-Kickback Statute she's referring to?

A.713

Page 15

A.  I don't remember at the time I thought I was concerned or what my reaction was.  But overall, I mean, concern to me does not mean, you know, it's unlawful.  And so that's kind of why I kept seeking more clarity and definitive yes-or-no guidance.

Q.  Was there a reason MD Labs employed certain representatives as 1099 contractors but other representatives on a W-2 basis?

A.  I don't recall the specific reasons, no.

Q.  Was one arrangement or another more beneficial financially for MD Labs?

A.  No.  I mean, not that I can recall.

Q.  Do you recall if certain sales reps had a preference to be employed as a 1099 contractor as opposed to a W-2 employee?

A.  I believe there was a preference for some, yes.

Q.  Do you know why they had that preference?

A.  I mean, specifically, no.  But I know a lot of them sold other products and had similar arrangements for other product lines and wanted to be able to spend however much time they felt necessary selling one service versus another so they can sell more services to the same providers.

Q.  Look at another document.  This we just

A.714

A.715

Page 17

advice Ms. Redman provided here where she says "The federal Anti-Kickback Statute prohibits offering payment, soliciting or receiving anything of value to induce or reward referrals or general federal healthcare program business."

Then she says "The AKS has a statutory and rule exception for bona fide employment relationships."

Following receipt of this information from Ms. Redman, did you still have a question as to whether it would potentially violate the Anti-Kickback Statute to employ sales reps as 1099 contractors?

A.   I don't feel like, you know, it was -- any advice that I received from Anne was really clear.

Q.   So you feel this advice you received right here wasn't clear?

A.   You know, our reps didn't -- did not provide anything of value in exchange for referrals. So that's why I was having a hard time understanding, you know, where the kickback was coming from.

Q.   You're saying that your sales representatives didn't provide anything of value to providers in exchange for referrals; is that

A.716

A.717

Page 19

A.   I believe it was just the agreement that we had at that time which, you know, was drafted by our legal team.  So it would be in reference to that.

Q.   What agreement was that?

A.   It was our independent sales rep agreement.

Q.   Why didn't you feel good about it, to your recollection?

A.   I think in this case -- I think what I should have said was "I don't have a good understanding of it" is maybe -- in looking back at this conversation and maybe what I was trying to communicate there but, you know -- because I still -- you know, a lot of this is was black and white -- it wasn't black and white, I should say. So I was trying to get a better understanding of it, not being a legal professional, so.

Q.   Do you recall what steps you took to obtain a better understanding of, you know, the applicable --

A.   In addition to the conversations or the e-mails and conversations with Ms. Redman, I did reach out to Noridian -- our Medicare MAC -- to see if they had additional guidance because I wasn't really satisfied with the level of advice given here and reached out to other, you know, other lab owners

A.718

A.719

Page 27

REPORTER'S CERTIFICATE

I, SONYA LOPES, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was properly identified and put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 9th day of August, 2024.

Sonya Lopes                    My Commission Expires:

Notary Public                  October 28, 2027

A.720

# EXHIBIT 24

Page 1

Volume II  Pages 1-22

Exhibits 21-25

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

_____

UNITED STATES OF AMERICA, et al., ex rel.

OMNI HEALTHCARE, INC.

    Plaintiffs                              Case No.

V.                                       18-cv-12558-PBS

MD SPINE SOLUTIONS LLC, D/B/A MD LABS

INC., DENIS GRIZELJ, MATTHEW RUTLEDGE

AND DOE HEALTHCARE PROVIDERS 1-100

    Defendants

_____

VIDEOCONFERENCE DEPOSITION OF

MATTHEW RUTLEDGE

Friday, July 26, 2024, 1:00 p.m.

-----REPORTER:  Sonya Lopes, RPR, CSR-----

A.722

A.723

Page 12

A.   Pardon me?

Q.   Would you like me to zoom in?

A.   Yeah.  Would you please zoom in?  It's really in fine print on my screen.  It's saying that it's according to the OIG and various federal cases, payments of percentage of sales commissions to contract sales personnel implicates the Federal AKS and it's not protected by an AKS safe harbor.

Q.   Yes.  That's correct.

A.   I don't recall reviewing this document, no.

Q.   Okay.

A.   I'm also -- I'm sorry.

Q.   I can bring it back up.  Give me a moment.

A.   There was a section on California that I didn't explore, but that document I don't believe I've ever seen.

Q.   I have it back up.  Is there anything else you'd like to review?

A.   The California law piece.  So "Percentage labs payment of percentage of sales commissions" -- "labs payment of percentage of sales commissions to contract sales personnel has been held by California courts to violate Medi-Cal Antikickback Statutes." Okay.  That's specific to Medi-Cal.  Okay.  Do you care for me to read through the whole document at

A.724

A.    She references some attachment or something or something included in her e-mail.  Is there anything attached to that?  No.

Q.    Doesn't appear there -- doesn't indicate that there's an attachment, but.

A.    Okay.  Could you scroll up, please?  Pause right there.  Would you scroll up, please?

Q.    Top-line e-mail.

A.    Okay.  This is from 2017.  Okay.  I've read it.

Q.    Okay.  Do you recall receiving this e-mail and e-mail chain from Mr. Grizelj in 2017?

A.    I don't recall it, but it was seven years ago.

Q.    When Mr. Grizelj says "I don't feel good about our current comp plan" in this paragraph "and would rather pay money now to get it right than face consequences later," do you know to what he's referring there?

A.    I don't.  I don't know what specifically he's referring to about being noncompliant, no.  California --

Q.    Go ahead and finish your answer.

A.    He references California specifically.

Q.    Do you know what he's referring to by "comp

A.726

Page 22

REPORTER'S CERTIFICATE

I, SONYA LOPES, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was properly identified and put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 9th day of August, 2024.

Sonya Lopes                    My Commission Expires:

Notary Public                  October 28, 2027

A.727

**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

UNITED STATES OF AMERICA, *et al., ex rel.*
OMNI HEALTHCARE, INC.,

      Plaintiffs,

      v.

MD SPINE SOLUTIONS LLC, D/B/A MD LABS
INC., DENIS GRIZELJ, MATTHEW
RUTLEDGE AND DOE HEALTHCARE
PROVIDERS 1 - 100,

      Defendants.

Case No. 18-cv-12558-PBS

**DEFENDANT MD SPINE SOLUTIONS LLC, D/B/A MD LABS INC.,
DENIS GRIZELJ AND MATTHEW RUTLEDGE'S RESPONSE TO PLAINTIFF-
RELATOR OMNI HEALTHCARE, INC'S ADDTIONAL
STATEMENT OF MATERIAL FACTS**

      1.      The most recent AUA guidelines issued in 2022 found that more sensitive culture-based or molecular bacterial detection methods (e.g., polymerase chain reaction-based detection methods) are not necessarily beneficial in the diagnostic evaluation of patients with a suspected UTI. *See* Ex. D ("Recurrent Uncomplicated Urinary Tract Infections in Women: AUA/CUA/SUFU Guideline (2022), available at https://www.auanet.org/guidelines-and-quality/guidelines/recurrent-uti, last accessed August 27, 2024).

      **RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Admitted that AUA guidelines, published in 2019 and reviewed in 2022, state that "[m]ore sensitive cultured-based or molecular bacterial detection methods (e.g., high-throughput sequencing, polymerase chain reaction-based detection methods) are not necessarily beneficial in the diagnostic evaluation of patients with suspected bacterial cystitis." In further answering, the AUA guidelines state, "[f]or the purposes of the AUA guidelines, the Panel considers only recurrent episodes of uncomplicated cystitis in women. The guideline does not apply to pregnant women, patients who are immunocompromised, those with anatomic or functional abnormalities of the urinary

A.728

tract, women with [recurrent UTIs] due to self-catheterization or indwelling catheters or those exhibiting signs or symptoms of systemic bacteremia, such as fever and flank pain." *See* Ex. D at 1. By its terms, the AUA guidelines do not apply to women with other types of complicated UTIs or to men. *Id.*

2.  Often greater specificity and accuracy are not clinically useful because any incremental information they provide does not affect the treatment the patient will receive. *Id.*

> **RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Defendants deny that greater specificity and accuracy are not clinically useful. MD Labs' faster results enabled providers to prescribe appropriate antibiotics more quickly or eliminate a UTI as the cause of the patient symptoms. Ko Rpt., Ex. 5, at 5; Ko. Tr., Ex. 6, at 134:21-135:19. MD Labs offered providers the ability to receive PCR UTI results before AST results were available to further aid in the clinical decision-making process. *See, e.g.,* MD Labs_0008722, Ex. 8. Additionally, MD Labs' PCR testing provided significant clinical benefit to patients whose UTIs were caused by pathogens traditional BUC was incapable of identifying. Ko Rpt., Ex. 5, at 5; Ko. Tr., Ex. 6, 94:16-95:1; 113:12-24.

3.  AUA guidelines state that "[s]ensitive detection of microorganisms will likely be associated with increased diagnostic confusion and dilemmas, including overdiagnosis and associated overtreatment." *Id.*

> **RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Admitted that AUA guidelines are accurately quoted. In further answering, PCR testing, combined with AST, ensures that clinicians use an effective antibiotic the first time, and thus decreases overtreatment. *See* Ko. Rpt., Ex. 5, at 6-7.

4.  While the AUA guidelines acknowledge that "[m]olecular testing technologies have the potential to provide accurate and rapid information, and hold promise for the future," they advise that "more evidence is needed before these technologies become incorporated into the guideline, as there is concern is that adoption of this technology in the evaluation of lower urinary tract symptoms may lead to over treatment with antibiotics." *Id.*

> **RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Admitted that AUA guidelines state, "[m]olecular testing technologies have the

- 2 -

A.729

potential to provide accurate and rapid information, and hold promise for the future. To date, more evidence is needed before these technologies become incorporated into the guideline, as there is concern that adoption of this technology in the evaluation of lower urinary tract symptoms may lead to over treatment with antibiotics."

5.      AUA guidelines state that "[t]he impact of such tests on the accuracy of diagnosis is not documented and cannot yet be recommended for incorporation into clinical practice." *Id.*

> **RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Admitted that AUA guidelines state, "While there is some early evidence that molecular diagnostic methods to rapidly identify uropathogen antibiotic susceptibility may help to avoid delayed or inappropriate antimicrobial treatment, the impact of such tests on the accuracy of diagnosis is not documented and cannot yet be recommended for incorporation into clinical practice."

6.      The guidelines conclude that "despite a growing desire for the accurate diagnosis of UTI in patients with suggestive symptoms, particularly those who lack positive urine cultures or who have vague lower urinary tract symptoms (LUTS), the utility of this technology remains unproven and the potential for overtreatment with antibiotics remains significant." *Id*.

> **RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Admitted that the AUA guidelines are accurately quoted. In further answering, the AUA guidelines do not call for abstaining from using PCR or abandoning the use of PCR to add information to diagnose UTIs accurately. Ko. Rpt., Ex. 5, at 8.

7.      As Defendants' own expert acknowledged, PCR testing for UTIs is not generally accepted by the medical community, and certainly was not generally accepted when Defendants began employing it as MD Labs' executive test for UTIs in 2017. Dr. Ko did not begin using PCR testing for UTIs until June 2020, several years after MD Labs introduced it. *See* Ex. E, Ko Dep. Tr. At 107:19-108:3.

> **RESPONSE**: Denied that PCR testing for UTIs is not generally accepted by the medical community and was not generally accepted when Defendants began employing it as MD Labs' exclusive test for UTIs in 2017.  These assertions are not supported by the cited materials.  Admitted that Dr. Ko testified that he did not begin using PCR testing for UTIs until June 2020 and that MD Labs began using PCR UTI testing in 2017.

A.730

Furthermore, Dr. Ko testified that he began using PCR testing in June 2020 when he started at Brown University, but that the testing was already available when he started at Brown at the time he joined. In other words, Brown University had already been using PCR UTI testing prior to Dr. Ko's employment. *See* Ex. E, Ko Dep. Tr. at 108:4-6.

8.      He also acknowledged that the research around the PCR testing for UTIs was ongoing, stating: "that's why we're trying to collect evidence and that's why I'm in this research field. That's why I'm in this area to try to collect the information so that people could help various patients have a better diagnostic in terms of how to treat infection." *Id*. at 175:1-8.

> **RESPONSE**: Admitted. Further answering, given that this quotation has been deprived of critical context, medical research is constantly evolving and thus Dr. Ko further stated in his Report, "[T]he development of society guidelines in antibiotics stewardship usually takes years after peer-reviewed articles are reviewed for data relevance and whether there has been an impact on disease processes. Thus, there has always been a lag between evidence supporting new treatments and technologies and their incorporation into society guidelines. The lag does not suggest that the treatment or technology is experimental. Such lags are typical of medical society guidelines. As is typical in medical practice, society guidelines for PCR UTI testing must catch up to the scientific data regarding such testing." Ex. 5, Ko Rpt. at 7-8.

9.      It is well established that laboratories may not use reasonably large "panels" of tests to cause physicians to prescribe many tests at once, when only one or a few tests are medically necessary.

> **RESPONSE**: Defendants object to this statement as it is unsupported by any citation to evidence in the record, as required by Fed. R. Civ. P. 56(c)(1) and L.R. 56.1. As such, the entire statement is denied.

10.     The HHS-OIG's laboratory guidance warns about situations where the standardized order or requisition form encourages or even misleads the physicians into ordering more than one test as part of a "panel" when the full "panel" is not medically necessary and/or without giving the physician the option or enough information to understand how to order only those tests that are necessary.

> **RESPONSE**: Paragraph 10 does not state a fact but rather consists of argument. As such, the entire statement is denied.

- 4 -

A.731

11.     Specifically, the Guidance cautions:

    a.  Requisition design: While [CMS] does not design or approve requisition forms, laboratories, should construct the requisition form to capture the correct program information as required by Federal or private health care programs and to promote the conscious ordering of tests by physicians or other authorized individuals. The laboratory should construct the requisition form to ensure that the physician or other authorized individual has made an independent medical necessity decision with regard to each test the laboratory will bill . . ."

Ex. G at 45079.

**RESPONSE**: Admitted that HHS-OIG laboratory guidance is accurately quoted. In further answering, the Guidance does not use the word "caution" but states "[l]laboratories *may* implement the following steps through their compliance programs or some other appropriate mechanism . . . ." Ex. G at 45079 (emphasis added).

12.     MD Labs' requisition form did not give physicians the option to make an independent medical necessity decision with regard to each test. Ex. O.

**RESPONSE**: Denied. MD Labs' requisition form gave physicians the option to make an independent medical necessity decision with regard to whether MD Labs' PCR UTI test was appropriate for each patient. *See* Ex. O. Moreover, certain requisition forms offered by MD Labs reflected that MD Labs gave ordering providers the option of customizing the UTI panel to include certain pathogen targets. *See*, *e.g.*, MDLabs_0151537, attached hereto as **Exhibit 25**.[1]

13.     MD Labs' own Laboratory Director, Alexander Stojanoff, testified that he was "totally confused" by MD Labs' requisition form, stating, "I don't know where the panel is. It just – it just is all of three different diagnoses. So that is what is confusing." Ex. R, Stojanoff Dep. Tr. at 37:5-20.

**RESPONSE**: Admitted that Dr. Stojanoff's testimony is accurately quoted. In further answering, Dr. Stojanoff is neither a medical doctor nor had he seen a copy of the requisition form prior to his deposition. *See* Stojanoff Dep. Tr. at 17:4-6; 35:21-23, attached hereto as **Exhibit 26**.

---

[1] The patient's protected health information has been redacted from this exhibit.

A.732

14.     Additionally, in May of 2018, the Healthcare Fraud Prevention Partnership, a public-private partnership between the Federal Government, state and local government agencies, law enforcement, private health insurance plans, employer organizations, and healthcare anti-fraud associations, published a report highlighting the problem of fraud in the clinical laboratory industry. Ex. S.

> **RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Admitted that the Healthcare Fraud Prevention Partnership published the stated report. In further answering, Exhibit S does not discuss PCR UTI testing.

15.     The report specifically warned about the use of excessively large testing panels:

> A commonly reported problem is the use of more expensive, excessively broad panels in place of smaller panels. For example, a 5-panel urine drug screening test for cannabinoids, cocaine, amphetamines, opioids, and phencyclidine is typically sufficient to detect the use of commonly abused substances such as marijuana, cocaine/crack, heroin, and methamphetamine. In contrast, larger and more expensive definitive panels (i.e., 12- or 14-panel) can be used to detect particular subsets of the substances identified in the smaller panels, as well as the presence of some other less-commonly abused substances. While this may be clinically warranted in some cases, the use of overly broad panels can also be used for the purpose of maximizing reimbursement in the absence of medical necessity. A related problem that can be difficult to control is the use of definitive drug testing for a wide range of substances for which the patient has no history of abuse.

Ex. S.

> **RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Admitted that the Healthcare Fraud Prevention Partnership's report is accurately quoted. In further answering, the quoted section of the report discusses the design of panels for urine drug testing which is a fundamentally different than PCR UTI testing.

16.     MD Labs argues that its UTI testing for 17-19 pathogens was "within the range of pathogens endorsed by peer-reviewed literature." The only authority it cites for this statement though is its own expert's report, not any independent analysis. See ECF #254 at ¶29.

> **RESPONSE**: Admitted that MD Labs argues that its PCR UTI testing for 17-19 pathogens was "within the range of pathogens endorse by peer-reviewed literature." Defendants admit that the authority cited for its statement is Dr. Ko's report. In further

- 6 -

A.733

answering, the cited portion of Dr. Ko's expert report cites a peer-reviewed study not authored by Dr. Ko. *See* Ex. 5, p. 5. (citing Hao et al., *The Essential Role of PCR and PCR Panel Size in Comparison with Urine Culture in Identification of Polymicrobial and Fastidious Organisms in Patients with Complicated Urinary Tract Infections*, INT J MOL SCI, 24(18) (2023), available at https://doi.org/10.3390/ijms241814269).

17.    Defendants' expert acknowledged that he was not aware of any other studies besides own that reached similar conclusions on the purported value of PCR UTI testing. Ex. E, Ko Dep. Tr. at 163:21-164:2.

> **RESPONSE**: Defendants object to Paragraph 17 as vague because it is not clear what "similar conclusions" refers to.  Defendants admit that Dr. Ko testified that he was not aware of other studies on the overall ***cost-savings*** of PCR UTI testing.  Ex. E, Ko Dep. Tr. at 163:21-164:2.

18.    MD Labs' independent contractor sales representatives made extensive efforts to cause providers like those at OMNI to order PCR UTI testing, especially since this was the only type of UTI testing that MD Labs offered.

