# UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

UNITED STATES, ex rel. OMNI HEALTHCARE INC.,

*Plaintiff - Appellant*,

STATE OF ALASKA, ex rel Omni Healthcare, Inc.; STATE OF CALIFORNIA, ex rel Omni Healthcare, Inc.; STATE OF COLORADO, ex rel Omni Healthcare, Inc.; STATE OF CONNECTICUT, ex rel Omni Healthcare, Inc.; STATE OF DELAWARE, ex rel Omni Healthcare, Inc.; DISTRICT OF COLUMBIA, ex rel Omni Healthcare, Inc.; STATE OF FLORIDA, ex rel Omni Healthcare, Inc.; STATE OF GEORGIA, ex rel Omni Healthcare, Inc.; STATE OF HAWAII, ex rel Omni Healthcare, Inc.; STATE OF ILLINOIS, ex rel Omni Healthcare, Inc.; STATE OF INDIANA, ex rel Omni Healthcare, Inc.; STATE OF IOWA, ex rel Omni Healthcare, Inc.; STATE OF LOUISIANA, ex rel Omni Healthcare, Inc.; STATE OF MARYLAND, ex rel Omni Healthcare, Inc.; STATE OF MASSACHUSETTS, ex rel Omni Healthcare, Inc.; STATE OF MICHIGAN, ex rel Omni Healthcare, Inc.; STATE OF MINNESOTA, ex rel Omni Healthcare, Inc.; STATE OF MONTANA, ex rel Omni Healthcare, Inc.; STATE OF NEVADA, ex rel Omni Healthcare, Inc.; STATE OF NEW JERSEY, ex rel Omni Healthcare, Inc.; STATE OF NEW MEXICO, ex rel Omni Healthcare, Inc.; STATE OF NEW YORK, ex rel Omni Healthcare, Inc.; STATE OF NORTH CAROLINA, ex rel Omni Healthcare, Inc.; STATE OF OKLAHOMA, ex rel Omni Healthcare, Inc.; STATE OF RHODE ISLAND, ex rel Omni Healthcare, Inc.; STATE OF TENNESSEE, ex rel Omni Healthcare, Inc.; STATE OF TEXAS, ex rel Omni Healthcare, Inc.; STATE OF VERMONT, ex rel Omni Healthcare, Inc.; STATE OF VIRGINIA, ex rel Omni Healthcare, Inc.; STATE OF WASHINGTON, ex rel Omni Healthcare, Inc.,

*Plaintiffs*,

v.

MD SPINE SOLUTIONS LLC, d/b/a MD Labs Inc.; DENIS GRIZELJ; MATTHEW RUTLEDGE, DOE HEALTHCARE PROVIDERS 1 - 100,

*Defendants - Appellees*.

On Appeal from the United States District Court
for the District of Massachusetts, No. 1:18-cv-12558-PBS

## BRIEF OF DEFENDANTS-APPELLEES

| | | |
|---|---|---|
| Seth B. Orkand | Danielle H. Tangorre | Edward J. Heath |
| Julianna M. Charpentier | ROBINSON & COLE LLP | Scott T. Garosshen |
| ROBINSON & COLE LLP | Chrysler East Building | ROBINSON & COLE LLP |
| One Boston Place, 25th Fl. | 666 Third Avenue, 20th Fl. | One State Street |
| Boston, MA 02108 | New York, NY 10017 | Hartford, CT 06103-3597 |
| Tel: (617) 557-5915 | Tel: (212) 451-2900 | Tel: (860) 275-8200 |
| *sorkand@rc.com* | *dtangorre@rc.com* | *eheath@rc.com* |
| *jcharpentier@rc.com* | | *sgarosshen@rc.com* |

# DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendant-Appellee MD Spine Solutions d/b/a MD Labs Inc. ("MD Labs") respectfully declares that it is a corporation organized under the laws of California with its headquarters located at 10715 Double R Blvd., Suite 102, Reno, NV 89521. MD Labs has no parent corporation and no publicly held corporation currently owns 10 percent or more of its stock.

**TABLE OF CONTENTS**

**Page**

DISCLOSURE STATEMENT ................................................................i

TABLE OF AUTHORITIES ...............................................................iv

REASONS WHY ORAL ARGUMENT NEED NOT BE HEARD .................... vii

STATEMENT OF ISSUES .............................................................. viii

TABLE OF ABBREVIATIONS ..........................................................ix

INTRODUCTION ...........................................................................1

STATEMENT OF CASE ..................................................................4

    I.     MD Labs offered PCR testing for rapid, precise results. ......................4

    II.    Clinical laboratories like MD Labs perform PCR testing based on medical providers' test orders when necessary for their patients.........................................................................8

    III.   Omni hunts for *qui tam* targets.........................................9

    IV.   Deligdish duplicitously overrode providers' medical necessity determinations. ...............................................................10

    V.    The District Court renders summary judgment for MD Labs.............11

SUMMARY OF THE ARGUMENT ....................................................12

    I.     No genuine dispute exists that MD Labs did not bill for PCR tests "knowing" they were medically unnecessary. ...........................14

        A.    Standard of Review.................................................14

        B.    Scienter may be resolved at the summary judgment stage.............................................................15

        C.    No genuine dispute exists that MD Labs did not knowingly submit false claims.................................16

            1.    MD Labs had no reason to override treating medical providers' certifications that the tests they ordered were medically necessary...............................17

            2.    UTI PCR testing itself is not intrinsically medically unnecessary.................................19

        3.      MD Labs subjectively believed PCR testing to be medically necessary. ...................................................... 24

    D.    Omni's arguments to the contrary lack merit. ......................... 29

        1.      Neither the lack of optional LCD / NCD guidance, nor the post-dated AUA guidelines, show Defendants "knew" PCR testing to be medically unnecessary. ................................................................. 29

        2.      The purported "smoking gun" email on which Omni seizes is anything but. .......................................... 31

        3.      The number of pathogens for which MD Labs tested was appropriate. ................................................. 32

II.    No genuine dispute exists that Deligdish's fraudulent intervention severed the causal chain for purposes of the False Claims Act. ..................................................................................... 35

    A.    Standard of Review ............................................................... 35

    B.    Deligdish falsifying test requests was a superseding cause. .................................................................................... 35

CONCLUSION ...................................................................................... 39

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*U.S. ex rel. Allen v. Alere Home Monitoring, Inc.*,
    334 F. Supp. 3d 349 (D. Mass. 2018)....................................................17, 33, 34

*Caban Hernandez v. Philip Morris USA, Inc.*,
    486 F.3d 1 (1st Cir. 2007)..............................................................................4, 7

*U.S. ex rel. Cantekin v. Univ. of Pittsburgh*,
    192 F.3d 402 (3d Cir. 1999) ............................................................................36

*Casale v. Ecolab Inc.*,
    No. 2:21-CV-00126-NT, 2022 WL 1910126 (D. Me. June 3, 2022)................37

*U.S. ex rel. Franklin v. Parke-Davis, Div. of Warner- Lambert Co.*,
    147 F. Supp. 2d 39 (D. Mass. 2001)................................................................36

*Gilday v. Dubois*,
    124 F.3d 277 (1st Cir. 1997), *cert. denied*, 524 U.S. 918 (1998)......................14

*U.S. ex rel. Groat v. Boston Heart Diagnostics Corp.*,
    296 F. Supp. 3d 155 (D.D.C. 2017)............................................................17, 18

*Hahn v. Sargent*,
    523 F.2d 461 (1st Cir. 1975), *cert. denied*, 425 U.S. 904 (1976)......................15

*U.S. ex rel. Hendow v. Univ. of Phoenix*,
    461 F.3d 1166 (9th Cir. 2006) .........................................................................24

*U.S. ex rel. Hutcheson v. Blackstone Med., Inc.*,
    647 F.3d 377 (1st Cir. 2011)............................................................................36

*Ing v. Tufts Univ.*,
    81 F.4th 77 (1st Cir. 2023), *cert. denied*, 144 S. Ct. 2530 (2024)....................15

*Miller by Miller v. Whitburn*,
    10 F.3d 1315 (7th Cir. 1993) ...........................................................................21

