# UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

UNITED STATES, ex rel. OMNI HEALTHCARE INC.,

*Plaintiff-Appellant*,

STATE OF ALASKA, ex rel. Omni Healthcare, Inc.; STATE OF CALIFORNIA, ex rel. Omni Healthcare, Inc.; STATE OF COLORADO, ex rel. Omni Healthcare, Inc.; STATE OF CONNECTICUT, ex rel. Omni Healthcare, Inc.; STATE OF DELAWARE, ex rel. Omni Healthcare, Inc.; DISTRICT OF COLUMBIA, ex rel. Omni Healthcare, Inc.; STATE OF FLORIDA, ex rel. Omni Healthcare, Inc.; STATE OF GEORGIA, ex rel. Omni Healthcare, Inc.; STATE OF HAWAII, ex rel. Omni Healthcare, Inc.; STATE OF ILLINOIS, ex rel. Omni Healthcare, Inc.; STATE OF INDIANA, ex rel. Omni Healthcare, Inc.; STATE OF IOWA, ex rel. Omni Healthcare, Inc.; STATE OF LOUISIANA, ex rel. Omni Healthcare, Inc.; STATE OF MARYLAND, ex rel. Omni Healthcare, Inc.; STATE OF MASSACHUSETTS, ex rel. Omni Healthcare, Inc.; STATE OF MICHIGAN, ex rel. Omni Healthcare, Inc.; STATE OF MINNESOTA, ex rel. Omni Healthcare, Inc.; STATE OF MONTANA, ex rel. Omni Healthcare, Inc.; STATE OF NEVADA, ex rel. Omni Healthcare, Inc.; STATE OF NEW JERSEY, ex rel. Omni Healthcare, Inc.; STATE OF NEW MEXICO, ex rel. Omni Healthcare, Inc.; STATE OF NEW YORK, ex rel. Omni Healthcare, Inc.; STATE OF NORTH CAROLINA, ex rel. Omni Healthcare, Inc.; STATE OF OKLAHOMA, ex rel. Omni Healthcare, Inc.; STATE OF RHODE ISLAND, ex rel. Omni Healthcare, Inc.; STATE OF TENNESSEE, ex rel. Omni Healthcare, Inc.; STATE OF TEXAS, ex rel. Omni Healthcare, Inc.; STATE OF VERMONT, ex rel. Omni Healthcare, Inc.; STATE OF VIRGINIA, ex rel. Omni Healthcare, Inc.; STATE OF WASHINGTON, ex rel. Omni Healthcare, Inc.,

*Plaintiffs*,

v.

MD SPINE SOLUTIONS LLC, d/b/a MD Labs Inc.; DENIS GRIZELJ; MATTHEW RUTLEDGE; DOE HEALTHCARE PROVIDERS 1 – 100,

*Defendants-Appellees*.

On Appeal from the U.S. District Court for the District of Massachusetts
Hon. Patti B. Saris, Case No. 1:18-cv-12558-PBS

## REPLY BRIEF OF PLAINTIFF-APPELLANT OMNI HEALTHCARE INC.

Evan Bianchi
Thomas M. Kenny
Spiro Harrison & Nelson LLC
40 Exchange Place, Ste. 1100
New York, New York 10005
(646) 880-8850

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. ii

INTRODUCTION ............................................................................................... 1

ARGUMENT ...................................................................................................... 2

I.    THE EVIDENCE DEMONSTRATES THAT DEFENDANTS ACTED
      WITH THE REQUISITE SCIENTER .......................................................... 2

      A.    The only evidence of Defendants' subjective beliefs establishes that
            Defendants acted knowingly ............................................................. 3

      B.    Defendants misunderstand the relevance and import of OMNI's
            additional evidence. ....................................................................... 10