> **RESPONSE**: Paragraph 18 does not state a fact but rather consists of argument. As such, the entire statement is denied.

19.    MD Labs, through its independent contractor sales representatives like Todd, approached OMNI, and Dr. Deligdish, to encourage them to use MD Labs' medically unnecessary PCR UTI testing. *See* Ex. T.

> **RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Admitted that MD Labs representatives encouraged Omni to use MD Labs for PCR UTI testing services. Denied that such services were medically unnecessary or that MD Labs independent contractor sales representatives encouraged Omni to use any medically unnecessary services. *See* Defs.' SOF ¶¶ 16-32.

20.    On April 23, 2018, MD Labs' Jack Todd, Sales Manager, East Coast Region, an independent contractor, emailed OMNI Healthcare executives and proposed an arrangement where MD Labs would charge OMNI $150 per PCR UTI test to be billed to commercial customers.

A.734

**RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Admitted that on April 23, 2018 Jack Todd emailed Deligdish and Bobango. Admitted further that Todd's email discussed a potential business arrangement between MD Labs and Omni. The remainder of the allegations in Paragraph 20 are denied as unsupported by the email that Relator cites. The email does not propose a charge of $150 per PCR UTI test to be billed to commercial customers but rather states that that is MD Labs' preferred price. Furthermore, while the email discusses a proposed business arrangement between MD Labs and Omni, the email itself does not establish whether the proposal was originally made by Todd or by Omni personnel. Moreover, the aforementioned email discusses a reference lab arrangement, by which Omni would pay MD Labs a flat rate for each PCR UTI test, and where Omni would bill its patients or their insurance carriers for each test.

21.     Todd explained the financial assumptions underlying the proposal as follows:

> We considered a monthly volume of 200 specimens (plus or minus)
> We considered a payer mix of 35% Commercial and 65% all Federal plans to include Medicare, Medicaid, and Tricare.
> You collect all specimens in your lab and we will pick up daily.
> We bill Omni their share monthly.

Ex. T.

**RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Admitted that the quoted text appears in Exhibit T.

22.     On Jul 26, 2018, MD Labs' sales representative Dale A. Stenberg, an independent contractor, wrote to OMNI's practice administrator, offering to bring the office lunch for the following week. On July 30, 2018, manager Wendy Williams, the practice for OMNI's Urgent Care Clinic, asked Stenberg how much MD Labs bills for UTI testing. Stenberg forwarded her question to Todd, with the note: "This question comes up frequently, what should my response be? This is the Urgent Care Omni." Stenberg forwarded Todd's response to Williams:

> Our PCR based UTI is billed at 1 time Medicare rate to all. When Medicare changes so do we . (FYI. Currently it is approximately $700.00.)
> We accept whatever the insurance company pays us … no balance bill. If insurance does not pay we bill patient $50.00 only. They also get the credit for the deductible the insurance company had shared with them on their EOB.

A.735

Ex. U.

**RESPONSE**:  Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. As to the first sentence, admitted that the email attached as Exhibit U so states. As to the second sentence, admitted that Exhibit U states that On July 30, 2018, Wendy Williams asked Stenberg how much MD Labs bills for "urine cultures," not "UTI testing." As to the third and fourth sentences, admitted that Exhibit U so states.

23.     On August 13, 2018, OMNI's Dr. Craig Deligdish and Brad Smith spoke with MD Labs' Director of Sales, Howard Clausen. Clausen shared that he had been with MD Labs for four years. He observed that when he began working with the lab they were 16 samples a month and they are now doing 16,000 samples a month. He then stated that approximately 70% of MD Labs' UTI tests are paid for by Medicare, and the remainder are covered by Medicaid or commercial insurance. Ex. V.

> **RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Admitted that Exhibit V consists of a memorandum authored by Deligdish that so states.

24.     On August 27, 2018, OMNI's Mark Bobango spoke with MD Labs' Clausen and Todd. Bobango reported in an email summary of the call that Clausen had stated, inter alia:

> I had another conversation with Howard today regarding the pricing structure. This is what he confirmed:
>
> 1.  They will not bill any patient anything greater than $50.00 regardless of insurance, co-pay or deductible. They do not want patients to have to pay a lot for this service. They do not go after the patient for any balances over $50.00.
>
>     ….
>
> 3.  For UTI tests, he stated Omni will profit between $200 and $700 per claim. The price for Omni is $250.00. Their cost is approximately $75.00 for these tests. After 90 days, they will take a look at EOBs and negotiate the rate as well.

Ex. W.

A.736

**RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Admitted that Exhibit W consists of an email authored by Bobango that so states.

25.     On August 27, 2018, Todd also emailed OMNI personnel a proposed "Clinical Testing Program Agreement," between MD Labs and OMNI. The contract proposed that MD Labs would provide clinical laboratory testing for OMNI, and bill OMNI $250 for UTI testing. The UTI tests did not include an option or differential pricing for smaller panel of tests than the standard, broad MD Labs panel. *See* ECF #254-19.

      **RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. As to the first sentence, denied that the cited document supports that any email was sent on that date. As to the second sentence, admitted that Ex. W contains a fee schedule listing the "Cost per specimen" for a "Custom UTI panel on file" as $250. As to the third sentence, denied that Exhibit W addresses the size of the panel for any UTI testing.

26.     Although the UTI price purported to cover "Custom UTI Panel on file," MD Labs personnel had never discussed establishing a custom panel or offering anything other than the full panel of PCR follow up tests.

      **RESPONSE**: Defendants object to this statement as it is unsupported by any citation to evidence in the record. As such, the entire statement is denied.

27.     In early January 2018, as MD Labs was beginning to roll out PC[R] UTI testing, Grizelj recommended to Rutledge that they seek "guidance on medical necessity from Noridian, a Medicare Administrative Contractor. *See* Ex. Y.

      **RESPONSE**: Admitted.

/ / /

A.737

Dated: September 18, 2024

Respectfully submitted,

MD SPINE SOLUTIONS LLC, D/B/A MD
LABS INC., DENIS GRIZELJ AND MATTHEW
RUTLEDGE

By their attorneys,

*/s/ Seth B. Orkand*
Seth B. Orkand (BBO #669810)
Julianna M. Charpentier (BBO #703284)
ROBINSON & COLE LLP
One Boston Place, 25th Floor
Boston, Massachusetts 02108
Tel: (617) 557-5915
Fax: (617) 557-5999
sorkand@rc.com
jcharpentier@rc.com

Edward J. Heath (admitted *pro hac vice)*
Kevin P. Daly (BBO #675644)
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT 06103
Tel: (860) 275-8200
Fax: (860) 275-8299
eheath@rc.com
kdaly@rc.com

Danielle H. Tangorre (admitted *pro hac vice*)
ROBINSON & COLE LLP
Chrysler East Building
666 Third Avenue, 20th Fl.
New York, NY 10017
Tel: (212) 451-2900
Fax: (212) 451-2999
dtangorre@rc.com

- 11 -

A.738

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served upon all counsel of record via ECF electronic filing on September 18, 2024.

>/s/ Seth B. Orkand
>Seth B. Orkand

A.739

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al., ex rel.* OMNI HEALTHCARE, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>MD SPINE SOLUTIONS LLC, D/B/A MD LABS INC., DENIS GRIZELJ, MATTHEW RUTLEDGE AND DOE HEALTHCARE PROVIDERS 1 - 100,<br><br>Defendants. | Case No. 18-cv-12558-PBS |

**DEFENDANT MD SPINE SOLUTIONS LLC, D/B/A MD LABS INC.,**
**DENIS GRIZELJ AND MATTHEW RUTLEDGE'S RESPONSE TO PLAINTIFF-**
**RELATOR OMNI HEALTHCARE, INC'S ADDTIONAL**
**STATEMENT OF MATERIAL FACTS**

1.      The most recent AUA guidelines issued in 2022 found that more sensitive culture-based or molecular bacterial detection methods (e.g., polymerase chain reaction-based detection methods) are not necessarily beneficial in the diagnostic evaluation of patients with a suspected UTI. *See* Ex. D ("Recurrent Uncomplicated Urinary Tract Infections in Women: AUA/CUA/SUFU Guideline (2022), available at https://www.auanet.org/guidelines-and-quality/guidelines/recurrent-uti, last accessed August 27, 2024).

> **RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Admitted that AUA guidelines, published in 2019 and reviewed in 2022, state that "[m]ore sensitive cultured-based or molecular bacterial detection methods (e.g., high-throughput sequencing, polymerase chain reaction-based detection methods) are not necessarily beneficial in the diagnostic evaluation of patients with suspected bacterial cystitis." In further answering, the AUA guidelines state, "[f]or the purposes of the AUA guidelines, the Panel considers only recurrent episodes of uncomplicated cystitis in women. The guideline does not apply to pregnant women, patients who are immunocompromised, those with anatomic or functional abnormalities of the urinary

A.740

tract, women with [recurrent UTIs] due to self-catheterization or indwelling catheters or those exhibiting signs or symptoms of systemic bacteremia, such as fever and flank pain." *See* Ex. D at 1. By its terms, the AUA guidelines do not apply to women with other types of complicated UTIs or to men. *Id.*

2.      Often greater specificity and accuracy are not clinically useful because any

incremental information they provide does not affect the treatment the patient will receive. *Id.*

> **RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Defendants deny that greater specificity and accuracy are not clinically useful. MD Labs' faster results enabled providers to prescribe appropriate antibiotics more quickly or eliminate a UTI as the cause of the patient symptoms. Ko Rpt., Ex. 5, at 5; Ko. Tr., Ex. 6, at 134:21-135:19. MD Labs offered providers the ability to receive PCR UTI results before AST results were available to further aid in the clinical decision-making process. *See, e.g.,* MD Labs_0008722, Ex. 8. Additionally, MD Labs' PCR testing provided significant clinical benefit to patients whose UTIs were caused by pathogens traditional BUC was incapable of identifying. Ko Rpt., Ex. 5, at 5; Ko. Tr., Ex. 6, 94:16-95:1; 113:12-24.

3.      AUA guidelines state that "[s]ensitive detection of microorganisms will likely be

associated with increased diagnostic confusion and dilemmas, including overdiagnosis and

associated overtreatment." *Id.*

> **RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Admitted that AUA guidelines are accurately quoted. In further answering, PCR testing, combined with AST, ensures that clinicians use an effective antibiotic the first time, and thus decreases overtreatment. *See* Ko. Rpt., Ex. 5, at 6-7.

4.      While the AUA guidelines acknowledge that "[m]olecular testing technologies

have the potential to provide accurate and rapid information, and hold promise for the future,"

they advise that "more evidence is needed before these technologies become incorporated into

the guideline, as there is concern is that adoption of this technology in the evaluation of lower

urinary tract symptoms may lead to over treatment with antibiotics." *Id.*

> **RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Admitted that AUA guidelines state, "[m]olecular testing technologies have the

A.741

potential to provide accurate and rapid information, and hold promise for the future. To date, more evidence is needed before these technologies become incorporated into the guideline, as there is concern that adoption of this technology in the evaluation of lower urinary tract symptoms may lead to over treatment with antibiotics."

5.      AUA guidelines state that "[t]he impact of such tests on the accuracy of diagnosis is not documented and cannot yet be recommended for incorporation into clinical practice." *Id.*

> **RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Admitted that AUA guidelines state, "While there is some early evidence that molecular diagnostic methods to rapidly identify uropathogen antibiotic susceptibility may help to avoid delayed or inappropriate antimicrobial treatment, the impact of such tests on the accuracy of diagnosis is not documented and cannot yet be recommended for incorporation into clinical practice."

6.      The guidelines conclude that "despite a growing desire for the accurate diagnosis of UTI in patients with suggestive symptoms, particularly those who lack positive urine cultures or who have vague lower urinary tract symptoms (LUTS), the utility of this technology remains unproven and the potential for overtreatment with antibiotics remains significant." *Id*.

> **RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Admitted that the AUA guidelines are accurately quoted. In further answering, the AUA guidelines do not call for abstaining from using PCR or abandoning the use of PCR to add information to diagnose UTIs accurately. Ko. Rpt., Ex. 5, at 8.

7.      As Defendants' own expert acknowledged, PCR testing for UTIs is not generally accepted by the medical community, and certainly was not generally accepted when Defendants began employing it as MD Labs' executive test for UTIs in 2017. Dr. Ko did not begin using PCR testing for UTIs until June 2020, several years after MD Labs introduced it. *See* Ex. E, Ko Dep. Tr. At 107:19-108:3.

> **RESPONSE**: Denied that PCR testing for UTIs is not generally accepted by the medical community and was not generally accepted when Defendants began employing it as MD Labs' exclusive test for UTIs in 2017.  These assertions are not supported by the cited materials.  Admitted that Dr. Ko testified that he did not begin using PCR testing for UTIs until June 2020 and that MD Labs began using PCR UTI testing in 2017.

A.742

Furthermore, Dr. Ko testified that he began using PCR testing in June 2020 when he started at Brown University, but that the testing was already available when he started at Brown at the time he joined. In other words, Brown University had already been using PCR UTI testing prior to Dr. Ko's employment. *See* Ex. E, Ko Dep. Tr. at 108:4-6.

8.      He also acknowledged that the research around the PCR testing for UTIs was ongoing, stating: "that's why we're trying to collect evidence and that's why I'm in this research field. That's why I'm in this area to try to collect the information so that people could help various patients have a better diagnostic in terms of how to treat infection." *Id*. at 175:1-8.

**RESPONSE**: Admitted. Further answering, given that this quotation has been deprived of critical context, medical research is constantly evolving and thus Dr. Ko further stated in his Report, "[T]he development of society guidelines in antibiotics stewardship usually takes years after peer-reviewed articles are reviewed for data relevance and whether there has been an impact on disease processes. Thus, there has always been a lag between evidence supporting new treatments and technologies and their incorporation into society guidelines. The lag does not suggest that the treatment or technology is experimental. Such lags are typical of medical society guidelines. As is typical in medical practice, society guidelines for PCR UTI testing must catch up to the scientific data regarding such testing." Ex. 5, Ko Rpt. at 7-8.

9.      It is well established that laboratories may not use reasonably large "panels" of tests to cause physicians to prescribe many tests at once, when only one or a few tests are medically necessary.

**RESPONSE**: Defendants object to this statement as it is unsupported by any citation to evidence in the record, as required by Fed. R. Civ. P. 56(c)(1) and L.R. 56.1. As such, the entire statement is denied.

10.     The HHS-OIG's laboratory guidance warns about situations where the standardized order or requisition form encourages or even misleads the physicians into ordering more than one test as part of a "panel" when the full "panel" is not medically necessary and/or without giving the physician the option or enough information to understand how to order only those tests that are necessary.

**RESPONSE**: Paragraph 10 does not state a fact but rather consists of argument. As such, the entire statement is denied.

- 4 -

A.743

11.     Specifically, the Guidance cautions:

    a.    Requisition design: While [CMS] does not design or approve requisition forms, laboratories, should construct the requisition form to capture the correct program information as required by Federal or private health care programs and to promote the conscious ordering of tests by physicians or other authorized individuals. The laboratory should construct the requisition form to ensure that the physician or other authorized individual has made an independent medical necessity decision with regard to each test the laboratory will bill . . ."

Ex. G at 45079.

**RESPONSE**: Admitted that HHS-OIG laboratory guidance is accurately quoted. In further answering, the Guidance does not use the word "caution" but states "[l]laboratories *may* implement the following steps through their compliance programs or some other appropriate mechanism . . . ." Ex. G at 45079 (emphasis added).

12.     MD Labs' requisition form did not give physicians the option to make an independent medical necessity decision with regard to each test. Ex. O.

**RESPONSE**: Denied. MD Labs' requisition form gave physicians the option to make an independent medical necessity decision with regard to whether MD Labs' PCR UTI test was appropriate for each patient. *See* Ex. O. Moreover, certain  requisition forms offered by MD Labs reflected that MD Labs gave ordering providers the option of customizing the UTI panel to include certain pathogen targets. *See*, *e.g.*, MDLabs_0151537, attached hereto as **Exhibit 25**.[1]

13.     MD Labs' own Laboratory Director, Alexander Stojanoff, testified that he was "totally confused" by MD Labs' requisition form, stating, "I don't know where the panel is. It just – it just is all of three different diagnoses. So that is what is confusing." Ex. R, Stojanoff Dep. Tr. at 37:5-20.

**RESPONSE**: Admitted that Dr. Stojanoff's testimony is accurately quoted. In further answering, Dr. Stojanoff is neither a medical doctor nor had he seen a copy of the requisition form prior to his deposition. *See* Stojanoff Dep. Tr. at 17:4-6; 35:21-23, attached hereto as **Exhibit 26**.

---

[1] The patient's protected health information has been redacted from this exhibit.

A.744

14.     Additionally, in May of 2018, the Healthcare Fraud Prevention Partnership, a public-private partnership between the Federal Government, state and local government agencies, law enforcement, private health insurance plans, employer organizations, and healthcare anti-fraud associations, published a report highlighting the problem of fraud in the clinical laboratory industry. Ex. S.

> **RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Admitted that the Healthcare Fraud Prevention Partnership published the stated report. In further answering, Exhibit S does not discuss PCR UTI testing.

15.     The report specifically warned about the use of excessively large testing panels:

> A commonly reported problem is the use of more expensive, excessively broad panels in place of smaller panels. For example, a 5-panel urine drug screening test for cannabinoids, cocaine, amphetamines, opioids, and phencyclidine is typically sufficient to detect the use of commonly abused substances such as marijuana, cocaine/crack, heroin, and methamphetamine. In contrast, larger and more expensive definitive panels (i.e., 12- or 14-panel) can be used to detect particular subsets of the substances identified in the smaller panels, as well as the presence of some other less-commonly abused substances. While this may be clinically warranted in some cases, the use of overly broad panels can also be used for the purpose of maximizing reimbursement in the absence of medical necessity. A related problem that can be difficult to control is the use of definitive drug testing for a wide range of substances for which the patient has no history of abuse.

Ex. S.

> **RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Admitted that the Healthcare Fraud Prevention Partnership's report is accurately quoted. In further answering, the quoted section of the report discusses the design of panels for urine drug testing which is a fundamentally different than PCR UTI testing.

16.     MD Labs argues that its UTI testing for 17-19 pathogens was "within the range of pathogens endorsed by peer-reviewed literature." The only authority it cites for this statement though is its own expert's report, not any independent analysis. See ECF #254 at ¶29.