*U.S. ex rel. Phalp v. Lincare Holdings, Inc.*,
    857 F.3d 1148 (11th Cir. 2017) .......................................................................15

Page(s)

*U.S. ex rel Polukoff v. St. Mark's Hosp.*,
 895 F.3d 730 (10th Cir. 2018) .................................................................29, 30

*U.S. ex rel. Rost v. Pfizer, Inc.*,
 507 F.3d 720 (1st Cir. 2007), *overruled on other grounds by
 Allison Engine v. U.S. ex rel. Sanders*, 553 U.S. 662 (2008) ...........................37

*Rush v. Parham*,
 625 F.2d 1150 (5th Cir. 1980) .................................................................21

*Russo v. Baxter Healthcare Corp.*,
 140 F.3d 6 (1st Cir. 1998)..................................................................37, 38

*Salmon v. Lang*,
 57 F.4th 296 (1st Cir. 2022)...................................................................36

*U.S. ex rel. Schutte v. SuperValu Inc.*,
 598 U.S. 739 (2023)........................................................................*passim*

*U.S. ex rel. Senters v. Quest Diagnostics, Inc.*,
 No. 1:10-CV-2202-AT, 2024 WL 4297469 (N.D. Ga. Aug. 23,
 2024) .................................................................17, 23, 24, 35

*U.S. v. Castillo-Martinez*,
 16 F.4th 906 (1st Cir. 2021)...................................................................36

*U.S. v. DaVita Inc.*,
 No. 818CV01250JLSDFM, 2020 WL 3064771 (C.D. Cal. Apr. 10,
 2020) .................................................................20

*U.S. v. King-Vassel*,
 728 F.3d 707 (7th Cir. 2013) .................................................................36

*U.S. v. Regeneron Pharmaceuticals, Inc.*,
 128 F.4th 324 (1st Cir. 2025).............................................................35, 39

*Weaver v. Reagen*,
 886 F.2d 194 (8th Cir. 1989) .............................................................21, 22

Page(s)

*White v. Hearst Corp.*,
669 F.2d 14 (1st Cir. 1982)................................................................................16

**Statutes**

31 U.S.C. § 3729 ...................................................................................*passim*

42 U.S.C. § 1395l.....................................................................................8, 9

**Other Authorities**

63 Fed. Reg. 45,076, 45,079 (Aug. 24, 1998) ......................................................17

66 Fed. Reg. 58,788, 58,801 (Nov. 23, 2001) ......................................................18

Annual Fee Schedule Updates, available at
https://www.cms.gov/regulations-and-
guidance/guidance/manuals/downloads/clm104c16.pdf (last visited
June 11, 2025)................................................................................................8

Black's Law Dictionary (12th ed. 2024) ...............................................................37

Centers for Medicare & Medicaid Services, Health Insurance
Claim Form, available at https://www.cms.gov/medicare/cms-
forms/cms-forms/cms-forms-items/cms1188854
(last visited June 12, 2025) ...............................................................30, 31, 32, 33

**REASONS WHY ORAL ARGUMENT NEED NOT BE HEARD**

Defendants-Appellees MD Spine Solutions LLC, d/b/a MD Labs Inc., Denis Grizelj, and Matthew Rutledge respectfully submit, pursuant to Local Rule 34, that oral argument is unnecessary in this appeal. The District Court's well-reasoned decision amply explains why summary judgment was proper.

# STATEMENT OF ISSUES

1. From 2017–2019, medical providers ordered PCR tests for urinary tract infections from MD Labs, a clinical laboratory, that experts and the medical literature agree are faster and more precise than alternatives. MD Labs' staff thought so too. Did the District Court properly grant summary judgment for MD Labs on Plaintiff's False Claims Act counts, reasoning that Plaintiff's personal criticisms of the tests' necessity and cost did not mean MD Labs billed for them "knowing" they were medically unnecessary?

2. For the lab tests at issue, Plaintiff's owner falsified the underlying test request forms to manufacture this lawsuit. Did his fraudulent intervention sever the causal chain required to establish a claim against MD Labs under the False Claims Act?

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| Plaintiff's Appellant Brief | "PB__" |
| Plaintiff's Appendix | "PA__" |
| District Court ECF Document | "ECF No. __" |

# INTRODUCTION

The record here does not come close to satisfying any theory that Defendant MD Spine Solutions LLC, d/b/a MD Labs Inc. ("MD Labs"), and its owners, Defendants Denis Grizelj and Matthew Rutledge, "knowingly" submitted false claims when offering lab testing to medical practitioners. The classic way to show a defendant "*knowingly* present[ed], or cause[d] to be presented, a false or fraudulent claim for payment or approval" under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A) (emphasis added), is evidence that they "received notice" of the falsity of a claim, "then tried to hide" the truth while internally admitting the lie. *U.S. ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 746–47, 754 (2023). Plaintiff adduced no evidence that Defendants had the requisite scienter to violate the False Claims Act through actual knowledge, deliberate ignorance; or reckless disregard. *See id*. at 751, 754.

Rather, the undisputed evidence shows that far from "knowingly" presenting medically unnecessary (and thus "false") claims, clinical laboratory MD Labs performed a type of infectious disease test that experts and the medical literature *agree* is faster and more precise. PA665–69. That highly effective testing technology became a household name during the COVID-19 pandemic—the polymerase chain reaction or "PCR" test. MD Labs offered it for urinary tract infection ("UTI") testing.

1

Both parties' experts agreed it was medically necessary when properly ordered by providers to diagnose UTIs in certain patients. PA667–68.

Unsurprisingly, ample discovery located no evidence that MD Labs was ever on notice that PCR testing for UTIs was medically unnecessary. Omni could not even find internal correspondence at MD Labs *doubting* the test's medical necessity. The most it found were two emails between MD Labs' co-founders, Rutledge and Grizelj, extolling the superiority of PCR testing and suggesting they wanted formal medical necessity guidance issued amidst an effort to streamline billing and coding as they scaled up MD Labs' PCR testing in response to provider demand for its benefits. PA659–60. The District Court evaluated these emails and dismissed Omni's argument. Neither email notes any problem with PCR UTI testing itself—quite the opposite. *See id.* Omni portrays these emails as expressing grave concerns about the medical necessity of PCR UTI tests only by omitting most of the emails' actual text. *See* PB3, 11.

Coming up blank on evidence that Defendants subjectively believed their tests were medically unnecessary, Omni's last-ditch effort is to argue a genuine dispute exists about whether PCR UTI tests are *so obviously* medically unnecessary that MD Labs *must* have believed them improper. *See* PB22–30. But Omni failed to raise a genuine dispute even on medical necessity—its own expert conceded PCR UTI testing is medically necessary for a wide variety of patients. *See infra* Argument

I.C.2. Omni failed utterly to show that its opposite position was so obvious that MD Labs must have subjectively believed such tests to be medically unnecessary. *See infra* Argument I.C.3.

Because the District Court granted summary judgment on this basis, it did not need to reach the second basis for summary judgment—that the misconduct of Omni's owner, Dr. Craig Deligdish, broke the causal chain when he fraudulently manufactured every test order that Omni sent to MD Labs to invent a basis for this lawsuit. At his deposition, Deligdish expressly acknowledged his scheme: he directed Omni staff to change test selections that Omni medical providers had ordered for their patients from less expensive bacterial urine cultures ("BUC") to more expensive PCR tests from MD Labs (generally without advising the provider or patient). He did so solely to gin up a False Claims Act case against MD Labs. Deligdish's fraudulent intervention irrevocably breaks the causal chain. On either ground, this Court should affirm.

## I.      MD Labs offered PCR testing for rapid, precise results.

Defendant MD Labs is an independent clinical laboratory in Reno, Nevada, founded by Defendants Matthew Rutledge and Denis Grizelj in 2011 (all three collectively, "Defendants"). PA155. MD Labs historically performed urine drug testing. In 2017, it added UTI testing using PCR technology. *Id*. MD Labs first considered offering UTI testing because many of the patient specimens it received for toxicology testing had physical indicators "resembling having the characteristics of an infection." PA206. Many of these patients took pain medication that could suppress UTI symptoms, so "there might be a lot of undiagnosed urinary tract infections coming through the lab…." *Id.* Defendants thus saw an opportunity to collaborate with medical providers who deemed it medically necessary to test for such UTIs with greater precision. *See id*.