      C.    At minimum, Defendants' scienter is a triable issue. ......................... 13

II.   DEFENDANTS' CAUSATION ARGUMENT IS MERITLESS ............... 14

CONCLUSION ................................................................................................. 16

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

<h1 style="text-align:center">TABLE OF AUTHORITIES</h1>

**Cases**                                       **Page(s)**

*Reeves v. Sanderson Plumbing Prods., Inc.,*
530 U.S. 133 (2000) ...................................................................................14

*Sec. & Exch. Com'sn v. Commonwealth Equity Servs., LLC,*
133 F.4th 152 (1st Cir. 2025) ..............................................................10, 14

*Sec. & Exch. Comm'n v. Ficken,*
546 F.3d 45 (1st Cir. 2008) ........................................................................13

*Sec. & Exch. Comm'n v. Lemelson,*
532 F. Supp. 3d 30 (D. Mass. 2021) ...........................................................13

*United States ex rel. Allen v. Alere Home Monitoring, Inc.,*
334 F. Supp. 3d 349 (D. Mass. 2018) ...............................................7, 12, 13

*United States ex rel. Franklin v. Parke-Davis, Div. of Warner-Lambert Co.,*
147 F. Supp. 2d 39 (D. Mass. 2001) ...........................................................16

*United States ex rel. Groat v. Bos. Heart Diagnostics Corp.,*
296 F. Supp. 3d 155 (D.D.C. 2017)...............................................................7

*United States ex rel. Schutte v. SuperValu Inc.,*
598 U.S. 739 (2023) .................................................................................3, 8

*United States v. Bertram,*
900 F.3d 743 (6th Cir. 2018) ........................................................................7

*United States v. Coloplast Corp.,*
327 F. Supp. 3d 300 (D. Mass. 2018)..........................................................14

*United States v. Regeneron Pharms., Inc.,*
128 F.4th 324 (1st Cir. 2025) ......................................................................15

**Statutes & Rules**

31 U.S.C. § 3730 ..............................................................................................16

42 U.S.C. § 1320a-7b(g) ..................................................................................16

Federal Rule of Civil Procedure 56(a) .............................................................13

**Other Authorities**

*Medicare Program Integrity Manual* (2015) .......................................................4

S. Rep. No. 345, 99th Cong., 2d Sess. (July 28, 1986) ........................................16

# INTRODUCTION

The issue in this appeal is narrow and straightforward: Does the record conclusively support a determination that Defendants knew that PCR UTI testing was medically necessary between 2018 and early 2019? The answer to that question is no. Because Defendants' answering brief does nothing to change that conclusion, this Court should reverse the District Court's scienter holding, vacate its judgment, and remand.[1]

The parties do not dispute that Defendants' subjective beliefs control the scienter inquiry. And, contrary to Defendants' assertions, only one piece of evidence reveals Defendants' subjective beliefs regarding the dispositive question. An internal email chain from January 2018 shows that Defendants acknowledged the need to seek guidance on medical necessity from the relevant Medicare contractor but, tellingly, never took such action. This correspondence independently confirms that Defendants acted in deliberate ignorance or reckless disregard of the fact that PCR UTI testing was medically unnecessary. When it is combined with the multitude of evidence demonstrating that Defendants lacked a basis to believe PCR UTI testing was medically necessary, the conclusion is even clearer.

---

[1] Throughout this brief, OMNI's opening brief is referred to as "Op. Br." and Defendants' answering brief is referred to as "Ans. Br."

1

Defendants bury their response to the January 2018 email chain more than thirty pages into their brief, opting instead to focus on evidence unrelated to the question of medical necessity (*e.g.*, whether PCR UTI testing generated faster results than traditional testing methods, or was offered by other laboratories). But even if Defendants' evidence actually addressed the scienter inquiry, it would not obviate the fact that OMNI's evidence—at the very least—creates a genuine dispute of material fact that must be resolved by a jury.