> **RESPONSE**: Admitted that MD Labs argues that its PCR UTI testing for 17-19 pathogens was "within the range of pathogens endorse by peer-reviewed literature." Defendants admit that the authority cited for its statement is Dr. Ko's report. In further

- 6 -

A.745

answering, the cited portion of Dr. Ko's expert report cites a peer-reviewed study not authored by Dr. Ko. *See* Ex. 5, p. 5. (citing Hao et al., *The Essential Role of PCR and PCR Panel Size in Comparison with Urine Culture in Identification of Polymicrobial and Fastidious Organisms in Patients with Complicated Urinary Tract Infections*, INT J MOL SCI, 24(18) (2023), available at https://doi.org/10.3390/ijms241814269).

17.     Defendants' expert acknowledged that he was not aware of any other studies besides own that reached similar conclusions on the purported value of PCR UTI testing. Ex. E, Ko Dep. Tr. at 163:21-164:2.

> **RESPONSE**: Defendants object to Paragraph 17 as vague because it is not clear what "similar conclusions" refers to.  Defendants admit that Dr. Ko testified that he was not aware of other studies on the overall ***cost-savings*** of PCR UTI testing.  Ex. E, Ko Dep. Tr. at 163:21-164:2.

18.     MD Labs' independent contractor sales representatives made extensive efforts to cause providers like those at OMNI to order PCR UTI testing, especially since this was the only type of UTI testing that MD Labs offered.

> **RESPONSE**: Paragraph 18 does not state a fact but rather consists of argument. As such, the entire statement is denied.

19.     MD Labs, through its independent contractor sales representatives like Todd, approached OMNI, and Dr. Deligdish, to encourage them to use MD Labs' medically unnecessary PCR UTI testing. *See* Ex. T.

> **RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Admitted that MD Labs representatives encouraged Omni to use MD Labs for PCR UTI testing services. Denied that such services were medically unnecessary or that MD Labs independent contractor sales representatives encouraged Omni to use any medically unnecessary services. *See* Defs.' SOF ¶¶ 16-32.

20.     On April 23, 2018, MD Labs' Jack Todd, Sales Manager, East Coast Region, an independent contractor, emailed OMNI Healthcare executives and proposed an arrangement where MD Labs would charge OMNI $150 per PCR UTI test to be billed to commercial customers.

A.746

**RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Admitted that on April 23, 2018 Jack Todd emailed Deligdish and Bobango. Admitted further that Todd's email discussed a potential business arrangement between MD Labs and Omni. The remainder of the allegations in Paragraph 20 are denied as unsupported by the email that Relator cites. The email does not propose a charge of $150 per PCR UTI test to be billed to commercial customers but rather states that that is MD Labs' preferred price. Furthermore, while the email discusses a proposed business arrangement between MD Labs and Omni, the email itself does not establish whether the proposal was originally made by Todd or by Omni personnel. Moreover, the aforementioned email discusses a reference lab arrangement, by which Omni would pay MD Labs a flat rate for each PCR UTI test, and where Omni would bill its patients or their insurance carriers for each test.

21.     Todd explained the financial assumptions underlying the proposal as follows:

> We considered a monthly volume of 200 specimens (plus or minus)
> We considered a payer mix of 35% Commercial and 65% all Federal plans to include Medicare, Medicaid, and Tricare.
> You collect all specimens in your lab and we will pick up daily.
> We bill Omni their share monthly.

Ex. T.

**RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Admitted that the quoted text appears in Exhibit T.

22.     On Jul 26, 2018, MD Labs' sales representative Dale A. Stenberg, an independent contractor, wrote to OMNI's practice administrator, offering to bring the office lunch for the following week. On July 30, 2018, manager Wendy Williams, the practice for OMNI's Urgent Care Clinic, asked Stenberg how much MD Labs bills for UTI testing. Stenberg forwarded her question to Todd, with the note: "This question comes up frequently, what should my response be? This is the Urgent Care Omni." Stenberg forwarded Todd's response to Williams:

> Our PCR based UTI is billed at 1 time Medicare rate to all. When Medicare changes so do we . (FYI. Currently it is approximately $700.00.)
> We accept whatever the insurance company pays us … no balance bill. If insurance does not pay we bill patient $50.00 only. They also get the credit for the deductible the insurance company had shared with them on their EOB.

A.747

Ex. U.

**RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. As to the first sentence, admitted that the email attached as Exhibit U so states. As to the second sentence, admitted that Exhibit U states that On July 30, 2018, Wendy Williams asked Stenberg how much MD Labs bills for "urine cultures," not "UTI testing." As to the third and fourth sentences, admitted that Exhibit U so states.

23.     On August 13, 2018, OMNI's Dr. Craig Deligdish and Brad Smith spoke with MD Labs' Director of Sales, Howard Clausen. Clausen shared that he had been with MD Labs for four years. He observed that when he began working with the lab they were 16 samples a month and they are now doing 16,000 samples a month. He then stated that approximately 70% of MD Labs' UTI tests are paid for by Medicare, and the remainder are covered by Medicaid or commercial insurance. Ex. V.

> **RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Admitted that Exhibit V consists of a memorandum authored by Deligdish that so states.

24.     On August 27, 2018, OMNI's Mark Bobango spoke with MD Labs' Clausen and Todd. Bobango reported in an email summary of the call that Clausen had stated, inter alia:

> I had another conversation with Howard today regarding the pricing structure. This is what he confirmed:
>
> 1.  They will not bill any patient anything greater than $50.00 regardless of insurance, co-pay or deductible. They do not want patients to have to pay a lot for this service. They do not go after the patient for any balances over $50.00.
>
>     ….
>
> 3.  For UTI tests, he stated Omni will profit between $200 and $700 per claim. The price for Omni is $250.00. Their cost is approximately $75.00 for these tests. After 90 days, they will take a look at EOBs and negotiate the rate as well.

Ex. W.

A.748

**RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Admitted that Exhibit W consists of an email authored by Bobango that so states.

25.     On August 27, 2018, Todd also emailed OMNI personnel a proposed "Clinical Testing Program Agreement," between MD Labs and OMNI. The contract proposed that MD Labs would provide clinical laboratory testing for OMNI, and bill OMNI $250 for UTI testing. The UTI tests did not include an option or differential pricing for smaller panel of tests than the standard, broad MD Labs panel. *See* ECF #254-19.

>   **RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. As to the first sentence, denied that the cited document supports that any email was sent on that date. As to the second sentence, admitted that Ex. W contains a fee schedule listing the "Cost per specimen" for a "Custom UTI panel on file" as $250. As to the third sentence, denied that Exhibit W addresses the size of the panel for any UTI testing.

26.     Although the UTI price purported to cover "Custom UTI Panel on file," MD Labs personnel had never discussed establishing a custom panel or offering anything other than the full panel of PCR follow up tests.

>   **RESPONSE**: Defendants object to this statement as it is unsupported by any citation to evidence in the record. As such, the entire statement is denied.

27.     In early January 2018, as MD Labs was beginning to roll out PC[R] UTI testing, Grizelj recommended to Rutledge that they seek "guidance on medical necessity from Noridian, a Medicare Administrative Contractor. *See* Ex. Y.

>   **RESPONSE**: Admitted.

/ / /

A.749

Dated: September 18, 2024

Respectfully submitted,

MD SPINE SOLUTIONS LLC, D/B/A MD LABS INC., DENIS GRIZELJ AND MATTHEW RUTLEDGE

By their attorneys,

*/s/ Seth B. Orkand*

Seth B. Orkand (BBO #669810)
Julianna M. Charpentier (BBO #703284)
ROBINSON & COLE LLP
One Boston Place, 25th Floor
Boston, Massachusetts 02108
Tel: (617) 557-5915
Fax: (617) 557-5999
sorkand@rc.com
jcharpentier@rc.com

Edward J. Heath (admitted *pro hac vice)*
Kevin P. Daly (BBO #675644)
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT 06103
Tel: (860) 275-8200
Fax: (860) 275-8299
eheath@rc.com
kdaly@rc.com

Danielle H. Tangorre (admitted *pro hac vice*)
ROBINSON & COLE LLP
Chrysler East Building
666 Third Avenue, 20th Fl.
New York, NY 10017
Tel: (212) 451-2900
Fax: (212) 451-2999
dtangorre@rc.com

A.750

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served upon all counsel of record via ECF electronic filing on September 18, 2024.

*/s/ Seth B. Orkand*
Seth B. Orkand

A.751

# EXHIBIT 25



**MD LABS**
10715 Double R Blvd Suite 102. Reno, NV 89521
Phone: (775) 391-5221 | Fax: (775) 737-9133
Laboratory Director: Dr. Alexander Stojanoff, Ph.D.
CLIA #: 29D2032647

[ ] Binod Sinha, MD

VBCU1Z2723

Urology Care Of Central New Jersey
4 Progress St. Ste A-9
Edison, NJ, 08820
VBCU 514179

## Patient & Collection Information

REDACTED - PHI

**Race ~ Required for COVID-19:**
❑ American Indian/ Alaska Native
❑ Asian
❑ Black/ African American
❑ Native Hawaiian or other Pacific Islander
❑ White
❑ Other

**Ethnicity ~ Required for COVID-19**
❑ Hispanic/Latino
❑ Not Hispanic/Not Latino
❑ Unknown

## Patient Address (Required for COVID-19 Only)

| Address | Phone | City, State, ZIP | County of Residence |
|---|---|---|---|

**Payment Type:** ☑ Insurance   ❑ Account Bill   ❑ Self-Pay

**In Office Dipstick Results**  ☑ POSITIVE (R82.90)   ❑ Blood   ❑ Protein   ❑ Nitrite   ☑ Leukocytes   ❑ ALL NEGATIVE

### URINARY TRACT INFECTION
Use Gray Top Tube

☑ **UTI Test Requested:** Please select target(s) below. UTI targets ranked in order of frequency of detection at MD Labs from most common to least common.

☑ **UTI Targets**
Acinetobacter baumannii ❑
Candida albicans ❑
Citrobacter freundii ❑
Enterobacter cloacae ❑
Enterococcus faecalis ❑
Enterococcus faecium ❑
Escherichia coli ❑
Klebsiella aerogenes ❑
Klebsiella oxytoca ❑
Klebsiella pneumoniae ❑
Morganella morganii ❑
Proteus mirabilis ❑
Providencia stuartii ❑
Pseudomonas aeruginosa ❑
Staphylococcus saprophyticus ❑
Streptococcus agalactiae ❑

❑ **Sexually Transmitted Bacteria**
Mycoplasma genitalium ❑
Ureaplasma urealyticum ❑
Ureaplasma parvum ❑

### URINALYSIS & MICROSCOPIC
Use Tiger Top Tube

Please select one:
❑ Urinalysis
❑ Urinalysis with Microscopy

### COVID-19
Use Nasopharyngeal Swab + VTM

❑ **SARS-CoV-2 (COVID-19)** (qPCR)
In the event this specimen is negative for COVID-19, would you like MD Labs to reflex test for other respiratory pathogens?

❑ YES   ❑ NO

If yes, please designate desired targets below.

### RESPIRATORY
Use Nasopharyngeal Swab + VTM and/or Sputum

❑ **Respiratory Bacterial Targets** (qPCR + Swab and/or Sputum)
Bordetella (PAN) ❑
Bordetella pertussis ❑
Chlamydophila pneumoniae ❑
Haemophilus influenzae ❑
Klebsiella pneumoniae ❑
Legionella pneumophila ❑
Mycoplasma pneumoniae ❑
Staphylococcus aureus ❑
Streptococcus pneumoniae ❑

Medicare and other carriers often cover PCR testing for up to 5 viral targets, in addition to bacterial targets above, for patients with appropriate diagnoses. Please select the desired viral targets below.

❑ **Respiratory Viral Targets** (qPCR + Swab)
Human Respiratory Syncytial Virus A ❑
Human Respiratory Syncytial Virus B ❑
Influenza A (PAN) ❑
Influenza A/H1-2009 ❑
Influenza B (PAN) ❑

### WOMEN'S HEALTH
Use ESwab

❑ **Vaginal Microbiota Targets**
Atopobium vaginae ❑
Bacteroides fragilis ❑
BVAB2 ❑
Chlamydia trachomatis ❑
Enterococcus faecalis ❑
Escherichia coli ❑
Gardnerella vaginalis ❑
Haemophilus ducreyi ❑
HSV1 & HSV2 ❑
Lactobacillus crispatus ❑
Lactobacillus gasseri ❑
Lactobacillus iners ❑
Lactobacillus jensenii ❑
Megasphaera 1 & 2 ❑
Mobiluncus curtisii ❑
Mobiluncus mulieris ❑
Neisseria gonorrhoeae ❑
Prevotella bivia ❑
Staphylococcus aureus ❑
Streptococcus agalactiae ❑
Treponema pallidum ❑
Trichomonas vaginalis ❑
Mycoplasma genitalium ❑
Mycoplasma hominis ❑
Ureaplasma urealyticum ❑

❑ **Candidiasis Targets**
Candida albicans ❑
Candida auris ❑
Candida dubliniensis ❑
Candida glabrata ❑
Candida krusei ❑
Candida lusitaniae ❑
Candida parapsilosis ❑
Candida tropicalis ❑

*Please include an additional ESwab if ordering STI

### SEXUALLY TRANSMITTED INFECTION
Use ESwab or Yellow Tube

❑ **STI Targets** (Urine or Swab)
Chlamydia trachomatis ❑
Neisseria gonorrhoeae ❑
Treponema pallidum ❑
Mycoplasma genitalium ❑
Ureaplasma urealyticum ❑
Ureaplasma parvum ❑
Trichomonas vaginalis ❑
Gardnerella vaginalis ❑

❑ **STI Targets** (Swab Only)
Haemophilus ducreyi ❑
Herpes simplex virus 1 ❑
Herpes simplex virus 2 ❑
Human Papillomavirus 16 ❑
Human Papillomavirus 18 ❑
Human Papillomavirus 45 ❑

### ICD-10 CODES
(SEE LIST ON BACK)

A list of ICD-10 Codes are provided on the back for your convenience. (please read disclaimer)

N40.1   R35.1   R3
R39.15   N39.0

### FOR INTERNAL USE ONLY

☑ Reviewed Collection Date: **3/15**
Received Collection Devices:
☑ Gray Tube   ❑ Sputum
❑ Tiger Tube   ❑ ESwab
❑ VTM Tube   ❑ Yellow Tube
Notes: UTI   Initials: SF

## PROVIDER'S AUTHORIZATION

I hereby authorize MD Labs to perform the testing indicated above

I acknowledge that I will provide the appropriate diagnosis codes (ICD-10) to the highest level of specificity, as to support medical necessity of the tests ordered. Additionally, I will have documentation to support medical necessity recorded in the patient's medical chart . I understand the Office of the Inspector General requires such documentation in the patient's medical record including date of service, tests ordered and documentation to support medical necessity. I also agree to comply in a timely manner with any request for medical documentation required for the adjudication of MDLabs claims.

**Provider's Authorization Signature:** _____   **Date:** 3/15/21

**SHIP SPECIMENS DAILY! --- SEND TOP COPY TO MD LABS WITH SAMPLE & ATTACH A COPY OF PATIENT FACE SHEET AND INSURANCE CARD**

PEEL LABEL HERE ↓   PEEL LABEL HERE ↓   PEEL LABEL HERE ↓

VBCU1Z2723   VBCU1Z2723   VBCU1Z2723

UTISTI-REQ-V5-3768 (1/21)

A.753

Highly Confidential - PHI   MDLabs_0151537

## COMMONLY USED ICD-10 CODES

The following diagnosis codes are listed as a convenience only. Ordering physicians should use the ICD-10 code that best describes the reason for performing the test, whether or not that code is listed below.

### Urinary Tract Infection

| | |
|---|---|
| N39.0 | Urinary tract infection, site not specified |
| N76.0 | Acute vaginitis |
| N76.1 | Subacute and chronic vaginitis |
| N89.8 | Other specified noninflammatory disorders of vagina |
| R19.7 | Diarrhea, unspecified |
| R30.0 | Dysuria |
| R35.0 | Frequency of micturition |

### Sexually Transmitted Infection

| | |
|---|---|
| N39.0 | Urinary tract infection, site not specified |
| N76.0 | Acute vaginitis |
| N89.8 | Other specified noninflammatory disorders of vagina |
| R30.0 | Dysuria |
| Z01.411 | Encounter for gynecological examination (general) (routine) without abnormal findings |
| Z11.3 | Encounter for screening for infections with a predominantly sexual mode of transmission |
| Z12.4 | Encounter for screening for malignant neoplasm of cervix |
| Z20.2 | Contact with and (suspected) exposure to infections with a predominantly sexual mode of transmission |

### Women's Health

| | |
|---|---|
| N76.0 | Acute vaginitis |
| N89.8 | Other specified noninflammatory disorders of vagina |
| Z01.411 | Encounter for gynecological examination (general) (routine) without abnormal findings |

### Respiratory

| | |
|---|---|
| B97.29 | Other coronavirus as the cause of diseases classified elsewhere |
| J06.9 | Acute upper respiratory infection, unspecified |
| J12.9 | Viral pneumonia, unspecified |
| J12.89 | Other viral pneumonia |
| J18.9 | Pneumonia, unspecified organism |
| J20.8 | Acute bronchitis due to other specified organisms |
| R05 | Cough |
| R06.2 | Wheezing |
| R50.9 | Fever, unspecified |

## TESTING MENU

### Urinalysis Screening:

Protein, Glucose, Leukocytes, Nitrite, Urobilinogen, pH, Blood, Specific Gravity, Ketone-acetoacetic acid, and Bilirubin. Microscopic Urinalysis: Crystalluria, Red blood cells, White blood cells, White cell casts, Red cell casts, Bacteria, Mucous, Squamous Epithelial Cells, Transitional Epithelial Cells, Renal Epithelial Cells, Yeast, Hyaline casts, Renal tubular (epithelial) casts, Granular casts, Waxy casts, Fatty casts, and Sperm.

### Urinary Tract Infection (UTI) qPCR:

Acinetobacter baumannii, Candida albicans, Citrobacter freundii, Enterobacter cloacae, Enterococcus faecalis, Enterococcus faecium, Escherichia coli, Klebsiella aerogenes, Klebsiella oxytoca, Klebsiella pneumoniae, Morganella morganii, Mycoplasma genitalium, Proteus mirabilis, Providencia stuartii, Pseudomonas aeruginosa, Staphylococcus saprophyticus, Streptococcus agalactiae, Ureaplasma urealyticum, and Ureaplasma parvum.

Identification of over 300 gram-positive and gram-negative organisms are also available via an identification method that uses modified conventional, fluorogenic, and chromogenic substrates.