---

[1] Attempting to evade summary judgment, Omni admitted next to nothing of note in its response to MD Labs' Local Rule 56.1 statement of undisputed facts. *See* PA661–82. Critically though, Omni routinely failed to cite any evidence controverting the portions it refused to admit. *See id.* The rules are clear that "[m]aterial facts of record set forth in the [movant's] statement" are "deemed . . . admitted" at summary judgment "unless controverted by the statement required" in opposition, which must include "page references to affidavits, depositions and other documentation" controverting each such fact. Local Rule 56.1. "In the event that a party opposing summary judgment fails to act in accordance with the rigors that such a rule imposes, a district court is free, in the exercise of its sound discretion, to accept the moving party's facts as stated." *Caban Hernandez v. Philip Morris USA, Inc.*, 486 F.3d 1, 7 (1st Cir. 2007). Omni flouted this rule at its peril. *Id.*

MD Labs consulted its medical director, infectious disease specialist Dr. Steven Parker, when it considered offering PCR UTI testing because it was "looking to see whether there was a potentially more useful way to provide information to doctors concerning urinary tract testing than the traditional method," a bacterial urine culture ("BUC"). PA813; PA275; *see also* PA176 (testifying that MD Labs consulted Dr. Parker to offer expertise specifically on UTI testing and how PCR UTI testing could help medical providers better care for their patients).

PCR testing has been available since the mid-1980s. PA155. It rapidly produces highly accurate and precise results by amplifying copies of segments of DNA to enable identification of genetic material belonging to a particular biological origin. PA156. In recent years, testing using PCR technology has become a standard method to identify a wide range of pathogens. *Id*. By contrast, the traditional test for UTIs for over 60 years has been the BUC, where a urine sample is placed on a growth medium in a Petri dish, and laboratories typically wait between 24 to 72 hours to determine if any bacteria grew, and sometimes longer for slow-growing bacteria. *Id*.; PA255

MD Labs used PCR technology to test for the presence of genetic material in the urine for 17 or 19 pathogens. PA156. In addition to performing the PCR test, MD Labs would simultaneously begin culturing the pathogens in a Petri dish. In the event the PCR results were positive for the presence of one or more pathogens, MD

Labs allowed the urine culture to continue to grow and conducted an antibiotic susceptibility test ("AST") to determine whether bacteria grown in the Petri dish was susceptible to an array of antibiotics. *Id.* Performing both tests simultaneously provided faster AST results than would be available if the lab delayed culturing the sample for AST until PCR results were available. *Id.* But if PCR tests did not detect any pathogens, MD Labs discarded and did not report or bill for the urine culture, instead billing only for the PCR pathogen detection test. PA157. This system allowed MD Labs to expedite the return of results to treating physicians, whose patients may have potentially life-threatening infections. *See* PA156–57.

Because PCR testing is faster than BUC (PA157), MD Labs could often determine if a patient had an infection at least 24 hours before a BUC would have produced results. *Id.* MD Labs intended faster results to enable providers to either prescribe effective antibiotics more quickly or eliminate a UTI as the cause of patient symptoms. *Id.* Several providers who ordered tests from MD Labs' also requested PCR UTI pathogen detection results reported before AST results were available in a preliminary results report to further aid in the clinical decision-making process. *See id.* Moreover, PCR UTI testing is more accurate than BUC, which may fail to detect bacteria where a patient has a slow-growth bacterial infection, has already started antibiotics, or has a polymicrobial infection where a dominant organism might overgrow a secondary pathogen. *Id.*; PA252–53. MD Labs' PCR

testing thus provided significant clinical benefit to patients whose UTIs were caused by pathogens traditional BUC was incapable of identifying. PA157. As explained by Defendants' urology expert, Dr. Dicken Ko,[2] PCR testing can decrease the spread of antibiotic-resistant bacteria that can generate dangerous infections because it ensures that clinicians use an effective antibiotic the first time, rather than potentially prescribing an ineffective antibiotic. PA158.

Both parties' experts agreed that PCR UTI testing is reasonable and necessary in certain cases, even though it is more expensive than BUC. *Id*.; PA813. Omni's own medical expert acknowledged myriad reasons that PCR testing for UTIs may be medically necessary. PA158. His opinion was consistent with that of MD Labs' expert, who testified that PCR testing is indicated for a patient with a "complicated urinary tract infection or a recurrent urinary tract infection with prior negative studies or recurrent positive polymicrobial infection and a lot of antibiotic resistance," to "help the providers further define . . . the interplay of organisms that exist in that urobiome." PA159 (PCR UTI testing is indicated for patients with

---

[2] Dr. Ko is a urological and transplant surgeon at Rhode Island Hospital and a Professor of Surgery at Warren Alpert School of Medicine at Brown University. PA230. Dr. Ko earned a Bachelor's in Physiology/Biology from the University of British Columbia and a medical degree from Queen's University. *Id*. He completed his residency in urology at the University of British Columbia and his fellowship in Transplantation at Massachusetts General Hospital. *Id*.

persistent symptoms but for whom a standard culture does not identify the bacteria and in some cases, a urinalysis indicated signs of an infection).

When MD Labs offered PCR UTI testing, no local coverage determination or national coverage determination limited the use of PCR UTI testing and government and commercial payors routinely paid claims. PA158.

Notably, the rate that Medicare paid MD Labs (or any laboratory) for clinical testing was (and still is) set by the appropriate government agency, *not MD Labs*. *See* 42 U.S.C. § 1395l(h). The government updates its fee schedule annually. *See* Medicare Claims Processing Manual, Section 20.2 – Annual Fee Schedule Updates, available at https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/clm104c16.pdf (last visited June 11, 2025). MD Labs never set the rates that federal healthcare programs paid to MD Labs or any laboratory performing clinical testing. *See* 42 U.S.C. 1395l(h).

## II. Clinical laboratories like MD Labs perform PCR testing based on medical providers' test orders when necessary for their patients.

The Parties also agree that medical providers—not clinical laboratories—determine the medical necessity of the laboratory tests they order. *See* PA160. Laboratory staff do not examine patients to assess their medical conditions and do not treat patients. PA161. By contrast, medical providers, like Deligdish, meet with patients, assess their conditions, have knowledge of their medical histories, and determine the course of appropriate treatment based on their skill and expertise. *Id*.

Medical providers typically send laboratories such as MD Labs a requisition form indicating the test the *provider* determined to be medically necessary and the applicable diagnosis code. *Id*. Clinical laboratories must perform the tests ordered by providers; they may not lawfully override the providers' clinical decisions. *Id*.

### III. Omni hunts for *qui tam* targets.

Omni is a Florida medical practice owned by Deligdish. Omni and Deligdish are relators in numerous dismissed, pending, or settled *qui tam* actions, in which they have sought to bring alleged False Claims Act violations to the government in exchange for a cut of any settlement or recovery. Filing *qui tam* actions is part of Omni's business model. Omni has received $10-20 million in revenue from settlements or other awards from *qui tam* actions. PA164. Deligdish also owns another entity, Lo Tignov, whose sole purpose is to investigate potential *qui tam* defendants and reap substantial investigatory fees through settlements with its targets. *Id*.

The government settled and dismissed Omni's claims against MD Labs concerning urine drug testing. Thereafter, Omni continued advancing its claims challenging Defendants' use of PCR technology to conduct UTI testing without government intervention.