Perhaps recognizing the feebleness of their position, Defendants take another tack and argue that the actions of Dr. Deligdish, OMNI's owner, severed the causal chain, defeating causation and relieving Defendants of any FCA liability. This argument should be rejected out of hand as a transparent and baseless attempt to prejudice Dr. Deligdish in the eyes of this Court. Dr. Deligdish had no involvement in events occurring after Defendants sought reimbursement from Medicare for PCR UTI testing, meaning that his conduct cannot be viewed as a superseding cause. Like the rest of its arguments, Defendants' causation argument also fails.

**ARGUMENT**

I.     **THE EVIDENCE DEMONSTRATES THAT DEFENDANTS ACTED WITH THE REQUISITE SCIENTER**

Defendants do not dispute that scienter turns on their "knowledge and subjective beliefs—not [on] what an objectively reasonable person may have known or believed." Ans. Br. at 24 (citing *United States ex rel. Schutte v. SuperValu Inc.*,

598 U.S. 739, 749 (2023)). Here, there is only one piece of evidence that sheds light on Defendants' subjective belief regarding whether PCR UTI testing was medically necessary: the January 2018 email chain between MD Labs' co-founders, Rutledge and Grizelj. That email chain establishes Defendants' scienter in and of itself. But even if it didn't, there can be no dispute that—at the very least—it raises a genuine dispute as to Defendants' scienter that must be resolved by a jury.[2]

### A. The only evidence of Defendants' subjective beliefs establishes that Defendants acted knowingly.

Defendants assert that a "plethora of evidence in the record demonstrates that Defendants believed that PCR UTI was appropriate and medically necessary." Ans. Br. at 25. But Defendants are unable to cite any such evidence, because there is none. Instead, Defendants emphasize that they believed that PCR UTI testing was faster than and "superior" to bacterial urine culture testing. *Id.* at 25–28. Those beliefs do not bear on the question of medical necessity, which turns on whether a service is

---

[2] Defendants spend a great deal of effort arguing that PCR UTI testing is medically necessary. *See, e.g.*, Ans. Br. at 19–24. While that issue was vigorously contested below, the District Court expressly declined to reach it. *See* Add.14 (holding that it "need not address" the argument that "the claims for PCR UTI testing were not false because the tests were not medically unnecessary"). In any event, Defendants' repeated claim that OMNI's expert "agreed that PCR UTI testing is reasonable and necessary in certain cases," Ans. Br. at 7, is misleading, as there is no indication that OMNI's expert—who only used PCR UTI testing once in seventeen years of practice, A.618—believed that PCR UTI testing was medically necessary during the relevant time period. In fact, Defendants' expert testified that he did not start using PCR UTI testing until June 2020. *See* A.520–21.

safe and effective, not experimental or investigational, and appropriate (*i.e.,* furnished in accordance with accepted standards of medical practice, not exceeding a patient's medical need, etc.). *See* Op. Br. at 6 (citing CMS, *Medicare Program Integrity Manual* § 13.5.1 (2015)).[3]

In contrast to the evidence Defendants cites, OMNI has identified evidence demonstrating Defendants' subjective belief regarding the *actual* dispositive issue: medical necessity. The January 2018 email chain between Rutledge and Grizelj shows that Defendants *knew* that PCR UTI testing needed to be medically necessary, *recognized* the need for guidance on whether PCR UTI testing was medically necessary, and *considered* (but apparently did not follow through with) requesting such guidance from Noridian, the Medicare contractor overseeing MD Labs' jurisdiction. *See* A.659–60.

To distract from the obvious impact of these emails, Defendants accuse OMNI of "omitting most of the emails' actual text" and relying on "misleading excerpts." Ans. Br. at 2, 32.[4] Not so. As OMNI explained in its opening brief, *see, e.g.*, Op. Br.

---

[3] Defendants assert that PCR—not PCR UTI—testing is "not new, novel, relatively unknown or rarely used." Ans. Br. at 21. But Defendants themselves repeatedly characterized PCR *UTI* testing as "new technology" in internal correspondence (discussed in detail below) during the relevant time period. *See, e.g.*, A.659–60.