### Antimicrobial Susceptibility Testing (AST):

Amikacin, Amoxicillin/Clavulanate, Ampicillin, Ampicillin/Sulbactam, Aztreonam, Cefazolin, Cefepime, Cefoxitin, Ceftazidime, Ceftriaxone, Ciprofloxacin, Clindamycin, Confirmatory ESBL, Daptomycin, Ertapenem, Erythromycin, Gentamicin, Gentamicin-synergy, Imipenem, Inducible Macrolide Resistance Test (iMLSb), Levofloxacin, Linezolid, Meropenem, Moxifloxacin, Nitrofurantoin, Oxacillin, Penicillin, Piperacillin/Tazobactam, Quinupristin/Dalfopristin, Rifampin, Streptomycin-synergy, Tetracycline, Tobramycin, Trimethoprim/Sulfamethoxazole, and Vancomycin.

### Women's Health qPCR:

Atopobium vaginae, Bacteroides fragilis, BVAB2, Candida albicans, Candida auris, Candida dubliniensis, Candida glabrata, Candida krusei, Candida lusitaniae, Candida parapsilosis, Candida tropicalis Chlamydia trachomatis, Enterococcus faecalis, Escherichia coli, Gardnerella vaginalis, Haemophilus ducrey, HSV1, HSV2, Lactobacillus crispatus, Lactobacillus gasseri, Lactobacillus iners, Lactobacillus jensenii, Megasphaera 1, Megasphaera 2, Mobiluncus curtisii, Mobiluncus mulieris, Mycoplasma genitalium, Mycoplasma hominis, Neisseria gonorrhoeae, Prevotella bivia, Staphylococcus aureus, Streptococcus agalactiae (group B), Treponema pallidum (Syphilis), Trichomonas vaginalis, Ureaplasma urealyticum.

### Respiratory qPCR:

SARS-CoV-2 (COVID-19), Bordetella (PAN), Bordetella pertussis, Chlamydophila pneumoniae, Haemophilus influenzae, Klebsiella pneumoniae, Legionella pneumophila, Mycoplasma pneumoniae, Staphylococcus aureus, and Streptococcus pneumoniae!

### Sexually Transmitted Infection (STI) qPCR:

Chlamydia trachomatis, Neisseria gonorrhoeae, Treponema pallidum, Mycoplasma genitalium, Ureaplasma urealyticum, Ureaplasma parvum, Trichomonas vaginalis, Haemophilus ducreyi, Herpes simplex virus 1, Herpes simplex virus 2, Human Papillomavirus 16, Human Papillomavirus 18, Human Papillomavirus 45, and Gardnerella vaginalis.

## Respiratory

Medicare will only pay for the tests that are medically reasonable and necessary based on the clinical condition of each individual patient.

LCD – https://www.cms.gov/medicare-coverage-database/details/lcd-details.aspx?LCDId=37301&ContrId=364

Article A7338 – https://www.cms.gov/medicare-coverage-database/details/article-details.aspx?articleId=57338

## STI/STD

Medicare will only pay for the tests that are medically reasonable and necessary based on the clinical condition of each individual patient.

NCD 210.10 –
https://www.cms.gov/medicare-coverage-database/details/ncd-details.aspx?NCDId=352&ncdver=1&TAId=41&CoverageSelection=Both&NCSelection=NCA%7CCAL%7CNCD%7CMEDCAC%7CTA%7CMCD&ArticleType=Ed%7CKey%7CSAD%7CFAQ&PolicyType=Final&KeyWord=inpatient+rehabilitation&KeyWordLookUp=Doc&KeyWordSearchType=And&kq=true&bc=IAAAABAAAAAA&

A.754

Highly Confidential - PHI

MDLabs_0151538



A.755

Highly Confidential - PHI

MDLabs_0151539

# EXHIBIT 26

A.756

UNITED STATERS DISTRICT COURT
DISTRICT OF MASSACHUSETTS


***************************

UNITED STATES OF AMERICA, et
al, ex rel. OMNI HEALTHCARE,
INC.,

        Plaintiffs,
vs.                                    Case No.:
                                       18-cv-12558-PBS

MD SPINE SOLUTIONS LLC,
D/B/A MD LABS INC., DENIS
GRIZELJ, MATTHEW RUTLEDGE
AND DOE HEALTHCARE PROVIDERS
1-100,

        Defendants
***************************



DEPOSITION of ALEXANDER STOJANOFF, PH.D.

via Zoom

Wednesday, November 15, 2023

1:00 p.m. Easter Standard Time




Judith McGovern Williams, CSR, CRR
Registered Professional Reporter


Williams & Associates Court Reporters
177 Beach Avenue
Hull, Massachusetts  02045
781-760-6619
judithmwilliams@gmail.com

A.757

A.758

Q. Yes.  That's correct?

A. That is very vague.  I don't understand.

Q. I am trying to -- you have a medical degree?  Is that correct?

A. I don't.

Q. All right.  What is the highest level of education you received in terms of either a Ph.D. or a Master's or an M.B.A. or a Bachelor's degree or something aside from that?

A. I have a Bachelor's degree.  I have a Master's degree.  I have a Ph.D., and I am board certified as a high intensity lab director.

Q. Where did you obtain your Bachelor's degree?

A. From where?

Q. Yes.

A. From a university.

Q. Which one?

A. Monash University.

Q. That is in Australia?

A. Correct.

A.759

A.760

documents which were produced which are Bates numbers 347 and 348.  If I read the protective order, I think he is entitled to see the unredacted version, but again in an abundance of caution, I don't think patient names are going to be relevant in my questioning anyway, but it is MD Labs 347 and 348.

Do you recognize this document, Dr. Stojanoff?

A. Not really.  No.

Q. Do you recognize this form?  Aside from the specific names and dates on it, do you recognize this form of document?

A. I'm not sure what this document is.

Q. At the top where it says ResolUTIon, with the UTI capitalized, do you know what that refers to?

A. No, I don't.

Q. You don't recall seeing this form of document before?

A. I -- I -- I haven't.  No.

Q. Are you aware that MD Labs offers

A.761

A.762

Page 77

CERTIFICATE

Commonwealth of Massachusetts

Plymouth, ss.




          I, Judith McGovern Williams, a

Notary Public in and for the Commonwealth of

Massachusetts, do hereby certify:

          That ALEXANDER STOJANOFF, PH.D.,

the witness whose deposition is hereinbefore

set forth, was duly sworn by me and that such

deposition is a true record of the testimony

given by the said witness.

          IN WITNESS WHEREOF, I have hereunto

set my hand this 28th day of November, 2023.



                    Judith McGovern Williams
               Registered Professional Reporter
                  Certified Realtime Reporter
            Certified Shorthand Reporter No. 130993


My Commission expires:

April 19, 2024

# EXHIBIT Z

A.764

Message
| | |
|---|---|
| **From**: | Chuck Dushman [chuck@rxight.com] |
| **Sent**: | 9/18/2019 1:03:39 PM |
| **To**: | mmathis@mcso-llc.com |
| **CC**: | office@woodfieldurology.com |
| **Subject**: | Real-time PCRq UTI testing Follow-up |
| **Attachments**: | PCRq for UTI - MCSO and MD Labs v9-18-19.pdf; ATT00001.htm; MD Labs Sample UTI Report 8.1.19.pdf; ATT00002.htm; PastedGraphic-1.png; ATT00003.htm; PastedGraphic-2.png; ATT00004.htm; Prelim Report - Findings.pdf; ATT00005.htm; PastedGraphic-22.tiff; ATT00006.htm |

Hi Maureen,

Here are the highlights for Dr. Randazzo … it is all about better patient care AND easier for staff:

1.      **Urine Cultures** date back to 1890's with well documented **30% false negative rate on pathogen detection, even for E. coli**

2.      **MCSO Physicians** choose MD Labs **Realtime PCRq** Testing with <u>Concurrent</u> Culturing because:

1.              we accept **ALL** insurance

2.              we do **NOT** balance bill … the most your patients will pay is $50 (about the same as a specialist copay in many cases)

3.              Preliminary report in **24 hours** from receipt of specimen at lab

1.                      if non-common pathogen detected, reflex to panel of 360+ gram positive/negative organisms

2.                      Final report with Susceptibility results generally **24 hours** after Preliminary report

▪                      **Gold Standard Susceptibility testing** using culture

4.      **NOW** also provide **STI** testing using RT PCRq (for your staff's convenience we will also handle your UA testing needs)

5.      **NO STAFF PAPERWORK** (simply place pre-printed stickers on tube and on lab order printed from Athena)

6.      **ATHENA INTEGRATION**

7.      **I take great care of the staff**

I would refer you to Dr. Vaselopulos, or if you want someone closer to Schaumburg, Dr. Sadah, for independent confirmation of our strong service levels and dedication to your office.

I look forward to serving you.

A.765

CONFIDENTIAL

MDLabs_0001699

# EXHIBIT AA

A.766

**From:** Chuck Dushman[chuck@rxight.com]
**Sent:** Wed 1/15/2020 7:38:30 PM Eastern Standard Time
**To:** usa3633@fedex.com[usa3633@fedex.com]
**Subject:** for chuck
**Attachment:** Print for Folders.zip
**Attachment:** ATT00001.htm
**Attachment:** PastedGraphic-1.png
**Attachment:** ATT00002.htm
**Attachment:** PastedGraphic-2.png
**Attachment:** ATT00003.htm

Please print in color, 2-sided on glossy stock

25 sets collated of documents labeled and in this order: 1), 2), 3), 4), 5)

25 sets collated of documents labeled and in this order: 11), 12), 13), 14)

Please call to confirm timing and with any questions.

A.767

Confidential



## MD Labs

MD Labs, a privately-held high complexity clinical laboratory, founded in 2011 in Reno, Nevada has the mission to create a more provider-friendly testing service that prides itself on delivering prompt, accurate, reliable and easy to understand results using state-of-the-art technology.

| | |
|---|---|
| Testing Services: | ➤ Prescription Monitoring Toxicology (2011)<br>➤ Pharmacogenetics (2014)<br>➤ Urinalysis with Microbiology (2018)<br>➤ Molecular Diagnostic qPCR UTI (2018)<br>➤ Molecular Diagnostic qPCR STI (2019) |
| Accreditation: | CLIA Certified High Complexity Laboratory. MD Labs utilizes triplicate quality assurance measures incorporating College of American Pathologists (CAP) Certification, Reference Proficiency Testing and Internal Proficiency Testing to ensure accuracy and reproducibility. |
| Laboratory Director and Credentials: | Manoj Tyagi, Ph.D. F AACC/ FACB, NRCC<br>Laboratory Director with 15 + years of experience in Quality management systems, clinical laboratory regulatory affairs and accreditation. |
| Chicago Contact: | Chuck Dushman, chuck@rxight.com,  773-919-4138 |



### qPCR with Concurrent Culturing

MD Labs improves outcomes by **replacing Urine Culture testing for UTI detection and identification** with our qPCR technology that evaluates 17 common pathogens with 100% specificity faster and without the 20-30% false negatives from urine culture.

**Culturing is still the Gold Standard for detecting non-common pathogens and for specificity testing.** Which is why, upon receipt, we also immediately culture the specimen which enables us to detect any other growing organisms which, if found, are reflexed to a panel of over 320 gram positive/negative organisms for positive identification.

The culture is also used to apply our automated Sensitivity testing from a menu of 35 antimicrobials, to identify antibiotic resistance with MIC specificity to the identified pathogen(s) for that patient.

A.768

MDLabs_0531848



# RES⊚LUTION™

## qPCR with Concurrent Culturing

- **NOW** with optional Preliminary Report available within 24 hours of lab receiving specimen
  - Pathogen Identification
  - Specific Colony Count
- **NOW** with reflex to panel of > 320 gram positive/negative organisms
- Final Report with susceptibility results generally 1 day after Preliminary Report
  - Automated Sensitivity testing of up to 35 antimicrobials
    - Identify **MIC-specific** antibiotic resistance to that pathogen(s)
    - Enable optimal treatment plan for each identified pathogen(s)
- **NOW Resolution In Action** integrates the Sanford Guide into our results report, just one click away from the industry standard source for antimicrobial stewardship
- **NOW** STI testing
- We accept all insurance
  - **No Balance Billing**
  - $50 Maximum Patient Cost
- **NOW** no more forms for staff to complete; simple account-specific pre-printed stickers
- **NOW** Athena Integration

## Local Urologists Using MD Labs/Resolution™

ALLEN M. CHERNOFF, MD

FADI A. HABIB, MD

PHUONG HUYNH, MD

JAMES KIM, MD

JOHN LEYLAND, MD

MICHAEL PAIK, MD

JOSEPH PIGATO, MD

ALAN SADAH, MD

NITIN SHARMA, MD

GEORGE SOSENKO, MD

PETER T. VASELOPULOS, MD

A.769

# EXHIBIT BB

A.770

| | |
|---|---|
| **From:** | Howard Claussen [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=85B530516E874C8FAD7845A97ED9EDD0-HOWARD] |
| **Sent:** | 7/20/2018 1:17:26 PM |
| **To:** | Melissa Laudenschlager [mml-2@cox.net] |
| **CC:** | erikmissylaud@gmail.com |
| **Subject:** | RE: A solid primer for UTI testing for all sales reps and PHYSICIANS |

Call me on this when you can.

We are BY CHOICE out of network, not in network.

This is by design.  We could NOT offer the following if we were in network.

1.      50$ self-pay
2.      50$ billing if denied
3.      50$ bill if entire amt goes to deductible ( if any gets paid to us, it is no charge)
4.      No balance billing.

We would be required to raise our price to the patient.  That is our basic philosophy.  The best for the patient.

Call with questions

**From:** Melissa Laudenschlager <mml-2@cox.net>
**Sent:** Friday, July 20, 2018 1:12 PM
**To:** Howard Claussen <howard@mdlabs.com>
**Cc:** erikmissylaud@gmail.com
**Subject:** Re: A solid primer for UTI testing for all sales reps and PHYSICIANS

Hi Howard! Hope you're well. Does MD labs have a comprehensive insurance list of what insurances we are contracted with?

Thanks,

Melissa

Sent from my iPhone

On Jul 20, 2018, at 10:07 AM, Howard Claussen <howard@mdlabs.com> wrote:

This was written by our own Dylan Stone.  It is brilliant and makes it obvious to all why we should be a urologist's vendor of choice.  If you have any questions, please email me

Howard

Please see the information below:

- White paper referencing the 30% error rate in the Standard Culture.

- Treatment recommendations on Standard Culture vs PCR Technology - are they the same or more advanced?

Quantitative PCR (qPCR) is used for pathogen identification, not to determine treatment recommendation.  qPCR can detect slow-growing, difficult-to-cultivate, or uncultivable microorganisms.  Real-time PCR techniques provide better categorization and detection of these microorganisms.

A.771

MDLabs_0533566

To determine susceptibilities specimens are incubated and processed via an automated susceptibility testing system that provides rapid, accurate and reliable detection of known and emerging antimicrobial resistance.  Our susceptibility system incorporates the use of an oxidation-reduction indicator, turbidometric growth detection, full on-panel antimicrobial concentrations and a state-of-the-art software system.

- Any literature discussing 10^3 vs 10^5; monitoring vs treating?

Significant bacteriuria traditionally refers to >10^5 colony-forming units (CFU) of bacteria per mL of urine. Urine cultures from patients with symptomatic UTIs usually show >10^5 CFU/mL of urine, whereas asymptomatic patients whose cultures have been contaminated usually show < 10^3 CFU/mL of urine.  However, limitations of the ">10^5 per mL rule" have become increasingly apparent. In brief, fewer than 10^5 CFU/mL often assume significance when the pre-test probability of UTI is high because of the clinical setting. These cases are sometimes called low colony-count UTI. Stated differently, 10^4 or even fewer bacteria per mL of urine represent "significant bacteriuria" when there is strong clinical evidence of UTI.

http://www.microbiologybook.org/Infectious%20Disease/Urinary%20Tract%20Infections.htm

Ultimately, personalized treatment decisions need to be based on the patient's results, symptoms, and condition.  Our laboratory does not make treatment recommendations, but we do offer susceptibility results.

I have attached an article highlighting the strength of qPCR to share with them if necessary: *Women with symptoms of a urinary tract infection but a negative urine culture: PCR-based quantification of Escherichia coli suggests infection in most cases.*

<Women-with-symptoms-of-UTI-but-negative-Urine-test-Journal-of-Microbiology-2017.pdf>

A.772

MDLabs_0533567

**From:** Howard Claussen[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=85B530516E874C8FAD7845A97ED9EDD0-HOWARD]
**Sent:** Thur 3/29/2018 4:54:06 PM Eastern Standard Time
**To:** Bill Dunn[bdunns@gmail.com]
**Subject:** RE: Cost of UTI pcr test

Self pay $50
Denial $50
No balance billing
No billing if it went to deductible

-----Original Message-----
From: Bill Dunn <bdunns@gmail.com>
Sent: Thursday, March 29, 2018 4:51 PM
To: Howard Claussen <howard@mdlabs.com>
Subject: Cost of UTI pcr test

Howard, this is Bill Dunn, i am a rep with the SureTrust group. Had a question from a doc today about the cost of our test versus culture method, Medicare allowable and typical copay amounts due from patients. Thanks in advance, Bill

Sent from my iPhone

A.773

Confidential

MDLabs_0580168

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


OMNI HEALTHCARE, INC., et al,    )
    )
    Plaintiffs    )
    )
    -VS-    ) CA No. 18-12558-PBS
    ) Pages 1 – 37
MD SPINE SOLUTIONS LLC, D/B/A    )
MD LABS INC., et al,    )
    )
    Defendants    )


**MOTION HEARING BY VIDEO**

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE








United States District Court
1 Courthouse Way
Boston, Massachusetts  02210
November 13, 2024, 10:03 a.m.





LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
leemarz47@gmail.com

A.774

APPEARANCES:

THOMAS M. KENNY, ESQ., SVJETLANA TESIC, ESQ., and EVAN BIANCHI, ESQ., Spiro Harrison & Nelson, 363 Bloomfield Avenue, Suite 2C, Montclair, New Jersey, 07042, for the Plaintiff/Relator.

SETH B. ORKAND, ESQ., JULIANNA M. CHARPENTIER, ESQ., and THERESA E. LANE, ESQ., Robinson & Cole LLP, One Boston Place, 25th Floor, Boston, Massachusetts, 02108, for the Defendants.

EDWARD J. HEATH, ESQ., Robinson & Cole LLP, One State Street, Hartford, Connecticut, 06103-3102, for the Defendants.

DANIELLE H. TANGORRE, ESQ., Robinson & Cole, LLP, 111 Washington Avenue, Third Floor, Albany, New York, 12210, for the Defendants.

ABRAHAM R. GEORGE, ESQ., Assistant United States Attorney, Office of the United States Attorney, 1 Courthouse Way, Boston, Massachusetts, 02110, for the United States of America.

ALSO PRESENT: Dennis Grizeli and Matthew Rutledge

P R O C E E D I N G S

THE CLERK: Good morning, Judge.

THE COURT: Good morning to everyone.