**IV. Deligdish duplicitously overrode providers' medical necessity determinations.**

Discovery revealed the lengths to which Omni went to contrive this *qui tam* case. When an Omni provider determined that a particular laboratory test was necessary, the provider generally chose from a list of tests in Omni's electronic medical record system and Omni medical assistants completed a requisition form to send to a particular lab with a biological sample. PA165. However, beginning in 2017, irrespective of Omni providers' decisions to order *BUC* tests for their patients, Deligdish instructed Omni's staff to order *PCR* tests from MD Labs, readily admitting that he did this "so that OMNI could accumulate the necessary evidence to substantiate the allegations in the Complaint." *Id*. Notwithstanding that Omni providers determined a BUC was the medically necessary test, Omni ordered more expensive PCR tests at Deligdish's direction. *Id.*

Indeed, unbeknownst to MD Labs, Deligdish also caused some patients' urine samples to be split into smaller samples to be submitted to ten *other* clinical laboratories, in furtherance of his scheme to manufacture additional *qui tam* actions, knowing that federal health care programs would be billed for the duplicate, medically unnecessary tests. PA165. Medicare rules make clear that knowingly testing a patient with the same test multiple times on the same date of service is not reasonable or necessary. *Id*. Deligdish did this in furtherance of his scheme, knowing

that federal funds would be used to pay for the testing. *Id*. A clear violation of the False Claims Act by Deligdish.

Omni did not obtain discovery concerning MD Labs' PCR UTI tests ordered by any medical practice other than Omni. *Id*. As a result, Omni's expert witnesses reviewed and opined only upon claims Omni submitted to MD Labs, representing less than 0.5% of all PCR UTI tests performed by MD Labs. *Id.* Omni's expert did not extrapolate these results to the 99.5% of tests ordered by other practices (in which, unlike tests for Omni patients, Deligdish did not fraudulently intervene). *See id.* As a result, Omni's expert opinions were limited to the tainted test orders submitted to MD Labs by Deligdish and Omni.

## V.     The District Court renders summary judgment for MD Labs.

Defendants moved for summary judgment in full and, after extensive briefing and oral argument, the District Court granted it. The District Court held that Omni's claims failed on the key element of scienter, because the undisputed evidence showed that Defendants "believed that PCR testing was *superior* to BUC testing for diagnosing UTIs" given its precision and speed, among other benefits. PA824 (emphasis added); *see also* PA156. Omni thus failed "to raise a triable issue that Defendants submitted claims for PCR UTI tests *knowing* that the performance of the PCR testing was medically unnecessary." PA824 (emphasis added). The District Court reasoned that Omni's own disagreement or dissatisfaction with the research

supporting PCR tests fell far short of establishing a genuine dispute as to whether MD Labs billed for these tests "knowing" they were medically unnecessary and "false" under the False Claims Act. PA824–25. Because summary judgment was warranted based on the scienter element, the District Court did not analyze the remaining elements of the False Claims Act, such as whether Deligdish's fraudulent intervention was a superseding event that severed the causal chain.

Omni now appeals the District Court's grant of summary judgment, arguing that it raised a genuine dispute of material fact as to whether MD Labs submitted PCR reimbursement claims "knowing" them to be false, repeating its failed claim that evidence shows UTI PCR testing itself is *inherently* medically unnecessary.[3] Omni seeks to revive both this federal claim and its claims under the False Claims Act's state-law analogues.

## SUMMARY OF THE ARGUMENT

I.      *First*, the District Court properly rendered summary judgment on the scienter element. The parties' medical experts and scientific research confirm that PCR testing enables sensitive, reliable, and rapid diagnosis for UTIs. The record showed that MD Labs' staff shared that understanding. Regardless of whether Omni thinks UTI PCR tests are too expensive, no genuine dispute of fact exists that MD

---

[3] Omni made various other claims in the District Court which it abandons on appeal. *See* PA820-822, PA829-836 (Anti-Kickback Statute claims); PA837-838 (billing practices claims).

Labs did not "knowingly present[], or cause[] to be presented, a false or fraudulent claim for payment or approval" under the False Claims Act when submitting for reimbursement. *See* 31 U.S.C. § 3729(a)(1)(A). It unequivocally did not.

The slender reed on which Omni rests its contrary argument consists of: (1) the lack of Medicare contractor coverage pre-determinations for PCR testing—which are not required, and in fact *were* formally adopted during this lawsuit; (2) a couple emails noting that absence and considering whether to proactively attempt to obtain billing guidance; (3) trade association guidelines that Omni could not show existed when MD Labs performed the tests here; and (4) Omni's claim, without evidence, that MD Labs tested for the presence too many different pathogens.

Relying on these baseless allegations, Omni concludes that UTI PCR testing was medically unnecessary from 2017 to 2019. So, Omni reasons, MD Labs' claims must have been false, and knowingly so. On the contrary, none of the four arguments, alone or together, comes close to showing that PCR testing is medically unnecessary, let alone that Defendants subjectively believed that to be so. The District Court properly rendered summary judgment for Defendants based on the lack of a genuine dispute on the scienter element.

II.    *Second*, because the District Court granted summary judgment on scienter, it did not need to reach MD Labs' challenge concerning the causation element—whether Deligdish also broke any causal chain when he fraudulently

13

manufactured the claims relied upon by Omni in the lawsuit. This second element provides an additional, independent ground to affirm. Simply put, Deligdish caused Omni medical assistants to fraudulently create requests for tests not determined to be medically necessary by Omni patients' treating providers, sought to launder these falsified requests through MD Labs, later label MD Labs' claims for reimbursement false, and profit from the ensuing *qui tam* action. Deligdish conceded that he directed Omni staff to change test selections Omni providers had ordered for their patients from BUC to PCR UTI tests, and that he did so solely to create this False Claims Act case against Defendants. That fraudulent intervention irrevocably breaks the causal chain. For this second reason too, this Court should affirm.

## ARGUMENT

**I.  No genuine dispute exists that MD Labs did not bill for PCR tests "knowing" they were medically unnecessary.**

### A.  Standard of Review.

**De Novo.** *Gilday v. Dubois*, 124 F.3d 277, 282 (1st Cir. 1997) ("A summary judgment ruling is reviewed *de novo* and must be affirmed if the record, viewed in the light most favorable to the nonmoving party, reveals no trialworthy issue of material fact and the moving party is entitled to judgment as a matter of law.") (cleaned up), *cert. denied*, 524 U.S. 918 (1998).

**B.     Scienter may be resolved at the summary judgment stage.**

"[T]he presence of issues involving state of mind, intent, or motivation does not automatically preclude summary judgment." *Rua v. Glodis*, 52 Supp. 3d 84, 97 (D. Mass. 2014), *aff'd*, No. 14-2158, 2015 WL 13933038 (1st Cir. Dec. 21, 2015) (quoting *Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 928-29 (1st Cir. 1983). The potential difficulty of proving state of mind "does not mean that a party against whom summary judgment is sought is entitled to a trial simply because he has asserted a cause of action to which state of mind is a material element. There must be some indication that he can produce the requisite quantum of evidence to enable him to reach the jury with his claim." *Hahn v. Sargent*, 523 F.2d 461, 468 (1st Cir. 1975), *cert. denied*, 425 U.S. 904 (1976).

Summary judgment is appropriate where, as here, a plaintiff has failed to adduce sufficient evidence to support a finding of intent. *See*, *e.g.*, *Ing v. Tufts Univ.*, 81 F.4th 77, 82 (1st Cir. 2023), *cert. denied*, 144 S. Ct. 2530 (2024) ("[S]ummary judgment [on intent] is appropriate if the non-moving party rests merely upon conclusory allegations, improbably inferences, and unsupported speculation."); *see also U.S. ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1156 (11th Cir. 2017) (finding that the district court correctly concluded no reasonable jury could find defendant knowingly submitted a false claim where "[r]elators' 'best evidence'

of scienter consisted of two emails: one dealt with an entirely different compliance issue and the other postdated the relevant transactions by several months.")

"While appellants are entitled to all favorable reasonable inferences supported by the record, they are 'not entitled to build (their) case on the gossamer threads of whimsey, speculation and conjecture.'" *White v. Hearst Corp.*, 669 F.2d 14, 19 (1st Cir. 1982) (quoting *Manganaro v. Delaval Separator Co.*, 309 F.2d 389, 393 (1st Cir. 1962)).