[4] Defendants appear to be projecting. While OMNI provided significant detail about the email chain in its opening brief, *see, e.g.*, Op. Br. at 11, 22–23, *Defendants* make sweeping statements about the emails quoting barely any of its language, *see, e.g.*, Ans. Br. at 31–32.

at 11, 22–23, the email chain contains two emails, one from Rutledge to Grizelj on January 2, 2018, and Grizelj's response to Rutledge later that day.

Rutledge's initial email asked Grizelj for his thoughts on a draft email to Noridian:

> Hey Dude,
>
> What do you think about this letter to Dr Lurvey at Noridian to give them a heads-up on *our new molecular diagnostic testing*? I think it would be a prudent move to at least document that we told CMS of this *new technology* and advised them to modify their billing and coding. I think it's our duty, in a way.
>
> Lemme know what you think of this first draft…

A.659 (emphasis added). The embedded draft email stated, in relevant part:

> I'm writing to let you and Noridian know of some *new clinical laboratory testing* we are now offering *which is becoming very popular* in the area of urinary tract infections (UTl's).
>
> Genetic analytical technology *is now allowing us* to pinpoint DNA signatures from various infectious pathogens in order to positively identify them with almost 99% certainty very quickly and relatively affordably. We couple this with antibiotic susceptibility testing here at the lab and the result is a report provided to physicians that positively identifies the infecting agent and what antimicrobials will be most effective at killing it and treating the infection.
>
> We are finding physicians are excited about this test and starting to order it in greater numbers. Thus, you will be seeing an increasing number of claims submitted by our laboratory and labs around the country for this testing in 2018 and beyond.
>
> But... the current CPT coding system doesn't adequately describe this testing very well and the fee schedule payment is quite robust for the

> work being performed. *New technology* is able to do this work much more affordably than it could in the past.
>
> I'd recommend we have a discussion on how to best change the current payment system to best accommodate this *new testing technology* so that CMS can develop a fair compensation system and simplified coding system that makes billing easy and avoids future overpayments to labs.
>
> I'd strongly advise having this discussion sooner, rather than later. Let me know when you are available.

A.659–60 (emphasis added). In response, Grizelj wrote:

> I think we should wait on this and *instead of asking them to modify their rates, we should ask them to give us guidance on medical necessity instead*. I don't think we are going to a significant amount of testing that would reach Millennium-like levels so we still may end up being a blip. I am not sure how many Pathnostics is currently doing but I am hoping that they are at least aware of this testing currently.
>
> The other reasons I want to wait are 1) I want some time to leverage this on some of the commercials carriers we are not in network in yet to hopefully backdoor a tox contract and 2) I would like for them to re-visit looking at Rxight and adopting a similar model that Pathway Genomics (or whoever it was) has in their Medicare jurisdiction.
>
> I get what you are trying to do but I would like to wait at least 6 months if that's cool with you. We haven't even made a dent yet.

A.659 (emphasis added).

This evidence closes the door on any claim that Defendants' lacked scienter. Grizelj's warning that Defendants "should ask [Noridian] to give us guidance on medical necessity" can only be read one way: Grizelj recognized the need for guidance from the relevant Medicare contractor because he was unsure of whether

PCR UTI testing was medically necessary. Yet, despite recognizing that need, Defendants apparently did nothing. Defendants cite no evidence showing that they sought such guidance, nor that they independently received such guidance, nor that Rutledge even responded to Grizelj or suggested that guidance was unnecessary.