THE CLERK: So I have both sides on, so I'll call the case. The Court calls Civil Action 18-12558, Omni Healthcare Inc., et al v. MD Spine Solutions LLC, et al.

Could counsel please identify themselves for the record.

MR. KENNY: Good morning, your Honor. For plaintiff/relator Omni Healthcare, Thomas Kenny with my colleagues Svjetlana Tesic and Evan Bianchi of Spiro Harrison & Nelson.

THE COURT: Thank you.

MR. ORKLAND: And good morning, your Honor. Seth Orkland, and I appear on behalf of MD Spine Solutions, Matthew Rutledge and Dennis Grizeli, and I'm here with my cocounsel, Edward Heath, Danielle Tangorre, Julianna Charpentier, and Theresa Lane.

THE COURT: Thank you. Is anyone here from the United States?

MR. GEORGE: Yes. Good morning, your Honor. Abraham George from the United States Attorney's Office in Boston.

THE COURT: You're exactly who I was going to ask about to make sure I had someone from the U.S. government here.

MR. GEORGE: I'm here, your Honor.

THE COURT: Okay. So I am worried about certain

A.776

aspects of this case. I'm not sure what legally and doctrinally to do with them, but I'm worried about one key threshold issue. Let me first ask plaintiff. Is it true that the relator submitted false claims?

MR. KENNY: No, I don't believe -- I don't believe it is true, your Honor. What occurred is that the defendants approached relator's medical practice about, you know, providing this type of PCR testing that they were offering apparently widely throughout the country; and, you know, the relator submitted claims, submitted orders for testing to MD Labs in the same format. Now, the --

THE COURT: But can I just -- this is what I'm just trying to focus on. At least the allegation was that he submitted them requesting tests he knew were medically unnecessary.

MR. KENNY: Relator --

THE COURT: In other words, he even changed, I think, what some of the providers in the organization had requested to make it the -- what's it, the larger panel? I forget -- 15- to 17-panel PCR. And at least the way defendant framed it was that he had actually changed the requisition forms in order to basically test his theory that there were unnecessary tests being paid out.

MR. KENNY: No, respectfully, your Honor, I don't believe that's accurate. That's not accurate that the relator

changed -- or at least -- you're referring to relator's principal doctor?

THE COURT: Yes. I'm sorry. And how do you pronounce it? The only reason I didn't say it, I was going to say doctor --

MR. KENNY: Craig Deligdish.

THE COURT: All right, let me just say, it wasn't really -- there was certainly debate about it in the briefing papers in terms of what legal consequence that has, but the fact of it wasn't debated.

MR. KENNY: Well, the fact that Omni submitted orders for these tests is not for debate.

THE COURT: Knowing -- knowing that they were unnecessary.

MR. KENNY: Well, actually, defendants --

THE COURT: What?

MR. KENNY: Go ahead, your Honor.

THE COURT: And indeed the allegation is, he actually switched some of the requisition forms.

MR. KENNY: No, I don't think there's any evidence in the record that he actually switched requisition forms. What happened is the --

THE COURT: Not switched, but he changed what the provider wanted. I may not be using the correct terminology.

MR. KENNY: No, and I understand. I think it's an

A.778

important detail that your Honor is getting at.  Numerous doctors from Omni's practice were deposed in this case; yet there wasn't any evidence that came to light.  There wasn't any evidence that there was any switch of what the providers ordered.  The providers repeatedly indicated they wanted a UTI test and didn't have any specific preference as to what type of UTI test was ordered.  Now, some of the providers didn't even know, you know, what a PCR test was.

THE COURT:  Is it true that some of them, that he basically filled it in to request tests that he believed were reasonably unnecessary?

MR. KENNY:  Well, whether he actually did it --

THE COURT:  Or at his direction someone did it?

MR. KENNY:  Sure.  What he -- well, they agreed to provide -- you know, they agreed to order testing from MD Labs.  MD Labs only performed the PCR test.  So, yeah, I guess when you're ordering testing from MD Labs, so, yes, certainly there was awareness that --

THE COURT:  Let me ask the government about this.  Were you aware of this?

MR. GEORGE:  Your Honor, I haven't followed the ins and outs of discovery between the parties since we settled the UBT portion of the case, so I would say I was not aware of this.  I was reading as I was catching up on the briefing.  But I do think --

THE COURT: I was really startled. I have to say, I'm not sure legally what consequence it has, but --

MR. GEORGE: May I address that?

THE COURT: -- I was really troubled by this. You didn't authorize this, right?

MR. GEORGE: No, your Honor. This came to us -- you know, it was already -- the activity was already complete by the time that we took the case. But, your Honor, I think legally, if your Honor looks at 31 U.S.C., Section 3730(d)(3), I have no position on whether this happened or not, but let's assume for purposes of your analysis that it did happen, I don't think that absolves the defendants of liability under the False Claims Act.

THE COURT: I think that may be right, but it does create -- I didn't know what to call it, so let me just generically call it "certainly it's troubling," and it may well be sort of an unclean hands kind of situation. I don't know whether that affects attorneys' fees or whether you've ever run into this or not.

MR. GEORGE: I have not run into this specific situation, but this section of the FCA that I just cited, 3730(d)(3), states that if the court finds that the action was brought by a person who planned and initiated the violation of Section 3729, the Court can reduce the share; or if the person is convicted of a crime, the Court can zero the person out and

A.780

dismiss the case. So if you are troubled by this, your Honor, and you find that the facts are that the relator did initiate the fraud here, and I'm not --

THE COURT: What section was that, 37 --

MR. GEORGE: 31 U.S.C. 3730(d)(3).

THE COURT: I will look at it. But basically what you're saying is, it doesn't exonerate, if you will, the lab that it was an unnecessary test, but it may affect the relator's ability to collect full attorneys' fees? That's sort of your view of the statute?

MR. GEORGE: Right. The Court can decide to lower the share or perhaps even -- I'm not sure of this -- but perhaps send the shares to zero. But I don't think it absolves the defendants of liability, especially where, again, if true -- I don't know the truth of this or not, but if the defendant lab company and the individuals submitted claims for payment to Medicare, especially where it's not clear that the physician, the provider, actually even ordered confirmatory testing, it doesn't matter what the relator did. In the government's view, that's unnecessary testing per se.

THE COURT: Well, excuse me. That was your case, right?

MR. GEORGE: Well, in the relator's response to the defendant's motion for summary judgment, one point the relator makes is that MD Labs submitted claims for payment based on

A.781

tests where it was not clear that the provider even ordered confirmatory testing. So whether the relator in his own claim submitted by Omni engaged in any fraud or not is irrelevant to the question of whether MD Labs submitted medically unnecessary --

THE COURT: So what you're saying, it's not irrelevant; it's just the punishment, if you use that word broadly, would be in the attorneys' fees portion of this?

MR. GEORGE: Well, it would be relevant to the -- I think I'm saying both. The relator's conduct is relevant to the claims that were submitted from Omni, right, potentially? There's also thousands of other claims that were submitted that had nothing to do with Omni.

THE COURT: That may be. I'm just sort of -- I was deeply troubled, and I've been doing this whistleblower work for 40 years or 30 years as a District Court judge and as a magistrate judge before that. It's sort of almost like a testing case, like where you go into a housing project and you're testing to see if there's racial bias, like a self-appointed tester. I just have never seen it, and I didn't know if the government had a position on it.

So you didn't know about it until this briefing came through; is that right?

MR. GEORGE: I believe that that is correct. I think I knew that Omni submitted claims, but --

A.782

THE COURT: But not false claims. I mean, basically they're guilty under the False Claims Act too. So, I mean, that's the thing is, there may be two wrongdoers here. So I just wanted to know whether you knew and had a position, and that statutory cite is helpful because maybe that is the penalty.

Now, let me ask the lawyer for Omni this question. I found it really troubling. I'm assuming lawyers didn't know about this.

MR. KENNY: Well, we certainly did not, and we only began to represent Omni at the end of 2021, long after any of these claims were submitted.

THE COURT: Because I think it would be unethical for a lawyer to knowingly participate in a fraud; in fact, I know it is under the ethical rules. So I'm just -- I was shocked when I read that, just shocked.

Now, what to do with it? I don't know. I think there are some claims -- I don't know that it's an intervening cause. It's the initial cause. But, in any event, I just wanted to get it. So you didn't know about it, right, beforehand?

MR. KENNY: No, and we weren't representing the relator at that point. We weren't representing the relator till several years after, you know, till any of these claims were submitted.

THE COURT: Okay, I think that's right. I remember

A.783

you came in late. I'm certainly hoping that nothing like this happens again. I don't know, it's quite possible that we have two wrongdoers here -- let's put it that way -- maybe.

So let's go through the basic arguments apart from that, but I was, I must say, deeply troubled, in fact shocked.

MR. ORKLAND: And, your Honor, we were shocked too to learn this, and let me just correct just sort of the factual basis for this. What actually happens, and what the relator's principal admitted to during his deposition, was that each Omni provider ordered a bacterial urine culture, which is not the type of test that MD Labs performed. Knowing full well that he believed that PCR UTI tests were never medically necessary, Dr. Deligdish instructed the staff at MD Labs to take all of the tests for which a provider ordered a bacterial urine culture and send samples to MD Labs for PCR-based UTI testing. And you have only offered PCR-based UTI testing, and so the requisition forms that the staff filled out were for PCR-based UTI testing. It's not that Dr. Deligdish changed forms or anything like that, but what he did do is intervene in the provider's decision-making, essentially usurped the individual provider's decision-making as to what type of test to order, and instead caused those samples to be sent to MD Labs for PCR UTI testing. And just to --

THE COURT: So let me just -- when you say "provider," you mean a doctor or medical provider?

A.784

MR. ORKLAND: Correct.

THE COURT: So when they filled in -- when they asked for the UTI test, they don't specify what they want?

MR. ORKLAND: They do. In fact, each of them submitted an order through Omni's electronic medical records system for a bacterial --

THE COURT: Oh, they specified bacterial?

MR. ORKLAND: Correct.

THE COURT: And he switched it to ask for PCR?

MR. ORKLAND: He caused it to be switched, yes.

THE COURT: I'm sorry. Caused it to be switched.

MR. ORKLAND: Yes.

THE COURT: All right, we will look closely at the record and his deposition, but it's shocking if he did that. I don't think it necessarily let's MD Labs off the hook. It's just shocking, and I wish that the government could look into it with the whistleblower unit down in D.C. and find out if they've ever run into this situation before.

MR. KENNY: And, your Honor, just to respond briefly to Mr. Orkland's point, I mean, Mr. Orkland deposed numerous physicians in this case, and they testified that they weren't requesting any specific type of UTI test; that, you know, they just wanted to test for UTI. Many of them didn't have any type of familiarity with -- they didn't care which type of test they received.

THE COURT: So when they checked something off on the medical records, they just said ordered UTI --

MR. KENNY: It's a drop-down menu for UTI testing, you know, generally. Yeah, one of the specific providers testified that she only wanted sensitivity test results back so she knew what test to prescribe.

THE COURT: In the drop-down, does it include bacterial?

MR. ORKLAND: Yes, your Honor. It says a urine culture, and a urine culture is not a PCR test.

THE COURT: And then there's another drop-down that says PCR?

MR. ORKLAND: No. Omni had no drop-down option for a PCR test.

THE COURT: All right. Well, I'll look at the record, but I must say I've never seen a whistleblower before who actually commenced a fraud. So I don't know what to do with it, and I am flagging it as a big red flag, and I will be addressing it in an opinion. I'm not sure it wins the day for the lab. However, I would appreciate it if the government could look into this and sort of maybe send me any case law that could help me through this, okay?

MR. GEORGE: Can I add one thing, your Honor? Only one similar case, and it is a bit different, comes to mind, and it's currently pending I believe before Judge Young. I can

check that, but the case is *U.S. Ex Rel Perry v. Bournewood*; and in that case, the relator had involvement in the underlying fraud and has asked for a relator's share that the government does not agree with. And relator has filed a motion to get, you know, the full statutory relator share they're entitled to, and I believe the time is still running for us to respond. So I just raise that because it may raise somewhat similar issues.

THE COURT: I appreciate that. Thank you. I will be in touch with Judge Young's session to see what happens. And I will also mention, which is a pending case, as we understand it, in front of the First Circuit on this, the appropriate standard of causation, which I will not be weighing in on right now because the First Circuit will address it, I think.

In any event, okay, let's go to the heart of it, whether the tests were medically necessary, because regardless of what the relator did appropriately or inappropriately, there's still a question -- there are three, as I understand it, theories of liability potentially: One is whether they're medically necessary. The second is balanced billing, and the third is whether almost per se the independent contractor relationship creates a kickback. Maybe there are other theories, but I'm not familiar with them.

So motion to dismiss, go ahead.

MR. ORKLAND: Yes, this is a motion for summary judgment, your Honor.

A.787

THE COURT: I'm sorry. You're right. I already did the motion to dismiss.

MR. ORKLAND: You did.

THE COURT: Motion for summary judgment. It's the gift that keeps giving, this litigation, yes.

MR. ORKLAND: It is. Your Honor, I do want to address what the legal significance is of the relator's fraud here. It pervades this case with respect to each of the elements that we moved on, falsity, causation, and scienter; and it pervades each of the orders that Omni sent to MD Labs. And the reason this is so significant, your Honor, is that the relator didn't conduct discovery with respect to any other provider's orders for tests. So the only evidence that they have, the only evidence that's in the record are the tests that Omni ordered itself, and each one of those is poisoned by Dr. Deligdish's --

THE COURT: Were there no other tests from other labs -- or not labs -- other provider offices?

MR. ORKLAND: Yes. 99.5 percent of the tests that were conducted by MD Labs were from other provider offices. The issue that I'm raising is that there has been no discovery, and therefore no facts in the record related to those 99.5 percent of tests. So the relator's expert didn't analyze any other provider's testing orders. The only orders that their expert analyzed were Omni's own tests.

So let me turn to each of the elements specifically.

You know, with respect to --

THE COURT: Can I also just say, one of the reasons I moved it up is, I have a plane to catch, so I'm thinking maybe 15 minutes for you and 15 minutes for opposing counsel, with hopefully --

MR. ORKLAND: I appreciate that. That should be fine.

THE COURT: -- briefing, so --

MR. ORKLAND: Yes. So with respect to Omni's medical necessity theory, Omni is unable to offer any credible evidence that PCR UTI testing is not medically necessary. It's undisputed that medical providers, and not clinical labs like MD Labs, make the decisions as to whether lab testing is reasonable and necessary, because unlike medical providers, labs don't see patients. They lack complete medical records. They don't know about a patient's medical history. And so the *Boston Heart* case that we cited noted that neither the Medicare statute nor Medicare regulations regarding laboratories require labs to independently determine the medical necessity of tests billed.

Here, each and every test that the defense performed were ordered by a medical provider after the medical provider determined that the test was medically necessary. The only exception are the tests that were ordered for Omni patients, for which the Omni providers apparently did not make genuine medical necessity determinations because unbeknownst to MD

Labs, Dr. Deligdish intervened and misrepresented Omni providers' determinations by submitting or causing to be submitted requisition forms that were allegedly, you know, the result of a medical provider's order. And so because the relator and its medical expert only examined tests that were ordered by Omni providers, the relator lacks evidence that a single non-Omni provider ordered the test that was medically unnecessary.

So Omni's argument then transitions to the fact that there was no national or local coverage determination on PCR UTI testing at the time, but that's a red herring because Omni misunderstands the role of an NCD or an LCD. The absence of an NCD or an LCD doesn't mean that the tests were not medically necessary because NCDs and LCDs can limit coverage, but they're not required for coverage. So in the absence of an NCD or an LCD, Medicare contractors determine whether services are reasonable and necessary on a case-by-case basis, and here Medicare chose to provide coverage for PCR UTI tests, and it still does. And so the fact that there was no NCD or LCD is just irrelevant.

So next Omni pivots to voluntary HHS LIG compliance program guidance for clinical laboratories, and they claim that labs should take reasonable steps to insure that they're submitting claims for services that are reasonable and necessary, but its reliance on that program guidance is misplaced because

A.790

guidelines aren't binding as a matter of law. They're not regulations that go through a rulemaking and comment period. And the guidance that Omni cites is voluntary by its own terms. It specifically states that.

THE COURT: I understand that, but there also is a little bit of a conflict between the experts on medical necessity. I understand those points you just made, one saying it's almost never medically necessary and the other saying, no, that's not true; sometimes it is, but it's not usually true.

MR. ORKLAND: Not really, your Honor. So Omni's medical necessity theory doesn't boil down to a battle of the experts because Omni's own expert agrees that PCR UTI testing can be medically necessary in a variety of circumstances, even though it's more costly than a bacteria urine culture. And he admitted in his deposition, you know, a list of nine or ten specific instances in which PCR UTI testing became medically necessary, including when UTI fails standard therapy, or if patients have recurrent UTIs, or where, you know, they're complicated UTIs; they're based on, you know, issues with anatomy, or even where antibiotics have been started empirically in the office. So if one has a UTI and goes to the doctor and the doctor prescribes antibiotics and then performs a bacterial urine culture, the bacteria likely won't grow in the bacterial urine culture, and so it will be a false negative. So a PCR UTI test is a different type of test that

tests for genetic material of the pathogen and can identify in those cases bacteria that may be causing a UTI.

So let me turn then to falsity with respect to the sales rep compensation theory, and this fails for Omni as well. So Omni needs to provide evidence that a specific claim resulted from unlawful remuneration to sales reps, and it can't. First of all, a significant percentage of claims submitted by MD Labs where there is lots of sales efforts by W-2 employees, whose compensation fell within the employee compensation safe harbor of the AKS, and Omni didn't conduct any discovery to determine which claims were the result of sales efforts of W-2 employees and which were the result of 1099 sales reps.

But more importantly, even if a compensation is not protected by a safe harbor, MD Labs' arrangements with independent contractor sales reps were not per se unlawful. Omni still needs to establish --

THE COURT: Can I stop you there because I've read that statutory section over and over and over again. If you read it according to its plain terms, every independent contractor arrangement is illegal. Now, no one is asking me to do that, no one has in that case or another case that I have like that, no one's asking me to, but it's hard to figure out. You know, it's a payment to a contractor to get someone to procure goods from the lab. So I'm just trying to figure out,

if I'm not saying it's per se -- no one wants me to do that, as I understand. Even the Office of Inspector General doesn't want me to do that, but the plain language of the statute might capture it all. It's just an extraordinarily broad statute. So what do I do with that? I mean, technically, technically just per se, having independent contractor commissions violates the plain language of the statute. So should I just say that and then deal with it on the causation theory? I mean, I am stuck. It bothered me at the motion to dismiss stage too. It really bothered me, but I had the Fourth Circuit case, so I stuck with it.