### C. No genuine dispute exists that MD Labs did not knowingly submit false claims.

The trial court properly rendered summary judgment on scienter for three reasons. *First*, no genuine dispute exists that MD Labs, as the clinical lab fulfilling test orders from treating medical providers, relied on the providers' medical necessity determinations. *Second*, the record overwhelmingly shows that PCR UTI testing is medically necessary when ordered for its proper purpose—i.e., to diagnose a patient's urinary tract infection, not simply to manufacture a *qui tam* lawsuit. Because no genuine dispute exists that such PCR testing is medically necessary, Defendants could not have "known" the opposite. *Third*, the undisputed evidence is that MD Labs' staff subjectively believed PCR testing was medically necessary, again defeating the scienter element. On each of these three bases, the District Court's ruling on scienter was proper.

**1. MD Labs had no reason to override treating medical providers' certifications that the tests they ordered were medically necessary.**

First, clinical laboratories are entitled to rely on medical providers' determinations of medical necessity in the absence of a specific basis to second-guess providers' certifications regarding medical necessity. *U.S. ex rel. Allen v. Alere Home Monitoring, Inc.*, 334 F. Supp. 3d 349, 365 (D. Mass. 2018) (citing *U.S. ex rel. Groat v. Boston Heart Diagnostics Corp.*, 296 F. Supp. 3d 155, 165 (D.D.C. 2017)). In *Boston Heart*, the court held that "a laboratory cannot and is not required to determine medical necessity, but rather is permitted to rely on the ordering physician's determination that the laboratory tests billed to Medicare are medically necessary." 296 F. Supp. 3d at 159 (the voluntary "OIG Guidance[4] makes clear that 'laboratories do not and cannot treat patients or make medical necessity determinations,' but 'should be able to produce or obtain from the treating physician . . . documentation to support the medical necessity of the service the laboratory has provided.") (citing OIG Guidance at 45,079); *see also U.S. ex rel. Senters v. Quest Diagnostics, Inc.*, No. 1:10-CV-2202-AT, 2024 WL 4297469, at *5 (N.D. Ga. Aug. 23, 2024) ("[G]overning legal authority acknowledges . . . that [clinical laboratory] Quest had no obligation to make an independent determination

---

[4] Office of the Inspector General for the Department of Health and Human Services ("HHS") Compliance Program Guidance for Clinical Laboratories, 63 Fed. Reg. 45,076, 45,079 (Aug. 24, 1998) ("OIG Guidance").

of medical necessity or second guess doctors' medical determinations") (citing *Boston Heart* at 163), *appeal pending*, 24-12998 (11th Cir.). Finding that "neither the Medicare statute nor the regulation regarding laboratories require laboratories to independently determine the medical necessity of the tests billed," the *Boston Heart* court noted:

> HHS recognized the special circumstances related to laboratories because they frequently do not have direct contact with the patient, and, in the Court's view, issued the regulation regarding recordkeeping and documentation in an attempt to balance a laboratory's statutory requirement to certify medical necessity with the requirement that the ordering physician determine medical necessity.

*Boston Heart*, 296 F. Supp. 3d at 162 (quoting HHS Laboratory Final Rule at 58,801).[5]

Given these "special circumstances," Omni's argument on appeal—that Defendants knew or recklessly disregarded the fact that MD Labs' PCR UTI tests were medically unnecessary—hinges on a fundamentally incorrect assertion of how medical necessity determinations are made for laboratory testing. MD Labs

---

[5] Medicare Program; Negotiated Rulemaking: Coverage and Administrative Policies for Clinical Diagnostic Laboratory Services; Final Rule ("HHS Laboratory Final Rule"), 66 Fed. Reg. 58,788, 58,801 (Nov. 23, 2001).

performed PCR UTI testing upon receipt of a requisition form reflecting medical providers' determinations that PCR tests were medically necessary.[6]

Holding laboratories responsible for determining medical necessity would be inconsistent with well-established precedent and potentially harmful to patients. In most cases, laboratories do not have patients' complete medical records or knowledge of patients' conditions or medical histories. Nor do laboratory staff have the appropriate education, experience, or licensure to determine whether tests are appropriate for the patients for whom they are ordered. By contrast, treating providers examine patients, determine course of treatment, have access to patients' medical records and make clinical judgments based on patients' presentations, which is why the law requires treating providers—not laboratories—to determine what tests are medically necessary. Omni's claims are predicated upon the fundamental inaccuracy that MD Labs should have determined the medical necessity of the tests it performed or second-guessed treating providers' determinations.

### 2. UTI PCR testing itself is not intrinsically medically unnecessary.

Second, Defendants could not have "known" PCR testing was medically unnecessary because it is not. Omni tries to have it both ways on medical necessity.

---

[6] In the case of Omni's requisitions, however, Defendants were unaware that Deligdish had intervened to misrepresent Omni providers' determinations, and so Defendants followed the requisition orders in good faith. *See infra* Part II.

On one hand, Omni tells this Court that "[w]hether PCR UTI testing is medically necessary is not relevant to this appeal." PB8. On the other hand, in its analysis on appeal, Omni simply "assum[es] that PCR UTI testing is medically unnecessary" and relies on that premise when arguing that Defendants acted in deliberate ignorance and reckless disregard of "the fact that PCR UTI testing is medically unnecessary." PB22, 25. In doing so, Omni seeks to shed its burden of showing a genuine dispute on medical necessity, knowing it cannot satisfy that requirement.

Contrary to Omni's "assumption," the Parties' experts *agreed* that PCR UTI testing *is* medically necessary when properly ordered by a patient's treating provider. To the extent Omni claims MD Labs' PCR UTI testing violated the FCA because PCR UTI testing is *never* medically necessary, that theory of liability must fail based on its own expert's testimony. Although Deligdish's subjective, non-expert opinion is that PCR UTI testing is *never* medically necessary (PA166), his "subjective difference of opinion with other physicians as to the medical necessity of certain treatments . . . is not sufficient on its own to suggest that those judgments—or any claims based on them—are false under the FCA." *U.S. v. DaVita Inc.*, No. 818CV01250JLSDFM, 2020 WL 3064771, at *8 (C.D. Cal. Apr. 10, 2020) (internal quotations and citation omitted).

Omni's vague assertion that "the tests that MD Labs performed . . . should be at best considered investigational" (PA41) has no support. As an initial matter, Omni

fails to identify what features of MD Labs' PCR UTI test allegedly rendered it an "investigational" test such that it would fall outside the scope of Medicare coverage. While there is no governing definition of what constitutes an "experimental" test for purposes of determining Medicare coverage, the Fifth Circuit has noted, "[t]he clearest articulation of the considerations that go into determining whether a particular service is experimental is found in a letter Medicare uses to explain to its clients and providers why a service is ineligible for reimbursement." *Rush v. Parham*, 625 F.2d 1150, 1156 n.11 (5th Cir. 1980). In *Rush,* these denial letters stated:

> In making such a decision (whether to provide payment for a particular service), a basic consideration is whether the service has come to be generally accepted by the professional medical community as an effective and proven treatment for the condition for which it is being used. If it is, Medicare may make payment.

*Id.*; *see also Weaver v. Reagen*, 886 F.2d 194, 198 (8th Cir. 1989) (applying the *Rush* definition of "experimental."). PCR testing is not new, novel, relatively unknown or rarely used and is the standard test for a range of pathogens. PA159. Nonetheless, even procedures that "may be so new and, as a result, relatively unknown, that the medical community may not yet have formed an opinion as to their efficacy" are "not *per se* experimental. If 'authoritative evidence' exists that attests to a procedure's safety and effectiveness, it is not 'experimental.'" *Miller by Miller v. Whitburn*, 10 F.3d 1315, 1320 (7th Cir. 1993) (citing *Rush*, 625 F. 2d at 1156); *see*

*also Weaver*, 886 F.2d at 199 (affirming summary judgment and holding that prescribing a drug for off-label use was not experimental where plaintiff's expert was uncontroverted by defendant's expert on that issue).