Grizelj's admission that Defendants needed guidance on medical necessity is underscored by Rutledge's email. Rutledge consistently characterized PCR UTI testing as "new" technology. It would make sense that a laboratory would feel the need to ensure that new testing services it was offering were medically necessary before seeking reimbursement for such testing. Indeed, while Defendants spill much ink on the irrelevant point that laboratories do not treat patients and so cannot make patient-specific determinations, *see* Ans. Br. at 17–19, they do not contest that "[a] laboratory violates the FCA . . . if it knows that it is submitting claims for medically unnecessary tests." Op. at 13 (citing *United States v. Bertram*, 900 F.3d 743, 750 (6th Cir. 2018); *United States ex rel. Allen v. Alere Home Monitoring, Inc.*, 334 F. Supp. 3d 349, 357, 365 (D. Mass. 2018); and *United States ex rel. Groat v. Bos. Heart Diagnostics Corp.*, 296 F. Supp. 3d 155, 165 (D.D.C. 2017)); *see also* Op. Br. at 23.

The natural conclusion that follows from the January 2018 email chain is that Defendants acted with the requisite scienter. While Defendants intimate that OMNI should be able to (but cannot) demonstrate a triable issue regarding whether

Defendants "received notice of the falsity of a claim, then tried to hide the truth while internally admitting the lie," Ans. Br. at 1 (internal quotation marks omitted), they concede that actual knowledge is not the only way to satisfy the scienter requirement, *id.* at 24 (recognizing that "knowledge" can be shown by deliberate ignorance or reckless disregard).

Here, the evidence shows that Defendants acknowledged the significant risk that PCR UTI testing was medically unnecessary, but intentionally took no steps to determine if that was so—despite knowing exactly which steps to take (*i.e.*, asking Noridian for guidance).[5] At worst, this conduct constitutes deliberate ignorance. *See Schutte*, 598 U.S. at 750–51 ("deliberate ignorance" encompasses "intentionally avoid[ing] steps to confirm" a substantial risk of falsity or "purposely abstain[ing] from inquiring into" facts). At best, this conduct constitutes reckless disregard. *See id.* at 751 ("reckless disregard" encompasses submitting claims while being "conscious of a substantial and unjustifiable risk that th[ose] claims are false").

---

[5] The failure to take any action after identifying the risk is what makes Defendants' conduct particularly suspect. Imagine a scenario where a contractor says to a homeowner, "let's check if we need permits before starting the drainage work," but then begins construction immediately. The contractor's comment reflects a clear awareness of potential risk (*i.e.*, completing unauthorized work), and the decision to press ahead without resolving the known uncertainty exemplifies the kind of deliberate ignorance or reckless disregard that satisfies the FCA's scienter requirement.

Rather than engage with the natural consequences of the January 2018 email chain, Defendants misrepresent the bad and overemphasize the immaterial. Defendants characterize the email chain as "reflect[ing] a conversation regarding pricing and additional guidance for a test that Rutledge and Grizelj believed to be appropriate and were working with Noridian *to expand*." Ans. Br. at 32. First off, Defendants were *not* "working with Noridian" to expand PCR UTI testing. The draft email to Noridian was clearly intended to *inform* Noridian of the "new clinical laboratory testing"—PCR UTI testing—that Defendants were beginning to offer. A.659; *see also id.* ("I think it would be a prudent move to at least document *that we told CMS of this new technology . . . .*" (emphasis added)).

And it is misleading to describe the chain as reflecting a conversation "regarding pricing and additional guidance." In reality, Rutledge's email sought input from Grizelj regarding how to inform Noridian of the new PCR UTI testing (and the corresponding need to update CMS's payment system); Grizelj's response advised Rutledge to table that outreach and, instead, ask Noridian for guidance on medical necessity. A.659–60. The focus of the chain is certainly not on pricing, nor is it on seeking *additional* guidance—rather, it is on seeking medical necessity guidance in the first instance.[6]

---

[6] Defendants assert that "[t]he only logical conclusion that can be drawn from the suggestion to give Noridian a 'heads-up on our new molecular testing' is that Rutledge believed it to be medically necessary and thus an appropriately

## B. Defendants misunderstand the relevance and import of OMNI's additional evidence.

Defendants levy attacks against OMNI's reliance on the AUA guidelines, the lack of an NCD regarding PCR UTI testing, and the lack of any LCD regarding PCR UTI testing during the relevant time period, Ans. Br. at 29–31, but misunderstand the function of this evidence. This evidence confirms that Defendants had no basis for believing that PCR UTI testing was medically necessary when they submitted reimbursement claims for PCR UTI testing, explaining why Defendants recognized the need to seek guidance on medical necessity from Noridian (and exacerbating the import of their failure to do so).