MR. ORKLAND: Your Honor, the statute, I think you're reading the statute, the section of the statute that refers to the safe harbor, but the Antikickback Statute still requires a knowing and willful violation. So even if a sales compensation arrangement falls outside of the safe harbor, there still needs to be a genuine issue of material fact that the defendants intended, willfully and knowingly, to violate the Antikickback Statute by paying compensation in this manner, and the relator doesn't have any evidence of that.

THE COURT: Well, they do have their attorney saying, you know, "You're on thin ice."

MR. ORKLAND: Yeah, so let me address that. So, you know, the attorneys, you know, did not advise the defendants that their contracts with independent sales reps were unlawful.

They wrote emails with generalized statements about, you know, regulators being concerned about fund-based compensation to independent sales reps, and they said that the payment of sales commissions implicates the federal Antikickback Statute and isn't protected by safe harbor. That's what counsel said. And a reasonable layperson wouldn't understand that to mean you can't do it. In fact, the same law firm drafted MD Labs' contracts with independent contractor sales reps and never instructed them that the agreement that they drafted was contrary to the law. And that's not theoretical. There are emails in the record that indicate the defendants' actual understanding of their counsel's advice, and they did not get the impression that paying sales reps on commission was unlawful. So falling outside the safe harbor doesn't necessarily make payments to independent contractors unlawful. The relator still needs to prove a knowing and willful violation of the AKS.

THE COURT: In any event, is the record that the basic commission scheme for the independent contractors is tantamount to the same thing as what was being paid to sales employees?

MR. ORKLAND: Was it the same? Is that what you're asking?

THE COURT: Yes.

MR. ORKLAND: Yes, it was, so --

THE COURT: The same commission structure, that sort

A.794

of thing?

MR. ORKLAND: The same exact structure. In fact, the relator identified two sales reps in its complaints that were paid on commission, and said this is proof positive that there were unlawful payments. We've submitted an affidavit from one of those sales reps who said that it didn't matter to him what the compensation structure was; whether he was a 1099 or a W-2, his message to providers was the same. And he was never instructed, nor did he, attempt to improperly influence providers, and that's key here. You know, *Guilfoile v. Shields* says that in order to survive a motion for summary judgment, the relator has to prove improper influence or provide sufficient facts to show improper influence. You know, we've said that there was no improper influence, and it's the relator's burden to come back with some contrary evidence, and it hasn't done that.

THE COURT: Okay, but I just want you to jump to balanced billing.

MR. ORKLAND: Yes, absolutely.

THE COURT: And I'm not going to deal with the plaintiffs' request for summary judgment. I'm not sure I'll even get to that, but I do want to hear. It looks like you advertise no balanced billing.

MR. ORKLAND: Yes. So, you know, with respect to balanced billing, there's no evidence that that caused the

A.795

submission of false claims. So as to Omni, the only provider that was aware of MD Labs' purported billing practices was Dr. Deligdish, and he wasn't induced by them. He was induced by his own desire to benefit financially from qui tam litigation.

And as to non-Omni providers, the relator has no evidence as to whether any of them were actually induced to order tests by MD Labs' advertising materials or its purported billing practices. You know, the marketing materials, there's no evidence to show that any non-Omni providers relied on them. There's no evidence to show --

THE COURT: I know, but that's -- I mean, it's your marketing materials, so I've got to assume that some of them read it. So then the --

MR. ORKLAND: Your Honor, there's no evidence of how many non-Omni providers even received the marketing materials. And in fact, the unrebutted testimony of MD Labs' personnel is that the billing arrangements described in those marketing materials did not actually reflect MD Labs' actual billing practices, and Omni has no evidence to the contrary.

THE COURT: That's a harder one for me. But let's assume for a minute, with all reasonable inferences drawn in favor of the non-moving party, that I say that a bunch of the marketing materials got into the hands of providers, does that lead us to a jury trial, or is there another theory here?

MR. ORKLAND: Yeah, so, you know, with respect to, you

know, the marketing materials, the uncontroverted evidence is that those marketing materials were created by a single sales rep, and those marketing materials were unauthorized by MD Labs. So this is a rogue sales rep who happened to be assigned to this particular account, and he created those materials, and so --

THE COURT: What's "this account"? You mean Omni?

MR. ORKLAND: I'm sorry, Omni, so the relator's territory.

THE COURT: All right. All right, but let me jump to -- and one last question I realized, because I am short on time, which is the intervening cause. I don't see how relator's an intervening cause. They're the precipitating cause.

MR. ORKLAND: Well, they're intervening cause because even if you decide that the advertising materials, the marketing materials, or the billing arrangements that were being discussed would violate the Antikickback Statute or the False Claims Act, Dr. Deligdish then stepped in, and his actions broke the causal chain between whatever was --

THE COURT: Oh, so it just goes to the balanced billing argument?

MR. ORKLAND: It goes to all the arguments. Anything that was said during the sales process, for lack of a better term, no longer caused any submission of false claims because

Dr. Deligdish intervened.

THE COURT: I see. So it goes to balanced billing. All right, thank you.

All right, let me jump to plaintiff, here relator's counsel.

MR. KENNY: Thank you, your Honor. Just to briefly address one point Mr. Orkland makes at the end of his argument regarding these marketing materials were only created by one rogue sales representative in a certain territory, I mean, we present evidence that these materials were distributed all over the country. I mean, we have evidence that Omni's practices in Florida at least show them being distributed to practices in Illinois. So it certainly seems that these materials were distributed all over the country and not just the work of one sales rep.

Getting back to medical necessity, defendants I think used the term "red herring." I think defendants try to create a number of red herrings in their arguments and shift the burden back to Omni on summary judgment. You know, we point out numerous indicators that these tests were not medically necessary, among them the fact that there was no national coverage determination -- there still is no national coverage determination for these tests. Until 2022, there was no local coverage determination at all for these tests. We point to the American Neurological Association Guidelines. After 2022,

A.798

several years after MD Labs began implementing this testing, the American Neurological Association is still not recommending these tests for widespread use, saying that more evidence is needed, you know, before these tests can be employed in the manner in which MD Labs was using them.

I mean, the defendants strictly state that Omni only represents 99.5 percent of all testing performed. You know, MD Labs performed this testing; this is the only type of test they performed, they performed in the first instance. There was no indication that they only performed it in limited circumstances for certain extreme --

THE COURT: Well, you said this is all they do is PCR testing, so any lab that submits it to them must only want this. I mean, it's not like in the other situation, which was settled, you know, where there were two simultaneous tests, and you couldn't possibly want the first one; the presumption is you could get the final one. I mean, this is one where this is all they do is PCR.

MR. KENNY: Yes, yes, as we understand it, PCR is the only type of UTI --

THE COURT: So some lab apart from Omni who's submitting for it wants the PCR testing. The provider I should say.

MR. KENNY: Yeah, yeah, I mean, but as we point out, the fact that a provider may order the test doesn't absolve MD

A.799

Labs entirely performing this test in the first instance for any type of UTI test that may have come in.

THE COURT: So you think the lab overrules the doctor? I mean, that's the part -- it's one thing if they sort of have multiple choices, if you will, you could do, and then they just basically don't give them a choice -- I've seen some of those cases -- but this is what they do.

MR. KENNY: Well, in fact, your Honor, as we point out, there are numerous examples where they perform the testing, even when there was no indication on the requisition form to perform PCR tests.

THE COURT: That's for Omni, right, the Omni acquisitions, not other --

MR. KENNY: For Omni requisitions, and defendants produced a number of other requisition forms for other practices in this litigation where the same issue arises, where PCR test isn't even checked, and there's just a test ordered, and MD Labs still went ahead and performed the test.

THE COURT: Well, that's all they do. I mean, it's not like some of these other labs, you have a choice kind of thing, and they switched it from one to the other or --

MR. KENNY: Yes, and we argue that the widespread use of this test in the first instance for any type of UTI is not medically necessary, and that MD Labs implementing this form of testing knowing that providers are not overly focused on

A.800

exactly what type of tests they're ordering, and that they would be able to in fact charge -- you know, make claims to Medicare for ten times, you know, the amount that they would normally charge Medicare for a standard culture.

THE COURT: Okay, thank you. I want to jump into the -- believe it or not, in the balanced billing, I agree with you that there's enough evidence that there was marketing for balanced billing. Do we have any examples of where they waived it, the balanced billing, where actually MD Labs didn't bill the patient?

MR. KENNY: And, again, the marketing insists that that's their standard practice. So I guess, are there specific examples in the record? I don't know that anything was submitted in connection with this motion related to that.

THE COURT: All right. And then the next question I have is, which is one I've actually been struggling with since the motion to dismiss, is how to think about the independent contractor arrangement. I don't remember if it was this case or it was the other, *Biomet*, *Zimmer v. Biomet*. I've had a couple cases like this where the question is, if you read it on plain language, the statutory breadth of the Antikickback Statute. And the OIG guidelines are not controlling. In fact, they admit they're only advisory, and no human being on earth could figure out which factors count. You couldn't read the fifteen factors and figure out which side of the line you fell

A.801

on. So I'm just trying to understand whether or not the argument is essentially that any independent contractor relationship is essentially a kickback. Is that the --

MR. KENNY: Yes -- I'm sorry, your Honor.

THE COURT: No, I'm just wondering if that was your position.

MR. KENNY: Yeah. I think, I mean, I think there's a pretty clear line that bona fide employment relationships with W-2 employees fall within the safe harbor, and relationships with independent contractors do not. I don't want to state for Mr. George, but I believe he expressed the government's position the last time we were here on the motion to dismiss, that an independent contractor arrangement would violate the Antikickback Statute. You know, as far as we're aware --

THE COURT: I don't remember the government saying per se it did.

MR. GEORGE: May I address that?

THE COURT: Yes, yes, yes. That's why I'm so glad you're here, so thank you.

MR. GEORGE: I'm glad to be here. Both of these cases that you have, *Zimmer Biomet* and *MD Labs* are my cases, so it's --

THE COURT: You're the perfect man to --

MR. GEORGE: I agree. Your Honor got in both cases, and the government's position is, your Honor got the law

A.802

exactly right.  The law is that paying independent contractors commission-based fees is not per se unlawful, but it does bring the conduct within the confines of the Antikickback Statute. And the out, if your Honor is concerned that that's too broad, is what Mr. Orkland raised, which is the government or the relator needs to prove that the defendant acted knowingly and willfully.  So the policing of the statute is, can we prove willfulness, which is obviously a difficult burden?  In this case, as your Honor pointed out -- and this was a series of extensive motion practice, and it began with something that I was involved in -- there is evidence that the defendants' lawyers told them that this was a problematic course of action to take.

Now, whether they actually were told something else that made them think differently --

THE COURT:  Yes, but that was based on a, like, look -- I have to admit I didn't actually read the language of the email other than what was in the brief, but it basically was, "Watch out, watch out.  You're not in the safe harbor." But it doesn't help someone understand, unless there's a per se violation, what to do.

MR. GEORGE:  But, your Honor, I would say this is fundamentally and clearly a question for the jury.  The lawyers told them "Watch out."  They say that's all it said, and they say that, you know, "We thought we could still do this."  That

A.803

is a fact question that, in my opinion, has to go to the jury. I mean, the jury needs --

THE COURT: I'm just not sure because I thought I'd see a lot more evidence in the record about something that was extraordinary or that would check some of the boxes from the OIG or some concerns, like. I just -- I'm not sure this record proved that up other than the fact it's independent contractor.

I don't understand it. Let me just say that. I don't know how, without clearer guidance, how a company would know one way or another which side they fell on other than a "Watch out. You're not in the safe harbor."

MR. GEORGE: But, your Honor, I would think that where defendants' lawyers tells them, "This is concerning, you really need to be careful," that the defendants' mental state is a classic question for the jury. And in *Teva*, which --

THE COURT: No, no, no, but it is, I agree, the mental state, but I'm also worried that I don't -- unless I'm going to say it's per se illegal.

MR. GEORGE: And, your Honor, I don't believe you have to say it's per se illegal, and I don't believe it is per se --

THE COURT: Then you've got to tell me what it is that differentiates the ones that are legal versus the ones aren't.

MR. GEORGE: It's the mental state, your Honor. It's whether the government can prove knowing and willfulness. That's what distinguishes it. So if the defendants have

A.804

independent sales reps and then they have employee sales reps and they pay them the same, and they've never heard that this is illegal or this is even problematic under the AKS, then perhaps that's a case --

THE COURT: Yes, but what if you did the exact same thing? This is where I'm not really comfortable. Different from the motion to dismiss, all I'm hearing is that they're being paid the exact same way and treated the exact same way, except one are W-2 employees and one are independent contractors. So even if the lawyer warns them, which they were smart to do a CYA, "You're in difficult territory here," I've got to also prove that it was a violation of the Antikickback law. I've got to prove it. I don't know what I would tell a jury. That's one of my problems: I don't know what I would tell a jury. Why wouldn't I grant summary judgment simply saying it's not a sales employee? I mean, I don't know, I've got a big problem with the government's position, I've got a big problem with plaintiffs' position, and I actually have a big problem with defense's position because if you read the plain language of the statute, it covers all of this. It makes it per se illegal.

MR. GEORGE: There is a reason for that, your Honor, which is that the fundamental position of OIG is that when a rep is employed by the company, they are subject to oversight, and a sales-commissioned 1099 is not. And so although there

A.805

might be particular instances where that doesn't lead to concerning conduct, this is a prophylactic statute. It's meant to prevent misconduct.

THE COURT: Well, then it's per se. I know you don't want to say that. I know the national association of whoever they were sent me an amicus brief in one of the cases. I don't want to take that position. No one's urging me to take that position. I just don't know how you would put someone on notice other than a lawyer correctly saying because, for example, they're in the suit right now, "Watch out. You're in legal difficult territory."

Anyway, I don't have that much time. I want to let plaintiff finish. By the way, the Fifth Circuit case is a little tempting on this -- I forget the name of it -- but "Are you just selling a product or are you sort of luring someone in?" That's a tempting line that I'm thinking about.

Anyway, so balanced billing you've dealt with. I think, have we dealt with all your theories, the independent contractor theory, the unnecessary test theory? I think we've picked it all up, is that right, from the plaintiff? Is there something else you wanted to --

MR. KENNY: Just briefly, your Honor. I mean, as Mr. George indicated and as we set forth, I mean, certainly questions of intent are not, you know, questions that are often decided on summary judgment and are more appropriate for a

jury. So we would certainly agree with Mr. George that, you know, as you said, when attorneys are repeatedly advising them over a period of years that they're on thin ice and they continue to engage in these relationships --

THE COURT: Well, it just means that they can't do independent contractor ever, right? I mean, basically. I mean --

MR. KENNY: Yeah, and, again, I don't want to step on Mr. George again, but I think the statute does render these relationships improper.

THE COURT: You're effectively -- I mean, I know everyone is dancing around the subject -- you're effectively arguing it's per se illegal unless there's some --

MR. KENNY: Well, it has to be willful. I don't think there's a dispute --

THE COURT: Well, everybody in this field now knows that you're in trouble if it's an independent contractor, so you're essentially saying it's per se unlawful. I mean, I had thought there were all these plus factors, if you will, that I had to think about, not just whether there was an attorney letter, like, some plus factor that -- I forget. You listed them in the complaint.

Anyway, I am taking this under advisement. I'm staying discovery. Is settlement dead?

MR. KENNY: I mean, we've had discussions. I mean,

A.807

I'm happy to elaborate on them. You know, we made a demand. Their demand was significantly reduced from our demand. Defendants -- I guess it's been somewhat frustrating to plaintiff. The defendants have communicated, I guess, a range of settlement based on ability to pay. They've only done it through Mr. George, which, you know, we're fine with that. We work closely --

THE COURT: Do you want to go to mediation, or do you want to have me rule, and then you can figure out what to do? I think part of this may hinge on what the First Circuit does on "but for," so I don't know. That's pending. And I hope you transmit to the relator, if he's not on the phone, how deeply troubled I am by him submitting false claims to the federal government.

MR. GEORGE: Your Honor, could I address one other thing that came up very quickly? I know you have to go. Just one quick point.

THE COURT: Yes.

MR. GEORGE: You raised the point about the lab only providing PCR tests, and I understand your concern there. And just as a legal matter, a lab can't offer an order and bill to the government what it knows to be medically unnecessary tests just because a provider has ordered them. So if the lab is only offering a panel of 17 PCR tests and that is medically unnecessary, it does not matter, in the government's view,

whether the provider ordered them or not.

THE COURT: Can I just say, as far as the government -- I'm always happy to have you on here -- you didn't intervene in this. It would have been useful to have you intervene in this. The other one was so crystal clear. This one is not. And I thought maybe you didn't intervene because you knew the guy had submitted false claims. And now it turns out it's just a murkier claim because you didn't know that, and I'm assuming counsel for plaintiff didn't know that, because it's a fraud. But I think you've persuaded me that I need to go through the -- maybe if he wins, there's another remedy, and I'll watch Judge Young's case.

MR. ORKLAND: Your Honor, I did just want to respond to one issue about independent contractors, which is that everyone on the call agrees that the plaintiffs still need to show a willful and knowing violation. Typically -- the plaintiff is right -- typically scienter is not resolved on summary judgment because the state of mind, there's genuine issues that affect the defendants' state of mind, and here there are not. You have in the record the defendants' responses to their lawyer's purported advice, and it clearly shows what the defendants' state of mind was, which was that they did not understand these arrangements to be unlawful. I urge you to look at that.

THE COURT: I know, but if your lawyer tells you, you

A.809

know, something is unlawful, and then you reject his advice, essentially is what you're telling me, it's a harder issue for me to do on summary judgment. I am worried about the "but for" on this. It's one where actually the level of causation because if it's the exact same sales structure, whether it's independent contractor or just a sales employee, then I'm not sure how that caused a false claim and somehow influenced the decision of a provider.

But, in any event, I'm going to take this under advisement, and I will see you -- I will rule, unless you tell me it's going to settle. Okay, thank you.

MR. KENNY: Thank you, your Honor.

MR. ORKLAND: Thank you, your Honor.

MR. GEORGE: Thank you, your Honor.

(Adjourned, 10:53 a.m.)

A.810

C E R T I F I C A T E


UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS    ) ss.
CITY OF BOSTON               )


I, Lee A. Marzilli, Official Federal Court Reporter, do hereby certify that the foregoing transcript, Pages 1 through 37 inclusive, was recorded by me stenographically at the time and place aforesaid in CA No. 19-12558-PBS, Omni Healthcare, Inc., et al v. MD Spine Solutions LLC, et al, and thereafter by me reduced to typewriting and is a true and accurate record of the proceedings.

Dated this 8th day of December, 2024.