When pressed at deposition to explain what medical literature supports his conclusory and inadmissible opinion that PCR UTI testing is experimental, Deligdish could cite nothing in particular. *See* PA350–51 (citing "[t]he world, medical literature, all medical literature"). This sharply contrasts with the wealth of peer-reviewed literature—including data from the time period relevant to this litigation—supporting the efficiency and accuracy of PCR UTI testing and its utility as an alternative to the traditional BUC. *See* PA239–40 (listing papers). This literature notes that BUC has several limitations, including missed microbial infections, false negatives, contamination of urine specimens, and prolonged turnaround times. PA159–60. Furthermore, MD Labs' expert opined that PCR UTI testing is not experimental and instead is "very standard across the country." PA160. Omni's expert did not touch upon, let alone refute, these conclusions. The uncontroverted record demonstrates that PCR UTI testing is safe, effective, and medically necessary when properly ordered by a treating physician.

To the extent Omni alleges that its *own* orders submitted to MD Labs for PCR UTI testing were not medically necessary, that is only so because *Deligdish* usurped the treating providers' medical necessity determinations by diverting patient BUC

specimens to manufacture this action and has no impact on whether *Defendants* believed the tests to be medically necessary. *See infra* Part II.

Furthermore, due to Omni's complete lack of analysis for the over 99.5% of MD Labs PCR UTI tests ordered by non-Omni providers, Omni cannot refute Defendants' overwhelming evidence—in the form of (1) Omni's own expert and provider testimony that PCR UTI testing is medically necessary in certain circumstances, (2) MD Labs' expert testimony, and (3) thousands of requisition forms showing that MD Labs performed PCR UTI tests in accordance with provider orders—that PCR UTI testing was reasonable and necessary for non-Omni patients.

Omni does not identify a single claim in which "doctors later discovered, or even now believe, that they were tricked or confused into ordering medically unnecessary tests or tests they did not intend to order," except of course for Deligdish's own fraudulent actions in changing the tests his providers ordered. *U.S. ex rel. Senters*, 2024 WL 4297469, at *5. In *U.S. ex rel. Senters*, the relator failed to establish a single medically unnecessary claim and instead argued that the defendant laboratory's "certification was false because [it] submitted the claims when it *did not know* one way or the other whether they were true. But in so arguing, Relator conflates the two distinct requirements of falsity and knowledge — which are separate elements." *Id.* at *6 (emphasis in original) The Court dismissed the claims, explaining, "[i]f the tests *were* medically indicated and necessary, then the billing

23

claim certification was true regardless of [its] knowledge or lack thereof regarding the tests' medical necessity." *Id.* at *7 (emphasis in original).

### 3. MD Labs subjectively believed PCR testing to be medically necessary.

Not only is there no genuine dispute on medical necessity—defeating Omni's claim—but Omni's scienter argument fails for another reason too: the only evidence in the record establishes that Defendants in fact believed the testing to be medically necessary. *See SuperValu, Inc.*, 598 U.S. at 749 ("The FCA's scienter requirement refers to respondents' knowledge and subjective beliefs—not to what an objectively reasonable person may have known or believed."); *see also U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1172 (9th Cir. 2006) ("A palpably false statement, known to be a lie when it is made, is required for a party to be found liable under the False Claims Act.").

Interpreting the FCA's scienter element begins with the text. *SuperValu Inc.*, 598 U.S. at 749. It forbids one from "*knowingly* present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A) (emphasis added). Knowledge can be (1) "actual knowledge of the information," (2) "act[ing] in deliberate ignorance of the truth or falsity of the information"; or (3) "act[ing] in reckless disregard of the truth or falsity of the information." *Id.*, at 749–50. The third prong, similar to the second, requires a *conscious* disregard. *Id.* at 751. Moreover, critically, "the focus is not, as respondents

24

would have it, on post hoc interpretations that might have rendered their claims accurate. It is instead on what the defendant knew when presenting the claim." *Id.* at 752.

Omni attempts to claim on appeal that Defendants recognized and ignored a substantial risk based on a few words pulled from a single email exchange. PB22–23. Yet, as the District Court properly held, nowhere in that exchange was anyone "advised that they were conducting medically unnecessary tests." PA828. Nor did the exchange identify any problem with PCR UTI testing at all, let alone one so severe as to be a "substantial risk that the tests were medically unnecessary when a doctor orders them." *Id.*

The plethora of evidence in the record demonstrates that Defendants believed that PCR UTI was appropriate and medically necessary. Here, Defendants relied on the expertise of Dr. Steven Parker, an infectious disease specialist serving as MD Labs' clinical director, when they decided to add PCR UTI testing to MD Labs' offerings. *See* PA160 ("Based on MD Labs' medical director's clinical expertise, Defendants believed PCR UTI testing could assist providers treating patients better than BUCs, as PCR testing could be completed more quickly and was more sensitive in identifying bacteria than BUC."). Indeed, several other clinical laboratories were already offering PCR UTI testing when MD Labs began to offer the testing, and contemporaneous research indicated PCR UTI superiority over BUCs. PA160.

The only direct evidence before the District Court on Defendants' state of mind at the time they began offering PCR UTI testing establishes their actual subjective belief that the testing was appropriate to offer for medical providers to choose when they determined it was medically necessary for a particular patient, and in fact superior to the traditional BUC. *See* PA824 (citing ECF No. 254-3 ¶ 6, *and* ECF No. 254-7 at 10, 14–15). The District Court was correct to rely on this evidence to determine Defendant's actual subjective belief.

In response, Omni tries to wave away all this evidence by now arguing Defendants' belief in the superiority of PCR testing could have meant merely that they thought it was "easier to administer," or "more readily attainable," or "more comfortable for the patient," none of which bear on medical necessity. PB27–28. That claim fails because it misrepresents the evidence. The testimony about why Defendants believed PCR tests were better was quite clear—because "PCR testing [1] could be completed more quickly and [2] was more sensitive in identifying bacteria than BUC." PA160. No one at MD Labs ever mentioned, anywhere in the record, the ease, supply, or comfort factors that Omni now *speculates* may have been at play. Omni's imagination is not evidence.

Omni then quickly pivots to picking out two citations from the District Court's opinion to criticize. PB28–29. As to the first citation, Omni argues it was improper to rely on a paragraph in the declaration of Rutledge, co-founder and President of

MD Labs, where he attested that "MD Labs was aware that several labs already offered PCR UTI testing when MD Labs began offering the testing, and that contemporaneous research indicated the superiority of PCR UTI testing over bacterial urine culture." PB28 (quoting PA223). Omni takes issue with this citation on the grounds that (A) other labs doing PCR tests does not prove medical necessity; and (B) Rutledge should have specified which research he meant. PA28.

But Omni has shifted the goal posts. The District Court relied on other labs performing the same PCR tests not for what it said about *objective medical necessity*, but for what it said about whether Defendants *subjectively must have known* such tests to be inherently medically unnecessary. PA824–25. Other labs doing the same thing plainly speaks to whether Defendants would have *thought* it improper, which is the only purpose for which the District Court used that evidence. *See id.* Similarly, Omni's demand for more research specificity misses the mark. *See* PB28. To start, the record supplies studies dating back to at least 2010, well before MD Labs began PCR UTI testing in 2017, that informed Defendants' belief in its benefits. *See*, *e.g.*, PA234 (citing Lehmann et al., 2010, on improved speed of PCR testing), PA236 (citing Spoorenberg et al., 2014, on antibiotic stewardship), PA237 (citing Lindback et al., 2017, on need for improved diagnostic tests to avoid fostering growth of multi-drug-resistant bacteria), PA240 (citing McDonald et al., 2017 on benefits of DNA sequencing over standard urine culture test). And again, Omni confuses the standard.

The key question is whether Defendants must have "known" something that was false—that PCR UTI testing cannot be medically necessary. Studies before, during, and after MD Labs began offering such testing confirm that the opposite is true. *See* PA239–40.

As to the second citation Omni criticizes, it comprises testimony by a former MD Labs employee that "PCR UTI testing can deliver results faster than bacterial urine culture testing." PB29. Omni contends that speed "in and of itself, does not render a testing method *medically necessary*." *Id.* (emphasis added). That argument fails for two reasons. First, Omni has shifted the goal posts again. The District Court relied on this not as establishing objective "medical necessity," but rather as evidence of Defendants' *subjective belief*. PA824–25. Evidence that MD Labs employees believed in the superior speed of PCR testing plainly bears on Defendants' subjective belief that medical providers ordering it may indeed need that quick turnaround for cases where every hour matters for treatment. *See* PA279–80. Second, Omni's suggestion that speed of diagnosis is categorically irrelevant to medical necessity cites nothing in support and runs headlong into the ample evidence to the contrary. *Compare* PB29, *with* PA157–59, PA233–34.