To begin, Defendants offer no response to OMNI's argument that the AUA guidelines are probative "not because Defendants relied on them, but because even *after* Defendants submitted false claims, the country's authoritative urological organization confirmed that the utility and accuracy of PCR UTI testing was unsubstantiated." Op. Br. at 24. The guidelines state that, as of 2019, "[t]he impact of [PCR] tests on the accuracy of [UTI] diagnosis [was] not documented and cannot yet be recommended for incorporation into clinical practice," and "the utility of

---

reimbursable test." Ans. Br. at 32. But Rutledge's silence in response to Grizelj's urging to seek medical necessity guidance suggests the exact opposite. If Rutledge truly believed PCR UTI testing was medically necessary, he would have almost certainly told Grizelj that seeking guidance from Noridian was unnecessary. *Cf. Sec. & Exch. Com'sn v. Commonwealth Equity Servs., LLC*, 133 F.4th 152, 167 (1st Cir. 2025) (all reasonable inferences should be drawn in favor of the nonmoving party).

[PCR UTI testing] technology remain[ed] unproven and the potential for overtreatment with antibiotics remain[ed] significant." *See* A.484–85. If the utility and accuracy of PCR UTI testing was undocumented and unproven as of 2019, it must have been undocumented and unproven *before* 2019.[7]

Defendants' argument that the AUA guidelines are irrelevant because they did not pre-date the submission of false claims thus misses the point. To be sure, the guidelines are not *direct* evidence of Defendants' scienter, but they support the conclusion that Defendants lacked any legitimate basis to believe that PCR UTI testing was medically necessary (and reinforce evidence of Defendants' subjective awareness of the risk that such testing was not medically necessary).

The absence of an NCD or LCD regarding PCR UTI testing during the relevant period is probative for the exact same reason. *See* Op. Br. at 25 ("[T]he lack of any governmental authorization of such testing during the relevant time period is

---

[7] Defendants' assertion that "the record supplies studies dating back to at least 2010, well before MD Labs began PCR UTI testing in 2017," wrongfully implies that those studies could have had any bearing on their subjective beliefs regarding the medical necessity of PCR UTI testing. As described in the record or by Defendants' expert himself: Spoorenberg et al., 2014 concerns the appropriate use of antibiotics (an inapposite point); McDonald et al., 2017 focuses on DNA NGS testing, not PCR testing; Lindback et al., 2017 identifies a need for improvement of the use of diagnostic tools and antibiotic drugs, but says nothing of PCR testing; and Lehmann et al. 2010, a "prospective pilot study," identified PCR testing only as a *supplement* to conventional culture methods to diagnose UTI. *See, e.g.*, A.240 (citing and providing links to studies). In any event, there is no evidence that Defendants were subjectively aware of these studies.

11

simply further support for finding that Defendants knew the PCR UTI testing claims were false."). Indeed, if there had been an applicable NCD or LCD, Defendants would have had no need to seek medical necessity guidance from Noridian in the first place.