/s/ Lee A. Marzilli
_____
LEE A. MARZILLI, CRR
OFFICIAL COURT REPORTER

A.811

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| _____ )<br>OMNI HEALTHCARE, INC., et al.,　　)<br>　　　　　　　　　　　　　　　)<br>　　　　　　　　Plaintiffs,　　)<br>　　　　　　　　　　　　　　　)<br>v.　　　　　　　　　　　　　　)<br>　　　　　　　　　　　　　　　)<br>MD SPINE SOLUTIONS LLC, et al.,　)<br>　　　　　　　　　　　　　　　)<br>　　　　　　　　Defendants.　　)<br>_____) | Civil Action<br>No. 18-cv-12558-PBS |

**MEMORANDUM AND ORDER**

January 6, 2025

Saris, D.J.

**INTRODUCTION**

Relator OMNI Healthcare, Inc. ("Relator" or "OMNI") brings this qui tam action on behalf of the federal government, 29 states, and the District of Columbia against MD Spine Solutions LLC ("MD Labs") and its owners, Denis Grizelj and Matthew Rutledge (collectively, "Defendants"). Relator alleges that Defendants violated the federal False Claims Act ("FCA") and state law by submitting or causing the submission of false claims for medically unnecessary urinary tract infection ("UTI") tests. Relator also alleges that Defendants submitted false claims for UTI testing that resulted from violations of the federal Anti-Kickback Statute ("AKS").

1

A.812

Defendants move for summary judgment on all of Relator's remaining claims. Relator cross-moves for partial summary judgment, asking the Court to resolve legal questions about the FCA standard for materiality, causation, and damages.

After hearing, the Court **ALLOWS** Defendants' motion for summary judgment (Dkt. 252) and **DENIES** as moot Relator's motion for partial summary judgment (Dkt. 255).

**BACKGROUND**

## I.   Factual Background

The following facts are undisputed, except where otherwise noted. See Deaton v. Town of Barrington, 100 F.4th 348, 353 (1st Cir. 2024).

### A.   MD Labs' UTI Testing

MD Labs is an independent clinical laboratory founded by Grizelj and Rutledge. MD Labs began performing UTI testing around 2017. The standard test for UTIs for over 60 years has been the bacterial urine culture ("BUC"). The BUC test involves placing a urine sample on a growth medium and waiting between twenty-four and forty-eight hours to see if any bacteria grow. MD Labs used a different testing method involving polymerase chain reaction ("PCR") technology. PCR testing amplifies one or more copies of a DNA segment in the sample, which enables identification of genetic material belonging to a particular biological origin. PCR testing is more costly than BUC testing.

2

A.813

MD Labs used PCR technology to test for either seventeen or nineteen pathogens that could cause UTIs, depending on the time period. Some requisition forms that MD Labs used for UTI testing orders only allowed the physician to select the entire seventeen- or nineteen-pathogen panel, while others enabled physicians to customize the panel to test for specific pathogens.

Relator OMNI is a medical practice in Florida owned by Dr. Craig Deligdish. OMNI sent around 600 samples to MD Labs for PCR UTI testing between 2017 and 2019, some of which were billed to government health programs. When an OMNI provider determined that a particular laboratory test was warranted, the provider would select the test in the patient's electronic medical record, and a medical assistant would complete a requisition form for a laboratory.

Deligdish instructed his staff to order PCR UTI testing from MD Labs even when the provider had selected a BUC test for the patient.[1] He did so in order to substantiate OMNI's FCA claims against MD Labs. All the PCR UTI testing that MD Labs performed for OMNI patients resulted from this switch.

---

[1] The parties explained at the summary judgment hearing that the only option for UTI testing in OMNI's electronic medical record system was a BUC test.

A.814

**B.    MD Labs' Sales Force**

During the relevant period, MD Labs used both employees and independent contractors to promote its PCR UTI testing to providers. These sales representatives received commissions based on the revenue generated from the testing ordered by providers at their accounts. MD Labs trained and managed its sales representatives identically whether they were employees or independent contractors. In 2018, Dr. Deligdish and others at OMNI discussed PCR UTI testing with multiple independent-contractor sales representatives from MD Labs. There is no evidence that any sales representative offered or paid inducements to providers.

MD Labs sought legal advice about its use of independent-contractor sales representatives in late 2016 and early 2017. Outside counsel advised MD Labs multiple times that making commission-based payments to independent-contractor sales representatives could violate the AKS. Nonetheless, Grizelj and Rutledge both testified at their depositions that they either believed the arrangement was lawful or that they were unsure of its legality. MD Labs reconfigured its sales force to use solely employees after counsel reported that a 2021 Fourth Circuit decision had upheld a jury verdict finding federal FCA liability for commissions paid to independent-contractor sales representatives. See United States v. Mallory, 988 F.3d 730, 738 (4th Cir. 2021).

A.815

### C.   MD Labs' Billing Practices

MD Labs advertised to providers that it did not balance bill -- i.e., bill patients for the difference between its charge and the amount paid by insurance -- for PCR UTI testing and that a patient would never pay more than $50 per test. See Mass. Med. Soc'y v. Dukakis, 815 F.2d 790, 790 (1st Cir. 1987) (defining balance billing). The $50 cap applied if the patient lacked insurance, the patient's insurer denied coverage, or the billed amount would go entirely to the patient's deductible. An MD Labs sales representative advertised the $50 self-pay price to Dr. Deligdish and OMNI.

Although the record reflects that MD Labs routinely advertised its billing practices in this manner, Grizelj claimed at his deposition that MD Labs always balance billed patients. For his part, Rutledge stated in an affidavit that only some patients benefited from the $50 cap as part of MD Labs' financial hardship policy and that MD Labs stopped charging a reduced rate to certain patients around 2020.

## II.   Procedural Background

Relator filed this action against MD Labs in December 2018. Relator alleged that MD Labs submitted false claims for medically unnecessary or otherwise improper UTI tests, pharmacogenetic tests, and urine drug tests in violation of the federal FCA and various state and local analogs.

A.816

In October 2021, Defendants entered into a settlement agreement with the federal government and Relator to resolve some of the claims regarding urine drug tests ("UDTs"). Defendants admitted that MD Labs simultaneously performed presumptive and confirmatory UDTs even though Defendants knew that, in certain situations, providers would not use the result of the presumptive test because the more precise confirmatory result was available at the same time. Relator retained the right to pursue other claims relating to the "submission or causing the submission of false claims for [UTI] testing." Dkt. 85-1 at 9. The United States has not intervened in the non-settled claims.

Defendants moved to dismiss in May 2022. The Court denied the motion, holding that Relator had adequately pled claims under the federal FCA and state and local analogs with regard to medically unnecessary UTI testing. Relator subsequently amended its complaint to add claims under the AKS and the Eliminating Kickbacks in Recovery Act ("EKRA"). Relator also advanced three new sets of factual allegations in support of its FCA claims: 1) that MD Labs entered into independent-contractor service agreements in which it paid compensation for referrals; 2) that MD Labs routinely did not balance bill patients; and 3) that MD Labs submitted claim forms to health care programs listing diagnosis codes that differed from those on the requisition forms from the ordering physicians. Defendants moved to dismiss these new claims and allegations. The

6

A.817

Court allowed the motion with respect to the new AKS and EKRA claims and the allegation that Defendants submitted claim forms with false diagnosis codes but otherwise denied the motion.

In due course, Defendants moved for summary judgment on all of Relator's remaining claims. Relator cross-moved for summary judgment on three questions of law related to the federal FCA standard.[2]

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute is one which 'a reasonable jury could resolve . . . in the favor of the non-moving party,' and a material issue is one with the 'potential to affect the outcome . . . under the applicable law.'" Kinzer v. Whole Foods Mkt., Inc., 99 F.4th 105, 108 (1st Cir. 2024) (alterations in original) (quoting Cherkaoui v. City of Quincy, 877 F.3d 14, 23-24 (1st Cir. 2017)). In determining whether to grant summary judgment, a court must construe "the facts in the light most favorable to the non-moving party" and "draw[] all reasonable inferences" in its favor. Id.

---

[2] After the deadline for summary judgment motions, Defendants sought leave to file a supplemental motion arguing that the FCA's qui tam provision is unconstitutional. Because the Court grants summary judgment to Defendants on all of Relator's remaining claims for other reasons, there is no need to address the constitutional issue.

7

A.818

(quoting Harley-Davidson Credit Corp. v. Galvin, 807 F.3d 407, 408 (1st Cir. 2015)).

The party seeking summary judgment "must [first] adumbrate 'an absence of evidence to support the nonmoving party's case.'" Pleasantdale Condos., LLC v. Wakefield, 37 F.4th 728, 733 (1st Cir. 2022) (alteration in original) (quoting Brennan v. Hendrigan, 888 F.2d 189, 191 (1st Cir. 1989)). Once the movant does so, "[t]he burden then shifts to the nonmovant to establish the existence of a genuine issue of material fact." Id. To satisfy this burden, the nonmovant "must present definite, competent evidence" demonstrating that a trialworthy issue exists. Id. (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)). "[C]onclusory allegations, improbable inferences, and unsupported speculation" do not suffice. Kinzer, 99 F.4th at 108 (quoting Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018)).

## DISCUSSION

### I.   Federal FCA Standard

#### A.   General Standard

Relator's primary argument is that Defendants "knowingly present[ed], or cause[d] to be presented, a false or fraudulent claim for payment or approval" to the federal government. 31 U.S.C. § 3729(a)(1)(A). Liability under this presentment provision has multiple elements. "Evidence of an actual false claim is 'the sine qua non of [an FCA] violation.'" United States ex rel. Booker v.

8

A.819

Pfizer, Inc., 847 F.3d 52, 57 (1st Cir. 2017) (quoting United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 225 (1st Cir. 2004)). The plaintiff also must prove that the defendant either "present[ed]" or "cause[d] to be presented" the false claim to the federal government, 31 U.S.C. § 3729(a)(1)(A), and that the claim's falsity was material to the government's payment decision, see Guilfoile v. Shields, 913 F.3d 178, 187 (1st Cir. 2019). Lastly, "[t]he FCA includes a scienter requirement that the false claim be submitted 'knowingly.'" Id. (quoting 31 U.S.C. § 3729(a)(1)(A), (b)(1)). The FCA defines "knowingly" to mean that the defendant "has actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). "[P]roof of specific intent to defraud," however, is not required. Id. § 3729(b)(1)(B).

**B.   FCA Claims Premised on an AKS Violation**

Two of Relator's theories of FCA liability are premised on alleged AKS violations. The AKS makes it a criminal offense to "knowingly and willfully offer[] or pay[] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person":

9

A.820

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program . . . .

42 U.S.C. § 1320a-7b(b)(2). Congress enacted the AKS "to prevent medical providers from making decisions based on improper financial incentives rather than medical necessity and to ensure that federal health care programs do not bear the costs of such decisions." United States ex rel. Banigan v. PharMerica, Inc., 950 F.3d 134, 137 (1st Cir. 2020). "[T]he heartland of what the AKS is intended to prevent" is "the use of payments to improperly influence decisions on the provision of health care that lead to claims for payment to federal health care programs." Guilfoile, 913 F.3d at 192-93. "Essentially, the AKS targets any remunerative scheme through which a person is 'paid "in return for" referrals' to a program under which payments may be made from federal funds." Id. at 189 (quoting United States v. Patel, 778 F.3d 607, 618 (7th Cir. 2015)).

For purposes of the FCA, "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim." 42 U.S.C. § 1320a-7b(g). In other words, "[a]n AKS violation that results in a federal health care

10

A.821

payment is a per se false claim under the FCA." Guilfoile, 913 F.3d at 190 (alteration in original) (quoting United States ex rel. Lutz v. United States, 853 F.3d 131, 135 (4th Cir. 2017)).

Certain legal principles come into play when an FCA claim is premised on an underlying AKS violation. For starters, the plaintiff need not prove that "compliance with the AKS was material to the government's decision to pay any specific claim." Id. The plaintiff must show, however, "a sufficient causal connection between [the] AKS violation and a claim submitted to the federal government." Id. Finally, establishing a violation of the AKS requires proof that the defendant acted "knowingly and willfully." 42 U.S.C. § 1320a-7b(b)(2). In this context, the term "willfully" refers to knowledge that the conduct was unlawful. See United States ex rel. Langer v. Zimmer Biomet Holdings, Inc., __ F. Supp. 3d __, __ (D. Mass. 2024) [2024 WL 3633536, at *5]; United States v. Teva Pharms. USA, Inc., 560 F. Supp. 3d 412, 421 (D. Mass. 2021); see also United States ex rel. Hart v. McKesson Corp., 96 F.4th 145, 154-55, 157 (2d Cir.) (adopting this construction and collecting cases from other circuits doing the same), cert. denied, __ S. Ct. __ (2024) [2024 WL 4426646].

## II.  **Medically Unnecessary PCR Testing**

Relator's main theory of FCA liability posits that Defendants submitted claims for medically unnecessary PCR testing for UTIs. Medicare is statutorily prohibited from covering "items or

11

A.822

services" that "are not reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(1)(A); see D'Agostino v. ev3, Inc., 845 F.3d 1, 10 (1st Cir. 2016). And the Medicare claim form requires the submitting entity to certify that the listed items or services were medically necessary. See United States ex rel. Riedel v. Bos. Heart Diagnostics Corp., 332 F. Supp. 3d 48, 57 (D.D.C. 2018). Thus, "claims for medically unnecessary treatment are actionable under the FCA." United States ex rel. Polukoff v. St. Mark's Hosp., 895 F.3d 730, 742 (10th Cir. 2018) (quoting United States ex rel. Riley v. St. Luke's Episcopal Hosp., 355 F.3d 370, 376 (5th Cir. 2004)).

Defendants seek summary judgment on this theory of liability on three grounds: 1) the claims for PCR UTI testing were not false because the tests were not medically unnecessary; 2) Relator cannot prove that Defendants caused the submission of false claims because Dr. Deligdish's direction to his staff to order PCR testing from MD Labs was an intervening cause that broke any causal chain with regard to OMNI-related claims; and 3) Defendants did not know that MD Labs was performing medically unnecessary tests. The Court agrees with Defendants' scienter argument and, therefore, need not address their other arguments.

"[A] laboratory generally may rely on [a] doctor's order in submitting a claim for reimbursement as medically necessary." United States v. Bertram, 900 F.3d 743, 750 (6th Cir. 2018); cf.

12

A.823

<u>United States ex rel. Allen v. Alere Home Monitoring, Inc.</u>, 334 F. Supp. 3d 349, 365 (D. Mass. 2018) (explaining that the seller of an at-home testing kit was "generally entitled to rely on the independent judgment of a medical provider" regarding medical necessity). A laboratory violates the FCA, however, if it knows that it is submitting claims for medically unnecessary tests. <u>See, e.g.</u>, <u>Bertram</u>, 900 F.3d at 750; <u>Allen</u>, 334 F. Supp. 3d at 357, 365; <u>United States ex rel. Groat v. Bos. Heart Diagnostics Corp.</u>, 296 F. Supp. 3d 155, 165 (D.D.C. 2017). To satisfy the FCA's scienter requirement, Relator must show one of the following: 1) Defendants were aware they were submitting claims for medically unnecessary tests (actual knowledge); 2) they were aware of a substantial risk that they were submitting claims for medically unnecessary tests but intentionally avoided confirming that fact (deliberate ignorance); or 3) they were conscious of a substantial and unjustifiable risk that the tests were medically unnecessary but submitted the claims anyway (reckless disregard). <u>See</u> 31 U.S.C. § 3729(b)(1)(A); <u>United States ex rel. Schutte v. SuperValu Inc.</u>, 598 U.S. 739, 751 (2023).

Defendants offer evidence indicating that they believed that PCR testing was superior to BUC testing for diagnosing UTIs. <u>See</u> Dkt. 254-3 ¶ 6; Dkt. 254-7 at 10, 14-15. The evidence Relator puts forth in response is not sufficient to raise a triable issue that

13

A.824

Defendants submitted claims for PCR UTI tests knowing that the performance of the PCR testing was medically unnecessary.

Relator first argues that a reasonable jury could infer that Defendant acted knowingly from the absence of government authorization for coverage for PCR UTI testing. There was no national coverage determination ("NCD") or local coverage determination ("LCD") governing Medicare's coverage of PCR UTI testing during the relevant period, although half of Medicare administrative contractors have since adopted an applicable LCD that took effect in June 2022. See Odell v. U.S. Dep't of Health & Hum. Servs., 995 F.3d 718, 720 (9th Cir. 2021) (describing NCDs and LCDs). This argument fails because Relator concedes that "an NCD or LCD may not be specifically required in all cases for a particular service" to be deemed medically necessary. Dkt. 269 at 7. "Absent a regulation, [an NCD], or an LCD, the Medicare contractor proceeds on a case-by-case basis to determine whether a service is reasonable and necessary." Odell, 995 F.3d at 720; see Banks v. Sec'y, Dep't of Health & Hum. Servs., 38 F.4th 86, 90 (11th Cir. 2022) ("[A]pplying [the medical necessity] standard often entails case-by-case adjudication."); Polukoff, 895 F.3d at 735 (noting that Medicare contractors may "make individual claim determinations, even in the absence of [a national or local coverage determination], . . . based on the individual's particular factual situation" (alterations in original) (quoting

14

A.825

Medicare Program: Review of National Coverage Determinations and Local Coverage Determinations, 68 Fed. Reg. 63,692, 63,693 (Nov. 7, 2003))). Knowledge of the absence of an applicable NCD or LCD would not have made Defendants aware of a substantial risk that the PCR UTI tests were medically unnecessary.

Relator's reliance on a set of guidelines from the American Urological Association ("AUA") is similarly unconvincing. The AUA guidelines -- which were "published" in 2019 and had their "validity confirmed" in 2022 -- state that "the impact of [PCR] tests on the accuracy of diagnosis [of UTIs] is not documented and cannot yet be recommended for incorporation into clinical practice." Dkt. 259-4 at 2, 6-7. The only specific claims for payment documented in the record, however, occurred in 2018 and early 2019. See Dkt. 259-8 at 3-4. Even assuming the AUA guidelines did not change in relevant part between 2019 and 2022, Relator has not shown that their original publication in 2019 pre-dated submission of any claim for payments. Nor has Relator provided guidelines with similar language about PCR testing that were published before MD Labs' submission of claims.