In short, neither Omni's speculation nor its baseless quibbles with two record citations in the District Court's decision created a genuine issue of material fact precluding summary judgment. The evidence confirmed, overwhelmingly, that

Defendants subjectively believed in the benefits of PCR UTI testing and believed that those benefits were why medical providers kept ordering it from MD Labs.

**D.    Omni's arguments to the contrary lack merit.**

In addition to nitpicking the District Court's citations to Defendants' evidence, on appeal, Omni also offers a highlights reel of its own failed summary judgment evidence. This recitation merely confirms the wisdom of the District Court's decision.

**1.    Neither the lack of optional LCD / NCD guidance, nor the post-dated AUA guidelines, show Defendants "knew" PCR testing to be medically unnecessary.**

The District Court correctly found that the lack of a national coverage determination ("NCD") or local coverage determination ("LCD") does not support scienter under the FCA. "The Secretary of health and Human Services decides 'whether a particular service is 'reasonable and necessary' . . . by promulgating a generally applicable rule *or by allowing individual adjudication*.'" *U.S. ex rel Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 735 (10th Cir. 2018) quoting *Heckler v. Ringer*, 466 U.S. 602, 617 (1984)) (alteration in original) (emphasis added). "In the absence of [an NCD], local Medicare contractors *may* issue [an LCD] that announces 'whether or not a particular item or service is covered' by that contractor." *Id.* (citing 42 U.S.C. § 1395ff(f)(2)(B)) (emphasis added). Medicare contractors are nonetheless permitted to make individual determinations as to whether a service is

reasonable and necessary when adjudicating a claim "based on the individual's particular factual situation." *Id.* (citing 78 Fed. Reg. 63,692, 63,693 (Nov. 7, 2003)). For this reason, the Health Insurance Claim Form, which requires a provider to certify "that the services shown on this form were medically indicated and necessary for the health of the patient," does not reference NCDs or LCDs. Centers for Medicare & Medicaid Services, Health Insurance Claim Form, available at https://www.cms.gov/medicare/cms-forms/cms-forms/cms-forms-items/cms1188854 (last visited June 12, 2025). In other words, while NCDs and LCDs may limit what services may be payable under Medicare, they are not prerequisites for approval of a particular service. The absence of an issued guidance concerning a particular service does not render a claim for payment for that service false, but rather the statute dictates that claims are determined on an individual basis for medical necessity, and, as such, the lack of an LCD or NCD cannot be used to support a finding of scienter.

Omni has not presented either the District Court or this Court with any case law supporting a finding of scienter—or even allowing the question to go to a jury—based on the absence of a national coverage determination or local coverage determination. Indeed, as the District Court noted, Omni's argument must fail because Omni "concedes that 'an NCD or LCD may not be specifically required in all cases for a particular service' to be deemed medically necessary." PA825 (citing

ECF No. 269 at 7). As such, the District Court correctly concluded that "[k]nowledge of the absence of an applicable NCD or LCD would not have made Defendants aware of a substantial risk that the PCR UTI tests were medically unnecessary." PA826. The District Court correctly found that Omni's reliance on a set of guidelines from the American Urological Association ("AUA"), initially published in 2019, was "similarly unconvincing" because Omni "has not shown that their original publication in 2019 pre-dated submission of any claim for payments." *Id.* In any event, Omni ignores the fact that medical society guidelines are not legally binding, and that its own expert testified that there are many reasons why PCR UTI testing may be medically necessary.

### 2. The purported "smoking gun" email on which Omni seizes is anything but.

Omni's argument based on two emails between MD Labs' co-owners Grizelj and Rutledge considering whether to reach out to Noridian for "guidance on medical necessity" fares no better. *See* PA659–60. It simply does not follow from a suggestion to seek formal guidance and ensure Noridian was "aware of this testing" as they scaled it up that Grizelj or Rutledge believed MD Labs' PCR UTI testing was medically unnecessary and that MD Labs was thus submitting false claims every time it requested payment for a PCR UTI test. *See id.* Similarly, the suggestion that they might ensure Noridian was "aware of this testing" does not indicate that Defendants believed that PCR UTI testing was medically unnecessary. *See id.* Omni

baselessly suggests that this email reflects nefarious intent based on misleading excerpts when, in fact, the full email exchange reflects a conversation regarding pricing and additional guidance for a test that Rutledge and Grizelj believed to be appropriate and were working with Noridian *to expand*. *See id.* The only logical conclusion that can be drawn from the suggestion to give Noridian a "heads-up on our new molecular testing" is that Rutledge believed it to be medically necessary and thus an appropriately reimbursable test. *See id.* The District Court also appropriately dismissed the interpretation advanced by Omni, noting that Omni "does not, however, offer evidence indicating that Defendants were ever advised that they were conducting medically unnecessary tests or aware of a substantial risk that the tests were medically unnecessary when a doctor orders them…." PA828.

### 3. The number of pathogens for which MD Labs tested was appropriate.

Omni cannot salvage its claims by pointing to the number of pathogens for which MD Labs tested simply assuming that number was too large. Omni declined below to offer even a scintilla of evidence establishing the purported appropriate number of UTI pathogens for which to test. On appeal, Omni continues to fail to give the Court any yardstick by which to measure if 17 or 19 pathogens is too many.

Ironically, while Omni claims MD Labs' PCR test was overbroad (PB26), Deligdish criticized another laboratory for running too *few* targets in its PCR UTI test, suggesting that a narrower panel "had a much greater likelihood of missing a

diagnosis." PA166. Deligdish acknowledged this contradiction at his deposition, claiming that he believed the other lab "tests for too many, too, and at the same time, not enough" pathogens. *Id.*

The District Court properly held that Defendants had put forth uncontroverted evidence both that MD Labs' test for 17 or 19 pathogens was within the range of pathogens endorsed by peer-reviewed literature and that the specific pathogens for which MD Labs tested were appropriate. *See* PA828. Omni failed to "respond with any evidence indicating that the makeup of the panels was unnecessarily broad." *Id.* Deligdish's convoluted lay opinion cannot fill that gap.

Omni offers the illogical contention that MD Labs' PCR UTI testing was inherently overbroad because providers could not always customize the list of pathogens to be tested. Omni conveniently overlooks that Defendants consulted Dr. Parker, an infectious disease physician, as well as providers not affiliated with the laboratory to develop the appropriate tests that would provide clinical data for ordering providers. *See* PA160; PA176; PA275; PA813. In addition, the cases Omni cites do not involve infectious disease testing. *See* PB25–26. Omni improperly relies on *U.S. ex rel. Allen v Alere Home Monitoring, Inc.*, 334 F.Supp.3d 349 (D. Mass 2018) to support its broad interpretation that the 17 to 19 pathogens MD Labs offered was not medically necessary. In *Allen*, the relator alleged violations of the FCA because it was alleged the lab required multiple tests a month as a precondition to

33

providing test kits. However, even there, the court was not convinced the requisitions

forms that required a higher frequency of testing gave rise to an adequate inference

that false claims were submitted without more. Similarly, Omni again tries to stretch

the fact that Defendants' requisition forms did not allow for individual selection of

pathogens, which Omni calls "forc[ing] physicians to request … panels" (PB25), as

indicative of scienter for false claims when Omni submitted evidence only of the

Deligdish-tainted tests (and provided only a counsel-selected subset of those tests to

its expert), all of which does not give rise to the inference that Defendants knowingly

submitted false claims. *See* PA827.

Liability here does not attach unless the "certifying entity is aware that one or

more of the tests are medically unnecessary, or medically disregards such a risk."

*U.S. ex rel. Allen v. Alere Home Monitoring, Inc.*, 334 F. Supp. 3d 349, 364 (D.

Mass. 2018) (design of order form heightened risk of medically unnecessary testing

when it removed ability of providers to specify testing *frequency* (not panel size)).