Finally, Defendants try to brush off the fact that some of their requisition forms forced physicians to request seventeen- or nineteen-pathogen panels. Ans. Br. at 32–35; *see also* Add.5. But, again, Defendants focus (on whether "[t]he number of pathogens for which MD Labs tested was appropriate," Ans. Br. at 32) misses the mark. The import of Defendants' forced multi-panel pathogen test is that it strengthens the inference that Defendants acted knowingly. Upon learning about Defendants' seventeen- and nineteen-pathogen panels, a jury could rightfully ask why—when Defendants already had concerns about whether PCR UTI testing was medically necessary—they would structure requisition forms to ensure that they could bill for up to nineteen tests per order.[8]

---

[8] Notably, Defendants offer no response to the fact that the sole basis for the District Court's conclusion that the make-up of Defendants' panels were appropriate—the Hao 2023 study—did not actually find that a panel range of seventeen- to nineteen-pathogens for PCR UTI was medically necessary. *See* Op. Br. at 26–27. And while Defendants dispute the relevance of *United States ex rel. Allen v. Alere Home Monitoring, Inc.*, 334 F. Supp. 3d 349 (D. Mass. 2018), their objections fail to see the forest for the trees. *See* Ans. Br. at 33–34. As the District Court recognized, Add.19, *Allen* observed that courts have held "that bundled tests, ordered via a pre-printed form," like the forms at issue here, "can create FCA liability, provided the

Accordingly, not only did OMNI present evidence showing that Defendants were aware of and disregarded a substantial risk that PCR UTI testing was medically unnecessary, but it also presented evidence undermining any claim that Defendants had a good faith basis for believing the opposite.

**C.    At minimum, Defendants' scienter is a triable issue.**

As OMNI has shown, the only evidence of Defendants' subjective belief regarding the medical necessity of PCR UTI testing shows that Defendants knew, as defined by the FCA, that such testing was not medically necessary. But even if this Court disagrees, it must still reverse the District Court's scienter holding because, *at minimum*, OMNI has demonstrated that there is a genuine dispute as to Defendants' scienter. *See* Fed. R. Civ. P. 56(a).

Defendants argue the uncontroversial point that scienter may be resolved at the summary judgment stage. *See* Ans. Br. at 15–16. While that is of course true, Defendants do not dispute that it is "*unusual* to grant summary judgment on scienter," because the scienter inquiry is a fact-intensive inquiry best suited for a jury. *Sec. & Exch. Comm'n v. Lemelson*, 532 F. Supp. 3d 30, 42 (D. Mass. 2021) (emphasis added) (quoting *Sec. & Exch. Comm'n v. Ficken*, 546 F.3d 45, 51 (1st Cir. 2008)); *see also United States v. Coloplast Corp.*, 327 F. Supp. 3d 300, 309 (D.

---

certifying entity is aware that one or more of the tests is medically unnecessary, or recklessly disregards such a risk," 334 F. Supp. 3d at 357 (collecting cases).

Mass. 2018). This case is the exact type of case in which granting summary judgment on scienter was inappropriate, particularly given that all inferences should have been drawn in OMNI's favor. *Sec. & Exch. Com'sn v. Commonwealth Equity Servs.*, LLC, 133 F.4th 152, 167 (1st Cir. 2025).

The fact that the parties are disputing the interpretation of Defendants' internal emails proves the point. A jury assessing those emails would surely ask: What did Grizelj mean when he wrote that Defendants should seek guidance on medical necessity from Noridian? Did Rutledge agree seeking such guidance was necessary? If Defendants claim that they subjectively believed PCR UTI testing to be medically necessary, what basis did they have for those beliefs during the relevant time period? At the very least, these questions are best suited for a jury that can make determinations about Defendants' credibility, weigh and balance the evidence, and draw corresponding inferences. *See Reeves v. Sanderson Plumbing Prods.*, Inc., 530 U.S. 133, 150 (2000).

Applying these well-established standards, summary judgment in Defendants' favor was error.

## II. DEFENDANTS' CAUSATION ARGUMENT IS MERITLESS

Perhaps recognizing that the record does not support the scienter finding required to sustain the District Court's judgment in favor of Defendants, Defendants pivot to a new argument that was not addressed in the District Court's opinion: that

Defendants cannot be liable under the FCA because the conduct of OMNI's owner, Dr. Deligdish, was a superseding cause that severed the causal chain. Ans. Br. at 35–39. This argument is so clearly at odds with the facts that it is hard to see it as anything but a bald—and futile—attempt to malign OMNI's owner.