Relator also highlights an analysis examining fifty-seven PCR tests that MD Labs performed for OMNI patients. Of the requisition forms sent to MD Labs for these patients, the box for the PCR UTI panel was unchecked on twenty-one forms, and the provider failed to sign twenty-three forms. See id. at 4. Under the circumstances,

15

A.826

the absence of checkmarks and provider signatures on certain requisition forms would not have suggested a substantial risk that the ordered tests were medically unnecessary. See Allen, 334 F. Supp. 3d at 365 (asking whether the defendant "had a specific basis to second-guess" the physician's certification of medical necessity). As the form at issue was specific to MD Labs' PCR UTI testing, see Dkt. 259-15 at 2, MD Labs had no reason to doubt that the provider intended to order such a test. And the form expressly stated that a provider signature was "optional." Id.

Moreover, Relator offers no reason to believe that this sample of fifty-seven tests -- which was selected by counsel, see Dkt. 254-18 at 5 -- is representative of the PCR UTI tests performed for OMNI patients, let alone of the tests MD Labs performed for all patients. With no proof of the representativeness of this sample, all that is left is missing checkmarks and signatures on a small percentage of the requisition forms submitted to MD Labs. At best, this evidence may support a reasonable finding that Defendants negligently performed PCR tests that providers did not intend to order. But "innocent mistakes and negligence are not offenses under the [FCA]." United States v. President & Fellows of Harvard Coll., 323 F. Supp. 2d 151, 189 (D. Mass. 2004) (alteration in original) (quoting United States v. Taber Extrusions, LP, 341 F.3d 843, 845 (8th Cir. 2003)).

A.827

Finally, Relator points to a January 2018 email in which Grizelj recommended to Rutledge that they ask a Medicare administrative contractor for "guidance on medical necessity" regarding the PCR UTI tests. Dkt. 259-25 at 2. Relator does not, however, offer evidence indicating that Defendants were ever advised that they were conducting medically unnecessary tests or aware of a substantial risk that the tests were medically unnecessary when a doctor orders them.

In addition to arguing that the performance of PCR UTI testing was generally medically unnecessary, Relator advances a separate theory regarding the make-up of MD Labs' PCR testing panels. Relator notes that MD Labs' default PCR panel tested for either seventeen or nineteen pathogens and argues that use of these overly broad panels resulted in the performance of medically unnecessary tests. It is true that "bundled tests, ordered via a pre-printed form, can create FCA liability, provided the certifying entity is aware that one or more of the tests is medically unnecessary, or recklessly disregards such a risk." Allen, 334 F. Supp. 3d at 357 (collecting cases). But a medical expert for Defendants opined based on peer-reviewed literature that the make-up of MD Labs' panels of seventeen and nineteen pathogens was appropriate for UTI testing. See Dkt. 254-5 at 6. Relator does not respond with any record evidence indicating that the make-up of the panels was unnecessarily broad.

17

A.828

In sum, no reasonable jury could conclude on this record that Defendants knew that they were submitting claims for PCR UTI testing that was medically unnecessary. Summary judgment is therefore warranted for Defendants on this theory of liability.

## III. **Independent-Contractor Sales Representatives**

Relator's second theory of FCA liability is premised on Defendants' purported violation of the AKS via MD Labs' commission-based payments to independent-contractor sales representatives.[3] The AKS prohibits individuals from paying remuneration to induce a person to "arrange for or recommend purchasing . . . or ordering" healthcare items or services. 42 U.S.C. § 1320a-7b(b)(2)(B). The AKS includes a safe harbor for payments "by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services," id. § 1320a-7b(b)(3)(B); see 42 C.F.R. § 1001.952(i), but this safe harbor does not protect payments to independent contractors, see Mallory, 988 F.3d at 738; Langer, __ F. Supp. 3d at __ [2024 WL 3633536, at *4].

---

[3] Relator asserts that these payments also violated the EKRA, which criminalizes the knowing and willful payment of "any remuneration . . . to induce a referral of an individual to a . . laboratory" for "services covered by a health care benefit program." 18 U.S.C. § 220(a)(2). Relator frames its arguments solely in terms of the AKS, however, and does not contend that the analysis would differ under the EKRA.

18

A.829

The plain language of the AKS's broad prohibition covers payments to independent contractors who were hired to influence those who make healthcare decisions on behalf of providers by promoting a company's product or service. See Mallory, 988 F.3d at 738; Langer, __ F. Supp. 3d at __ [2024 WL 3633536, at *3-4]. At the hearing, the government stated: "The law is that paying independent contractors commission-based fees is not per se unlawful, but it does bring the conduct within the confines of the [AKS]." Dkt. 277 at 30.[4] While Relator does not dispute that MD

---

[4] The Department of Health and Human Services' Office of Inspector General ("OIG") has twice outlined factors relevant for determining whether an independent-contractor sales arrangement falls afoul of the AKS. See OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23,731, 23,739 (May 5, 2003) (advising consideration of 1) "[t]he amount of compensation"; 2) "[t]he identity of the sales agent engaged in the marketing or promotional activity (e.g., is the agent a 'white coat' marketer or otherwise in a position of exceptional influence)"; 3) "[t]he sales agent's relationship with his or her audience"; 4) "[t]he nature of the marketing or promotional activity"; 5) "[t]he item or service being promoted or marketed"; and 6) "[t]he composition of the target audience"); OIG Advisory Opinion No. 98-10, 1998 WL 35287765, at *3-4 (Aug. 31, 1998) (listing the following "suspect characteristics": 1) "compensation based on percentage of sales"; 2) "direct billing of a Federal health care program by the Seller for the item or service sold by the sales agent"; 3) "direct contact between the sales agent and physicians in a position to order items or services that are then paid for by a Federal health care program"; 4) "direct contact between the sales agent and Federal health care program beneficiaries"; 5) "use of sales agents who are health care professionals or persons in a similar position to exert undue influence on purchasers or patients"; and 6) "marketing of items or services that are separately reimbursable by a Federal health care program"); see also Langer, __ F. Supp. 3d at __ [2024 WL 3633536, at *4] (discussing these OIG factors).

A.830

Labs' payments to sales representatives who were employees fall within the bona fide employee safe harbor, it alleges that the payments to independent-contractor sales representatives violated the AKS and that this violation resulted in the submission of claims for payment for PCR UTI testing.[5]

Again, Defendants seek summary judgment on this theory of liability on three alternative grounds: 1) no underlying AKS violation occurred because Defendants did not pay the sales representatives with an unlawful intent to induce referrals; 2) no underlying AKS violation occurred because Defendants did not know that the payments at issue were unlawful; and 3) even if an underlying AKS violation occurred, it did not result in the submission of claims.

The Court begins and ends its analysis with Defendants' causation argument. Under 42 U.S.C. § 1320a-7b(g), "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of" the FCA. The First Circuit has interpreted the "resulting from" language in this provision as requiring "a sufficient causal connection

_____

[5] Relator asserts that MD Labs paid sales representatives a fee for collecting specimens from providers. It is not clear from the record whether these payments are different from the commission-based payments that the parties otherwise discuss. The characterization of the payments as a specimen collection fee rather than a commission does not affect the legal analysis.

20

A.831

between an AKS violation and a claim submitted to the federal government." Guilfoile, 913 F.3d at 190.

The parties dispute the relevant standard for determining whether this "sufficient causal connection" exists. Defendants urge the Court to apply the "but-for" causation standard adopted by the Sixth and Eighth Circuits. See United States ex rel. Martin v. Hathaway, 63 F.4th 1043, 1052-55 (6th Cir.), cert. denied, 144 S. Ct. 224 (2023); United States ex rel. Cairns v. D.S. Med. LLC, 42 F.4th 828, 834-36 (8th Cir. 2022). Under this standard, the plaintiff must show "that the defendants would not have included particular 'items or services' [in claims for payment] absent the illegal kickbacks." Cairns, 42 F.4th at 835 (quoting 42 U.S.C. § 1320a-7b(g)). Relator responds that proof of but-for causation is not necessary. The Third Circuit has held that a claim results from an AKS violation if the plaintiff shows "that at least one of [the] claims sought reimbursement for medical care that was provided in violation of the [AKS]." United States ex rel. Greenfield v. Medco Health Sols., Inc., 880 F.3d 89, 98 (3d Cir. 2018). In other words, a court must ask whether "a particular patient [was] exposed to an illegal recommendation or referral and a provider submit[ted] a claim for reimbursement pertaining to that patient." Id. at 100. Courts within this district are split on whether but-for causation is required in this context. Compare United States v. Regeneron Pharms., Inc.,

21

A.832

No. 20-11217-FDS, 2023 WL 6296393, at *11 (D. Mass. Sept. 27, 2023) (adopting the but-for causation standard), perm. app. granted, No. 23-8036, 2023 WL 8599986 (1st Cir. Dec. 11, 2023), with United States ex rel. Witkin v. Medtronic, Inc., No. 1:11-cv-10790-IT, 2024 WL 1892405, at *18-19 (D. Mass. Mar. 31, 2024) (rejecting but-for causation), and United States v. Teva Pharms. USA, Inc., 682 F. Supp. 3d 142, 148 (D. Mass. 2023) (same).

The Court holds that the "resulting from" language in § 1320a-7b(g) requires a plaintiff to show that the AKS violation was a but-for cause of the inclusion of the item or service in a claim for payment. To begin, I do not read the First Circuit's decision in Guilfoile to have reached a binding holding adopting the Third Circuit's approach. While the First Circuit stated that a "sufficient causal connection" is required and then cited to the Third Circuit's opinion in Greenfield, it did not define what type of causal connection is "sufficient." Guilfoile, 913 F.3d at 190. The First Circuit also expressly warned that it was "not attempt[ing] to assess the full implications of" § 1320a-7b(g) because it was addressing "not the standard for proving an FCA violation based on the AKS, but rather the requirements for pleading an FCA retaliation claim." Id.

Moreover, construing "resulting from" to mandate a showing of but-for causation is consistent with basic principles of statutory interpretation. When, as here, "Congress uses a term in a statute

22

A.833

and does not define it," courts "generally assume that the term carries its plain and ordinary meaning." United States v. Saemisch, 70 F.4th 1, 7 (1st Cir. 2023) (quoting City of Providence v. Barr, 954 F.3d 23, 31 (1st Cir. 2020)). The Supreme Court has explained that the "ordinary meaning" of a nearly identical phrase -- "results from" -- entails "a requirement of actual causality," i.e. but-for causation. Burrage v. United States, 571 U.S. 204, 210-11 (2014). There is "no textual or contextual indication" that Congress intended to give a different meaning to the phrase "resulting from" in § 1320a-7b(g). Id. at 212. While the congressional record suggests that § 1320a-7b(g) was enacted to "strengthen[] whistleblower actions," Guilfoile, 913 F.3d at 190 (alteration in original) (quoting 155 Cong. Rec. S10,852, S10,853 (daily ed. Oct. 28, 2009) (statement of Sen. Kaufman)), that legislative history cannot "be used to 'muddy' the meaning of 'clear statutory language.'" Food Mktg. Inst. v. Argus Leader Media, 588 U.S. 427, 436 (2019) (quoting Milner v. Dep't of Navy, 562 U.S. 562, 572 (2011)). Relator emphasizes the First Circuit's decision in United States ex rel. Hutcheson v. Blackstone Medical, Inc., 647 F.3d 377 (1st Cir. 2011), in support of its argument that it need not prove but-for causation. The court in Hutcheson expressly declined to address the then-recently enacted language in § 1320a-7b(g), see id. at 392 & n.17, so that decision does not help Relator's case.

23

A.834

Applying this but-for causation standard, the Court concludes that no reasonable jury could find on this record that the submission of claims for PCR UTI testing resulted from the alleged AKS violation, i.e., Defendants' commission-based payments to independent-contractor sales representatives. For one, Relator has offered no evidence that the independent-contractor status of some of its sales representatives unduly influenced any provider's decision to order PCR UTI testing from MD Labs. As previously noted, the AKS includes a safe harbor for payments made to bona fide employees. See 42 U.S.C. § 1320a-7b(b)(3)(B); 42 C.F.R. § 1001.952(i). Defendants submitted unrebutted evidence that MD Labs trained, managed, disciplined, and paid its sales representatives identically whether they were employees or independent contractors. See Dkt. 254-3 ¶¶ 15-17. Plainly, the sales representatives, whether employee or independent contractor, sought to influence referral of testing to MD Labs -- that's why they were hired. But there is no evidence that MD Labs' independent-contractor sales representatives acted any differently than the employees receiving commission-based payments from MD Lab.

Nor does the record support a reasonable finding that any independent-contractor sales representative engaged in conduct that improperly or unduly influenced a provider's decision to purchase the product. It is true that sales representatives

24

A.835

participated in discussions with OMNI about an arrangement in which OMNI would share in the profits from PCR UTI tests ordered from MD Labs. See Dkt. 259-22 at 2; Dkt. 259-23 at 2. While Defendants insist that these troubling discussions concerned the negotiation of a lawful reference laboratory agreement, they have not adequately explained when that type of arrangement is permissible. Nonetheless, the record reflects that the parties never executed any such agreement, and Relator offers no evidence that the profit-sharing proposal ever came to fruition. Thus, any potentially improper conduct by the independent-contractor sales representatives did not cause the submission of claims for MD Labs' PCR UTI testing.

Finally, Dr. Deligdish admitted at his deposition that OMNI chose to order PCR UTI testing from MD Labs in every instance in order to substantiate FCA allegations against Defendants. See Dkt. 254-12 at 22-23; Dkt. 260 ¶¶ 60-61. In other words, Dr. Deligdish caused submission of false claims for PCR testing which he knew were not medically necessary. Relator cites no evidence that the commission-based payments to independent-contractor sales representatives played any role in OMNI's decision to order PCR UTI tests from MD Labs. Accordingly, no reasonable jury could find that the alleged AKS violation arising from these payments was a but-for cause of the submission of claims for payment to the federal government.

25

A.836

## IV.  Billing Practices

That leaves Relator's final theory of FCA liability, which concerns Defendants' purported failure to balance bill patients and capping of out-of-pocket costs for patients at $50. Relator asserts that these billing practices violated the AKS and that Defendants submitted claims for payment to the federal government that resulted from these AKS violations. Defendants have submitted evidence that they never engaged in these practices. The matter is disputed.

Even assuming that the record suffices to show that MD Labs declined to balance bill and capped out-of-pocket costs for certain patients, Relator has put forth no proof that MD Labs submitted a claim for PCR UTI testing to a government health care program for a patient that received either of these financial benefits. The only evidence in the record of specific claims for MD Labs' PCR UTI testing is a summary chart that describes fifty-seven tests conducted by MD Labs for OMNI patients (only some of which involved claims submitted to a government health care program). See Dkt. 259-8 at 3-4. The chart does not state whether MD Labs declined to balance bill or capped out-of-pocket costs for any of the patients for whom the claims were submitted. Without such evidence, a reasonable jury could not conclude that, absent the allegedly

26

A.837

unlawful kickbacks, Defendants would not have submitted the claims for payment for PCR UTI testing. See Cairns, 42 F.4th at 835.[6]

## V.   Texas Law Claims

Finally, Defendants assert that Relator's claims under various state and local analogs of the federal FCA fail as a matter of law for the same reasons as its federal claims. Relator responds that even if summary judgment is warranted for Defendants on its federal claims, its claim under Texas law (Count XXVIII) survives. Relator points to three purported differences between Texas law and federal law: 1) liability under the Texas Medicaid Fraud Prevention Act ("TMFPA") does not require proof either of the submission of false claims or of materiality; 2) the TMFPA defines "materiality" differently than the federal FCA in that it "reaches conduct beyond influencing the payment of money"; and 3) unlike the federal AKS, neither the TMFPA nor the Texas Anti-Kickback Statute requires that a defendant act "willfully." Dkt. 259 at 30-31.

Relator's arguments about Texas law are unconvincing. Because the Court's grant of summary judgment to Defendants on the federal

---

[6] This evidentiary gap would be fatal to this theory of liability even under the looser causation standard employed by the Third Circuit. See Greenfield, 880 F.3d at 98, 100 (requiring a plaintiff to "prove that at least one of [the] claims sought reimbursement for medical care that was provided in violation of the [AKS]," i.e., that "a particular patient [was] exposed to an illegal recommendation or referral and a provider submit[ted] a claim for reimbursement pertaining to that patient").

27

A.838

claims does not turn either on the federal FCA's materiality element or on the willfulness requirement for a federal FCA claim premised on an AKS violation, any distinctions in those elements between federal and Texas law are beside the point. And insofar as Relator wishes to advance theories of liability under Texas law that differ from those it presses under federal law -- i.e., that do not involve the submission of false claims -- it does not articulate those theories with any specificity. Relator's allusion to other possible theories of liability cannot save its case at this juncture.

### ORDER

For the reasons stated above, Defendants' motion for summary judgment (Dkt. 252) is **ALLOWED**, and Relator's motion for partial summary judgment (Dkt. 255) is **DENIED** as moot.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge

28

A.839

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

OMNI HEALTHCARE, INC.                    )
                                         )
              Plaintiff,                  )
       v.                                )          CIVIL ACTION
                                         )          NO. 18-12558-PBS
MD SPINE SOLUTIONS LLC, ET AL            )
                                         )
              Defendants.                )

## JUDGMENT

SARIS, D. J.

       In accordance with the Court's Memorandum and Order dated January 6, 2025 (Docket

No. 279), granting defendants' motion for summary judgment, it is hereby ORDERED that

judgment is entered in favor of defendants.

                                         By the Court,

                                         Robert M. Farrell
                                         Clerk of Court


                                         / s / Clarilde Karasek
                                         Deputy Clerk

DATED: January 6, 2025

A.840

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, *ex rel.* OMNI HEALTHCARE, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>MD SPINE SOLUTIONS LLC, D/B/A MD LABS INC., DENIS GRIZELJ, MATTHEW RUTLEDGE AND DOE HEALTHCARE PROVIDERS 1 - 100,<br><br>Defendants. | **CIVIL ACTION NO.: 18-cv-12558-PBS**<br><br><br>**NOTICE OF APPEAL** |

**NOTICE IS HEREBY GIVEN** that plaintiff-relator OMNI Healthcare, Inc. ("OMNI") appeals to the United States Court of Appeals for the First Circuit from the Judgment (ECF #280) of the United States District Court for the District of Massachusetts entered on January 6, 2025  as well as all aspects of the Memorandum and Order (ECF #279) dated January 6, 2025.

February 3, 2025

**OMNI HEALTHCARE, INC.**
*By its attorneys,*

/s/ *Thomas M. Kenny*
DAVID B. HARRISON (*pro hac vice*)
THOMAS M. KENNY (*pro hac vice*)
SPIRO HARRISON & NELSON

SHN\885664.1

A.841

## CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all registered participants identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

February 3, 2025

**OMNI HEALTHCARE, INC.**
*By its attorneys,*

*/s/ Thomas M. Kenny*
THOMAS M. KENNY (*pro hac vice*)
SPIRO HARRISON & NELSON

SHN\885664.1

A.842