Here, the only evidence of Defendants' state of mind at the time they offered PCR

UTI testing establishes that they believed the specific panel of pathogens they

offered, and which was ordered by the patients' treating providers, was medically

necessary. *See* PA160. This is a far cry from the requisition forms dictating

frequency in *Allen*, which is a choice routinely made by ordering providers, in

contrast to here when the requisition provided a reasonably informed set of

pathogens that was "within the range of pathogens endorsed by peer-reviewed literature, and the specific pathogens for which MD Labs tested were appropriate." PA160.

Omni fails to identify a single claim in which, due to the panel size, medical providers came to realize that they were forced to order medically unnecessary tests. *See U.S. ex rel. Senters*, 2024 WL 4297469, at *5. The number of pathogens for which MD Labs tested cannot save Omni's defunct lawsuit.[7]

## II.     No genuine dispute exists that Deligdish's fraudulent intervention severed the causal chain for purposes of the False Claims Act.

### A.     Standard of Review

**De Novo.** *See U.S. v. Regeneron Pharmaceuticals, Inc.*, 128 F.4th 324, 328 (1st Cir. 2025).

### B.     Deligdish falsifying test requests was a superseding cause.

The judgment below must be affirmed for a second reason too—Deligdish's fraud was a superseding cause that sundered the causal chain. Omni thus cannot establish that Defendants caused medically unnecessary claims to be submitted. While the District Court's grant of summary judgment on scienter meant it had no need to reach this second element, this Court may affirm on any basis supported by

---

[7] The parties agree that Omni's tagalong state-law analogue claims live or die with its federal False Claims Act claim. *See* PB29–30.

the record, even if not ruled on below. *See Salmon v. Lang*, 57 F.4th 296, 308 (1st Cir. 2022); *U.S. v. Castillo-Martinez*, 16 F.4th 906, 915 (1st Cir. 2021).

Here, the undisputed facts demonstrate that Omni's own actions—falsely representing that its providers had determined the UTI PCR tests ordered were medically necessary when they had not—were a superseding cause that irreparably broke the causal chain. Omni's failure to create any triable issue on this second element provides another, independent ground to affirm because all four False Claims Act elements must be satisfied, including causation. *See* 31 U.S.C. § 3729(a)(1)(A); *U.S. ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 382 (1st Cir. 2011).

Critically, the causation element is not satisfied as to a defendant where the unforeseeable act of a third party breaks the causal chain. *See U.S. v. King-Vassel*, 728 F.3d 707, 714 (7th Cir. 2013) (holding that "an action that breaks the chain of causation would relieve a defendant of liability" and that unforeseeable superseding causes break the chain of causation); *U.S. ex rel. Franklin v. Parke-Davis, Div. of Warner- Lambert Co.*, 147 F. Supp. 2d 39, 52 (D. Mass. 2001) (recognizing that unforeseeable superseding forces break the chain of causation under the False Claims Act); *U.S. ex rel. Cantekin v. Univ. of Pittsburgh*, 192 F.3d 402, 416 (3d Cir.

1999) (applying superseding cause analysis to claim under False Claims Act).[8] An intervening cause is "[a]n event that comes between the initial event in a sequence and the end result, thereby altering the natural course of events that might have connected a wrongful act to an injury." Black's Law Dictionary (12th ed. 2024). *See also Casale v. Ecolab Inc.*, No. 2:21-CV-00126-NT, 2022 WL 1910126, at *3 (D. Me. June 3, 2022) (same). "If the intervening cause is strong enough to relieve the [defendant] of any liability, it becomes a superseding cause." Black's Law Dictionary (12th ed. 2024); *see also Russo v. Baxter Healthcare Corp.*, 140 F.3d 6, 11 (1st Cir. 1998) (affirming judgment as a matter of law based on third party misconduct rising to the level of superseding cause).

Here, the undisputed facts show that intentional, illegal action by Omni's principal, Deligdish, broke the chain of causation and caused the submission of false claims. After MD Labs began offering PCR UTI testing services to Omni, Deligdish intervened by instructing Omni staff to convert orders for BUCs to orders for PCR UTI tests from MD Labs. Deligdish testified that, in many instances where an Omni provider ordered a BUC, he fraudulently diverted the patient specimens and sent them to MD Labs for PCR UTI testing to manufacture a basis for this lawsuit.

---

[8] This Court has acknowledged the case law holding that unforeseeable third-party actions break the chain of causation. *See U.S. ex rel. Rost v. Pfizer, Inc.*, 507 F.3d 720, 732 n.9 (1st Cir. 2007), *overruled on other grounds by Allison Engine v. U.S. ex rel. Sanders*, 553 U.S. 662 (2008).

PA164. This intervention caused Omni to submit nearly 600 PCR UTI test requisitions to MD Labs, despite Deligdish's claimed belief that *all* PCR UTI testing was medically unnecessary, and notwithstanding the determination by patients' providers that a BUC test was medically necessary. *Id*.[9]

This intentional misconduct by Deligdish was not foreseeable within the meaning of the False Claims Act's causation requirement, and especially given the laboratory's unique role in patient care. Deligdish's fraud intervened as an unforeseeable, intentional act that broke the chain of causation here.

In short, Omni has adduced no evidence that *Defendants* caused any provider to order medically unnecessary PCR UTI tests, only that *Deligdish* did. PA165. Omni's expert reviewed only Omni's Deligdish-tainted test orders. *Id.* He did not review orders that MD Labs fulfilled from other medical providers, comprising 99.5% of the total quantity of tests MD Labs performed. *Id*. Nor did Omni's expert opine that he could extrapolate his findings about the tests Omni ordered to tests performed by other practices. Indeed, such extrapolation is logically impossible. There was no evidence that the principal of any other practice similarly intervened to alter the tests its providers ordered. No reasonable jury could find, on this record,

---

[9] In furtherance of his scheme, Deligdish also submitted duplicate patient samples to up to ten other medical laboratories to support additional potential *qui tam* actions, knowing that federal health care programs would be billed for these duplicate, medically unnecessary tests. PA165.

that Defendants' actions or omissions were the but-for cause of medically unnecessary testing claims. *See U.S. v. Regeneron Pharmaceuticals, Inc.*, 128 F. 4th 324 (1st Cir. 2025) (establishing but-for causation test). Accordingly, summary judgment must be affirmed also on the independent ground that Omni cannot satisfy the causation element of the False Claims Act.

## CONCLUSION

WHEREFORE, Defendants-Appellees MD Labs, Mr. Grizelj, and Mr. Rutledge pray the Court affirms the judgment in full.

Dated: June 12, 2025

Respectfully submitted,

DEFENDANTS-APPELLEES MD SPINE
SOLUTIONS LLC, D/B/A MD LABS
INC., DENIS GRIZELJ, and
MATTHEW RUTLEDGE,

By their attorneys,

*/s/ Seth B. Orkand*
Seth B. Orkand
Julianna M. Charpentier
ROBINSON & COLE LLP
One Boston Place, 25th Floor
Boston, Massachusetts 02108
Tel: (617) 557-5915
Fax: (617) 557-5999
sorkand@rc.com
jcharpentier@rc.com

Edward J. Heath
Scott T. Garosshen
ROBINSON & COLE LLP
One State Street
Hartford, Connecticut 16103
Tel: (860) 275-8317
Fax: (860) 275-8299
eheath@rc.com
sgarosshen@rc.com

Danielle H. Tangorre
ROBINSON & COLE LLP
Chrysler East Building
666 Third Avenue, 20th Fl.
New York, NY 10017
Tel: (212) 451-2900
Fax: (212) 451-2999
dtangorre@rc.com

# RULE 32(A)(7) CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because: (1) this brief contains 9,100 of 13,000 words excluding the parts of the brief exempted by Fed. R. App. 32(f); and (2) this brief complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14 point proportionally spaced using Times New Roman font.

*/s/ Seth B. Orkand*
Seth B. Orkand

**CERTIFICATE OF SERVICE**

On June 12, 2025, a copy of the foregoing brief was electronically filed with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the Court's appellate CM/ECF system, and service will be accomplished by the appellate CM/ECF system.

*/s/ Seth B. Orkand*
Seth B. Orkand