Dr. Deligdish could not have been a superseding cause because his conduct occurred *before* Defendants submitted false claims. Defendants attempt to avoid this obvious fact by arguing that the causation chain began when MD Labs "began offering PCR UTI testing services" to OMNI. *Id.* at 37. That is wrong. The conduct that subjects Defendants to FCA liability was their submission of claims to Medicare for reimbursement for PCR UTI testing services, not the offering of those services. *See, e.g.*, Add.13 ("Relator's main theory of FCA liability posits that Defendants submitted claims for medically unnecessary PCR testing for UTIs").

Dr. Deligdish was not involved in Defendants' submission of reimbursement claims to Medicare. *See* Ans. Br. at 37–38 (conceding that Dr. Deligdish's involvement pre-dated Defendants' submission of Medicare claims). At most, then, he was a *preceding* cause, not a *superseding* cause—rendering each of Defendants' cited cases inapplicable. *See id.* at 36–37 (collecting cases concerning actions that occur after the initial event in a sequence, breaking the chain of causation).[9]

---

[9] Separately, Defendants wrongfully assert that a but-for causation standard applies here, citing this Court's recent decision in *Regeneron*. *See* Ans. Br. at 39 (citing *United States v. Regeneron Pharms., Inc.*, 128 F.4th 324 (1st Cir. 2025)). *Regeneron*,

Moreover, while Defendants raise this argument in a transparent attempt to try to impugn Dr. Deligdish, *see, e.g.*, Ans. Br. at 38, his role in outing Defendants' submission of false claims is *exactly* the type of conduct the FCA was passed to incentivize. By expanding the FCA in 1986, Congress sought to incentivize private citizens to bolster the government's fraud enforcement efforts to recover uncollected lost public funds. *See, e.g.*, S. Rep. No. 345, 99th Cong., 2d Sess. 4–8 (July 28, 1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5269, 5273.[10] That is true even where a relator "plan[s] and initiate[s] the violation." 31 U.S.C. § 3730 (providing that a court "may . . . reduce the share of the proceeds of the action which the [relator] would otherwise receive").

## CONCLUSION

For these reasons, and for the reasons explained in OMNI's opening brief, this Court should reverse the District Court's scienter holding, vacate the District Court's judgment, and remand for further proceedings.

---

however, applied a but-for causation standard in the context of interpreting 42 U.S.C. § 1320a-7b(g), a 2010 amendment to the federal Anti-Kickback Statute ("AKS"). The claims at issue here do not fall within the AKS, rendering the but-for causation standard wholly inapplicable. *See id.* at 333 ("[T]here is nothing in the 2010 amendment [to the AKS] that requires proof of but-for causation in a false-certification FCA case."); *cf. United States ex rel. Franklin v. Parke-Davis, Div. of Warner-Lambert Co.*, 147 F. Supp. 2d 39, 52 (D. Mass. 2001).

[10] Indeed, through other *qui tam* actions brought on behalf of the government, OMNI has recovered tens of millions of dollars—recovering public funds that would otherwise have remained in the hands of fraudsters. A.677–78 at ¶ 54.

Dated: July 17, 2025

                                Respectfully submitted,

                                /s/ Evan Bianchi
                                Evan Bianchi
                                Thomas M. Kenny
                                Spiro Harrison & Nelson LLC
                                40 Exchange Place, Ste. 1100
                                New York, New York 10005
                                (646) 880-8850
                                ebianchi@shnlegal.com
                                tkenny@shnlegal.com

                                *Counsel for Plaintiff-Appellant*

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 4,241 words, excluding those parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.      This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared using Microsoft Word in 14-point Times New Roman, a proportionally spaced typeface.

Dated: July 17, 2025

/s/ Evan Bianchi
Evan Bianchi

**CERTIFICATE OF SERVICE**

I hereby certify that on July 17, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Evan Bianchi
Evan Bianchi